### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| JANET ROE, and | ) | |
| JANICE COE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NETFLIX, INC.; NETFLIX WORLDWIDE | ) | Case No. 1:22-cv-1281-TWP-MJD |
| ENTERTAINMENT, LLC; and | ) | |
| REALHOUSE PRODUCTIONS, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS' OPPOSITION TO MOTION TO COMPEL

Plaintiffs seek to compel the production of certain documents listed in RealHouse's privilege log, none of which have been the subject of a meet-and-confer among the parties in violation of this court's local rules. The parties were instructed to conduct a document-by-document discussion of privilege issues, but Plaintiffs did not do so. For 60 of the 63 documents sought in this Motion, Plaintiffs raised issues for the first time in the Motion itself. Still other issues could have been resolved by a simple phone call with Defendants' counsel, which is the point of a document-by-document meet and confer. Plaintiffs' motion should be stricken and summarily denied for failure to comply with the meet-and-confer requirement. But, in any event, it is substantively meritless and should be denied, for the reasons explained more fully below.

## I.     Relevant Timeline

- **December 8, 2022:** The parties conducted a meet and confer over certain Netflix and RealHouse interrogatory answers, certain elements of Netflix's and RealHouse's then-existing

document productions, and generally discussed one category of documents on the privilege log provided by non-party Michael Petrella (specifically, "Fair Use Logs" or "Release Logs").

- **December 16, 2022**:   The parties' attended a discovery conference with the Court, discussing the above documents.   Regarding Netflix's document production, and relevant here, the Court ordered defendant Netflix to remove redactions for links to Netflix's other documents. The Court heard some argument relating to the privileges and protections applicable to certain "Fair Use Logs" or "Release Logs" identified in non-party Michael Petrella's privilege log.   The Court ultimately instructed Plaintiffs that they must engage in a document-by-document meet and confer with Defendants before filing a motion to compel.

- **December 31, 2022:**  RealHouse provided Plaintiffs with its privilege log, 23 days after the parties' original meet and confer of Dec. 8 on other issues. See **Exhibit A** (correspondence conveying privilege log).

- **January 6, 2023:**  Plaintiffs took the deposition of RealHouse's 30(b)(6) representative.

- **January 12, 2023:**  Plaintiffs deposed non-party and director of "Our Father," Lucie Jordan Coyne.

- **January 26, 2023:** The parties held a meet and confer on discovery issues not addressed in plaintiffs' motion to compel. Plaintiffs never mentioned this motion to compel or any of the issues raised therein.

After the December 16 discovery conference, the parties never again discussed the issues raised at that conference.

II.     **Defendants will produce non-privileged documents associated with unredacted links, an issue that could have easily been handled through a phone call (Plaintiff's "Issue A").**

Plaintiffs request access to all files linked in documents produced by RealHouse and Netflix, without attempting to identify any specific documents.  Defendants have produced some of the linked documents.  Defendants also will review their productions and produce any linked files as long as the file (1) is accessible (some links have expired due to the passage of time) and (2) is not privileged (some links lead to privileged documents identified in the Defendants' respective privilege logs).  Defendants agree to produce unprivileged linked documents by February 17, 2023, and to identify the document to which the link applies. That issue could have been quickly resolved through a phone call.

III.    **Plaintiffs' motion to compel should be stricken for all documents identified in RealHouse's privilege log (60 of the 63 specifically identified and sought documents) because they did not attempt to meet and confer with Defendants.**

Plaintiffs ask the Court to compel Defendants to produce 63 different documents (in addition to the unspecified, linked documents discussed above).  Sixty of those documents are identified on defendant RealHouse's privilege log.  Plaintiffs state that their motion to compel was "authorized by the Court" after extensive discussion between counsel and the court. (Plaintiffs' Motion ("Motion"), Dkt. 82 at 1).  But that is not true for the 60 documents Plaintiff seek from RealHouse's privilege log.  RealHouse served its privilege log on December 31, 2022, more than three weeks after the parties' December 8 meet and confer and over two weeks after the December 16 discovery conference with the Court.  The parties never met and conferred on a single document on RealHouse's privilege log prior to Plaintiffs' filing their motion.  And Plaintiffs did not seek a Rule 37-1 discovery conference on those documents.

This failure is particularly egregious because, at the December 16 discovery conference, the Court instructed plaintiffs' to participate in a document-by-document meet and confer. No such meet and confer occurred, and no such conference was even requested, for any set of documents. Defendants respectfully request that the Court strike Plaintiff's Motion directed at the 60 documents identified on RealHouse's privilege log (of the total 63 documents Plaintiffs seek).

Plaintiffs offer repeated, boilerplate "arguments" that often have no relation to the documents at issue and with virtually no substantive analysis. Plaintiffs repeat the same set of arguments for every document "issue group," regardless of the issues purportedly raised by any particular group. For example, the first such group of documents – "Issue B Documents" – are all identified on RealHouse's privilege log. It appears Plaintiffs grouped the "Issue B Documents" together solely because a lawyer is not identified as a sender or recipient of the communication, which Plaintiffs apparently contend means the documents should be produced. Nonetheless, Plaintiffs' first two arguments address the timing of work product protection, which has nothing to do with whether a lawyer is on a particular communication or not. *See* Fed. R. Civ. P. 26(b)(3). Such boilerplate argument wastes the Court's and Defendants' time.

Additionally, Plaintiffs know – or should know – that the absence of a lawyer on a particular communication is not determinative of whether the communication is privileged, as the Court expressly stated at the December 16 discovery conference. Thus, the very premise of Plaintiffs' demand for "Issue B Documents" – the absence of a lawyer on the identified communications – has no relevance to the assertion of either the attorney-client privilege or work product protection.

Plaintiffs follow that same format for each document "group," repeating the same arguments even if they have no substantive relevance to the purported issue. Plaintiffs' practice

4

and organization have made Defendants' and the Court's job exponentially, and unnecessarily, harder.

Nonetheless, Defendants will address each of Plaintiffs' arguments.

**IV.   Plaintiffs' arguments for production of "Issue B Documents" are invalid and are not properly supported by law and argument.**

For the Court's ease, Defendants will attempt to follow and respond to Plaintiffs' organization of their brief by their "issue documents" categories, followed by a series of truncated arguments.

   **A.  Plaintiffs' statement that RealHouse abandoned any work product protection prior to August 2021 is not based on substance, but on a mistake from RealHouse's witness regarding the date of RealHouse's contract with Netflix.[1]**

Plaintiffs' statement that "RealHouse has abandoned any claim to work product protection before September or August 2021" has nothing to do with the reason "Issue B Documents" are purportedly part of Plaintiffs' motion, as noted above. Also, it's an attempted "gotcha" that ignores the substance of the witness' actual testimony.

Plaintiffs did not ask the witness about any specific "Issue B Documents" or even any category of documents. Rather, they generically asked "when it was that RealHouse reasonably anticipated litigation," which does not orient the witness to any particular issue or communication, and certainly not to the documents at issue here. In response, the witness identified the date it sold the project to Netflix as the triggering event for when RealHouse reasonably expected litigation. The witness simply got the date of the event wrong, as she states in her accompanying Declaration.[2]

---

[1] RealHouse substantively addresses Plaintiffs' issues with RealHouse's asserted privileges for the Court's benefit, even though none of those issues are ripe for consideration due to Plaintiffs' failure to attempt any kind of meet and confer with respect to any of those documents, as noted above.

[2] The witness will correct this mistake in her errata sheet.

(*See* **Exhibit B**, Reed Decl., ¶ 5).  Defendants' argument, based on nothing but an obvious mistake about the date of an otherwise identified event, borders on bad faith.  Here is the witness' full testimony:

> Q.    And can you tell the Court when it was that RealHouse reasonably anticipated litigation?
>
> A.    *That would be when we sold the project to Netflix*, which would have been in September or August of 2021.
>
> Q.  All right.  And why did you anticipate litigation at that time in September or August of 2021?
>
> A.    That's because we're making a documentary.  It is a standard part of making documentaries, to anticipate litigation.
>
> Q.  And why do you say it's a standard?
>
> A.  Almost every documentary is upsetting to somebody.
>
> Q.  Thank you very much.
>
> A.  And we try and avoid litigation as much as we can; therefore, we always try and plan for how to avoid it.  *When we start producing a show, we identify problem areas.*
>
> Q.  All right.  So in August or September of 2021, did you anticipate a specific claim related to Our Father?
>
> A.  No.

(**Dkt. 83-2**, Reed Dep., 37:12-38:8) (emphasis supplied).  Clearly, the witness identified its sale of the project to Netflix as the time it first expected litigation – *i.e.*, the date it began producing the subject film.  Plaintiffs know that RealHouse entered its contract with Netflix – "selling" the project to Netflix – on June 10, 2020.  That is obviously the date the witness intended.  She just got the date of that event wrong in her testimony.  (Reed Decl., ¶ 5).  Plaintiffs' statement that RealHouse abandoned any work product protection as of September or August 2021 is nothing but

an insubstantial, attempted "gotcha," to which the Court should not give any credence, and which could have easily been addressed in a meet and confer, had Plaintiffs attempted one.

Finally, while each document in the "Issue B Documents" was properly identified as privileged or work product protected, the facts and circumstances of the documents in that group, which justify the privilege or protection, may differ, which is why the Court instructed Plaintiffs to engage in a document by document review with Defendants -- an instruction they ignored.[3]

### B. Plaintiffs' assertion that RealHouse admitted no work product protection applied before September 2021 is irrelevant and factually unfounded.

Work product arguments are, again, irrelevant to "Issue B," relating to the absence of a lawyer on the identified communications. Nonetheless, Plaintiffs incorrectly state that RealHouse admitted that no work product protection applies to communications before May 21, 2022 and thus no work product can be asserted to "Issue B Documents" because they are dated before May 21, 2022. (Motion at 4.) Plaintiffs again confuse and do not attempt to discuss the actual issue, testimony, or facts.

RealHouse's 30(b)(6) witness testified she did not anticipate an actual lawsuit relating to "Our Father" before this lawsuit was filed. But Plaintiffs never asked "why" and never showed the witness any specific documents, such as sibling complaints RealHouse received after "Our Father" was released. Plaintiffs got what they believed was a helpful soundbite and now misuse that soundbite in their motion. Had Plaintiffs asked further questions, the witness would have

---

[3] Plaintiffs' ambiguous, unexplained – and incorrect – challenge to documents on the RealHouse privilege log because a lawyer is not on the communication is not sufficient to shift the burden to RealHouse on this motion. RealHouse properly identified and described its privileged documents on its privilege log. Plaintiffs have not challenged those descriptions with any specificity. If Plaintiffs have specific questions about a document or documents, such specific questions need to be raised with Defendants' counsel so that they can be discussed on a document by document basis, prior to any briefing on a motion to compel, as this Court instructed.

explained that her communications after receipt of sibling complaints about "Our Father" in May 2021 were to protect the company from litigation, establishing work product protection.

Specifically, if Plaintiffs had been interested in the substance of the witness' testimony, she would have told them that the fact that she did not think there would be an actual lawsuit based on "Our Father" was her personal opinion, because RealHouse and Netflix did nothing wrong and because RealHouse and Netflix acquiesced in siblings' requests to have their names blurred in the documentary.   (Reed Decl., ¶ 7.)   If Plaintiffs had asked her about her response to sibling complaints in response to the release of "Our Father," the witness would have testified that regardless of her personal opinions, she recognized the potential for legal exposure, and took proactive steps to protect the company from potential litigation, at the direction of and with the input of RealHouse's counsel.  *Id*.  Ms. Reed's declaration establishes that work product protection applies to RealHouse's communications relating to and addressing sibling complaints about "Our Father," received prior to the filing of this lawsuit, just as RealHouse asserted on its privilege log.

### C. As the Court instructed, the attorney-client privilege applies when the communications include or reference legal advice, even if an attorney is not on the specific communication.

Throughout their motion, Plaintiffs state that a document cannot be attorney-client privileged unless an attorney is on the communication.  *See e.g.* Motion at 5.  That, however, is not the law.  At the December 16 discovery conference, the Court directly and correctly instructed Plaintiffs that their understanding is wrong.  Documents are privileged if they contain, describe, or reference legal advice, even if the attorney is not a party to the particular communication. *Annie Oakley Enterprises Inc. v. Amazon.com, Inc.*, 2020 WL 6882177, at *1 (S.D. Ind. Sept. 9, 2020) ("A communication that is made by an agent of an attorney to a client (or vice versa) for the purposes of giving or obtaining legal advice can be protected by the attorney-client privilege, as

can communications between non-attorneys that reflect [] an attorney's advice."); *citing to In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 433 (N.D. Ill.), *supplemented,* 432 F. Supp. 2d 794 (N.D. Ill. 2006) ("Plaintiffs' insistence that an attorney must be involved as a participant in the communication before it can be found to reflect a client confidence or legal advice is misplaced.").

Here, Defendants have properly asserted the attorney-client privilege to documents forwarding, or referencing legal advice. For example, in the "Issue B" documents, those identified documents in lines 6-11 of RealHouse's log are communications between Alexandra Reed and Shéh Pittman. Although Ms. Pittman is not an attorney, her role was legal in nature, and she was either receiving information for the legal department so it could provide legal advice, or providing legal advice from the legal department.  (*See* Reed Decl., ¶ 4). Similarly other documents, like the "fair use logs," also called "clearance logs," or letters from outside clearance counsel to RealHouse, contain direct advice from outside clearance counsel, (documents in lines 51, 74, 83, 90, and 92 of the "Issue B Documents," for example). Other documents contain information to be provided to outside clearance counsel for the purpose of obtaining legal advice (lines 59, 63-69).  All of the above documents are privileged despite the absence of an attorney on the communication itself, as the Court has instructed.  A document by document meet and confer would have revealed that fact to Plaintiffs.

**D. RealHouse did not waive the attorney-client privilege or work product protection by providing privileged/protected information to those working on the documentary, because all recipients shared a common interest.**

Plaintiffs state that documents 63-65 on RealHouse's privilege log and within the "Issue B Documents" were shared with a contractor. That's true. They were shared with Nathan Rotmenz, who was contracted to work on the film. [4]

As the parties discussed at the December 16 discovery conference, RealHouse did not waive the attorney-client privilege or work product protection by sharing legal advice with contractors working on the documentary, because all recipients shared a common interest in producing a film that complied with the law. There are multiple cases directly on point, supporting that position.

For example, in *Twentieth Century Fox Film Corp. v. Marvel Enters.*, No. 01 Civ. 3016, 2002 WL 31556383 (S.D.N.Y. Nov. 15, 2002), the court held that communications between the movie studio's attorney and the film's director and scriptwriter—both independent contractors—remained privileged because "the non-employees to whom disclosure was made were the functional equivalent of employees. Fox's determination to conduct its business through the use of independent contractors is a result of the sporadic nature of employment in the motion picture industry . . . The fact that the nature of the industry dictates the use of independent contractors over employees should not, without more, create greater limitations on the scope of the attorney-client privilege." *Id.* at *2.

Similarly, in *Tyne v. Time Warner Ent. Co., L.P.*, 212 F.R.D. 596, 601 (M.D. Fla. 2002), employees of two third-parties solicited and received advice from the filmmaker's legal

---

[4] See also Section VII below, addressing the facts establishing an attorney-client communication between RealHouse's outside clearance counsel and contractors working on the documentary.

department about how to protect their common legal interests in avoiding liability. The court found the communications remained privileged, because "[w]hile employees of [the third parties] may not be clients of the Warner Bros. legal department, Warner Bros. required their cooperation with regard to the production of "A Perfect Storm" in order to protect Warner Bros.' legal interests . . . The advice of the Warner Bros. legal department would be useless to Warner Bros. if the advice could not be disseminated to the few key individuals who were intimately involved in the joint production of The Perfect Storm. Therefore, disclosure to these individuals who have a common legal interest does not constitute a waiver of privilege." *Id.*  *See also Berisha v. Lawson*, 973 F.3d 1304, 1319-20 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021) (communications between author and publisher's attorneys regarding pre-publication legal review of book were privileged: "If it were not apparent from the nature of the work itself, the publishing contract makes clear that Lawson and Simon & Schuster were indeed engaged in a joint effort to produce a published book to their mutual satisfaction and for their mutual benefit."); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1098 (S.D.N.Y. 1984) (privilege covered communications between movie studio attorneys and the author of the book on which the screenplay was based; although the author "was not a Universal employee and did not participate in the production of the film . . . his participation in" a legal review "meeting was functionally equivalent to that of an author of a magazine or newspaper article who submits his work to in-house counsel for prepublication libel review and should thus come within the rule of Upjohn [in which the Supreme Court established the employee-equivalent doctrine].")

The above cases are directly on point and refute Plaintiffs' position.  They are also consistent with Indiana law and Seventh Circuit law, both of which recognize that sharing

privileged information with someone who has a common interest does not waive the privilege. The Seventh Circuit has recognized that:

> In effect, the common interest doctrine extends the attorney-client privilege to otherwise non-confidential communications in limited circumstances. For that reason, the common interest doctrine only will apply where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise . . . Other than these limits, however, the common defense doctrine does not contract the attorney-client privilege. Thus, communications need not be made in anticipation of litigation to fall within the common interest doctrine. Applying the common interest doctrine to the full range of communications otherwise protected by the attorney-client privilege encourages parties with a shared legal interest to seek legal 'assistance in order to meet legal requirements and to plan their conduct' accordingly.

*United States v. BDO Seidman, LLP,* 492 F.3d 806, 815–16 (7th Cir. 2007); *see also Price v. Charles Brown Charitable Remainder Unitrust Tr.*, 27 N.E.3d 1168, 1173 (Ind. Ct. App. 2015) (the common interest privilege "is an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party.") (*citing United States v. BDO Seidman, LLP,* 492 F.3d 806, 815–16 (7th Cir. 2007)).

Here, as in *Twentieth Century Fox Film Corp. v. Marvel Enters.,* RealHouse made "Our Father" jointly with a roster of independent contractors, as is its general practice for documentaries. (Reed Decl. ¶10). As the court noted in that same case, the film was akin to a joint venture between RealHouse and its contractors. They all shared a common interest in making the film, making it as good as possible, and making sure it did not create legal issues for any of them. Those common interests could be accomplished only if all participants in it had the benefit of legal advice from RealHouse in-house and outside counsel. "The advice of the [RealHouse lawyers] would be useless to [RealHouse] if the advice could not be disseminated to the few key individuals who were intimately involved in the joint production of ["Our Father"]." *Tyne*, 212 F.R.D. at 601. As

12

in all of the above cases, the common interests between and among RealHouse and its contractors prevented any waiver of attorney-client protected material.

Finally, Plaintiffs, again, did not comply with the meet-and-confer requirement to discuss the basis for RealHouse's assertion of privilege and why it continues to apply after the privileged communications were shared with RealHouse's contractors working on the film. They just filed their Motion.

**V.    "Issue C Documents" – RealHouse's communications with its insurance agent, before this lawsuit was filed, and for the purposes of securing coverage – were not to an "adversary," and remain privileged.**

Again, no meet and confer occurred regarding "Issue C Documents" and for that reason, alone, Plaintiffs' motion should be denied. And Plaintiffs again chose not to provide the Court with key facts that contradict and vitiate their argument that RealHouse provided documents to an "adversary."

The four "Issue C Documents" are communications between RealHouse and its insurance broker in December 2021, months before "Our Father" was made available for streaming, before this lawsuit existed, and before RealHouse requested coverage for the allegations in this lawsuit – all facts Plaintiffs do not disclose. At the time they were made, the communications with the insurance agent were not, in any way, with an "adversary," as Plaintiffs state. Indeed, courts have consistently found privileged communications between an insured and its broker or agent do not lose their privileged or protected status, law Plaintiffs do not acknowledge. *See e.g.*, *BASF Aktiengesellschaft v. Reilly Indus., Inc.*, 224 F.R.D. 438, 441 (S.D. Ind. 2004) (as a result of the work-product's purpose, "disclosure of a document to third persons does not waive the work-product immunity unless it has substantially increased the opportunities for potential adversaries to obtain the information."); *TC Ravenswood, LLC v. Nat. Union Fire Ins. Co. of Pitt.*, Index No.

400759/11, Supreme Court of N.Y. (June 18, 2013) (upholding privilege for documents exchanged with Marsh, including (1) communications between Marsh and insured's counsel; (2) communications between insured and its counsel that were forwarded to Marsh, or that copied Marsh; and (3) discussions between non-attorney employees of Marsh and/or insured discussing advice from counsel); *Royal Surplus Lines Ins. v. Sofamor Danek Grp.*, 190 F.R.D. 463 (W.D. Tenn. 1999) (holding communications between insured's counsel and insured and between broker's counsel and broker, which were shared between the insured and broker remained privileged and work product protected in the context of a coverage dispute); *Cellco P'ship v. Certain Underwriters at Lloyd's London*, No. CIV.A. 05-3158 (SRC), 2006 WL 1320067, at *4 (D.N.J. May 12, 2006).

Defendants incorporate their responses, in Sections V(A) and V(B) above, to Plaintiffs' arguments that no work product protection applies to the "Issue C Documents."

**VII:** **The "Issue D Documents" were created for the sole purpose of avoiding litigation and contain core attorney-client communications, but Plaintiffs do not address either issue.**

"Issue D Documents" are each "fair use logs" a/k/a "release logs," or "clearance logs." The parties never discussed these particular documents. The parties and the Court did discuss, at length, similar documents on Michael Petrella's privilege log at the December 16 conference. Plaintiffs do not address the law, cited in RealHouse's privilege log, supporting the assertion of both work product and attorney-client privilege to the "Issue D Documents."

As Defendants have explained to Plaintiffs multiple times, and as witnesses have testified, the "Issue D Documents" contain legal advice. The logs are the mechanism through which RealHouse's outside "clearance counsel" provided legal advice to RealHouse and the independent filmmakers making "Our Father," regarding potential or actual legal issues raised by the film. Each line on the spreadsheet contains legal advice. Here is RealHouse's 30(b)(6) witness describing the privileged content and use of the "Issue D Documents":

". . . [D]uring the editing process, when we take our mass of footage and reduce it to 90 minutes, we keep an ongoing grid as -- all the elements that are in each shot, whether it is individuals, if it's footage, if it's -- whatever it is. And that grid is then shared at a certain editorial stage with our First Amendment attorney, for him to go through the cut and determine if we have appropriate releases for everything, whether we are able to fair use the materials we are -- request to fair use. He is also supposed to watch out for defamation, if we're saying something that we cannot corroborate.  And one of his biggest issues is to ask us for corroboration."

***

Q.  So this -- and in the ordinary course of business at RealHouse, you call this a grid?

A.   I would call it a legal grid because of all the -- it's something we use to work with our lawyers to get legal advice on the entire project. That is their method for providing legal advice on all our clearance issues to us.  But we can call it a clearance grid.  There's not a standard, as far as I know, name.

Q.  So either a legal grid or a clearance grid; either one?

A.  Correct.

Q.  All right.  And that legal grid or clearance grid would include information on whether something could be considered fair use?

A.  Yes.

Q.  Of whether something would be potentially defamatory?

A.  Yes.

Q.  Whether something would be -- whether licenses have been procured or not?

A.  Yes.

Q.  And that would relate to a person's appearance on a film, for example, or music or anything of the things that you mentioned?

A.  Yes.

(**Exhibit C**[5], Reed Dep., 58:1-14, 60:11- 61:11.)

---

[5] This transcript is designated confidential, but Plaintiffs had no objection to the public filing of these pages.

Additionally, an attorney-client relationship existed between RealHouse's outside clearance counsel for "Our Father" and the independent contractors working on the film. Diana Palacios, clearance counsel on the documentary, states that she considered her clients to include independent contractors working on the documentary, such as Ms. Coyne and Mr. Petrella. (**Exhibit D**, Palacios Decl., ¶ 6). RealHouse made its in-house legal function available to independent contractors working on the documentary for issues relating to the documentary. (Dkt. 82-3). Both Mr. Petrella and Ms. Coyne testified or would have testified if asked that they considered legal advice from RealHouse and outside clearance counsel legal advice to them, which they followed. (**Exhibit E**[6], Petrella Dep., 324:10-326:19; **Exhibit F**, Coyne Decl. at ¶¶ 3-5).[7] The record establishes an attorney-client relationship between independent contractors such as Coyne and Petrella and both outside clearance counsel and the RealHouse legal team. There are no facts to the contrary. As a result, legal advice from outside clearance counsel to those working on the documentary was within the privilege.

Ms. Palacios explains the legal advice in the "Issue D Documents":

> One mechanism by which DWT provided legal advice to Clients on issues relating to the Film was through "Release Logs," "Fair Use Logs," or "Legal Ledgers." The purpose of those logs/ledgers was for DWT to identify, in writing, for those working on the Film, scenes which contained content for which licenses, consents, releases, or other authorizations DWT believed were needed or not needed. DWT also provided advice regarding questions, items or issues identified by Clients. The logs functioned as a method of communication between DWT and Clients for issues relating to the production of the Film. The logs were living documents, in which DWT and Clients would communicate and in which DWT provided legal advice throughout the production of the Film.

---

[6] This transcript is designated confidential, but Plaintiffs had no objection to the public filing of these pages.

[7] No other contractors have been deposed.

(Decl. of Diana Palacios, ¶ 7.)  There cannot be any question that RealHouse properly withheld the "Issue D Documents" from production due to the attorney-client privilege.  As noted above, the absence of an attorney's name on those documents is entirely irrelevant to their privileged nature.

Plaintiffs demand, based on Fed. R. Evid. 502, that RealHouse either produce its "fair use logs" or "release logs" or "legal ledgers" or certify that it will not reference the procedures it follows to avoid violation of law is entirely unfounded. But Rule 502 does not address the waiver of a privilege by putting privileged materials "at issue."  That rule merely states that a party waives the privilege by intentionally disclosing it.  Plaintiffs do not argue that Defendants disclosed the content of their "fair use logs" or "release logs."  They, in fact, state the opposite – that Defendants have not provided testimony regarding the content of those logs.  (Motion at 9) ("Defendants refused to answer any questions about the contents of the Clearance Log due to privilege.").  Rule 502, Plaintiffs' cited authority is entirely irrelevant to Defendants' ability to describe their procedures and practices for ensuring a documentary's legal compliance and should be ignored.

Similarly, the legal advice within the "fair use logs" or "release logs" or "legal ledgers" is irrelevant to RealHouse's description of its general procedures to prevent violation of law. RealHouse's witness described certain of those procedures in her deposition, including hiring of outside counsel to review every scene in the documentary for potential legal issues and to provide advice in the "fair use logs" or "release logs" or "legal ledgers," as noted above.  The existence of that review is a fact relevant to show how films like this are made.  The legal advice provided as part of that review is, however, privileged.  RealHouse's review reflects the process, and RealHouse's care, not the legal advice on the myriad issues that arise while making a film.  As a result, testimony and evidence regarding the procedures, practices, and processes RealHouse

follows to avoid violations of law does not amount to use of privileged communications as a "sword," does not involve, directly or indirectly, the disclosure of legal advice, and cannot be a waiver of the legal advice contained in the "Issue D Documents." Plaintiffs' sword/shield argument should be rejected.

Finally, RealHouse properly claims work product protection for the logs. Those logs were created for the sole purpose of avoiding litigation, which Ms. Reed testified RealHouse expects from the moment it begins making a documentary. The court in *Tyne v. Time Warner Ent. Co., L.P.*, found that the work product protection applies to documents like those at issue, created for the sole purpose of avoiding litigation. L.P., 212 F.R.D. 596, 601 (M.D. Fla. 2002). In that case, related to the film *The Perfect Storm*, family members of Captain Billy Tyne, the subject of the film, brought a claim against the film's production companies for unauthorized commercial misappropriation of publicity rights and invasion of privacy. *Id.*, at 597. Plaintiffs sought the disclosure of certain documents defendants had withheld for work product relating to the production studio's processes for obtaining clearances for use of certain material in the film. *Id.*, 597-598. The court found those documents were protected from disclosure by the work product doctrine, even though they were created before the particular plaintiff's claim arose, reasoning:

> Many, if not all, of the documents are protected by the work product doctrine because they were developed in order to avoid, and eventually to defend against, threatened or anticipated litigation. The production companies accurately anticipate that they may be sued for misuse of certain material in their films. The legal department analyzes the legal risks of including such material in the film, and either obtains what it believes to be adequate clearance, or recommends that the studio not include the material in the film. The work product associated with this process is produced in anticipation of litigation, and is protected from discovery.

*Id.*, at 601. That same rational applies to this case.

Defendants incorporate here their additional work product arguments from Sections V(A) and V(B).

**VIII:** **"Issue E Documents" are a grouping of different communications between different groups of people, which should have been addressed on a document-by-document basis, and which remain privileged and work product-protected for the reasons stated in Section V(A) and (D) above.**

All but three of the "Issue E Documents" are listed on RealHouse's privilege log and include independent contractors working on the film, such as its director Lucie Jourdan Coyne and its producer Michael Petrella.  No meet and confer of any kind has occurred for any of the RealHouse documents in the "Issue E Documents."  And, Plaintiffs never requested the document-by-document meet and confer the Court directed must occur with respect to the three Petrella-produced documents in Plaintiffs' "Issue E" list.  For that reason, Plaintiffs' motion with respect to all "Issue E Documents" should be summarily denied.

Furthermore, within the "Issue E Documents" are those forwarding legal advice from outside clearance counsel for "Our Father" and from the in-house legal department at RealHouse to the documentary's director, Lucie Jourdan Coyne, or to its producer, Michael Petrella.  As stated above, there was an attorney-client relationship between both RealHouse's legal department and its outside clearance counsel on the one hand, and Ms. Coyne and Mr. Petrella on the other.  That means any communications forwarding legal advice to them were not sharing privileged information with anyone outside the privilege, but only to those within it.  No waiver could occur with such communications.  Plaintiffs do not attempt to address that issue.  Without doing so, and without conferring with Defendants in advance of filing their motion, there is no way for the Court to meaningful evaluate Plaintiffs' arguments for "Issue E Documents."

In this last section of their motion, Plaintiffs finally attempt to address Defendants' argument that RealHouse's sharing privileged information with those who jointly made "Our

Father" did not waive the applicable privileges and protections.  Plaintiffs, however, do not address any of the cases Defendants cite in its privilege logs and previously cited to Plaintiffs and to the Court, and again identify above in Section V(D), including those from the Indiana Court of Appeals and Seventh Circuit.  Plaintiffs also do not address the reality of a direct attorney-client relationship between outside clearance counsel and the independent contractors working on the documentary, which eliminates the possibility of waiver, as explained above.  Instead, Plaintiffs cite two cases:  *Schilling v. Mid-America Apt. Cmtys., Inc.*, No. A-14-CV-1049-LY, 2016 U.S. Dist. LEXIS 75395 (W.D. Tex. June 9, 2016)[8] and *In re Vioxx Products Liability Litigation,* 501 F.Supp.2d 789 (E.D. La. 2007).[9]  Neither applies here.

In *Schilling*, a third party sought to be directly within the attorney client privilege relationship (without facts like those here establishing such a relationship).  Here, the facts establish an attorney-client relationship between outside clearance counsel and the independent contractors working on the documentary.  Alternatively, RealHouse argues that privileged information did not lose its privileged status when shared with those it jointly made "Our Father."  Additionally, the third party in *Schilling* was not an independent contractor, employee, or agent, but rather a customer of the entity who provided privileged information.  On those facts, not applicable here, the court found that the customer was not an employee-equivalent of the entity who owned the privilege.

In *Vioxx* the special master was again asked to consider whether the privilege included communications with a company's outside advertising agency.  That decision was also not based on the common interest doctrine.  Ultimately, the special master in that case rejected extending the

---

[8] Incorrectly cited as *Brooks v. Mid-America Apt. Cmtys., Inc.*

[9] Plaintiffs did not provide a full cite for *Vioxx.*

privilege to the outside agency based on the particular facts of that case – specifically the company's retention of control over every aspect of the agency's work meant that the purposes for extending the privilege were not present. That, however, is not the case here. Ms. Reed testifies in her Declaration that the independent contractors for "Our Father" had significant freedom to create the content for "Our Father." (Reed Decl. ¶ 10).

This case is like *Tyne*, where the court recognized that the client holding the privilege needed its legal advice to be shared with independent contractors in order to achieve the parties' joint purpose. That is the same here. RealHouse needed individuals like Coyne and Petrella to have the benefit of its and its outside counsel's legal advice so they could make proper, informed decisions while making their film. Plaintiffs' cited cases do not apply.

Finally, Plaintiffs again just incorporate arguments without any specificity, indeed without identifying any particular document or document to which the prior arguments may apply. Defendants incorporate their responses to those same arguments.

## IX.    Conclusion.

For all of the above reasons, and each of them, the Court should deny Plaintiffs' Motion to Compel.

Dated: January 30, 2023                              Respectfully submitted,

*/s/ T. Joseph Wendt*
T. Joseph Wendt
Steven M. Badger
Alejandra Reichard
Barnes & Thornburg LLP
11 S. Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Jwendt@btlaw.com
Steve.Badger@btlaw.com

21

Alejandra.reichard@btlaw.com

Rachel F. Strom *(admitted pro hac vice)*
Jesse Feitel
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 402-4069
Fax: (212) 489-8340
Rachelstrom@dwt.com
Jessefeitel@dwt.com

*Attorneys for Defendants Netflix Worldwide Entertainment, LLC, Netflix, Inc., RealHouse Productions, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 30th day of January, 2023, a copy of the

foregoing was filed with the Court using the Court's CM/ECF System, which sent notice of this

filing to all counsel of record.  All parties may access this filing via the Court's CM/ECF System.


<u>/s/ T. Joseph Wendt</u>
T. Joseph Wendt