UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JANE DOE, et al.,                             )
                                              )
                    Plaintiffs,               )
                                              )
            v.                                )          No. 1:22-cv-01281-TWP-MJD
                                              )
NETFLIX, INC., et al.,                        )
                                              )
                    Defendants.               )


**ORDER ON MOTION TO COMPEL**

This matter is before the Court on Plaintiffs' Motion to Compel Production of

Documents, [Dkt. 82].  For the reasons set forth below, the motion is **GRANTED IN PART** and

**DENIED IN PART**.  In addition, Defendant RealHouse's related Motion for Leave to File Short

Sur-Reply in Opposition to Plaintiffs' Motion to Compel, [Dkt. 97], is **DENIED**.

**I.  Background**

This case arises out of a documentary film entitled "Our Father."  The film, which was

streamed on Netflix, tells the story of Dr. Donald Cline, a physician who fathered dozens of

children by inseminating his fertility patients with his own semen without their knowledge.  The

Plaintiffs in this case are three of those children.  Plaintiffs assert various claims against

Defendants,[1] all of which relate to the allegation that Defendants disclosed Plaintiffs' identities as children of Dr. Cline without Plaintiffs' consent in the film and via video clips posted on social media.

## II.  Discussion

Numerous issues are raised by the parties in their briefs, each of which is addressed, in turn, below.

### A.  Lack of Document-by-Document Meet and Confer

Defendants argue that Plaintiffs' motion should be denied as to all but three of the documents at issue because the parties have not conducted a document-by-document discussion with regard to the documents.  As noted below, the Court agrees with regard to many of the documents at issue.  However, the Court has resolved some of the issues raised in the motion because it is evident that a document-by-document discussion would not aid the resolution of the parties' dispute as to those documents.

### B.  "Issue A":  Linked Attachments

Plaintiffs complain that Defendants have not produced all of the documents that are referenced by links contained in documents that have been produced.  Defendants state in their response that this is a non-issue; they already have produced some of the linked documents and have agreed to do the following:

> Defendants also will review their productions and produce any linked files as long as the file (1) is accessible (some links have expired due to the passage of time) and (2) is not privileged (some links lead to privileged documents identified in the Defendants' respective privilege logs).  Defendants agree to produce unprivileged

---

[1] The Court will, for the most part, refer to the Defendants collectively throughout this Order, as the distinction between them generally is not relevant to the issues discussed herein.

linked documents by February 17, 2023, and to identify the document to which the link applies.

[Dkt. 89 at 3] (noting that this "issue could have been quickly resolved through a phone call").

Plaintiffs do not mention this issue in their reply brief.  Accordingly, Plaintiffs' motion is **DENIED** as to this issue.

### C.  "Issue B":  Documents

As their "Issue B," Plaintiffs have identified twenty documents on RealHouse's privilege log which RealHouse has withheld on both attorney-client privilege and work product grounds. Because the parties have not had a document-by-document discussion regarding these documents, Plaintiffs' motion is **DENIED** as premature with regard to this issue.  The Court believes that, if these discussions are undertaken in good faith, the parties should be able to resolve any issues with regard to the production of any non-privileged, relevant portions of these documents and how each document is subject to the attorney-client privilege regardless of the fact that no attorney authored or received the document.

With regard to the documents referenced in Lines 63, 64, and 65 of the privilege log, Plaintiffs argue that any attorney-client privilege was waived because the documents were disclosed to an independent contractor.  Again, it is likely that a good faith discussion between counsel regarding whether the common interest exception applies will resolve this issue.  To the extent that Plaintiffs suggest in their reply brief that RealHouse waived this issue by failing to mention the common interest exception on the privilege log with regard to these three documents, the Court rejects that argument.  This is precisely the type of omission that would be revealed and corrected by a document-by-document discussion prior to the filing of a motion to compel.  In addition, to aid in the parties' discussion of this issue, the Court notes that it does not

find the cases cited by Plaintiffs with regard to this issue to be particularly analogous to this case, and are, therefore, not persuasive.

### D.  "Issue C":  Work Product Only Documents

As their "Issue C," Plaintiffs identify four documents on RealHouse's privilege log that have been withheld only on work product grounds.  To be frank, both sides' arguments with regard to whether these and the other documents are entitled to work product protection are a jumble of unhelpful and unsupported assertions.

Plaintiffs argue that work product protection is foreclosed based on the testimony of Alexandra Reed, who was deposed as RealHouse's Rule 30(b)(6) designee.  Reed testified as follows:

> Q:  Now, if you would look at the notice of deposition, one of the topics that you've been designated on is Topic 15, the date upon which RealHouse reasonably anticipated litigation. Are you prepared on that topic?
>
> A. Yes.
>
> Q. And can you tell the Court when it was that RealHouse reasonably anticipated litigation?
>
> A. That would be when we sold the project to Netflix, which would have been in September or August of 2021.
>
> Q. All right. And why did you anticipate litigation at that time in September or August of 2021?
>
> A. That's because we're making a documentary. It is a standard part of making documentaries, to anticipate litigation.
>
> Q. And why do you say it's a standard?
>
> A. Almost every documentary is upsetting to somebody. . . .  And we try and avoid litigation as much as we can; therefore, we always try and plan for how to avoid it. When we start producing a show, we identify problem areas.

Q. All right. So in August or September of 2021, did you anticipate a specific claim related to Our Father?

A. No. . . .

Q. Can you tell the Court whether, in your judgment, as a company, that in August or September '21, 2021, your company had concluded that Our Father was likely to lead to litigation?

A. Can you define what determines "likely"?

Q. Yeah, "likely" would be more probable than not.

A. I don't believe we ever determined that.  I would have regarded it as equal likelihood to any other documentary.

Q. So you would not—you're not able to say under oath here today that as of August or September 2021, Netflix—pardon me—RealHouse concluded that it was likely that Our Father would result in litigation?

A. No. It was no more likely than any other project that I worked on.

Q. Is it fair also to say that as of August or September of 2021 that a claim had not arisen at the time, as of that time?

A. Yes. We had not made the project, so we had no claim.

[Dkt. 83-2 at 3-4.]  Reed further testified:

Q. Turning to the reality now of the claim—of the claim that was filed, did you anticipate a specific claim associated with Our Father at some point in time?

A. Did I anticipate a specific claim associated with Our Father at some time? I'd say no. I mean, until the—I anticipate it when the claim was filed.

Q. Okay.

A. Yeah.

Q. So it wasn't—RealHouse, for its part, did not anticipate a lawsuit associated with Our Father, or claim, until it was actually filed?

A. We always anticipated a claim, from the beginning; that's what I said before. That—you're asking me now if we anticipated a claim, but we always anticipated a claim.

Q. I'm asking you about a specific claim associated with Our Father. When did you—well, let me ask it this way. Did you anticipate a claim being made in connection with Our Father specifically in May of 2022?

A. No.

Q. Okay. When did you anticipate that there would actually be a claim, during the spring of 2022?

A. I anticipated there would be a claim when I was notified a claim had been made.

Q. Okay. And as far as RealHouse was concerned, you did not anticipate a claim specifically until that time?

A. That's correct.

Q. Now, in connection with the testimony . . . that you have just given on behalf of RealHouse, as its corporate representative in connection with the notice, and specifically Topic 15, do you—can you represent to the Court that you took reasonable steps, reasonable in your judgment, to prepare yourself to give truthful and accurate testimony on this topic?

A. Yes.

Q. And based on that preparation, based on the meetings you had with Mr. Wendt, Mr. Wendt's team, and based on your meeting with the Netflix lawyer, did you—do you believe that all those things put you in a position to give testimony that was accurate and correct in all respects as to when RealHouse first anticipated litigation?

A. Yes.

Q. And the date that RealHouse anticipated litigation associated with Our Father was when you received notice of the complaint filed in this lawsuit?

A. Correct.

*Id.* at 4-5.

Plaintiffs first argue that Reed "admitted that RealHouse did not reasonably

anticipate litigation until September or August 2021." [Dkt. 83 at 3.]  However, Reed's actual testimony was that RealHouse anticipated litigation when it "sold the project to Netflix," which she stated was "in September or August of 2021."  *Id.* at 3.  It was not.  RealHouse sold the project to Netflix on June 9, 2020.  [Dkt. 89-2 at 3.]  Reed's misstatement of the date in her testimony does not change reality; nor does her misstatement of the date change the substance of her testimony, which clearly was that RealHouse anticipated the possibility of litigation from the moment that the project was sold to Netflix.[2]  Reed's testimony can only reasonably be read as such.

Plaintiff next argues that Reed admitted that RealHouse did not satisfy the anticipation of litigation requirement for work product protection purposes until the date this case was filed in state court, May 21, 2022.  As set forth above, Reed did, in fact, so testify.  Defendants argue:

> [Reed] testified she did not anticipate an actual lawsuit relating to "Our Father" before this lawsuit was filed.  But Plaintiffs never asked "why" and never showed the witness any specific documents, such as sibling complaints RealHouse received after "Our Father" was released.  Plaintiffs got what they believed was a helpful soundbite and now misuse that soundbite in their motion.  Had Plaintiffs asked further questions, the witness would have explained that her communications after receipt of sibling complaints about "Our Father" in May 202[2] were to protect the company from litigation, establishing work product protection.

---

[2] The Court does not mean to suggest that this "anticipation" of possible litigation satisfies the requirement for work product protection.

> [T]o be subject to work product immunity, the documents at issue must have been created in response to "a substantial and significant threat" of litigation, which can be shown by objective facts establishing an identifiable resolve to litigate. Documents are not work product simply because litigation is in the air, or there is a remote possibility of some future litigation.

*City of Evanston v. N. Illinois Gas Co.*, 2017 WL 11558474, at *2 (N.D. Ill. Aug. 31, 2017) (internal citations and quotation marks omitted).

> Specifically, if Plaintiffs had been interested in the substance of the witness' testimony, she would have told them that the fact that she did not think there would be an actual lawsuit based on "Our Father" was her personal opinion, because RealHouse and Netflix did nothing wrong and because RealHouse and Netflix acquiesced in siblings' requests to have their names blurred in the documentary. (Reed Decl., ¶ 7.)  If Plaintiffs had asked her about her response to sibling complaints in response to the release of "Our Father," the witness would have testified that regardless of her personal opinions, she recognized the potential for legal exposure, and took proactive steps to protect the company from potential litigation, at the direction of and with the input of RealHouse's counsel. *Id.*  Ms. Reed's declaration establishes that work product protection applies to RealHouse's communications relating to and addressing sibling complaints about "Our Father," received prior to the filing of this lawsuit, just as RealHouse asserted on its privilege log.

[Dkt. 89 at 7-8] (footnote added).  This argument is without merit.  Plaintiffs did not simply receive a "soundbite" and move on; as quoted above, they elicited clear and concise testimony from Reed about a topic that she was required to be prepared to testify about on behalf of RealHouse.  She was not asked about her personal opinion; she was asked multiple times about when RealHouse anticipated litigation.

That said, Plaintiffs' suggestion that RealHouse is forever bound by Reed's deposition testimony goes too far.

> A corporate party is not unconditionally bound to its deposition designee's recollection.  *See A.I. Credit Corp. v. Legion Ins. Co.,* 265 F.3d 630, 637 (7th Cir. 2001), *as amended on denial of reh'g* (Nov. 26, 2001).  It is true that that [sic] an entity's Rule 30(b)(6) deposition testimony is "binding in the sense that whatever its deponent says can be used against the organization."  *Keepers, Inc. v. City of Milford,* 807 F.3d 24, 35 (2d Cir. 2015) (internal quotation marks omitted).  But Rule 30(b)(6) testimony is not "binding in the sense that it precludes the deponent from correcting, explaining, or supplementing its statements."  *Id.*

> In fact, testimony given pursuant to Rule 30(b)(6) is "merely an evidentiary admission," and it does not have "conclusive effect."  *Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.,* 839 F.3d 1251, 1260 (10th Cir. 2016); *see also A.I. Credit Corp.,* 265 F.3d at 637 (stating "testimony of Rule 30(b)(6) designee does not bind corporation in sense of judicial admission") (citing *United States v. Taylor,* 166 F.R.D. 356, 362 (M.D.N.C.), *aff'd,* 166 F.R.D. 367 (M.D.N.C. 1996)).  Thus, "testimony given at a Rule 30(b)(6) deposition is evidence which, like any

other deposition testimony, can be contradicted and used for impeachment purposes." *A.I. Credit Corp*, 265 F.3d at 637 (internal quotation marks omitted) (quoting *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 92 F. Supp. 2d 786, 791 (N.D. Ill. 2000)).

*Litterer v. United States*, 545 F. Supp. 3d 625, 633 (N.D. Ill. 2021).

Defendants have submitted the Declaration of Alexandra Reed, in which she states the following:

> When we received complaints from several siblings relating to the Our Father documentary immediately after its release in May of 2022, I recognized the potential for legal exposure, and took proactive steps to protect the company from potential litigation, at the direction and with the counsel of our legal team.

[Dkt. 89-2 at 4.] This is of no help to Defendants with regard to the Issue C documents, however, which were created well before that date. As Defendants admit,

> "[t]he four "Issue C Documents" are communications between RealHouse and its insurance broker in December 2021, months before "Our Father" was made available for streaming, before this lawsuit existed, and before RealHouse requested coverage for the allegations in this lawsuit—all facts Plaintiffs do not disclose.

[Dkt. 89 at 13.] Given this admission, it is difficult to see how the Issue C Documents could possibly be considered work product, and Defendants make no attempt to explain how they could be. Accordingly, Plaintiffs' motion to compel is **GRANTED** as to these four documents. RealHouse shall produce them **within 7 days of the date of this Order**.

### E.  "Issue D":  Fair Use Logs

As explained by Defendants, the "Issue D" documents consist of spreadsheets that are referred to as "fair use logs," "release logs," and various other names.

> The logs are the mechanism through which RealHouse's outside "clearance counsel" provided legal advice to RealHouse and the independent filmmakers making "Our Father," regarding potential or actual legal issues raised by the film. Each line on the spreadsheet contains legal advice.

[Dkt. 89 at 14.]  The Court has no doubt that the logs are protected by the attorney-client

privilege.[3]  The issue is whether that privilege has been waived, or whether it will be waived if

Defendants use testimony or evidence about the clearance process as part of their defense in this

case.  Plaintiff argues that Defendants wish to improperly use the privilege as both a sword and a

shield by introducing evidence about receiving legal advice in order to avoid legal issues but

refusing to allow Plaintiffs to see what that legal advice actually was.  Defendants respond that

> the legal advice within the "fair use logs" or "release logs" or "legal ledgers" is
> irrelevant to RealHouse's description of its general procedures to prevent violation
> of law.  RealHouse's witness described certain of those procedures in her
> deposition, including hiring of outside counsel to review every scene in the
> documentary for potential legal issues and to provide advice in the "fair use logs"
> or "release logs" or "legal ledgers," as noted above.  The existence of that review
> is a fact relevant to show how films like this are made.  The legal advice provided
> as part of that review is, however, privileged.  RealHouse's review reflects the
> process, and RealHouse's care, not the legal advice on the myriad issues that arise
> while making a film.  As a result, testimony and evidence regarding the
> procedures, practices, and processes RealHouse follows to avoid violations of law
> does not amount to use of privileged communications as a "sword," does not
> involve, directly or indirectly, the disclosure of legal advice, and cannot be a
> waiver of the legal advice contained in the "Issue D Documents."  Plaintiffs'
> sword/shield argument should be rejected.

[Dkt. 89 at 17-18.]

While neither side has cited to particularly helpful law on this issue, the Court agrees

with Plaintiffs that this "is a classic sword and shield problem" that creates an implied waiver of

---

[3] Plaintiffs argue that "[a]t a minimum, Defendants should be required to produce the facts within the spreadsheets and redact the legitimately privileged information, if any," because "[t]he attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."  [Dkt. 82 at 11] (citation and internal quotation marks omitted).  In this case, however, the spreadsheets **are** the privileged communications.  It is true that factual information contained in the spreadsheets does not become privileged simply because it is contained on a privileged communication, but that does not change the fact that the communication itself is, in fact, privileged.

the privilege.  "An implied waiver occurs when (1) [t]he party asserting the privilege acts affirmatively (2) to place the privileged communications in issue between the party seeking discovery and itself (3) such that denying access to the communication becomes manifestly unfair to the party seeking discovery." *Volterra Semiconductor Corp. v. Primarion, Inc.*, 2013 WL 1366037, at *2 (N.D. Cal. Apr. 3, 2013) (citations and internal quotation marks omitted); *see also Waterfield v. Waterfield*, 61 N.E.3d 314, 326 (Ind. Ct. App. 2016) ("Indiana courts have previously held that evidentiary privileges created 'to shield selected information from discovery . . . may not be wielded as swords at the will of a party.' *Madden v. Ind. Dept. of Transp.*, 832 N.E.2d 1122, 1128 (Ind. Ct. App. 2005).  In other words, 'a party may not place an issue before the trier of fact and then assert a privilege to prohibit the introduction of evidence regarding that issue.'" *Id.*).

In this case, Defendants wish to inform the jury that they take care to avoid legal issues—such as revealing someone's identity without authorization—by having clearance counsel conduct a thorough review.  If the results of that review as relevant to the issues in this case are not revealed to Plaintiffs, allowing Defendants to present such testimony "would result in unfairness to [Plaintiffs] to the extent it would leave the jury with the impression that [Defendants] relied on the advice of counsel." *Volterra Semiconductor Corp.*, 2013 WL 1366037, at *2.  There are many possible scenarios that could call into question the care taken by Defendants.  For example, perhaps clearance counsel expressly told Defendants to blur Plaintiffs' names and Defendants decided not to—or simply failed to do so.  Or perhaps the scenes at issue in this case did not appear on the logs and therefore were never reviewed by counsel.  Plaintiffs are entitled to examine the relevant portions of the logs to determine whether they provide

11

evidence to refute the evidence that Defendants concede is intended to show the "care" that they took.

    **Within fourteen days of the date of this Order**, Defendants shall either certify that they will not introduce any evidence regarding their clearance procedures in this case or produce all portions of the "Issue D" documents that relate to any of the scenes, shots, or "edits" of "Our Father" that are at issue in this case.[4]

### F. "Issue E" Documents

    As with the "Issue B" Documents, the Court **DENIES** Plaintiffs' motion as to the "Issue E" Documents as premature because a good faith, document-by-document discussion regarding these documents should resolve most, if not all, of the issues raised by Plaintiffs.

### III.  Conclusion

    For the reasons set forth above, Plaintiffs' motion to compel, [Dkt. 82], is **GRANTED** as to the "Issue C" documents, which RealHouse shall produce **within 7 days of the date of this Order**.  The motion is **GRANTED** as to the "Issue D" documents to the following extent: **Within fourteen days of the date of this Order**, Defendants shall either certify that they will not introduce any evidence regarding their clearance procedures in this case or produce all portions of the "Issue D" documents that relate to any of the scenes, shots, or "edits" of "Our

---

[4] Reed explained in her deposition that the clearance grids consisted of "an ongoing grid [of] all elements that are in each shot" of the movie.  [Dkt. 89-3 at 4]; *see also id.*https://www.westlaw.com/Document/I6ef300179e1f11e28500bda794601919/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0 (explaining difference between "edit" and "shot").

Father" that are at issue in this case.  The motion is **DENIED as premature** with regard to the

"Issue B" and "Issue E" documents.  The motion is **DENIED** in all other respects.

Defendant RealHouse's Motion for Leave to File Short Sur-Reply in Opposition to

Plaintiffs' Motion to Compel, [Dkt. 97], is **DENIED**.

SO ORDERED.

Dated:  16 FEB 2023

_____

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.