## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SARAH BOWLING, | ) | |
| LAURA DISALVO, | ) | |
| LORI KENNARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-01281-TWP-MJD |
| | ) | |
| NETFLIX, INC., | ) | |
| NETFLIX WORLDWIDE ENTERTAINMENT, | ) | **SEALED** |
| LLC, | ) | |
| REALHOUSE PRODUCTIONS, LLC, | ) | PUBLIC VERSION |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Netflix, Inc., Netflix Worldwide Entertainment, LLC (together, "Netflix"), and RealHouse Productions, LLC ("RealHouse") (Netflix and RealHouse, together, "Defendants") (Filing No. 183). Plaintiffs Sarah Bowling ("Ms. Bowling," f/k/a Jane Doe), Laura DiSalvo ("Ms. DiSalvo," f/k/a Janet Roe), and Lori Kennard ("Ms. Kennard," f/k/a Janice Coe) (collectively, "Plaintiffs") brought this action against Defendants alleging they committed various torts by disclosing Plaintiffs' identities as children of Dr. Donald Cline to millions of people on social media and on Netflix's streaming platform without Plaintiffs' consent. The Court previously granted judgment on the pleadings as to some of Plaintiffs' claims (Filing No. 155). Defendants now move for summary judgment as to the remaining claims. For the following reasons, Defendants' Motion for Summary Judgment is **granted in part and denied in part**.

## I.      BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Plaintiffs as the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

RealHouse is a production company that among other things, produces documentaries. Netflix is a subscription-based streaming service that allows users to watch movies, TV shows, and documentaries on internet-connected devices. The Plaintiffs are all biological children of disgraced fertility doctor Donald Cline ("Dr. Cline"). Ms. Bowling and Ms. DiSalvo also have the same mother.   In or around 2019, Plaintiffs used the genetic testing service 23andMe and discovered that they were three of several dozen individuals fraudulently fathered by Dr. Cline.  In 2020, Netflix agreed to purchase from RealHouse a documentary about Dr. Cline's misconduct and his victims, titled *Our Father* ("*Our Father*" or the "Film"), which gave rise to this litigation.

### A.      Dr. Cline's Fertility Fraud and Media Coverage

Dr. Cline was an Indianapolis, Indiana-based fertility doctor who, in the 1970s and 1980s, inseminated several of his patients with his own semen without their knowledge and fathered approximately ninety-four children (Filing No. 1-1 at ¶¶ 22–24).  In 2015, Dr. Cline's heinous misconduct was uncovered after several of his now-adult biological children (the "Secret Children") took DNA tests on 23andMe.  *Id.* ¶ 25.  Two of the half-siblings, Jacoba Ballard ("Ms. Ballard") and Matt White, contacted the media and local prosecutors to try to publicize Dr. Cline's misdeeds and seek justice.  In May 2015, Indianapolis journalist Angela Ganote ("Ms. Ganote") broke the story, which generated local and national news coverage.

2

**B.      Plaintiffs' Use of 23andMe**

23andMe is a DNA testing company that allows customers to submit a physical DNA sample through the mail (Filing No. 185-5 at 12:17–20).  The company analyzes the sample and makes various versions of that analysis available to the customer on the company's electronic platform.  *Id.* at 21:2–22:8.  The company's default settings do not share any customer information with anyone else, but customers can choose what personal information they want to share with other users of 23andMe.  *Id.* at 23:19–24; 48:1–12.  A customer may, for example, create a profile that displays their full name or initials and a personal picture.  *Id.* at 32:3–11.

A customer may also opt to participate in certain information-sharing features on 23andMe, including a "DNA Relatives" feature and, within that, an "Open Sharing" feature. The DNA Relatives feature provides its participants with a list of approximately one thousand of their closest matched relatives (ranging from identical twins to seventh cousins), and it allows the participant to see other relatives who have tested with 23andMe and have also opted to participate in DNA Relatives.  *Id.* at 22:1–4, 23:3–18, 34:1–8.  What a DNA Relatives participant can see about another relative/participant depends on the relative/participant's 23andMe profile settings.  *Id.* at 24:4–17. If a participant opts into Open Sharing, then their profile will show other relative/participants their ancestry results and matching DNA segments, which provides a percentage of DNA in common and an "estimate of . . . relatedness."  *Id.* at 29:8–30, 40:16–23; (Filing No. 203-11 at 2–3; Filing No. 199-14 at 65:23–69:3).  Users of 23andMe can also send "connection" invitations to other users.  If a user accepts a sender's "connection" invitation, then the sender's full ancestry report will be shared with the "connection."  (Filing No. 185-5 at 40:1–41:7; Filing No. 199-14 at 65:8–13)

Plaintiffs each created a 23andMe profile that displayed their full names and current pictures (Filing No. 185-5 at 23:3–24, 31:16–33:11, 42:23–43:2, 51:1–13). Plaintiffs also opted

into the DNA Relatives and Open Sharing features, which allowed Plaintiffs' relatives who also tested with 23andMe and opted into DNA Relatives to see their names, photographs, matching DNA segments, and estimated relationships (Filing No. 185-1 at 94–400; Filing No. 185-4 at 6–308; Filing No. 185-6 at 55–355).  Over fifty other Secret Children who tested with 23andMe and opted into DNA Relatives, some of whom were "total strangers" to Plaintiffs, could see Plaintiffs' names, photographs, and estimated relation as half-siblings (Filing No. 185-1 at 94–106; Filing No. 185-4 at 6–18; Filing No. 185-6 at 55–66; Filing No. 185-7 at 140:14–18).[1]  Plaintiffs also have limited "connections" on 23andMe: Ms. Bowling has 9 connections (Filing No. 203 ¶ 18; Filing No. 203-12), Ms. DiSalvo has 11 connections (Filing No. 204 ¶ 8; Filing No. 204-2), and Ms. Kennard has 14 connections (Filing No. 205 ¶ 7; Filing No. 205-2 at 5–6).  Relatives with access to the Plaintiffs' genetic information could copy, print, share, and use that information however they wanted (Filing No. 185-9 at 29:15–19, Filing No. 185-5 at 24:18–25:17; Filing No. 185-8 at 4).

**C.     Plaintiffs' Discussions of Their Identities as Secret Children**

**1.     Ms. Bowling and Ms. DiSalvo**

In October 2019, Ms. DiSalvo sent a Facebook message to Ms. Ganote disclosing that she and Ms. Bowling are Dr. Cline's children and thanking Ms. Ganote for reporting on the story. (Filing No. 185-3 at 44).  In February 2020, Ms. DiSalvo sent an email to a siblings-themed podcast hosted by celebrity actress Kate Hudson, explaining her and her sisters' relation to Dr. Cline:

> My name is Laura DiSalvo, and I live in Indianapolis. . . . I currently (as of 2/5/2020) have 74 siblings—2 full and 72 half, I need to clarify the date because it can absolutely change tomorrow.

---

[1] Defendants assert that Plaintiffs allowed "[o]ver one thousand 'quite distant' relatives . . . to see—in real time—results from Plaintiffs' genetic testing, including Plaintiffs' list of half-siblings." (Filing No. 184 at 13). This assertion is not supported by the designated evidence and overstates the amount of information available to 23andMe users, even those related to Plaintiffs, as described by 23andMe's deposition designee.

> I have a twin sister . . . and an older (by 2 years) sister, Sarah. We found out on August 3, 2019 that we were biological children of our mother's fertility doctor. It came as a total shock—We never knew my mom was inseminated or that they consented to donor sperm. That was a shock in itself, but the fact that my biological father is my mom's fertility doctor—Holy. Sh[*]t.
>
> . . . .
>
> We'd love to chat!
>
> Laura DiSalvo
>
> ***for reference, google Dr. Donald Cline***

(Filing No. 185-2 at 3; *see* Filing No. 185-7 at 129:24–130:9).  Ms. DiSalvo told Ms. Bowling about this email, but she does not remember whether she asked Ms. Bowling for permission before sending it, and Ms. Bowling does not recall what Ms. DiSalvo told her about the email (Filing No. 185-7 at 131:4–6; Filing No. 185-9 at 178:12–23).  Ms. DiSalvo did not ask for confidentiality in her message to Ms. Ganote or her email to Kate Hudson's podcast.  However, Ms. Ganote never published Ms. DiSalvo's or Ms. Bowling's names, and their names never appeared on Kate Hudson's podcast (Filing No. 203 ¶¶ 24–25; Filing No. 204 ¶¶ 17–18).

In early 2020, Ms. Bowling, Ms. DiSalvo, and Ms. DiSalvo's husband attended an event hosted by the producers of the podcast *Sick*, which had previously discussed Dr. Cline (the "Podcast Event").  Neither Ms. Bowling nor Ms. DiSalvo spoke at the Podcast Event (Filing No. 185-7 at 122:17–123:2).  After the event, an email was sent to thank attendees and audience members who shared personal stories.  The email included an image of Ms. Bowling, Ms. DiSalvo, Ms. DiSalvo's husband, and a fourth person speaking to one another, though nothing in the email

indicates that Ms. DiSalvo or Ms. Bowling "shared their stories," and Ms. DiSalvo's and Ms. Bowling's faces cannot be seen in the photograph (Filing No. 185-3 at 81).[2]

Ms. Bowling and Ms. DiSalvo also posted about their identities as Secret Children on Instagram.  Both of their Instagram accounts are private, meaning that only their "followers" can see their posts (Filing No. 185-7 at 92:16–17; Filing No. 185-9 at 118:20–25; Filing No. 203 ¶ 19; Filing No. 204 ¶ 9).  Ms. DiSalvo has 495 followers, and Ms. Bowling has 422 followers (Filing No. 185-7 at 92:21–93:20; Filing No. 185-9 at 87).  In September 2019, Ms. Bowling posted a photograph of someone's (presumably Ms. Bowling's) arm being tattooed, with the caption "This life is a crazy ride.  Here for it. [tagging Ms. DiSalvo] #sisterstar #theasterisk." (Filing No. 185-6 at 357).[3]  Seventy-nine accounts interacted with Ms. Bowling's post by "liking" it, and several accounts commented on it.  Id.[4]  In April 2020, Ms. DiSalvo posted a photograph of her and Ms. Bowling with asterisk tattoos on their wrists, captioned: "Happy #nationalsiblingsday to my other half [women with bunny ears emoji] and to all of my siblings—all 75+ of you! My life is filled with 100 x's more love because of you. Cheers to making more lemonade together!" (Filing No. 185-4 at 310).  Ninety-six accounts interacted with Ms. DiSalvo's post.

---

[2] Defendants contend, without support, that "during the event [Ms. Bowling] told the podcast producers she is a biological child of Dr. Cline." (Filing No. 184 at 14).  Defendants also assert a public post on Twitter from the Podcast Event shows Ms. Bowling or Ms. DiSalvo, but Defendants only cite a link to the Twitter post rather than admissible evidence of the post.  Pursuant to Local Rule 56-1, "[a] party must support each fact the party asserts in a brief with a citation to . . . admissible evidence. . . . The court has no duty to search or consider any part of the record not specifically cited in the manner described in subdivision (e)." S.D. Ind. L.R. 56-1(e), (h).

[3] The Court is not obligated to comb through the over two thousand pages of evidence that Defendants submitted or consider any evidence to which Defendants have not properly cited. S.D. Ind. L.R. 56-1(e), (h); *see Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (stating the Seventh Circuit has "long upheld" Local Rule 56-1); *Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 849 (7th Cir. 2015) ("We will not consider factual arguments that were not raised below nor shall we consider evidence that was not properly cited to the court below.").

[4] Defendants' brief contains two additional images that are perhaps from Ms. Bowling's Instagram post, but Defendants do not properly cite either image, so the Court will not consider them. S.D. Ind. L.R. 56-1(e), (h).

Ms. Bowling and Ms. DiSalvo's mother, Barbara Huff ("Ms. Huff"), also posted about Dr. Cline on her Facebook page.  Ms. Huff's Facebook is private and had fewer than one hundred "friends" at the time of the post (Filing No. 185-12 at 38:1–21).  Defendants assert that this post "announc[ed] that Cline had used his own sperm to inseminate her without consent, and that her daughters were born as the result of Cline's misconduct", (Filing No. 184 at 16), but the record is not so clear.  The Facebook post itself was deleted and was not designated by either party.  The only evidence of the post's contents are people's recollections.  Ms. Huff recalled that the post "just said that . . . [she] had gone to Dr. Cline" and that "we had found out that he had been using his own sperm and that [she] had been a patient of his." (Filing No. 185-12 at 38:22–39:5.)  Ms. Huff was not sure whether the post stated that Dr. Cline had used his own sperm to inseminate her, *id.* at 39:11–16, 49:22–50:1, but she was sure that the post did not state Dr. Cline was Ms. Bowling or Ms. DiSalvo's father.  *Id.* at 49:17–50:7.  She "would never say that." *Id.* at 5:6–7.  Ms. DiSalvo's husband recalled that the post "identified that [Ms. Huff] was a patient of Dr. Cline and that she doesn't regret anything that . . . happened in the long run, because she has her daughters, something along those lines." (Filing No. 185-13 at 82:2–7.)  And a high school acquaintance of Ms. DiSalvo, Sarah Sexton ("Ms. Sexton"), recalled that the post said that Ms. Huff and her family "just found out that [her] daughters . . . were not fathered by like their father, they were fathered by this fertility doctor, and that . . . [she] was devastated about it." (Filing No. 185-14 at 7)[5].

Defendants relatedly assert that Ms. Huff's post "tagged" Ms. Bowling and Ms. DiSalvo, so "the post made its way into Ms. Bowling and Ms. DiSalvo's Facebook feeds where one of Ms. DiSalvo's distant acquaintances [Ms. Sexton] testified she first learned about Ms. DiSalvo's

---

[5] These varying recollections do not establish, beyond genuine dispute, that Ms. Huff's Facebook post disclosed that Ms. Bowling and Ms. DiSalvo were Dr. Cline's children.

biological connection to Dr. Cline." (Filing No. 184 at 16.)[6]  Ms. Sexton stated that she saw Ms. Huff's post and that she was not Facebook friends with Ms. Huff, but she did not testify that Ms. Huff's post appeared on Ms. DiSalvo's Facebook page (Filing No. 185-14 at 26:9–16; Filing No. 185-4 at 315).

Plaintiffs also joined a private Facebook group intended for children of Dr. Cline (the "Facebook Group").  Strict privacy rules were explained to all members of the Facebook Group, and all members were expected to adhere to the privacy rules (Filing No. 208 at 23–24; Filing No. 185-7 at 121:9–17, 145:23–146:4; Filing No. 202-18; Filing No. 202-19 at 13:10–13, 62:3–10, 64:23–65:2, 66:13–67:15).   After *Our Father* was released, Ms. Bowling and Ms. DiSalvo expressed their frustration with and distrust of certain Secret Children in the Facebook Group— namely, Ms. Ballard—who had violated those rules (Filing No. 185-3 at 25 ("I don't trust a lot of people in this group. It just really drives home the point that we really are all strangers."); Filing No. 185-4 at 331 ("I don't feel safe with certain people having access to my information. We have to remember, some of us are absolute strangers to each other."); Filing No. 185-6 at 25 ("Realizing there is a small handful of people that I trust and I don't need to share any information with these [people].")).

### 2.    Ms. Kennard

Ms. Kennard also referred to her identity as a Secret Child on social media.  On March 17, 2021 (St. Patrick's Day), she posted on her Facebook page:

> According to 23andme, I am 45.1% British/Irish. So, here is an Irish Blessing to all
> of my family and friends, near and far. Happy St. Patrick's Day! [clover emoji]

---

[6] But this assertion is unsupported by designated evidence.  Ms. Huff only testified that Ms. Bowling and Ms. DiSalvo saw the post, not that she "tagged" them or that her post appeared on Ms. Bowling's or Ms. DiSalvo's Facebook pages (Filing No. 185-12 at 48:4–9).

> P.S. If you have not completed a DNA test with 23andme.com or ancestry.com, I strongly encourage you to. It has been VERY interesting to explore my results, to say the least.

(Filing No. 185-1 at 54). Thirty-three people interacted with this post. *Id.* Ms. Kennard's Facebook is private, so only "friends" can see her posts (Filing No. 185-15 at 117:3–7; Filing No. 205 ¶ 8).[7]

A few weeks later, Ms. Kennard disclosed her relation to Dr. Cline via a Facebook message to an acquaintance who had asked Ms. Kennard why she chose to use 23andMe over Ancestry.com, another DNA testing service. *Id.* at 406–07. Ms. Kennard also disclosed her identity to a fourth cousin on her maternal side, whom she had never met and who was not related to Dr. Cline. *Id.* at 48; (Filing No. 185-15 at 102:11–14). Ms. Kennard did not ask either person to keep her connection to Dr. Cline confidential. Despite these disclosures, though, Ms. Kennard still considered her identity as a Secret Child to be private (Filing No. 185-1 at 39 ("I was thoroughly impressed with the professional quality of the trailer. . . . It truly makes me question if I should go public. . . I'm tired of holding all this in. My insides can't take it.")).

Like Ms. Bowling and Ms. DiSalvo, Ms. Kennard was a member of the private Facebook Group. One of the half-siblings in the Facebook Group, ▇▇▇▇▇▇▇▇ (▇▇▇▇▇▇▇") disclosed Ms. Kennard's connection to Dr. Cline to a mutual friend, Sara Thompson ("Ms. Thompson"), though it is not clear from the record whether ▇▇▇▇▇▇ had Ms. Kennard's permission to do so (Filing No. 185-1 at 43 ("If it comes up, you can mention that we are half sibs to the Thompsons."); Filing No. 185-15 at 23 (testifying that "it wasn't ▇▇▇▇▇▇▇] intention" to expose Ms. Kennard; "[i]t was the fact that we had a mutual friend, and we needed to tell that

---

[7] Defendants assert that Ms. Kennard has "1,500 Facebook friends," but do not cite any evidence supporting this assertion. Defendants cite only an image of Ms. Kennard's Facebook post, which does not reflect her number of "friends." (Filing No. 184 at 16; Filing No. 185-1 at 54.)

mutual friend that I was a half sibling")).  Ms. Kennard later asked Ms. Thompson to keep that information private (Filing No. 185-15 at 67:11–68:10).

**D.      Production of _Our Father_**

In 2020, Netflix agreed to purchase _Our Father_ from RealHouse (Filing No. 78-10 ¶ 1). Netflix's agreement with RealHouse was conditioned upon "Netflix approval of Producer's production counsel."  Attorney Alonzo Wickers ("Mr. Wickers") was "pre-approved" by Netflix. _Id._ ¶ 2(d).  Throughout his years of practice, Mr. Wickers has received various accolades (Filing No. 186-1 at 13).  Mr. Wickers has worked with RealHouse for many years (Filing No. 185-17 at 9:9–14).  Mr. Wickers reviewed _Our Father_ with a "more conservative" approach because it "look[ed] across state lines" and implicated "uncertainty or openness in an area of law." _Id._ at 21:4–23.

Mr. Wickers provided comments regarding potential legal issues in a clearance "log" created by RealHouse (Filing No. 199-8 at 57:17–61:7; Filing No. 202-15).  The clearance log contains "all the elements that are in each shot, whether it is individuals, if it's footage . . . whatever it is." (Filing No. 58:1–14.)  RealHouse would create a clearance log, review releases, adjust any releases with specific requests, and then share that information with its lawyers to make "decisions in terms of what they regard as necessary."  (Filing No. 185-18 at 198:13–21.)  The log was the "mechanism through which RealHouse's outside 'clearance counsel' provided legal advice to RealHouse and the independent filmmakers making 'Our Father,' regarding potential or actual legal issues raised by the film."  (Filing No. 89 at 14.)  The clearance log reviewed by Mr. Wickers did not include the scenes displaying Plaintiffs' names (Filing No. 112 (acknowledging that the clearance logs "do not reference the scenes at issue"); Filing No. 201-12 through Filing No. 201-20 (clearance logs); Filing No. 202-1 through Filing No. 201-10 (clearance logs)).  Mr. Wickers also provided an opinion letter, which stated that the Film does not "give rise to any viable claims

for invasion of privacy by disclosure of private facts" because, "[m]ost importantly, the patients and their children who appear on camera all are released and voluntarily disclosed their experiences with Dr. Cline and their trauma when they learned of his betrayal." (Filing No. 202-15.)

Netflix and RealHouse provided "creative feedback" to the filmmakers for *Our Father*, but Netflix relied on RealHouse and, in turn, Mr. Wickers, to evaluate any legal issues with its content (Filing No. 185-19 at 100:14–103:1). Netflix believed that it did not need to check Mr. Wickers' work since Netflix believed he was "arguably the most preeminent clearance counsel in the entertainment industry." (Filing No. 185-20 at 101:5–105:15.) Netflix therefore took no independent steps to determine whether Plaintiffs' names could legally be used in the Film. *Id.*

The Film's director, Lucie Jourdan ("Ms. Jourdan"), was primarily responsible for the content included in the Film, including deciding whether to blur certain names. (Filing No. 186-2 at 181:1–183:16.) Ms. Jourdan testified it was important to show the names of Ms. Ballard's half-siblings because they "show[ed] the breadth of . . . how many people Cline had affected," and they were "important to show there are real people behind . . . what he has done, and there are real siblings, and that was a part of the creative storytelling with Jacoba." (Filing No. 67 at 16–20.)

One of the Film's producers, Michael Petrella ("Mr. Petrella"), reached out to several Secret Children about participating in the Film. In September 2020, a half-sibling in the Facebook Group explained that he had been contacted by Mr. Petrella and asked whether any other Facebook Group members had heard from him (Filing No. 185-4 at 336). Ms. Bowling commented, "Yes he reached out to me too." *Id.* at 338. Ms. DiSalvo commented, "...but why not ME?! Marsha! Marsha! Marsha! [laughing crying emoji]." *Id.*

In April 2021, Mr. Petrella sent a group Facebook message to several Secret Children, including Ms. Bowling and Ms. DiSalvo, but not Ms. Kennard ([Filing No. 185-21 at 2](#)). The message stated, in relevant part:

> We would love to have each of you submit a photograph of your choosing, as well as one of you as a baby – again, if you're comfortable with being depicted visually. You will not be identified (unless you've already given us explicit permission to do so), but we wanted as many interested siblings represented as we could have. It's important to Lucie and to me that we offer everyone the opportunity to be involved in some way.

*Id.* at 14.  A RealHouse employee was included in this group message.  *Id.* at 2.  Ms. Bowling did nothing in response.  Ms. DiSalvo decided she was "okay with being shown visually" ([Filing No. 185-7 at 40](#):21–24), so she submitted two photographs of herself and signed a Materials Release Agreement (the "Release") ([Filing No. 185-23 at 4](#)–6; [Filing No. 185-24 at 4](#)–5).  The Release allowed filmmakers to use Ms. DiSalvo's photographs without restriction ([Filing No. 185-23 at 5](#)–6).  Ms. DiSalvo only signed the Release because Mr. Petrella assured her that she would not be identified, except in the photographs, without her permission ([Filing No. 165](#):6–8, 166:6–12).

Defendants recognized the sensitivity of the Secret Children's identities and the importance of obtaining releases for those involved in the Film.  A strategy presentation for the Film noted it would be "not only traumatizing for the children of Dr. Cline but also equally so, if not more, for the mothers/parents." ([Filing No. 200-2 at 30](#).)  In August 2020, Alexandra Reed ("Ms. Reed"), a RealHouse production executive, exchanged emails with an insurance representative about an insurance application.  The representative asked Ms. Reed to confirm that *Our Father* "isn't exposing content that isn't already out there."  Ms. Reed responded:

> Many of the half siblings involved have spoken publicly about the results of their DNA tests and their experiences, but we will not include any information about any of the siblings without a signed release from them. . . . We will NOT include any personal information about people's inception or newfound knowledge without their permission.

([Filing No. 200-12 at 4](#)) (emphasis in original).  On Netflix's insurance application form, the "Yes"

box was checked for the question: "Have all licenses, clearances and consents been obtained or

will be obtained for the following: . . . Persons featured in film footage, TV clips, photographs"

([Filing No. 201-6 at 4](#)).

In June 2021, a RealHouse employee internally emailed a cut of *Our Father*, noting the

"Caveat" that "All sensitive information, ie. email addresses, names[,] physical addresses - will be

blurred."  ([Filing No. 201-2 at 1](#).)  In July 2021, Ms. Jourdan forwarded RealHouse another email

for an upcoming call.  The email stated, in part, "AS ALL THE SIBLINGS AT THIS JUNCTURE

WANT TO REMAIN ANONYMOUS, WE CAN JUST USE THE STANDARD FEMALE AND

MALE ICONS, NO NAMES, JUST 'HALF SISTER' OR 'HALF BROTHER.'" ([Filing No. 201-4](#)

[at 2](#) (emphasis in original; bold emphasis omitted)).  And on September 10, 2021, Ms. Jourdan

sent the following via email, copying a RealHouse employee:

Hey! Here are the directions for vfx

. . . .

2. Jacoba scrolls through her real 23&me account and we need to blur names and
some pics of siblings who do not want to be identified

We need to blur the following names and pic:

(1:18:19) Lori Kennard . . . .

([Filing No. 201-7 at 1](#)).

On March 17, 2022, just a few months before the release of the Film, Mr. Petrella sent an

email to Ms. Jourdan and two Netflix employees about Secret Children and other individuals who

should or should not be included in the Film.  Mr. Petrella "pared back the [email's] recipient list"

due to "the sensitivity of the . . . information" ([Filing No. 200-14 at 1](#)).  He asked that the three

email recipients "[p]lease keep these names confidential, since the siblings are fiercely protective

of one another's privacy, particularly if they've made it known that they don't want to be publicly identified."  *Id.*  The email identified, in part, Secret Children with "photos [that] appear in the film, but wished not to be identified by name," including Ms. DiSalvo.  *Id.* at 1–2.  Ms. Bowling and Ms. Kennard's names were not in this email.  A Netflix employee responded, "Thank you so much Michael, a very helpful list! Just want to assure you that we will absolutely keep the names confidential."  *Id.* at 1.

Later in March 2022, a Netflix employee emailed Mr. Petrella and Ms. Jourdan "just want[ing] to triple check on . . . attached shots to see whether we should blur any of the names or faces[.]"  (Filing No. 201-8 at 1.)  Mr. Petrella responded that the Secret Children who submitted photographs "didn't want to be identified by name, and they are not in that (or any) shot."  *Id.*  The Netflix employee ultimately decided to "blur to be extra safe."  *Id.*

**E.**    **Release of *Our Father***

*Our Father* was released on Netflix's subscription streaming service on May 11, 2022.  Ms. Kennard's name appeared once in the Film.  Ms. Bowling and Ms. DiSalvo's names appeared twice.

**1.**  **Timestamp 00:17:03–00:17:04 (Ms. Kennard's True Name)**

Roughly sixteen minutes into the Film, Ms. Ballard begins recounting a discussion she had with a newly discovered cousin (Filing No. 63, Manually-filed Film at 00:16:00).[8]  Ms. Ballard states that this discussion "confirmed what I think we probably already knew but we were hoping wasn't true—Dr. Donald Cline could be our biological father."  *Id.*  The Film then shows a woman at a laptop printing a full-page image of Dr. Cline.  *Id.*  The Film cuts back to Ms. Ballard, who says, "I was in shock. There were so many emotions. So many questions."  During this statement,

---

[8] The Court refers to timestamps for the Film using the format "[hour]:[minute]:[second]."

the Film cuts to footage of Ms. Ballard scrolling through her list of 23andMe matches.  A portion

of the computer screen appears in the top left corner of the frame.  Around the seventeen-minute

mark, Ms. Ballard scrolls through several names, none of which are blurred, including Ms.

Kennard's name.  Ms. Kennard's name is shown for approximately one second.

### 2.      Timestamp 01:18:20–01:18:24 (Ms. DiSalvo's and Ms. Bowling's True Names)

Ms. Bowling's and Ms. DiSalvo's names appear much later in the film.  About one hour

and ten minutes into *Our Father*, the Film depicts the change-of-plea and sentencing hearing for

Dr. Cline.  At the one hour, eighteen-minute mark, Ms. Ballard is shown talking about her

disappointment with Dr. Cline's suspended sentence.  At the one hour, eighteen minute, and sixteen

second mark, the Film cuts to footage of Ms. Ballard again scrolling through a list of matches on

23andMe, saying "and I dread every new match that comes."  Ms. Ballard's entire computer screen

is shown on the left side of the frame.  At first, all of the names are blurred.  But as Ms. Ballard

continues to scroll, Ms. DiSalvo's and Ms. Bowling's names and 23andMe profile pictures appear,

unblurred, as well as the words "half sister".  Ms. DiSalvo's and Ms. Bowling's names can be seen

for approximately four seconds.

### 3.      Timestamp 01:18:26–01:18:30 (Ms. DiSalvo's and Ms. Bowling's True Names)

A few seconds later, Ms. Ballard continues, "but [the matches] just keep coming," and the

Film cuts to a close-up of Ms. Ballard's genetic matches on 23andMe.  Many of the matches are

again blurred, but Ms. Bowling's and Ms. DiSalvo's are not.  Ms. Bowling's and Ms. DiSalvo's

names, their profile pictures, and the words "Half Sister" again appear unblurred. Ms. DiSalvo's

and Ms. Bowling's names can be seen for approximately four seconds.

### 4.      The Trailer for *Our Father*

Timestamp 01:18:20–01:18:24, which shows Ms. Bowling's and Ms. DiSalvo's names, was

included in a trailer for *Our Father* (the "Trailer").  On April 14, 2022, the Twitter and Facebook

accounts for RealHouse posted the Trailer with the caption "We've got the chills. The unimaginable rocked this small town by revealing over 90 siblings and counting...watch as one fertility doctor's sinister secret unfolds in #OurFather, on @Netflix May 11." (Filing No. 203-1; Filing No. 203-6.) The Twitter post was viewed 39,900 times, and the Facebook post was viewed 575,000 times (Filing No. 203-1; Filing No. 203-6). The TikTok account for RealHouse also posted the Trailer, which was viewed 7,700,000 times[9] (Filing No. 203-7; Filing No. 203 at ¶ 9). Also on April 14, 2022, the Twitter account for Jason Blum, the founder of RealHouse ("Mr. Blum"), posted the Trailer with the caption, "A small town, one doctor, over 90 siblings... and counting. My jaw is on the floor and I think yours will be too." (Filing No. 203-2). Mr. Blum's Twitter post was viewed 7,875 times. *Id.* The same day, Netflix posted the Trailer on its Twitter and Facebook accounts with the caption, "A top fertility doctor had a sickening secret: he was using his own sperm. Decades later, his 'children' band together to pursue justice." (Filing No. 203-3; Filing No. 203-4). Netflix's Twitter post was viewed 1,900,000 times, and its Facebook post was viewed 46,000 times (Filing No. 203-3; Filing No. 203-4). On April 25, 2022, Netflix re-posted the Trailer on Facebook with the same caption (Filing No. 203-5). The April 25, 2022 post was viewed 266,000 times. *Id.*

**5.    Release of *Our Father* and Blurring of Plaintiffs' Names**

In the original version of *Our Father*, released on May 11, 2022, all three Plaintiffs' names were visible. Ms. Kennard's name was visible until it was blurred on May 18, 2022, by which time 14,762,628 people had watched over ninety percent of the Film (Filing No. 199-7 at 3). By the time Ms. DiSalvo's and Ms. Bowling's names were blurred on May 23, 2022, 18,010,187 people

---

[9] The image of the TikTok post itself does not show the date it was posted, but the designated evidence indicates it was made on April 14, 2022 (Filing No. 200-8 at 1 ("The trailer is doing great on our TikTok! As of right now, our post has 5M views, 638.5K likes, and 4.6k comments (and counting!)").

had watched over ninety percent of the Film.  *Id.*  According to a Twitter post by Mr. Blum, the

Film was the "Number 1" movie on Netflix as of May 12, 2022 (Filing No. 197 at 35).

On May 12, 2022, a RealHouse executive explained that the computer shown at timestamp

00:17:03–00:17:04, which showed Ms. Kennard's name, should not have shown any names:

> [O]n our master we have inhouse . . . there is a shot of a computer at 16:59. The
> shot in our master has been blown up or re-positioned, so that you can't read the
> screen. However, when you look at what Netflix is airing, that shot is no longer
> blown up, so that some names are visible on the left hand side of the screen, which
> we were not supposed to show.
>
> We are going to need to replace that shot and send as a patch to Netflix, I am
> reaching out to [an employee] at Netflix to alert him.

(Filing No. 201-1 at 1).

After the Film's release, Ms. DiSalvo "had people reach out saying they did see it," and

"[f]riends that she talked to later" told her that they saw her name in the Film (Filing No. 193:25,

194:23).  Ms. DiSalvo could only name two people whom she knew had seen her name, but both

of those people did or might have already known about her relation to Dr. Cline.  *Id.* at 194:4–

195:2 (stating no one texted her "out of the blue" to say they had learned about her identity as a

Secret Child).  Neither Ms. Bowling nor Ms. Kennard could identify any individual who first

learned about their relation to Dr. Cline through the Film.  (Filing No. 185-15 at 144:2–8; Filing

No. 185-9 at 116:12–19.)  At least one deponent saw Ms. Bowling's name in the Film, though that

person already knew that Ms. Bowling was a Secret Child (Filing No. 201-9 at 76:17–77:14).[10]

---

[10] Plaintiffs cite messages from other individuals who claim they, or people they know, saw Ms. DiSalvo's or Ms.
Bowling's names (Filing No. 208 at 12–13).  However, these messages are inadmissible hearsay.

**F.**     **Procedural History**

In May and June 2022, Plaintiffs filed three separate state court actions against Defendants.[11]  Plaintiffs each asserted five counts against Defendants: (I) Public Disclosure of Private Facts; (II) Deception[12] under the Crime Victim's Relief Act ("CVRA"), Ind. Code § 35-43-5-3, *as repealed by* P.L.174-2021, SEC.45, eff. July 1, 2021; (III) Intentional Infliction of Emotional Distress ("IIED"); (IV) Identity Deception under the CVRA; and (V) Theft under the CVRA.  Defendants removed all three actions to this Court, and the cases were consolidated under the above caption (Filing No. 27).

In December 2022, Defendants moved for judgment on the pleadings (Filing No. 61).  The Court granted the motion as to Counts IV and V (identity deception and theft), but denied the motion as to Counts I, II, and III (public disclosure, deception, and IIED) (Filing No. 155).

After months of vigorous discovery, Defendants filed the instant Motion for Summary Judgment as to Plaintiffs' remaining claims (Filing No. 183).  In November, Plaintiffs filed their response in opposition, and Defendants filed their reply.  The Court heard oral argument on the Motion on March 13, 2024 (Filing No. 257).

**II.**     **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d

---

[11] *Jane Doe v. Netflix, Inc.*, Cause No. 49D01-2205-PL-017068 (Marion Sup. Ct.) (filed May 21, 2022); *Janet Roe v. Netflix, Inc.*, Cause No. 49D11-2205-PL-017080, (Marion Sup. Ct.) (filed May 21, 2022); *Janice Coe v. Netflix, Inc.*, Cause No. 32D04-2206-PL-000073 (Hendricks Sup. Ct.) (filed June 20, 2022). Plaintiff filed these actions anonymously, but in light of recent precedent, Plaintiffs disclosed their true names (Filing No. 264). While the parties' briefs use Plaintiffs' pseudonyms, the Court uses Plaintiffs' true names in this Order.

[12] Only Ms. Bowling and Ms. DiSalvo assert Deception claims under the CVRA (Filing No. 177 at 5).

487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).  "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.    DISCUSSION

Defendants argue they are entitled to summary judgment on Count One: public disclosure of private facts, Count Two: Crime Victim's Relief Act-Deception, and Count Three: Intentional Infliction of Emotional Distress, because Plaintiffs cannot satisfy all elements of those claims. Defendants also argue that Plaintiffs cannot carry their burden of proving punitive damages. Alternatively, Defendants argue that all of Plaintiffs' claims are barred by the First Amendment.

19

The Court will address each of Plaintiffs' claims, Plaintiffs' request for punitive damages, and then Defendants' First Amendment arguments.  The Court will also briefly address Plaintiffs' request to deem Defendants' defenses waived.

## A.       Public Disclosure of Private Facts

In Indiana, 'invasion of privacy' encompasses intrusion upon seclusion, appropriation of likeness, false-light publicity, and public disclosure of private facts.  *See Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 380 (Ind. 2022).  Count I of Plaintiffs' Complaints alleges that Defendants publicly disclosed their private status as Secret Children of Dr. Cline.  To succeed on a public-disclosure claim under Indiana law, Plaintiffs must show that Defendants disclosed information: (1) that is private; (2) to the public; (3) that would be highly offensive to a reasonable person; and (4) that is not of legitimate public concern.  *McKenzie*, 185 N.E.3d at 382.  Defendants argue Plaintiffs cannot satisfy the first two elements because they failed to keep their relation to Dr. Cline private, and because Defendants did not publicize Plaintiffs' identities as Secret Children.

### 1.       Whether Plaintiffs' Identities as Secret Children Were Private

To succeed on a public-disclosure claim, the plaintiff must show the information disclosed was privately held.  "[I]f the information is left 'open to public inspection' or if 'the defendant merely gives further publicity to information about the plaintiff that is already public,' this element is not satisfied."  *McKenzie*, 185 N.E.3d at 382 (quoting Restatement (Second) of Torts § 652D cmt. b).  Defendants argue that all three Plaintiffs failed to keep their identities as Secret Children private through their use of 23andMe and their participation in the Facebook Group.  Defendants also argue that Ms. DiSalvo and Ms. Bowling further failed to keep their identities private through their attendance at the Podcast Event and Ms. Huff's Facebook post, and that each Plaintiff made additional disclosures that show their identities as Secret Children were not private.

20

### a.   Ms. DiSalvo

Defendants first argue that none of the Plaintiffs kept their connection to Dr. Cline "private" because they shared that information to thousands of people on 23andMe.  However, based on the record before the Court, there is no evidence that all of Plaintiffs' genetic matches on 23andMe could see their relation to their half-siblings.  The evidence shows that a genetic match could see Plaintiffs' name, picture, and their estimated relation to that genetic match.  Only Plaintiffs' half-siblings and the few "connections" with whom Plaintiffs chose to share their full genetic test results could see Plaintiffs' half-siblings.  Defendants still argue that Plaintiffs "did not have any expectation of trust" with their newfound half-siblings (Filing No. 184 at 28).  But Defendants do not cite any evidence that Plaintiffs had no expectation that their half-siblings would maintain their privacy.  To the contrary, the rules of the Secret Children's Facebook Group show that the Secret Children all expected the others to keep the others' identities private, absent their permission.

Defendants likewise have not cited any authority to support their argument that information is not "private" if it is shared with newfound family members.  The Restatement (Second) of Torts does not distinguish between family that a plaintiff has known for years and family she has known for days—it applies to "family."  Restatement (Second) of Torts § 652D.  It is reasonable to expect that family members will respect each other's privacy because they have a special relationship as family, and Defendants have offered no authority showing otherwise.  For these reasons, and for the reasons explained in the Court's Order on Defendants' Motion for Judgment on the Pleadings (Filing No. 155 at 9–10), the Court finds that Plaintiffs did not fail to keep their connection to Dr. Cline private through their use of 23andMe.

Defendants next argue that Plaintiffs failed to keep their identities private by participating in the private Facebook Group. Defendants specifically argue that the Facebook Group was "uncontrolled," and Plaintiffs continued to be members of the Group "even though Plaintiffs found

many of the members untrustworthy." (Filing No. 184 at 30–31.)  The Court disagrees.  Although Plaintiffs acknowledged that the other Facebook Group members *could have* disclosed the other members' identities, there is evidence supporting Plaintiffs' position that they reasonably expected the Group members to keep that information confidential—namely, evidence that Group members were expected to follow strict privacy rules as a condition to joining the Group (Filing No. 208 at 23–24; Filing No. 185-7 at 121:9–17, 145:23–146:4; Filing No. 202-18; Filing No. 202-19 at 13:10–13, 62:3–10, 64:23–65:2, 66:13–67:15); *see Multimedia WMAZ, Inc. v. Kubach*, 443 S.E.2d 491, 710 (Ga. Ct. App. 1994) ("Although there was testimony that plaintiff did not explicitly tell his friends and family not to tell anyone else, there was also testimony that they understood that plaintiff's condition was not something they would discuss indiscriminately.").  After a Group member identified Ms. DiSalvo as a Secret Child to Mr. Petrella, Ms. DiSalvo did not believe that the Group member had violated her trust because she thought that the Film would not disclose her name without her permission (Filing No. 185-7 at 146:5–147:10 ("I was told my privacy was in good hands.")).  And even after the Film was released, Ms. Ballard assured Ms. Kennard that she did not intend for the Film to display her name (Filing No. 185-1 at 30 ("I am so sorry your name was visible. I did not know or I would have said something.")).  Drawing all reasonable inferences in Plaintiffs' favor, the Court cannot conclude as a matter of law that Plaintiffs failed to keep their identities as Secret Children private by joining or remaining in the Facebook Group.

Next, Defendants argue that Ms. DiSalvo and Ms. Bowling publicized their connection to Dr. Cline by attending the Podcast Event (Filing No. 184 at 29).  But neither Ms. DiSalvo nor Ms. Bowling shared their relation to Dr. Cline at the event.  They were shown in photographs from the event, but those photographs do not identify them as Secret Children (Filing No. 185-3 at 81).  The evidence likewise does not demonstrate that Ms. DiSalvo or Ms. Bowling failed to keep their

identities private because Ms. Huff posted on Facebook about Dr. Cline.  The evidence is not clear
as to how many people or who exactly saw the post.  Ms. Huff testified only "close friends and
family" would have seen her post (Filing No. 185-12 at 9).  The evidence also does not establish,
beyond genuine dispute, that Ms. Huff's Facebook post disclosed that Dr. Cline is Ms. DiSalvo and
Ms. Bowling's father.  Drawing all reasonable inferences in favor of Ms. DiSalvo and Ms. Bowling,
the Court cannot conclude as a matter of law that Ms. DiSalvo or Ms. Bowling failed to keep their
identity private because of their mother's Facebook post.

Even though Ms. DiSalvo did not fail to keep her identity as a Secret Child private by using
23andMe, joining the Facebook Group, attending the Podcast Event, or via Ms. Huff's Facebook
post, the Court agrees with Defendants that her additional disclosures fall outside a clear and
identifiable "zone of privacy."  (Filing No. 155 at 9.)  Ms. DiSalvo disclosed her identity (and Ms.
Bowling's identity) to Ms. Ganote and to Ms. Hudson's podcast.  Ms. DiSalvo argues that Ms.
Ganote never reported Ms. DiSalvo's name, and her name never appeared on Ms. Hudson's
podcast, but the fact remains that Ms. DiSalvo voluntarily disclosed her identity to two people with
whom she had no connection and whose job it is to report information to the public.  Ms. DiSalvo
also posted a photograph of herself, Ms. Bowling, and Matt White with asterisk tattoos for her
nearly five hundred Instagram followers to see.  At least ninety-six of those followers saw the post.
Although Ms. DiSalvo's tattoo and appearance with Matt White might not have disclosed her
identity as a Secret Child, her caption wishing "Happy #nationalsiblingsday" to her "75+" siblings
did (Filing No. 185-4 at 310).

Additionally, Ms. DiSalvo allowed her identity as a child of Dr. Cline to be disclosed in
the Film via photograph.  The Court does not consider whether Ms. DiSalvo's Release bars her
claim as a matter of law, as that issue is immaterial.  The material fact is that Ms. DiSalvo

voluntarily allowed filmmakers to identify her as a Secret Child in the Film via photograph. During her deposition, Ms. DiSalvo could not identify any private information that was disclosed by her name that was not also disclosed by her photograph (Filing No. 185-7 at 42):8–11 ("Q: What fact was disclosed about you by showing your name like that, that wasn't disclosed by showing your photograph? A: I don't know.")). Ms. DiSalvo alleges that she sought to keep her relation to Dr. Cline private, but that very fact was disclosed by the inclusion of her photographs in the Film.

Based on the facts that Ms. DiSalvo disclosed her relation to Dr. Cline to two unfamiliar media personalities, disclosed that she has "75+" siblings to her hundreds of social media followers, and allowed her identity as a Secret Child to be disclosed via photograph in the Film, no reasonable jury could conclude that Ms. DiSalvo kept her identity as a Secret Child private. The Court therefore **grants** Defendants' Motion as to Ms. DiSalvo's public-disclosure claim.

### b.   Ms. Bowling

Defendants argue that Ms. Bowling failed to keep her identity as a Secret Child private for many of the same reasons as Ms. DiSalvo (Filing No. 184 at 27–32). The Court has already explained why Plaintiffs did not fail to keep their identities private by using 23andMe or remaining in the Facebook Group, and why neither Ms. DiSalvo nor Ms. Bowling failed to keep their identities private by attending the Podcast Event or via Ms. Huff's Facebook post. And while Ms. DiSalvo shared Ms. Bowling's identity with media personalities, the designated evidence does not show that Ms. Bowling knew about or consented to those disclosures.

Ms. Bowling did refer to her relation to Dr. Cline on Instagram, but her post is distinguishable from Ms. DiSalvo's post. Whereas, Ms. DiSalvo's post showed her, Ms. Bowling, and Matt Smith with asterisk tattoos and, more importantly, explicitly disclosed the existence of her "75+" siblings, Ms. Bowling's post merely showed an arm being tattooed. Ms. Bowling's caption is also much vaguer than Ms. DiSalvo's caption: "This life is a crazy ride. Here for it.

[tagging Ms. DiSalvo] #sisterstar #theasterisk." ([Filing No. 185-6 at 357.](#))  Neither the photograph nor the caption identifies Ms. Bowling as a Secret Child.  On reply, Defendants contend "it is well known that Cline's children have decided to get this asterisk tattoo" ([Filing No. 215 at 10](#) n.4), but Defendants offer no admissible evidence supporting that argument.  Defendants' links to online news articles and podcast episodes were not properly designated, and Defendants do not explain how those articles or episodes are admissible.  Defendants' designated evidence partially undercuts their argument, as it indicates that even some of the Secret Children did not know what the asterisk represented ([Filing No. 185-4 at 324](#) (asking "What is the concept behind using a [*sic*] asterisk tattoo")).

Drawing all inferences in Ms. Bowling's favor, a genuine issue of material fact exists as to whether Ms. Bowling kept her identity as a Secret Child private.  Summary judgment is **denied** on Ms. Bowling's public-disclosure claim.

### c.   <u>Ms. Kennard</u>

The undisputed material facts likewise do not show that Ms. Kennard failed to keep her identity as a Secret Child private.  Ms. Kennard kept her identity private despite her use of 23andMe and her participation in the Facebook Group.  Defendants fault Ms. Kennard for remaining in the Facebook Group "after a half-sibling [█████████] exposed her connection to Dr. Cline to a third-person," Ms. Thompson ([Filing No. 184 at 17](#)).  However, the evidence does not show that █████████ shared Ms. Kennard's identity without permission.  In October 2020, Ms. Kennard sent a message to █████████ stating "I haven't announced our situation on Facebook but I'm not necessarily hiding it either.  *If it comes up, you can mention that we are half sibs to the Thompsons*." ([Filing No. 185-1 at 43](#) (emphasis added).)  Ms. Kennard testified that she and █████████ "needed to tell" Ms. Thompson, and Ms. Kennard asked Ms. Thompson to keep her identity private ([Filing No. 195-1 at 23](#), 43; [Filing No. 185-15 at 67](#):11–69:8, 153:18–154:4).

Defendants also argue that Ms. Kennard did not consider her connection to Dr. Cline private and "told friends and half-siblings she was not 'hiding' her connection to Dr. Cline," citing statements that Ms. Kennard made to ███████ and Ms. Ballard (Filing No. 184 at 18).  This argument takes Ms. Kennard's statements out of context.  While Ms. Kennard told ███████ that she was not "necessarily hiding" her connection to Dr. Cline, she clarified that she had not "announced [her] situation on Facebook," either (Filing No. 185-1 at 43).  Then, after *Our Father* was released, Ms. Ballard sent a message to Ms. Kennard apologizing that her name had appeared (Filing No. 185-1 at 30).  Ms. Kennard, in accepting the apology, responded "It is what it is. Like I said in the group, I'm not hiding *but I'm not announcing it either*." *Id.* (emphasis added).  Ms. Kennard's two statements that she had neither announced nor hidden her identity does not show that she failed to keep her identity private.

Defendants lastly argue that Ms. Kennard shared her identity with more than one thousand "friends" on Facebook.  Despite Defendants' assertions that Ms. Kennard had 1,500 Facebook friends, they cite no supporting evidence.  But regardless of who saw the post, the post did not disclose that Ms. Kennard is a Secret Child.  It only reveals that her ancestry test results were "VERY interesting." (Filing No. 185-1 at 54.)  To anyone who did not already know that Ms. Kennard is a Secret Child, this statement would not disclose her identity.[13]  Ms. Kennard's only other disclosures were limited to two people—a maternal cousin and an acquaintance.

Despite Ms. Kennard's limited disclosures, a genuine issue of material fact exists as to whether Ms. Kennard kept her identity as a Secret Child private.  *See Kubach*, 443 S.E.2d at 493 (finding plaintiff did not fail to keep AIDS diagnosis private despite disclosing diagnosis to sixty

---

[13] Defendants' arguments that Ms. Kennard's reference to "VERY interest" ancestry results disclosed her identity as a Secret Child (Filing No. 184 at 29) but the Film did not (*id.* at 35–36) are incongruous.

"family, friends, medical personnel and members of his support group").  Summary judgment is **denied** as to Ms. Kennard's public-disclosure claim.

### 2.        Whether Defendants Publicized Plaintiffs' Identities

To satisfy the second element of their public-disclosure claim, Plaintiffs must show that Defendants gave "publicity" to their private information.  Mere publication is not enough.  *Z.D. v. Cmty. Health Network, Inc.*, 217 N.E.3d 527, 535–36 (Ind. 2023).  The Indiana Court of Appeals has explained that publicity "means that the information must be communicated in a way that either reaches or is sure to reach the public in general or a large enough number of persons such that the matter is sure to become public knowledge."  *McKenzie*, 185 N.E.3d at 382 (citing Restatement (Second) of Torts § 652D, cmt. a).  There is no "threshold number that constitutes 'a large number' of persons."  *Id.*  Disclosures made by a mass media entity generally satisfy the "publicity" threshold.  *See* Restatement (Second) of Torts § 652D, cmt. a (noting that disclosures made by media platforms presumptively give publicity considering their audience is generally the public at large).  Nevertheless, courts must consider the facts and circumstances of each case in determining whether the publicity element is satisfied.  *McKenzie*, 185 N.E.3d at 382.

To be entitled to summary judgment, Defendants "must demonstrate the absence of any genuine issue of material fact" that they communicated Plaintiffs' information in a way that "(1) did not reach the public or a large number of people such that the matter was sure to become public knowledge; *and* (2) was not sure—that is, not probable—to reach the public or a large number of people such that the matter was sure to become public knowledge."  *Z.D.*, 217 N.E.3d at 536 (emphasis added). Defendants argue that they did not give publicity to Plaintiffs' status as Secret Children by analogizing this case to several other cases.  Defendants also argue that "Plaintiffs could not identify a single person who learned of their connection to Dr. Cline through the Film," and the Film does not actually disclose that Plaintiffs are Dr. Cline's children (Filing No. 184 at

27

35).  In response, Plaintiffs argue that the publicity element is satisfied by the fact that over fifteen million people viewed the Film before Plaintiffs' names were blurred and that Defendants' cases are distinguishable (Filing No. 208 at 24).  The Court agrees with Plaintiffs in both respects.

The Film was made available to Netflix's more than two-hundred-twenty-million subscribers worldwide.[14]  Over fourteen million people watched at least ninety percent of the Film before Ms. Kennard's name was blurred, and over eighteen million people watched it before Ms. Bowling's and Ms. DiSalvo's names were blurred.  Millions more viewed the Trailer.  It is immaterial that Plaintiffs could not identify any specific individual who first learned of their relation to Dr. Cline through the Film because, as Defendants explain in their brief, "the proper test is not how many individuals the information is *published* to, the focus is on if the publication was done in a way that was sure to make that information public." (Filing No. 184 at 33 (emphasis in original).)  A reasonable jury could certainly conclude that Defendants' method of publication did, or was probable to, reach the public.

The Court is also wholly unpersuaded by Defendants' argument that the Film does not disclose Plaintiffs' relation to Dr. Cline.  The Film follows Ms. Ballard, a child of Dr. Cline, discovering Dr. Cline's other children on 23andMe.  The Film also discloses that Ms. Ballard is her mother's only child, clarifying who the shared parent is (Filing No. 63 at 00:05:16).  The very purpose of the Film is to uncover the extent of Dr. Cline's misdeed of fraudulently fathering children.  The Film leaves no room for confusion; it tells viewers that Ms. Ballard's "half-siblings" are Dr. Cline's children.

---

[14] As of December 31, 2021, Netflix had 221,844,000 paid memberships, and by December 31, 2022, that number had increased to 230,747,000 memberships. Netflix, Inc., Annual Report (Form 10-K) (Jan. 26, 2023), (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001065280/000106528023000035/nflx-20221231.htm); *see In re Guidant Cop. Secs. Litigation*, 536 F. Supp. 2d 913, 921 (S.D. Ind. 2008) (permitting judicial notice of SEC filings); (Filing No. 199-1 at 5, Answer to Interrogatory No. 6 ("Plaintiffs can obtain the information available to Netflix regarding the number of its subscribers from Netflix's public SEC filings.")).

Additionally, the fact that Plaintiffs' names appear on screen for "mere seconds" is not grounds for dismissal of their claims.  There is no evidence that the viewing public would have been unable to read Plaintiffs' names in just a few seconds.  Viewers were also able to pause, rewind, and rewatch the frames displaying Plaintiffs' names.

The Court further agrees with Plaintiffs that the cases cited by Defendants are distinguishable.  Defendants primarily rely on *Rubendall v. Community Hospital of Anderson and Madison Counties*, 202 N.E.3d 1151 (Ind. Ct. App. 2023).  Defendants argue that in *Rubendall*, the Indiana Court of Appeals found that transmitting information "over the radio in a way that was accessible to the general public . . . using 'freely available online software'" was not sure to reach the public or a large number of people.  (Filing No. 184 at 34.)  A closer reading of *Rubendall* shows that the facts are entirely distinguishable.  The defendant hospital in *Rubendall* used "an email-to-pager messaging system" to transmit patients' protected health information ("PHI") "using an unencrypted format over open radio airwaves."  202 N.E.3d at 1152–53.  A local news reporter received a tip that the hospital was transmitting PHI using open radio airwaves and began investigating. "The reporter purchased an SDR radio and used it to intercept the Hospital's transmissions . . . . Using freely available online software, the reporter was then able to decode the transmissions." *Id.* at 1136.  The reporter notified the plaintiff, Rubendall, that his PHI had been transmitted over radio, and the plaintiff sued the hospital for public disclosure of private facts.

The hospital in *Rubendall* moved for summary judgment, arguing that its use of the short-wave radio airwaves did not "publicize" the plaintiff's PHI.  Rubendall responded that the use of radio airwaves was "publicity *per se*," relying on *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34 (Minn. Ct. App. 2009).  In *Yath*, the plaintiff's private information was posted on a public webpage.  Even though the webpage was viewed by only a small number of people, the *Yath* court found that

the method of communication was sufficiently public, as it was "materially similar in nature to a newspaper publication or a *radio broadcast* because upon its release it is available to the public at large." *Id.* at 43 (emphasis added).  Rubendall argued that here, like in *Yath*, "'one is hard-pressed to imagine a more public disclosure than broadcasting information unencrypted over open radio airwaves.'" *Rubendall*, 202 N.E.3d at 1156.

 The Indiana Court of Appeals found that the methods of disclosure in *Rubendall* and *Yath* were "fundamentally different." *Id.* at 1157.

> As pointed out by the Hospital, one had to have a special radio and then take a separate step of downloading special software from the internet to decode the information the Hospital transmitted via short-wave radio airwaves. *This is quite different than a broadcast over traditional radio airwaves where members of the public can hear what is being broadcast with their car radio or home stereo systems.* The Hospital notes too that the transmission containing Rubendall's PHI *could be intercepted only at a precise moment in time and was not otherwise accessible outside of that moment.*

*Id.* (emphases added). For those reasons, the *Rubendall* court concluded that the hospital's transmission of PHI using unencrypted short-wave radio airwaves was not actionable.

 The *Rubendall* court's analysis and discussion of *Yath* explains why the Film *did* publicize Plaintiffs' identities.  The Film was available to Netflix's hundreds of millions of subscribers at home on their televisions, or anywhere on their computers, tablets, or phones.  The Trailer was also viewable to anyone with access to Twitter, Facebook, or TikTok.  And whereas the short-wave radio broadcast in *Rubendall* could be intercepted "only at a precise moment," the Film could be paused, rewound, and rewatched as many times as the viewer wanted.  In short, for all of the reasons the disclosure in *Rubendall* was *not* actionable, Defendants' disclosure in this case *is* actionable.

 In the other cases cited by Defendants, the methods of publication were distinguishable. *See Black v. Kelly*, 982 N.E.2d 360 (Table), 2022 WL 3972489 (Wis. Ct. App. 2022) (unpublished)

(finding no publicity where defendant uploaded an attachment page with a hyperlink to plaintiff's private information to a folder within a public website, where the attachment page could be found via internet search for plaintiff's name but could not be accessed through the website); *Howell v. Morrison Mgmt. Specialists, Inc.*, No. 10-CV-1587, 2013 WL 6568935, at *33 & n.21, *35 (N.D. Ala. Dec. 13, 2013) (dismissing invasion of privacy claim based on video uploaded to publicly accessible area of YouTube where there was no evidence as to how to find the video, the court was unable to find the video, there was no evidence anyone had seen the video or that the video was available elsewhere, the video was not in the record, and there was little evidence as to the video's contents); *Nyanjom v. NPAS Sols., LLC*, No. 21-CV-1171, 2022 WL 168222, at *5 (D. Kan. Jan. 19, 2022) (dismissing invasion of privacy claim in part because evidence showed that defendant only disclosed private information to a letter vendor, "not to the public at large or even beyond [the vendor's] computer to its employees"); *Bullock v. Am. Sec. Programs, Inc.*, No. 16-1645, 2017 WL 456429, at *3 (D.D.C. Feb. 2, 2017) (finding no "disclosure" where plaintiff's physical personnel file was left unattended and unsecured in a common area, but there was no evidence that anyone opened, looked inside, or read the file).

Defendants have failed to show that based on the undisputed material facts, the "medium used to communicate the information"—a Film advertised to, available to, and watched by millions of individuals—did not *and* was not probable to reach the public or a large number of people such that the matter was sure to become public knowledge. *Z.D.*, 217 N.E.3d at 536 (denying defendant's motion for summary judgment as to public-disclosure claim). The Court therefore **denies** summary judgment as to Ms. Bowling and Ms. Kennard's public-disclosure claims.

**B.    Crime Victims Relief Act Deception**

Ms. DiSalvo and Ms. Bowling next allege deception under the CVRA. To succeed on their deception claim, Plaintiffs must show Defendants "knowingly or intentionally ma[de] a false or

misleading statement with the intent to obtain property." *NextGear Cap., Inc. v. Premier Grp. Autos LLC*, No. 20-cv-354, 2022 WL 1566808, at *5 (S.D. Ind. May 18, 2022) (citing Ind. Code § 35-45-5-3). Defendants argue Plaintiffs cannot succeed on this claim because they did not obtain anything from Plaintiffs other than Ms. DiSalvo's photographs (Filing No. 184 at 40). Defendants explain that they obtained Plaintiffs' names, 23andMe profile pictures, and relation to Dr. Cline from Ms. Ballard. *Id.* Defendants also argue Plaintiffs cannot recover for deception because they cannot show pecuniary harm. *Id.* at 41.

In response, Plaintiffs argue only: "Defendants offer no argument on why Plaintiffs' Subject Property, as defined in the Complaint does not constitute 'property' under Ind. Code § 35-31.5-2-254. Therefore Defendants' arguments about 'property' fail." (Filing No. 208 at 36 (citation omitted) (citing Filing No. 1-1 at ¶¶ 85, 112, defining "Subject Property" as "Plaintiffs' name, image, likeness, and story")). This argument is undeveloped and therefore waived. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002) (stating that where party fails to support position with any legal analysis or citation, the argument is waived); *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

Even if Plaintiffs' response were not waived, it does not address Defendants' main argument: that assuming Plaintiffs' names, images, likeness, and stories were "property" under § 35-31.5-2-254, Defendants did not obtain that "property" from Plaintiffs. The undisputed material facts confirm that Defendants obtained Plaintiffs' alleged "property" from Ms. Ballard, the only exception being Ms. DiSalvo's photographs, which are not actionable pursuant to the

Release (Filing No. 185-16 at 37:5–39:9).   Defendants have therefore carried their burden of

proving that Ms. Bowling and Ms. DiSalvo cannot succeed on their deception claim, and the Court

**grants** Defendants' Motion for Summary Judgment as to the deception claims.

**C.**     **IIED**

　　　　To succeed on a claim of IIED, a plaintiff must show the defendant: (1) engaged in extreme

and outrageous conduct that; (2) intentionally or recklessly; (3) caused; (4) severe emotional

distress to the plaintiff.   *Ali v. All. Home Health Care, LLC*, 53 N.E.3d 420, 433 (Ind. Ct. App.

2016).   "The requirements to prove this tort are rigorous."   *Westminster Presbyterian Church of*

*Muncie v. Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013) (quotation marks omitted).   In

discussing IIED claims, Indiana courts consistently quote the Restatement (Second) of Torts with

approval, which states:

> Liability has been found only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go beyond all possible bounds of decency,
> and to be regarded as atrocious, and utterly intolerable in a civilized community.
> Generally, the case is one in which the recitation of the facts to an average member
> of the community would arouse his resentment against the actor, and lead him to
> exclaim, "Outrageous!"

*Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 550 (Ind. Ct. App. 2015) (quoting

Restatement (Second) of Torts § 46 cmt. d (1965)).

　　　　Defendants argue that Plaintiffs cannot prove that Defendants acted with the requisite intent

or that their alleged damages are attributable to the Film, and that Defendants' right to publish the

allegedly "outrageous" matters depicted in the Film is protected by the First Amendment (Filing

No. 184 at 36–40).   The Court finds that Defendants' argument regarding outrageousness is

dispositive of Plaintiffs' IIED claims and will therefore address only that argument.

　　　　Defendants assert that Plaintiffs' IIED claims are based on Defendants' "outrageous,"

"blasphemous," "far-flung," and "disgusting" depiction of Dr. Cline in the Film, but Dr. Cline's

misdeeds are a matter of public concern, so Defendants' depiction of those misdeeds is protected by the First Amendment. *Id.* at 39. Plaintiffs respond that they do not seek to impose liability simply because of Defendants' depiction of Dr. Cline. "They instead seek compensation for the emotional harm they suffered from having their names and identities expressly associated with such a despicable film." (Filing No. 208 at 29.) Plaintiffs explain that because their "names and Defendants' decision to associate those names with their film were not 'matters of legitimate public concern,'" the First Amendment is inapplicable. *Id.* at 28.

To the extent Plaintiffs' IIED claims are based on Defendants' disclosure of their names and their relation to Dr. Cline, that information is not sufficiently extreme or outrageous to support an IIED claim. The act of truthfully identifying Dr. Cline's children in a documentary about Dr. Cline's fertility fraud, while offensive, is not the type of conduct that goes "beyond all possible bounds of decency," and is "utterly intolerable in a civilized community." *Bah*, 37 N.E.3d at 550. To the contrary, it is the very type of conduct that is expected of reporters and documentarians in our free and civilized society. The fact that Plaintiffs may have been harmed by Defendants' conduct does not change that conclusion.

The only arguably "outrageous" conduct by Defendants was their depiction of Dr. Cline as a "white supremacist, a member of an Aryan Clan, and a cult member." (Filing No. 208 at 2.) But because Dr. Cline and his misconduct are matters of public concern, Defendants' depiction of him and his actions is entitled to First Amendment protections. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (holding that speech on matters of public concern is entitled to protection under the First Amendment that cannot be overcome by a jury finding that the speech was "outrageous").

Defendants' conduct in revealing that Plaintiffs are Dr. Cline's children is not "extreme and outrageous," and Defendants' sickening depiction of Dr. Cline, his misconduct, and his motivations

are protected by the First Amendment.   The Court therefore **grants** Defendants' Motion for Summary Judgment as to Plaintiffs' claims for IIED.

**D.    Punitive Damages**

Defendants argue Plaintiffs cannot recover punitive damages for two reasons. First, "Plaintiffs have no evidence that Defendants acted negligently, [so] they cannot meet the heightened standard for punitive damages." (Filing No. 184 at 45.)  Plaintiffs respond that they can meet this standard, as the designated evidence shows that Defendants acted with conscious disregard for the harm they might cause Plaintiffs, and with knowledge or reckless disregard as to whether they were violating Plaintiffs' rights (Filing No. 208 at 36).

Under Indiana law, "[p]unitive damages may be awarded only if there is clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence, *or* oppressiveness which was not the result of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.'" *Williams v. Younginer*, 851 N.E.2d 351, 358 (Ind. Ct. App. 2006) (emphasis added) (quoting *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 520 (Ind. 1993)); *see also, e.g.*, *Hi-Tec Props., LLC v. Murphy*, 14 N.E.3d 767, 778 (Ind. Ct. App. 2014); *Westray v. Wright*, 834 N.E.2d 173, 180 (Ind. Ct. App. 2005) (citing *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137 (Ind. 1988)) (confirming gross negligence is a proper basis for an award of punitive damages.  The Indiana Supreme Court has defined "gross negligence" as a "conscious, voluntary act or omission in reckless disregard of . . . the consequences to another party." *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003) (omission in original) (quoting Black's Law Dictionary 1057 (7th ed. 1999)); *see Westray*, 519 N.E.3d at 137.

Defendants concede that Dr. Cline's misdeeds are "chilling" (Filing No. 184 at 11), and they recognized that the Film could harm Plaintiffs (Filing No. 200-2 at 30 (noting the Film could be "traumatizing" for Dr. Cline's children and victims); Filing No. 200-7 at 6–7 (describing story

of the Film as "super creepy" and "so crazy"); Filing No. 200-8 at 1 (describing "[t]op conversation themes" following the Trailer as "The jaw-dropping chilling subject matter" . . . . "Viewers are left with disgust" . . . . "People . . . expressing empathy by imagining themselves in a situation that would be their 'worst fear'"); Filing No. 200-10 at 2 ("[T]his is indeed a pretty nightmarish story."); *id.* (stating Netflix was "keeping an eye out for any threats against the main contributors and siblings"); Filing No. 200-2 at 2 (describing the Film as "triggering"); *id.* at 30 (identifying "challenge[]" of finding a balance between a marketing campaign that "hopes to expose Dr. Cline and one that relies too heavily on shock and awe"); *id.* (finding "opportunit[y]" in "isolat[ing] the most emotionally impactful moments"); Filing No. 200-3 at 6, 8 ("When real life feels exactly like a horror movie.")).

Defendants also knew that Secret Children who did not affirmatively opt to participate in the Film, even those who submitted photographs, wished to keep their names confidential.  A RealHouse employee was copied on Mr. Petrella's Facebook message promising anonymity, except with respect to the use of photographs (Filing No. 185-21 at 12). Regardless of whether Mr. Petrella was acting as an agent of RealHouse (or Netflix) when he made that promise, RealHouse indisputably knew that the Secret Children had been promised anonymity.  RealHouse employees were also copied on emails from Ms. Jourdan stating that as of July 2021, "all the siblings . . . want to remain anonymous," and another email stating that Ms. Kennard's name needed to be blurred (Filing No. 201-4 at 2; Filing No. 201-7 at 1).  Further, an executive for RealHouse represented to its insurer that RealHouse would not disclose any information about the Secret Children without a signed release or, at minimum, their permission (Filing No. 200-12 at 4).  Netflix also knew that the Secret Children were "fiercely protective" of their privacy and assured Mr. Petrella that it would "absolutely keep the names confidential." (Filing No. 200-14 at 1.)  Netflix even opted to blur

names in Ms. Ballard's 23andMe family tree just "to be extra safe," despite Ms. Jourdan stating the blurring might not be necessary "[g]iven the film went through a deep legal pass." (Filing No. 201-8 at 1.)

The designated evidence further shows that Defendants did not take appropriate steps to determine whether Plaintiffs' names should have been blurred in the first place, despite knowing that Plaintiffs wished to remain anonymous and recognizing the harm that the disclosure of their identities might cause.  Defendants emphasize that Mr. Wickers reviewed the Film and advised that Plaintiffs' names did not need to be redacted.  However, the designated evidence shows that the clearance log created by RealHouse did not include the scenes displaying Plaintiffs' names (Filing No. 112; *see* Filing No. 185-18 at 198:13–18).  Mr. Wickers' legal opinion letter likewise did not address the legalities of disclosing Plaintiffs' names; it only addressed the Secret Children who "appear on camera" who "all released and voluntarily disclosed their experiences." (Filing No. 202-15.)

On reply, Defendants argue that Mr. Wickers "specifically testified that he reviewed 'many cuts of the film' with Plaintiffs' names in it and chose not to identify the names in the clearance logs for blurring or removal because he felt—and feels today—the names should not create liability for the Defendants." (Filing No. 215 at 22.)  That is not what Mr. Wickers stated. Mr. Wickers testified that he was asked to review "many cuts of the film," but he did not state whether he reviewed cuts with Plaintiffs' names in it (Filing No. 215-7 at 103:18–25)  He testified that he did and does believe "that the three plaintiffs do not have a viable invasion of privacy claim under Indiana law" and he does not believe "it's legally required that their names be blurred," *id.* at 97:13–20, but he did not testify that he "chose" not to name Plaintiffs in the clearance log for that reason. *Id.* at 97:8–12.  There is no evidence that RealHouse itself took any steps to determine whether

Plaintiffs' names should have been redacted from the Film, or to ensure that Mr. Wickers determined whether Plaintiffs' names should have been blurred.

Netflix concedes that it "had nothing to do with the creation or use of the clearance logs" and relied entirely on RealHouse's obligation to work with Mr. Wickers (Filing No. 215 at 21). Given Netflix's knowledge that the Secret Children were incredibly protective of their identities, and the potential harm that their disclosure could cause due to the nature of the Film, there is a genuine issue of material fact as to whether Netflix acted with reckless disregard for Plaintiffs by "simply passing the buck" to RealHouse. Further, there is evidence that Netflix may not have even taken care to air the version of the Film that RealHouse prepared, which resulted in the disclosure of certain names, including Ms. Kennard's name, that the Film "was not supposed to show" (Filing No. 201 at 1).

There is also a material dispute of fact that Defendants did not seriously regard the consequences of their failure to assure that all appropriate names were blurred. Upon learning that a clip of the Film had shown "a name . . . that didn't get cleared," a Netflix employee responded "OMG LOL." (Filing No. 200-9 at 2.) Based on the undisputed material facts, when drawing all reasonable inferences in Plaintiffs' favor, a reasonable jury could find that Plaintiffs' have shown by clear and convincing evidence that Defendants acted with reckless disregard.

Second, Defendants assert "the First Amendment prevents recovery of [punitive] damages because Plaintiffs have not established that Defendants acted with 'actual malice,'" citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974). This argument is perfunctory and therefore waived. *M.G. Skinner & Assocs. Ins. Agency, Inc.*, 845 F.3d at 321; *Boomer*, 309 F.3d at 422 n.10; *Lanzotti*, 205 F.3d at 957. But even so, Defendants' reliance on *Gertz* is improper. In *Gertz*, the Supreme Court held that the protections of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), extended

38

to speech concerning a public issue.  However, in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), a plurality of the Supreme Court held that the protections of *New York Times* did not apply to speech involving no matters of concern, and "the state interest in providing remedies for defamation . . . adequately supports awards of presumed and punitive damages—even absent a showing of 'actual malice.'"  *Id.* at 761; *see Counterman v. Colorado*, 600 U.S. 66, 111 (2023) (Barrett, J., joined by Thomas, J., dissenting) ("A private person need only satisfy an objective standard to recover actual damages for defamation.  And if the defamatory speech does not involve a matter of public concern, she may recover punitive damages with the same showing." (citations omitted) (citing *Gertz*, 418 U.S. at 347–50, and *Dun & Bradstreet, Inc.*, 472 U.S. at 760–61)).

Plaintiffs' names are not matters of public concern (Filing No. 155 at 12), so they are not required to prove actual malice to recover punitive damages.  Genuine disputes of material facts exist as to whether Defendants acted with reckless disregard for the consequences of their improper disclosure of Plaintiffs' names.  The Court therefore **denies** Defendants' Motion for Summary Judgment as to Plaintiffs' claims for punitive damages.

**E.**   **First Amendment**

Defendants alternatively argue that Plaintiffs' claims are all barred by the First Amendment to the United States Constitution and Article I, Section 9 of the Indiana Constitution (Filing No. 184 at 42–39).  Plaintiffs respond that this argument is misplaced, since "the applicable First Amendment principles are wrapped into the elements of each of Plaintiffs' claims." (Filing No. 208 at 30; *see* Filing No. 155 at 10 ("The fundamental function of the newsworthy element is to ensure that a defendant's First Amendment rights are properly weighed against the plaintiff's privacy interest.")).  The Second Restatement of Torts notes that "[i]t has not been established with certainty that liability of this nature is consistent with the free-speech and free-press provisions of

the First Amendment to the Constitution."  Restatement (Second) of Torts § 652D, Special Note

on Relation of § 652D to the First Amendment to the Constitution.  The Court therefore addresses

Defendants' First Amendment arguments.

"To determine if the publication of truthful information can be prohibited, courts balance

the purportedly newsworthy value of the private information against both the degree it was actually

disclosed by the defendant, and the extent to which the plaintiff previously disclosed the

information herself." (Filing No. 184 at 42 (citing *Shulman v. Grp. W Prods., Inc.*, 955 P.2d 469,

484 (Cal. 1998); *Sipple v. Chronicle Pub. Co.*, 201 Cal. Rptr. 665, 669 (Cal. Ct. App. 1984))).

"Ordinarily the evaluation and comparison of offensiveness and newsworthiness would be, like

other questions of the application of a legal standard to the facts of a particular case, matters for a

jury, not for a judge on a motion for summary judgment."  *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d

1222, at 1233–34 (7th Cir. 1993).  However, a court may award summary judgment "when on the

basis of the evidence obtained in pretrial discovery no reasonable jury could render a verdict for

the plaintiff."  *Id.*

Defendants contend that the balance of intrusiveness and newsworthiness weighs in their

favor, and summary judgment is appropriate, for three reasons.  First, "the 'degree of intrusion'

here is exceedingly minimal" because "[n]o one learned about the Plaintiffs' connection to Cline

by watching the Film."  (Filing No. 184 at 43.)  The Court disagrees.  The method by which

Defendants intruded on Plaintiffs' privacy allowed hundreds of millions of people worldwide to

see their names in the Trailer and in the Film.  Additionally, Defendants have not shown that "no

one" learned about Plaintiffs' relation to Dr. Cline through viewing the film.  As the Court has

previously explained, the designated evidence shows only that Plaintiffs could not identify a

specific individual who first learned about their relation to Dr. Cline through the Film (Filing No. 201-9 at 76:17–77:14).

Second, Defendants argue that "'the information revealed' is flashed for mere seconds and was information that Plaintiffs shared with thousands of people." (Filing No. 184 at 43). As the Court has explained, Plaintiffs did not share their connection to Dr. Cline with "thousands" of people on 23andMe, and Ms. Bowling and Ms. Kennard did not share that information on social media. Further, the fact that Plaintiffs names were only "flashed" in the Film does not show that Defendants' intrusion was not sufficiently extreme. There is no evidence that Plaintiffs' names and the description "half-sibling" could not be read in "mere seconds." Further, viewers of the Trailer and the Film could pause, rewind, rewatch, and photograph the frames displaying Plaintiffs' names, making Defendants' disclosures less fleeting than they describe.

Third, Defendants argue that "[t]he use of Plaintiffs' names was part of the filmmakers' consistent effort to ensure that the documentary had sufficient truthful, factual information so the audience would understand the effect Dr. Cline's actions had on real people." (Filing No. 184 at 43–44.) There are several cases in which courts have held that individual plaintiffs' private information was substantially relevant to a newsworthy topic "because [it] strengthen[ed] the impact and credibility of [a news] article" and was therefore not actionable under the First Amendment. *Gilbert v. Med. Econ. Co.*, 665 F.2d 305, 308 (10th Cir. 1981).

In *Gilbert*, an article described an alleged breakdown in the evaluation of a doctor's fitness and malpractice problems, purportedly resulting from inadequate policing of medical personnel. 665 F.2d at 306. To demonstrate this inadequacy, the article discussed the plaintiff's history of psychiatric and related personal problems and revealed her name and photograph. *Id.* The Tenth Circuit Court of Appeals found that these private details were "substantially relevant to a

newsworthy topic because they strengthen the impact and credibility of the article" and "obviate any impression that the problems raised in the article are remote or hypothetical, thus providing an aura of immediacy and even urgency that might not exist had plaintiff's name and photograph been suppressed." *Id.* at 308.

In *Ross v. Midwest Communications, Inc.*, a documentary questioned the guilt of a man convicted of rape, and "[t]o make its case, the documentary spelled out the details of several rapes." 870 F.2d 271, 271 (5th Cir. 1989). The documentary used one of the victim's real first name and picture. The victim argued that even if the details of her rape were newsworthy, her name and photograph were not. The Fifth Circuit Court of Appeals disagreed and held that the victim's identifying information was newsworthy because "[c]ommunicating that this particular victim was a real person with roots in the community, and showing [the broadcaster's] knowledge of the details of the attack upon her, were of unique importance to the credibility and persuasive force of the story." *Id.* at 274–75. But the *Ross* court clarified that its holding was "narrow," explaining that its decision left open "the possibility that the rape victim's name may be irrelevant when the details of the rape victim's experience are not so uniquely crucial to the story as they are in this case, or when the publisher's 'public concern' goes to a general, sociological issue." *Id.* at 275.

In *Wilkins v. National Broadcasting Co., Inc.*, cited by Defendants (Filing No. 184 at 44), a *Dateline NBC* news report investigated the then-growing practice of charging for services on so-called "toll-free" phone lines without the knowledge of the person being billed. 84 Cal. Rptr. 2d 329, 341 (Cal. Ct. App. 1999). The company SimTel Communications programmed and leased several 800 and 900 phone lines and sold them to investors. Two *Dateline* producers posed as potential investors and met with SimTel representatives Steve Wilkins and Thomas Scott. The producers videotaped their meeting, and portions of the meeting aired on *Dateline*. The California

Court of Appeals held that Wilkins' and Scott's names, likenesses, and voices, and the fact that they worked for SimTel, were of legitimate public interest.   "'It is difficult to see how the subject broadcast could have been edited to avoid completely any possible identification without severely undercutting its legitimate descriptive and narrative impact.'"   *Id.* at 340–41 (quoting *Shulman*, 955 P.2d at 489).  The use of Wilkins' and Scott's identifying information "showed who was making the presentation" about the "toll-free" numbers, "what they were saying, and how they were saying it. . . . It turned an abstract story into something the public could more readily understand by making it more concrete."  *Id.* at 1086.

And in *Howard v. Des Moines Register & Tribune Co.*, also cited by Defendants ([Filing No. 184 at 44](#)), the article at issue focused on the forced sterilization of the plaintiff while she was a resident of a county home.  283 N.W.2d 289, 303 (Iowa 1979).  The article identified the plaintiff by name. The Iowa Supreme Court held that this information "was closely related to the subject matter of the news story," which focused on "maladministration and patient abuses" at the county home.  *Id.* The *Howard* court further explained that "[i]n the sense of serving an appropriate news function, the disclosure contributed constructively to the impact of the article.  It offered a personalized frame of reference to which the reader could relate, fostering perception and understanding. Moreover, it lent specificity and credibility to the report."  *Id.*

All of the above cases are distinguishable from this case.  *Our Father*, unlike the reports in the above cases, featured testimonials from eleven affected individuals (eight Secret Children and three former patients), all of whom agreed to be identified in the Film.  The Film also displayed baby photographs and recent photographs of many more Secret Children who, again, all agreed to have those photographs displayed in the Film.  This is not a case in which Plaintiffs' names were clearly needed to lend credibility or authenticity to the Film's story.

RealHouse conceded that none of the Plaintiffs were "key participants" in the Film (Filing No. 78-1 at 228:20–229:10).  Mr. Petrella, who is a producer and artist, testified that as a creator and producer, he did not need to show every sibling's name "in order to procure the art that [he] wanted to deliver" (Filing No. 78-2 at 115:9–21).  The Film's director agreed that not all of the sibling's names were needed.  (Filing No. 78-21 at 91:14–24.)  Mr. Petrella specifically testified that *Our Father* did not need any of the Plaintiffs' names to retain its intended impact or artistic value.  *Id.* at 115:23–117:4, 349:9–350:2.  And Ms. Jourdan only asserted that "multiple names were needed" to show "the breadth of damage done" by Dr. Cline; she did not state that Ms. DiSalvo's, Ms. Bowling's, or Ms. Kennard's names were needed.  *Id.* at 92:4–93:24.  To the contrary, at one point, Ms. Jourdan instructed that Ms. Kennard's name be blurred (Filing No. 201-7 at 1).  Email statements from RealHouse further show that Ms. Kennard's name was never supposed to appear in the Film (Filing No. 201-1 at 1).  The fact that many of the Secret Children's names were blurred in the as-released version of the Film weakens any argument that Plaintiffs' names were substantially related to the Film's topic.  The fact that Defendants only showed Plaintiffs' names for "mere seconds" further undercuts their argument that Plaintiffs' names are so important to the Film that their disclosure must be protected by the First Amendment (Filing No. 208 at 31).

Based on the facts and circumstances of this case, including the intrusiveness into Plaintiffs' privacy and the newsworthiness of their identities, the Court cannot conclude as a matter of law that Plaintiffs' claims are barred by the First Amendment.  Whether Defendants had a constitutional right to disclose Plaintiffs' identities in the manner that they did is a question for the jury.

Defendants also argue that Plaintiffs cannot prove Defendants' negligence, as required by the First Amendment (Filing No. 184 at 44).  For the reasons explained in the Court's discussion of punitive damages, Plaintiffs are not unable to show Defendants acted with negligence.

Accordingly, the Court **denies** summary judgment on the basis of First Amendment protections.

## F.   Defendants' Affirmative Defenses

Plaintiffs ask the Court to deny Defendants' Motion for Summary Judgment because they failed to file a statement of defenses, as required by the Case Management Plan, and have therefore waived their defenses (Filing No. 208 at 38).  On reply, Defendants argue that it was not required to file a statement of defenses as to any defense which it carries the burden of proof, and Defendants have not asserted any affirmative defenses in their Motion (Filing No. 215 at 23–24).  The Court acknowledges that the Case Management Plan does not clarify whether a statement of defenses must be filed as to only affirmative defenses or all defenses.  In any event, this Court has not consistently found waiver based on a failure to file a statement of claims or defenses.  *See Parker v. Brooks Life Science, Inc.*, No. 19-cv-4796, 2021 WL 3140768, at *9 (S.D. Ind. July 26, 2021) (listing cases).  In the absence of any prejudice to Plaintiffs, the Court declines to deny Defendants' Motion on the basis of waiver.

## IV.   CONCLUSION

For the reasons explained in this Order, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment (Filing No. 183).  Summary judgment is **granted** as to Ms. DiSalvo's claim for Public Disclosure of Private Facts, Ms. Bowling and Ms. DiSalvo's claims for Deception under the CVRA, and Plaintiffs' claims for Intentional Infliction of Emotional Distress. These claims are **dismissed with prejudice**.

Summary judgment is **denied** as to Ms. Bowling and Ms. Kennard's claims for Count One: Public Disclosure of Private Facts, and these claims **shall proceed**.  The Court further **denies** Summary judgment as to punitive damages concerning Ms. Bowling and Ms. Kennard.

The **Clerk is directed** to terminate Defendant Laura DiSalvo as a party in this action. No final judgment will issue at this time.

Pursuant to the Court's Order on Motion to Consolidate (Filing No. 27), the parties are **ORDERED** to file any motion to sever claims for trial pursuant to Federal Rule of Civil Procedure 42(b) within **fourteen (14) days** of this Order.

Because of the nature of some of the matters in this Order, this Order shall be **docketed as a SEALED order**, accessible only to the Court and the parties.  The parties are **ORDERED** to confer and agree on a redacted version of this Order that can be filed on the public docket within **fourteen (14) days** of this Order.

Magistrate Judge Dinsmore is requested to hold a status conference to discuss settlement and trial readiness.

**SO ORDERED**.

Date:  9/30/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIUTION:

Matthew Thomas Ciulla
MACGILL PC
matthew.ciulla@macgilllaw.com

Robert D. MacGill
MACGILL PC
robert.macgill@macgilllaw.com

Andrea Roberts Pierson
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
andrea.pierson@faegredrinker.com

46

Blanca Young
MUNGER, TOLLES & OLSON LLP
blanca.young@mto.com

Brad Dennis Brian
MUNGER, TOLLES & OLSON LLP
brad.brian@mto.com

J. Benjamin Broadhead
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
ben.broadhead@faegredrinker.com

Jesse Feitel
DAVIS WRIGHT TREMAINE LLP
jessefeitel@dwt.com

Rachel Strom
DAVIS WRIGHT TREMAINE LLP
rachelstrom@dwt.com

Sara A McDermott
MUNGER, TOLLES & OLSON LLP
sara.mcdermott@mto.com

T. Joseph Wendt
BARNES & THORNBURG LLP
jwendt@btlaw.com

Craig Ray Martin
GREENBERG TRAURIG
Craig.Martin@gtlaw.com