UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


SARAH BOWLING,                    )
LORI KENNARD,                     )
                            ) Cause No.
        Plaintiffs,      )  1:22-cv-1281-TWP-MJD
                          ) Indianapolis, Indiana
   vs.                   ) **December 3, 2024**
                          ) 8:30 a.m.
NETFLIX, INC., NETFLIX     )
WORLDWIDE ENTERTAINMENT, LLC,  )
REALHOUSE PRODUCTIONS, LLC.,   )
                          ) **<u>VOLUME II</u>**
        Defendants.      )


**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL


Court Reporter:          David W. Moxley, RMR, CRR, CMRS
                      United States District Court
                      46 East Ohio Street, Room 340
                      Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

Vol. 2-281

**APPEARANCES:**

For Plaintiffs:     Robert D. MacGill, Esq.
            Matthew Thomas Ciulla, Esq.
            Mackenzie Thompson, Esq.
            Jordan Cecelia Satterthwaite,Esq.
            MacGill PC
            Suite 1200
            156 East Market Street
            Indianapolis, IN  46204


For Defendants:     Brad Dennis Brian, Esq.
            Munger, Tolles & Olson, LLP
            50th Floor
            350 South Grand Avenue
            Los Angeles, CA  90071-3426

            Blanca Young, Esq.
            Munger, Tolles & Olson, LLP
            Suite 27th Floor
            560 Mission Street
            San Francisco, CA  94105-2907

            Andrea Roberts Pierson, Esq.
            Faegre Drinker Biddle & Reath
            Suite 2500
            300 North Meridian Street
            Indianapolis, IN  46204

Vol. 2-282

# I N D E X

**PLAINTIFFS' WITNESSES:**                                        **PAGE**

SARAH SEXSON

Direct Examination by Mr. MacGill .............291
Cross-examination by Ms. Young ...............296
Redirect examination by Mr. MacGill ..........301

AMY STROBEL

(Video deposition played.) ...................302

JACQUIE COOK

(Video deposition played.) ...................303

JOELLE SHAPIRO

(Video deposition played.) ...................305

TIMOTHY MIZRAHI

(Video deposition played.) ...................306

ZANA LAWRENCE

(Video deposition played.) ...................307

ALEXANDRA REED

(Deposition read into record.) ...............311

NATHAN ROTMENSZ

(Video deposition played.) ...................313

LORI KENNARD

Direct Examination by Mr. MacGill .............316
Cross-examination by Ms. Young ...............372
Redirect examination by MR. MacGILL ..........422
Recross-examination by MS. YOUNG .............425

# I N D E X   O F   E X H I B I T S

<u>**PLAINTIFFS' EXHIBITS:**</u>                                    <u>**PAGE**</u>

9   .............................................306
33  .............................................311
37  .............................................311
37  .............................................341
38  .............................................311
41  .............................................311
42  .............................................311
44  .............................................311
45  .............................................311

52  .............................................311
55  .............................................311
56  .............................................311
57  .............................................311
58  .............................................311
59  .............................................311
68  .............................................311
69  .............................................311
88  .............................................306
96  .............................................304
97  .............................................304
98  .............................................304
99  .............................................304

101 .............................................304
102 .............................................304
103 .............................................304
104 .............................................304
126 .............................................313
127 .............................................313
128 .............................................313
129 .............................................313
130 .............................................313
134 .............................................303
135 .............................................303
136 .............................................303
160 .............................................335
241 .............................................295
736A .............................................351
950 .............................................337
9002 .............................................285

**DEFENDANTS' EXHIBITS:**                                    **PAGE**

154 .........................................304
161 .........................................411
164 .........................................419
166 .........................................407
903 .........................................417
915 .........................................408
917 .........................................414
962 .........................................304

1004 ........................................304
1006 ........................................304
1007 ........................................304
1009 ........................................304
1010 ........................................304
1026 ........................................407

1                        (In open court.)

2            THE COURT:  Good morning.  We are on the record.  This

3   is Bowling and Kennard, plaintiffs, versus Netflix and

4   Realhouse Productions.  And the bailiff advised that you had

5   some questions or concerns before we bring in the jury; is that

6   correct?

7            MR. CIULLA:  The plaintiffs would just like to offer

8   Exhibit 9002 into evidence, Your Honor.

9            THE COURT:  And what was 9002?

10           MR. CIULLA:  That is the discovery materials that we

11  read filed at Docket 382-1.

12           MS. YOUNG:  No objection.

13           THE COURT:  Who was that speaking?

14           MS. YOUNG:  That was Blanca Young.  Sorry, Your Honor.

15           THE COURT:  All right, so 9002 will be admitted into

16  evidence without objection.

17           MR. CIULLA:  Thank you.

18                   (Plaintiffs' Exhibit 9002 was

19                    received in evidence.)

20           MS. McDERMOTT:  Good morning, Your Honor.  Sara

21  McDermott.  We have a few other issues for you.

22           THE COURT:  You may.

23           MS. McDERMOTT:  Plaintiffs will be playing a number of

24  deposition videos this morning that include references to Laura

25  DiSalvo's name appearing in the documentary, also references to

1    three plaintiffs, or my three clients, and we are concerned

2    that this may be confusing for the jury who may be speculating

3    about why Ms. DiSalvo's name is in the documentary and what was

4    going on with her.  We filed, at Docket 400 this morning, a

5    proposed limiting instruction.  That's based on the Seventh

6    Circuit Pattern Jury Instruction Number 2.13, and a version of

7    that plaintiffs actually proposed in their proposed final jury

8    instructions, so we think it should hopefully not be

9    controversial.  We did reach out to the plaintiffs about this

10   on Sunday but did not hear back.  I have copies of that filing

11   if you would like to look at it.

12           THE COURT:  I would.  Because I was going to tell

13   Sarah to print them for me, but if you have a copy...

14           MS. McDERMOTT:  Thank you.

15           THE COURT:  Sarah, get that for me.  Thank you.

16           MS. McDERMOTT:  And we would just propose that this be

17   read in before the video designations start today.

18           THE COURT:  Let me read it real quick.

19           MS. McDERMOTT:  Thank you, Your Honor.

20           THE COURT:  Any objection?

21           MR. CIULLA:  Your Honor, the instruction is fine with

22   us.  You had offered us to also proffer an instruction about

23   Mrs. DiSalvo and her on-line disclosures, so we will file one

24   tonight and we would request that that be read before

25   defendants' case in a similar manner, but that specific

1    instruction is fine.

2          THE COURT:  Okay.  So when -- so which videos will

3    they discuss Laura DiSalvo's name?  Which witnesses?

4          MS. McDERMOTT:  It will be -- let me think.

5          MR. CIULLA:  I would think the first would be

6    Ms. Cooke.

7          MS. McDERMOTT:  Maybe as early as Ms. Cooke.  Yes, in

8    fact, it's there.

9          THE COURT:  Okay.  So before Ms. Cooke's testimony, I

10   will read this proposed limiting instruction.

11         MS. McDERMOTT:  Yes, please.  Thank you, Your Honor.

12         THE COURT:  And that's without objection from the

13   plaintiffs.

14         MS. YOUNG:  Thank you, Your Honor.  Blanca Young.  A

15   few other minor issues.  Just on the read-ins that are going to

16   happen today from the depo transcript, we would ask that if the

17   witness is being questioned about an exhibit, only the portion

18   of that exhibit that the witness is talking about be

19   highlighted and not some other parts of the exhibit, and that

20   when the witness is done testifying about the exhibit, the

21   exhibit is then taken down.  There were some issues with that

22   yesterday, so we just wanted to make sure we were on the same

23   page about how that would happen today.

24         THE COURT:  Any objection?  You should take the

25   exhibits down once the witness is finished discussing it.

 1              MR. CIULLA:  Sure.  Thank you, Your Honor.

 2              THE COURT:  Okay.

 3              MS. YOUNG:  And two other short things about Lori

 4    Kennard, who is going to be testifying today.  First, we just

 5    wanted to confirm that Ms. Kennard is aware of the Court's

 6    rulings about post-traumatic stress disorder.  We don't want

 7    that to inadvertently get stated in her testimony, so we wanted

 8    to confirm that before she testifies.

 9              THE COURT:  Have you talked to your client?

10              MR. MacGILL:  Yeah, certainly.

11              THE COURT:  Okay.  All right.

12              MS. YOUNG:  Thank you, Your Honor.

13              THE COURT:  So that's confirmed.  Anything else?

14              MS. YOUNG:  Yes, one other thing.  As the evidence has

15    been presented by the plaintiffs, we have repeatedly heard

16    questions about people did not consent or written permission

17    was not obtained, and we are concerned that that is becoming

18    very misleading to the jury because consent is not an element

19    of the claim.  We flagged this in the trial brief at

20    Docket 298, and we believe that the jury should be instructed

21    that the plaintiffs do not establish an invasion of privacy

22    claim by showing they did not consent to the disclosure, and

23    we've proposed an instruction to that effect at Docket 309.

24    It's the defendants' proposed Instruction Number 29.  So given

25    the way that the evidence has come in at trial so far, we think

1    it would be appropriate to so instruct the jury at this

2    juncture.

3           THE COURT:  That's a proposed final instruction at

4    309?

5           MS. YOUNG:  Yes, proposed final instruction at

6    Docket 309, and the proposed instruction itself is Number 29.

7           MR. CIULLA:  So, Your Honor, we would reserve that for

8    the charge conference and we filed our objections and we don't

9    think it's necessary to have, you know, an interlocutory

10   instruction on that before the final instruction.

11         THE COURT:  And you haven't objected to that being

12   relevant, their consent.  I mean, the witnesses have just

13   testified about that, so you could do that, also, counsel.

14         MS. YOUNG:  Okay.

15         THE COURT:  Because consent is not an element.

16         MS. YOUNG:  It is not an element of the claim.

17         THE COURT:  Right.  And it's not -- so if they don't

18   refrain from talking about consent, you can make the objection,

19   and I'll most likely sustain that objection.

20         MS. YOUNG:  Thank you, Your Honor.

21         THE COURT:  Okay.  All right.  But I will not give the

22   interlocutory instruction at this time.

23         MS. YOUNG:  Thank you.

24         THE COURT:  Okay.  Anything else?

25         MR. MacGILL:  No.

 1          THE COURT:  Okay.  We're still waiting on I think --

 2    maybe the jury is here.  We are still waiting on two jurors, so

 3    it will just a few moments.

 4          Your first witness is here?

 5          MR. MacGILL:  She is here and ready, Your Honor.

 6    Sarah Sexson.

 7          THE COURT:  As soon as those two jurors arrive, we'll

 8    get started.  They may be here because I see Sarah left the

 9    room, but we will see in just a few.  As soon as we get all of

10    our panel here, we'll get started.  We'll be in recess for just

11    a few moments.

12          COURTROOM DEPUTY:  All rise.

13       (Recess at 8:37, until 8:57.)

14          THE COURT:  We are on the record, Sarah Bowling and

15    Lori Kennard, plaintiffs, versus Netflix Worldwide, and Netflix

16    Worldwide Entertainment and Realhouse Productions, LLC,

17    defendants.

18          And, counsel, all of the jurors have made it in.

19          Plaintiffs, are you ready for the jury?

20          MR. MacGILL:  Your Honor, we are ready.

21          THE COURT:  All right.

22          Defendants ready?

23          MR. BRIAN:  Yes.

24          THE COURT:  You may bring in the panel.

25          And, witness, you can just remain standing.  Once she

1   says "all rise," and then I'll get you sworn in.

2           COURTROOM DEPUTY:  All rise.

3       (Jury in at 8:58.)

4           THE COURT:  You may be seated.

5           And, witness, if you would remain standing and raise

6   your right hand and face me, I'll get you sworn in.

7       (The witness is sworn.)

8           THE COURT:  You may have a seat.

9           Good morning, Ladies and Gentlemen of the Jury.  I

10  know it was a tough getting in this morning because the roads

11  were a little slippery.  I'm glad we all made it safely, and

12  we're going to get to work.

13          You may call your first witness of the day,

14  plaintiffs.

15          MR. MacGILL:  May it please the Court, Ladies and

16  Gentlemen of the Jury, and counsel, we are calling Ms. Sarah

17  Sexson to the witness stand.

18          THE COURT:  You may.

19          MR. MacGILL:  Thank you.

20          **SARAH SEXON, PLAINTIFFS' WITNESS, SWORN**

21                  **DIRECT EXAMINATION**

22  BY MR. MacGILL:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  Would you state your name for the record, please.

*SEXSON - DIRECT/MacGILL*                Vol. 2-292

1    A.    Sarah Sexson.

2    Q.    Can you tell us where you live.

3    A.    I live here in Indianapolis.

4    Q.    And where are you employed?

5    A.    Landmark Recovery.

6    Q.    What is Landmark Recovery?

7    A.    It's an inpatient adult treatment center.

8    Q.    And what do you do there?

9    A.    I'm a therapist.

10   Q.    Okay.  And are you a licensed therapist?

11   A.    I am.  I'm a licensed clinical social worker.

12   Q.    All right.  Let's talk a little bit about your educational

13   background, if we could.  Could you explain to this Court and

14   jury your educational background.

15   A.    Yeah.  I have a bachelor's in social work that I got in

16   2009, and then I have a master's in social work, which I

17   received in 2011.

18   Q.    In 2000 --

19   A.    -- '11.

20   Q.    '11, okay.

21         Now, with respect to just a little bit more of your

22   background, where were you employed prior to your current

23   employer?

24   A.    I was a court-appointed therapist for DCS cases, so I

25   worked for a service provider that had contract with The

*SEXSON - DIRECT/MacGILL*                          Vol. 2-293

1   Department of Child Services.  I helped families work on the

2   issues that had their children removed from them.

3   Q.  All right.  And that was here in Indianapolis.

4   A.  Yes, Marion County.

5   Q.  Okay.  Now, ma'am, I want to turn to the *Our Father* movie.

6   Did you watch the movie *Our Father*?

7   A.  I did.

8   Q.  And do you recall when it was that you watched the movie

9   *Our Father*?

10  A.  Yes.  I watched it in May of 2022.

11  Q.  When you watched the movie in May of 2022, do you recall

12  seeing some names, in particular?

13  A.  Yes, I do.

14  Q.  Could you please tell this Court those names that you did

15  see when you watched the *Our Father* movie in May of 2022.

16  A.  Sarah Bowling, Laura DiSalvo, and Lisa Sheehan.

17  Q.  Okay.  And could you explain to the Court and jury the

18  reactions you had, if any, at the time that you watched this

19  movie?

20  A.  I was extremely --

21          MS. YOUNG:  Objection, relevance.

22          THE COURT:  I'll sustain on the form of that question.

23  BY MR. MacGILL:

24  Q.  When you watched the movie, what did you -- after watching

25  the movie, what did you do?

1    A.  I messaged Laura DiSalvo.

2    Q.  Okay.  Why did you message Laura DiSalvo?

3            MS. YOUNG:  Objection, relevance.

4            THE COURT:  Sustained.

5    BY MR. MacGILL:

6    Q.  When you say the names -- strike that.

7        Do you recall, specifically, seeing the name Sarah Bowling?

8    A.  Yes.

9    Q.  At the time that you saw the name Sarah Bowling, was the

10   image of her name clear to you?

11   A.  Yes.

12   Q.  And did you have to pause the movie in order to see her

13   name?

14   A.  No.

15   Q.  Did you know Sarah Bowling prior to the time that you saw

16   her name in this movie?

17   A.  No.

18   Q.  Did you -- strike that.

19           MR. MacGILL:  Your Honor, at this time, we would offer

20   Exhibit 241, which is a stipulated exhibit.

21           THE COURT:  Any objection to the stipulated exhibit,

22   241?

23           MS. YOUNG:  I'll find a copy of the exhibit, Your

24   Honor.

25           No objection.

1          THE COURT:  241 is admitted into evidence without

2    objection and pursuant to stipulation of the parties.

3                    *(Plaintiffs' Exhibit 241 was*

4                    *received in evidence.)*

5          MR. MacGILL:  Thank you.  May I publish the exhibit,

6    Your Honor?

7          THE COURT:  You may.

8    BY MR. MacGILL:

9    Q.  Okay.  We're going to play and you'll see on your screen to

10   your left this exhibit.  I'm going to ask you to watch it, and

11   I have a question for you.

12   A.  Okay.

13       (Video playing in open court.)

14   BY MR. MacGILL:

15   Q.  Is this a portion of the movie that you saw with your own

16   eyes in May of 2022?

17   A.  Yes.

18   Q.  Now, after seeing this particular image or this -- the

19   movie including this image, you sent a Facebook message?

20   A.  Yes.

21   Q.  Who did you send the Facebook message to?

22   A.  Laura DiSalvo.

23   Q.  Okay.  When is the last time you communicated to Laura

24   DiSalvo prior to the time that you sent this Facebook message?

25           MS. YOUNG:  Objection, relevance.

*SEXSON – CROSS/YOUNG*                                  Vol. 2-296

1           THE COURT:  I think I know where you're going,

2     counsel, but get there.

3           MR. MacGILL:  Okay.

4           THE COURT:  Okay?  So I'll overrule and let her answer

5     this one, but get there.

6           MR. MacGILL:  Understood.

7     BY MR. MacGILL:

8     Q.  So the question is, how long had it been since you sent

9     this message -- or since you had communicated with Laura

10    DiSalvo?

11    A.  It had been six years.

12    Q.  Okay.  Why, after six years of no contact with Laura

13    DiSalvo, did you send this message?

14          MS. YOUNG:  Objection, relevance.

15          THE COURT:  I'll sustain.

16          MR. MacGILL:  No further questions.

17          THE COURT:  You may cross-examine the witness.

18          MS. YOUNG:  Thank you, Your Honor.

19                    **CROSS EXAMINATION**

20          MS. YOUNG:  May it please the Court.

21          THE COURT:  You may.

22    BY MS. YOUNG:

23    Q.  Good morning, Ms. Sexson, how are you this morning?

24    A.  I'm good, how are you?

25    Q.  I'm well.  Thank you.  Thank you for being here.

*SEXSON – CROSS/YOUNG*                          Vol. 2-297

1      You understand Sarah Bowling is a plaintiff in this

2   lawsuit?

3   A.  I do.

4   Q.  And you just testified you saw her name in the *Our Father*

5   documentary; is that right?

6   A.  Yes.

7   Q.  Isn't it true that before you ever saw the *Our Father*

8   documentary, you already knew that Sarah Bowling was a child of

9   her mother's fertility doctor?

10  A.  Yes.

11  Q.  Okay.  And the reason you knew about that is you had seen a

12  Facebook post from Sarah Bowling's mother where that

13  information was shared; is that correct?

14  A.  Yes.

15  Q.  And in that Facebook post, Sarah Bowling's mother said she

16  and her mother had just found out that their three daughters,

17  Sarah, Lisa, and Laura were fathered by their fertility doctor;

18  is that right?

19  A.  Yes.

20  Q.  And you're not actually friends on Facebook with Sarah

21  Bowling's mother; is that correct?

22  A.  That's correct.

23  Q.  You're not friends with her either in real life; is that

24  right?

25  A.  Correct.

*SEXSON - CROSS/YOUNG*                    Vol. 2-298

1  Q.  You've never even met Sarah Bowling's mother; is that

2  right?

3  A.  I have not.

4  Q.  You've never talked with her either; correct?

5  A.  No, I haven't.

6  Q.  But still you were able to see the Facebook post that Sarah

7  Bowling's mother posted saying that Ms. Bowling and her two

8  sisters were the biological children of her fertility doctor,

9  Dr. Donald Cline; correct?

10  A.  Yes, correct.

11  Q.  And the reason that you were able to do that is because you

12  are Facebook friends with Sarah Bowling's two sisters, Laura

13  DiSalvo and Lisa Sheehan; correct?

14  A.  Yes.

15  Q.  And so what happened was you believe either Laura DiSalvo

16  or Lisa Foley were tagged in the post that their mother made;

17  correct?

18  A.  I don't -- I can't recall.

19  Q.  Okay.  Is it the case that if someone tags someone on

20  Facebook, that you're a friend with, then you can see the post

21  that they were tagged with in their feed?

22  A.  That's my understanding.

23  Q.  Okay.  And when that happens, all of the other people who

24  are friends with that person can also see the same post;

25  correct?

*SEXSON – CROSS/YOUNG*                    Vol. 2-299

1  A.  I'm not sure about that.

2  Q.  Okay.  Now, you know Sarah Bowling's sister, Laura DiSalvo,

3  because you went to high school with her; is that right?

4  A.  Yes, that's correct.

5  Q.  And you also went to high school with her other sister,

6  Lisa Foley; correct?

7  A.  I did.

8  Q.  And you were aware that they had a sister named Sarah; is

9  that right?

10  A.  Yes.

11  Q.  But you didn't actually know Sarah personally; is that

12  correct?

13  A.  That's correct.

14  Q.  You did not go to high school with Ms. Bowling; right?

15  A.  Not that I know of.

16  Q.  Okay.  And you're not friends with Ms. Bowling on Facebook,

17  are you?

18  A.  I'm not.

19  Q.  You're not friends with her on Instagram or any other

20  platform, are you?

21  A.  That I don't know for sure.

22  Q.  Okay.  Have you ever met Ms. Bowling?

23  A.  I have not.

24  Q.  Have you ever talked to her?

25  A.  I have not.

1   Q.  But even so, before you watched the *Our Father* documentary,

2   you already knew that she was the biological child of her

3   mother's fertility doctor, Dr. Donald Cline; correct?

4   A.  I did.

5   Q.  Now, isn't it the case that when you were watching the *Our*

6   *Father* documentary, you had that post by Sarah Bowling's mother

7   in mind as you were watching the film; is that right?

8   A.  I did not.

9   Q.  You did not?  So you had a deposition taken in this case;

10  is that right?

11  A.  Yes.

12  Q.  Okay.  And do you remember taking an oath to tell the truth

13  at that deposition?

14  A.  Yes.

15  Q.  Okay.  And I'd like to just show you your deposition

16  transcript, if that's all right?

17  A.  That's fine.

18          THE COURT:  You may approach.

19          MS. McDERMOTT:  Thank you.

20  BY MS. YOUNG:

21  Q.  Okay.  And if you can turn to page 27 of your deposition,

22  starting at line 1, and you were asked:

23      Question:  That's your memory of the post by Laura's mom.

24  Do you see that?

25  A.  Yes.

1   Q.  And then your answer was:

2       That's my memory, that was years, like I don't remember

3   exactly when it was posted, when it was, I just remember it

4   sticking out.  I remember seeing that and then I remember

5   seeing the movie and, like, remembering the post as I watched

6   the movie.

7       Was that your testimony at your deposition?

8   A.  Yes, but it wasn't the reason I watched the movie.

9   Q.  I understand that, but as you were watching the movie, you

10  had that post in mind; is that correct?

11  A.  It was -- yeah, from what I recall, now that I'm refreshed

12  from this deposition that I gave over a year ago, I do remember

13  having the post in mind as I watched the movie.

14        MS. YOUNG:  Thank you.  I don't have any further

15  questions.

16        THE COURT:  Any redirect?

17        MR. MacGILL:  Briefly.

18        THE COURT:  You may.

19                    **REDIRECT EXAMINATION**

20  BY MR. MacGILL:

21  Q.  Ms. Sexson, just focusing on that last line of questioning

22  for a minute, at the time that you watched the *Our Father* movie

23  in May of 2022, did you -- were you looking for the name of

24  Sarah Bowling?

25  A.  No.

1          MR. MacGILL:  No further questions.

2          THE COURT:  Any question on that one question?

3          MS. YOUNG:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you, you may be excused,

5    and you can just leave that document on the witness stand.

6          THE WITNESS:  Thank you.

7       (Witness excused.)

8          THE COURT:  All right.  And you may call your next

9    witness.

10       MR. CIULLA:  Your Honor, we call to the stand by video

11   deposition Amy Strobel, Sarah Bowling's therapist.  I would

12   like to mark her designations for identification purposes as

13   8003.

14         THE COURT:  You may.

15       (Deposition of Amy Strobel played in open court.)

16       MR. CIULLA:  Your Honor, we call to the standby video

17   deposition Ms. Jacquie Cooke, who is a representative of

18   23andMe, Incorporated.  I would like to mark her designations

19   for identification purposes 8004.  We offer into evidence

20   Exhibit 134, Exhibit 135, and Exhibit 136.

21         THE COURT:  Any objection to 8004, as well as Exhibits

22   134, 135, and 136?

23         MS. YOUNG:  No objection, Your Honor.

24         THE COURT:  And you need to cut your mic on.  Could

25   you cut your mic on and repeat that.

1        MS. YOUNG:  No objection.

2        THE COURT:  All right.  Exhibits 134, 135, and 136 are

3   admitted into evidence without objection and you may play 8004.

4              *(Plaintiffs' Exhibits 134 - 136 were*

5              *received in evidence.)*

6        (Deposition of Jacquie Cooke played in open court.)

7        MR. CIULLA:  Your Honor, we call to the witness stand

8   by video deposition Ms. Joelle Shapiro, Netflix's creative

9   marketing lead.  We'll mark her transcript as Exhibit,

10  Identification Exhibit 8005.

11       THE COURT:  And, counsel, before you do that, the

12  Court is going to give the Ladies and Gentlemen of the Jury a

13  limiting instruction.

14       Ladies and Gentlemen, you have heard some testimony

15  about Laura DiSalvo.  Laura DiSalvo is not a plaintiff in this

16  case.  Do not speculate on the reasons.  Your focus must be on

17  the claims of plaintiffs Sarah Bowling and Lori Kennard.

18       And did you have something, counsel?

19       MS. YOUNG:  I did, Your Honor. I would like to move

20  into evidence some of the other exhibits that were mentioned

21  during Ms. Cooke's testimony.

22       THE COURT:  You may.  We'll do that before we get to

23  your next witness.

24       MS. YOUNG:  Thank you, Your Honor.  I would like to

25  move Exhibit 154, Exhibit 962, Exhibit 1003, Exhibit 1004,

1    Exhibit 1006, Exhibit 1007, Exhibit 1009, and Exhibit 1010.

2            THE COURT:  Any objection to Exhibits 154, 962, 1003,

3    1004, 1006, 1007, 1009, and 1010?

4            MR. CIULLA:  No, Your Honor.

5            THE COURT:  Those exhibits are admitted into evidence

6    without objection.

7                    *(Defendants' Exhibits 154, 926, 1003, 1004,*

8                        *1006, 1007, 1009, and 1010 were*

9                        *received in evidence.)*

10           MS. YOUNG:  Thank you, Your Honor.

11           THE COURT:  Now, counsel, what is the number of the

12   witness --

13           MR. CIULLA:  Yes, Your Honor, it's supposed to be

14   Joelle Shapiro, Netflix creative marketing lead, Identification

15   Exhibit 8005, and we would like to move into evidence, please,

16   quite a few exhibits, so Exhibit 96, 97, 98, 99, 100, 101, 102,

17   103, and 104.

18           THE COURT:  Any objection to any of those exhibits,

19   counsel?

20           MS. YOUNG:  No objection.

21           THE COURT:  Exhibits 96, 97, 98, 99, 100, 101, 102,

22   103, and 104 are admitted into evidence without objection.

23                   *(Plaintiffs' Exhibits 96 - 104 were*

24                       *received in evidence.)*

25           THE COURT:  And you may play the video 8005.

Vol. 2-305

1          (Deposition of Joelle Shapiro played in open court.)

2          THE COURT:  Is that the end?

3          MR. CIULLA:  Yes, ma'am.

4          THE COURT:  Okay.  All right.  We're going to take our

5   morning break.

6          Ladies and Gentlemen of the Jury, the Court is going

7   to admonish you not to have any discussion about the case, and

8   we'll have you back in about ten minutes.  Enjoy your break.

9          COURTROOM DEPUTY:  All rise.

10      (Jury out at 10:41.)

11          THE COURT:  You may be seated.

12          Who do we have for your next couple of witnesses,

13  plaintiffs?

14          MR. MacGILL:  Go ahead, please.

15          MR. CIULLA:  Your Honor, Tim Mizrahi is a video, Zana

16  Lawrence is a video, and Alexandra Reed is a reading.

17          THE COURT:  Okay.  Let's take our ten minute break.

18          MR. MacGILL:  Thank you.

19          COURTROOM DEPUTY:  All rise.

20      (Recess at 10:42 until 11:06.)

21          THE COURT:  We're back on the record.

22          And plaintiffs, are you ready for the jury?

23          MR. CIULLA:  Yes, ma'am.

24          THE COURT:  Defendants ready?

25          MR. BRIAN:  Yes.

1          THE COURT:  You may bring in the panel.

2          COURTROOM DEPUTY:  All rise.

3      (Jury in at 11:07.)

4          THE COURT:  We're back on the record.

5          And plaintiffs, you may present your next witness.

6          MR. CIULLA:  Your Honor, we call to the stand by video

7   deposition Tim Mizrahi, the Netflix vice president of business

8   affairs and content.  We'll mark his designations for

9   identification purposes as 8006.

10          And we offer into evidence Exhibit 88 and Exhibit 9.

11          THE COURT:  Any objection to Exhibits 88 and

12   Exhibit 9?

13          MS. YOUNG:  No objection.

14          THE COURT:  Exhibits 88 and 9 are admitted into

15   evidence without objection.

16              *(Plaintiffs' Exhibits 9 and 88 were*

17              *received in evidence.)*

18          THE COURT:  And you may play 8006.

19          (Deposition of Timothy Mizrahi read in open court.)

20          THE COURT:  Is that the end?

21          MR. CIULLA:  Yes, ma'am.

22          THE COURT:  Okay.

23          MR. CIULLA:  I would call to the witness stand, by

24   video deposition, Zana Lawrence, the Netflix director of

25   documentary film, and we'll mark her designations as

1    Identification Exhibit 8007.  We believe it's approximately 20

2    minutes.

3            THE COURT:  All right.  And this will be the last one

4    before we take a lunch break.

5            MR. CIULLA:  Thank you.

6            THE COURT:  Any exhibits?

7            MR. CIULLA:  No, ma'am.

8            THE COURT:  Okay.  You may play 8007.

9            (Deposition of Zana Lawrence read in open court.)

10           THE COURT:  Is that the end of that?

11           MR. CIULLA:  Yes, ma'am.

12           THE COURT:  All right.  Ladies and Gentlemen of the

13    Jury, we're going to go ahead and take a -- we're taking an

14    early lunch today.  It's 12:05.

15           The Court is going to admonish you, during this period

16    of time, that you're allowed to separate for your lunch break,

17    remember you're not to have any discussion about the case among

18    yourselves or with anyone else.

19           If anyone should attempt to talk to you about the

20    matter, what are you going to do?  Refuse and report that

21    attempt to the bailiff.

22           Again, don't do any research about anything.  Go ahead

23    and -- I know it's cold out.  If you want to bring your lunch

24    back and eat in the jury room, you're welcome to do that.  But

25    we'll resume at 1:00.  So have a good lunch break.

1    COURTROOM DEPUTY:  All rise.

2    (Jury out at 12:06.)

3    THE COURT:  Let's see how we're looking for the

4    afternoon.

5    MR. MacGILL:  So, Your Honor, we would -- plaintiffs

6    would be calling Alexandra Reed, a reading of her testimony.

7    We're estimating maybe an hour.  Nathan Rotmensz, short, 20

8    minutes.  And then we would call Lori Kennard to testify.

9    THE COURT:  Go ahead and get the jury out.

10    Ms. Kennard?

11    MR. MacGILL:  Yes, ma'am.

12    THE COURT:  Okay.

13    MR. MacGILL:  And then we would propose to show the

14    film at the close of her testimony, and then we have a

15    financial stipulation, and then we rest.

16    THE COURT:  Okay.  All right.  Well, we hopefully can

17    get all of that done this afternoon.

18    MR. MacGILL:  Okay.  May I make one quick note?

19    On the financial stipulation, Mr. Brian and the team

20    has said: Can you narrow down the proposed stipulation?

21    We proposed a narrowing.  I'm hoping we can agree to

22    what's in that stipulation so that that process is smooth, but

23    we just gave him this information a few minutes ago so he's not

24    had a chance to look at it.

25    THE COURT:  Is this both your compensatory and your

1    punitive damages?

2            MR. MacGILL:  Just the punitive damage side.

3            THE COURT:  Okay.

4            MR. BRIAN:  We're going to look at the stipulation,

5    Your Honor.  We've been going back and forth.  We're happy to

6    take a look at it.  Hopefully that will streamline that.

7            We are going to -- as I mentioned, I think, yesterday,

8    we don't think that information is admissible unless they've

9    made out a prima facie case.  We're going to make a motion for

10   a directed verdict on a number of issues, but specifically,

11   we're going to make a motion for directed verdict at the end of

12   our case on all the elements, including compensatory damages.

13   We are going to make a directed verdict motion at the end of

14   plaintiffs' case on punitive damages, and we'll be prepared to

15   argue that whenever Your Honor wants to do it.

16           What I would ask the Court to consider, over the lunch

17   break, is plaintiffs would rest, but they can keep their case

18   open for the purpose of admitting those financial statements,

19   if Your Honor denies our motion.  If Your Honor grants our

20   motion, they shouldn't go to the jury and they shouldn't be

21   admitted.

22           MR. MacGILL:  We're happy to do it either way in the

23   sense, Your Honor, that we could put -- submit -- let you admit

24   the stipulation, subject to your ruling.  But we'll do it

25   either way, whatever the Court prefers.  We could rest with the

1  exception of the financial stipulation or we'll do it however

2  you prefer.

3           THE COURT:  Why don't you go ahead and put it in.  It

4  will be a stipulation.  It won't be read to the jury unless

5  they survive the motion.

6           MR. BRIAN:  That's our only concern, Your Honor, that

7  it not be published to the jury until Your Honor has ruled.

8           THE COURT:  It won't be published to the jury.

9           MR. MacGILL:  Thank you.

10          MR. BRIAN:  Thank you.

11          THE COURT:  So let's take our lunch break, and I'll

12  see everybody at 1:00.

13          COURTROOM DEPUTY:  All rise.

14     (Recess at 12:09, until 1:15.)

15          THE COURT:  We are back on the record, and I see the

16  next witness is on the stand.

17          Are you ready for the jury, plaintiffs?

18          MR. CIULLA:  Yes, Your Honor.

19          THE COURT:  Defendants ready?

20          MR. BRIAN:  Yes.

21          THE COURT:  You may bring in the panel.

22          COURTROOM DEPUTY:  All rise.

23     (Jury in at 1:15.)

24          THE COURT:  Witness, if you would remain standing and

25  raise your right hand.

1        (The witness is sworn.)

2              THE COURT:  You may have a seat.

3              And, Ladies and Gentlemen of the Jury, welcome back

4    from lunch.

5              And the witness has been sworn.  And, counsel, you may

6    examine your witness.

7              MR. CIULLA:  Thank you, Your Honor.

8              This is Alexandra Reed by deposition designation

9    reading, and we would like to mark her designation as 8008.

10             And we have quite a few exhibits to preadmit, so

11   Exhibit 33, 37, 38, 41, 42, 44, 45, 51, 52, 55, 56, 57, 58, 59,

12   68, and 69.

13             THE COURT:  Any objection to any of those exhibits?

14             MS. YOUNG:  No objection.

15             THE COURT:  Exhibits 33, 37, 38, 41, 42, 44, 45, 51,

16   52, 55, 56, 57, 58, 59, 68, and 69 are admitted into evidence

17   without objection.

18                  *(Plaintiffs' Exhibits 33, 37, 38, 41, 42, 44,*

19                    *45, 51, 52, 55, 56, 57, 58, 59, 68, and 69*

20                    *were received in evidence.)*

21             (Deposition of Alexandra Reed read into the record.)

22             MS. YOUNG:  We have an objection.

23             Can we please take the exhibit down?

24             THE COURT:  Yes.  Take the exhibit down.

25             You may continue.

1              (Deposition of Alexandra Reed read into the record.)

2              MS. PIERSON:  I'm sorry.

3              THE COURT:  We can't hear you.

4              MS. PIERSON:  May I have one second with counsel?

5         (Off the record.)

6              MS. PIERSON:  All right.  Apologies, Your Honor.

7              (Deposition of Alexandra Reed read into the record.)

8              MS. YOUNG:  I hate to interrupt, Your Honor.  Can we

9    take the exhibit down again?

10             THE COURT:  Yes.  Take the exhibit down.

11             (Deposition of Alexandra Reed read into the record.)

12             MR. CIULLA:  That concludes the testimony of Ms. Reed.

13             THE COURT:  Thank you.

14             MR. CIULLA:  Next witness?

15             THE COURT:  Next witness.

16             MR. CIULLA:  Your Honor, we call to the stand by video

17   deposition Nathan Rotmensz, who was the *Our Father*

18   post-production supervisor.  I'd like to please mark his

19   excerpts for identification purposes as 8009.

20             And I have a few exhibits to preadmit, Exhibit -- we

21   offer into evidence Exhibit 126, 127, 128, 129, and 130.

22             THE COURT:  Any objection to Exhibits 126, 127, 128,

23   129, and 130?

24             MS. YOUNG:  No objection, Your Honor.

25             THE COURT:  Those exhibits are admitted into evidence

Vol. 2-313

1    without objection.

2                    *(Plaintiffs' Exhibits 126, 127, 128, 129, and*

3                    *130 were received in evidence.)*

4            THE COURT:  And you may play 8009.

5            (Deposition of Nathan Rotmensz played in open court.)

6            MR. MacGILL:  Your Honor, that completes this

7    deposition testimony.

8            THE COURT:  All right.  Thank you, Counsel.

9            And who will be your next witness?

10           MR. MacGILL:  The plaintiff will call Lori Kennard.

11           THE COURT:  Okay.  This is a good time to take our

12   afternoon break.

13           Ladies and Gentlemen, no deliberation and no

14   discussion.  We'll have you back in the courtroom in about 10

15   or 15 minutes.

16           COURTROOM DEPUTY:  All rise.

17       (Jury out at 2:52.)

18           THE COURT:  Okay.  We're in recess.

19           MR. MacGILL:  Thank you.

20       (Recess at 2:53 until 3:14.)

21           THE COURT:  Counsel, you had some matters before we

22   bring in the jury?

23           MR. BRIAN:  Just informational, Your Honor.

24           I mentioned earlier that we want to make a Rule 50

25   motion on the punitive damage issue.  We are going to do that.

Vol. 2-314

1      We're actually trying to prepare something and file something

2      in writing.  I have people struggling to put that together

3      right now.

4              THE COURT:  Good.  You've got a big team so you can do

5      it.

6              MR. BRIAN:  I hope so.

7              The question for Your Honor is:  Should we push to try

8      to get something filed by, say, 5:00 and argue it tonight at

9      6:00, or would you rather argue it tomorrow morning early or

10     some other time?  I don't mean to impose on your schedule.

11             THE COURT:  It would be great if you could have it on

12     file by tonight and talk about it tonight, and I'll rule in the

13     morning.

14             MR. MacGILL:  Will we have an opportunity -- I would

15     like to read what they have, and an opportunity to respond in

16     writing, Your Honor, would be helpful from our standpoint.

17             THE COURT:  Do you have a team working behind the

18     scenes for you, also?

19             MR. MacGILL:  We're here.  No, but we could do it

20     tonight or, you know, we could respond tonight in writing --

21             THE COURT:  Okay.

22             MR. MacGILL:  -- if that's acceptable to the Court.

23             THE COURT:  That sounds good.  If you can get it on

24     file by 5:00, that will be great, then you guys can respond

25     tonight, and then we'll do any oral argument on it and a ruling

1    in the morning.

2         MR. BRIAN:  I'm going to email my team right now and

3    we'll get it on file by 5:00.  And I think we can get a

4    courtesy -- I think we can get courtesy copies.  We don't have

5    as many copying facilities here.

6         THE COURT:  Don't worry about it.  If it's docketed,

7    Sarah will make copies for anybody that wants a copy.

8         MR. BRIAN:  Thank you.

9         THE COURT:  Are you ready for the jury, counsel?

10         MR. MacGILL:  We are.

11         THE COURT:  Defendants ready?

12         MS. YOUNG:  Yes, Your Honor.

13         THE COURT:  All right.  You may bring in the panel.

14         COURTROOM DEPUTY:  All rise.

15    (Jury in at 3:17.)

16         THE COURT:  You may be seated.

17         And, witness, if you would remain standing and raise

18    your right hand.

19    (The witness is sworn.)

20         THE COURT:  You may have a seat.

21         Counsel, you may examine your witness.

22         MR. MacGILL:  Thank you, Your Honor.

23

24

25

**LORI KENNARD, PLAINTIFFS' WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. MacGILL:

Q.  Would you state your name for the record, please.

A.  Lori Kennard.

Q.  All right.  And before we get started, Mrs. Kennard, on your testimony, I just had one first question for you.  You were here during the opening statement given -- you heard opening statements in the case; is that correct?

A.  Yes.

Q.  And you heard the opening statement given by counsel for Netflix and Realhouse?

A.  Yes.

Q.  One question:  There was a statement made, I believe repeatedly, that your name --

        MS. YOUNG:  Objection, Your Honor.  This is in violation of the Court's procedure.

        THE COURT:  Just ask the question.  So I'll sustain the commentary.  Just ask -- what is your question, counsel?

        MR. MacGILL:  Understood.  Thank you.

BY MR. MacGILL:

Q.  The statement was made in opening statement.

        MS. YOUNG:  Objection, Your Honor.  Same objection.

        THE COURT:  I don't -- let's put on our equipment, because I'm not sure what -- the statement you're referring to.

 1              MR. MacGILL:  Okay.

 2              THE COURT:  Let's put it on.

 3         (Bench conference on the record.)

 4              THE COURT:  Mine wasn't booted up.

 5              MR. MacGILL:  Your Honor, what we -- I want to ask her

 6   about the statement made in opening statement, your name --

 7   Lori Kennard's name, appeared not even for a second.

 8              MS. YOUNG:  Your Honor, the Court's courtroom

 9   procedures, Docket 125 at 3D, says counsel should avoid

10   questions that contain preparatory remarks such as summarizing

11   what was stated in opening statements, what other witnesses

12   have said, or what is contained in exhibits.

13              THE COURT:  I'm going to allow him to ask that one

14   question.

15              MR. MacGILL:  Thank you.

16                        (Open court.)

17   BY MR. MacGILL:

18   Q.  Mrs. Kennard, during opening statement, did you hear

19   counsel state that your name appeared in the documentary for

20   not even a second?

21   A.  Yes.

22   Q.  Did you see your name in the *Our Father* film?

23   A.  Yes.

24   Q.  I want to talk a little bit about your -- first, where do

25   you live?

*KENNARD - DIRECT/MacGILL*                          Vol. 2-318

1   A.  Brownsburg, Indiana.

2   Q.  And how long have you lived there in Brownsburg?

3   A.  I was technically born there, brought home from the

4   hospital there.  All my life, except for when I was staying on

5   campus at Purdue, or for about five years, I lived in Avon with

6   my first husband.

7   Q.  And during what years, ma'am, did you live in Avon,

8   Indiana?

9   A.  The Fall of 2007 to just after New Year of 2012.

10  Q.  And your mother and father are still living?

11  A.  Yes.

12  Q.  What is your mother's name?

13  A.  Barb Lanham.

14  Q.  What is her age, ma'am?

15  A.  She is 73.

16  Q.  Your father's name?

17  A.  Stephen Lanham.

18  Q.  All right.  And were you the only child in your family?

19  A.  Yes.

20  Q.  Okay.  Now, I want to speak for a few minutes -- or ask you

21  for a few minutes about your children.  Can you tell us who

22  your children are?

23  A.  I have three.  I have biological twins.  They're boy/girl.

24  Q.  Okay.

25  A.  And I have a bonus daughter who is 18.  Sorry.  My twins

*KENNARD - DIRECT/MacGILL*                    Vol. 2-319

1   are 14, and my biological -- or excuse me, my oldest daughter

2   is 18.

3   Q.   Eighteen.  And where do your twins go to school?

4   A.   They go to Brownsburg High School.

5   Q.   Okay.  And a little bit about your working history.  Could

6   you tell us a little bit more about your education starting

7   with your high school?  Where were you educated in your high

8   school years?

9   A.   I did all my schooling through Brownsburg High School,

10  graduated from that high school in 2002 with honors.

11  Q.   2002?

12  A.   Uh-huh.

13  Q.   All right.  And then where did you go to college?

14  A.   I went to Purdue in West Lafayette.

15  Q.   And were you awarded a degree?

16  A.   I was.

17  Q.   In what field?

18  A.   BA in elementary education with an endorsement in reading.

19  Q.   Okay.  Now, after your graduation from Purdue in the year

20  2006, where did you first go to work?

21  A.   I started off as an interventionist in a Wayne Township

22  school, which is here in Marion County.  I did that for about a

23  semester.

24  Q.   What is an interventionist?

25  A.   I was a reading interventionist.  I would work with kids

1    who were in kindergarten, first, second, or third grade who, at

2    the time, were not reading, not even at grade level or a grade

3    level below.  They were at least two grade levels below reading

4    level.

5    Q.  Okay.  After this job as an interventionist, where did you

6    next work?

7    A.  I got my job with Avon schools in May of 2007.  I've been

8    there ever since.

9    Q.  Now, just to get a little more detail, if we could on your

10   background, did you teach at the same elementary school each

11   year?

12   A.  No.  I started at Maple Elementary teaching first grade.

13   And then I was asked to loop up with my class and stay with

14   them for second grade.  I stayed in second grade for six years,

15   but in that time, I switched from Maple Elementary to River

16   Birch Elementary, staying in second grade working with

17   high-ability kids.

18       I was asked to loop up to third grade and stay with the

19   class.  Stayed there for six years.  Made my way back to

20   second grade.

21   Q.  Now, where did you teach third grade?

22   A.  I taught third grade at River Birch, as well.

23   Q.  Did you teach another grade after that?

24   A.  I went back to second grade for a few years.

25   Q.  Okay.  At any time, did you teach at a higher level?

1    A.  Yes.  I currently teach at Avon Intermediate East teaching

2    sixth grade math and science.

3    Q.  When did you begin that job at Avon?

4    A.  It was for the school year of '23-'24.

5    Q.  Okay.  Are you currently married?

6    A.  Yes.

7    Q.  And what is the name of your husband?

8    A.  Jared.

9    Q.  And when were you and Jared Kennard married?

10   A.  We got married July 5th of 2014.

11   Q.  Okay.  And when did you first meet Mr. Kennard?

12   A.  We met in high school.

13   Q.  Okay.  And married some years later?

14   A.  Yes.

15   Q.  All right.  Did you have a marriage previous to your

16   marriage with Jared Kennard?

17   A.  Yes.  We both were in marriages and had our kids.  Both got

18   divorces and reconnected and blended our family, officially, on

19   July 5th of 2014.

20   Q.  All right.  Now, going back in time for just a minute, when

21   were you married to your first husband?

22   A.  We were married June 7th of 2008.

23   Q.  And that marriage lasted how many years?

24   A.  About four years.

25   Q.  And your twins were born of that marriage; is that right?

*KENNARD - DIRECT/MacGILL*                     Vol. 2-322

1   A.  Yes.

2   Q.  Now, you mentioned, I think earlier, that you reconnected

3   with your current husband approximately 10 years ago; is that

4   correct?

5   A.  Yes.

6   Q.  Okay.  Now, I want to talk about your work life for a few

7   minutes.  With respect to your current work life as a teacher,

8   can you describe who that work life -- who you relate to or who

9   you socialize with in that work life?

10  A.  Yes.  Every year in Avon schools, each grade level is about

11  150 kids.  Currently, I work with 43 kids who are either in my

12  homeroom or my teaching partner's homeroom, that I switch with

13  to teach math and science to both groups.

14      But in Avon schools, we always say that every teacher is

15  your teacher.  So when I'm walking down the hallways, the kids

16  know who I am, whether they're in the fifth grade or sixth

17  grade, whether they are in my class or I've taught them

18  physically in a classroom before, they know who I am and get to

19  know me throughout the year.

20  Q.  Okay.  Let me ask a couple of follow-up questions.

21  A.  Yeah.

22  Q.  So you described, in your testimony a few minutes ago, your

23  work life as a teacher for some 16 years; is that correct?

24  A.  This is my 18th year.

25  Q.  Eighteenth year.  And during those 18 years, has it been in

*KENNARD - DIRECT/MacGILL*                    Vol. 2-323

1   the same school system other than -- it's been in the same

2   Brownsburg school system?

3   A.   Same Avon schools, yeah.

4   Q.   I'm sorry.

5   A.   That's all right.

6   Q.   Now, during that 18-year period, do you interact -- have

7   you interacted with the students in the school?

8   A.   Yes.  Not only do I get to know the kids within my grade

9   level within my classroom, I get to know their families, and

10  oftentimes, there are older or younger siblings that get to

11  know me.  You know, run up and give me hugs because they know

12  me as big brother's teacher or little sister's teacher.  So,

13  yeah, I can't walk down the hallways without getting a hug.

14  Q.   Have you worked with -- during this 18 years of work in the

15  Avon school system, have you also worked, over time, with

16  school administrators in that school system?

17  A.   Yes.  In my time in Avon schools, I have had, let's see,

18  two -- nine to ten different administrators with the turnover

19  in Avon schools.

20  Q.   Looking at what you just described, can you describe to the

21  Court -- strike that.

22       Let me ask it this way:  Can you estimate for us how many

23  children and parents you've interacted with at the Avon school

24  systems during your 18-year tenure?

25  A.   I'd have to crunch the numbers, but it would be close to

*KENNARD - DIRECT/MacGILL*                          Vol. 2-324

1    8- to 10,000.

2    Q.   People?

3    A.   Yes.

4    Q.   How about administer -- strike that.

5         With respect to this 18-year career with the Avon school

6    system, have you also -- can you estimate for the Court the

7    number of colleagues or staff that you've interacted with

8    during that time?

9    A.   Among colleagues and staff, man, that's hard with 18 years

10   and redistricting or, you know, unfortunately, referendums.  We

11   lost some teachers.  There can be between 30 and 40 staff

12   members in a building for one year.  Half of them could be a

13   turnover for the next year, half couldn't.  So we'll just say

14   35 times 18.

15   Q.   Okay.  Now, I want to focus on the period of time before

16   the movie *Our Father*, and I want to ask you about social

17   relationships.

18   A.   Okay.

19   Q.   Before the movie, could you describe where your friends

20   came from?

21   A.   Well, it started with, obviously, you know, my school

22   upbringing from elementary, junior high, Brownsburg High

23   School, but I was also heavily involved in travel basketball

24   and volleyball.  I was with the same AU team in basketball for

25   five years, as well as the same travel volleyball club,

*KENNARD - DIRECT/MacGILL*                    Vol. 2-325

1  volleyball team for two years.

2  Q.  And did those -- did the teammates or participants with you

3  in those athletic matters or athletic events, is that where

4  many of your friends came from?

5  A.  In my childhood, yes.

6  Q.  Okay.  And are some of those teammates from that athletic

7  participation friends today?

8  A.  Yes.

9  Q.  Social relationships before the movie.  Have you had social

10  relationships with classmates of your children?

11  A.  Oh, yes.

12  Q.  Okay.  Can you describe that?

13  A.  So my kids have been in Brownsburg schools since they were

14  in kindergarten.  That was important to not only me and my

15  husband but, you know, my kids' father.  He still lives in

16  Brownsburg, as well.

17      But, yes, they play for -- they play their sport for their

18  school, for soccer and softball, but they also play travel in

19  that sport.  My son plays travel soccer and has been with the

20  same team since he was nine, but has played since he was three.

21  And my daughter has been with the same travel softball team

22  since she was ten, but played recs, you know, in the community

23  when she started at eight.

24  Q.  Okay.  Now, how about, again, focusing on social

25  relationships that you had before the *Our Father* movie was

*KENNARD - DIRECT/MacGILL*                    Vol. 2-326

1    distributed, have your social relationships in that period of

2    time involved parents of your children's classmates?

3    A.  Yes.  With their involvement in sports, I have met a lot of

4    their classmates and teammates' parents.  My time as a parent

5    includes going to school to, you know, instruct my class, doing

6    what I need to do as a teacher, but as soon as that bell rings

7    and my obligations are filled being a teacher, I am with my

8    kids and taking them to where they need to be, whether it's a

9    school function or a sporting function.

10   Q.  All right.  I want to turn now, Mrs. Kennard, to the

11   discovery of Dr. Cline as your biological father.  So I want to

12   ask you first, did you take a 23andMe test at some point in

13   time?

14   A.  I did.

15   Q.  Describe, generally, what a 23andMe test is, please.

16   A.  The test required me to provide a saliva sample to send off

17   in a protected box back to the company to analyze.

18   Q.  And were you given test results?

19   A.  I was.

20   Q.  Now we put on the screen Exhibit 134, which has been

21   previously received in evidence in this case.  Could you look

22   at your screen, please, and tell us what you see here in

23   Exhibit 134.

24   A.  I see myself and in this screen, five other half-siblings.

25   Q.  And what is this second screen?  Can you tell the Court and

*KENNARD - DIRECT/MacGILL*                          Vol. 2-327

1   jury what this second screen is that is now displayed?

2   A.  That is another part of my provided family tree with more

3   half-siblings displayed.

4   Q.  Okay.  Now I notice there's a reference to L.K. in the

5   first exhibit.  Is that you?

6   A.  Yes.

7   Q.  Okay.  Now, with respect to -- and it's now -- as it's

8   displayed here, you did submit your photograph to 23andMe?

9   A.  I did.

10  Q.  And you provided the initials you described; fair enough?

11  A.  Yes.

12  Q.  Now, looking back now on Exhibit 134, did 23andMe ever show

13  Donald Cline as your father?

14  A.  No.

15  Q.  Based on this test result that we now see, Exhibit 134, did

16  you reach out to any other secret children?

17  A.  I did.  The day --

18  Q.  Who did you reach out to?

19  A.  Okay.  I chose to reach out to one of my half-siblings, a

20  half-sister who, based on the 23andMe results at the time,

21  showed that I had the most DNA percentage match.  It was the

22  highest percentage match.

23  Q.  What do you mean by that?

24  A.  I believe she was -- so it tells you how much DNA you

25  share, and based on that DNA, that percentage, they can infer

*KENNARD - DIRECT/MacGILL*                    Vol. 2-328

1    if you are a half-sibling, full sibling, cousin, and how far

2    away you are in your tree.

3    Q.  When you reached out to her, when you reached out to her,

4    did she share any information with you about a Facebook group?

5    A.  Yes.

6    Q.  Could you tell the Court and jury what she shared with you

7    about a Facebook group?

8    A.  So I didn't understand my result at the time, and I had to

9    ask her what they meant.  I thought I was an only child.  She

10   explained to me that all of her half-siblings, she shared a

11   father that was Donald Cline.  She started to give me more

12   information about him.

13       I had not known anything.  I had not seen the news.  I knew

14   nothing about him.  So she invited me to the private secret

15   sibling Facebook group so that I could find support and get

16   more information and...

17   Q.  Okay.  At that time, Mrs. Kennard, what did you understand

18   that this term "private" meant as to this Facebook group?

19   A.  Private being that all the information shared in the group

20   would stay private.  I understood that I wasn't even allowed to

21   share names with my spouse.

22   Q.  Okay.

23   A.  And also that no one could request to join it, and the

24   secret part of it, they couldn't search it in Facebook.  It

25   would not pop up on any search, even if they had an idea of

*KENNARD - DIRECT/MacGILL*                    Vol. 2-329

1    what the name might be.  It just -- it won't pop up.  You have

2    to be invited by someone who is an administrator of the group.

3    Q.  Okay.  Now, you mentioned that you had a -- you had a

4    discussion with Ms. Martin about Dr. Cline at this time; is

5    that correct?

6    A.  Yes.

7    Q.  All right.  What was your reaction -- well, let me back up.

8        What year was this?  Could you tell us?

9    A.  It was April 11th of 2019.

10   Q.  Okay.  What was your reaction when you heard this news from

11   the 23andMe and the conversation that you have described?

12   A.  When I first saw my results, I was completely confused.  I

13   wondered what my father, Steve Lanham, had done.  Like, why do

14   I have all these half-siblings?  I was thinking it was

15   something he did.

16       So I was in a panic.  I didn't know how much my mom knew.

17   I was -- it was just a whirlwind.  Everything just started

18   spinning.  I was texting with my husband, saying, you know,

19   what were your results?  I was trying to grasp, like, maybe

20   this is false.  Maybe it's a mistake, but he said he saw his

21   brother was connected to him.  His mother was connected to him.

22   His results seemed to be accurate.

23   Q.  Where were you when you got this -- when you had this phone

24   call?

25   A.  I was sitting in my -- one of my colleague's classroom.

*KENNARD - DIRECT/MacGILL*                          Vol. 2-330

1   Both of our classes, third grade at the time, were watching a

2   puppet show.

3   Q.  Okay.  And what happened next in terms of your own reaction

4   on that day to this news and this information?

5   A.  Because the kids were distracted, I immediately reached out

6   to someone, Lindsey Martin, who I thought could give me some

7   information.  And she didn't get back to me right away, so I

8   did what I always do.  I distract myself and compartmentalize

9   and do what I need to do for my third graders.

10      We were getting toward the end of the day, toward

11  dismissal, and that's when her message popped up to tell me all

12  of her half-siblings, they share the biological father,

13  Dr. Cline.  He was the infertility doctor in Indianapolis who

14  impregnated his patients with his own semen that did not have

15  his patients' consent.

16  Q.  Okay.  And this is additional -- this is the information

17  amongst the information that you got while at school; is that

18  correct?

19  A.  Yes.

20  Q.  All right.  Now, let's turn, Mrs. Kennard, to the events

21  after the days after or the weeks after this event; okay?

22  A.  Uh-huh.

23  Q.  All right.  Now, after you had this conversation with

24  Lindsey Martin, did you reach out to any other secret children?

25  A.  I accepted my invitation to the group.  I believe Lindsey

1    said:  Hey, everyone, welcome, Lori.  And I just kind of --

2    they said:  Hi, you know.  Sorry, but welcome.  Please reach

3    out with any questions.

4        They encouraged me to read through past posts, but I

5    couldn't at the time.  I just needed to be at my house and cry

6    to my husband, and, which was very hard to control, because my

7    kids were in the house.

8    Q.  Okay.  Now, let's -- let me just ask a follow-up question

9    here, if I may.  So was the Facebook group of these other

10   secret children helpful in any way to you?

11   A.  It was a double-edged sword.  I mean, I thought I was an

12   only child, and I always wanted to have siblings, so I tried to

13   find the silver lining in it that, you know, I would get to

14   know people.  But as I learned more and more about my mom's

15   fertility doctor, I just -- I became disgusted.  I didn't

16   know -- I didn't know what to do.  Do I embrace my siblings,

17   but then that just reminds me of what he did, and that my own

18   father is not my father.

19   Q.  All right.  So let me follow up with a question

20   specifically, if I may.  So at this point in time, did you gain

21   any comfort -- you described some of the challenges.  Did you

22   gain any comfort of any kind from speaking to other members --

23   or I should say other secret children in this Facebook group?

24   A.  I did.  There were -- go ahead.

25   Q.  Let me follow up, if I may.

*KENNARD - DIRECT/MacGILL*                    Vol. 2-332

1    A.    Yeah.

2    Q.    So with respect to this Facebook group that you've

3    described, I think, you know, you described this conversation

4    that you had.  Was your Facebook profile on this public or

5    private?

6    A.    Private.

7    Q.    Okay.  Now, I want to focus on a period of time for just a

8    few minutes, if I may, and I want to be specific to orient you

9    to the questions.

10   A.    Okay.

11   Q.    So after you learned this news in the manner that you

12   described to this court, and between the time of this 2019

13   event that you have described, and the *Our Father* movie, did

14   you reach out, at any point, to communicate with others about

15   these circumstances?

16   A.    A few.

17   Q.    Okay.  How many?

18   A.    I told --

19   Q.    Now just first, how many?

20   A.    Okay.  In the Facebook group?

21   Q.    Yes.  No --

22   A.    I'm sorry.

23   Q.    I'm sorry, outside the Facebook group.

24   A.    Oh, I'm sorry.

25   Q.    Did you speak -- during the 2019 to 2022 period of time,

1    before the movie, did you reach out to any persons, any person

2    not in the sibling Facebook group?

3    A.   Yes.

4    Q.   Okay.  How many people?

5    A.   Six, seven.

6    Q.   Okay.  And were -- was one of those persons a close friend?

7    A.   Yes.

8    Q.   Was one of those persons a relative?

9    A.   Yes.

10   Q.   Was one of those persons a work colleague?

11   A.   Yes.

12   Q.   Now, I want to switch time periods with you one more time,

13   if I may.  I want to focus now on April of 2021; okay?  And

14   specifically, I want to ask you, did you -- do you recall,

15   during that period of time, reaching out to a coworker?

16   A.   A coworker?

17   Q.   Yes.

18   A.   No.  I believe he was -- he worked within the schools with

19   the PTO and as a volunteer as a parent.

20   Q.   Did you reach out?  Was he one of the people that you

21   reached out to in April of 2021?

22   A.   I believe he started the conversation about 23andMe or

23   Ancestry.

24   Q.   Okay.  Did you also reach out in the May -- in the May 2021

25   period to your college roommate about this matter?

*KENNARD - DIRECT/MacGILL*                    Vol. 2-334

1   A.  Yes.

2   Q.  Now, I want to focus on some communications that you were

3   involved with after the movie.

4   A.  Okay.

5   Q.  Okay?  So I want to focus on May of 2022, and I'm going to

6   ask you to look at what's on the screen, which is Exhibit 160.

7   And before we talk about it, I just want to identify this

8   first.

9   A.  Okay.

10  Q.  Do you have it on your screen?

11  A.  No, not yet.

12  Q.  Okay.

13  A.  May I look in the binder?

14  Q.  Hold on.

15       MR. MacGILL:  May I have one minute?

16     (Off the record.)

17  BY MR. MacGILL:

18  Q.  It's number 160 in your binder.

19  A.  Okay.

20  Q.  I'm sorry.  It's tab number 8.  That's what I should have

21  told you.  Do you have tab number 8 in front of you?

22  A.  Yes.

23  Q.  All right.  And is this an exchange -- is this a -- some

24  form of messaging on Exhibit 160?

25  A.  Yes.

*KENNARD - DIRECT/MacGILL*                     Vol. 2-335

1   Q.  And what is this, a Facebook chat?

2   A.  Yes.

3   Q.  And is -- who -- could you please tell the Court who this

4   Facebook chat was with?

5   A.  It's a chat with Jacoba Ballard, who is one of my

6   half-sisters.

7   Q.  On what date?

8   A.  April 12th of 2019.

9   Q.  Okay.  Now, if you --

10          MR. MacGILL:  At this time, Your Honor, we would offer

11  into evidence Exhibit 160.

12          MS. YOUNG:  No objection.

13          THE COURT:  Exhibit 160 is admitted into evidence

14  without objection.

15                  *(Plaintiffs' Exhibit 160 was*

16                   *received in evidence.)*

17          MR. MacGILL:  May we publish the exhibit, Your Honor?

18          THE COURT:  You may.

19  BY MR. MacGILL:

20  Q.  Okay.  So looking at Exhibit 160, and I want to turn you to

21  a particular page.

22          MR. MacGILL:  If we could blow that up.  Let's see.

23  BY MR. MacGILL:

24  Q.  So do you see this text on May 13, 2022?

25  A.  Yes.

1  Q.  Okay.  And you also can look at it on the screen, if that

2  would be easier for you.

3  A.  Okay.

4  Q.  Do you see this text on May 13, 2022?

5  A.  Yes.

6  Q.  And this is at 10:37 p.m.?

7  A.  Yes.

8  Q.  Is this a text that you sent to Jacoba Ballard?

9  A.  Yes.

10 Q.  Okay.  And could you describe who Jacoba Ballard is?

11 A.  She's my half-sister and the leader of our siblings group.

12 Q.  Okay.  And I want to ask you about some of your words here.

13 You're saying, and specifically:  In my opinion; do you see

14 that section?

15 A.  Yes.

16 Q.  Okay.  In my opinion, that screen should have never been up

17 in the first place.  That was just playing with fire and

18 opening up the possibility of this happening; do you see that?

19 A.  Yes.

20 Q.  And could you tell -- could you describe what -- why you're

21 communicating this to Jacoba Ballard.

22 A.  She was the point person in the documentary of helping get

23 this produced, and she was my point person to make sure that it

24 would get blurred.

25 Q.  Okay.  And were you frustrated with this circumstance as

1  far as Ms. Ballard was concerned?

2  A.  Yes.

3  Q.  That you just described?

4  A.  Yes.

5  Q.  So I'm going to turn you now to Exhibit 950, and that is at

6  tab number 10 in your binder.  Please tell me when you're

7  there.

8  A.  I'm there.

9  Q.  First, could you tell the Court what this is.

10 A.  It looks like it is a printout of someone's posts from our

11 private secret Facebook group.

12 Q.  Okay.  Of the siblings?

13 A.  Yes.

14      MR. MacGILL:  Okay.  Your Honor, we would offer into

15 evidence Exhibit 950.

16      MS. YOUNG:  No objection.

17      THE COURT:  Exhibit 950 is admitted into evidence

18 without objection.

19           *(Plaintiffs' Exhibit 950 was*

20           *received in evidence.)*

21      MR. MacGILL:  May we publish this exhibit, Your Honor?

22      THE COURT:  You may.

23 BY MR. MacGILL:

24 Q.  Okay.  Now, first let's look at page 1 for a minute.  This

25 is -- is this a -- well, let's look at -- this is Trial

1   Exhibit 950.  And is this a communication that you had -- or

2   that you were involved with with Amanda Davenport?

3   A.  Yes.

4   Q.  All right.  And was she a half-sibling?

5   A.  Yes.

6   Q.  And what is the date of this post, can you tell the Court?

7   A.  May 11th of 2022.

8   Q.  Okay.  And this is her post that -- did you read this -- on

9   that day, did you read that post?

10  A.  Yes.  I responded that day.

11  Q.  Okay.  And you see that, in pertinent part, it says:  I

12  know specifically -- you say:  I know the release of info.  And

13  I'm looking at the top, Amanda Davenport.  I know the release

14  of info without consent is bad, but just take -- but just take

15  the damned day.  Sorry if I lose some people after this.

16      Do you see that?

17  A.  Yes.

18  Q.  And that was her post that you responded to?

19  A.  Yes.

20  Q.  All right.  Now, let's look at your response that day; is

21  that correct, the same day response?

22  A.  Yes.

23  Q.  All right.  And we see that displayed here; do we not?

24  A.  Uh-huh.

25  Q.  Now, let's look at the third line down, beginning:  I did

*KENNARD - DIRECT/MacGILL*                                    Vol. 2-339

1   not.

2        Do you see that?

3   A.   Yes.

4   Q.   It says, as part of your response here:  I did not give

5   consent to Michael and haven't been public.

6        When you refer to Michael, who are you referring to?

7   A.   Michael Petrella.

8   Q.   Okay.  And you continue:  But I'm not announcing this to my

9   1,500 friends on Facebook either.

10       Can you explain that comment.

11  A.   Uh-huh.  I haven't been public.  I haven't announced it to

12  say: Hey, I am a child of Donald Cline.  When I say I'm not

13  hiding it, it's that I am telling people who I deem I need to

14  tell.

15            MR. MacGILL:  Okay.  Now, we can take that down.

16  BY MR. MacGILL:

17  Q.   I want to now ask you about the -- I want to go back to the

18  point in time before the movie.  Do you recall in

19  September 2020 having a phone -- a phone call with a Realhouse

20  individual?

21  A.   Yes.

22  Q.   And can you describe what you said to the Realhouse

23  individual.

24  A.   The point of the conversation was to get an idea of what

25  the film's angle was going to be, what kind of tone it was

*KENNARD - DIRECT/MacGILL*                              Vol. 2-340

1    going to have, what kind of information it was -- and content

2    it was going to focus on, but also to make sure that they

3    understood that I was not public.  They asked me if I would

4    like to be involved in the documentary as far as in front of

5    the camera or my picture.  I said that the only way I would say

6    anything is if I had an anonymous quote flashed on the screen.

7    I thought maybe that would be therapeutic to get my voice out,

8    or sit in front of the camera being blacked out, voice altered,

9    all of that, and they -- I, specifically, remember her saying

10   to me: We can't do that.  We're wanting as many people in front

11   of the camera to give our film more credibility.

12   Q.  Okay.  Now, I want to go to May 11, 2022.  Did you

13   understand, on that day, that the movie was going to be

14   released?

15   A.  Yes.

16   Q.  How did you come to learn that?

17   A.  Well, several different avenues.  Not only was it being

18   shared for years before it came out in our group, I was aware

19   that the project was in production, but also I saw news and

20   advertisements and trailers for it.

21   Q.  Okay.  And how did you then -- did you then watch the movie

22   on that day?

23   A.  I did.

24   Q.  Okay.  Now, prior to watching the movie, did you have any

25   communications with any half-siblings?

*KENNARD - DIRECT/MacGILL*                    Vol. 2-341

1   A.  I did.

2   Q.  And could you describe those communications.

3   A.  We were all very nervous for that day coming out, and I

4   knew I wasn't going to be able to watch it until after I got

5   home from work, the kids asleep, but I was at school preparing

6   for my students to come in and I had about five minutes, so I

7   hopped on Facebook for -- to look at what everyone was sharing

8   and some of them had watched it already, someone hadn't -- some

9   of them hadn't, they were asking questions, so I was just

10  trying to gather information having not watched it yet.

11  Q.  Okay.  And you -- you did, indeed, watch it that night?

12  A.  Yes.

13  Q.  And what did you see?

14  A.  My name.

15          MR. MacGILL:  Okay.  Now, what I would like to do is,

16  Your Honor, Exhibit 60 -- or 37, we would offer that into

17  evidence at this point.

18          THE COURT:  Any objection to 37?

19          MS. YOUNG:  No objection, Your Honor.

20          THE COURT:  Exhibit 37 is admitted without objection.

21              *(Plaintiffs' Exhibit 37 was*

22              *received in evidence.)*

23          MR. MacGILL:  Okay.

24  BY MR. MacGILL:

25  Q.  And with respect to --

1          MR. MacGILL:  May we display Exhibit 37?

2          THE COURT:  You may.

3          MR. MacGILL:  Okay.

4  BY MR. MacGILL:

5  Q.  Now, with respect to seeing your name in the movie -- back

6  up.

7       When you learned from the Facebook group that your name was

8  in the movie, what was your reaction while you were at school?

9  A.  That was not something I was expecting to learn hopping on

10 Facebook right before school, but it was a half-sibling saying

11 my name, tagged me in the post for our group to see that my

12 name, she saw it in the film.  And just like when I had found

13 out that I was a child of Don Cline's, I -- it swirled.  I

14 panicked, I ran out of my room but went in circles, not knowing

15 if I should go to the bathroom, if I should go cry to a

16 colleague, but they don't know -- they don't know.  Do I go to

17 the counselor?  Like, where do I go?  But the kids were walking

18 in, so I had to get my composure and I went to the bathroom and

19 I called my husband, panicking, telling him that I was in the

20 movie and he tried to calm me down, saying it was going to be

21 okay, maybe no one will see it.  He was asking me questions

22 that I didn't have the answers to.  I didn't know when it was,

23 I didn't know in what context.  I was just told my name is in

24 the movie.

25 Q.  Okay.  Now -- and then you confirmed, as you testified

1    earlier, you did watch the movie?

2    A.  So I watched the movie entirely, late that night once my

3    kids were asleep.

4           THE COURT:  All right.  Next question.

5           I want you to listen to the question, and then just

6    answer that question.

7           THE WITNESS:  Okay.

8    BY MR. MacGILL:

9    Q.  So let's focus for a minute, just very specifically, you

10   watched the movie when you got home that night --

11   A.  Yes.

12   Q.  -- is that correct?

13      Now, did -- how did this event of you seeing your name in

14   the movie affect you in general terms?

15   A.  From that point forward, I have been completely and

16   internally traumatized.

17   Q.  All right.  Let me just follow up.  I want to look at a

18   period of time here for a minute; okay?

19   A.  Uh-huh.

20   Q.  Let's focus on a period of time.  Now, you're able -- let

21   me move this over a little bit.

22      Now, relative to your just -- the answer you gave and the

23   testimony that you provided this Court, what happened after

24   May 11, 2022, in terms of your ability to return and work on a

25   permanent basis at the school system?

*KENNARD - DIRECT/MacGILL*                    Vol. 2-344

1    A.  I couldn't.  I tried, but I had a complete lack of trust,

2    lack of confidence.  I just was waiting for someone to ignore

3    my wishes or someone to tell my kids.

4    Q.  Let me interrupt you if I may.

5    A.  Yeah.

6    Q.  Now, focus with me on the time period.

7    A.  Yeah.

8    Q.  Okay?  Now, after May 11, 2022, how long did you stay

9    employed -- where were you employed on May 22?  Where were you

10   teaching?

11   A.  I was teaching second grade, at the time, at River Birch

12   Elementary.

13   Q.  All right.  How long did you stay in that job after May 11,

14   2022?

15   A.  Less than a year.

16   Q.  Okay.  Now, less than a year after May 11.  When did you

17   leave that job?

18   A.  April 22nd of 2023.

19   Q.  All right.  You said April 22nd, 2023?  All right.

20       Why did you leave the job at that school system on

21   April 22nd, 2023?

22   A.  I was so emotional distressed I had to -- I had to get

23   away.  I had to take care of myself.  I couldn't be in that

24   building, I couldn't be in that room, I couldn't be in that

25   hallway.  Everything would just come back to me.

*KENNARD - DIRECT/MacGILL*                                    Vol. 2-345

1    Q.  Okay.  Now, let's focus on what happened next; okay?  So

2    after you left this job on May -- pardon me, after you left

3    this job on April 22nd, 2023, where were you next employed?

4    A.  I worked with HR to get transferred to another school

5    within my corporation at East, where I am now.

6    Q.  And what is the name of that school?

7    A.  Avon Intermediate East.

8    Q.  Okay.  Avon Intermediate East.  And what do you do there?

9    A.  I teach sixth grade math and science.

10   Q.  I want to focus on another event, if I can.  So after

11   May 11, 2022, did there come a time when your name was blurred

12   out of the movie?

13   A.  Yes.

14   Q.  And do you remember when that was?

15   A.  May 18th --

16   Q.  Okay.

17   A.  -- of 2022.

18   Q.  Of 2023?

19   A.  '22.

20   Q.  My mistake.

21       Now, I want to be specific in my questions that are going

22   to follow; okay?  Now, have you suffered emotional distress

23   from seeing your name in this movie?

24   A.  Yes.

25   Q.  I have some specific questions.  Can you tell the Court

*KENNARD - DIRECT/MacGILL*                          Vol. 2-346

1  whether or not you had any stressful conditions as a result of

2  seeing your name in this movie?

3  A.  Absolutely.

4  Q.  Okay.  Have you experienced any trauma based on seeing your

5  name in this movie?

6  A.  Every day.

7  Q.  Okay.  Now, I want to focus on frequency; okay?  Do you

8  understand what I mean by "frequency"?

9  A.  Yes.

10 Q.  Okay.  Now, in general terms, you've described that there

11 has been stress and trauma.  Can you describe to this Court and

12 jury how often it is that you have stress from the fact that

13 your name was in this movie?

14 A.  It's daily.

15 Q.  Okay.  All right.  And with respect to context, I want to

16 ask you just one question about context first; all right?

17 A.  Yes.

18 Q.  With respect to the stress or other emotional distress that

19 you may have experienced, are there places, are there places

20 where the stress is triggered, specifically?

21 A.  Yes.

22 Q.  Okay.  What places?

23 A.  Currently, it is anytime I am going to one of my kids'

24 sporting events.

25 Q.  And why -- why is it that going to one of your children's

*KENNARD - DIRECT/MacGILL*                     Vol. 2-347

1    sporting events causes you difficulties or distress?

2    A.   The first reason is because my son plays for a travel

3    soccer team that is based out of Zionsville, which is where

4    several half-siblings live and where Donald Cline lives.

5    Q.   Okay.  Now, I want to go back to a couple -- a follow-up

6    question on the situations.  Are there any other situations,

7    just situations, that you can describe to the Court where

8    emotional distress is triggered in you?

9    A.   Anytime I am expressing my wishes in a relationship, my

10   thoughts, my feelings, I don't think it's going to be

11   validated.

12   Q.   All right.  Now, is that a situation -- you're describing a

13   situation in which some of this distress results; is that fair?

14   A.   Yes.

15   Q.   Okay.  Now, I want to talk -- I'm going to ask you some

16   specific questions; okay?  Specific questions.

17        Now, during this period of time, from May 11, 2022, to the

18   present day, have you experienced anxiety as a result of your

19   name being in this movie?

20   A.   Yes.

21   Q.   Have you experienced humiliation by virtue of your name

22   being in this movie?

23   A.   Yes.

24   Q.   Okay.  Now, specific question:  Ms. Kennard, do you have

25   any feelings yourself since May 11, 2022, and as a result of

*KENNARD - DIRECT/MacGILL*                    Vol. 2-348

1  your name being in this movie, that others in your community

2  will regard you with dislike or aversion because of your

3  biological father being Dr. Cline?

4  A.  Yes.

5  Q.  All right.  Now, with respect to that particular feeling

6  that you just described, do you have concern of particular

7  groups of people in Brownsburg that would have this type of

8  fear -- or this type of aversion, potentially, as far as you're

9  concerned?

10  A.  Specific to Brownsburg would be my kids, my family being

11  devastated to learn this since they don't know; my kids'

12  classmates and their parents.

13      But specific to Avon, my students, their families who

14  entrust me to take care of their child every day.

15  Q.  Okay.  Now, I want to go back to one event associated with

16  you leaving the school on April 22nd, 2023.  Was this departure

17  communicated in the Brownsburg school community?

18  A.  In the Avon school community.

19  Q.  I'm sorry.  I stand corrected.

20      Was your departure from your job on April 22nd, 2023,

21  communicated in the Avon school community?

22  A.  Yes.

23  Q.  To whom?

24  A.  My entire class and their families.  They didn't say why,

25  but it was that I wasn't -- I wasn't going to be coming back

*KENNARD - DIRECT/MacGILL*                    Vol. 2-349

1   that school year.  All my colleagues found out that I wasn't

2   returning, and they knew not to reach out to me.  I couldn't --

3   I couldn't reach out to them because I was on an FMLA so I

4   couldn't have communication with people from work.

5   Q.  Okay.  Now was this -- was your departure communicated to

6   the parents in the Avon school system?

7   A.  Yes.

8   Q.  Was it communicated to the friends that you have in the

9   Avon school system?

10  A.  Yes.

11  Q.  Was it communicated to coworkers in the Avon school system?

12  A.  Yes.

13  Q.  Now, I'm going to get to some specifics here.

14      Contemporaneous with this event, did you -- were you seeing

15  a therapist -- with this -- let me be more specific.

16      After your name was -- strike that.

17      After you saw your name in the documentary on May 11, 2022,

18  did you seek therapy?

19  A.  Yes.

20  Q.  All right.  And in your binder, at tab number 14, is what

21  we've marked as Exhibit 736A.  First, could you explain?  What

22  is this document?

23  A.  It looks to be my therapist's notes from our sessions.

24  Q.  Okay.  A portion of those sessions?

25  A.  Yes.

1          MR. MacGILL:  Okay.  At this time, Your Honor, we

2     would offer Exhibit 736A.

3          THE COURT:  Any objection?

4          MS. YOUNG:  No, subject to certain information being

5     redacted, which we've discussed with counsel.  I don't see

6     redactions on the copy I've been given.

7          MR. MacGILL:  Yeah.  Let me -- may I hand this to

8     counsel?

9          THE COURT:  Yes.

10         MR. MacGILL:  Sorry about that.  It's on page 2.

11         MS. YOUNG:  May we confer for just one minute, Your

12    Honor?

13         THE COURT:  Yes.  Make sure you cut your mics off.

14         MR. MacGILL:  One second.

15       (Off the record.)

16         MR. MacGILL:  So, Your Honor, we would renew our offer

17    of 736A.

18         Counsel has requested -- and we agree -- to make

19    certain redactions in the document, number one; and, number

20    two, that we will not publish any of these particular portions

21    of concern, but only of the other document.

22         THE COURT:  With those conditions, do you have any

23    objection to 736A?

24         MS. YOUNG:  No, subject to the redactions being made

25    before it goes to the jury, we have no objection.

*KENNARD - DIRECT/MacGILL*

1          THE COURT:  736A, as redacted, is admitted into

2     evidence without objection.

3                    *(Plaintiffs' Exhibit 736A was*

4                    *received in evidence.)*

5     BY MR. MacGILL:

6     Q.  Mrs. Kennard, I just want to go back to where we were a

7     minute ago.  You were describing some of the feelings that you

8     have a few minutes ago, and I asked you about therapy.

9          Do you remember that line questioning?

10    A.  Yes

11    Q.  All right.  Now, focusing on the time after you saw your

12    name in the movie, have you, at any time, had any inherent

13    feeling that other people in your community will regard you

14    with dislike or aversion because of how you were conceived?

15    A.  Absolutely.

16    Q.  Okay.  Can you explain briefly what that particular feeling

17    is or concern that you have?

18    A.  Everywhere I go, I wonder if that person knows and if

19    they're going to reveal it to my kids.

20    Q.  All right.  And has that caused anxiety in you?

21    A.  Yes.

22    Q.  Has that caused -- has that circumstance caused stress in

23    you?

24    A.  Yes.

25    Q.  One more question along this line, specific question:  Do

1    you have any inherent feelings that other people will regard

2    you with dislike or aversion because of what's been called

3    here: Bizarre beginnings?

4    A.  Yes.

5    Q.  Could you explain briefly to this Court what that concern

6    is?

7    A.  Now, he was a trusted -- he was supposed to be a trusted

8    doctor in the community, and it turns out to be completely

9    false.  And for me to be connected to him, that's my identity.

10   I'm a teacher, I'm a wife, and I'm a mom.  And for anyone to

11   think less of me for being great in those roles ...

12   Q.  That causes you anxiety?

13   A.  Yes.

14   Q.  Does that cause you stress?

15   A.  Yes.

16   Q.  Now, looking at May 11 -- looking at the time period on

17   May 11, 2022, when you saw your name in the movie, have you

18   encountered difficulties sleeping?

19   A.  Yes.

20   Q.  Can you describe briefly to the Court the nature of those?

21          MS. YOUNG:  Objection, Your Honor.  Discussion to the

22   Court's ruling on in limine motion 12.

23          THE COURT:  I'll sustain.  About sleeping.

24          MR. MacGILL:  About sleeping, got it.

25   BY MR. MacGILL:

*KENNARD - DIRECT/MacGILL*                    Vol. 2-353

1  Q.  Have -- since your name was included in -- strike that.

2       Since you saw your name in the *Our Father* film, have you

3  been depressed, at any time, during this period shown on the

4  board?

5  A.  The whole time.

6  Q.  Okay.  Now, prior to the movie, did you have a point of

7  view that you had control over your own identity?

8  A.  Yes.

9  Q.  Do you have -- do you feel today, Mrs. Kennard, as you sit

10  here in this courtroom, that you have control over your

11  identity today?

12  A.  No.

13  Q.  Now, I want to focus -- I want to go back, if you don't

14  mind -- prior to May 11, 2022.  Are you with me on the time

15  period?

16  A.  Yes.

17  Q.  Okay.  Now, prior to May 11, 2022, did you feel that you

18  had control over the information pertaining to you personally?

19  A.  Yes.

20  Q.  After your name -- strike that.

21       After you saw your name in the movie, do you feel that you

22  have control since that time, with the information about you

23  personally?

24  A.  None.

25  Q.  Have the circumstances that you just described created any

*KENNARD - DIRECT/MacGILL*                    Vol. 2-354

1  type of trust issues that you have in terms of how you look at

2  life?

3  A.  I don't want to get close to anyone.

4  Q.  Now, I want to go to another specific topic; okay?

5      With respect to how you carry yourself, your confidence

6  prior to May 11, 2022, how would you, in your own words,

7  describe your confidence about yourself and your work life?

8  A.  I walked with my head held high.

9  Q.  Okay.  Now, focusing on after you saw your name in the

10  movie, how would you describe your confidence in your work

11  life?

12  A.  I just want to show up at my job and do what I need to do

13  for the kids and leave.

14  Q.  Okay.  Now, I want to change topics.  I want to talk about

15  your confidence -- your confidence prior to May 11, 2022.

16      Prior to May 11, 2022, were you confident in your social

17  relationships?

18  A.  Yes.

19  Q.  After May 11, 2022, can you tell the Court whether or not

20  you're confident in your social relationships since you saw

21  your name in the movie?

22  A.  Not at all.

23  Q.  Now, I want to look again at -- pardon me -- April 22nd,

24  2023.

25      Did your professional standing change in your school

*KENNARD - DIRECT/MacGILL*                    Vol. 2-355

1    community in terms of whether or not you were regarded as a

2    reliable teacher?

3              MS. YOUNG:  Objection, foundation.

4              MR. MacGILL:  Let me restate, if I may.

5              THE COURT:  If you would.

6    BY MR. MacGILL:

7    Q.  With respect to the time at which you departed on

8    April 22nd, 2023, have you yourself had any stress about how

9    you're viewed in your professional capacity?

10   A.  Yes.

11   Q.  What is the stress that you are feeling about that

12   particular circumstance?

13   A.  That year and every year before and now, those parents find

14   out that I'm their child's teacher, and they have heard about

15   me, they have heard stories that I am a great teacher, I was

16   the bunny teacher.  I had the class pet.  You know, I had the

17   bunny.  Kids wanted to be in my class.  Their siblings wanted

18   to be in my class.  And then that day, I just abandoned them.

19   Q.  Okay.  Now, I want to -- I want to review some records with

20   you; okay?

21        You described to the Court that you had sought therapy;

22   right?

23   A.  Yes.

24   Q.  And you sought therapy during this specific period of time,

25   did you not, in terms of June 22 as one example?

*KENNARD - DIRECT/MacGILL*                    Vol. 2-356

1    A.  Yes.

2    Q.  Now, I'm going to show -- we're going to display -- this

3    exhibit that's now been received, 736A.  I'm going to refer to

4    this, and you can see it on your screen.  These are the notes

5    from your therapist.

6         The notes reflect -- and what is the date of these notes;

7    do you know?  Can you see these?  Do you recall whether this is

8    a June 1, 2022, note?  Do you know?

9    A.  I don't know.

10   Q.  Okay.  So looking at this --

11           MR. MacGILL:  Could we scroll up on that?  No?

12           Okay.  Well, let me just focus for a minute.

13   BY MR. MacGILL:

14   Q.  Did you report to your therapist that -- or did you

15   discuss, I should say, with your therapist in June of 2022,

16   that -- there it is.  This -- do you see the exam date of

17   June 1, 2022 --

18   A.  Yes.

19   Q.  -- that's here at the bottom of this document?

20   A.  Yes.

21   Q.  Okay.  On June 1st, 2022, did you discuss anxiety and trust

22   issues with your therapist after that documentary was released?

23   A.  Yes.

24   Q.  I'm going to move to another -- this time to page 23 of

25   this particular collection of therapy notes.  And this is -- do

1  you recall having a session with your therapist on June 15,

2  2022?

3  A.  Yep.

4  Q.  Okay.  And I want to -- I want to ask you about this note

5  here that's been highlighted.

6     Do you recall discussing with your therapist the concerns

7  that you had with respect to a recent documentary about your

8  biological father and your worries about how she would be

9  perceived?  Do you remember that?

10 A.  Yes.

11 Q.  And did you express to your therapist on that day that you

12 had worries related to how students she works with and their

13 families could see her and how this may impact the views others

14 have of her?  Is that a fair description of your discussions

15 with your therapist?

16 A.  Yes.

17 Q.  Okay.  And at this time, did you also have concerns that

18 some percentage of people in your community would judge you?

19 A.  Yes.

20 Q.  And we see the note here:  Lori stated worries about

21 25 percent of people would judge me and having examples of

22 family who may judge her parenting/teaching abilities due to

23 her family history.

24    Do you see that?

25 A.  Yes.

*KENNARD - DIRECT/MacGILL*                    Vol. 2-358

1  Q.  And what is the family history that you discussed with your

2  therapist that day?

3  A.  Being a child of Donald Cline.

4  Q.  Okay.  Let's turn to -- this is now a January 6, 2023,

5  note.  And while Mr. Ciulla is pulling that up, I want to ask

6  you -- this is January 2023.  This is now, what, six or seven

7  months past.  I guess it's the next year, January; is that

8  correct?

9  A.  Yes.

10 Q.  Okay.  And you described to this Court and to this jury

11 earlier that you, during the May 2022 to April 2022 -- or 2023,

12 that you had what I think you described as flashbacks.  Do you

13 recall that testimony?

14 A.  Yes.

15 Q.  All right.  Now, turning to this note -- and this is

16 from -- do you see this is from January 6, 2023?

17 A.  Yes.

18 Q.  Lori stated having flashbacks at her school building due to

19 memories from finding out my stepdaughter hurt herself in an

20 environment or role.

21     Do you see that?

22 A.  Yes.

23 Q.  In that building, and information about her father and the

24 documentary which causes anxiety when she flashes back to

25 receiving the information.

1      Do you see that?

2    A.  Yes.

3    Q.  When you -- when the reference -- with respect to the

4    therapist's communication you had here, receiving the

5    information, was that -- what was that pertaining to, the

6    information about what?

7            THE COURT:  That was a terrible question.  Repeat.

8            MR. MacGILL:  It was.  Understood.  Let me do better.

9    BY MR. MacGILL::

10   Q.  Okay.  There's a clause here: Receiving the information.

11   Do you see that?

12   A.  Yes.

13   Q.  What information did you discuss with your therapist?

14   A.  First, it was that I -- my biological father was not my

15   father.  And then it was about the documentary having my name

16   in it and -- as well as my stepdaughter hurting herself.

17   Q.  All right.  Now, there also is -- the next line is:

18   Discuss need for more consistent frequent sessions to help

19   build skills for managing triggers and discuss potential FMLA

20   and setting boundaries with school.  Do you see that?

21   A.  Yes.

22   Q.  I want to ask you about this -- these two words, "managing

23   triggers."  Do you see those two words?

24   A.  Yes.

25   Q.  Can you describe what triggers, if any, were you attempting

*KENNARD - DIRECT/MacGILL*                    Vol. 2-360

1  to manage?

2  A.  It was really hard to manage it because it was

3  environmental, it was in that room, it was in that hallway,

4  walking by the room that I was in when I found out I was a

5  child of Don Cline's.  But I was still in the room that I found

6  out my name was in the film.  I was still currently teaching in

7  that room.

8  Q.  Two more questions on these records; okay?

9         MR. MacGILL:  I would like to go to the next -- the

10  next entry, February 3rd, 2023.

11  BY MR. MacGILL:

12  Q.  And did you also have a session with your therapist on

13  February 3rd, 2023?

14  A.  Yes.

15  Q.  Okay.  Now, I want to look at the last portion of this,

16  what's being highlighted here.  It says here:  Lori identified

17  worries about who knows my half-siblings and constant worry

18  about who judges her and you don't belong to the family you

19  grew up -- in the family you grew up with.

20      Do you see that?

21  A.  Yes.

22  Q.  Okay.  Now, you reference here: Constant worry about who

23  judges her.

24      Can you be more specific about what you shared with the

25  therapist on that particular point?

*KENNARD - DIRECT/MacGILL*                          Vol. 2-361

1   A.  The constant worry of who judges me is everywhere I go in

2   my daily life, from my school to in my community at the events,

3   for sporting events, whether it's soccer, softball, who knows,

4   and are my kids going to find out?

5   Q.  Okay.  Now, two other questions on this:  There's a

6   reference here about what Lori identified examples of

7   uncomfortable situations.  Do you see that?

8   A.  Yes.

9   Q.  With people knowing her family history and feeling: I don't

10  have control over who my dad is.  Do you see that?

11  A.  Yes.

12  Q.  And was that a feeling that you expressed to your therapist

13  at that time?

14  A.  Yes.

15  Q.  You also -- continuing:  Of who my dad is and feeling a

16  lack of control over who now can make that connection.

17      Could you be more -- could you -- did you describe that,

18  first?  Did you describe that to the therapist?

19  A.  Yes.

20  Q.  Could you tell us -- could you give us more detail on this

21  phrase: Who can make that connection?

22  A.  My name was in the film, so it was -- they've connected me

23  to the monster who conceived me without permission.

24  Q.  All right.  Now, let's look at the last clause here that's

25  highlighted:  I feel like I'm a story and not a person.

1          Did you say that to your therapist?

2    A.  Yes.

3    Q.  Was that a fair description of how you felt -- or the

4    symptoms you reported during that session on February 3rd,

5    2023?

6    A.  Yes.  I said I'm a person, I'm not newsworthy.

7    Q.  Okay.  Now, let's turn to the last entry I want to ask you

8    about; all right?  Did you also describe that you had a feeling

9    of -- to your therapist --

10          THE COURT:  Can you take that one down?

11          MR. MacGILL:  Yeah.  Actually, I missed a question.

12   May I ask one more question, Your Honor?

13          THE COURT:  Oh, all right.

14          MR. MacGILL:  On this exhibit?

15   BY MR. MacGILL:

16   Q.  You say in the last sentence of this -- of this paragraph:

17   You're able to recognize some things she could control in the

18   situation to reduce feelings of helplessness.

19          Do you see that?

20   A.  Yes.

21   Q.  Okay.  Can you describe -- did you share with the therapist

22   on February 3rd, 2023, that you had, in fact, feelings of

23   helplessness?

24   A.  Yes.

25   Q.  Could you describe to the Court here what you mean by

1  "helplessness" or meant by "helplessness"?

2  A.  I felt like no matter what I did, what precautions I

3  thought I was making of who I said no to, it wouldn't matter

4  that I --

5  Q.  All right.  Now, let me ask -- I've got some follow-up

6  questions now, if we could focus on May 11, 2022; all right?

7      Were you in denial of any type on that day?

8  A.  Absolutely.

9  Q.  Could you explain to the Court why -- or why you were in

10  denial?

11  A.  That's my go-to coping mechanism of, it's going to be okay,

12  immediate try to make the best of it.  It's going to be okay.

13  It wasn't done on purpose.  Not many will see it.  But my

14  husband kept trying to convince me and reassuring me that it

15  will be okay and not the average viewer will see it.

16  Q.  Okay.  Now, with respect to your children, has your

17  relationship, to any extent, been affected with your children

18  as a result of your name being in this movie?

19  A.  I would say I'm definitely overcompensating.  I stay busy

20  with them all the time so that I'm distracting myself as much

21  as possible.  It doesn't work, but I try.

22      And I can't control my emotions at times at home.  I have

23  them over 50 percent of the time.  They love being at my house.

24  And they wonder why I'm crying, and I just have to make

25  something up --

*KENNARD - DIRECT/MacGILL*                        Vol. 2-364

1   Q.  All right.

2   A.  -- and I hate lying to them.

3   Q.  I want to talk about two other topics on this line.  Now,

4   your parents, your father and your mother, do they have a

5   relationship with your children?

6   A.  They do.

7   Q.  Now, how often -- just now, how often do your twins see

8   your mother and your father?

9   A.  If not every day, every other day.

10  Q.  Okay.  And with respect to your father -- and when I say

11  "father," I'm referring, as you know, to Steve Lanham.

12  A.  Yes.

13  Q.  Okay.  With respect to Steve Lanham, how would you describe

14  your children's relationship with Mr. Steve Lanham?

15  A.  He's their papa.  He's at all of their things.  He takes

16  them on his motorcycle.  He's -- he's the fun papa who he does

17  adventures with them and cracks jokes with them all the time

18  and they kind of have a fun banter back and forth.  If they're

19  not at my house, they want to be at their house.

20  Q.  All right.  Now, a couple of questions:  Have you told your

21  children about Dr. Cline?

22  A.  No.

23  Q.  Okay.  Is that -- does that cause you -- does that

24  circumstance cause you any stress?

25  A.  Absolutely.

*KENNARD - DIRECT/MacGILL*                    Vol. 2-365

1    Q.  Why?

2    A.  When I found out, I was 35, and I'm still not okay with it.

3    I'm still in the process of trying to heal, trying to function.

4    I couldn't even wrap my head around it as a 35-year-old woman.

5    They were six -- excuse me.  That was five years ago.  So they

6    were in third grade, fourth grade.  They were not ready to know

7    about this.  They're still not ready to know about this.

8    Q.  Does that cause you any anxiety?

9    A.  Yes.

10   Q.  Why?  Well, let me be more specific.

11      Does the prospect of telling them cause you anxiety?

12   A.  Absolutely.

13   Q.  Does the prospect of them finding out this fact cause you

14   anxiety?

15   A.  Yes.

16   Q.  All right.  Now, a couple other items:  Have you been

17   taking medication since May 11, 2022?

18   A.  Yes.

19          MS. YOUNG:  Objection, Your Honor, as to our motion.

20          THE COURT:  Let's put on our equipment.

21          MR. MacGILL:  Yeah.

22      (Bench conference on the record.)

23          THE COURT:  What medication, counsel?

24          MR. MacGILL:  Your Honor, this was the subject of your

25   order that comes at Document 394.  And what the Court

KENNARD - DIRECT/MacGILL                    Vol. 2-366

1    specifically said.  And I'll quote, if I may, from page 5 of 7:

2    However, to clarify, either party my offer evidence or argument

3    about plaintiffs' conditions, diagnoses, symptoms,

4    prescriptions, and/or side effects to support or oppose

5    plaintiffs' timely disclosed claim for emotional damages.

6           So it's for that reason we're making this offer of two

7    prescriptions.

8           THE COURT:  Are they mental health prescriptions or

9    what?  What are the prescriptions?

10          MR. MacGILL:  One, Your Honor, is for Wellbutrin and

11   the other is for Cymbalta.

12          THE COURT:  What are those for?

13          MR. MacGILL:  Depression and anxiety.

14          THE COURT:  What's your objection, counsel?

15          MS. YOUNG:  Can you hear me?  So the Wellbutrin

16   prescription was specifically mentioned, I believe, in the

17   filing where we objected to this newly disclosed evidence

18   coming in.  It's not a prescription that I believe we've heard

19   about before, nor is it evidenced in any of the medical records

20   that we have.

21          Cymbalta is one that we've heard about before, but if

22   she's going to talk about Wellbutrin, I think that that was

23   disclosed too late to us to be a part of this trial, and I

24   think it's precluded under the Court's order.

25          THE COURT:  Any other response, counsel?

1          MR. MacGILL:  Wellbutrin is an antidepressant medicine

2    that was prescribed as a result of the very treatment that is

3    in the treatment records that we have now in this 736A.

4          MS. YOUNG:  I'm sorry.  I missed the first part of

5    what counsel said.

6          MR. MacGILL:  The Wellbutrin prescription was given

7    six months ago, and it is an antidepressant, and it is a part

8    of the therapy that the plaintiff, Mrs.-- with respect to the

9    depression and anxiety that is being testified to.

10          MS. YOUNG:  I don't believe any record of that

11    prescription has been produced to us, Your Honor.  I don't

12    believe that's been part of the discovery in this case.  And I

13    think it's part of what they were attempting to supplement with

14    their supplemental interrogatory that was served one week

15    before trial.

16          THE COURT:  Can you show her where you previously

17    disclosed that?

18          MR. MacGILL:  Can you say that again, please?

19          THE COURT:  Can you show opposing counsel where you

20    previously disclosed the Wellbutrin?

21       (Off the record.)

22          THE COURT:  Do you have it?

23          Counsel, I'll let in the Cymbalta and let's keep

24    going; okay?

25          MR. MacGILL:  Thank you.

*KENNARD - DIRECT/MacGILL*                    Vol. 2-368

1           MS. YOUNG:  Can you hear me now?  So I just want to be

2    heard on one more issue related to this.  I'll wait for

3    Mr. MacGill to get his headphones on.

4           So one other issue that we have with this is there's

5    no medical expert testimony saying that this prescription is

6    necessary to treat symptoms that she may have arising from the

7    disclosure, and so I think there's also an issue of not having

8    the necessary medical testimony to tie any of this together.

9           MR. MacGILL:  There's a IME -- conducted an all-day

10   IME of Mrs. Kennard, and their IME exam included the

11   prescriptions and discussion of these prescriptions, all of

12   which is a part of the reports -- report.

13          THE COURT:  You're saying all that is in 736A, those

14   medical records?

15          MR. MacGILL:  The independent medical exam that was

16   conducted by the defense expert included, I think, an all-day

17   exam of Ms. Kennard including all of her treatment records,

18   these therapy records in their entirety and also a prescription

19   history.

20          MS. YOUNG:  Your Honor, that independent medical exam

21   took place before this Wellbutrin prescription, which we've

22   never heard of before, and I believe I am correct on that.  And

23   this is our expert.  They have the burden to put in medical

24   expert testimony of their own to make the causal link that the

25   Cymbalta prescription or Wellbutrin prescription is necessary

*KENNARD - DIRECT/MacGILL*                    Vol. 2-369

1   to treat a condition that she has arising out of the

2   disclosure.  It's the same causation issue for which you need

3   medical expert testimony that they just don't have.

4           MR. MacGILL:  Your Honor, maybe to settle this, we

5   could just ask about Cymbalta and not inquire about Wellbutrin.

6           THE COURT:  Well, I've already ruled you can't talk

7   about the Wellbutrin.

8           Now, how long -- when did she start the Cymbalta?  Was

9   it after May 11, 2022?

10          MS. YOUNG:  It was not, Your Honor.  She was on that

11  prescription prior to the disclosure.  Her dose did not change

12  after the disclosure.  And there's no medical evidence saying

13  that she needed that prescription because of the disclosure.

14          THE COURT:  All right.  If she's been on the Cymbalta,

15  even before the May 11th incident, I think you would need

16  medical testimony to support that she needed that Cymbalta for

17  the disclosure, so I'm going to sustain the objection.

18          MR. BRIAN:  Your Honor, one other issue since we have

19  it.  It does not appear -- can you hear me now?

20          It does not appear that we're going to finish

21  Ms. Kennard's testimony by 5:00.  We would prefer to file our

22  Rule 50 motion after she finishes, which I'm hoping would be

23  closer to 6:00.  I'm just asking if that's okay with the Court.

24                      (Open court.)

25          THE COURT:  All right.  The objection is sustained.

1          Next question.

2     BY MR. MacGILL:

3     Q.  So, Mrs. Kennard, just looking at the -- just reviewing

4     where you have --

5          MS. YOUNG:  Sorry, Your Honor.  May we please have the

6     questioning from the podium?

7          THE COURT:  If you would go to the podium.

8          MR. MacGILL:  Yes.  Sure.

9          MS. YOUNG:  Thank you.

10    BY MR. MacGILL:

11    Q.  Mrs. Kennard, I'm going to point now to the board.  Okay.

12    Do you see the entry of emotional distress?

13    A.  Yes.

14    Q.  And do you see the entry, loss of enjoyment of life?

15    A.  Yes.

16    Q.  Have you described, to the best of your ability, the

17    emotional distress that you have sustained, in your judgment,

18    since you saw your name in the movie?

19    A.  As best to my ability.

20    Q.  Have you, to the best of your ability, and I'll point

21    again.  Here's the loss of enjoyment of life reference in my

22    handwriting; do you see that?

23    A.  Uh-huh.

24    Q.  Now, have you, to the best of your ability, described to

25    this Court and jury, the manner or manners in which your

*KENNARD - DIRECT/MacGILL*                    Vol. 2-371

1   enjoyment of life has been lost to an extent to the best of

2   your ability?

3   A.  Yes.

4   Q.  With respect to the emotional distress and the loss that

5   you testified to today; would you agree to endure these

6   emotional distresses in exchange for a payment of $1,000 per

7   day?

8   A.  Absolutely not.

9   Q.  Would you agree to endure these emotional distresses and

10  this loss of enjoyment of life in exchange for a payment of

11  $2,000 a day?

12  A.  Absolutely not.

13  Q.  Mrs. Kennard, are you aware how many times the movie was

14  viewed with your name in it?

15       MS. YOUNG:  Objection, Your Honor.  Can we lay some

16  foundation, please?

17       THE COURT:  You should, counsel.

18       MR. MacGILL:  Yeah.  Fair enough.

19       Mrs. Kennard, I have no further questions.  Thank you.

20       THE COURT:  You may cross-examine the witness.

21       MS. YOUNG:  Thank you, Your Honor.

22       MR. BRIAN:  Any objection if I take the board down?

23       THE COURT:  No.  Let's take the board down.  Rob?

24       MR. MacGILL:  One second.

25       THE COURT:  If you want to stand and stretch, Ladies

*KENNARD – CROSS/YOUNG*                    Vol. 2-372

1    and Gentlemen, feel free to do so.  I think I will.  We've been

2    sitting awhile.

3              MR. BRIAN:  Good idea.

4         (Off the record.)

5              THE COURT:  All right, counsel, you may examine the

6    witness.

7              MS. YOUNG:  Thank you, Your Honor.

8                        **CROSS EXAMINATION**

9    BY MS. YOUNG:

10   Q.  Good afternoon, Ms. Kennard.

11   A.  Good afternoon.

12   Q.  My name is Blanca Young.  I am counsel for Netflix and

13   Realhouse.  Nice to meet you.

14   A.  Nice to meet you.

15   Q.  So let me ask you some questions about the *Our Father*

16   documentary, and if you don't mind, I would like to play you a

17   clip from that, if that's all right?

18   A.  Okay.

19              MS. YOUNG:  Mr. Nickels, can you please play from

20   Exhibit 241, starting at 16 minutes and 57 seconds in.

21        (Video playing in open court.)

22   BY MS. YOUNG:

23   Q.  Okay.  Ms. Kennard, that clip I just showed you, that is

24   the basis for your claim in this lawsuit; is that correct?

25   A.  Yes.

1   Q.  For how long was your name on the screen there?

2   A.  Long enough.

3   Q.  Okay.  Well, we all watched it together.  For how many

4   seconds was your name on the screen?

5   A.  I don't know.

6   Q.  You can't say?

7   A.  A second.

8   Q.  Maybe less?

9   A.  Maybe.

10  Q.  Now, you said your name was blurred in the documentary by

11  May 18th, 2022?

12  A.  Yes.

13  Q.  So it was in the documentary for seven days; is that

14  correct?

15  A.  Yes.

16  Q.  And your kids don't know that you're a child of Donald

17  Cline; do they?

18  A.  Correct.

19  Q.  The documentary came out on May 11, 2022; right?

20  A.  Yes.

21  Q.  And you watched it that day; is that correct?

22  A.  Yes.

23  Q.  Now, isn't it true that before you watched any of the

24  documentary, you knew that your name was in it?

25  A.  Yes.

*KENNARD – CROSS/YOUNG*                    Vol. 2-374

1    Q.  And that's because you got a message from one of your

2    half-siblings that was posted in the siblings Facebook group

3    saying that they saw your name in the documentary; right?

4    A.  Yes.

5    Q.  And your half-sibling also told you the timestamp where

6    your name appears in the documentary; is that right?

7    A.  Yes.

8    Q.  And then sometime after you got that message, you pulled up

9    the documentary on your phone, and you fast-forwarded through

10   the opening scene.  And then you saw your name in the

11   documentary; is that right?

12   A.  I watched to that, yeah.  I -- yes.

13   Q.  You watched to the timestamp that --

14   A.  Yes.

15   Q.  -- your half-sibling had told you about where your name was

16   in the documentary; correct?

17   A.  Yes.

18   Q.  So before you saw your name in the documentary for the

19   first time, you already knew it was in there; right?

20   A.  Yes.

21   Q.  You knew the timestamp where it appeared; correct?

22   A.  Yes.

23   Q.  And you've talked about worries you have about other people

24   who may have seen this documentary; right?

25   A.  Yes.

1    Q.  You don't know if any of those people were told ahead of

2    time that your name was in the documentary; do you?

3    A.  No.

4    Q.  And you don't know if any of those people were told ahead

5    of time the timestamp where your name appears in the

6    documentary; do you?

7    A.  No.

8    Q.  And, in fact, from -- aside from your half-siblings and

9    family who you've told about this, you don't know if any other

10   people who watched this film even noticed that your name

11   appeared on that screen for about a second or less; right?

12   A.  Right.

13           MS. YOUNG:  Can we pull up Exhibit 950.  It's been

14   admitted into evidence.

15   BY MS. YOUNG:

16   Q.  Now, Ms. Kennard, these are posts to a Facebook group for

17   half-siblings who are related to -- through Donald Cline; is

18   that right?

19   A.  Yes.

20   Q.  And you posted in this group on May 11, 2022; is that

21   right?

22   A.  Yes.

23   Q.  And that was the same day that you found out your name was

24   in the documentary when it was released; correct?

25   A.  Yes.

1   Q.  And you were writing in this Facebook group about your name

2   appearing in the documentary; correct?

3   A.  Yes.

4   Q.  And you wrote:  As someone told me today, this is our

5   story.  So we are watching every detail carefully.  The average

6   Indy, Indiana U.S. viewer may not even notice.

7        Did you write those words?

8   A.  Yes.

9   Q.  And you wrote those words on May 11, 2022; correct?

10  A.  Yes.

11  Q.  Let's look at Exhibit 160.  This is also in evidence.

12       Now, this is a series of text messages that you have

13  exchanged with Jacoba Ballard; is that correct?

14  A.  Yes.

15  Q.  Okay.  Let's go down to the ones from May 13, 2022.  So

16  this is two days after the documentary is released; is that

17  correct?

18  A.  Yes.

19  Q.  And Jacoba is Jacoba Ballard.  We see her picture there;

20  correct?

21  A.  Yes.

22  Q.  And on May 13, 2022, you and Ms. Ballard were exchanging

23  messages about your name being in the documentary; is that

24  right?

25  A.  Yes.

*KENNARD – CROSS/YOUNG*                    Vol. 2-377

1  Q.  And you said to Ms. Ballard:  I know, Jacoba, it is what it

2  is.  Like I said in the group, I'm not hiding, but I'm not

3  announcing it either.

4       You wrote that; correct?

5  A.  Uh-huh.

6  Q.  And you continued:  To the average viewer, it isn't

7  noticeable unless you know what you're looking for; correct?

8  A.  Yes.

9  Q.  And what you were referring to there was the fact that your

10 name was in the documentary; right?

11 A.  Yes.

12 Q.  And let's look at how you concluded this paragraph.  You

13 thanked Jacoba for reaching out to you; is that right?

14 A.  Yes.

15 Q.  And you also thanked her for all the time she had spent and

16 will spend advocating for us; is that right?

17 A.  Yes.

18      MS. YOUNG:  So if we can continue down through this

19 message chain, let's go down past all the -- there we go.

20 BY MS. YOUNG:

21 Q.  And then you said to her:  A lot of work and a lot of

22 details went into that.

23      And that's referring to the documentary; correct?

24 A.  Yes.

25 Q.  And you said:  I'm sure it was hard to catch everything;

1  did you not?

2  A.  Uh-huh.

3       THE COURT:  I need you to say yes or no, please.

4       THE WITNESS:  Yes.

5       THE COURT:  Thank you.

6  BY MS. YOUNG:

7  Q.  So on May 13th, 2022, you wrote:  I'm sure it was hard to

8  catch everything; correct?

9  A.  Yes.

10  Q.  I'd like to ask you a little bit more about the shot in the

11  documentary where your name appears; okay?  And your name shows

12  up on Jacoba Ballard's computer screen in that shot; is that

13  right?

14  A.  Yes.

15  Q.  And it shows up as she's scrolling through her 23andMe

16  account; correct?

17  A.  Yes.

18  Q.  And you have a 23andMe account; is that right?

19  A.  I do.

20  Q.  When you signed up for 23andMe, you opted to share your

21  name with anyone who matched with you as a DNA relative; is

22  that correct?

23  A.  Yes.

24       MS. YOUNG:  And let's take a look at Exhibit 183.

25  It's been admitted into evidence.

*KENNARD – CROSS/YOUNG*                                    Vol. 2-379

1    BY MS. YOUNG:

2    Q.   And it's also in your binder.  You've got one there in

3    front of you if you want to take a look at that.

4    A.   Yes.

5    Q.   And is this a printout from your 23andMe account?

6    A.   Sorry.  It's not in my binder.

7    Q.   There may be two different binders up there.  There might

8    be one that says cross-examination.

9    A.   Nope.

10   Q.   No?

11              THE COURT:  We'll get her one.

12              MS. YOUNG:  May I approach, please.

13   My apologies, Ms. Kennard.  Thank you.

14   BY MS. YOUNG:

15   Q.   So we are looking at Exhibit 183.  Just let me know when

16   you're there.

17   A.   Yes.

18   Q.   Okay.  So Exhibit 183 is a list of people who are connected

19   to you on 23andMe as DNA relatives; is that right?

20   A.   Yes.

21   Q.   How many pages long is that exhibit?

22   A.   When I turn the page, I see that it has 61 pages that I

23   could click to for a link to 61 pages.

24   Q.   Okay.  There are 1,502 people on that list; is that right?

25   A.   Yes.

*KENNARD – CROSS/YOUNG*                              Vol. 2-380

1   Q.   And you don't know all of those people, do you?

2   A.   No.

3   Q.   Some of those people have their full name and their profile

4   photos; right?

5   A.   Yes.

6   Q.   Others opted to remain anonymous, didn't they?

7   A.   Yes.

8   Q.   So if you look at page 2.

9           MS. YOUNG:  And if we could pull up the exhibit,

10  please, Mr. Nickels?  Can we please pull up the exhibit?

11  Exhibit -- okay.

12          THE COURT:  183?

13          MS. YOUNG:  183, yes.  Do we have it?  Okay.

14  Wonderful, thank you.

15  BY MS. YOUNG:

16  Q.   Okay.  If we look at page 2, do you see one of your

17  half-sisters there is identified only as P Private 1; do you

18  see that?

19  A.   Yes.

20  Q.   And you don't know who that person is; do you?

21  A.   No.  She chose not to get to know us siblings.

22  Q.   Okay.  And if we go to the next page, page 3, there's

23  another half-sister identified only as BN.  Do you see that?

24  A.   Yes.

25  Q.   And you don't know who that is either; do you?

1  A.  I'm sure I could figure it out if I had some time to figure

2  out who BN is.  I would --

3  Q.  Sitting in --

4  A.  -- be able to infer, infer.

5  Q.  Sitting in the witness chair here today, you don't know who

6  that is, do you?

7  A.  Not off the top of my head, no.

8  Q.  If we go to page 7, you have another sibling identified

9  only as AE; is that right?

10  A.  Yes.

11  Q.  And you don't know who AE is; do you?

12  A.  Off the top of my head, no.

13  Q.  You don't know if AE is part of what you called the secret

14  private Facebook group for siblings; do you?

15  A.  Right now, no.

16  Q.  Now, just like these folks did, you could have chosen to

17  list yourself as private; correct?

18  A.  Yes.

19  Q.  And Mr. MacGill showed you Exhibit 134 earlier today, your

20  profile from 23andMe.  Do you recall that?

21  A.  Yes.

22  Q.  And you are identified in that exhibit with the initials

23  L.K.; is that right?

24  A.  Yes.

25  Q.  But that's not what your profile looked like when you

*KENNARD – CROSS/YOUNG*                     Vol. 2-382

1   first signed up for 23andMe; is it?

2   A.  No.

3   Q.  When you first signed up for 23andMe, you used your

4   first and last name; correct?

5   A.  Yes.

6           MS. YOUNG:  Let's turn back to page two of

7   Exhibit 183, please.

8   BY MS. YOUNG:

9   Q.  And on page 2, we can see that one of your DNA relatives is

10  Jacoba Ballard; is that right?

11  A.  Yes.

12  Q.  So by opting in to this feature, you could see that Jacoba

13  Ballard, full first and last name, was predicted to be your

14  half-sister; correct?

15  A.  Yes.

16  Q.  And she could see that you, Lori Kennard, first and last

17  name, was predicted to be her half-sister; correct?

18  A.  I'm sorry, can you repeat that question.

19  Q.  Yeah.  Ms. Ballard -- you could see that Ms. Ballard was

20  predicted, by 23andMe, to be your half-sister; correct?

21  A.  Yes.

22  Q.  And she, because you opted into DNA relatives, could see

23  that you were predicted to be her half-sister; correct?

24  A.  Yes.

25  Q.  And she could see your first and last name in that regard?

*KENNARD – CROSS/YOUNG*                     Vol. 2-383

1    A.  Yes.

2    Q.  And that's because of what you chose to share on 23andMe at

3    that time; correct?

4    A.  Chose to know my relatives.

5    Q.  Okay.  Since -- you chose to share your full name,

6    first and last, on 23andMe with anyone who matched as a DNA

7    relative; correct?

8    A.  Yes, because I don't want my kids dating one of their

9    first cousins.

10   Q.  Thank you, Ms. Kennard.  Just please answer the question.

11   A simple question.  You chose to share your first and last name

12   with anyone who matched with you as a DNA relative; is that

13   right?

14   A.  Yes.

15   Q.  And at any time after you signed up for 23andMe, you could

16   have changed to use your initials, like you do today; right,

17   L.K.?

18   A.  Yes.

19   Q.  And I think you testified that you knew for, I think, a

20   period of years before the documentary came out that it was in

21   the process of being made; correct?

22   A.  Yes.

23   Q.  And you testified someone actually reached out to you about

24   the documentary; is that right?

25   A.  Yes.

*KENNARD – CROSS/YOUNG*                              Vol. 2-384

1   Q.  Okay.  And you did not change your 23andMe settings at that

2   time; did you?

3   A.  I didn't think I needed to.

4   Q.  You did not change your 23andMe settings at that time; did

5   you, Ms. Kennard?

6   A.  No.

7   Q.  Now, when you signed up for 23andMe, you agreed to their

8   terms of service; is that correct?

9   A.  Yes.

10  Q.  Did you read the terms of service?

11  A.  Briefly.

12  Q.  Okay.  Were you concerned about privacy when you signed up

13  for 23andMe?

14  A.  At the time, no.

15  Q.  You had to send a sample of your saliva for DNA testing to

16  23andMe; didn't you?

17  A.  Yes.

18  Q.  And did you understand that 23andMe would use that saliva

19  sample to get genetic information about you?

20  A.  Yes.  I was interested in the ancestry/nationality part of

21  it.

22  Q.  Right.  So you understood that when you gave your saliva

23  sample to 23andMe, they would be getting genetic information

24  about you; correct?

25  A.  Yes.

*KENNARD – CROSS/YOUNG*                                      Vol. 2-385

1   Q.  So let's take a look at the terms of service.

2           MS. YOUNG:  Can we please bring up Exhibit 962.

3           And this is in evidence.

4   BY MS. YOUNG:

5   Q.  Have you seen this document before, Ms. Kennard?

6   A.  I believe I read it when I had the box and was making my

7   account.

8   Q.  So you read this document?

9   A.  Uh-huh.

10          THE COURT:  Yes or no?

11          THE WITNESS:  Yes.  Sorry.

12  BY MS. YOUNG:

13  Q.  Okay.  Let's go to Section 13 and look at what you read

14  when you signed up for the service.  Do you see that the title

15  of Section 13 is: Material provided to 23andMe, your

16  proprietary rights?

17  A.  Yes.

18  Q.  Okay.  And if we look in the paragraph titled: Genetic

19  and/or self-reported information, are you there?

20  A.  Yes.

21  Q.  Okay.  And the second sentence, do you see where it says:

22  Note, that 23andMe cannot control any further distribution of

23  genetic and/or self-reported information that you share

24  publicly on the 23andMe website?

25  A.  Yes.

1  Q.  And we know that's a truthful statement, because that's

2  what Jacoba Ballard did; right?  Jacoba Ballard was able to

3  show your name in her 23andMe results when her results were

4  filmed for the documentary; correct?

5  A.  Yes.

6  Q.  And 23andMe was not able to control what Jacoba Ballard did

7  with the information that you shared with her on that website;

8  were they?

9  A.  No.

10      MS. YOUNG:  Now, you can take that down, Mr. Nickels.

11  Thank you.

12  BY MS. YOUNG:

13  Q.  Your lawyer asked you some questions about the fact that in

14  your family tree on 23andMe you did not identify Donald Cline

15  as your biological father.  Do you recall those questions?

16  A.  Yes.

17  Q.  Okay.  But Jacoba Ballard knew that you shared a biological

18  father with her; correct?

19  A.  Yes.

20  Q.  And so did dozens of your half-siblings who were also on

21  23andMe; correct?

22  A.  Yes.

23  Q.  And that may have included half-siblings whose identities

24  you did not know; right?

25  A.  Sorry, can you repeat that.

1    Q.  The people who knew that they shared a biological father

2    with you on 23andMe included people whose identities you did

3    not know; is that right?

4    A.  Yes.

5    Q.  Okay.  And 23andMe had warned you that they could not

6    control what any of those people did with your common

7    information; correct?

8    A.  Yes.

9    Q.  So I want to shift gears now and ask you about how your

10   name being in the documentary affected you, if that's okay.

11   And I'm sorry to get into this.  I know that it's a difficult

12   subject for you.

13       Isn't it true, Ms. Kennard -- well, let me back up.  You

14   talked about seeking therapy after the documentary came out; is

15   that right?

16   A.  Yes.

17   Q.  But you were actually in therapy before the documentary was

18   released; is that correct?

19   A.  Yes.

20   Q.  And you started seeing a therapist in 2021; is that right?

21   A.  I don't know the exact, but --

22   Q.  Some months before the documentary came out; correct?

23   A.  Yes.

24   Q.  And the reason you started seeking therapy was to deal with

25   severe anxiety that you were having at the time; is that right?

1   A.  In part.

2   Q.  Okay.  And so your name being in the documentary is not why

3   you initiated therapy; is that correct?

4   A.  No.  It hadn't been -- the documentary hadn't been released

5   yet.

6   Q.  Right.  And similarly, because the documentary had not yet

7   been released, it was not what was causing you the anxiety that

8   was one of the reasons that you started to seek out therapy; is

9   that right?

10  A.  I have had on-and-off anxiety for a while.

11  Q.  For how long?

12  A.  Probably since 2007, 2008.

13  Q.  Okay.  Now, you were shown some notes from your therapist

14  when Mr. MacGill was asking you questions; correct?

15  A.  Yes.

16  Q.  And he actually showed you just a selection of the notes

17  from your therapist; is that right?

18  A.  Yes.

19  Q.  So in your binder, you have Exhibit 1024.  Could you turn

20  to that, please.

21          MS. YOUNG:  And we're not going to publish this to the

22  jury at this moment.

23  A.  Sorry, you said 1024?

24  BY MS. YOUNG:

25  Q.  1024, yes.

1    A.  Okay.

2    Q.  Are you there?

3    A.  Yes.

4          MR. MacGILL:  May I interrupt one second?  Do you have

5    a binder for us?

6          MS. YOUNG:  Oh, I'm sorry, so sorry.  Yes.  Of course.

7          MR. MacGILL:  Thank you.

8    BY MS. YOUNG:

9    Q.  Okay.  Are you at Exhibit 1024?

10   A.  Yes.

11   Q.  Are these therapy notes that your therapist produced in

12   this case?

13   A.  I see the therapy name -- or excuse me, the firm name.  I'm

14   not seeing his name yet.

15   Q.  Okay.  Do you see just at the very first page of the

16   exhibit, exam date 11/15/2021, Lori Kennard?

17   A.  Yes.

18   Q.  So do you deny that these are your therapy notes?

19   A.  Like I said, I don't see his name yet, but -- the firm or

20   whatever you --

21   Q.  Okay.  Why don't you go --

22   A.  The company is at the top.

23   Q.  Why don't you go to the second page of the exhibit.  Do you

24   see where it says electronically signed by there?

25   A.  Yes.

*KENNARD – CROSS/YOUNG*                                    Vol. 2-390

1   Q.  And James Davis has the electronic signature there?

2   A.  Yes.

3   Q.  Is he your therapist?

4   A.  Yes.

5   Q.  Okay.  So what is the first date in this group of records?

6   A.  11/15 of 2021.

7   Q.  Okay.  And do you see that, sort of, partway down the page

8   it says: Initial intake?

9   A.  Initial intake?

10  Q.  It's about a quarter of the way or a third of the way down

11  the page.

12  A.  I see individual notes.

13  Q.  There's tests performed and then under that it says:

14  Therapy/treatment and then it says: Initial intake.  Do you see

15  that?

16  A.  I'm sorry, I don't.

17  Q.  I'm sorry.  I'm on the first page of Exhibit 1024.

18  A.  Okay.  I'm with you now, yes.

19  Q.  You are?

20  A.  Yes.

21  Q.  Okay.  So you see where it says: Initial intake?

22  A.  Yes.

23  Q.  Okay.  So does that indicate that you started to see

24  Mr. Davis for therapy on November -- in November of 2021?

25  A.  That's what it would indicate, yes.

1  Q.  Okay.  And do you continue to see Mr. Davis today?

2  A.  I do.

3  Q.  Okay.  So we can agree that the documentary did not cause

4  you to seek out therapy in the first place; is that right?

5  A.  Correct.

6  Q.  And we can agree that the documentary did not cause the

7  anxiety that you were feeling that caused you to seek out that

8  therapy; correct?

9  A.  The initial, no.

10 Q.  Right.  And the documentary did not cause any of the other

11 issues that prompted you to seek out therapy in November of

12 2021; correct?

13 A.  Correct.

14 Q.  Now, Mr. MacGill asked you about some difficulties that you

15 had emotionally after the documentary came out.  Do you recall

16 those questions?

17 A.  Yes.

18 Q.  And one of the things that you testified about was

19 difficulty expressing your wishes in your relationship; do you

20 recall that?

21 A.  I believe I didn't say I had difficulties with it.  It was

22 that I had lack of confidence in those being respected and

23 granted and heard.

24 Q.  Okay.  And before the documentary came out, you also

25 identified feeling that you were unable to advocate for

*KENNARD – CROSS/YOUNG*                           Vol. 2-392

1   yourself; correct?

2   A.   I'm sorry, can you repeat that.

3   Q.   Before the documentary came out, you had identified to your

4   therapist that you had feelings of being unable to advocate for

5   yourself; is that right?

6   A.   Yes.

7   Q.   And you discussed with him needs for expressing your

8   emotions for advocating for yourself; correct?

9   A.   Yes.

10  Q.   And you also discussed feelings of powerlessness; is that

11  right?

12  A.   Yes.

13  Q.   I think that you also told Mr. MacGill that, after the

14  documentary came out, you had feelings of helplessness;

15  correct?

16  A.   Yes.

17  Q.   And isn't it true that you also had feelings of

18  helplessness that you discussed with your therapist before the

19  documentary came out?

20  A.   Yes.

21  Q.   You also discussed with Mr. MacGill that, after the

22  documentary came out, you had feelings of being stressed; is

23  that right?

24  A.   Yes.

25  Q.   And you also, before the documentary came out, had

*KENNARD - CROSS/YOUNG*                    Vol. 2-393

1  discussed feelings of stress with your therapist; is that

2  correct?

3  A.  Yes.

4  Q.  And one of the things that you talked a lot about with

5  Mr. MacGill is your worries about being judged since the

6  documentary came out; is that right?

7  A.  Yes.

8  Q.  And isn't it true that, before the documentary came out,

9  you had also had discussions with your therapist about going

10  into public and being judged?

11  A.  Yes.

12  Q.  Now, I don't want to get into any details here, Ms.

13  Kennard, but it is true that you had some pretty difficult

14  circumstances you had to deal with in your family life before

15  the documentary came out; right?

16  A.  Yes.

17  Q.  And, again, without getting into any details, you've had

18  prior trauma in your life before the documentary came out;

19  correct?

20  A.  Yes.

21  Q.  Is that a yes?

22  A.  Yes.

23  Q.  And I'm talking about trauma that doesn't involve Donald

24  Cline; is that correct?

25  A.  Yes.

*KENNARD – CROSS/YOUNG*                                    Vol. 2-394

1   Q.  And that prior trauma has had a lasting effect on you; is

2   that right?

3   A.  I wouldn't say it's as lasting, no.

4   Q.  Okay.  Since the documentary came out, there have been

5   other distressing things that have happened to you, as well;

6   correct?

7   A.  One other, yes.

8   Q.  Okay.  So I want to talk about you taking leave from the

9   school that you were working at.

10  A.  Okay.

11  Q.  That was in April of 2023; is that right?

12  A.  Yes.

13  Q.  And I believe you testified that you had to leave the

14  school in April of 2023 because that's where you were when you

15  found out that your name was in the documentary; is that

16  correct?

17  A.  That was a triggering environment, yes.

18  Q.  Okay.  And I think that you said you were at the school

19  when you hopped on Facebook and found out through a post from

20  one of your half-siblings that your name was in the

21  documentary?  You were at school, I think you said, when you

22  did that?

23  A.  Yes.

24  Q.  Is that accurate, Ms. Kennard?

25  A.  Is what accurate?

*KENNARD – CROSS/YOUNG*                                      Vol. 2-395

1   Q.  That you were at school when you saw that Facebook post?

2   A.  Yes.

3   Q.  Okay.  You weren't at home when you found out that your

4   name was in the documentary?

5   A.  No.

6   Q.  You don't remember being at home, waking up, seeing a

7   Facebook post, and telling your husband about it?

8   A.  No.  I called him from school.

9   Q.  Okay.  You don't recall showing the Facebook post to your

10  husband at home before you went to school?

11  A.  I might have screenshot it and sent it to him while I was

12  at school.

13  Q.  But you don't recall waking up at home with your husband?

14  A.  No.

15          MS. YOUNG:  Your Honor, may I approach to try to

16  refresh her recollection?

17          THE COURT:  You have a deposition?

18          MS. YOUNG:  I do.

19          THE COURT:  You may.

20  BY MS. YOUNG:

21  Q.  Did your husband give a deposition in this case?

22  A.  Yes.

23  Q.  Okay, Ms. Kennard.  Can you please turn to page 56 and just

24  read to yourself.  When you get there, let me know.

25  A.  Okay.

*KENNARD – CROSS/YOUNG*                    Vol. 2-396

1  Q.  Page 56, starting at line 7, and read it all the way over

2  to page 57, line 2.

3  A.  Okay.

4  Q.  And then let's look over at page 62, line 19, through

5  page 63, line 1.

6  A.  Sorry.  He's wrong.

7  Q.  Okay.  So that doesn't refresh your recollection that you

8  were actually at home when you saw the documentary?

9  A.  So can I refer back to the first part I wrote -- I read?

10 Q.  Does it refresh your recollection.

11         THE COURT:  You can read it silently to yourself.

12 Read it to yourself.

13         THE WITNESS:  Okay.  I did.

14         THE COURT:  All right.  Next question.

15 BY MS. YOUNG:

16 Q.  My question is whether what you read refreshes your

17 recollection that you were actually at home when you found out

18 about your name being in the documentary.

19 A.  It tells me that he doesn't remember it correctly.

20 Q.  Okay.  Thank you, Ms. Kennard.

21         Now, you've actually had other distressing experiences at

22 the school that you took a leave of absence from; isn't that

23 right?

24 A.  Yes.

25 Q.  Okay.  You actually were at that school when you learned

1    that Donald Cline was your biological father in 2019; correct?

2    A.  Yes.

3    Q.  And I think you said that that was the most traumatic day

4    of your entire life; right?

5    A.  Until May 11th of 2022.

6    Q.  Oh.  Was May 11, 2022, more than traumatic than that?

7    A.  I can't equate it.

8    Q.  Do you remember saying in your deposition that May 11,

9    2022, was the second most traumatic day in your life?

10           MR. MacGILL:  Objection, Your Honor.  Hearsay.

11           COURT REPORTER:  I cannot hear you.

12   BY MS. YOUNG:

13   Q.  Why don't we take a look at your deposition transcript.  Do

14   you have your deposition transcript there?

15   A.  I don't know.

16   Q.  Let's get it to you, please.

17           MS. McDERMOTT:  May I approach?

18           THE COURT:  You may approach.

19   BY MS. YOUNG:

20   Q.  Okay.  If you can look at your deposition at -- by the way,

21   that was a deposition that you took under oath; is that right?

22   A.  Yes.

23   Q.  Take a look at page 50, line 23 to 25.

24           MR. MacGILL:  Counsel, may we have one moment?  We're

25   still looking it up real quickly.

 1            MS. YOUNG:  Yes.

 2    BY MS. YOUNG:

 3    Q.  Page 50, line 23 to 25.

 4    A.  I'm there.  I reread it.

 5    Q.  And did you say at your deposition:  As soon as I knew my

 6    name was in the documentary, that was the second most

 7    traumatic day of my life?

 8    A.  Yes.

 9    Q.  And today it's the most traumatic day of your life.

10    A.  I didn't say that.

11    Q.  Okay.  Now, that school environment was a difficult

12    environment; wasn't it?

13    A.  What do you mean?

14    Q.  Well, did you have issues at the school with kids throwing

15    things and self-harming in class?

16    A.  For those couple of years, yes.

17    Q.  Okay.  Well, let's just get oriented in time.

18    A.  Okay.

19    Q.  The documentary came out May 11, 2022; correct?

20    A.  Yes.

21    Q.  And that was almost a year before you took medical leave in

22    April of 2023; correct?

23    A.  Yes.

24    Q.  Okay.  And in between when the documentary came out,

25    May 11, 2022, and when you took that medical leave in April of

*KENNARD – CROSS/YOUNG*                         Vol. 2-399

1    2023, you had issues at your school with kids throwing things

2    and self-harming in class?

3    A.   Yeah, but that wasn't unusual.

4    Q.   That was a typical experience for you there?

5    A.   Unfortunately, anymore, in school, yes.

6    Q.   I'm sure.

7         And you reported that to your therapist; correct?

8    A.   Yes.

9    Q.   And you had a coworker who was assaulted by a student;

10   correct?

11   A.   Yes.

12   Q.   And you had students who were shoving tables and ripping

13   things off the walls; right?

14   A.   Yes.

15   Q.   And was that also a typical experience at the school?

16   A.   Yes.

17   Q.   And, tragically, around March of 2023, a student in your

18   school district took their own life; right?

19   A.   Yes.

20   Q.   And you remember reporting that to your therapist; correct?

21   A.   Yes.

22   Q.   And that was in March of 2023; correct?

23   A.   Yes.

24   Q.   And the next month, you were out on family medical leave;

25   is that right?

*KENNARD – CROSS/YOUNG*                                    Vol. 2-400

1    A.  To be clear, I didn't -- she -- that student wasn't my

2    student in my class.  It was just -- it was a student in the

3    community.

4    Q.  Let's take a look at Exhibit 1024 again, page 23.

5    A.  I'm sorry.  Can you repeat that?  1024?

6    Q.  Yes.  Exhibit 1024, page 23.

7    A.  I'm having difficulty finding page numbers.

8    Q.  I'm sorry.  It is hard.

9        So at the very bottom, in the middle of the exhibit, it

10   says Trial Exhibit 1024, and it's got a dash and then a couple

11   of numbers.

12   A.  Ah, okay.

13   Q.  So I'm looking at the one that has the dashes on 23.

14   A.  Yes.

15   Q.  Are you there?

16   A.  Yes.

17   Q.  And can you confirm for me that the exam date here is

18   March 20th, 2023?

19   A.  Yes.

20   Q.  And that's the month before you took the family medical

21   leave?

22   A.  Yes.

23   Q.  And do you see under: Intervention?

24   A.  Yes.

25   Q.  And there's a sentence in there says:  Lori identified a

*KENNARD — CROSS/YOUNG*                    Vol. 2-401

1    student in the district committed suicide and feeling this was

2    the final straw of: I need to change what I'm doing.

3        Did you say that to your therapist in March of 2023?

4    A.  If he quoted me on it, then ... I don't remember saying it,

5    but ...

6    Q.  You're not disputing that you told this to your therapist

7    in March of 2023?

8    A.  I trust him that he quoted me on it.

9    Q.  Okay.  So you believe he transcribed this accurately?

10   A.  Yes.

11   Q.  Now, that medical leave was a paid leave; correct?

12   A.  Yes.

13   Q.  And it was paid at the same salary you had been earning up

14   until that point; correct?

15   A.  Yes.

16   Q.  And when school started up again in the Fall of 2023, you

17   got a transfer to a different school; correct?

18   A.  Yes.

19   Q.  Teaching sixth grade?

20   A.  Yes.

21   Q.  And you're still teaching sixth grade; correct?

22   A.  Yes.

23   Q.  And your students still love you, and they still give you

24   hugs; right?

25   A.  Sixth graders don't give that many hugs.

1    Q.  Maybe not as many.

2         Do your students still appreciate what you're doing for

3    them, as far as you can tell?

4    A.  As far as I can tell.

5    Q.  Yes.

6         Okay.  Let me turn to a different subject now, Ms. Kennard.

7         You're claiming, in this case, that you kept your

8    connection to Donald Cline a secret; is that right?

9    A.  Yes.

10   Q.  And do you remember referring to yourself as a secret child

11   of Donald Cline before in this case?

12   A.  To who?

13   Q.  Did you refer to yourself as a secret child of Donald Cline

14   in your deposition?

15   A.  I -- I'd have to reread.

16   Q.  Okay.  Let's take a look at it.  You can take the

17   deposition out.  If you turn to page 51, at line 1 through 3.

18        And do you see, you were asked:  What was the first most

19   traumatic day?

20        Your answer was:  The day I found out I was a secret child

21   of Donald Cline.

22   A.  Yes.

23   Q.  Is that how you usually refer to yourself?

24   A.  It goes back and forth.

25   Q.  It goes back and forth?

*KENNARD – CROSS/YOUNG*                         Vol. 2-403

1   A.  I have a bunch of different ways that I refer to it.

2   Q.  Okay.  So when do you refer to yourself as a secret child

3   of Donald Cline?

4   A.  It was probably early on, because it was so fresh and raw

5   that I didn't know, so it was a secret.  My parents didn't even

6   know.

7   Q.  Your lawyers have referred to you and to your co-plaintiff

8   as secret children of Donald Cline; right?

9   A.  Yes, because we didn't want to be connected with him.

10  Q.  Okay.  And you've heard them refer to you and your

11  co-plaintiff as the secret children of Donald Cline; haven't

12  you?

13  A.  Yes.

14  Q.  And you've heard them do that since the beginning of this

15  case; correct?

16  A.  Yes.

17  Q.  Now, you also, when you were talking with Mr. MacGill

18  earlier, talked about what you referred to as a private secret

19  Facebook group; is that right?

20  A.  Yes.

21  Q.  And you opted to be a part of that group; right?

22  A.  Yes.

23  Q.  Everybody in that Facebook group knew that Donald Cline was

24  your biological father; correct?

25  A.  Yes.

*KENNARD – CROSS/YOUNG*                                    Vol. 2-404

1   Q.  There were dozens of people in that Facebook group; right?

2   A.  Yes.

3   Q.  And Jacoba Ballard was one of them; correct?

4   A.  Yes.

5   Q.  Okay.  And you referred to that as your private secret

6   Facebook group, but it's true that you shared your connection

7   with Donald Cline outside of the private secret Facebook group;

8   is that right?

9   A.  To people I chose to, yes.

10  Q.  Ms. Kennard, you did share your connection to Donald Cline

11  outside of the private secret Facebook group; correct?

12  A.  Yes.

13          MS. YOUNG:  Let's take a look at Exhibit 166.

14  BY MS. YOUNG::

15  Q.  Is this a post that you made on Facebook?

16  A.  It is not a post.

17  Q.  Did you put this message on Facebook?

18  A.  It is a private message between me and a friend through

19  Facebook Messenger.  I really can't --

20  Q.  Exhibit 166?

21  A.  I'm sorry.  I heard 161.

22  Q.  I'm sorry.

23  A.  My apologies.

24  Q.  Let's make sure we're on the same page so we're

25  communicating.  Let me know when you get to Exhibit 166.  And

1    I'll just doublecheck it in my binder, as well.

2    A.  Yes.  166.

3    Q.  Okay.  So 166 is something that you posted to Facebook;

4    correct?

5    A.  Yes.

6    Q.  And so this was posted on Facebook outside of the secret

7    private Facebook group; correct?

8    A.  Yes.

9    Q.  And so all your Facebook friends could see it; correct?

10   A.  Yes.

11   Q.  All your 1,500 friends on Facebook; right?

12   A.  I don't know how many I had at the time.

13   Q.  Okay.  Well, did you answer interrogatories, in this case,

14   asking you to verify -- identify all the individuals you've

15   been Facebook friends with prior to May 11th, 2022?

16   A.  Yes.

17   Q.  Do you remember doing that?

18   A.  Yes.

19   Q.  And do you remember providing a cross reference to a

20   document that was marked as Exhibit 1026?  We can take a look

21   at that, if you --

22   A.  Yes, please.

23   Q.  And do you see Exhibit 1026?

24   A.  Yes.

25   Q.  And is this the document that you cross-referenced when you

*KENNARD – CROSS/YOUNG*                    Vol. 2-406

1   were asked, in this litigation, to identify all individuals who

2   you have been Facebook friends with prior to May 11, 2022?

3   A.  Yes.

4   Q.  And you see it says: Lori Lanham Kennard.  That's you;

5   correct?

6   A.  Yes.

7   Q.  And underneath it, it says "1.5k friends"?

8   A.  Yeah.

9   Q.  So that means -- does that mean that at the time -- prior

10  to the documentary's release, you had 1,500 Facebook friends?

11  A.  Yes.

12  Q.  So going back to the exhibit, you posted this for all your

13  Facebook friends to see, Exhibit 166; correct?

14  A.  Yes.

15  Q.  And what you wrote in this message is:  P.S., if you have

16  not completed a DNA kit with 23andMe.com or Ancestry.com, I

17  strongly encourage you to.  It has been very, in all caps,

18  interesting to explore my results to say the least.

19       Do you see that?

20  A.  Yes.

21  Q.  And you posted this more than a year before the documentary

22  came out; correct?

23  A.  Yes.

24          MS. YOUNG:  And I apologize, Your Honor.  I would like

25  to move into evidence some exhibits that I forgot to do.  I'd

1  like to move Exhibit 1026.

2        THE COURT:  Any objection to 1026?

3        MR. MacGILL:  No objection, Your Honor.

4        THE COURT:  1026 is admitted into evidence without

5  objection.

6              (Defendants' Exhibit 1026 was

7              received in evidence.)

8        MS. YOUNG:  And I would like to also move into

9  evidence Exhibit 166.

10        MR. MacGILL:  No objection.

11        THE COURT:  166 is admitted without objection.

12              (Defendants' Exhibit 166 was

13              received in evidence.)

14  BY MS. YOUNG:

15  Q.  Okay.  And you posted this more than a year before the

16  documentary came out; is that correct?

17  A.  Yes.

18  Q.  Okay.  Now, let's take a look at Exhibit 915 in your

19  binder.

20  A.  I'm there.

21  Q.  Are these messages from your Facebook account?

22  A.  Yes.

23        MS. YOUNG:  We would move Exhibit 915 into evidence.

24        THE COURT:  Any objection to 915?

25        MR. MacGILL:  No objection, Your Honor.

*KENNARD – CROSS/YOUNG*                          Vol. 2-408

1          THE COURT:  915 is admitted into evidence without

2    objection.

3                      *(Defendants' Exhibit 915 was*

4                      *received in evidence.)*

5    BY MS. YOUNG:

6    Q.  So a couple of weeks after you sent the post that we just

7    looked at, you got this Facebook message from someone named

8    Ron Mesarosh?

9    A.  Yes.

10   Q.  And Mr. Mesarosh is not a family member of yours; is he?

11   A.  No.

12   Q.  He's not one of your very close friends; is he?

13   A.  He was a close acquaintance that I saw every day.

14   Q.  Okay.  Was he one of the -- is he one of the people in the

15   parent teacher association that you were mentioning when you

16   were talking with Mr. MacGill?

17   A.  Yes.

18   Q.  Okay.  And he was a volunteer parent at the school, is that

19   how you know him?

20   A.  Yes.

21   Q.  And -- and let's go to the bottom of the third page of the

22   exhibit.

23   A.  I'm there.

24   Q.  Okay.  And there's a date -- the date is April 3rd, 2021.

25   A.  Yes.

1  Q.  That's before the documentary comes out; right?

2  A.  Yes.

3  Q.  And just after that, Mr. Mesarosh, is that how you say his

4  name?

5  A.  Yes.

6  Q.  He wrote:  Hey there, weird question.  Seems I remember

7  seeing a post by you about one of those ancestry tests.  I was

8  thinking you did 23andMe.

9      Do you see that?

10 A.  Yes.

11 Q.  And he went on to ask if you were happy with the results;

12 right?

13 A.  Yes.

14 Q.  And you responded:  Haha, well, I found out my dad isn't my

15 biological father; correct?

16 A.  Yes.

17 Q.  And if you look further down, going onto the fourth page of

18 the document, you also told him:  I've always been interested

19 in my family's history, just didn't realize I was going to find

20 80-plus half-siblings, as well.

21     Do you see that?

22 A.  Yes.

23 Q.  And if you continue along the message chain over to the

24 next page, you also told him:  Did your mom go to Dr. Donald

25 Cline in Indy for help conceiving, because my mom did and he

*KENNARD – CROSS/YOUNG*                    Vol. 2-410

1    used his sperm instead of my dad's?

2    A.   Yes.   That was in response to wondering if we were related.

3    Q.   Okay.   That's what you wrote in this message; correct?

4    A.   Yes.

5    Q.   And you didn't ask Mr. Mesarosh to keep this a secret; did

6    you?

7    A.   Not in this chain, no.

8    Q.   Okay.   We don't see you asking Mr. Mesarosh, in this

9    document, to keep this a secret; right?

10   A.   Right.

11   Q.   And you had no control over what Mr. Mesarosh was going to

12   do with this information that you just gave him; did you?

13   A.   No.

14   Q.   Let's look at Exhibit 161.

15       Okay.   And is Exhibit 161 a series of Facebook messages

16   between you and someone named Holly -- is it Winings-Gunn?

17   A.   Winings.

18   Q.   Holly Winings-Gunn?

19   A.   Uh-huh.

20   Q.   Is that a yes?

21   A.   Yes.

22            MS. YOUNG:   We would move Exhibit 161 into evidence.

23            MR. MacGILL:   No objection.

24            THE COURT:   161 is admitted into evidence without

25   objection.

*KENNARD – CROSS/YOUNG*                              Vol. 2-411

1              *(Defendants' Exhibit 161 was*

2              *received in evidence.)*

3    BY MS. YOUNG:

4    Q.  Ms. Winings-Gunn is someone you used to hang out with in

5    the walls of your high school; is that right?

6    A.  Junior high and high school, yes.

7    Q.  Okay.  And let's go to the messages that you exchanged with

8    her on May 1st, 2019.  It's page 12 of the document.

9    A.  I'm there.

10   Q.  Okay.  And you found out you were a biological child of

11   Donald Cline in April of 2019; is that right?

12   A.  Yes.

13   Q.  So these messages are being exchanged about a month after

14   that; correct?

15   A.  Yes.

16   Q.  And you reached out to Ms. Winings-Gunn and asked her how

17   she knows Matthew White; is that correct?

18   A.  Yes.

19   Q.  Matthew White is one of your half-siblings through Donald

20   Cline?

21   A.  Yes.

22   Q.  He's been quite public about the fact that he's a child of

23   Donald Cline; right?

24   A.  Yes.

25   Q.  In fact, he appeared in the *Our Father* documentary;

*KENNARD – CROSS/YOUNG*                              Vol. 2-412

1   correct?

2   A.  Yes.

3   Q.  And if you go down to your message to Ms. Winings-Gunn on

4   May 2nd, 2019, at 4:59 p.m., you wrote:  Well, I actually found

5   out last month that I am one of his half-sisters; correct?

6   A.  Yes.

7   Q.  And Ms. Winings-Gunn told you, in her response, that she's

8   been following Matt's story for almost two years; correct?

9   A.  Yes.

10  Q.  So you were aware that Ms. Winings-Gunn knew that Matt

11  White was a child of Donald Cline; right?

12  A.  Through this text chain, yes.

13  Q.  Okay.  And you had just -- well, so you just revealed to

14  her that you were a child of Donald Cline; right?

15  A.  Yeah.  I was excited that someone I knew knew my

16  half-brother.

17  Q.  Right.  And so you revealed to her that you were a child of

18  Donald Cline; correct?

19  A.  Yes.

20  Q.  And you did not tell her to keep this a secret; did you?

21  A.  Not that I am seeing.

22  Q.  And you could not control what she did with the information

23  that you shared with her; could you?

24  A.  No.

25  Q.  Let's go to the messages that you exchanged with

*KENNARD - CROSS/YOUNG*                    Vol. 2-413

1    Ms. Winings-Gunn, the same exhibit, on May 14, 2022.

2    A.   I'm there.

3    Q.   Okay.  And May 14, 2022, is just a few days after the *Our*

4    *Father* documentary was released; correct?

5    A.   Yes.

6    Q.   And you wrote to Ms. Winings-Gunn -- can we -- let's make

7    sure that we're there.

8        You wrote to her:  Hey, Holly, I saw you watched *Our*

9    *Father*.  I'm actually sibling number 57; correct?

10   A.   Yes.

11   Q.   And Ms. Winings-Gunn had actually posted on social media

12   that she had watched the film; correct?

13   A.   Yes.

14   Q.   She didn't tell you that your name was in the film; did

15   she?

16   A.   No.

17   Q.   Instead, you reached out to her, after seeing her Facebook

18   post, and you said: I'm actually sibling number 57; correct?

19   A.   Yes.

20   Q.   Let's go to Exhibit 917.  Let me know when you have it

21   before you.

22   A.   Okay.

23   Q.   These are Facebook messages you exchanged with someone

24   named Chelsie Sweazy; is that correct?

25   A.   Yes.

1          MS. YOUNG:  I would move Exhibit 917 into evidence.

2          MR. MacGILL:  No objection.

3          THE COURT:  917 is admitted into evidence without

4     objection.

5                    *(Defendants' Exhibit 917 was*

6                    *received in evidence.)*

7     BY MS. YOUNG:

8     Q.  Let's go to the messages that you exchanged with

9     Miss Sweazy on May 28, 2021.

10    A.  Okay.  I'm there.

11    Q.  Okay.  And at the bottom of the page, you told Ms. Sweazy:

12    I'm actually not an only child.  I have over 80 half-siblings.

13    Google Dr. Cline from Indy; is that right?

14    A.  Yes.

15    Q.  And you did not ask Ms. Sweazy to keep this a secret; did

16    you?

17    A.  Not at this time.

18    Q.  Okay.  Did you ever ask Ms. Sweazy to keep this a secret?

19    A.  Yes.

20    Q.  Okay.  But in this message that we're seeing here, you did

21    not tell her to keep this secret?

22    A.  Correct.

23    Q.  And you actually sent her a link to an article in *The*

24    *Atlantic*, *The Fertility Doctor's Secret*; do you see that?

25    A.  Yes.

*KENNARD – CROSS/YOUNG*                    Vol. 2-415

1   Q.  And we can see that it actually has a picture of Donald

2   Cline right there on it; correct?

3   A.  Yes.

4   Q.  And you gave this information to Ms. Sweazy in May of 2021;

5   correct?

6   A.  Yes.

7   Q.  That was before the documentary was released; right?

8   A.  Yes.

9   Q.  And you had no control over what Ms. Sweazy would do with

10  this information that you just gave her; did you?

11  A.  No.

12  Q.  And Ms. Sweazy is not one of your very close personal

13  friends; is she?

14  A.  Yes.

15  Q.  She is?

16  A.  Yes.

17  Q.  Do you remember preparing interrogatory responses in this

18  case?

19  A.  Yes.

20  Q.  Those are written responses to questions that we sent you

21  that you had to answer under oath?

22  A.  Okay.

23  Q.  Do you remember doing that?

24  A.  (Nods head up and down.)

25  Q.  Yes?

1    A.  Yes.

2    Q.  Let's take a look so we can have those before us.

3    Exhibit 972.

4    A.  What page?

5    Q.  Let's turn to the last page where it says:  Verification of

6    Responses to Interrogatories Only.

7    A.  I'm sorry.  You said what page?

8    Q.  The very last page.

9    A.  Okay.

10   Q.  And there's a page that says: Verification of Responses.

11   A.  Yes.

12   Q.  Okay.  And that's your signature there on that page?

13   A.  Yes.  Sorry, it's upside down.

14   Q.  It is upside down.  I apologize for that, and it's dated

15   February 28th, 2023?

16   A.  Yes.

17   Q.  And you signed that under penalty of perjury; is that

18   right?

19   A.  Yes.

20   Q.  So if you look at page 2, do you see you were asked to

21   identify all individuals or identifiable groups of individuals

22   who you informed or who you were aware had been informed prior

23   to May 11, 2022, that you are a secret child; is that right?

24   A.  Yes.

25   Q.  And there's a Number 3.  Do you see that in the response?

*KENNARD – CROSS/YOUNG*                                    Vol. 2-417

1   A.  Yes.

2   Q.  And you wrote:  Approximately seven or fewer are very close

3   personal friends.  These very close personal friends are

4   protective of plaintiffs' privacy and have been instructed to

5   safeguard plaintiffs' identity as a secret child; do you see

6   that?

7   A.  Yes.

8   Q.  And then you list, I think seven people or so; correct?

9   A.  Yes.

10  Q.  And Chelsie Sweazy is not one of those people; is she?

11  A.  No.

12  Q.  Look at Exhibit 903.  Is that another series of Facebook

13  messages from your Facebook account?

14  A.  Yes.

15          MS. YOUNG:  We would move Exhibit 903 into evidence.

16          MR. MacGILL:  No objection.

17          THE COURT:  Exhibit 903 is admitted into evidence

18  without objection.

19                  *(Defendants' Exhibit 903 was*

20                  *received in evidence.)*

21  BY MS. YOUNG:

22  Q.  Okay.  And are these messages that you exchanged with

23  another one of your half-siblings?

24  A.  Yes.

25  Q.  And the first message that we see here is from October 5th,

*KENNARD – CROSS/YOUNG*                    Vol. 2-418

1    2020; is that right?

2    A.  Yes.

3    Q.  And this is also before the documentary was released?

4    A.  Yes.

5    Q.  And you told this half-sibling:  So I haven't announced our

6    situation on Facebook but I'm not necessarily hiding it either;

7    correct?

8    A.  Correct.

9    Q.  And you wrote that in 2020; correct?

10   A.  Correct.

11   Q.  And by our situation, you meant that you have dozens of

12   half-siblings through Donald Cline; is that right?

13   A.  Yes.

14   Q.  And then you actually said in this message that if it comes

15   up, your half-sibling could mention that you're related to the

16   Thompsons; correct?

17   A.  Yes.

18   Q.  Let's look at Exhibit 164.

19        These are messages between you and someone named Chelane

20   Paine; is that correct?

21   A.  Yes.

22            MS. YOUNG:  We move Exhibit 164 into evidence.

23            MR. MacGILL:  No objection.

24            THE COURT:  Exhibit 164 is admitted into evidence

25   without objection.

*KENNARD – CROSS/YOUNG*                    Vol. 2-419

1          *(Defendants' Exhibit 164 was*

2          *received in evidence.)*

3   BY MS. YOUNG:

4   Q.  These messages are from February 8th, 2020; is that right?

5   A.  Yes.

6   Q.  That's before the documentary was released?

7   A.  Yes.

8   Q.  And Ms. Paine is a distant cousin who shares some DNA with

9   you according to 23andMe; is that right?

10  A.  Yes.

11  Q.  Is this the relative that you were talking about when

12  Mr. MacGill was asking you questions about people you've shared

13  information with?

14  A.  I don't remember.

15  Q.  Okay.

16  A.  Sorry.

17  Q.  At the time you got this message, though, Ms. Paine was a

18  total stranger to you; isn't that right?

19  A.  Yes.

20  Q.  You've had only one communication ever with her and we're

21  looking at it; correct?

22  A.  Yes.

23  Q.  And what Ms. Paine wrote to you was:  Hi, Lori.  I was

24  looking through my list of new cousins and clicked on yours and

25  was checking out in-common relatives and couldn't help but

*KENNARD – CROSS/YOUNG*                          Vol. 2-420

1  notice all of your half-siblings listed, 17 of them; right?

2  A.  Yes.  That's what it says.

3  Q.  And she was able to see that because you opted in to that

4  DNA relatives feature; correct?

5  A.  Yes, to see my siblings.

6  Q.  And you responded and gave her an explanation for all of

7  those half-siblings; correct?

8  A.  Yes.

9  Q.  You said:  My biological father was my mom's fertility

10 doctor who impregnated her without her consent.  I have over 70

11 half-siblings.  It's hard to say exactly how we're fourth

12 cousins.

13     You wrote that to this stranger; correct?

14 A.  Yes.

15 Q.  And you did not tell Ms. Paine to keep that information a

16 secret; did you?

17 A.  No.

18 Q.  And you had no control over what Ms. Paine would do with

19 the information that you gave her; correct?

20     Is that correct?

21 A.  Correct.

22        THE COURT:  All right, counsel, we need to take about

23 a five-minute recess.  The Court is going to admonish you,

24 Ladies and Gentlemen.  Do not begin any deliberation and no

25 discussion, and we'll come back in about five minutes.

1          MR. BRIAN:  Your Honor, I have literally two or three

2    questions left.

3          THE COURT:  Can you make it two or three more

4    questions, David?

5          The court reporter needs a finger break.

6          MS. YOUNG:  I understand and I'm almost done.

7          THE COURT:  All right.

8    BY MS. YOUNG:

9    Q.  So just a couple more questions, Ms. Kennard.

10        Do you know of any person who is not a half-sibling who saw

11   your name in the documentary?

12   A.  No.

13         MS. YOUNG:  Nothing further.

14         THE COURT:  Okay.  We'll take five, and if you have

15   any redirect, we'll do that tonight.

16         MR. MacGILL:  Thank you.

17         COURTROOM DEPUTY:  All rise.

18      (Jury out at 5:40.)

19         THE COURT:  All right, we'll take five minutes.  We'll

20   finish this witness tonight, and then we'll play that 90-minute

21   video in the morning, counsel.

22         MR. MacGILL:  Thank you.

23         THE COURT:  Okay.

24         MS. YOUNG:  Thank you, Your Honor.

25         THE COURT:  We can go off the record.  Take a break,

*KENNARD – REDIRECT/MACGILL*                    Vol. 2-422

1    everybody.

2         (Recess at 5:41, until 5:48.)

3              THE COURT:  Are you ready for the jury, counsel?

4              MR. MacGILL:  Yes, Your Honor.

5              THE COURT:  You may bring in the panel, Sarah.

6              COURTROOM DEPUTY:  All rise.

7         (Jury in at 5:48.)

8              THE COURT:  Counsel, if you have any cross --

9    redirect, you may.

10             MR. MacGILL:  Thank you, Your Honor.

11                    **REDIRECT EXAMINATION**

12   BY MR. MacGILL:

13   Q.  Just a few questions, Ms. Kennard.

14        Did you authorize Jacoba Ballard to share your private

15   information with the company, Netflix?

16   A.  No.

17   Q.  Did you authorize Jacoba Ballard to share your personal

18   information with a company called Realhouse?

19   A.  No.

20   Q.  Did you authorize Jacoba Ballard to share any of your

21   personal information with any film company, any Hollywood

22   operation, or anyone affiliated with the Netflix world?

23   A.  No.

24   Q.  And I take it it's also a fact -- well, let me state it

25   more clearly.

1      Did you authorize Netflix to utilize information provided

2  it by Jacoba Ballard?

3           MS. YOUNG:  Objection, Your Honor.  Relevance.

4           THE COURT:  She may answer that.  I'll overrule.

5           THE WITNESS:  Can you repeat the question, please?

6  BY MR. MacGILL:

7  Q.  Did you authorize Netflix to utilize the information that

8  Jacoba Ballard provided to it?

9  A.  No.

10 Q.  Okay.  Now, you were asked repeatedly on cross-examination

11 about how many people saw your name in the movie.  Do you

12 recall that line of questioning?

13 A.  Yes.

14 Q.  All right.  With respect to the emotional distress that's

15 listed here, is that associated with you seeing your name in

16 the movie?

17 A.  Yes.

18 Q.  With respect to the loss of the enjoyment of life, is that

19 associated with you seeing the movie?

20 A.  Yes.

21 Q.  Did you, at any time, ever authorize -- strike that.

22      Did you ever allow 23andMe to show your biological father?

23 A.  No.

24 Q.  And finally, you were asked about a number of different

25 people that you shared information with between 2019 and 2022;

*KENNARD – REDIRECT/MACGILL*                    Vol. 2-424

1   do you remember that line of questioning?

2   A.  Yes.

3   Q.  Just two or three quick things:  You did share information

4   were Holly Wings; is that right?

5   A.  Yes.

6   Q.  How long has she been a friend of yours?

7   A.  Since seventh grade.

8   Q.  Did you share information with your cousin, with a person

9   who is your cousin?

10  A.  Yes.

11  Q.  What is her name?

12  A.  Chelane Paine.

13  Q.  You were also asked about sharing information with a

14  gentleman at your PTO; do you remember that?

15  A.  Yes.

16  Q.  Ron Mesarosh?

17  A.  Mesarosh.

18  Q.  Okay.  Why did you share that information with him?

19  A.  He reached out to me about my post of encouraging people to

20  take a 23andMe test.  I needed to know who my half-siblings

21  are, so I posted, encouraging people to take the test.  He

22  inquired about 23andMe versus Ancestry, and, you know, was

23  wondering about his situation and I sought an opportunity to

24  share and connect with someone.

25  Q.  How often did you see or work with this gentleman?

*KENNARD – RECROSS/YOUNG*                    Vol. 2-425

1    A.  If not every day, every other day at school.

2            MR. MacGILL:  Your Honor, no further questions.

3            THE COURT:  Any questions on those, counsel?

4                    **RECROSS-EXAMINATION**

5    BY MS. YOUNG:

6    Q.  Just a couple of questions.

7            THE COURT:  You may.

8    BY MS. YOUNG:

9    Q.  The cousin who you referenced, that was fourth, sixth,

10   fifth, seventh cousin, something like that?

11   A.  Fourth.

12   Q.  Not a first cousin; right?

13   A.  Correct.

14   Q.  And you could not control what any of those people did with

15   the information you shared with them; could you?

16   A.  No.

17           MS. YOUNG:  Nothing further.

18           THE COURT:  Nothing on those questions?

19           MR. MacGILL:  Nothing further, Your Honor.

20           THE COURT:  Okay.  All right.  So, we're going to go

21   ahead and send the jury home for the evening.  And we're in

22   good shape, Ladies and Gentlemen.  We're right on track where

23   we want to be, so we're definitely going to finish up by

24   Thursday.  The Court is going to admonish you once again this

25   evening, during this period of time that you're allowed to

1  separate, you're not to have any discussion about the case

2  among yourselves or with anyone else.  If there is anything in

3  the media about it, you're not to read or listen to those

4  accounts.  And, again, you're not to do any research, so don't

5  look on Facebook or Google or anything else for anything

6  related to the case.  If anyone should attempt to talk to you

7  about the matter, report that attempt to your bailiff at your

8  earliest opportunity.  Tell your family:  Thursday night I'll

9  be able to talk about it, but not tonight.

10        So have a good evening, follow your admonishment, and

11  we'll see you at 8:30 a.m.

12        COURTROOM DEPUTY:  All rise.

13    (Jury out at 5:54.)

14        THE COURT:  Okay.  You can have a seat.  We're going

15  to let the jury leave first.

16        So, counsel, am I correct that the plaintiff -- do you

17  have any other witnesses?

18        MR. MacGILL:  We do not.

19        THE COURT:  So you're just going to play the

20  documentary.

21        MR. MacGILL:  We're going to play the movie, Your

22  Honor, and offer the financial stipulation and we rest.

23        THE COURT:  All right.

24        MR. BRIAN:  Your Honor, on that representation, we

25  will go ahead and file the Rule 50 motion, I think now, in the

1    next five or ten minutes.

2              THE COURT:  Great.

3              MR. BRIAN:  And when would you like to argue, then?

4              THE COURT:  Okay.  So they're going to get their

5    motion on file tonight.  Will you have your response in the

6    morning?

7              MR. MacGILL:  Yes, ma'am.

8              THE COURT:  Okay.  So by 7:00 a.m.?  Your team is

9    nodding that they --

10             MR. MacGILL:  If you say so.

11             THE COURT:  Okay.  We can --

12             MR. BRIAN:  That's what we'll do.

13             THE COURT:  We can all start looking at 7:00 a.m.  And

14   I'll give you -- if you want to have some brief argument, but

15   if you have most of it in writing, we'll do that after the

16   video.

17             MR. MacGILL:  After the video?

18             THE COURT:  After the video.

19             MR. MacGILL:  Thank you.

20             THE COURT:  Yeah, after the video.  And while we're

21   watching the video, me and my law clerk can be getting the

22   ruling ready for you; okay?  So that's great.  We can have time

23   to read your cases.

24             MR. BRIAN:  Your Honor, we are going to caucus

25   tonight.  I think it's happened in every case I think I've ever

*KENNARD - RECROSS/YOUNG*                    Vol. 2-428

1  tried on the defense side, the defense case will likely get

2  narrower rather than broader.

3           THE COURT:  It always does.

4           MR. BRIAN:  It always happens.  And I was just

5  wondering whether -- when you want to have the charging

6  conference.

7           THE COURT:  We'll have that when you rest, and then --

8  so after -- you'll have your rulings tomorrow, okay, before you

9  start your case in chief.  And then you can call your

10 witnesses.  And then after you call your witnesses, I don't

11 know if they will have any rebuttal or not.  Do you want to

12 wait and see?

13          MR. MacGILL:  I'm venturing to guess no.

14          THE COURT:  Okay.  All right.

15          MR. BRIAN:  I'm doing some quick math in my head.  I

16 think it's possible that we will rest tomorrow.

17          THE COURT:  That's what you need to do; okay?

18          MR. BRIAN:  But I think we need to caucus and make

19 some decisions quickly, and then we would do the charging

20 conference and then close Thursday, I assume, would be the

21 plan.

22          THE COURT:  Yes.  We'll let you come back and close

23 when the jury is fresh and when you're fresh to do your closing

24 arguments and to get the jury deliberating.  We'll do that

25 Thursday morning.  But if we can finish all the evidence

*KENNARD – RECROSS/YOUNG*                    Vol. 2-429

1    tomorrow, that's the goal.

2            MR. BRIAN:  I can't guarantee it, but we're gonna try.

3     We're gonna try.

4            THE COURT:  Well, I want you to guarantee it.  If we

5    have to be here till 6:00 or 7, so -- you don't want to do

6    that.  So work on it.  Make it concise.  Okay?

7            MR. BRIAN:  We will.

8            MR. MacGILL:  We have one other suggestion, and that

9    is that we're going to send the admitted exhibit list that we

10   have to counsel and see if we can get an agreed-upon list to

11   you tomorrow night so that we can at least say to you: Here's

12   what the lawyers have agreed to, are the admitted exhibits.

13           THE COURT:  Right.  And Sarah will give you -- she's

14   been keeping track also, and so does Carly, so we'll have lots

15   of lists to make sure we have the -- send the correct exhibits

16   back.  Okay?

17           MR. MacGILL:  Perfect.  Thank you.

18           THE COURT:  All right.  One more thing.  Lawyers, when

19   you leave, you cannot go out the door on the first floor.

20   Someone went out the door on the first floor and set off the

21   alarm, so you have to go to the handicap entrance in the

22   basement, so take the elevator down to B and go out that door,

23   okay, and the CSO will be at that door.

24           MR. BRIAN:  Thank you.

25           THE COURT:  Okay.  Carly will escort you down when

*KENNARD – RECROSS/YOUNG*                                    Vol. 2-430

1    you're ready.

2            MR. MacGILL:  Okay.  Thank you.

3            THE COURT:  Okay.

4            MR. BRIAN:  Thank you, Your Honor.

5            THE COURT:  All right.  So hopefully the jury has gone

6    down and so pack up and head on out.

7            MS. McDERMOTT:  Thank you, Your Honor.

8            THE COURT:  And we'll see you guys -- lawyers, you all

9    will be here between 8:00 and 8:15.

10            MR. BRIAN:  We will.

11            THE COURT:  Okay.  All right.

12        (Proceedings adjourned at 5:59.)

13

14    ----------------------------------------------------------------

15

16                    CERTIFICATE OF COURT REPORTER

17        I, David W. Moxley, hereby certify that the

18    foregoing is a true and correct transcript from

19    reported proceedings in the above-entitled matter.

20

21

22    /S/ David W. Moxley                    December 3, 2024
      DAVID W. MOXLEY, RMR/CRR/CMRS
23    Official Court Reporter
      Southern District of Indiana
24    Indianapolis Division

25