UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SARAH BOWLING,                          )
LORI KENNARD,                           )
                                        ) Cause No.
            Plaintiffs,                 )  1:22-cv-1281-TWP-MJD
                                        ) Indianapolis, Indiana
      vs.                               ) **December 4, 2024**
                                        ) 8:37 a.m.
NETFLIX, INC., NETFLIX                   )
WORLDWIDE ENTERTAINMENT, LLC,           )
REALHOUSE PRODUCTIONS, LLC.,            )
                                        )        **VOLUME III**
            Defendants.                 )

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL

Court Reporter:              David W. Moxley, RMR, CRR, CMRS
                             United States District Court
                             46 East Ohio Street, Room 340
                             Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

1  **APPEARANCES:**

2

3  **For Plaintiffs:**                    Robert D. MacGill, Esq.
                                          Matthew Thomas Ciulla, Esq.
4                                         Mackenzie Thompson, Esq.
                                          Jordan Cecelia Satterthwaite,Esq.
5                                         MacGill PC
                                          Suite 1200
6                                         156 East Market Street
                                          Indianapolis, IN  46204

7

8  **For Defendants:**                    Brad Dennis Brian, Esq.
                                          Munger, Tolles & Olson, LLP
9                                         50th Floor
                                          350 South Grand Avenue
10                                        Los Angeles, CA  90071-3426

11                                        Blanca Young, Esq.
                                          Munger, Tolles & Olson, LLP
12                                        Suite 27th Floor
                                          560 Mission Street
13                                        San Francisco, CA  94105-2907

14                                        Andrea Roberts Pierson, Esq.
                                          Faegre Drinker Biddle & Reath
15                                        Suite 2500
                                          300 North Meridian Street
16                                        Indianapolis, IN  46204

17

18

19

20

21

22

23

24

25

1

# I N D E X

2    **DEFENDANTS' WITNESSES:**                                    **PAGE**

3    LUCIE JOURDAN COYNE

4    Direct Examination by Mr. Brian ...............469
     Cross-examination by Mr. MacGILL .............511
5    Redirect Examination by Mr. Brian ............589

6    JONAH BERGER

7    Direct Examination by Mr. Brian ...............594
     Cross-examination by Mr. MacGill .............611
8    Redirect Examination by Mr. Brian ............639

9    AL WICKERS

10   Direct Examination by Ms. Young ...............646

11

12

# I N D E X   O F   E X H I B I T S

13   **PLAINTIFFS' EXHIBITS:**                                    **PAGE**

14   75 ...........................................514
     389A .........................................467
15   392, page 3 .................................468
     393 .........................................468
16   1039 ........................................577
     1041 ........................................583

17

18   **DEFENDANTS' EXHIBITS:**                                    **PAGE**

19   108 .........................................651
     131 .........................................497
20   183 .........................................437
     199 .........................................645
21   204 .........................................645
     239 .........................................475
22   242 .........................................645
     243 .........................................645
23   1024 ........................................645

24

25

1                           (In open court.)

2              THE COURT:  Good morning.  Okay.  We are on the

3      record.  This is Sarah Bowling and Lori Kennard, plaintiffs,

4      versus Netflix, Inc., Netflix Worldwide Entertainment, LLC, and

5      Realhouse Productions, LLC.  Day three of our jury trial.

6              And before we bring in the panel, you had some issues

7      or concerns.

8              MR. BRIAN:  Two issues.  Two issues.  One, I want to

9      confirm -- is to play the documentary.  I just want to confirm

10     it's going to be played from start to finish.

11             THE COURT:  Okay.  Can you confirm?

12             MR. MacGILL:  Yes, it is.

13             THE COURT:  Okay.

14             MR. BRIAN:  And not going to be stopped is what my

15     point is, not going to be stopped to highlight anything.

16             MR. MacGILL:  That's correct, and from start to

17     finish, Exhibit 241.

18             THE COURT:  Okay.

19             MR. BRIAN:  And secondly, Your Honor, we learned this

20     morning that counsel changed the brightness on the screens to

21     100 percent.  Obviously a major issue in the case is whether

22     the viewers would have noticed the names.  So with -- the

23     brightness level could affect that.  Nobody here, I think, is

24     an expert here on brightness levels.  But I don't think it's

25     appropriate to change the brightness from what they saw

1    yesterday or the day before when they were played snippets of

2    the film.  I think that's inappropriate.

3          MR. MacGILL:  So with the Court's staff, we wanted to

4    check, one, that 241 could be played and then appropriately

5    seen on the screens here in the court, so that was the

6    adjustment that was made.  We looked at it.  We checked it to

7    make sure that the movie was visible suitably prior to the

8    court proceedings beginning today, number one.

9          Number two, we asked counsel for the Netflix firms or

10   companies to take a look and to see.  We played two or three

11   minutes of the film.  So we think that the adjustment is

12   appropriate so the jury can see it appropriately for purposes

13   of seeing the movie from beginning to end.

14         THE COURT:  So what happens with those small screens,

15   they automatically adjust just like your cell phones do

16   sometimes.  They will dim for energy-saving purposes.  And

17   often when viewing films, they are too dim.  They're more dim

18   than the big screen will be.  And especially in our criminal

19   cases when they're doing police video cams, sometimes you can't

20   see what's -- I mean, what's on the big screen and what

21   actually is on the video is not clear.  But the Court will let

22   the jury know that their screens on their tablets have been

23   brightened --

24         MR. BRIAN:  Thank you, Your Honor.

25         THE COURT:  -- so that they'll know that it may be

1    different than what they -- the way they visualized the clips

2    yesterday.  So I'll just let them know the screens have been

3    brightened so that it's very clear.

4              MR. BRIAN:  Thank you, Your Honor.

5              MR. MacGILL:  To alleviate the concern, would it be

6    reasonable to move the big television to the front of the jury

7    box so they can make the election of seeing it on the big

8    screen or the smaller screen?  They could make their own

9    choice.

10             MR. BRIAN:  I don't --

11             THE COURT:  Only going to block you guys.

12             MR. BRIAN:  Yeah, that's the only thing I'm concerned

13   about is we can't see the jurors when they're doing that.

14             MR. MacGILL:  We could move it right here next to me.

15   They don't need to see me.

16             MR. BRIAN:  I'm fine with that.

17             THE COURT:  Okay.  We'll call IT to come and move it.

18             MR. MacGILL:  Okay.  I think that would -- that would

19   be reasonable, I think.

20             THE COURT:  Okay.

21             MR. BRIAN:  Your Honor, also just to let the Court

22   know, we advised counsel last night that we've cut a number of

23   our witnesses out.  So by our calculation, we should finish by

24   late afternoon today.

25             THE COURT:  Great.

 1          MR. BRIAN:  There's also one witness that we are still

 2   considering whether or not to call, and we'll make that

 3   judgment probably after the first witness we call.

 4          THE COURT:  Thank you.  Sounds good.

 5          MR. BRIAN:  Thank you.

 6          MS. YOUNG:  And Your Honor, one more housekeeping

 7   issue.  We would like to move into evidence Exhibit 183.  It

 8   was a stipulated exhibit that the parties stipulated was

 9   admissible if used with a witness, and it was discussed with

10   Lori Kennard in her testimony yesterday.

11          THE COURT:  What was it?  What is 183?

12          MS. YOUNG:  It's her 23andMe DNA relatives, list of

13   DNA relatives.

14          MR. MacGILL:  No objection.

15          THE COURT:  All right.  We'll admit into evidence

16   without objection Exhibit 183.

17          **_____(Defendants' Exhibit 183 was_**

18          **_____received in evidence.)_**

19          MS. YOUNG:  Thank you, Your Honor.

20          THE COURT:  Okay.  And then one more thing, lawyers.

21   On the Yondr bag exemption, no attorney -- these are the people

22   who are exempt from placing their electronic devices in the

23   locked pouch:  All attorneys.  If you're a lawyer, we don't

24   lock your phone.  If you are a juror, we don't lock your phone.

25   And then if you are a judicial officer.  If you are law

1    enforcement or if you are a member of the press or media

2    represented on official business and any other person who's

3    here on official business.  So if someone is on your team

4    helping you with witnesses, et cetera, and logistics, then they

5    don't have to have their phones off.  But if you're just here

6    observing and want to work on your phone for matters not

7    related to this case, you're not allowed to have your phone

8    locked in, so I know there's been some concern about people

9    wanting their phones.

10        Okay.  We're very secure in the federal courthouse,

11   like the airport.

12        Are we ready for the jury?

13        MR. BRIAN:  Yes, Your Honor.

14        THE COURT:  Okay.

15        MR. MacGILL:  Yes, Your Honor.

16        THE COURT:  Is somebody on their way?

17   (Off the record.)

18        THE COURT:  Go get the jury lined up.

19        MS. YOUNG:  Your Honor, I have a question for you.  I

20   may need to step out to meet a witness.  Would that be all

21   right if I do that during the documentary?

22        THE COURT:  That's fine.

23        MS. YOUNG:  Thank you, Your Honor.

24   (Off the record.)

25        MR. MacGILL:  Your Honor, I had one similar matter.

1       Mrs. Bowling -- her youngest son has his

2  reconciliation tonight -- would need to be leaving around 5:15.

3  So if she could just quietly leave with no objection?

4       THE COURT:  No objection to that.

5       MRS. BOWLING:  Thank you, Your Honor.

6    (Off the record.)

7       THE COURT:  Sarah, go ahead and bring the jury in, and

8  I'll just -- you can go ahead and bring them in.  He should be

9  here any minute.

10       COURTROOM DEPUTY:  Yeah.

11       All rise.

12    (Jury in at 8:45.)

13       THE COURT:  You may be seated.  And good morning,

14  Ladies and Gentlemen of the Jury.  Good morning, Ladies and

15  Gentlemen.  Okay.  Wake up.  It's time to get to work.  I hope

16  everyone had a good evening.

17       We are going to -- I believe the plaintiffs intend

18  to -- your next piece of evidence will be playing the video,

19  the documentary, counsel?

20       MR. MacGILL:  Yes.

21       Good morning, Your Honor.  May it please the Court,

22  Ladies and Gentlemen of the Jury, and counsel.

23       We are offering into evidence, Exhibit 241, the movie,

24  **Our Father,** and we propose, with the Court's permission, to

25  play it from beginning to end.

Vol. 3-440

1          THE COURT:  No objection to the admission of -- what's

2     the exhibit number?

3          MR. MacGILL:  241.

4          THE COURT:  Oh, it's already in evidence.

5          MS. YOUNG:  No objection, but I believe it's in

6     evidence already.

7          THE COURT:  Okay.  All right.  So you may play 241.

8          And, Ladies and Gentlemen of the Jury, we're going to

9     move the big screen so that you can see it better.

10          Jonathan, can you tip it towards -- tilt it towards

11     the jury box a little better?  We don't want to unplug

12     anything.  And so -- that's good.

13          Ladies and Gentlemen, your individual screens have

14     been brightened so that you can have a very good visualization

15     of the documentary, so they may be brighter than they were

16     yesterday when you were looking at the clip, so that's the

17     difference.  But the big screen --

18          Wait until we make sure it works.

19          The big screen usually has a much better view.  Let's

20     just make sure it's working.

21          All right.  You may play 241.

22       (Video playing in open court.)

23          MR. MacGILL:  Your Honor, that concludes the movie.

24          THE COURT:  All right.

25          Okay, Ladies and Gentlemen.  I think we'll take our

1    morning break.  The Court is going to admonish you.  Do not

2    begin any deliberation, no discussion, and we'll have you back

3    in the courtroom in about 10 minutes.

4                And, Sarah, you may take the jury to the jury room.

5                COURTROOM DEPUTY:  All rise.

6        (Jury out at 10:20.)

7                THE COURT:  So when the jury comes back, plaintiffs,

8    will you be resting?

9                MR. MacGILL:  Your Honor, we have just the financial

10   stipulations that -- or the financial data that we will offer.

11   We will offer the Realhouse financial statements and the

12   financial statements of Netflix.  And at that time, Your Honor,

13   we would rest as to the plaintiffs' case.

14               THE COURT:  Okay.  And then once they've rested,

15   you're going to make your Rule 50 motion?

16               MR. BRIAN:  We filed a motion last night.  We'll

17   formally make the motion.  As we've discussed, whether those

18   would go in evidence in front of the jury will depend on your

19   ruling.

20               THE COURT:  Okay.  All right.  So we'll come back in

21   about -- well, go ahead and take 10 minutes.  We'll come

22   back, and we'll do the oral argument, any supplemental

23   arguments on your Rule 50 motions, and I'll make a ruling

24   before we bring the jury back in.

25               MR. BRIAN:  Okay.  Can we take a restroom break now

1    then?

2                THE COURT:  Of course.  You get ten minutes.

3                MR. BRIAN:  Okay.  I don't need that much.

4                THE COURT:  All right.  We'll take a ten-minute break.

5                COURTROOM DEPUTY:  All rise.

6          (Recess at 10:22 until 10:44.)

7                THE COURT:  And we are back on the record.

8                Counsel, the Court indicated that it would give you an

9    opportunity if there's any additional oral argument that you

10   want to make on the Rule 50 motion.  The Court has received and

11   reviewed the defendants' first motion for judgment as a matter

12   of law at Docket 403, as well as the plaintiffs' response,

13   which is at 404.

14               So, plaintiffs -- defendants, do you have anything you

15   want to add?

16               MR. BRIAN:  I do, Your Honor.

17               THE COURT:  You may.

18               MR. BRIAN:  I'm conscious of the Court's time so I'll

19   try to be brief, Your Honor.

20               I want to focus on three things.  One is the issue of

21   consent.  The second is the plaintiffs' argument in opposition

22   that, essentially, Your Honor's ruling on the summary judgment

23   motion controls.  And the third, the principle of law that the

24   actors who allegedly acted wrongfully here need to be at a

25   certain level of management before punitive damages can be

1    imposed.

2          On the consent issue, they completely ignore our

3    argument.  In their opposition brief, they don't touch it, and

4    the reason they don't touch it is the law is clear that the

5    lack of consent or permission or release is not -- cannot be

6    the basis for a tort of invasion of privacy, and, therefore, it

7    cannot be the basis for a claim of punitive damages.  They

8    don't touch it.

9          Virtually -- we would argue that virtually all the

10   evidence they cite -- and we certainly heard a lot about it

11   yesterday -- was -- is based on the notion that the plaintiffs

12   didn't consent, they didn't sign a release, they didn't give

13   permission.  We think that none of that supports an argument --

14   a basis for punitive damages on the consent issue.

15         On your summary judgment ruling, Your Honor, the law

16   is very clear in a case that I'll mispronounce badly.  It's

17   Waubanascum versus Shawano County, 416 F.3d 658 at 664, Seventh

18   Circuit, 2005.  The Court, on a -- on this motion, is entitled

19   to consider all the evidence, including evidence that came into

20   the record that was not before the Court on summary judgment.

21         Plaintiffs are correct that inferences must be drawn

22   favorably to the plaintiffs, but Your Honor is perfectly

23   entitled to consider that evidence.

24         So in going back and looking at Your Honor's summary

25   judgment motion, I'll just say a couple of things.

1          They argue that Your Honor said that the documentary

2     about Dr. Cline was chilling, but what Your Honor also said

3     was:  The issue in the case is not whether the plaintiffs have

4     been damaged somehow by the movie's references to Dr. Cline.

5     It's whether they've been damaged by the use of the names, the

6     brief appearances of the name.  And that, I would argue, is not

7     chill and certainly not in a way that is reckless or wanton or

8     fraudulent or -- in the standard of punitive damages.

9          The second thing they say is that Your Honor said that

10    there was evidence that Netflix aired -- didn't air the correct

11    version of the film, but we heard yesterday from Alexandra

12    Reed, was that an e-mail they rely on was mistaken, that the

13    supposed deference was the result of a monitor she was looking

14    at in the film.

15         Zana Lawrence, in her deposition designations,

16    testified that Netflix did not edit the film.  This is all new

17    evidence that was not before Your Honor on summary judgment.

18         Third round they cite, they say that the defendants

19    allegedly knew that the children of Cline wanted to stay

20    confidential.  That's also new evidence.

21         You heard on my cross-examination of Sarah Bowling,

22    that she was the one that reached out to Michael Petrella in

23    2019 in an initial e-mail and voluntarily disclosed herself to

24    be a donor child of Cline.  That was voluntary, that was -- she

25    never said to keep it private at all.

1          As to Lori Kennard -- and by the way, obviously, Your

2    Honor, there was loads of evidence of both Ms. Bowling and

3    Ms. Kennard disclosing their information on Instagram to over

4    1,500 followers and all the evidence you heard on

5    cross-examination of both of those individuals.  But with

6    respect to Ms. Kennard, which I think is very important, you

7    heard -- you received in evidence an e-mail which plaintiffs

8    rely on, from Lucie Jourdan, instructing that Lori Kennard's

9    name be blurred.

10          It was blurred from one scene.  It stayed in for less

11   than half a second in the second scene.  There is no evidence,

12   at all, in the record, at all, that the -- that the presence of

13   her name in that other scene was anything other than a mistake.

14   There's no evidence of that at all.

15          The next point, they argued that based -- in your

16   summary judgment ruling, you mentioned there was an issue of

17   whether Mr. Wickers had done a good job and also whether or not

18   Netflix was entitled to rely on the second point.  What you

19   heard yesterday in the deposition clips of Zana Lawrence was

20   that what Netflix does is they contract with a production

21   company -- in this case, Realhouse.  They have the right to

22   approve the retention of the clearance counsel to watch the

23   film; and most importantly, what we heard yesterday, is that

24   Netflix insists on getting what are called deliverables.

25          She testified to the deliverables, which are the

1  opinion letter and the work product that is being done.  So

2  when you hear evidence that Netflix does not redo the work of

3  the expert, that is correct, once they've confirmed that the

4  work has been done.  And they, of course, have had much

5  experience with Al Wickers and are very familiar with his level

6  of expertise.

7        The OMGLOL e-mail, which goes really to the issue of

8  whether the persons that are saying these things -- first of

9  all, Joelle Shapiro testified that she certainly didn't think

10  this was a laughing matter, but in any event, the person who

11  said that, there is absolutely no evidence in the record that

12  the person who said that or indicated that in his -- I forget

13  if it was a text or e-mail, was of a sufficient management

14  level to bind the company for purposes of punitives damages.

15  So that's sort of my last point, Your Honor.

16        THE COURT:  Okay.

17        MR. BRIAN:  On that issue, the plaintiffs really

18  offered nothing to establish that the people that they say

19  committed the actions are at a sufficient management level of

20  either Realhouse or Netflix.  Lucie Jourdan and Michael

21  Petrella are independent producers.

22        They cite to the fact that Jason Blum is a producer on

23  the film.  He had nothing to do with any of the so-called

24  representations or decisions.  They say that the president of

25  Netflix signed the agreement between Realhouse and Netflix.

Vol. 3-447

1    There's no evidence, at all, that that individual had anything

2    to do with the production of this film, any of the decisions

3    about what names to include, any representations made to the

4    parties.

5         Joelle Shapiro, the young woman who appeared on the

6    screen, she does have the word "manager" in her title.  There's

7    no evidence that she's in the management of the company.  Tim

8    Mizrahi, who was the retired lawyer in charge of a certain part

9    of the legal department, did not work on this film at all.  He

10   had nothing to do with this film, and there's no evidence of

11   that.

12        And finally, Zana Lawrence, you could argue whether

13   her role as the director of the documentary film division,

14   whether that's a sufficiently high level, but what she

15   testified to clearly is the point I made earlier, which is she

16   insisted that they have qualified clearance counsel and that

17   they got the deliverables, confirming that the work had been

18   done.

19        So in light of all of that evidence, under a clear and

20   convincing standard in this circuit, which is very, very --

21   applies that standard very rigidly, we don't think the

22   plaintiffs have met their burden, and the issue of punitive

23   damages should not go to the jury, Your Honor.  Thank you.

24        THE COURT:  Okay.  Thank you.

25        MR. MacGILL:  Your Honor, briefly, and mindful that

1    the jury is waiting.  We wanted to make several different

2    points.

3            First, we understand and acknowledge the summary

4    judgment ruling is the summary judgment ruling.  There has been

5    evidence since, and so what we did in the materials that we

6    submitted to the Court earlier this morning was to confirm that

7    the evidence had been, in fact, received by this Court as shown

8    here in the document that we filed last night -- or I should

9    say this morning.

10            Now, one thing that is not in our materials, that came

11    from the movie, we didn't have the movie in evidence as we saw

12    it, anyway, but with respect to the movie itself, it shows what

13    the director understood.  And with respect to the reckless

14    disregard of the rights of the plaintiffs here, the

15    recklessness is confirmed by the content of the movie in

16    several respects.

17            One, the director knew, specifically, what was being

18    portrayed in the movie, and it affected these plaintiffs.

19    Dr. Cline was described in the movie as the evil -- I'm sorry.

20    He was described as, by his former partner, as a person who was

21    evil.  He knew what he was doing, was another reference.  There

22    was reference in the movie to the fact that Dr. Cline

23    intimidated witnesses, that he had attended a meeting with

24    siblings, some of the siblings, with a gun on his person.

25            Additionally, the reality here is that the movie also

1    depicted him as a felon; okay?  So what does that mean in terms

2    of the reckless disregard, specifically?  It provides

3    additional evidence, that with respect to what Sarah Bowling

4    might be expected for her part as to whether she would be

5    judged by the identity of her biological father shown in this

6    movie in that respect, and her association with him is shown in

7    further detail.  And the recklessness of that is shown in

8    further detail by the movie itself.

9           Second, with respect to Sarah Bowling, and also Lori

10   Kennard, the movie shows, specifically, a scene which confirms

11   what Ms. Bowling testified to, specifically.  She -- her

12   emotional distress includes the manner in which she was

13   conceived.  The director of this film from Realhouse and the

14   Netflix, its distributor, understood that that imagery from the

15   beginning of the movie would be showing the manner in which the

16   conception of Sarah Bowling occurred and the conception of Lori

17   Kennard occurred.  That is with respect to each plaintiff.

18          It was known to be by this director and by this

19   company, Netflix, it was known to be what the effect would be,

20   because by their own words that the Court has received, this

21   was shocking.  These were bizarre beginnings.  They admitted in

22   various marketing materials that they understood that this

23   would be, quote, traumatizing for the secret children or for

24   the children of Dr. Cline, that by their own words from their

25   publication -- from the publication department to their

1    marketing department, they knew it.

2        And they understood it throughout the company, but

3    when it's put in the further and the final context, Your Honor,

4    and what the Court and the jury saw this morning. The person

5    sitting in the director's chair and the distributors of this

6    movie knew exactly, could see exactly, what the effects would

7    be on Sarah Bowling.

8        Now, turning to Lori Kennard for a minute. With

9    respect to what the director could understand, reasonably, in

10   terms of the effect on Lori Kennard if she learned that her

11   name in the movie is the same, essentially. She would live in

12   fear that she would be discovered to be the biological child of

13   Dr. Cline as shown in the movie, and that association is a

14   realistic fear and an appropriate fear based on what she

15   testified she had based on her viewing of the movie and knowing

16   that she was in the movie itself.

17       In addition, for her, and as I just mentioned, she

18   makes reference, specifically, to conception in the fact that

19   she is in fear, based on her knowledge that she was in the

20   movie, that people might judge her, her fear based on the

21   manner in which she was conceived. All of this goes to the

22   conduct of what Netflix and the senior people at Realhouse

23   knew.

24       Now, with respect to the final point that is made, one

25   of the points -- I said it was point number three, I suppose.

1    Mr. Mizrahi was described as a retired person.  Mr. Mizrahi was

2    the vice president of legal affairs in charge of content and

3    intellectual property.  What he testified to this jury is that

4    there was no mistake here.  That's what he testified to, and

5    that's the evidence viewed most favorably from our standpoint,

6    which is the standard here.  We point that out to the Court,

7    and we mention that on brief, as well.

8         With respect to the burden of proof as to managing

9    agents and that argument that you've heard, we're not ready to

10   agree, and we will not agree, that as a -- that there exists, I

11   should say, a certain level of seniority or authority

12   requirement associated with an ability to have a jury consider

13   punitive damages.

14        And specifically, we refer to some individuals.  If we

15   look at Realhouse, senior and important people were involved.

16   We've given you the citation is Mr. Blum.  He's the founder of

17   Realhouse.  He was the executive producer of this film, Your

18   Honor, and he was paid for his services.  I believe the

19   evidence was $50,000 for his services.

20        Ms. Reed testified by the reading of the deposition

21   that you heard yesterday.  Ms. Reed was in charge entirely at

22   Realhouse of the business affairs of Realhouse in producing

23   this movie that was given and handed over to Netflix, senior

24   member by any appropriate view of the evidence.

25        The director has also given testimony in this from

1    Realhouse, and you're aware of that testimony.  And finally,

2    with respect to looking, briefly, at who at Netflix was

3    involved, the Court has heard that evidence, but Joelle Shapiro

4    from Netflix was involved, and she was the senior manager for

5    marketing of that company.

6           Tim Mizrahi, who we described a minute ago, was a very

7    senior person at Netflix in charge of business and legal

8    affairs, as in the manner we described, including intellectual

9    property.  He testified that he manages the intellectual

10   property team and that he's based -- and that that team, which

11   is, as it's based in the United States, he is in charge of the

12   United States.  He was the gentleman that, as I mentioned a

13   minute ago said, there was no mistake.

14          And with respect to Zana Lawrence, she was the

15   director of the original documentary, and she has given

16   testimony, as well.

17          So for all these reasons, Your Honor, we find

18   ourselves in a familiar place.  The Court has made important

19   rulings along the way, has written many pages of analysis and

20   legal review and conclusions that have guided the parties as we

21   get here today.

22          With respect to those legal rulings, Your Honor, we

23   are in a place now where the question is, could a reasonable

24   jury make a conclusion based on clear and convincing evidence

25   that punitive damages are appropriate, because there was a

Vol. 3-453

1    reckless disregard of the consequences to the plaintiff, a

2    reckless disregard of the consequences to these plaintiffs.

3            That, Your Honor, based on these circumstances, should

4    be given to the jury, and for the reasons that the Court wrote

5    in the summary judgment; but more importantly, based on the

6    evidence that the Court now has.  This isn't a matter of a

7    legal ruling, at this time, for all the reasons the Court has

8    written before and for all the reasons that we have described

9    this morning.  And we thank you for your time and your

10   attention.

11           THE COURT:  Thank you, counsel.

12           MR. BRIAN:  Your Honor, I can be very, very brief.

13           THE COURT:  Very, very brief.

14           MR. BRIAN:  Very brief.  I'm going to start by

15   referencing one of your prior rulings, which was in our Motion

16   in Limine Number 11.  In your Motion in Limine Number 11, you

17   granted our motion to say that it was irrelevant, all of the

18   stuff they were going to argue about religion and Dr. Cline's

19   conduct and all of that.  That is exactly what we just heard on

20   behalf of Sarah Bowling.

21           The argument he's making is that those things in the

22   film, those scenes that you have ruled are inadmissible and

23   irrelevant, somehow were calculated to cause harm to

24   Ms. Bowling.  That's their argument.  You've already ruled

25   previously that that is not relevant to the case.

1        And as to Ms. Kennard, what he says is, we recklessly

2  disregarded, somehow, that the appearance of her name for less

3  than half a second was going to cause fear of her being

4  discovered.  I would remind the Court again of the evidence

5  where Lucie Jourdan instructed people to blur her name.  There

6  is -- and her name was, in fact, blurred in the scene where her

7  name had appeared for a greater length of time, in a manner of

8  a few seconds, but more than a half a second.

9        There is no evidence that the presence of her name for

10  less than half a second was in any way reckless or delinquent.

11  His reference to Tim Mizrahi's testimony, who he says was not a

12  mistake, we don't hide from the fact that there was -- and

13  you're going to hear this from Lucie Jourdan, that there was a

14  decision to use real names, there was, but because of the

15  reality of a documentary.

16        That's not the issue here, though, because here, on

17  Ms. Kennard's, it was clearly a mistake, and there's no

18  evidence otherwise.  And the argument he made on behalf of

19  Ms. Bowling is barred by your ruling on Motion in Limine Number

20  11.

21        THE COURT:  Okay.  All right, lawyers.  I'm going to

22  take the Rule 50 motion under advisement, and let's continue

23  with our trial.  And I will hopefully, after the lunch break,

24  give you a ruling.

25        MR. BRIAN:  Thank you, Your Honor.

1          THE COURT:  Okay.  All right.  So, Sarah, bring in the

2     jury, and you're going to offer your --

3          MR. MacGILL:  Yes, ma'am.

4          THE COURT:  -- financial information?

5          MS. PIERSON:  Your Honor, can we argue that issue

6     before she brings the jury in?  We don't have an agreement on

7     the financial information.

8          THE COURT:  You didn't get that resolved?

9          MS. PIERSON:  Unfortunately, no.

10         THE COURT:  Okay.

11         MS. PIERSON:  Sorry.

12         THE COURT:  Go ahead.  What's the exhibit?

13         MR. MacGILL:  So first, Your Honor, Exhibit 394.  This

14    is the financial stipulation.

15         THE COURT:  Okay.  I don't have 394.

16         This is 390.  Do you have a copy of 394, Sarah?

17      (Off the record.)

18         MR. MacGILL:  Your Honor, I'm happy to hand one up if

19    it would be helpful.

20         THE COURT:  Yeah, if you would.  Is it in this book?

21    Okay, I have it.

22         MR. MacGILL:  You've got it?

23         THE COURT:  Yes.  So this is not a stipulation because

24    you have not agreed; correct?

25         MS. PIERSON:  We have not agreed to the admissibility

1    of the stipulation, that is correct, Your Honor.

2              THE COURT:  Okay.

3              MR. MacGILL:  Well, we did agree, and the agreement

4    was filed with the Court.

5              THE COURT:  Oh, and a stipulation regarding trial

6    exhibits?

7              MR. MacGILL:  Yes, the stipulation, Your Honor, is we

8    were -- after months of litigation of this, and working with

9    Magistrate Judge Dinsmore, we came to the stipulation in lieu

10   of testimony.  We were -- we did agree, and thanks to his

11   guidance, to handle this by documents, not testimony.  So as a

12   part of that discussion, Your Honor, we came to Exhibit 394,

13   and this was executed by counsel, the Davis Wright Tremaine

14   firm, and others, in December of last year.

15             THE COURT:  Okay.  What's your --

16             MS. PIERSON:  May I respond, Your Honor.

17             THE COURT:  Yes.

18             MS. PIERSON:  Just for the record, this is at

19   Docket 222.  This is a stipulation that was entered that

20   pertains to discovery, Your Honor.  It's not relevant to any

21   issue that the jury will be deciding here today, and it would

22   be inappropriate to read that to the jury or to admit it into

23   evidence.

24             You can see that there are statements made about --

25   well, you can read it if you have it in front of you, Your

1    Honor, but you can see that it really just relates to discovery

2    and production information.  It doesn't give the jury any

3    information that's relevant or probative.  We have agreed with

4    counsel to admit Exhibit 393, which is a statement that

5    pertains to Realhouse's assets and states that information

6    clearly, but there's nothing in 394 that would be probative of

7    any issue that the jury is to decide.

8         THE COURT:  It says:  If a punitive damage instruction

9    is to be read to the jury in this case, defendants will not

10   object to the Netflix 10k's or the Realhouse financials on the

11   base of authenticity, hearsay, foundation, or lack of a

12   sponsoring witness.

13        MS. PIERSON:  That is correct.  And just to be clear,

14   we reserved the other objections that are available to us for

15   things like the cumulative nature of documents that may be

16   admitted related to financials or any unfair prejudice.  We can

17   talk about that when we get to the actual financial documents

18   themselves.

19        But this document that counsel seeks to admit is a

20   stipulation between the lawyers about how discovery would be

21   handled, whether further depositions would be taken.  It

22   won't -- it won't make sense to the jury, and it isn't

23   probative of any issue they're being asked to decide.

24        MR. MacGILL:  Your Honor, with respect to what

25   happened here, and with all due respect to counsel, none of the

1  lawyers here in the courtroom were involved at the time.  What

2  we fought for months, and many months, was to get financial

3  information.  We got it, but this stipulation was done so that

4  we would have a document which references what we were provided

5  after all these many months.  And so Exhibit 394, we don't need

6  to -- we could redact paragraph number 2 and number 3, but

7  this -- the introductory paragraphs show that what the

8  Realhouse financials refers to the Realhouse Production's

9  supplemental response to particular interrogatories.  So it

10 just lays the foundation for what are these materials.

11        Now, in further context, I will tell you, I think I've

12 dealt with five lawyers, five, in the past month about these

13 issues, different lawyers from the esteemed firm, the Munger

14 firm, and the esteemed Faegre firm, as well, now today, but we

15 can't -- we just -- we can't get it done, with one exception.

16 As a part of the work with five different lawyers, we did agree

17 to make redactions to Exhibit 389, 390, 391.

18        THE COURT:  Okay.

19        MR. MacGILL:  And we -- you know, we're proposing

20 that, you know, with respect to -- I think it's a month's long

21 negotiation, we proposed redactions to 389, 390, and 391 to

22 move this matter forward.  So that's the -- you know, to be in

23 a problem-solving mode, if I may, we would propose 394 and just

24 have the cover page, we would redact paragraph 2 and 3.

25        THE COURT:  So you just want paragraph --

1          MR. MacGILL:   1 and 2 and the legend here, which

2    informs the document that's forthcoming.

3          MS. PIERSON:   Your Honor, we did propose a really

4    simple solution, which is a two-paragraph stipulation as to

5    assets and liabilities, but counsel rejected that, what would

6    be the cleanest and easiest thing for the jury to understand.

7    That being said, we don't have any objection to one of those

8    three exhibits, 391, 390, or 389, but to admit all three would

9    be cumulative.  These are portions of the 10k for Netflix for

10   -- two years are shown on each 10k.  There's no reason to admit

11   three different versions of that, and to do so would be

12   cumulative and unfairly prejudicial.

13         Admitting one of those -- and I told counsel, choose

14   any one you want, gives him the information that he needs to

15   argue about financial condition of my client.

16         THE COURT:   Do you agree, counsel, that these are

17   cumulative?  They're the same document, 389, 390, and 391A all

18   have the same information?

19         MR. MacGILL:   So they are not, in the sense that they

20   show the financial picture that we want to portray to the jury.

21   We, again, many months of work, we agreed with counsel then, at

22   the time that, we would get three years, 2020, 2021, and '22.

23   They show the company and the longitudinal circumstances of the

24   company and place into context what was happening at the

25   company, Netflix, at the time.  It's not cumulative.  It

1    shows -- this is -- I mean, pardon me.

2             THE COURT:  Why do you need all three?

3             MR. MacGILL:  Because it shows -- well, we can do with

4    two.  We could go with -- when I say do, that's not the right

5    way to say it.  The better way to say it is we could take off

6    391A, which is 2020, and go, Your Honor, in a compromise with

7    390A and 389A, which would be 2021 and 2022.

8             MS. PIERSON:  Your Honor, 389A shows two years' worth

9    of financial information.  We think that information is

10   sufficient.

11            THE COURT:  Okay.  I'm looking at 390A.  Is that the

12   one you're talking about?

13            MS. PIERSON:  389 is the 2022 10k.  I assume that's

14   what counsel wants, is the most recent financial information.

15            THE COURT:  389A?  So there's no dispute about --

16   there's no disagreement about 389A?

17            MR. MacGILL:  That's correct.

18            THE COURT:  So that one we can do.

19            Let's move to 390A.  What's the opposition to 390A?

20            MS. PIERSON:  These documents are the same, Your

21   Honor, but for one year that's shown on there.  You can see

22   when you look at the exhibit that you just admitted, it

23   actually shows three years' worth of financial data, 2022,

24   2021, and 2020, so when the -- you understand how the prior

25   year's 10k would show just one additional year.  There's really

1    no reason to have four years' worth of financial information

2    before the jury.  He's got three in the exhibit that you just

3    admitted.

4           MR. MacGILL:  Your Honor, these are different

5    exhibits.  I mean, in 380 -- 390A shows what accounting,

6    specifically, of revenues for the years 2019, 2020, and 2021,

7    and what -- the way in which this is described is different.

8    And with respect to the data, I agree that the primary

9    difference is the 2019 year that is shown.

10          THE COURT:  So you want 2019 through 2022?

11          MR. MacGILL:  Yes, '-2.  That's the difference between

12    the two.

13          MS. PIERSON:  Our objection, Your Honor, is that it's

14    cumulative and unfairly prejudicial and should be excluded

15    under 403 and 611.

16          THE COURT:  Why do you think you need 2019 also if

17    you've got '20, '21, and '22?

18          MR. MacGILL:  So our view is that it is profits over

19    people here, Your Honor, and with respect to the constant need

20    for revenue that the company had, it's shown by --

21    longitudinally, the data that we say here in 390A, and that

22    provides additional context for what happened and why.

23          THE COURT:  Okay.  I don't think you need 2019, so I'm

24    going to sustain the objection to 390A and 391A.  So you got in

25    389A.

1          And I believe they had no objection to the first two

2     paragraphs of 394?

3          MS. PIERSON:  No, Your Honor, we did object.  394 was

4     the discovery stipulation.  There's nothing about a discovery

5     stipulation that's relevant to any question that the jury will

6     decide.

7          And to the extent that counsel referred to the

8     second paragraph, which incorporates interrogatory responses,

9     that's the next document that we're going to talk about, are

10    the actual interrogatory responses, so it's not as though the

11    jury is going to pick up the stipulation and say, aha, this

12    lays the foundation for something else.

13         THE COURT:  Do you need 394 in evidence?  You've got

14    389A.

15         MR. MacGILL:  Maybe -- and the problem-solving

16    approach here, if I may simply use -- if I may narrate 393 a

17    little bit by simply saying to the jury, look, Ladies and

18    Gentlemen, we asked them to provide their financial information

19    and they did and here it is.  It doesn't have any reference

20    without me being able to narrate it.  394 gives me the

21    narrative, but I -- if they have no objection to me narrating

22    393, I'm fine with just going with 393 and not 394.

23         THE COURT:  Okay, just to verify that it is

24    information that you provided --

25         MS. PIERSON:  We have no objection to counsel reading

1    the title.  Anything else is for closing.  He can read the

2    title of the document.  That's not a problem.

3            MR. MacGILL:  That's all we're proposing, Your Honor.

4    We would just offer this in the presence of the jury, not make

5    any comment, and then narrate it in the final argument, if

6    appropriate.

7            THE COURT:  Sounds good.  Okay.

8            Anything else?

9            MR. MacGILL:  And there are two --

10           THE COURT:  So you're going to offer 389A and what

11   else?

12           MR. MacGILL:  So these two -- this also?

13       (Off the record.)

14           MR. MacGILL:  Okay, so 393 is in; is that right, with

15   the narration; is that correct?

16           THE COURT:  Okay.

17           MR. MacGILL:  Okay.  And then, Your Honor, one final

18   thing.  Exhibit 392, their supplemental response to our

19   interrogatories, we offer that into evidence.  And what this

20   does, it gives additional information -- or gives specific

21   information from Realhouse, and it shows Realhouse Production's

22   consolidated income for the years 2020 through 2023.  It

23   shows -- it has a breakdown that is income specific, not asset

24   specific, as 393 is.

25           THE COURT:  So you want page 3 --

1          MR. MacGILL:  Yes, ma'am.

2          THE COURT:  -- of 292?

3          Do you object to page 3 of 292?

4          MS. PIERSON:  Your Honor, we don't object to a

5    redacted form of page 3 as a standalone exhibit, and what we

6    suggested to counsel was, there's a lot of irrelevant detail

7    here about a company that's not a public company.  We suggested

8    that we redact out the information that that totals together to

9    be total revenue, expense, income, and net income.  So that

10   would include six specific lines, with the bottom line, as it

11   relates to income and expenses.  We have no objection to that.

12   But there's no probative value to all the detail of where the

13   revenues come from or what the specific expenses are, and

14   there's no witness who is going to talk about those things, so

15   our objection is relevance.

16         MR. MacGILL:  Well, this is why we -- months, months

17   of work.  This is why I provided your financial details for

18   2021 -- 2020, 2021, and 2022.  We got a supplemental response,

19   and here it is on page 3.  And we would simply like to have

20   this interrogatory admitted and to be able to read the

21   supplemental response and display page 3.

22         THE COURT:  What do you want to read?

23         MR. MacGILL:  I would like to read -- we asked

24   Realhouse the following question:  Provide your financial

25   details for the year 2020, 2021, and 2022.

1          And then their response, subject to objections:  We

2    state the below consolidated statement of operations is an

3    accurate reflection of Realhouse's financial status from 2020

4    to 2023.  And then display this.  So that would be the proposed

5    reading.

6          THE COURT:  All right.  You don't need to put "subject

7    to" and "without waiver" in your objection.

8          MR. MacGILL:  No, ma'am.

9          THE COURT:  You can just say Realhouse provided the

10   consolidated statement of operations as an accurate reflection

11   of Realhouse's financial status from June -- I'm sorry, from

12   2020 to June 30th, 2023.  And then the Court will allow you to

13   admit page 3 without any redactions.

14         MR. MacGILL:  Okay.

15         THE COURT:  And that's it.

16         MR. MacGILL:  All right.  I think that resolves --

17         Mr. Ciulla, anything else?  No.  That resolves all the

18   issues.

19         THE COURT:  Okay.  All right.  Let's get the jury in.

20         MR. BRIAN:  Your Honor, I guess I need to make a

21   formal motion, then, under Rule 50 to dismiss the plaintiffs'

22   case on the ground that they've not admitted sufficient

23   evidence from which a reasonable jury could conclude they've

24   met their burden of proving any of the elements of the invasion

25   of privacy tort, including that the information was private,

1    that the disclosure of that private information reached the

2    public, that it was highly offensive, that it was not of

3    legitimate concern, and that the defendants failed to use

4    reasonable care.

5           In addition, as we've already argued, our motion would

6    include that they've failed to include sufficient evidence to

7    meet the burden of showing a right to punitive damages under

8    the clear and convincing test.

9           MR. MacGILL:  I think Your Honor has heard the

10   evidence, and we'll leave it at that at this time, ma'am.

11          THE COURT:  At this point, the Court does find that

12   they've presented sufficient evidence on behalf of each

13   plaintiff to survive the Rule 50 motion.

14          And the Court has taken under advisement the punitive

15   damages issue.

16          MR. BRIAN:  Thank you, Your Honor.

17          THE COURT:  Okay.  All right.  You may bring in the

18   panel.

19          And they're going to rest.  And then after they get

20   those exhibits in --

21          So do you have your next witness ready?

22          MR. BRIAN:  We do.  We have our first witness in the

23   hallway, I think.

24          THE COURT:  Okay.

25          MS. YOUNG:  I'll go get her.

1        MR. BRIAN:  Actually, may I go get her and use the

2    restroom, too, Your Honor.

3        THE COURT:  Sure.  Because you're going to be here for

4    the ...

5        MR. BRIAN:  Yeah.

6        MR. MacGILL:  Who is your first witness?

7        MS. YOUNG:  Lucie Jourdan.

8        MR. MacGILL:  Lucie Jourdan.  Thank you.

9        COURTROOM DEPUTY:  All rise.

10    (Jury in at 11:22.)

11        THE COURT:  We're back on the record.

12        And, counsel, do you have any other evidence to

13    present?

14        MR. MacGILL:  Yes, Your Honor.  Thank you.  We would

15    offer into evidence Exhibit 389A.

16        THE COURT:  Any objection to 389A?

17        MS. PIERSON:  No, Your Honor.

18        THE COURT:  389A is admitted into evidence without

19    objection.

20            (Plaintiffs' Exhibit 389A was

21            received in evidence.)

22        MR. MacGILL:  Your Honor, we would offer into evidence

23    Exhibit 393.

24        MS. PIERSON:  No objection.

25        THE COURT:  393 is admitted into evidence without

1    objection.

2            **(Plaintiffs' Exhibit 393 was**

3            **received in evidence.)**

4            THE COURT:  And, counsel, cut your microphone on.

5            MR. MacGILL:  And, Your Honor, we would offer into

6    evidence Exhibit 392, limited to an introductory statement as

7    confirmed to the Court and at page 3.

8            THE COURT:  And 392 is admitted into evidence --

9            I'm sorry.  Do you object to 392 --

10           MS. PIERSON:  No objection --

11           THE COURT:  -- page 3?

12           MS. PIERSON:  -- no objection to page 3, Your Honor.

13           THE COURT:  All right.  Page 3 of Exhibit 392 is

14   admitted into evidence without objection.

15           **(Plaintiffs' Exhibit 392, page 3 was**

16           **received in evidence.)**

17           MR. MacGILL:  Your Honor, if we may, we prefer not to

18   publish these at this time.  But, instead, with the Court's

19   indulgence, we would rest our case at this time.

20           THE COURT:  You may.

21           MR. MacGILL:  Thank you.

22           THE COURT:  All right.  So the plaintiffs have rested.

23           Defendants, you may call your first witness.

24           MR. BRIAN:  Your Honor, the defendants call Lucie

25   Jourdan.  Lucie Jourdan Coyne.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-469

1      THE COURT:  All right.  If you would bring Ms. Jourdan

2  Coyne up to the witness stand.

3      Come right up here.  Right over here.  If would you

4  remain standing and raise your right hand.

5    (The witness is sworn.)

6      THE COURT:  You may have a seat.

7      And, counsel, you may examine your witness.

8      MR. BRIAN:  May it please the Court, members of the

9  jury, counsel.

10      **LUCIE JOURDAN COYNE, DEFENDANTS' WITNESS, SWORN**

11                  **<u>DIRECT EXAMINATION</u>**

12  BY MR. BRIAN:

13  Q.  Could you give your full name to the jury, please.

14  A.  Lucie Jourdan Coyne.

15  Q.  Make sure to keep your voice up, too.

16      Were you the director of the film *Our Father*?

17  A.  Yes.

18  Q.  Why did you make the film?

19  A.  After meeting with Jacoba Ballard and seeing that Donald

20  Cline only got a $500 fine for what he did, I was compelled to

21  bring him to justice, kind of, on the public court.

22  Q.  Did you think it was important to include the real names of

23  some of the Cline children in the documentary?

24  A.  Yes.

25  Q.  Why?

1    A.  Because these are real people, it was a real story, and

2    this -- the more reality you have in a documentary, the more

3    powerful it is.

4    Q.  So let's -- I'm going to back up now and ask you some

5    questions about your background.  Where were you born?

6    A.  London, England.

7    Q.  And where did you grow up?

8    A.  Palm Springs, California.

9    Q.  Can you describe your educational background?

10   A.  Yes.  After high school, I went to an acting academy.

11   Q.  And did you receive a degree?

12   A.  Yeah, a degree of -- associate's degree of occupational

13   studies.

14   Q.  And when did you get that?

15   A.  In 2002.

16   Q.  What kind of work did you do after getting that degree?

17   A.  Odd jobs until I ended up in a development position at a

18   documentary TV company in 2007?

19   Q.  And who was that?

20   A.  Pilgrim Films & Television.

21   Q.  Are you familiar with the phrase "developing" stories or

22   documentaries?

23   A.  Yes.

24   Q.  What does that mean?

25   A.  So prior to a documentary being made, you have to develop

1    the concept and take it out to a network or a production

2    company to help fund it, so you're creating the idea for the

3    show or the film.

4    Q.   And is that the kind of work you do now?

5    A.   Yes.

6    Q.   And tell the Ladies and Gentlemen of the Jury what kinds of

7    stories you have focused on in your career.

8    A.   I've been drawn to stories where women have been taken

9    advantage of.  I went undercover and rescued sex slaves for

10   MSNBC.  I focus on things that -- social justice.

11   Q.   Before you started your work on the documentary *Our Father*,

12   what was the last project you had developed?

13   A.   *Taken At Birth.*

14   Q.   Tell the Ladies and Gentlemen of the Jury generally -- not

15   the whole narration, but what that was about, generally.

16   A.   That was about a doctor who had -- was delivering babies

17   and then telling the mothers that their children were stillborn

18   and secretly selling them out the side of his clinic.

19   Q.   And did you work with a man named Michael Petrella on that

20   film, as well?

21   A.   Yes.

22   Q.   Okay.  So let's now turn to the documentary that's brought

23   us all together this week, *Our Father*.

24        How did you first hear about Donald Cline and his

25   misconduct?

1    A.  Michael Petrella sent me -- it was either an article or a

2    clip from a news piece.

3    Q.  And do you remember about when that was that he sent you

4    that information?

5    A.  December of 2017.

6    Q.  And what caught your attention about Donald Cline, from

7    what he had sent you, that made you believe that you wanted to

8    make either a TV show or a documentary?

9    A.  I was appalled that he -- you know, it was the day after

10   the trial in Indiana, and he received a $500 fine, and there

11   was no prison time, and it just seemed -- to me, this was a

12   story about, kind of, a nuanced rape situation, and so I wanted

13   to give the siblings who were talking about it a platform to

14   tell their story.

15   Q.  So in the -- after you first learned about Donald Cline,

16   did you take steps to learn more about the situation?

17   A.  Yes.

18   Q.  What did you do?

19   A.  I read articles, watched news pieces, and spoke with some

20   of the siblings.

21   Q.  Did you think that Donald Cline's misconduct was a matter

22   of legitimate public concern?

23   A.  Absolutely.

24   Q.  And at some point -- you mentioned a woman named Jacoba

25   Ballard, which the members of the jury have heard about now.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-473

1    At some point, did you make a decision to focus at least part

2    of the documentary on her story?

3    A.   Yes.

4    Q.   Why did you do that?

5    A.   She was already, kind of, a natural leader in the -- in the

6    news pieces, and she started, kind of, the hunt for other

7    siblings and figuring out who the father was.  She was a

8    natural, kind of, leader, so it made sense to put her at the

9    focus of the film.

10   Q.   So once you decided that this was something that you wanted

11   to make a film about, could you just go out and make a film?

12   A.   No.

13   Q.   Why not?

14   A.   A lot of money and a huge team to make it work.

15   Q.   So what did you do, initially -- let's focus, first, on

16   2018.  You found out in December of 2017.  Let's focus on the

17   2018 period.  What did you do in 2018 to try to get the

18   resources to make a film?

19   A.   I developed a deck, which had ideas of what the film could

20   be, and I made a thing called a sizzle reel.

21   Q.   What's a sizzle reel?

22   A.   A sizzle reel is a development tape that lasts three to

23   five minutes, which, essentially, shows potential networks and

24   buyers what the plan is for the film and what the story is

25   about.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-474

1   Q.  And is the purpose of a sizzle reel to take it to possible

2   funders or studios that might help you make the film?

3   A.  Yes.

4   Q.  And did you do that in 2018?

5   A.  Yes.

6   Q.  And were you successful?

7   A.  No.

8   Q.  And did you give up?

9   A.  No.  I was intent on telling the story and the more I got

10  to know the siblings so I pressed on regardless of the passes.

11  Q.  And at some point, did you connect with a company known as

12  Blumhouse?

13  A.  Yes.

14  Q.  And you now understand that Realhouse is part of Blumhouse?

15  A.  Yes.

16  Q.  Okay.  And why did you reach out to them?

17  A.  We had exhausted a lot of leads on different production

18  companies, and we had an in to go meet with them and thought

19  they could help us take it to the finish line.

20  Q.  Do you have a binder in front of you?

21  A.  I do not.

22  Q.  You do not.

23          MR. BRIAN:  We need a binder and they need a binder,

24  too.

25          May I approach?

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-475

1              THE COURT:  Yes.

2    BY MR. BRIAN:

3    Q.  I want you to flip to what's marked as Exhibit 239.  Just

4    flip through those pages.  I'm going to ask you whether you

5    recognize 239.

6    A.  I do.

7    Q.  What is it?

8    A.  It's a deal memorandum.

9    Q.  Between -- and are you a party to this?

10   A.  Yes.

11   Q.  And is Realhouse a party to this?

12   A.  Yes.

13             MR. BRIAN:  I would offer 239, Your Honor.

14             MR. MacGILL:  No objection.

15             THE COURT:  239 is admitted into evidence without

16   objection.

17                      *(Defendants' Exhibit 239 was*

18                      *received in evidence.)*

19   BY MR. BRIAN:

20   Q.  And you see that it says in the first line:  Set forth

21   below is a summary of the deal terms agreed to as of May 20,

22   2019?

23   A.  Yes.

24   Q.  And was that around the time, then, that you started

25   working with Realhouse to make the film?

*JOURDAN COYNE - DIRECT/BRIAN*                Vol. 3-476

 1   A.   Yes.

 2          MR. BRIAN:  We can take that down.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-477

1   BY MR. BRIAN:

2   Q.  Once Realhouse was on board, what did you do to push the

3   project forward?

4   A.  They wanted to fund a new sizzle reel, and so we shot a

5   reel and then took it to market.

6   Q.  So what was the purpose of then shooting a second sizzle

7   reel?

8   A.  Well, the first was cut together from footage that was on

9   the Internet that I had pieced together, and the purpose of

10  this was to actually interview some of the people featured in

11  the story.

12  Q.  To put together a higher quality sizzle reel?

13  A.  Yes.

14  Q.  That you thought might be more attractibve to potential

15  funders?

16  A.  Absolutely.

17  Q.  And at some point, did you take this second sizzle reel to

18  Netflix?

19  A.  Yes.

20  Q.  And I assume you met with Netflix and showed them the

21  sizzle reel and the like?

22  A.  Yes.

23  Q.  And did Netflix then decide to get involved in the project?

24  A.  They did.

25  Q.  About when did you meet with Netflix and they made the

1    decision to go forward?

2    A.   I believe it was December of 2019.

3    Q.   And do you remember who it was at Netflix that you met with

4    and made the decision to go forward?

5    A.   Yes.

6    Q.   Who was that?

7    A.   Zana Lawrence and Ariane Wu.

8    Q.   Did Netflix then provide the necessary funding to create a

9    feature documentary film?

10   A.   Yes, they did.

11   Q.   And did you serve as one of the producers of that film?

12   A.   Yes.

13   Q.   Did you also serve as the director of that film?

14   A.   Yes.

15   Q.   Tell the Ladies and Gentlemen of the Jury what -- something

16   I've always wondered about.  What are the differences --

17   different responsibilities of a producer and a director?

18   A.   Well, there's different producers, but generally, a

19   producer helps, kind of, behind the scenes of making something

20   come to life, and a director provides the creative vision, so

21   how it will look and how it will pace.  That's the director's

22   job.

23   Q.   Was Michael Petrella a director or a producer?

24   A.   A producer.

25   Q.   Okay.  So I want to ask you some questions to help the jury

1  understand, then, how your responsibilities differed from

2  Mr. Petrella's.  Do you have that in mind?

3  A.  Yes.

4  Q.  And was one of you principally responsible for finding

5  people who might have the connection to Donald Cline and then

6  approaching them?

7  A.  Yes.

8  Q.  Which one of the two of you had that responsibility?

9  A.  Michael Petrella.

10  Q.  And did you have much involvement in those initial efforts

11  to reach out and contact potential children of Dr. Cline?

12  A.  No.

13  Q.  Now, I think you mentioned there was -- you desired to

14  focus, in part, on Jacoba Ballard's story.  Did you want to

15  focus only on Jacoba Ballard?

16  A.  No.

17  Q.  Why not?

18  A.  Everyone involved who we -- had different reactions and

19  kind of, processes of understanding what Donald Cline did, and

20  so I wanted to tell unique stories to kind of show the breadth

21  of damage.

22  Q.  And for the people -- there were some people who agreed to

23  appear on camera during the documentary; correct?

24  A.  Yes.

25  Q.  And was one of your responsibilities to interview those

1  people?

2  A.  Yes.

3  Q.  And did you conduct interviews of both children and

4  parents?

5  A.  Yes.

6  Q.  And did you conduct those interviews in Indiana?

7  A.  Yes.

8  Q.  Were any of the interviews more difficult than some others?

9  A.  Yes.

10  Q.  How so?

11  A.  It kind of depended really on how long someone had sat with

12  the information, but there were times when I can think of two

13  particular cases, it was so emotional and raw for the interview

14  subject that we had to cut cameras and just let them cry and be

15  with it.  So, yes, incredibly emotional for some.

16  Q.  So let's focus now on the time period.  I think we just saw

17  the Deal Memo with Realhouse in May of 2019, and I think you

18  said you conducted some interviews for the preparation of that

19  second higher quality sizzle reel?

20  A.  Yes.

21  Q.  When did you conduct those interviews?

22  A.  I believe it was July of 2019.

23  Q.  And then you conducted other interviews in connection with

24  the preparation of the full documentary; did you not?

25  A.  Yes.

1   Q.  And when did you do those interviews?

2   A.  November 2020 at the height of the pandemic.

3   Q.  So were some of those done -- were -- some of those

4   interviews were done in person, and some were done on Zoom or

5   its equivalent?

6   A.  No.  These were all in-person interviews.

7   Q.  They were, okay.  In addition to doing interviews, what

8   else did your team film in order to make the documentary?

9   A.  We called them reenactments, so, kind of, to go back in

10  time as to reenact and kind of take us back to that moment as

11  an audience, so reenactments.

12  Q.  So for example, just so the jurors that have now seen the

13  documentary, did you actually hire somebody to play Dr. Cline?

14  A.  Yes.

15  Q.  And there's also a scene in the movie where Jacoba Ballard

16  is speaking on the phone with Donald Cline.  Was that a

17  reenactment 100 percent or something else?

18  A.  It was something else.  So she had been recording her phone

19  calls with Cline, and so that was a real phone call with Cline

20  that she was kind of reenacting by just pretending to hold the

21  phone up.

22  Q.  But it was his voice.

23  A.  It was his voice.

24  Q.  Are you familiar with 23andMe?

25  A.  Yes.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-482

1  Q.  Remind the members of the jury what 23andMe is.

2  A.  23andMe is a DNA website that you send in your DNA, and you

3  match with relatives and learn your ancestral history.

4  Q.  And was 23andMe important to the story that you were trying

5  to tell in this documentary?

6  A.  Extremely.

7  Q.  How so?

8  A.  It was really the place where Jacoba specifically started

9  finding these siblings, and that's where people were sending in

10  their information and discovering that they were part of this

11  story.

12  Q.  And we've seen some films of Jacoba Ballard's using

13  23andMe.  Were those reenactments?

14  A.  No.

15  Q.  What, if anything, did you do to incorporate Jacoba

16  Ballard's journey on 23andMe into the documentary?

17  A.  I filmed her while she was looking through her 23andMe.

18  Q.  And when you were looking at the people on Jacoba Ballard's

19  23andMe, did all the people have names and photos associated

20  with them, or were some of them anonymous?

21  A.  Some were anonymous.

22  Q.  And did the fact that her 23andMe, I guess account,

23  included the names of real people stop you from filming her?

24  A.  No.

25  Q.  Why not?

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-483

1   A.  This was her journey.  She was on her account, and I was

2   simply documenting her journey.

3   Q.  And once you filmed her scrolling through a list of real

4   names of siblings on 23andMe, did you personally have any legal

5   concerns about including that footage in the final version of

6   the documentary?

7   A.  No.

8   Q.  Why not?

9   A.  We had a legal team advising us.

10  Q.  And do you know who that was?

11  A.  Yes.

12  Q.  Who was it?

13  A.  A man named Al Wickers.

14  Q.  Did you rely on Al Wickers to tell you if any of the names

15  on 23andMe needed to be blurred from a legal perspective?

16  A.  Yes.

17  Q.  And did he ever tell you that you needed to blur any of the

18  names on her 23andMe account as she was scrolling?

19  A.  No.

20  Q.  You are a documentary filmmaker; are you not?

21  A.  Yes.

22  Q.  As a documentary filmmaker, do you often use information

23  that you find on the Internet?

24  A.  Yes.

25  Q.  And when you get access to information on the Internet, do

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-484

1   you consider that information to be public or private?

2   A.  Public.

3   Q.  Why is that?

4   A.  If I can find it, then it's out there.  So therefore, it's

5   public.

6   Q.  After you captured the footage you needed for the

7   documentary, did you then have to edit the footage into a film?

8   A.  Yes.

9   Q.  And were you involved in that process as the director, at

10  least to some extent?

11  A.  I oversaw the edits.

12  Q.  Now, we've heard -- I think we've heard the word, but maybe

13  not.  Are you familiar with the word "cut" of the film?

14  A.  Yes.

15  Q.  What is a cut?

16  A.  A cut is an iteration of the film before it is finished, so

17  a version of it before you get to the final product.

18  Q.  And did this documentary film go through a number of cuts?

19  A.  Yes.

20  Q.  Do you remember about how many?

21  A.  Four or five, six maybe.

22  Q.  Do you have -- take a look at your binder.  I think there

23  should be an Exhibit 127; do you see that?

24         MR. BRIAN:  I believe that's been admitted into

25  evidence, Your Honor.

1          THE COURT:  It is in evidence.

2     A.  Got it.

3     BY MR. BRIAN:

4     Q.  Okay.  And it should be on the screen, too, in front of

5     you.

6     A.  Oh, yeah.

7     Q.  Okay.  There's a reference to a Mary Lisio, and you see a

8     date of June 10th, 2021.  Who is Mary Lisio?

9     A.  She was an executive at Blumhouse.

10         MR. BRIAN:  Now, if you go down, Mr. Nickels, if you

11    can scroll down a bit.

12    BY MR. BRIAN:

13    Q.  Do you see, it appears that she's forwarding an e-mail that

14    originally came from a Nathan Rotmensz; is that right?

15    A.  Yes.

16    Q.  Who is Nathan Rotmensz?

17    A.  His title was post-production supervisor.

18    Q.  And what does that mean?

19    A.  He is, kind of oversees the logistical stuff that goes on

20    in the edit.

21    Q.  Was Mr. Rotmensz making any creative decisions in the

22    editing process?

23    A.  No.

24    Q.  And do you see that the subject at the top is *Our Father*,

25    Cut 3; do you see that?

1    A.  Yes.

2    Q.  And did you understand he was referring to the third cut of

3    the film?

4    A.  Yes.

5    Q.  And during the post-production phase, was Mr. Rotmensz

6    someone who was circulating updating cuts to your team?

7    A.  Yes.

8    Q.  Now, if you go down about halfway, you see a word

9    "caveats."  Do you see that?

10   A.  Yes.

11   Q.  What does a caveat mean in the context of circulating this

12   cut to your production team?

13   A.  So when a cut goes out, it's for the purpose of giving

14   notes back to me, and so the caveats are really to let the

15   people know when they're giving notes, that I already know

16   about the following things.  So it's to let -- basically, to

17   save me from getting the note.

18   Q.  And there are, there actually are nine, because I don't

19   know if the Ladies and Gentlemen noticed this, but there are

20   two number eights.  So there are nine of those.  Who wrote

21   these caveats?

22   A.  That's me.

23   Q.  And did you write them so that Mr. Rotmensz could circulate

24   them with the cut?

25   A.  Yes.

1   Q.  Did Mr. Rotmensz write any of these caveats?

2   A.  No.

3   Q.  He just incorporated yours?

4   A.  Yes.

5   Q.  So let's look at the second number eight, the last of the

6   caveats, where it says all sensitive information, i.e. e-mail

7   addresses, names, physical addresses --

8           THE REPORTER:  Mr. Brian.

9           THE COURT:  Slow down.

10          MR. BRIAN:  Yeah, I know.

11  BY MR. BRIAN:

12  Q.  You see the second number eight where it says all sensitive

13  information, i.e. e-mail addresses, names, physical addresses

14  will be blurred; do you see that?

15  A.  Yes.

16  Q.  Okay.  And is that something you wrote?

17  A.  Yes.

18  Q.  And what sensitive information were you referring to?

19  A.  Specifically in this, I think we had Jacoba's personal

20  address with her street number.  That was to go away.  We had

21  Angela Ganote's personal e-mail up.  Names -- I actually

22  remember that was one we were discussing, Panera Bread, if we

23  could use the name of the actual restaurant, so anything that

24  would be sensitive.

25  Q.  So when you say that names will be blurred, were you saying

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-488

 1    that every name would be blurred?

 2    A.  No.

 3    Q.  What names were you referring to?

 4    A.  Either the name of the Panera Bread, I think, and then also

 5    Jacoba had asked me to blur some names.

 6    Q.  So there's a word "all" at the beginning of the sentence.

 7    What is that intended to describe?

 8    A.  All the sensitive information, which we would figure out

 9    with lawyers later on.

10    Q.  Okay.  So let's -- let's discuss some of the scenes from

11    the documentary involving Jacoba Ballard.  I'd like to show you

12    a shot from the documentary, which I think --

13             MR. BRIAN:  Well, the film is 241, which is now

14    admitted in evidence, Your Honor, and I would like to ask

15    Mr. Nickels to play from one hour, 13 minutes, and 38 seconds

16    to one hour, 14 minutes, and 6 seconds.

17             THE COURT:  You may.

18             MR. BRIAN:  Thank you, Your Honor.

19        (Video playing in open court.)

20    BY MR. BRIAN:

21    Q.  Do you recognize that scene from the documentary?

22    A.  Yes.

23    Q.  And roughly, how far into the documentary does this shot

24    appear?

25    A.  This is early on.

1  Q.  Okay.  And even though I said one hour and 13 minutes, it's

2  actually --

3  A.  Sorry.

4  Q.  Why is that?

5  A.  It's a time code issue.

6  Q.  Okay.  And what is being shown in this scene?

7  A.  This is a scene where Jacoba is discovering for the first

8  time that she has seven siblings, which was in direct conflict

9  with what she was told of having no more than three.

10  Q.  And was this the actual -- what actually happened or was

11  this a graphic you created?

12  A.  This was a creative graphic we made.

13  Q.  And why did you create a graphic to depict that scene?

14  A.  Well, firstly, you can't go back in time on 23andMe and go

15  back to when the originals were there, so to get that moment,

16  we had to create it.  Also, Jacoba had found siblings on

17  different websites that no longer exist, and so it was a way to

18  kinda make it brief and have the impact.

19  Q.  And were there any actual names in those seven, I guess,

20  bubbles that came up?

21  A.  No.

22  Q.  Why not?

23  A.  Well, because at this juncture, it's just -- it's the

24  understanding that you have seven siblings that you don't know.

25  So they're anonymous at this point.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-490

1  Q.  Let's take a look in your binder at Exhibit 128.

2         MR. BRIAN:  That has been admitted, Your Honor, I

3  believe.

4         THE COURT:  You may.

5  BY MR. BRIAN:

6  Q.  So is Exhibit 128 an e-mail from you to a Maddie Wagg?

7  A.  Yes.

8  Q.  Who is Maddie Wagg?

9  A.  Maddie Wagg was a creative director at a graphics company

10 who was helping us do graphics for the film.

11 Q.  And which company was that?

12 A.  Burnish Creative.

13 Q.  And the e-mail is dated July 16th, 2021; right?

14 A.  Yes.

15 Q.  And at that point, in the process of making the film, how

16 far along were you in the editing process?

17 A.  We were about halfway through.

18 Q.  And at that point, were you making -- were you working on

19 adding graphics to the documentary?

20 A.  Yes.

21        MR. BRIAN:  So let's turn to page 2 of this, I guess.

22 Or maybe it's -- yeah, and down to the second -- see right down

23 there?  Thank you.

24 BY MR. BRIAN:

25 Q.  Do you see the reference, on the middle of page 2, it says

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-491

 1  number 5, and it says sibling alert.  Do you see that?

 2  A.  Yes.

 3  Q.  And this portion of the exhibit, there's some language --

 4  there's some words that are in -- typed in lower case and there

 5  are some that are typed in all capitals.  Do you see that?

 6  A.  Yes.

 7  Q.  And what's the significance of that?

 8  A.  Lower case is Maddie, and then the capital is me responding

 9  to her.

10  Q.  And do you see in -- where the e-mail is reiterating the

11  game plan?  Do you see that?

12  A.  Yes.

13  Q.  What does that mean?

14  A.  We had gone over the game plan on the phone, and so I was

15  reiterating the idea of what the graphics should look like.

16  Q.  Now let's go down almost to the bottom.  There's an all

17  caps, and it says:  As all the siblings at this juncture want

18  to remain anonymous.  We can just use the standard female and

19  male icons, no names, just half-sister or half-brother.

20      Did I read that correctly?

21  A.  Yes.

22  Q.  Did you write that?

23  A.  Yes.

24  Q.  And you write: As all the siblings at this juncture want to

25  remain anonymous.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-492

1       What is the juncture when you're saying "at this juncture"?

2   What are you referring to?

3   A.  At this point in the film, Jacoba's narrative, so the first

4   time she finds out.

5   Q.  So it's the reference to the graphic that the Ladies and

6   Gentlemen just saw a few minutes ago?

7   A.  Yes.

8   Q.  And does the "at this juncture" refer, in any way, to where

9   you are in your filmmaking process?

10  A.  No.

11  Q.  It refers to the juncture of actually the events as they

12  happened.

13  A.  The narrative, yes.

14  Q.  Yeah.  So when you say that all the siblings wanted to

15  remain anonymous, were you referring to every Cline sibling

16  that you knew as of July of 2021?

17  A.  No.

18  Q.  What were you referring to?

19  A.  The first seven.  And as I did two eights in a row.  It

20  should also be hard to remain anonymous.

21  Q.  So the first seven that you depicted in the graphic, the

22  members of the jury just saw; is that right?

23  A.  Yes.

24  Q.  Was Sarah Bowling one of those seven?

25  A.  No.

1  Q.  Was Lori Kennard one of those seven?

2  A.  No.

3  Q.  And when you wrote here that we can just use the standard

4  female and male icons, was that an instruction for any other

5  shot in the documentary, other than that graphic that you just

6  showed the jury?

7  A.  No.  This is very specific to that graphic alone.

8  Q.  And specifically, was that an instruction for the scenes

9  the jury has already seen with regard to Jacoba Ballard

10  scrolling through her 23andMe account?

11  A.  No, as that would have nothing to do with the graphics

12  person.

13  Q.  Let me change gears a bit and ask you about Lori Kennard,

14  one of the plaintiffs here.  Did you ever exchange e-mails with

15  Ms. Kennard?

16  A.  No.

17  Q.  Did you ever exchange Facebook messages with Ms. Kennard?

18  A.  No.

19  Q.  Do you remember ever speaking with Ms. Kennard in person?

20  A.  No.

21  Q.  Do you remember ever speaking with her on the phone?

22  A.  No.

23  Q.  Now, at some point before the documentary was released, did

24  you make a decision that Lori Kennard's name should not appear

25  in the documentary?

*JOURDAN COYNE - DIRECT/BRIAN*                        Vol. 3-494

1    A.  Yes.

2    Q.  And what did you -- what did you intend to do with her

3    name, then, in the scenes in the documentary?

4    A.  To blur them.

5    Q.  And why did you decide to blur Lori Kennard's name from the

6    documentary?

7    A.  Jacoba Ballard had asked me to blur a handful of names, and

8    Lori Kennard's was one.

9    Q.  And when you say Jacoba, you mean Jacoba Ballard?

10   A.  Yes.

11   Q.  Did she tell you why she wanted Ms. Kennard's name, or any

12   of the names, blurred?

13   A.  No.  It was a simple request, and given how long we had

14   been on this project together, I was just honoring that

15   request.

16   Q.  Because of her importance to the documentary?

17   A.  Yeah, and our relationship.

18        MR. BRIAN:  Let's turn to Exhibit 129, which has been

19   admitted, Your Honor.

20        If we could put that on the screen, Mr. Nickels.

21        THE COURT:  You may.

22   BY MR. BRIAN:

23   Q.  And do you recognize this as an e-mail that you sent to a

24   Ryan Valdez on September 10th, 2021?

25   A.  Yes.

1   Q.  Who was or is Ryan Valdez?

2   A.  He was an independent graphics person helping us finish.

3   Q.  And were you -- at the time of this e-mail, were you close

4   to the end of the editing process?

5   A.  Yes.

6           MR. BRIAN:  And if you go down below that -- actually,

7   let's start with number 2, Mr. Nickels.  You can get rid of

8   number 1.  Yeah, just enlarge from number 2 down to the bottom,

9   all the way down to the bottom, all the way down.  From 2 to

10  the bottom.  There you go.

11  BY MR. MacGILL:

12  Q.  So you say:  We need to blur the following names and pics.

13      And you see some names there; correct?

14  A.  Yes.

15  Q.  And is that the list of names that Jacoba Ballard asked you

16  to remove from the movie?

17  A.  Yes.

18  Q.  And the first name there is Lori Kennard; is it not?

19  A.  Yes.

20  Q.  And before her name, there are some numbers.  Do you see

21  that?

22  A.  Yes.

23  Q.  What do those numbers refer to?

24  A.  That's called a time code, and it's an hour and 18 minutes

25  and 19 seconds into the film.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-496

1   Q.  So in this particular e-mail, were you referring to one

2   shot where her name appeared?

3   A.  Yes.

4   Q.  At that timestamp?

5   A.  Yes.

6           MR. BRIAN:  Let's take a look now at Exhibit 130, also

7   in evidence, Your Honor, if we can put that up.

8           THE COURT:  You may.

9   BY MR. BRIAN:

10  Q.  Now, you see this is an e-mail from a man named Anthony

11  Deng.  Who is that?

12  A.  He was an assistant editor.

13  Q.  And he sends it to Nathan Rotmensz, copied to Mr. Valdez

14  and yourself; does he not?

15  A.  Yes.

16  Q.  And he says:  I'm sorry for the delay.  These are the shots

17  I believe Lucie was referring to.  Lucie, did I get them all?

18      Did I read that correctly?

19  A.  Yes.

20  Q.  And if you look at the attachment line, you see that one of

21  the attachments is, toward the end, it says:  Jacoba browses

22  her real 23andMe.mp4; is that right?

23  A.  Yes.

24  Q.  And in this e-mail, did you interpret that Mr. Deng was

25  asking you to confirm what shots needed to be blurred?

*JOURDAN COYNE - DIRECT/BRIAN*                          Vol. 3-497

1    A.  Yes.

2    Q.  Who was actually going to implement the blurring that you

3    had requested?

4    A.  Ryan Valdez.

5    Q.  And in this e-mail, was Mr. Deng pointing Mr. Valdez to the

6    shots where you had requested the blurs?

7    A.  Yes.

8          MR. BRIAN:  So let's turn now to Exhibit 131, which I

9    don't think is in evidence yet.

10         This is a -- this is a 17-second clip, Your Honor,

11   showing the unblurred names.  It's part of the film.  I would

12   offer Exhibit 131.

13         MR. MacGILL:  No objection.

14         THE COURT:  131 is admitted into evidence without

15   objection.

16                    *(Defendants' Exhibit 131 was*

17                    *received in evidence.)*

18         MR. BRIAN:  Thank you, Your Honor.

19         Can we go ahead and play that.

20     (Video playing in open court.)

21   BY MR. BRIAN:

22   Q.  Do you recognize that clip?

23   A.  Yes.

24   Q.  What is it?

25   A.  It's Jacoba scrolling through her 23andMe account.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-498

1   Q.  And did you see Lori Kennard's name in this clip?

2   A.  Yes.

3   Q.  And is that the shot that you instructed that her name

4   should be blurred?

5   A.  Yes.

6   Q.  And did you also see --

7           MR. BRIAN:  If we can put that back on the screen, at

8   the end there, Mr. Nickels.

9       (Video playing in open court.)

10  BY MR. BRIAN:

11  Q.  Okay.  Did you also see Sarah Bowling's name in that shot?

12  A.  Yes.

13  Q.  Had Jacoba Ballard asked you to blur Sarah Bowling's name?

14  A.  No.

15  Q.  And after your instruction to blur Ms. Kennard's name from

16  this shot, do you know whether it, in fact, was blurred from

17  that shot?

18  A.  Yes.

19  Q.  In the final documentary, did her name appear in that scene

20  of the film?

21  A.  No.

22          MR. BRIAN:  Okay.  So now I want to pull up another

23  portion, Your Honor, from the documentary, Exhibit 241.  I

24  would ask Mr. Nickels to play from 2 and then 17:55 to 2:18:40.

25      (Video playing in open court.)

1   BY MR. BRIAN:

2   Q.  In the clip we just saw, did you see the shot of Jacoba

3   Ballard's 23andMe scroll where you had instructed that Lori

4   Kennard's name be blurred?

5   A.  Yes.

6   Q.  Was it, in fact, blurred in that shot that we just saw that

7   appeared in the released documentary?

8   A.  Yes.

9   Q.  And were blurs added to other names, as well?

10  A.  Yes.

11  Q.  Were those the names that Jacoba Ballard had requested you

12  blur?

13  A.  Yes.

14  Q.  After the documentary was released, after it was released,

15  did you learn that Lori Kennard's name appeared somewhere else

16  in the documentary?

17  A.  Yes.

18       MR. BRIAN:  So at this time, I want to ask Mr. Nickels

19  to play, again from Exhibit 241, from the 1:16:37 mark to the

20  1:17:19 mark.

21       (Video playing in open court.)

22  BY MR. BRIAN:

23  Q.  Now, is that a different shot than what we looked at?

24  A.  Yes.

25  Q.  And in this shot, was Jacoba Ballard scrolling through a

1  list of people on her 23andMe account?

2  A.  Yes.

3  Q.  And when you shot that film, what were you trying to focus

4  the eye of the viewer on?

5  A.  Well, the camera is focused on Jacoba's hand, and I wanted

6  the scrolling of the finger to kind of show as she goes up and

7  up.

8  Q.  And for less than a second, did Lori Kennard's name appear

9  during the typing scene or scrolling scene in the upper

10  left-hand corner?

11  A.  Yes.

12  Q.  And did you watch the documentary after Jacoba Ballard had

13  identified Lori Kennard's name and it had been blurred in the

14  other scene?

15  A.  Yes.

16  Q.  When you watched it, did you notice it for the less than

17  second that it appeared in the scene the Ladies and the

18  Gentlemen just saw?

19  A.  I did not.

20  Q.  When did you first learn that her name appeared in the

21  documentary?

22  A.  After the film had come out.

23  Q.  And how did you react when you learned it?

24  A.  I was confused.

25  Q.  Because you thought it was being blurred?

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-501

1   A.  Yes.

2   Q.  Let's talk about Sarah Bowling.

3       Did you ever exchange e-mails with Sarah Bowling?

4   A.  No.

5   Q.  Did you ever exchange Facebook messages or any messages

6   with Sarah Bowling?

7   A.  No.

8   Q.  Did you ever speak with Ms. Bowling in person?

9   A.  No.

10  Q.  Did you ever speak with her on the phone?

11  A.  No.

12  Q.  When you were trying to set up interviews in Indiana, had

13  you discussed with Mr. Petrella whether Ms. Bowling might be

14  interested in an interview?

15  A.  Yes.

16  Q.  And did you ever interview Ms. Bowling on camera?

17  A.  No.

18  Q.  Did Ms. Bowling ever tell you that she did not want to

19  be -- to appear for an interview.

20  A.  No.

21  Q.  Did anyone -- before the film was released, did anyone tell

22  you that Sarah Bowling regarded her connection to Donald Cline

23  as private?

24  A.  No.

25  Q.  And at any time before the film was released, did you

1  believe that Sarah Bowling regarded her connection to Donald

2  Cline as private?

3  A.  No.

4  Q.  Did Jacoba Ballard ever tell you that Sarah Bowling

5  regarded her connection to Donald Cline as private?

6  A.  No.

7  Q.  Are you aware that the version of *Our Father* that was

8  released in -- on May 11, 2022, contained the real names of

9  some of the half-siblings?

10  A.  Yes.

11  Q.  Some of those names, real names, appear as Jacoba Ballard

12  is scrolling through a 23andMe account; is that right?

13  A.  Yes.

14  Q.  Who made the creative decision to include some of those

15  real names in the documentary?

16  A.  I did.

17  Q.  Why did you make that decision?

18  A.  A documentary is telling the truth of things, and the truth

19  is, these are, in fact, the children of Cline and siblings to

20  Jacoba, and I feel like you need to actually see the real world

21  people involved to kind of have the impact.

22  Q.  Was it an important part of the story that real people

23  might be living amongst their half-siblings without knowing it?

24  A.  Yes.

25  Q.  Why?

1  A.  You know, Jacoba, specifically, was very worried about her

2  children dating cousins.  The fact that your doctor, your

3  gynecologist, anybody could be related to you, it was important

4  to know that anyone could be part of that.

5  Q.  Was any particular name on 23andMe more important than any

6  other name?

7  A.  No.

8  Q.  If every name, in your view, shown on Jacoba Ballard's

9  23andMe scroll had been blurred, would that diminish the

10  artistic value and impact of the documentary?

11  A.  I believe so, yes.

12  Q.  Was it important to you to have at least some real names?

13  A.  Yes.

14  Q.  From your perspective, did you think that real names were

15  of a legitimate public concern?

16  A.  Yes.

17  Q.  Why is that?

18  A.  If she's scrolling through a blank computer screen of

19  blurs, it doesn't have nearly the same kind of impact as seeing

20  the real people that she's associated with.

21  Q.  When was *Our Father* released?

22  A.  May 11th of 2022.

23  Q.  And before the release, did Netflix perform any marketing

24  or publicity to promote the film?

25  A.  Yes.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-504

1   Q.  Let's take a look at Exhibit 7, which is in evidence.

2          MR. BRIAN:  Can you put that on the screen?

3   BY MR. BRIAN:

4   Q.  Do you have that in front of you?

5   A.  Yes.

6   Q.  Now, Exhibit 7 is an e-mail from Michael Petrella to

7   Lucie -- to you and some others.  Do you see that?

8   A.  Yes.

9   Q.  Dated March 17th, 2022, slightly less than two months

10  before the release; right?

11  A.  Yes.

12  Q.  And this -- do you know who the other recipients are in

13  this e-mail?

14  A.  Yes.  They're women, part of the publicity and marketing

15  team at Netflix.

16  Q.  And you see, in the first line after, hi team, Mr. Petrella

17  says:  Following our conversation yesterday.  Do you see that?

18  A.  Yes.

19  Q.  And were you part of a conversation with Mr. Petrella the

20  day before this e-mail went out?

21  A.  Yes.

22  Q.  And was that conversation -- did that conversation include

23  at least one or more of the other people that are named there?

24  A.  Yes.

25  Q.  Do you remember which ones?

1    A.  Not specifically.

2    Q.  But Michael was?

3    A.  Yes.

4    Q.  Okay.  And generally, without describing the details, what

5    was the subject of the conversation?

6    A.  An introduction to their marketing team, and they wanted to

7    know which siblings, even those that were not interviewed in

8    the documentary --

9            MR. MacGILL:  Objection, Your Honor.  Hearsay.

10           THE COURT:  I'll sustain.

11           Why don't you rephrase the question, counsel.

12   BY MR. BRIAN:

13   Q.  So all I want right now --

14           THE COURT:  Somebody's microphone is rubbing.

15           MR. MacGILL:  Sorry.

16           THE COURT:  Okay.  All right.

17           Go ahead.

18   BY MR. BRIAN:

19   Q.  Did the conversation pertain to the publicity -- the

20   potential publicity or marketing of the film?

21   A.  Yes.

22   Q.  And did you have a concern with respect to any of the

23   siblings with respect to those marketing efforts?

24   A.  Yes.

25   Q.  What was your concern?

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-506

1   A.  This was a really emotional documentary and journey, and we

2   didn't want the publicist/marketing team just to go after a

3   blanket of anybody who was associated with Cline's story, so we

4   were protective of that.

5          MR. BRIAN:  And, if you will, scroll down the exhibit

6   further, Mr. Nickels.

7   BY MR. BRIAN:

8   Q.  Do you see the lists that were in the e-mail?

9   A.  Yes.

10  Q.  And did you discuss, generally with Mr. Petrella, providing

11  a list of some of the siblings to the folks at Netflix involved

12  in the publicity of the marketing?

13  A.  Yes.

14  Q.  Why did you want that to happen?

15  A.  They had asked for a list of people that they could reach

16  out to.

17  Q.  And did you want them to reach out unannounced to some of

18  these siblings?

19  A.  No.

20  Q.  Why not?

21  A.  Because, again, this was an emotional thing, and we didn't

22  want Netflix marketing just contacting various people.

23  Q.  And were the names of Sarah Bowling and Lori Kennard

24  identified anywhere on Exhibit 7?

25  A.  No.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-507

1   Q.  Were -- was either Lori Kennard or Sarah Bowling an

2   individual -- a sibling that you were concerned about them

3   being, quote, fiercely protective of their privacy?

4   A.  No.

5   Q.  And is everyone on this list private about their connection

6   to Donald Cline?

7   A.  No.

8   Q.  For example, the list includes Jacoba Ballard; doesn't it?

9   A.  Yes.

10  Q.  And Julie Harmon?

11  A.  Yes.

12  Q.  Those people there were all people that appeared in the

13  film; were they not?

14  A.  Yes.

15          MR. BRIAN:  Let's turn to page 2, Mr. Nickels.

16  BY MR. BRIAN:

17  Q.  If you go to the bottom, you see reference to Donald Cline

18  and Cline's wife; correct?

19  A.  Yes.

20  Q.  Now, does this e-mail -- let me ask you this.  This

21  conversation and your concern about Netflix reaching out to

22  these people in connection with the marketing or the publicity,

23  did that have anything to do with what names would or would not

24  be blurred in the documentary?

25  A.  No.

*JOURDAN COYNE - DIRECT/BRIAN*                Vol. 3-508

1  Q.  At this point in time, March of 2022 -- if we can go back

2  to the front page, Mr. Nickels, at the top -- at this point in

3  time in March of 2022, had the documentary undergone legal

4  review by Mr. Wickers and his team?

5  A.  Yes.

6  Q.  And at that time, did you trust that the legal clearance

7  team had identified any legal issues that had to be resolved?

8  A.  Yes.

9  Q.  And were you confident at that point, in your mind, that

10 they had, in fact, been resolved?

11 A.  Yes.

12 Q.  Do you have any legal training?

13 A.  I have an acting degree.  No.

14         THE COURT:  Can you repeat your answer?

15         THE WITNESS:  No, I have no legal training.

16 BY MR. BRIAN:

17 Q.  Do you know the specific legal requirements for when

18 someone may have privacy rights under U.S. law?

19 A.  No.

20 Q.  Do you know the specific legal elements to determine

21 whether someone's privacy rights have been violated?

22 A.  No.

23 Q.  And did you rely on the legal team to identify those issues

24 for you?

25 A.  Yes.

1    Q.  And do you know if the legal team reviewed cuts of the

2    documentary during the legal process?

3    A.  Yes.

4    Q.  And did anyone from the legal team ever tell you that you

5    were required by law to blur names shown on 23andMe?

6              MR. MacGILL:  Objection.

7    A.  No.

8              MR. MacGILL:  Hearsay.

9              THE COURT:  I'll overrule.

10             Next question.

11   BY MR. BRIAN:

12   Q.  Did anyone from the legal team ever tell you that they

13   needed to blur Sarah Bowling's name?

14   A.  No.

15             MR. MacGILL:  Objection.  Same objection.

16             THE COURT:  Counsel, why don't you rephrase those

17   questions so that it doesn't elicit what someone told her.

18   What was her understanding?

19             MR. BRIAN:  I guess the point is they didn't tell her,

20   Your Honor, so that I don't think --

21             MR. MacGILL:  Your Honor, I'd move to strike counsel's

22   comment.

23             MR. BRIAN:  Fair enough.

24             THE COURT:  Counsel's comments are stricken.

25             MR. BRIAN:  Fair enough, Your Honor.  I apologize.

*JOURDAN COYNE - DIRECT/BRIAN*                    Vol. 3-510

1   BY MR. BRIAN:

2   Q.  When the documentary was released in May of 2022, were you

3   concerned that it violated anyone's privacy rights?

4   A.  No.

5   Q.  When the documentary aired, what was the public reaction?

6   A.  Incredibly positive.

7   Q.  After the release, did you learn that the two plaintiffs

8   expressed that they did not want their names to appear in the

9   documentary?

10  A.  Yes.

11  Q.  And after the release, were more blurs added to the

12  documentary to obscure certain names?

13  A.  Yes.

14  Q.  And did those blurs include the two plaintiffs in the

15  courtroom?

16  A.  Yes.

17  Q.  Did you go along with that decision?

18  A.  Yes.

19  Q.  Why?

20  A.  There was never any intention to do any harm to anyone.

21  And so if they wanted that, then we, of course, would do it.

22  Q.  From the time you started working on this project in

23  December of 2017 until the time it aired on May 11, 2022, about

24  how many hours did you put into this project?

25  A.  Thousands.

*JOURDAN COYNE – CROSS/MacGILL*    Vol. 3-511

1    Q.  And sitting here today, are you proud of the film?

2    A.  I'm incredibly proud of the film.

3    Q.  Why?

4    A.  It was one of the honors of my life to meet the siblings

5    featured in the film and the mothers and the father, and I

6    promised to give them a platform to tell their story.  And I

7    persevered.  I was told no many times, and I did it.

8         And then after the film came out, I got to experience

9    something a lot of filmmakers don't who are in this kind of

10   social justice work, is that the film got such a huge reaction

11   that it inspired legislatures to write laws to make elicit

12   insemination by your doctor officially illegal in some states,

13   and I know there's a federal bill on the table.  And that is

14   something that fills me with a lot of pride, and I'm incredibly

15   grateful to have been a part of that.

16        MR. BRIAN:  Thank you.  No further questions, Your

17   Honor.

18        THE COURT:  You may cross-examine the witness.

19                      **CROSS-EXAMINATION**

20   BY MR. MacGILL:

21   Q.  Good afternoon.  I'm Rob MacGill.  We met before at your

22   deposition.

23   A.  Yes.

24   Q.  I have a number of things I want to follow up with you,

25   just a little bit of background.  I think you described in the

 1  record your given name is Lucie Jourdan Coyne; is that correct?

 2  A.  Yes.

 3  Q.  And your professional name is Lucie Jourdan?

 4  A.  Yes.

 5  Q.  Can I refer to you as Mrs. Jourdan then?

 6  A.  Ms. Jourdan.

 7  Q.  Ms. Jourdan.  Okay.  Thank you.

 8          THE COURT:  All right.  Counsel, you all slow down.

 9  You're talking at the same time.

10          Witness, if you would just let him ask the question,

11  and once he's finished the question, then give your answer.

12  And then don't ask your next question until she's finished her

13  answer.  Thank you.

14          MR. MacGILL:  Thank you.

15  BY MR. MacGILL:

16  Q.  So you live in Los Angeles?

17  A.  Yes.

18  Q.  Okay.  And you described earlier you have an associate's

19  degree from an acting college; is that right?

20  A.  Yes.

21  Q.  Okay.  And when was that degree awarded?

22  A.  2002.

23  Q.  2002.  Now, in terms of your initial work in the Hollywood

24  world, you did some acting work?

25  A.  Yes.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-513

1    Q.  And some stunt work?

2    A.  Yes.

3    Q.  Okay.  And you became a development executive at a company

4    called Pilgrim Films and Television in 2007?

5    A.  Yes.

6    Q.  So that began your career in TV film at that time; is that

7    right?

8    A.  Yes.

9    Q.  All right.  And you're self-employed currently?

10   A.  Yes.

11   Q.  Where are you employed currently?

12   A.  I'm self-employed.

13   Q.  Okay.  What is -- do you have an entity?

14   A.  I do.  Lucie Jourdan Productions.  Or L.J. Productions,

15   sorry.

16   Q.  All right.  And I think you described your role in *Our*

17   *Father* in your direct examination, and I would like to follow

18   up on a couple of things.

19       So do you have a certificate of authorship of the movie *Our*

20   *Father*?

21   A.  There was one made.

22   Q.  I'm going to refer to Exhibit 75.  And in your binder, you

23   have some exhibits there.  Would you please take a look at

24   Exhibit 75.  I believe it's on the first tab.  Tell me when

25   you're there, please.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-514

1   A.  I'm there.

2   Q.  Okay.  And this was a document executed between you and

3   Realhouse?

4   A.  Yes.

5   Q.  All right.  And let's take a look at representations and

6   warranties that you made; okay?  Let's take a look at page 1.

7   And if you look specifically on page 1, if we can pull that

8   up -- I mean -- let me back up a step.

9       Is Exhibit 75 the certificate of authorship that you

10  operated -- or that you executed in connection with this film?

11  A.  Yes.

12          MR. MacGILL:  And we would offer into evidence

13  Exhibit 75.

14          MR. BRIAN:  No objection, Your Honor.

15          THE COURT:  Exhibit -- is it 175?

16          MR. MacGILL:  Seventy-five.

17          THE COURT:  Seventy-five is admitted into evidence

18  without objection.

19                  *(Plaintiffs' Exhibit 75 was*

20                  *received in evidence.)*

21  BY MR. MacGILL:

22  Q.  So looking at this, let's --

23          MR. MacGILL:  If I may publish it, Your Honor.

24  BY MR. MacGILL::

25  Q.  Page -- Exhibit 75, specifically looking at page 1, you

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-515

1  made some representations and warranties on this document; did

2  you not?

3  A.  Yes.

4  Q.  And these were representations and warranties that you were

5  making yourself to the company Realhouse; is that right?

6  A.  Yes.

7  Q.  All right.  Let's take a look at page 1, specifically

8  beginning: I further represent and warrant and agree that.  Can

9  you focus on that for a minute?

10     Do you see this on your -- it's on your screen,

11  Ms. Jourdan.  It might be easier to look on your screen, or you

12  can look at the document, whatever you prefer.

13     Do you see it on the screen?

14  A.  I do.

15  Q.  And what you said for your part is:  I further represent,

16  warrant, and agree that except with respect to materials

17  supplied to me by studio and materials in the public domain,

18  which will not be a material or substantial part of the results

19  in product of my services.

20     And then it continues at romanette number iii, and I want

21  to ask you about romanette number iii.

22  A.  Okay.

23  Q.  Okay.  Are you there?

24  A.  Yes.

25  Q.  So romanette number iii says:  The results and product of

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-516

1   my services do not infringe or violate the copyright,

2   trademark, or other intellectual property rights of any

3   third party.

4       Do you see that?

5   A.  Yes.

6   Q.  Now, focusing just for a minute on your promises and your

7   warranties and your representations to Realhouse, you also

8   said, for your part, that you would not defame, infringe, or

9   violate the rights of privacy of any other rights of any -- or

10  any other rights of any third party.

11      Is that one of the representations that you made?

12  A.  Yeah.

13  Q.  Now, so as you did your work from the outset on the *Our*

14  *Father* film, you knew that you had made a promise,

15  representation, warranty, and agreement that your work would

16  not defame, infringe, or violate the rights of any -- the

17  rights of privacy of any third party; right?

18  A.  Yes.

19  Q.  Now, just as we get a little context here, I believe you

20  said in your direct examination -- and I want to make sure I'm

21  fair to the words that you spoke here to the jury -- that you

22  made the creative decisions on this film *Our Father*,

23  ultimately; did you not?

24  A.  Yes.

25  Q.  And as you did that, you understood in terms of the people

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-517

1   that engaged you, Realhouse, that you were not going to defame,

2   infringe, or violate the rights of privacy of any party; right?

3   A.  Yeah.

4   Q.  All right.  Now, you understand that two of the people in

5   this courtroom, Mrs. Bowling and Mrs. Kennard, were people that

6   were shown in the *Our Father* film; you understand that?

7   A.  I do not believe there were people shown, no.

8   Q.  Their images were shown?

9   A.  One image was shown.

10  Q.  Sarah Bowling's image was shown?

11  A.  Yes.

12  Q.  Was Lori Kennard's name shown in the *Our Father* film?

13  A.  Yes.

14  Q.  Now, with respect to what you did as the director of the

15  film, you relied on Mr. Petrella to do certain work for you, as

16  well; right?

17  A.  Yes.

18  Q.  And you characterized him in your direct examination as a

19  producer; right?

20  A.  Yes.

21  Q.  And you characterized yourself, at one point, as the

22  producer of *Our Father* and ultimately, the director; right?

23  A.  Both, yes.

24  Q.  Both.  So you were arm and arm, so to speak, with

25  Mr. Petrella on this.  You were both producers of this film at

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-518

1   one point in time?

2   A.  Yes.

3   Q.  And ultimately, you were the director?

4   A.  Yes.

5   Q.  Right?  But at all times -- to repeat, at all times, you

6   trusted the judgment of Mr. Petrella in his work as the

7   producer of the *Our Father* film?

8   A.  Yes.

9   Q.  Okay.  And just as we focus on rights of privacy here in

10  terms of what you represented, you warranted and agreed to, you

11  understood, as you made decisions ultimately upon names in the

12  film or pictures in the film, that rights of privacy might be

13  implicated; right?

14  A.  I understand the rights of privacy be implicated?

15  Q.  They might come up.  There might be issues with rights of

16  privacy in the *Our Father* film; right?

17  A.  Yes.

18  Q.  And just as we look at further context in terms of what was

19  involved with that film, you understood that this film was

20  shocking; right?

21  A.  The acts of Don Cline were shocking.

22  Q.  Right.  And with respect to the film, to the extent that,

23  for example, Sarah Bowling's name was in the film; is that

24  right?

25  A.  Her name was in the film, yes.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-519

Q.  And the film showed, as one example, in terms of this

focus, rights of privacy, that Donald Cline was her biological

father; right?

A.  Yes.

Q.  Okay.  Now, that is sensitive information; isn't it?

A.  I can't say that, no.

Q.  Okay.  You can't say that?

A.  No.

Q.  Now, as you did your work as director, your would not

agree, then, for example, just as we're getting started here,

that her parentage of the biological father, Donald Cline,

would not be sensitive information, as far as you were

concerned?

A.  I didn't speak to her personally, so, no, I did not know

that.

Q.  But if you -- you know that her name was in the film;

right?

A.  Yes.

Q.  As the director, you knew, then, that any name in the film

was going to be associated with the man Donald Cline portrayed

in the film; right?

A.  Specifically, any name on the 23andMe, yes.

Q.  Okay.  Now, Sarah Bowling's name was in the film?

A.  Yes.

Q.  Yes, okay.  So as we look and as we get started here, the

1  rights of privacy that you had to be focused on as director, at

2  least as a director, were having some sensitivity, yourself,

3  about rights of privacy; right?

4  A.  Yes.

5  Q.  All right.  Now, at -- we're -- you talked about what you

6  did at Jacoba Ballard's request; remember?

7  A.  Yes.

8  Q.  You told the Court and the jury here that you had -- you

9  had blurred some names at her request?

10  A.  Yes.

11  Q.  Now, you blurred the names at her request, but not because

12  you made a rights of privacy analysis in those cases; right?

13  A.  No.

14  Q.  You did not make a rights of privacy analysis in those

15  cases?

16  A.  I didn't make an analysis.  I honored a request from the

17  lead character in my film.

18  Q.  Fair enough.  So you just did it on her request, not

19  because you went and said: Okay, there's are some privacy

20  issues associated with these particular names, I should blur

21  them?

22  A.  No.

23  Q.  No.  Now, in general terms, you understood that people who

24  were put -- who were pictured in the film would be associated

25  with Donald Cline as their father, biological father; right?

1  A.  Specifically in the 23andMe scenes, yes.

2  Q.  Okay.  In those scenes; right?

3  A.  Yes.

4  Q.  Okay.  Now, as to those scenes, you understood, and you

5  could, as the director, understand that those people disclosed

6  in the film could be affected to some degree; right?

7  A.  Yes.

8  Q.  Okay.  Now, let's talk about the degree to which those

9  people, people like Sarah Bowling and Lori Kennard, could be

10 affected.  Specifically, I have some questions.

11     So you know, as the director of the film, that there were

12 some women who indicated that they believed that he was a

13 sexual criminal in the film; right?

14 A.  Yes.

15 Q.  This Donald Cline; right?

16 A.  Yes.

17 Q.  The film also showed that he pled guilty to a felony;

18 right?

19 A.  Yes.

20 Q.  And this is the father of Sarah Bowling and Lori Kennard;

21 right?

22 A.  Yes.

23 Q.  And you knew, as you measured what to do and what not to do

24 in this case, that this was portrayed in your film, the film

25 you directed, that Donald Cline was a sick individual; right?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-522

1   A.  His actions were disturbing.

2   Q.  But to be more specific, sick individual is what words were

3   used in the film you directed when Donald Cline was described;

4   right?

5   A.  That was what whoever I interviewed said, yes.

6   Q.  Well, but when you interviewed them, I'm not talking about

7   the interview.  I'm talking about the film.  In the film, one

8   of your -- one of the people that you put in this film said

9   that Donald Cline, the father, the biological father of Sarah

10  Bowling and the biological father of Lori Kennard was a, quote,

11  sick individual, unquote; right?

12  A.  I don't know who said that.

13  Q.  But it's in your film?

14  A.  I don't recall specifically, but okay.

15  Q.  You don't recall that phrase?

16  A.  No.

17  Q.  Okay.  Now, just looking a little bit more specifically,

18  your film also showed Dr. Cline in meetings with some of the

19  half-siblings; right?

20  A.  Yes.

21  Q.  And in that film, the biological father was shown in your

22  film to have the outline of a gun in his clothing; right?

23  A.  Yes.

24  Q.  And he was described that way as a gentleman who carried a

25  gun; right?

1    A.  Yes.

2    Q.  Carried a gun not only to a meeting with the siblings, but

3    carried a gun to a meeting with the television news reporter;

4    right?

5    A.  Yes.

6    Q.  Repeatedly in the film that you directed, you depicted

7    their biological father, the biological father of Sarah Bowling

8    and the biological father of Lori Kennard, as a person who

9    intimidated witnesses in a variety of ways; right?

10   A.  Because that is what he did.

11   Q.  Yes.  But what you were willing to do is direct and have a

12   movie produced that associated Sarah Bowling with that

13   gentleman, Dr. Cline; right?

14   A.  Not specifically Sarah Bowling, but she was included, yes.

15   Q.  Yes.  And the viewer could see her name; right?

16   A.  Briefly, yes.

17   Q.  Okay.  See her name as you see, briefly in the movie, and

18   associate her with this gentleman, Dr. Cline, who is in the

19   business, according to the movie, of intimidating witnesses;

20   right?

21   A.  I would not call him a doctor anymore.  His medical license

22   is revoked.  He is Donald Cline.

23   Q.  Let's just be clear, make sure my question meets your

24   requirements.  Donald Cline was depicted as a person who

25   intimidated witnesses at the time he was being investigated in

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-524

1    the film that you directed; correct?

2    A.  Witnesses, I'm not sure.  There was -- he didn't intimidate

3    the witnesses.  He intimidated his biological children in a

4    singular meeting, and then also Angela Ganote.  But I'm not

5    sure about what witnesses means.

6    Q.  Removing witnesses in the investigation, you understood

7    that people, there were siblings that were intimidated.  Can we

8    use that language?  Would that be appropriate?

9    A.  Yes, siblings were intimidated --

10   Q.  And you --

11           THE REPORTER:  I'm sorry.

12           THE COURT:  Slow down, slow down.

13   A.  Siblings were intimidated.

14           MR. MacGILL:  Understood.

15   BY MR. MacGILL:

16   Q.  Siblings were intimidated in the film that you directed;

17   right?

18   A.  According to what they told me, yes.

19   Q.  Siblings intimidated by Dr. Cline; correct?

20   A.  Yes.

21   Q.  Donald Cline, yes?

22   A.  Yes.

23   Q.  And, again, the biological father of Lori Kennard and Sarah

24   Bowling; right?

25   A.  Yes.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-525

1  Q.  Now, a couple of other things in the film that Dr. Cline is

2  described as.  The film includes a vignette where the former

3  partner, the former physician partner of Dr. Cline discusses

4  him.  Do you recall that?

5  A.  Yes.

6  Q.  In the film you directed and the film that was published,

7  this former partner says that he was evil?

8  A.  Yes, he did.

9  Q.  Yes, he did.  Now, at the time you were -- you know, at the

10  time, whether you did it from the outset of your work with

11  Realhouse, promising that you would respect rights of privacy

12  or at any time thereafter, you understood that by including

13  Sarah's name, Sarah Bowling's name in the movie, that you were

14  associating her with the biological father that your film

15  called evil; right?

16  A.  I never thought about it that way, at all.

17  Q.  Okay.  You never gave thought.  You never went into that

18  level of thought in making your decisions, the creative

19  decisions here; did you, ma'am?

20  A.  No.

21  Q.  And in fact, just as a matter of fact, you didn't make the

22  decision when it came to Lori Kennard as to whether or not this

23  depiction and this vignette, showing her biological father as

24  evil, would affect her when she saw the movie; right?

25  A.  I made every effort to blur Lori Kennard's name.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-526

1    Q.  But Lori Kennard's name was in your movie; was it not?

2    A.  Yes, it was.

3    Q.  Okay.  Now, with respect to that -- those circumstances,

4    you understood that from the beginning to the end, that all

5    things considered, Dr. Cline would be portrayed as evil, as a

6    felon, as a person who carries a gun, a sick individual.  You

7    knew all of that was going to be portrayed in your film, the

8    film that you directed; right?

9             MR. BRIAN:  Objection, asked and answered, Your Honor.

10            MR. MacGILL:  Let me restate.

11            THE COURT:  If you would restate.

12   BY MR. MacGILL:

13   Q.  So all of the things that we have just covered, these are

14   things that you understood when you signed off on the final cut

15   for *Our Father*; right?

16   A.  Yes.

17   Q.  Now, I want to talk with you a little bit about your role

18   in this -- in this project.  You were -- you also understood

19   Jason Blum was involved in the *Our Father* film?

20   A.  Only so much that it was his company.

21   Q.  Okay.  And he was -- he was a person that was involved at

22   least at some point as the executive producer of the film;

23   right?

24   A.  He was named as.

25   Q.  Okay.  Named as what, the executive producer?

*JOURDAN COYNE - CROSS/MacGILL*                Vol. 3-527

1  A.  Yes.  He might be producer, I can't remember.

2  Q.  And is Mr. Blum a famous Hollywood person as you see it?

3  A.  He's a known Hollywood entity.

4  Q.  And known for his horror films?

5  A.  Yes.

6  Q.  And he's known for the profitability of his films; isn't

7  he?

8  A.  I don't know him as that actually, no.

9  Q.  You don't know anything about him?

10 A.  His personal profitability, no.

11 Q.  No, no.  Let me ask my question.  He's known to deliver

12 movies that are very profitable to the studios or to companies

13 like Netflix; right?

14 A.  No, I don't know about that.

15 Q.  You don't know that?

16 A.  But I do know they're popular.

17 Q.  The movies are popular.

18 A.  Yes.

19 Q.  Okay.  Now, with respect to the company -- with respect to

20 the movie that was delivered to Netflix, the budget for this

21 was approximately $1.8 million; is that right?

22 A.  I didn't know that at the time.  I didn't know the actual

23 budget, no.

24 Q.  Do you today?

25 A.  Yes.

1  Q.  And you know the number to be approximately 1.8 million as

2  what Realhouse was paid to deliver this film to Netflix?

3  A.  Yes.

4  Q.  Okay.  Now, and for $1.8 million, this was a film that

5  within a day became the number one movie in -- on the Netflix

6  distribution system in the United States?

7  A.  Yes.

8  Q.  Now, I want to focus on your relationship with Michael

9  Petrella.  I think you've confirmed a positive relationship

10  with Mr. Petrella?

11  A.  Yes.

12  Q.  You respect him; is that correct?

13  A.  I do.

14  Q.  All right.  And is it a fair statement that you trusted

15  Mr. Petrella in all respects in his work?

16  A.  That's a little vague, but I trusted him for specific jobs

17  that I asked him to do.

18  Q.  Okay.  And let me be more specific, if I may.  Is it fair

19  to say that you trusted Mr. Petrella in his work as he worked

20  on the *Our Father* film?

21  A.  Yes.

22  Q.  Okay.  Now, as a part of his work, in terms of what he did,

23  you trusted that he was doing his job; fair statement?

24  A.  Yes.

25  Q.  On *Our Father*, and you also trusted his judgment in the

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-529

1    filmmaking of *Our Father*; fair?

2    A.  No.  I don't -- he wouldn't be involved in the filmmaking

3    part of this.

4    Q.  Let me ask you a very specific question.  Do you trust

5    Mr. Petrella's judgment in filmmaking?

6    A.  No.  He doesn't qualify as a filmmaker.  He's a producer on

7    a film.  When I think filmmaker, I think the director.

8    Q.  Okay.  I'm going to ask you about a deposition, and I'm

9    going to put up on the screen -- first, I want to ask a couple

10   of preliminary questions and then I just have one question for

11   you.

12       Do you recall giving testimony in this case on January 12,

13   2023?

14   A.  Yes.

15   Q.  Okay.  And you understood, at the time, that you had been

16   sworn in by an officer of the court, solemnly to swear to tell

17   the truth, the whole truth, and nothing but the truth.  Do you

18   recall that?

19   A.  Yes.

20   Q.  Okay.  And so you regarded that process as solemn and

21   important in terms of getting to the truth of this matter just

22   as you are today; fair?

23   A.  Yes.

24   Q.  Okay.  Now, let's look at -- I'm going to put up on the

25   screen page 16 -- I'm sorry, page -- beginning on page 14.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-530

1      (Off the record.)

2   BY MR. MacGILL:

3   Q.  Do you have the deposition in front of you?  No.  Let me

4   hand this to you.

5          MR. MacGILL:  May I approach the witness, Your Honor?

6          THE COURT:  You may, counsel.

7          MR. BRIAN:  I'm sorry, can I see what you're going to

8   show?

9          MR. MacGILL:  Yeah.  Let me hand that to the witness,

10  and you can look at my copy, if you'd like.

11  BY MR. MacGILL:

12  Q.  While they're looking, I'm going to wait until they have

13  this in front of them, but would you mind turning to page 14.

14         MR. BRIAN:  Thank you.

15         MR. MacGILL:  Sorry.

16         MR. BRIAN:  I have it.

17  BY MR. MacGILL:

18  Q.  Okay.  I'm going to begin on line 21 on page -- I'm sorry,

19  I'm going to begin on page 15.  The last line there on page 15,

20  line 25, are you there?

21  A.  Yes.

22  Q.  And did I ask you the following question:

23      And did you trust him in his judgments in filmmaking?

24      Did you answer:  I do trust his judgment in filmmaking.

25  A.  Yes.

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-531

1  Q.  Not that that's his -- let me finish the answer.  Not that

2  that's his role.

3        MR. BRIAN:  No.  That doesn't quite read it correctly,

4  Your Honor.

5        MR. MacGILL:  Let me read --

6  A.  Can you show me what line you're actually on?

7  BY MR. MacGILL:

8  Q.  Let me make you understand, understand the sequence here.

9  So if you look at line 15, page 15, the line 25, and it jumps

10  across the page, all right?  So let's do that together.  Do you

11  see what I'm saying?

12  A.  Oh, so I'm starting on 15 and 25?

13  Q.  Fifteen -- line 15, page --

14  A.  Got it, and then it goes to 16.  Got it, yes.

15  Q.  All right.  And you see where page 16 is?

16  A.  Yes.

17  Q.  Okay.  Let's start over.  You remember me asking you this

18  question:

19      And do you trust him in his judgments in filmmaking?

20      And did you answer:  I do trust his judgment in filmmaking.

21  No, that's not his role, his role.

22      Do you see that?

23  A.  Yes.

24  Q.  Okay.

25        MR. BRIAN:  Your Honor?  Your Honor, I would ask that

1   he continue to read on page 16 from line 6 through 9.  Because

2   she's continuing her answer.

3                THE COURT:  For completeness?

4                MR. BRIAN:  Yes.

5                THE COURT:  Any objection?

6                MR. MacGILL:  No objection.  That's just fine.

7                THE COURT:  If you would.

8   BY MR. MacGILL:

9   Q.  All right.  So let's keep reading.  Did you also testify:

10       He would help me identify --

11       No, I'm sorry.

12       How would you describe his role?

13       He would help me identify characters and create a general

14   vision for a pitch, and to trust him with filmmaking.  That's

15   not part of his job.

16       It's, what part of it -- and then continuing.

17       What part of his job producing films, producing, *Taken at*

18   *Birth,* and then continuing.

19       I believe that's the rest of the section.  Okay.

20       So let me make sure we -- I wanted you to see that

21   testimony, but I want to just -- did you trust his judgment as

22   a producer?

23   A.  Yes, as a producer.

24   Q.  Okay.  Now, and did you trust him to call your attention to

25   problems that may exist?

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-533

1    A.  Yes.

2    Q.  Okay.  And as a producer, he was filming the different

3    scenes of the movie; is that right?

4    A.  No.

5    Q.  What was his -- what was his role in terms of the filming

6    of the movie?

7    A.  He was sometimes not even in the room during a filming

8    element.  He's kind of behind the scenes working in that area.

9    Q.  Working in what area?

10   A.  If I'm in the middle of an interview, he could be not even

11   in the same state as me.  He's just dealing with the production

12   side of making a film.

13   Q.  Okay.

14   A.  Which, speaking with siblings in this case, speaking with

15   interview subjects prior to me sitting down with them and

16   actually filming, but he was not involved in the filming part

17   of it.

18   Q.  Okay.  But he was involved in speaking with siblings?

19   A.  Yes.

20   Q.  Right?

21   A.  That was one of his jobs.

22   Q.  And that's one of the jobs that you trusted him on is this

23   role of speaking with siblings; right?

24   A.  Yes.

25   Q.  Because speaking -- the siblings here, this was -- this was

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-534

1    sensitive material, was it not?

2    A.   What material, specifically?

3    Q.   The parentage by Dr. Cline.  A very sensitive topic; right?

4    A.   To certain people, yes.

5    Q.   Okay.  And to certain siblings, you understood from the

6    beginning of this project to the present day that certain of

7    the siblings regarded this as private information?

8    A.   Yes.

9    Q.   Their parentage; right?

10   A.   Yes.

11   Q.   And the fact that their biological parent was Donald Cline,

12   you understood, at all times, was a sensitive topic for some

13   siblings?

14   A.   Yes.

15   Q.   Fair enough.  Now, Mr. Petrella gave you warnings about

16   that sensitivity throughout the process; did he not?

17   A.   I wouldn't consider them warnings.

18   Q.   And did Mr. Petrella give you -- did Mr. Petrella share

19   with you assurances that he gave to the siblings about their

20   private information?

21   A.   No.

22          MR. BRIAN:  Objection, it misstates the record.  No

23   foundation for that.

24          MR. MacGILL:  I'm sorry?

25          THE COURT:  You couldn't hear.  Is your mic on.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-535

1              MR. BRIAN:  I think so.

2              THE COURT:  All right.  What's your objection,

3    counsel?

4              MR. BRIAN:  Objection, assumes a fact not in evidence,

5    no foundation.

6              MR. MacGILL:  Let me call up an exhibit, Your Honor.

7              THE COURT:  Yes.

8              MR. MacGILL:  I'll withdraw the question.

9              So could we please call up Exhibit 120, which has been

10   previously admitted in the case.

11   BY MR. MacGILL:

12   Q.  Okay.  I think we've got -- we're going to pull up

13   Exhibit 120 and specifically, this is a Facebook message from

14   Mr. Petrella that's been previously received in evidence in

15   this case.  Have you seen this before?

16   A.  Recently, yes.

17   Q.  Okay.  And what Mr. Petrella wrote is:  We would love for

18   each of you to submit a photograph of your choosing, as well as

19   one of you as a baby and if you're company -- if you are

20   comfortable being depicted visually.  You will not be

21   identified unless you've already given us explicit permission

22   to do so.

23        So when did you first see this?

24   A.  When I was preparing for this trial.

25   Q.  So you never saw this before?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-536

1    A.  No.

2    Q.  And this is the producer of the *Our Father* film has given

3    this assurance to certain of the siblings?

4    A.  As it relates to a specific scene in the film, yes.

5    Q.  Okay.  Now, but you just saw it for the first time when?

6    A.  I can't recall, but recently, in preparation for this

7    trial.

8    Q.  Okay.  And then he continues:  But we wanted -- let's just

9    reread this section -- the sentence in full:  Mr. Petrella, you

10   will not be identified unless you have already given us

11   explicit permission to do so, but we wanted as many interested

12   siblings represented as we could have.

13        Right?

14   A.  Yes.

15   Q.  Now, did Mr. Petrella give you a warning of any kind about

16   the sensitivity of the information regarding the -- Dr. -- or

17   Donald Cline?

18   A.  No.

19   Q.  Okay.  Let's see if -- we'll call up Exhibit 7.

20        So is this -- you reviewed this with counsel.  This your

21   March 17  -- this is a March 17 e-mail that you got from

22   Mr. Petrella --

23   A.  Yes.

24   Q.  -- is that right?

25        Do you remember being asked about conversations, et cetera,

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-537

1    pertaining to these events, I should say?

2    A.  Yes.

3    Q.  Okay.  And then if we look, this is relating to *Our Father*

4    siblings and others; right?

5    A.  Yes.

6    Q.  And that was within the work responsibility as the

7    producer, Michael Petrella, did his job on *Our Father*; right?

8    A.  As it pertained to publicity, yes.

9    Q.  Yes, and as it pertains to the siblings, as shown right

10   here; right?

11   A.  The ones on the list, yes.

12   Q.  Okay.  *Our Father*: siblings and others; is that right?

13   That's the subject line?

14   A.  Yes.

15   Q.  All right.  Now, he says, next, second paragraph:  I pared

16   back the recipient list because of the sensitivity of the

17   following information.  Please keep these names confidential

18   since the siblings are fiercely protective of one another's

19   privacy, particularly if they've made it known they don't want

20   to be publicly identified.

21       Right?

22   A.  Yeah.

23   Q.  So two weeks -- so we're now on March 17th, less that two

24   months before the release of the *Our Father* film that you are

25   directing; right?

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-538

1    A.   Yes.

2    Q.   And you get this notice where he confirms to you with his

3    words, specifically, that the siblings are fiercely protective

4    of one another's privacy; right?

5    A.   Yes.

6    Q.   Okay.  Now, just remembering from your -- at the outset of

7    your relationship, you confirmed even to Realhouse that rights

8    of privacy were a matter that you were making agreements,

9    representations, and warranties on; right?

10   A.   Yes.

11   Q.   Okay.  So now you have this in writing with respect to

12   these siblings being, quote, fiercely protective of one

13   another's privacy; right?

14   A.   Yes.

15   Q.   Okay.  Now, but you were dealing with Jacoba, Jacoba

16   Ballard; right?

17   A.   Yes.

18   Q.   And she was one of the siblings that was okay being

19   featured in your film; right?

20   A.   Yes.

21   Q.   And she was okay, as far as you were concerned, being the

22   person who was on camera with you for a large portion of the

23   movie; right?

24   A.   Yes.

25   Q.   So you understood that maybe, at least to some extent, she

*JOURDAN COYNE - CROSS/MacGILL*                        Vol. 3-539

 1   had an interest in making sure that she worked with you on

 2   having this film go forward; right?

 3   A.  Yes.

 4   Q.  Okay.  Now, so let's just make sure we understand your

 5   perspective on March 17th.  You have a willing participant,

 6   Jacoba Ballard, on the one hand, and you have a warning here

 7   from Mr. Petrella, your producer, that some of these siblings

 8   are fiercely protective of one another's privacy; right?

 9   A.  Yes.

10   Q.  And did you believe, at that point, you could do whatever

11   you wanted with information that you were given by Jacoba

12   Ballard?

13   A.  No.

14   Q.  Okay.  Now, so just because Jacoba Ballard told you

15   something, you just weren't willing to accept that at face

16   value and just publish whatever it was that she said to you;

17   right?

18   A.  Publish what she said?

19   Q.  In other words, if she gave you information pertaining to

20   other siblings, you did not regard that as a license for you to

21   publish that information?

22   A.  I was documenting her journey, and she had agreed, so I

23   understood that in documenting her, that she had given me

24   permission to do so.

25   Q.  To document her?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-540

1    A.  Her journey, which included her 23andMe.

2    Q.  Well, all right.  But with respect to her journey, you

3    understood you could document her journey; right?

4    A.  Yes.

5    Q.  But you did not have authority or release to document

6    everyone's journey; did you?

7              MR. BRIAN:  Objection, calls for a legal conclusion.

8              MR. MacGILL:  May I restate?

9              THE COURT:  You may restate.

10   BY MR. MacGILL:

11   Q.  As you understood things, you did not have authority to

12   document every siblings' journey; did you?

13             MR. BRIAN:  Same objection, also relevance, Your

14   Honor.

15             THE COURT:  She can answer it.

16   A.  No.

17   BY MR. MacGILL:

18   Q.  Okay.  Now, there's a process for that, as the director of

19   the film, for making sure -- well, let me -- let me ask you one

20   more, if I may -- one more exhibit here with Mr. Petrella.

21        Let's go to Exhibit 51, which is -- Your Honor has

22   previously admitted that into evidence, and I want to show you

23   this April '22 exhibit, Exhibit 53.

24   A.  Exhibit 53.

25   Q.  Now, if you look at the top line, if we look at this as an

1   e-mail -- this is an e-mail that was exchanged -- or I should

2   say that Mr. Petrella wrote on April 20, 2022; do you see that?

3   A.  Yes.

4   Q.  And then this is -- this is from Milady Flores to Michael

5   Petrella with a copy to you; is that right?

6   A.  Yes.

7   Q.  Okay.  Now, I just want to focus on you for a minute.  As

8   the director of the film, you received a copy of this; did you

9   not?

10  A.  Yes.  This e-mail?

11  Q.  Yes.

12  A.  Yes.

13  Q.  And as a matter of your work, this is now approximately one

14  month before the film was sent; right?

15  A.  Yes.

16  Q.  And so you were copied, a person by the name of Skyler

17  Imhoff at Blumhouse was copied; right?

18  A.  Yes.

19  Q.  And a person -- and Milady Flores was also from Blumhouse;

20  right?

21  A.  Milady.

22  Q.  Thank you.  Roughly one month before the film, Mr. Petrella

23  writes, in part:  I appreciate that.  Do we know who was

24  populating this page in that case?  It is very important that

25  certain names do not appear there.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-542

1      Do you see that?

2   A.  Yes.

3   Q.  Okay.  Now, with respect to that language, did that give

4   you a month before the -- a month before the distribution and

5   the publishing of this film, a reminder that certain siblings'

6   names should not appear in the film, ultimately?

7   A.  No.

8   Q.  Okay.  Now, when it comes to putting names in a film,

9   there's a process at Realhouse for going about that; isn't

10  there?

11  A.  "Going about," as it gets legally reviewed?

12  Q.  Well, let me ask you this:  If someone appears physically

13  in one of your films, you will get an appearance release to

14  clear them; won't you?

15  A.  Yes.

16  Q.  Okay.  And that's what you do as a matter of your course?

17  A.  Yes.  A producer does that.

18  Q.  All right.  And -- but in terms of one of your films; you

19  do that?

20  A.  No, not always.

21  Q.  You direct a producer to do it?

22  A.  It's -- a different type of producer would get a clearance

23  release.

24  Q.  But you take responsibility, as a director, like in *Our*

25  *Father*, to get an appearance release if someone appears in the

*JOURDAN COYNE – CROSS/MacGILL*                Vol. 3-543

1  film?

2  A.  An appearance release is gotten, yes.

3  Q.  Okay.  Now, just so we're clear, in your film *Our Father*,

4  there was no appearance release for Mrs. Bowling; was there?

5  A.  No.

6  Q.  And just to be clear, with respect to the *Our Father* film

7  that you directed, there was no appearance release for Lori

8  Kennard; was there?

9  A.  No.

10  Q.  Now, with the comfort of an appearance release as a

11  filmmaker, as a director of a film, it allows you, as the

12  filmmaker, to use the likeness of a person and whatever the

13  appearance release covers; right?

14  A.  Yes.

15  Q.  Okay.  Now, we've discussed what you did not get from the

16  plaintiffs here, but I would like to show the jury what you did

17  get from Jacoba Ballard.  Okay?  So I'm going to refer you to,

18  now, to the next exhibit, Exhibit 73.  And we can put that on

19  your screen.  I think I need to authenticate this first with

20  you.  Do you see on your screen Exhibit 73?

21  A.  No.

22  Q.  Let me ask you to look at your binder, if you would,

23  please.  And this is tab number 6.  Do you see the appearance

24  release?

25  A.  Yes.

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-544

1   Q.  All right.  And is this -- is this the appearance release

2   that you got from Jacoba Ballard?

3   A.  I did not personally get this, no.

4   Q.  Okay.  Let me ask a better question.  Did someone at your

5   direction get this appearance release?

6   A.  No.

7   Q.  Who did?

8   A.  Someone at Blumhouse's direction.

9   Q.  Someone at Blumhouse.

10      But again, you didn't tell them to get this, but this

11  wasn't directed specifically from you?

12  A.  Right.  Correct.

13  Q.  But it was the result of the work on the film, this

14  release?

15  A.  Blumhouse required it, yes.

16  Q.  Blumhouse required an appearance release.

17  A.  For those featured on the film, yes.

18  Q.  Okay.

19  A.  Now, let's go to the exhibit and refer --

20      MR. MacGILL:  May I publish -- may I offer the exhibit

21  first, Your Honor?

22      THE COURT:  You may offer the exhibit.

23      MR. BRIAN:  We have a relevance objection, Your Honor,

24  for the reasons we discussed.

25      THE COURT:  Okay.  Well, this is a good time to take a

1    lunch break.  We've been in the courtroom for about two hours.

2           So, Ladies and Gentlemen of the Jury, we're going to

3    send you on your lunch break.  The Court is going to admonish

4    you that you're not to have any discussion about the case among

5    yourselves with anyone else.  If anyone should attempt to talk

6    to you, refuse and report that attempt to Sarah.  And again,

7    don't do any research.  And we'll -- we'll see you back in --

8    let's see.  It's 12:52.  So be back at 1:00.  Have a good

9    lunch.

10          Oh, I'm sorry.  That will give you eight minutes.

11   Let's say be back at 1:50; okay.  We'll see you soon.

12          MR. MacGILL:  Thank you.

13          COURTROOM DEPUTY:  All rise.

14      (Jury out at 12:52.)

15          THE COURT:  You may be seated.

16          And, witness may step down.

17          And let's go ahead and do your objection.

18          What is your objection?

19          MR. BRIAN:  It goes to the issue of consent, Your

20   Honor, and releases.

21          And our argument -- and I think we're right under

22   Indiana law -- whether or not there was consent or permission

23   or a release does not establish the tort of invasion of

24   privacy.  Now, there's a -- that doesn't determine the issue, I

25   suppose, of relevance, but that is the argument, that because

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-546

1    it's not -- it doesn't establish the tort, if anything, it's an

2    affirmative defense.  And we're not making that as an

3    affirmative defense.  It's not relevant.

4              THE COURT:  All right.  What was your exhibit that you

5    were going to offer?

6              MR. MacGILL:  Exhibit 73.

7              THE COURT:  What is Exhibit 73?

8              MR. MacGILL:  It's an appearance release executed by

9    Jacoba Ballard.

10             THE COURT:  Can I see a copy of what it is?

11             MR. MacGILL:  Yes.

12             THE COURT:  Thank you.

13             MR. BRIAN:  And I guess, Your Honor, I would add to it

14   under 403.  Because of that, it potentially misleads the jury.

15   It's confusing.

16             THE COURT:  And what in here did you want to highlight

17   because it's a long page?

18             MR. MacGILL:  I'm sorry.  So, yeah, what we would like

19   to highlight, Your Honor, is:  I hereby grant Realhouse -- the

20   first line:  I hereby grant Realhouse Productions and its

21   parents, et cetera, and each of them the absolute and

22   irrevocable right and permission to photograph, film,

23   videotape, et cetera.

24             THE COURT:  Okay.

25             MR. MacGILL:  And then continuing with the likeness.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-547

1          MR. BRIAN:  These are not -- neither of them made an

2   appearance in the film.  This is an appearance release, and

3   this is to -- designed to suggest to the jury, I think, that an

4   appearance release was required.  That's a question of law, and

5   it goes directly to what we've argued, that the lack of consent

6   is simply not -- does not matter for purposes of invasion of

7   privacy.

8          MR. MacGILL:  Well, it includes photographs -- the

9   specific definition contains photograph, portrayal,

10  characteristics, biographical material, image, or other actual

11  or simulated likeness.  That's our -- that's the release that

12  should have been presented to these plaintiffs.

13         THE COURT:  But, counsel, consent is not one of the

14  elements of the tort claim for invasion of privacy, so I'm

15  going to sustain the objection.  This exhibit is not relevant.

16         MR. MacGILL:  Okay.  Understood.

17         MR. BRIAN:  Thank you.

18         THE COURT:  All right.  So let's have our lunch break.

19  And if you all come back at 1:40, I'll give your ruling on the

20  punitive damages.

21         MR. BRIAN:  Thank you, Your Honor.

22         MR. CIULLA:  Thank you.

23         COURTROOM DEPUTY:  All rise.

24      (Recess at 12:56, until 1:48.)

25         THE COURT:  All right, lawyers.  At this time, the

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-548

1    Court is prepared to give you a ruling on defendants' motion

2    for judgment on the evidence under Rule 50(a) on the punitive

3    damages claim.

4          Federal Rule of Civil Procedure 50(a) allows the

5    district court to enter judgment against the party who has been

6    fully heard on an issue during a jury trial if a reasonable

7    jury would not have a legally sufficient evidentiary basis to

8    find for the party on that issue.  The standard for granting

9    summary judgment mirrors the standard for judgment as a matter

10   of law such that the inquiry under each is the same.

11         Under Rule 50, the district court is not free to weigh

12   the parties' evidence or the reasonable inferences that might

13   be drawn from the evidence.  Nor may the district court access

14   or evaluate the credibility of the witnesses.  The district

15   court must review the record as a whole but disregard all

16   evidence favorable to the moving party that the jury is not

17   required to believe.  That is, the Court should give credence

18   to the evidence favoring the non-movant as well as the evidence

19   supporting the moving party that is uncontradicted and

20   unimpeached at least to the extent that the evidence comes from

21   disinterested witnesses.  And that's from the United States

22   Supreme Court case Reeves versus Sanderson Plumbing Products.

23         Punitive damages are rare in Indiana and subject to a

24   heightened standard of proof.  Under Indiana law, punitive

25   damages may be awarded if there is clear and convincing

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-549

1    evidence that the defendant, one, acted with malice, fraud,

2    gross negligence, or oppressiveness; and, two, that the

3    defendants' act was not the result of a mistake of fact or law,

4    honest error of judgment, overzealousness, mere negligence, or

5    other human failing.

6            Indiana Supreme Court has defined gross negligence as

7    a conscious voluntary act or omission in reckless disregard of

8    the consequences of another party.

9            Wanton and willful misconduct has been defined as an

10   intentional act or failure to act done with reckless disregard

11   of probable injury to a person when the defendant knew of that

12   probability and, if the defendant failed to act, the

13   opportunity to avoid the risk.

14           Malice is an act or a failure to act done, one,

15   intentionally; or, two, without legal authority or excuse; and,

16   three, with the intent to injure or harm.

17           And fraud in Indiana is an act or failure to act or a

18   concealment done knowingly or intentionally to cheat or deceive

19   another person.

20           Oppressiveness is an act or failure to act done in a

21   domineering, overbearing, or controlling manner that subjects

22   another person to a cruel and unjust hardship.

23           The Indiana Court of Appeals has stated that heedless

24   or reckless disregard of consequences justifying punitive

25   damages would appear to be more accurately characterized as a

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-550

1    conscious and intentional wrongdoing better described by such

2    words as "oppression" or "malice."

3         In addition to proving reckless disregard, the party

4    seeking punitive damages must show that the alleged conduct was

5    not the result of mistake of law, honest error of judgment,

6    overzealousness, mere negligence, or other non-ubiquitous human

7    failing.

8         Here the plaintiffs only assert that the defendants

9    were grossly negligent on the ground that they engaged in a

10   conscious voluntary act or omission in reckless disregard of

11   the consequences to another person.

12        As defendants note in their motion, the clear and

13   convincing standard is demanding.  The clear and convincing

14   standard is an intermediate standard of proof that lies between

15   a preponderance of the evidence and beyond a reasonable doubt,

16   which is required to find guilty in criminal prosecutions.

17   This standard does not require the jury to conclude that

18   certain facts are certainly or almost certainly true, but it is

19   greater than a burden of convincing you that the facts are more

20   probably true than not true.

21        At the summary judgment stage, the Court ruled that

22   summary judgment was not appropriate because there were

23   disputes of material fact such that a reasonable jury could

24   find that the plaintiffs had shown by clear and convincing

25   evidence that defendants act with gross negligence or reckless

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3–551

1    disregard of plaintiffs' privacy rights.  But as compared to

2    the summary judgment record, the broader trial record leads the

3    Court to conclude that there is no legally sufficient basis for

4    the jury to return a verdict in either plaintiffs' favor on the

5    issue of punitive damages.

6           With respect to Realhouse, on summary judgment, the

7    Court found that the records supported the reasonable inference

8    that Realhouse failed to take any steps to ensure that its

9    legal clearance counsel, Alonzo Wickers, reviewed the cut of

10   film displaying plaintiffs' name, and, therefore, failed to

11   ensure that anyone had considered where plaintiffs' names could

12   legally be used in the film.

13          But during trial, Realhouse's 30(b)(6) witness,

14   Alexandra Reed, testified that Mr. Wickers reviewed a cut of

15   the film showing plaintiffs' names and used a clearance grid to

16   ensure that Realhouse had cleared everything that was necessary

17   to clear.

18          Ms. Reed testified that the scenes with plaintiffs'

19   names were not on the clearance grid because Mr. Wickers had

20   determined that those scenes had no elements that needed

21   clearance.

22          Ms. Reed also testified that she believed the

23   plaintiffs' names appeared so briefly that they did not require

24   clearance, and that after receiving the clearance grid from

25   Realhouse's counsel, she watched the film as an additional

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-552

1  check for any outstanding issues that might not have been

2  flagged by counsel.

3       The Court determines that it may consider Ms. Reed's

4  testimony because neither Ms. Reed's credibility nor candor has

5  been questioned, and her testimony has not been impeached or

6  contradicted.  And the Court's relying on Stratienko,

7  S-T-R-A-T-I-E-N-K-O, versus Cordis Corporation, which is a

8  Sixth Circuit case, 429 F.3d 592, finding that interpreting

9  reads as prohibiting courts from ever considering testimony by

10 interested persons would lead to absurd results, particularly

11 when a party is an entity that typically only speaks by its

12 interested employees.

13      The evidence of Mr. Petrella's assurances to

14 Ms. Bowling via Facebook message that she would not be

15 identified in the film without her consent does not change the

16 Court's conclusion.

17      As noted at oral argument, whether Realhouse kept its

18 promise is not an issue -- is not at issue.  This is not an

19 action for breach of contract or fraud.

20      It is important to keep in mind what this case is not

21 about.  Mr. Petrella's statements to Ms. Bowling do not show a

22 reckless disregard for Ms. Bowling's privacy rights,

23 particularly in light of the trial evidence that Ms. Bowling

24 affirmatively reached out to Mr. Petrella identifying herself

25 as a child of Donald Cline and not requesting confidentiality.

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-553

1          Based on the trial record currently before the Court,

2   drawing all reasonable inferences in plaintiffs' favor, the

3   Court finds that there is no legally sufficient basis for the

4   jury to find by clear and convincing evidence that Realhouse

5   acted with gross negligence or reckless disregard for either

6   plaintiffs' privacy rights.

7       With respect to Netflix, on summary judgment, the Court

8   found that a reasonable jury could conclude that Netflix acted

9   with reckless disregard of plaintiffs' privacy rights because

10  Netflix did nothing to ensure that plaintiffs' names could be

11  legally used other than requiring Realhouse to promise that it

12  would hire clearance counsel.

13      However, Zana Lawrence's uncontroverted testimony shows

14  that Netflix did take additional steps by approving Realhouse's

15  choice of clearance counsel and demanding deliverables from

16  Realhouse which ensured that the required clearance work had

17  been completed.

18      Mr. Mizrahi, who at the time he did his testimony, was

19  retired counsel from Netflix, further testified to the

20  qualifications of Realhouse's clearance counsel.  Although

21  Netflix did not itself perform any of the clearance work, the

22  contradicted evidence is that Netflix did take steps to ensure

23  that work had been done and had been done by a preeminently

24  qualified attorney.

25      The trial record, unlike the summary judgment record, shows

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-554

1    that Netflix did more than simply pass the buck to Realhouse.

2    In light of this additional trial evidence, even considering

3    the evidence in the light most favorable to the plaintiffs,

4    there is no evidence that Netflix acted with gross negligence

5    or reckless disregard for either plaintiffs' privacy rights.

6        At oral argument, the plaintiffs argued that additional

7    evidence adduced at trial supports their claim for punitive

8    damages.  Plaintiffs referred to evidence from the film about

9    the danger posed by Donald Cline, specifically that he brought

10   a gun to meetings with others and that he is a convicted felon,

11   and the sickening nature of Donald Cline's action.  However, as

12   the Court has repeatedly held, the film's depictions of Donald

13   Cline is not probative of the plaintiffs' claims, nor are the

14   film's creative depictions of Donald Cline's actions or

15   motivations.  The defendants' knowledge of the potential risk

16   of harm to plaintiffs is probative, but for the reasons

17   explained above, the trial evidence about the precautions and

18   assurances defendants employed precludes a verdict in

19   plaintiffs' favor on the question of punitive damages.

20       Plaintiffs' arguments about defendants' disregard for the

21   consequences to the plaintiffs is likewise unpersuasive.  The

22   specific question before the Court for purposes of punitive

23   damages is whether the defendants acted with reckless disregard

24   for the plaintiffs' legal privacy rights.

25       As we all know, the tort of invasion of privacy by public

*JOURDAN COYNE - CROSS/MacGILL*                Vol. 3-555

1    disclosure of a private fact has four elements:  One,

2    defendants disclosed information that was private in nature;

3    two, to the public; three, that was highly offensive to a

4    reasonable person; and, four, not of legitimate concern to the

5    public.  So consent is not an issue.

6        Based on all of the evidence presented in plaintiffs' case

7    in chief, with all reasonable inferences being drawn in

8    plaintiffs' favor, the Court concludes that there would be no

9    legally sufficient basis for the jury to conclude that either

10   defendant acted with gross negligence and reckless disregard

11   for plaintiffs' privacy rights and not the result of a mistake

12   of fact or law, honest error of judgment, overzealousness, mere

13   negligence, or other human failing.

14       So based on the current trial record, defendants' motion

15   for judgment as a matter of law, pursuant to Federal Rule of

16   Civil Procedure 50(a), is granted.

17       All right, lawyers, are you ready to bring the jury -- the

18   witness back in?

19            MR. BRIAN:  Yes, we are, Your Honor.

20            Two things.  I would ask that the exhibits that were,

21   I guess, conditionally admitted, the financial records, be not

22   admitted or deadmitted, if that's a word, stricken.  I don't

23   have those exhibit numbers at hand.

24            And, then, secondly, Your Honor, at the close of

25   Ms. Jourdan's testimony, maybe it will be a good time to break,

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-556

1    but I would ask for probably five or ten minutes so that we

2    can caucus and decide whether we're going to call -- we've

3    already advised counsel we're not calling Ms. Shapiro.   In

4    light of Your Honor's ruling, we need to discuss whether we

5    would call Mr. Wickers.

6            THE COURT:  Okay.

7            MR. BRIAN:  So I'll need a break, not a very long

8    break, but some break.

9            THE COURT:  Okay.  All right.  We can -- we'll work on

10   that exhibit once you guys get the number.  We can do that at

11   the break, also.

12           All right.  Let's get the witness back in here.

13           Where is your witness?

14           MR. BRIAN:  We're trying to find her.

15           THE COURT:  Oh, you're trying to find the witness?

16           MR. BRIAN:  Ms. Young's going to find her right now.

17           THE COURT:  Okay.  And, Sarah, you can get the jury

18   lined up.

19           MR. BRIAN:  Your Honor, just for the record, those

20   exhibits would be 392, page 3; 389A, and 393.  And I think they

21   would be -- not be admitted at this point.  So I guess I would

22   ask they be stricken or somehow not admitted.

23           THE COURT:  All right.  And over the plaintiffs'

24   objection, I will grant your request and we'll withdraw those

25   exhibits.

1          COURTROOM DEPUTY:  All rise.

2      (Jury in at 2:02.)

3          THE COURT:  We're back on the record.  The witness is

4   back on the stand.  You're still under oath.

5          You may continue your cross-examination.

6          MR. MacGILL:  Thank you.  Thank you, Your Honor.

7   BY MR. MacGILL:

8   Q.  Welcome back, ma'am.  I want to follow up.

9      Before lunch, your counsel -- counsel for Netflix and

10  Realhouse asked you -- now, I'll do my best to quote just to

11  orient you to the question -- whether any -- whether counsel

12  told you if any of the names on 23andMe were -- needed to be

13  blurred; do you remember that question?

14  A.  Yes.

15  Q.  Okay.  Now, relative to that question, I want to focus

16  on -- Mr. Wickers was the counsel; is that correct?

17  A.  Yes.

18  Q.  Okay.  I want to focus on what Realhouse submitted to

19  Mr. Wickers.  Do you understand what I'm saying in terms of his

20  review?

21  A.  Yes.

22  Q.  And do you understand that he -- it was -- there was a

23  clearance log that was submitted to him?

24  A.  Yes.

25  Q.  Okay.  And, again, submitted to Mr. Wickers by Realhouse;

1  right?

2  A.  Yes.

3  Q.  And that was part of the function that you participated in

4  as the director.  At least in the general sense, you knew that

5  was going on --

6  A.  Yes.

7  Q.  -- separately?

8      Okay.  Now, let's look at -- you understand that the

9  scenes -- the scene that included Sarah Bowling was not on the

10  clearance log; right?

11  A.  I do not understand that.  I did not know.

12  Q.  You understand -- at the time you gave that testimony, I

13  take it, then, when you told this Court that no one told you

14  that any names for 23andMe were not to be blurred, you didn't

15  know that at the time you so testified?

16  A.  I was told there was no names that needed to be blurred.

17  Q.  Okay.  You were told that by -- okay.  So that's what you

18  were told at one point in time; right?

19      But you were told that by Mr. Wickers?

20          MR. BRIAN:  Objection.  I don't think the witness

21  answered the question, Your Honor.

22          THE COURT:  Yeah, she didn't understand the question.

23  A.  I'm confused.

24  BY MR. MacGILL:

25  Q.  You were told by counsel that -- well, you were asked --

1    let me ask, make sure I'm precise.

2             THE COURT:  All right.  We're going to strike all

3    that.  Start over.

4             MR. MacGILL:  Thank you.

5             THE COURT:  Okay.

6    BY MR. MacGILL:

7    Q.  You were asked on direct examination about the question of

8    blurring names on the 23andMe scene; do you remember that?

9    A.  By this counsel?

10   Q.  Yes.

11   A.  Yes.

12   Q.  Okay.  Right.  Now, and you testified that no one told you

13   that any of the names on the 23andMe scene need to be blurred.

14   Do you remember saying that?

15   A.  Yes.

16   Q.  No one told you --

17   A.  No.

18   Q.  -- right?

19        Now, are you aware that Realhouse submitted a clearance log

20   with scenes in it to be cleared to Mr. Wickers?

21   A.  Yes.

22   Q.  All right.  And you're also -- I take it from your prior

23   testimony, you were not aware that the scene including Sarah

24   Bowling was not on the clearance log given by Realhouse to

25   Mr. Wickers; is that correct?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-560

1    A.  I don't remember the clearance log.

2    Q.  And you don't --

3    A.  What was on it.

4    Q.  And you don't know whether or not he was, in fact, included

5    on that -- that Sarah Bowling scene was, in fact, included on

6    the clearance log given to Mr. Wickers; right?

7    A.  It likely would have been.

8    Q.  Okay.  Do you know whether the scene including Lori Kennard

9    was included on the clearance log?

10   A.  I don't know specifically, but it should have been, yes.

11   Q.  Should have been.  And should the Sarah Bowling scene have

12   been included on the clearance log given to Mr. Wickers?

13   A.  The entire film would be given -- like, would be broken

14   down in the clearance log.  So, yes, it should be in there.

15   Q.  Into segments that you would clear?

16   A.  Yes.

17   Q.  Okay.  And are you saying that you understood or had some

18   understanding that the scene or the frame showing Sarah

19   Bowling's name would be included?

20   A.  Yes.

21   Q.  On the clearance log?

22   A.  Yes.

23   Q.  Given to Mr. Wickers?

24   A.  Yes.

25   Q.  All right.  I'm going to pull up Exhibit 9002.  And I'm

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-561

1   going to ask you if you reviewed the request for admissions,

2   these requests for admissions that are now in front of you.

3   And this is Exhibit 9002 that has been admitted into evidence.

4   A.  I have not seen this before.

5   Q.  Request No. 13:  Admit that Realhouse's clearance logs do

6   not reference the scenes of *Our Father* in which plaintiffs'

7   names are identified.

8        Netflix's response:  Admitted.

9        Realhouse's response:  Admitted.

10       Do you see that?

11  A.  I see it.

12  Q.  Okay.  Let's go to the next admission.

13       And you've not seen this before?

14  A.  No.

15  Q.  And no one showed that to you prior to the time that you

16  gave the testimony to this jury this morning in response to

17  Mr. Brian's questions; is that correct?

18  A.  Yes.

19  Q.  All right.  Let's look at Request No. 14:  Admit that

20  Realhouse's clearance logs do not address the film scenes in

21  which plaintiffs' names appear.

22       Netflix's response:  Admitted.

23       Realhouse response:  Admitted.

24       Do you see that?

25  A.  Yes.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-562

1  Q.  You didn't see that request for admission response prior to

2  giving your testimony in this courtroom today; is that correct?

3  A.  No.  No.

4  Q.  Now, before lunch, you had indicated in your testimony that

5  you made creative decisions in this movie; is that right?

6  A.  Yes.

7  Q.  All right.  And including the inclusion of the Sarah

8  Bowling name, as one example?

9  A.  Yes.

10  Q.  Now, you understood, too, that in terms of the workflow,

11  that Netflix retained final editing rights?

12     Did you understand that?

13  A.  Yes.  It's a strangely worded question.  They wouldn't edit

14  anything different than what we had all discussed together.

15  Q.  Well, but they had the right -- you understood that they

16  became the owner of the movie once you finished with it?

17  A.  Yes.

18  Q.  And that they had the copyright, for example?

19  A.  Yes.

20  Q.  And that they could edit it as they chose once they became

21  the owner; right?

22  A.  Yes, but there's no one else involved other than the editor

23  and people who were already doing it.

24  Q.  But just looking, if we could, at just Netflix, Netflix, as

25  you understood things, had the right, once it became the owner

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-563

1    of the film, to edit the film to its specifications or

2    requirements?

3    A.  Yes, as a company.

4    Q.  Okay.  Now, just looking at Lori Kennard and your work in

5    connection with you -- well, let me ask you generally.  Let me

6    start with a general question.

7        Did Mrs.-- Mrs. Kennard, who is in the courtroom, have, as

8    you understood it, privacy rights at the time of the *Our Father*

9    film?

10   A.  I feel she gave them up, so no.

11   Q.  Gave them up.  You say that she gave them up?

12   A.  I did not, at the time, believe she had the right to the

13   privacy of the name.

14   Q.  Okay.  Do you believe today that she has a right of privacy

15   as you sit here this afternoon?

16   A.  I think you have a right to privacy, but specifically to

17   this, to the name, no.

18   Q.  Okay.  Did Sarah Bowling, also in the courtroom here with

19   us today, have rights of privacy as you understood it, at the

20   time that the film was published?

21   A.  No.

22   Q.  Now, you testified, when Mr. Brian was asking you questions

23   on direct examination, about the number of names used in the

24   film; right?  Do you recall that?

25   A.  The number of names specifically?

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-564

1  Q.  Yes, the different names that were included.

2  A.  Different names, yes.

3  Q.  And you wanted as many names as you could get; fair

4  statement?

5  A.  Yes.

6  Q.  Okay.  And you'll agree that all names of the siblings were

7  not needed; right?

8  A.  True.

9  Q.  Okay.  And specifically, it was -- as far as Lori Kennard

10  was concerned, her specific name was not needed in the film;

11  right?

12  A.  No.

13  Q.  And Sarah Bowling's name, individually, was not needed in

14  the film; was it?

15  A.  Specifically her name?  No.

16  Q.  And as far as Sarah was concerned, I guess there was

17  more -- there are more specifics.  You agree, do you not, that

18  Sarah Bowling was not a key part of the film?

19  A.  I agree.

20  Q.  And you also agree that she's not a key sibling, as far as

21  you're concerned?

22  A.  I agree.

23  Q.  But nevertheless, her name remained in the film; correct?

24  A.  Yes.

25  Q.  Now, I want to turn to 23andMe.  There's --

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-565

1            MR. MacGILL:  And I would like to call up Exhibit 135,

2    if I could.

3    BY MR. MacGILL:

4    Q.  And do you recognize this Exhibit 135?

5    A.  I've not seen this particular exhibit before, but I see it

6    now.

7    Q.  Okay.  And you see it's a 23andMe posting?

8    A.  It appears to be, yes.

9    Q.  And you see there's a heading here:  Unknown relative,

10   unknown parent?

11   A.  Yes.

12   Q.  And where does it show that Dr. Cline is the father of

13   this -- of the plaintiff here?

14   A.  I do not.

15   Q.  You do not see it?

16   A.  No.

17   Q.  The answer is you do not, all right.

18        Now, with respect to the knowledge that you had at the time

19   as the director, you knew from at least the year 2021, that

20   the -- pardon me, you knew from at least the year 2021 that

21   23andMe shows, quote, unknown father, unquote, for these

22   plaintiffs; right?

23   A.  I did not know that.

24   Q.  Okay.  Let's make sure we get this individually.  I want to

25   break it down into two questions.

1      Did you notice in 2021 that the 23andMe listing for

2  Mrs. Bowling showed unknown father?

3  A.  No, I did not have access to her 23andMe.

4  Q.  Did you know, as early as 2021, that the 23andMe site

5  showed unknown father for Mrs. Kennard?  Did you know that?

6  A.  No.

7  Q.  Okay.  I'm going to refer to Exhibit 128.

8      Now, do you recall being questioned about this earlier?

9  A.  Yes.

10 Q.  And let's go back to page 1, if we could, just to remind

11 you.  Do you see this is an e-mail from you to different -- to

12 Maddie Wagg and cc'd to others; do you see that?

13 A.  Yes.

14 Q.  This is in what year?

15 A.  2021.

16 Q.  And what was your subject?

17 A.  *Our Father* progress.

18 Q.  And you copied different people from Blumhouse Productions?

19 A.  Yes.

20 Q.  And you then gave notes for your call; is that right?

21 A.  Yes.

22 Q.  All right.  Now, focusing on this e-mail that you sent in

23 July of 2021 -- let's go to the next page.

24     And I want to blow up a portion of this that Mr. Brian

25 reviewed to you -- with you.  But with respect to the game

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-567

1    plan, you were authorizing the game plan; are you not?

2    A.  Yes.

3    Q.  This is your game plan as the director?

4    A.  Yes.

5    Q.  And the words that -- I think you said the capitalized

6    words were yours; is that right?

7    A.  Yes.

8    Q.  And the lower case words are whose?

9    A.  Maddie Wagg.

10   Q.  Okay.  Now, with respect -- a couple of things.  The

11   capitalized words with you at the time in 2021, what you said

12   for your part in your capitals, is all the siblings -- well,

13   let me go to the next, if I could.  Let me start over.

14       First, since the 2023, 23andMe, let's look at what was

15   said -- all right.  Third time is going to be the charm.

16       In capitals, you wrote:  As all the siblings at this

17   juncture want to remain anonymous, we can just use the standard

18   female and male icons -- no names, just half-sister or

19   half-brother; right?

20   A.  Yes.

21   Q.  That was the game plan in 2021.

22   A.  Correct.  For this specific scene, yes.

23   Q.  And with respect to going back up, if we go back up, you

24   also had knowledge about 23andMe that is reported in this

25   e-mail; right?

1    A.  This is a recreation moment.  It's not an actual image of

2    23andMe.  It's a graphic representation.

3    Q.  Okay.  Now, with respect to the graphic representation that

4    you were reiterating a game plan about with your comments, you

5    can see in your bold, your words were:  This should echo

6    closely 23andMe home screen; right?

7    A.  Yes.

8    Q.  And we just looked at a home screen; right?

9    A.  Yes.

10   Q.  It says:  Unknown father, unknown relative; right?

11   A.  Yes.

12   Q.  Okay.  Now, you then, in your caps, it says:  A circle for

13   her mother and a circle for unknown father.  Your words, in

14   capitals; right?

15   A.  Yes.

16   Q.  So you knew as of 2021, that 23andMe, with respect to these

17   plaintiffs, showed unknown father?

18   A.  No.

19   Q.  You knew 23andMe, for at least some of the siblings, showed

20   unknown father?

21   A.  No.

22   Q.  Why, you wrote these words?

23   A.  This is in reference to a dated image of the very first

24   time Jacoba discovers, and at that time, they didn't know it

25   was Donald Cline.  And so it was, therefore, an unknown father.

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-569

1  This is recreating a moment from the past, nothing to do with

2  2021.

3  Q.  But what -- all right.  Well, let's look at -- at the time

4  you wrote this e-mail, what you said:  This should -- this

5  should echo -- here is the -- here's Exhibit 135, showing

6  unknown relative.  That's what you were dealing with at the

7  time; right?

8  A.  Yes.

9  Q.  You knew that's what 23andMe showed; correct?

10  A.  Yes.

11  Q.  All right.  Now, with respect to the siblings involved

12  here; right?

13  A.  No.  With respect to the seven siblings initially

14  discovered.

15  Q.  Okay.

16  A.  Before Don Cline was identified as the father.

17  Q.  With respect to seven siblings, you knew as of 2021, that

18  you saw unknown father references repeatedly as to each of

19  those; is that right?

20  A.  It was a creative decision to create that.  It wasn't -- it

21  was to echo 23andMe, but it wasn't a representation of 23andMe.

22  It was a creative decision to have this moment look like a

23  23andMe page.

24  Q.  Okay.  But you knew the 23andMe page in real life showed

25  unknown father; right?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-570

1  A.  I believe so, yes.

2  Q.  In fact, we can see that from the words that you wrote here

3  in capitals.  You knew that in real life that 23andMe, what it

4  showed, if we can go to the next -- go back to the other

5  exhibit.

6          THE COURT:  You need to put the exhibit numbers in the

7  record.

8          MR. MacGILL:  Let's go back to Exhibit 128.

9  BY MR. MacGILL:

10 Q.  In capitals, what you said, and let's just look -- these

11 are -- again, just to repeat, what appears in capitals are from

12 you; correct?

13 A.  Yes.

14 Q.  All right.  And what you say is specifically with

15 respect -- you want to echo closely 23andMe home screen; right?

16 A.  Yes.

17 Q.  A circle for unknown father, your words; is that correct?

18 A.  Yes.

19 Q.  Now, ma'am, you know as you sit here today that the 23andMe

20 site pertaining to Sarah Bowling did not include the name of

21 her biological father; correct?

22 A.  What I just saw, yes.

23 Q.  And you also know -- what you just saw for the first time?

24 A.  Sarah Bowling's 23andMe?  Yes.

25 Q.  Yes.  And you had never seen that before?

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-571

1    A.  No.

2    Q.  And you never saw that, at the time you were a director;

3    right?

4    A.  No.

5    Q.  In fact, when you were directing people as to who was going

6    to do what, you didn't know what her 23andMe site actually

7    said; did you?

8    A.  She wasn't involved at the time.

9    Q.  Okay.  Now, if we look at -- with Lori Kennard in 2021,

10   when you were being a director there, you didn't know what Lori

11   Kennard's 23andMe site said; right?

12   A.  No.

13   Q.  And with respect to that, as you sit here today, you don't

14   know what Lori Kennard's 23andMe site shows?

15   A.  No.

16   Q.  Yet you made a decision to tie Mrs. Bowling to Donald Cline

17   based on a 23andMe recreation when her 23andMe site did not

18   show Donald Cline; did it?

19   A.  That's not true.

20   Q.  Okay.  You want to look at it again?  Let's go back to

21   Exhibit 135.

22   A.  This is for the first seven siblings back in, I believe

23   it was 2003 or four, so they weren't involved at the time.

24   Q.  Okay.  Let's talk about May of 2022 when the film was

25   published.  At the time the film was distributed by Netflix,

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-572

1    the 23andMe slide showed up; right?

2    A.  The graphic?

3    Q.  Yeah, the graphic, I should say.

4    A.  Yes.

5    Q.  That graphic showed up, and it showed Sarah Bowling?

6    A.  No.

7    Q.  It showed a picture of Sarah Bowling?

8    A.  No.

9    Q.  No?  Where was the -- where was the, where was Sarah --

10   where was Sarah's picture depicted in the movie?

11   A.  In a real life version of Jacoba going through her 23andMe,

12   this is a graphic representation at the beginning of the film

13   that does not include her.

14   Q.  Okay.  But looking at what actually got included in the

15   film, as the director of the film, what you decided to do is

16   include a graphic or a picture of Jacoba scrolling through a

17   23andMe site; right?

18   A.  I did not make a graphic to do that, no.

19   Q.  What did you do?

20   A.  I -- this is not that graphic, and it does not -- Maddie

21   Wagg had nothing to do with this graphic.

22   Q.  Who put this graphic in the movie?

23         MR. BRIAN:  Your Honor, I'm going to object.  Unless

24   he's asking about this exhibit, I'm going to object to him

25   having it on the screen.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-573

1        THE COURT:  This is what we're talking about?

2        MR. MacGILL:  Yeah.

3        MR. BRIAN:  Okay.

4        THE COURT:  Okay.

5   BY MR. MacGILL:

6   Q.  Who put this graphic in the movie?

7   A.  This is not a graphic.  This is just a filming of

8   somebody's computer.

9   Q.  I stand corrected.  Who decided to include the filming of

10  what?

11  A.  Jacoba's 23andMe?  I did.

12  Q.  You did.

13  A.  Yes.

14  Q.  Okay.  Pardon me one second.

15      So you decided to include in the movie the filming of this

16  particular scene.

17  A.  Yes.

18        MR. BRIAN:  May I ask for exhibit numbers so the

19  record is clear.

20        MR. MacGILL:  135.

21  BY MR. MacGILL:

22  Q.  So with respect --

23        THE COURT:  Not 135, 035.

24        MR. MacGILL:  I am sorry.  My mistake.  Thirty-five.

25        THE COURT:  Right.

*JOURDAN COYNE – CROSS/MacGILL*          Vol. 3-574

1   BY MR. MacGILL:

2   Q.  So ma'am, so at the time that you made that decision, you

3   hadn't even looked at the 23andMe site of Sarah Bowling to

4   determine whether her biological father was referenced; had

5   you?

6   A.  No.

7   Q.  Okay.  The same is true with Lori Kennard.  At the time the

8   movie was published, you had never looked at her 23andMe site?

9   A.  No.

10  Q.  Okay.  Now, just going back to your decisions on whether to

11  blur or not, you testified earlier that Jacoba gave you

12  guidance on some names that she wanted blurred; right?

13  A.  She made the request to blur certain names.

14  Q.  And based on her request, you blurred names; right?

15  A.  Yes.

16  Q.  Okay.

17          MR. MacGILL:  And let's take a look at Exhibit 35

18  again.

19  BY MR. MacGILL:

20  Q.  We see that -- you see on this Exhibit 35 that Sarah

21  Bowling is not blurred, but you have -- we have five different

22  siblings that are blurred.  Do you see that?

23  A.  Yes.

24  Q.  Were those all at the request of Jacoba Ballard?

25  A.  Yes.

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-575

1   Q.  Not because you made a separate privacy evaluation?

2   A.  No.

3          MR. MacGILL:  Let's go to Exhibit 14, if we could.

4   BY MR. MacGILL:

5   Q.  Now, just in general terms, is this an e-mail from Joelle

6   Shapiro to you, Lucie Jourdan, on May -- pardon me, March 29,

7   2022?

8   A.  Yes.

9   Q.  Okay.  And with respect to this particular e-mail, and I'll

10  refer to -- this is Joelle to you; correct?

11  A.  Yes.

12  Q.  All right.  And if we could blow up the portion -- if you

13  could look on your screen, and there's a statement beginning:

14  Correct, sometimes we have to be a bit more cautious.  So

15  March 29 -- let me see if I can find it.  Yeah.

16      So in the first sentence, there is a reference in Joelle

17  Shapiro's e-mail to you.  Do you see it says:  Correct,

18  sometimes we have to be a bit more cautious for marketing,

19  especially in pre-promotion, so we will blur to be extra safe.

20      Is that; you understand that?

21  A.  Yes.

22  Q.  And you were communicating with Joelle Shapiro of Netflix;

23  is that right?

24  A.  Yes.

25  Q.  Okay.  Now, with respect to being more cautious -- so you

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-576

1    understood at least the marketing arm wanted to exercise some

2    caution in the marketing pre-promotion phase; is that fair?

3    A.   Yes.

4    Q.   Okay.  Now, over time you understood that Joelle Shapiro

5    and others would be doing some marketing in pre-promotion for

6    the film?

7    A.   Yes.

8    Q.   Okay.  I have some general questions for you.  If we could

9    look at Exhibit 1039, and this -- if you would look at your

10   binder --

11             THE COURT:  All right.  You have Exhibit 14 up.

12             MR. MacGILL:  Yeah, we should not do that.

13             THE COURT:  Okay.

14             MR. BRIAN:  Your Honor, I don't have that.

15             MR. MacGILL:  Let me get the other binder.

16             May I approach the witness, Your Honor?

17             THE COURT:  You may, counsel.

18   BY MR. MacGILL:

19   Q.   So this is Exhibit 1039, and I'm going to hand this to your

20   counsel, as well.

21             MR. BRIAN:  Thank you, counsel.

22   BY MR. MacGILL:

23   Q.   And just for -- I would like to identify this first, and

24   then I've just got a couple -- a general question for you.

25        So do you see this e-mail, 1039, and I'll state for the

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-577

1   record this is a stipulated exhibit admissible into evidence.

2   Do you see this e-mail chain that starts from Cara Benson at

3   the top, and there's a series of people that are referenced

4   here?

5   A.  I see it.

6   Q.  Okay.

7        MR. MacGILL:  In general terms, at this time, we'd

8   offer into evidence 1039.

9        MR. BRIAN:  Objection, no foundation.

10       THE COURT:  Well, he just said it is stipulated.

11       MR. MacGILL:  It's a stipulated exhibit.

12       MR. BRIAN:  Let me look.  No objection, Your Honor.

13       THE COURT:  1039 is admitted into evidence pursuant to

14  stipulation of the parties.

15            *(Plaintiffs' Exhibit 1039 was*

16            *received in evidence.)*

17       MR. MacGILL:  Thank you.

18       I want to just return, Exhibit 1039.  I would like

19  you -- I'm going to display that.  With the Court's permission,

20  may we display 1039?

21       THE COURT:  You may.

22  BY MR. MacGILL:

23  Q.  So looking at 1039, I want to move to page 7 at the bottom,

24  and I have just a general question in terms of your general

25  understanding; okay?  So let me -- let me read this to you,and

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-578

1   I have a question for you.

2       So here you see Joelle Shapiro wrote:  Hey, Ty, we have a

3   super creepy new doc film full of twists and turns.  I have a

4   few ideas, but I would love to talk with you about it.

5       As director of the film, do you think that's a fair

6   characterization of the film that you directed?

7           MR. BRIAN:  Objection, no foundation on this document,

8   Your Honor, for her.

9           THE COURT:  She can answer.

10  A.  It's super creepy?  No, I wouldn't describe it as super

11  creepy, personally.

12  BY MR. MacGILL:

13  Q.  Fair enough.  And then, so let's turn to the top of page 7,

14  if we could.

15      This is Mr. Budde at WeAreBOND.  Is that anyone you work

16  with?

17  A.  No.

18  Q.  I just want to ask you as director, there's a reference

19  here to quote, very creepy.  I take it you wouldn't agree with

20  that either?

21  A.  I think it does the film a disservice, personally.

22  Q.  Okay.  Now, if we go to page 6, at the bottom of page 6, a

23  couple of other quick questions for you.

24      On January 25th, Joelle Shapiro wrote:  Haha, it's so crazy

25  it comes out 5/18.  We do envision this being a social convo

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-579

1   that really takes off, but I'm looking for help on ideas on how

2   to responsibly do that while also feeling entertaining.  Also

3   struggle with true crime.

4       Do you see that?

5   A.  Yes.

6   Q.  Now, two questions:  Do you know what a social convo is in

7   connection with promoting the film you directed?

8   A.  Yes.

9   Q.  What is that?

10  A.  It will be, kind of, talked about in social circles.

11  Q.  All right.  Now, did you feel, as director, that your film

12  should be promoted responsibly?

13  A.  Yes.

14  Q.  And she writes here:  We're looking for help on ideas as to

15  help to responsibly do that.

16      Do you see that?

17  A.  Yes.

18  Q.  Okay.  Let's go to page 3.  And did you agree with that?

19  A.  Yeah.

20  Q.  All right.  Let's go to the page 3.  Now, looking at the

21  bottom of page 3, this is February 3rd, 2022.  And I want to

22  ask you a general question.  Were you -- do you see this

23  reference to the trailer:  It just may be more exciting to

24  watch.

25      As director of the film, were you involved with the

*JOURDAN COYNE - CROSS/MacGILL*                     Vol. 3-580

1  trailer?

2  A.  Only in giving notes.

3          MR. MacGILL:  Okay.  We can take that down.

4  BY MR. MacGILL:

5  Q.  So I have a couple of other questions for you as the

6  director.

7          MR. MacGILL:  And if I may hand the witness

8  Exhibit 1041, Your Honor.

9          THE COURT:  You may.

10         MR. MacGILL:  And, this, Your Honor, is also a

11 stipulated exhibit.  We would offer it into evidence.

12         MR. BRIAN:  Objection, Your Honor.  It's -- maybe I

13 should use the equipment.

14         THE COURT:  And I don't have a copy of what it is.

15         MR. MacGILL:  I'm sorry.

16         THE COURT:  We'll put on our equipment.

17         MR. MacGILL:  Thank you.

18     (Bench conference on the record.)

19         THE COURT:  What's your objection, counsel?

20         MR. BRIAN:  Can you hear me?  Your Honor, there were

21 two categories of stipulated exhibits, those that were

22 stipulated to be admissible under any circumstance, and those

23 that were stipulated if they were used with a sponsoring

24 witness.  This witness is not on this e-mail and he cannot lay

25 a foundation and therefore it's not admissible pursuant to the

1  stipulation because she can't possibly be a sponsoring witness,

2  as there's no foundation to ask her anything about it.

3         MR. MacGILL:  Your Honor, referring to the

4  stipulation, the stipulation expressly confirms this will be

5  the case.  We say in the stipulation that we -- the stipulation

6  says, in pertinent part:  The following exhibits are admissible

7  at trial and may be provided to the jury for deliberations

8  provided they are used in an examination of a witness at trial.

9         So that was the agreement coming in.  And this is a

10  document, 378.

11         MR. BRIAN:  That's correct, but they have to be used

12  for a witness for whom there's a foundation.  You can't just

13  show any exhibit to a witness and claim it comes in evidence.

14         MR. MacGILL:  This is exactly what we stipulated to,

15  and we have questions.  She was asked on direct examination

16  about the trailer and the promotion of the movie and we're

17  going to ask this witness about the statements made about the

18  trailer performing well and that's the reality here that we

19  want to ask her about.

20         MR. BRIAN:  I'll have to look back.  I don't think I

21  asked her questions about the trailer.  She did testify that

22  the movie got good reviews, the movie, not the trailer.

23         THE COURT:  So, counsel, go ahead and give some kind

24  of foundation that she did have something to do with the

25  trailer.

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-582

1                        (Open court.)

2    BY MR. MacGILL:

3    Q.  So, ma'am, in general terms, were you -- you were aware

4    that the pre-promotion -- that there was going to be a

5    promotion of the movie; is that right?

6    A.  Yes.

7    Q.  And did you -- who was going to have responsibility for

8    creating a trailer; do you remember?

9    A.  Specifically, no.

10   Q.  At Netflix?

11   A.  Yes.

12   Q.  And was Joelle Shapiro involved in that?

13   A.  I think she oversaw it.

14   Q.  And you just described an exhibit pertaining to some of the

15   activities associated with that; do you recall that, just a few

16   minutes ago?

17   A.  Yes.

18          MR. MacGILL:  All right.  And, Your Honor, we would

19   offer, with that additional foundation, this exhibit.

20          MR. BRIAN:  Same objection, no foundation.

21          THE COURT:  I'll sustain.  You need a better

22   foundation, counsel.

23          MR. MacGILL:  Okay.

24   BY MR. MacGILL:

25   Q.  Do you have Exhibit 1041 in your hand?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-583

1    A.  Yes.

2    Q.  Okay.  Now, this was -- this was an e-mail by Mil-lady

3    (phonetic)?

4    A.  Milady.

5    Q.  Milady, thank you, Flores.

6         And you were copied on this e-mail; were you not?

7    A.  Yes.

8    Q.  And this is pertaining to *Our Father* trailer exclusive?

9    A.  Yes.

10   Q.  Okay.  And with respect to that --

11        MR. MacGILL:  I offer into evidence Exhibit 1041.

12        MR. BRIAN:  Same objection.

13        THE COURT:  Because she was copied on the e-mail, the

14   Court will allow into evidence 1041 over the defendants'

15   objection.

16             *(Plaintiffs' Exhibit 1041 was*

17             *received in evidence.)*

18        MR. MacGILL:  May we publish the exhibit, Your Honor?

19        THE COURT:  You may.

20        MR. MacGILL:  Okay.

21   BY MR. MacGILL:

22   Q.  Now, looking at this -- at this exhibit, you see that it

23   was an April 19, 2022, e-mail at 7:09 p.m.  Do you see that?

24        THE COURT:  Blow it up.

25   A.  7:08 p.m.?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-584

1   Q.  My mistake.  Hold on a second.  Page 1 at the bottom.

2   A.  7:08 p.m.

3   Q.  Yep, 7:08.  You see at 7:08 p.m., Joelle Shapiro wrote.

4       Do you see that?

5   A.  Yes.

6           MR. MacGILL:  Let's blow that up, if we could.

7   BY MR. MacGILL:

8   Q.  She writes to you, to the persons copied on the e-mail:

9   The trailer is performing extremely well, basically everywhere.

10      Do you recall getting that information?

11  A.  That's not what's said here, but it's implied, I suppose.

12  Q.  Okay.  Let's just reread.  The trailer is performing

13  extremely well, basically everywhere.

14      Do you see that?

15  A.  Oh, sorry.  I'm at the top of it.  Yes.

16  Q.  Okay.  Then it says our Netflix, YouTube -- on our Netflix

17  YouTube, this is one of our highest performing true crime

18  trailers ever.

19      Do you see that?

20  A.  Yes.

21  Q.  All right.  Now, it also -- then we get to top conversation

22  themes.  Do you see that?

23  A.  Yes.

24  Q.  Now, this is Ms. Shapiro describing the jaw-dropping

25  chilling subject matter.  Do you agree -- as director of the

*JOURDAN COYNE – CROSS/MacGILL*                    Vol. 3-585

1   film; do you agree with that?

2   A.  Yes.

3   Q.  Okay.  Next you see:  Viewers were left with disgust for

4   the actions of Cline and further horrified and frustrated.

5       Do you see that?

6   A.  Yes.

7   Q.  And do you think that's fair, based on your work as the

8   director of the film?

9   A.  Yes.

10  Q.  Did you understand that also, as a part of this effort,

11  there was going to be -- there was going to be an effort to do

12  further promotion beyond the trailer itself?

13  A.  Yes.

14  Q.  Okay.  And what were the forms of promotion beyond the

15  trailer itself?

16  A.  There was a billboard in Times Square.

17  Q.  Okay.  And what else -- what else was there?

18  A.  I can't recall specifics.

19  Q.  Okay.  I'm going to hand you Exhibit 316.  I'll hand it to

20  the judge real quick.

21      So do you have Exhibits 316 in your hand?

22  A.  Yes.

23  Q.  Okay.  And this says social campaign calendar.  Do you see

24  that?

25  A.  Yes.

*JOURDAN COYNE - CROSS/MacGILL*          Vol. 3-586

1  Q.  Now, were you involved in the communications around this

2  social campaign?

3  A.  I don't believe I've ever seen this before.

4  Q.  You have not seen this before?

5  A.  This specific, no, I don't recall this.

6  Q.  All right.  Let me ask a couple of other questions.  Are

7  you familiar with efforts or an analysis being made in early

8  May of 2022 that -- of how there could be promotion on what is

9  referred to as FB reels?

10 A.  No.

11 Q.  Do you know what that is?

12 A.  I do not.

13 Q.  Do you know what Netflix film copy is?

14 A.  I imagine it's a copy of the film from Netflix.  I don't

15 know.

16 Q.  Okay.  Did you participate in meetings where there was

17 discussion around having a positioning of your film to the

18 effect that:  Somebody didn't really want their secret getting

19 out, huh?  Well, now the secret is out.

20      Do you recall being involved in conversations involving

21 that approach?

22          MR. BRIAN:  Objection, vague, compound.

23          MR. MacGILL:  Let me re-- I'll restate.

24          THE COURT:  Thank you.

25 BY MR. MacGILL:

1  Q.  All right.  Do you remember having conversations with the

2  promotion teams at Netflix about -- specifically, about getting

3  the, quote, secret out?

4  A.  Not specifically, but I'd have to reference or see

5  something.

6  Q.  All right.  Let me ask you to take a look at page --

7        MR. MacGILL:  And we'll publish, 2734, Netflix 2734 on

8  your --

9  BY MR. MacGILL:

10  Q.  On the document that is in front of you, page 6.

11      Do you have page 6 in front of you?

12  A.  I do.

13  Q.  I would ask you to read, only to yourself, what appears

14  under FB reels post-copy.  Do you see that?

15  A.  Yes.

16  Q.  Okay.  Please read that to yourself.

17      Have you done that?

18  A.  Yes.

19  Q.  And do you remember having conversations amongst the

20  Realhouse team and the Netflix team along this topic?

21  A.  Not specifically, no.

22  Q.  Okay.  You testified on direct examination that you never

23  intended to do any harm.  Do you remember that?

24  A.  Yes.

25  Q.  But you depicted Dr. Cline as you did in the movie; right?

*JOURDAN COYNE - CROSS/MacGILL*                    Vol. 3-588

1   A.  Yes.

2   Q.  And he was shown to be, by the movie, evil; fair?

3   A.  That's a -- that's someone's opinion of it, sure.

4   Q.  His partner in your film said that he was evil.  His former

5   partner in your film said he was evil; right?

6   A.  I can't remember if he was evil or the actions were evil,

7   specifically.

8   Q.  Okay.  Fair enough.  Well, but in any event, that was one

9   of the -- that was one of the objectives you had as director,

10  is to depict Dr. Cline in the film as evil; fair?

11  A.  No.

12  Q.  Okay.  If he wasn't evil, what was he, in your judgment, in

13  terms of what you wanted to convey about the film?

14  A.  His abject violation of women.

15  Q.  Okay.  And felon, as well?

16  A.  Yes.

17  Q.  Okay.  A person who many people in your film, many women in

18  your film, felt that he had sexually abused them?

19  A.  Yes.

20  Q.  Okay.  And by virtue -- by your publication -- or by your

21  film, Sarah Bowling's name was connected to Dr. Cline; right?

22        MR. BRIAN:  Objection, asked and answered, Your Honor.

23        THE COURT:  She may answer.

24  A.  She was connected to Jacoba Ballard as a sibling.

25  BY MR. MacGILL:

*JOURDAN COYNE – REDIRECT/BRIAN*                    Vol. 3-589

1   Q.  And she was connected -- my question is, your film

2   connected Sarah Bowling to Donald Cline; did he not?

3   A.  You could extrapolate that, but it was never specific -- it

4   was specific that she was connected to Jacoba as a sibling.

5   Q.  Your film connected Mrs. Kennard to Donald Cline; did it

6   not?

7   A.  It connected Lori Kennard to Jacoba Ballard as a sibling.

8   Q.  And to Dr. Cline?

9   A.  You could extrapolate that, but it wasn't specific.  It

10  just connected them as siblings.

11          MR. MacGILL:  No further questions.

12          THE COURT:  Thank you.

13          Any redirect, counsel?

14          MR. BRIAN:  Very brief, Your Honor.

15                  **REDIRECT EXAMINATION**

16  BY MR. BRIAN:

17  Q.  Remind the Ladies and Gentlemen when you got your

18  associate's degree.

19  A.  2002.

20  Q.  And how long have you been doing documentary work?

21  A.  Since 2007.

22  Q.  Counsel asked you some questions about your depictions of

23  Donald Cline in the film.  Do you recall those questions,

24  generally?

25  A.  Yes.

1  Q.  At all times, did you try to depict Donald Cline truthfully

2  and accurately?

3  A.  Yes.

4  Q.  You testified in response to Mr. MacGill's questions that,

5  in your view, neither Ms. Bowling or Ms. Kennard had a right of

6  privacy over their name at the time of the filming of the film;

7  do you recall that?

8  A.  Yes.

9  Q.  And you testified that at least one of them gave those

10  rights up.  What did you mean by that?

11  A.  When you sign up for 23andMe, there's an option to remain

12  anonymous.  And there are many siblings.  I have no idea their

13  names, their gender, because they remained anonymous.  And

14  there's others who were public with that information and gave

15  it to -- gave it publicly.  So that is what I meant by giving

16  up privacy.

17  Q.  Do you have Exhibit 14 in front of you still?  I think that

18  may have been in the binder that counsel gave you.  Maybe we

19  can -- it's in evidence.  Maybe we can put that on the screen.

20          MR. BRIAN:  Oh, we need time to switch it.  There we

21  go.

22  BY MR. BRIAN:

23  Q.  And you see an e-mail from Joelle Shapiro to you?  Do you

24  see that?

25  A.  Yes.

1  Q.  And below that, on March 29, 2022, there's an e-mail from

2  you; is there not?

3  A.  Yes.

4  Q.  And you say:  Given the film went through a deep legal

5  pass.  Do you see that?

6  A.  Yes.

7  Q.  What did you mean by "a deep legal pass"?

8  A.  Lawyers had reviewed every aspect of the film and gave us

9  the clearance to go ahead, so we felt that everything that

10  needed to be covered was covered.

11  Q.  You were asked early in the cross-examination about

12  Mr. Petrella, and you made a comment about not in that shot; do

13  you remember that?

14  A.  Yes.

15  Q.  Let me show you --

16       MR. BRIAN:  If we could play from Exhibit -- actually,

17  bring up a still frame, if you can, from Exhibit 241 at

18  2:29:40.

19  BY MR. BRIAN:

20  Q.  Was this image featured in your documentary?

21  A.  Yes.

22  Q.  What is it?

23  A.  It is what we called the baby wall, and it's images of the

24  children that Cline both helped bring into the world and

25  created.

*JOURDAN COYNE - REDIRECT/BRIAN*                   Vol. 3-592

1    Q.  And did you instruct Mr. Petrella to try to get these

2    photographs?

3    A.  Yes.

4    Q.  And are any of the names of these children affiliated with

5    the photographs in the scene?

6    A.  No.

7              MR. BRIAN:  I would like to play, Your Honor -- in the

8    playing of the documentary, Exhibit 241, the last approximately

9    two-and-a-half minutes were not played so I would like to play

10   from 2:32:25 to 2:33:23.

11             THE COURT:  You may.

12             MR. BRIAN:  Just the end of the film.

13        (Video playing in open court.)

14

15   BY MR. BRIAN:

16   Q.  Was that the end of the film?

17   A.  Yes.

18             MR. BRIAN:  No further questions, Your Honor.

19             THE COURT:  Any questions on those?

20             MR. MacGILL:  Nothing further.

21             THE COURT:  All right.  Thank you.  You may be

22   excused.

23        (Witness excused.)

24             MR. BRIAN:  Your Honor, as we discussed, could we take

25   a five- or ten-minute recess?

*JOURDAN COYNE - REDIRECT/BRIAN*                    Vol. 3-593

1          THE COURT:  We'll take a five- or ten-minute recess,

2    Ladies and Gentlemen.  No deliberation, no discussion, and

3    we'll have you back in the courtroom very shortly.

4          COURTROOM DEPUTY:  All rise.

5      (Jury out at 2:49.)

6          THE COURT:  See you in ten minutes.

7          MR. BRIAN:  Thank you, Your Honor.

8          MS. YOUNG:  Thank you, Your Honor.

9      (Recess at 2:50 until 3:10.)

10          THE COURT:  And we're back on the record.

11          And, counsel, are you ready for the jury?

12          MR. BRIAN:  We are, Your Honor.

13          THE COURT:  Are plaintiffs ready?

14          MR. MacGILL:  Yes.

15          THE COURT:  You may bring in the panel.

16          COURTROOM DEPUTY:  All rise.

17      (Jury in at 3:11.)

18          THE COURT:  Witness, if you would remain standing.

19          And everyone else, you may be seated.

20          And if you would raise your right hand to be sworn.

21      (The witness is sworn.)

22          THE COURT:  You may have a seat.

23          And you may examine your witness.

24          MR. BRIAN:  May it please the Court, Ladies and

25    Gentlemen of the Jury, counsel.

*BERGER - DIRECT/BRIAN*                          Vol. 3-594

**JONAH BERGER, DEFENDANTS' WITNESS, SWORN**

**<u>DIRECT EXAMINATION</u>**

BY MR. BRIAN:

Q.  Would you mind giving your name to the jury and spelling it
for them.

A.  Sure.  My name is Jonah, J-O-N-A-H, Berger, B-E-R-G-E-R.

Q.  Tell the Ladies and Gentlemen of the Jury what you do for a
living.

A.  I am a professor at the Wharton School at the University of
Pennsylvania.

Q.  And do you live in Pennsylvania or do you live somewhere
else?

A.  I split my time between Philadelphia and North Carolina.

Q.  Okay.  And why are you here today?

A.  I'm here as an expert witness in this case.

Q.  And what were you asked to do as an expert?

A.  I was asked to speak to the way in which individuals
process information, what they pay attention to, and how that
affects what they remember in the context of this case.

Q.  Let's talk very briefly about your background.  Tell us
about your educational background, both undergraduate and any
graduate degrees you have.

A.  Sure.  I did my undergraduate degree at Stanford
University, and I also have a Ph.D. from Stanford University,
as well.

*BERGER - DIRECT/BRIAN*                    Vol. 3-595

1   Q.  And when did you become a professor at the Wharton Business

2   School at the University of Pennsylvania?

3   A.  My memory is not perfect, but I believe it was 2007.

4   Q.  And with the exception of maybe a leave here or two, have

5   you worked at the university -- the Wharton University ever

6   since then?

7   A.  Yes.  I've been a visiting faculty member at Duke

8   University and also at Cornell Tech in New York City, but I've

9   been a faculty member at Wharton throughout that whole time.

10  Q.  As a marketing professor, what are your areas of research?

11  A.  So I study a few different things.  I study information

12  processing, how people make decisions, and how they form

13  attitudes and judgments.

14  Q.  So let's talk about information processing.  What do you

15  mean by information processing?

16  A.  Yes.  So we are constantly surrounded every day by stimuli

17  in our environment, sights, sounds, information.  Information

18  processing looks at how we take in all those things and how the

19  information or stimuli in our surrounding environment shape our

20  attitudes and the decisions that we make.

21  Q.  And is part of information processing, analyzing to the

22  extent to which people pay attention to or remember things that

23  they see?

24  A.  Certainly, yeah.

25      So when we think about information, there's so much

*BERGER - DIRECT/BRIAN*                                  Vol. 3-596

information in any one environment, we don't pay attention to
all that information, let alone even remember all the things we
paid attention to, and so part of the study of information
properties is saying: Of all this stuff that's out there, what
actually gets in and what is retained in any way, shape, or
form.

Q.  Have you published, at all, in your areas of research and
expertise?

A.  I have, yes.

Q.  What have you -- without getting into every book and
article, what do you publish, generally?

A.  I published over 75 articles in top tier academic journals,
in psychology, in marketing, and the sciences, more generally.
I've also published a number of popular press books.  Broadly
speaking, this work focuses on things like information
processing, how people make decisions, and how the environment
shapes our attitudes and judgments.

Q.  In addition to writing yourself, do you sometimes review or
edit other people's writings?

A.  I was just doing some of that on the plane, actually.  So,
yes, I am a reviewer for a variety of journals.  I serve on the
editorial board of some of those journals.  I've been an
associate editor or a guest editor.  Much of this is probably
meaningless, but the general idea is it's not just producing
your own academic research.  It's looking at others, improving

*BERGER - DIRECT/BRIAN*                    Vol. 3-597

1    it, and shaping what makes it out there to the populous, more

2    generally.

3    Q.  And have you won any awards for your research and writing?

4    A.  I have been fortunate to win a few, yes.

5    Q.  And, just generally speaking, what have you won?

6    A.  I've won best paper awards for the best paper published in

7    a certain journal in a certain year.  I've won awards for

8    teaching and other types of scholarship.  Most recently, I was

9    fortunate enough to win an award for the last ten years for a

10   couple thousand journals, the most cited article in any of

11   those journals over the past ten years, which was pretty

12   neat.

13   Q.  Now, in addition -- you're obviously not teaching today.

14   You're doing something else.  So in addition to your teaching

15   and writing, do you perform some services as an expert

16   consultant?

17   A.  I do, yes.

18   Q.  And approximately, if you were to divide your time, how

19   much do you spend in the teaching/publishing area versus the,

20   let's say, consulting and testifying area?

21   A.  The majority is teaching and research.  I'm not sure of the

22   exact number.  Maybe sort of two-thirds/one third or 60/40,

23   something like that.  So most of it is teaching and research,

24   and a small chunk of it is a mix of expert work and speaking

25   and consulting with organizations.

*BERGER - DIRECT/BRIAN*                              Vol. 3-598

1   Q.  And are you being compensated by the defendants in

2   connection with your work on this case?

3   A.  I am, yes.

4   Q.  At an hourly rate?

5   A.  Yes.

6   Q.  And what rate?

7   A.  It's $1,100 an hour.

8   Q.  Is that your typical rate?

9   A.  It is, yes.

10  Q.  Does that depend, in any way, on the substance of your

11  testimony today?

12  A.  No, it does not.

13  Q.  Does it depend, in any way, on the outcome of the trial?

14  A.  No, it does not.

15  Q.  So let's turn to the methodology you used.

16      What did you do to analyze the issues that you were asked

17  to analyze?

18  A.  Yeah.  So I started by reviewing the documentary.  I also

19  reviewed the complaint, a number of depositions in the case, as

20  well as looked at a variety of related academic literature

21  that's happened over decades in both psychology and other

22  disciplines to think about what science has taught us about how

23  people might process information in a situation like this, what

24  they might pay attention to, what they may register, and what

25  they might actually remember.

*BERGER - DIRECT/BRIAN*                         Vol. 3-599

1          MR. BRIAN:  And, Your Honor, I forgot to offer him.

2    Pursuant to Federal Rules of Evidence 702, I'm tendering

3    professor Jonah Berger as a qualified expert in the field of

4    information processing.

5          THE COURT:  Any objection to that qualification?

6          MR. MacGILL:  No, no objection.

7          THE COURT:  The Court will qualify Mr. Berger as an

8    expert in the way in which individuals process information and

9    how that effects what they remember in the context of this

10   case.

11   BY MR. BRIAN:

12   Q.  Is one of the materials that you reviewed, in this case,

13   the actual documentary?

14   A.  It is, yes.

15   Q.  Did you watch the entire documentary from start to finish?

16   A.  I did.  I've actually watched it at least two times start

17   to finish, if not even three or four.

18   Q.  And was it important to you in reaching your opinions to

19   watch the entire documentary?

20   A.  Certainly, yes.

21   Q.  Why?

22   A.  As I understand it, part of my job here today is to try to

23   think about what an ordinary viewer might have taken away from

24   this documentary.  And so while I certainly am a social

25   scientist and I know something about the research on

*BERGER - DIRECT/BRIAN*                                      Vol. 3-600

1    information processing, it was important to watch the

2    documentary just like a normal viewer might have to get a sense

3    of what that experience was like and understand how the

4    research might play out in this particular context.

5    Q.  Did you also read each of the plaintiffs' deposition

6    transcripts?

7    A.  I did, yes.

8    Q.  Now, did we ask you if you had an opinion -- after doing

9    this work, did we ask you if you had an opinion on whether an

10   ordinary viewer of the documentary was likely to pay attention

11   to, register, or remember the disclosures of the plaintiffs'

12   names for the few seconds they were on the screen?

13   A.  Yes, I did form an opinion on that.

14   Q.  And what is your opinion?

15   A.  My opinion is that it is unlikely that an ordinary viewer,

16   even if they were exposed to this documentary, would have paid

17   attention to, registered, and remembered the names of the

18   plaintiffs.

19   Q.  So let's break those down, the three different things you

20   mentioned there: pay attention to, register, and remember.

21       What do you mean by "pay attention to"?

22   A.  Yeah.  So maybe we can go back to what I talked about

23   before, sort of a noisy environment; right?

24       So maybe we can use an example of going for a drive in your

25   car; right?

*BERGER - DIRECT/BRIAN*                              Vol. 3-601

1    So you guys probably drove here today, everyone came here

2  by car, bus, or some sort of transportation.  Think about how

3  many things you were exposed to along that drive.  There were

4  hundreds of cars in different colors driven by different people

5  with different license plates.  There were various street signs

6  and buildings and maybe people walking around.

7    You didn't pay attention to all of those things; right?

8  You were exposed to them, they were in your environment, they

9  may have been in your visual field, but just because they were

10  in your visual field doesn't mean you paid attention to them,

11  doesn't mean you keyed into them.

12    So just because we're exposed to something, doesn't mean we

13  paid attention to it.  And so the first step to be able to

14  remember something is to pay attention to it in the

15  first place.

16  Q.  Okay.  So register was the second term you used.  What does

17  "register" mean in this analysis?

18  A.  Yeah.  So maybe we can go back to the idea of sort of

19  driving in our car.  You're coming in today, all these things

20  are around.  You might have briefly glanced at a car or glanced

21  at a road sign, glanced at a building.  Did you register that

22  it was there?

23    Did you say to yourself:  That's a really nice car; or, Oh,

24  wow, I've never seen that sign before; or, Maybe I should try

25  the product that was on the billboard?

*BERGER - DIRECT/BRIAN*                        Vol. 3-602

1    It's not just paying attention to it, it's not just

2    focusing your attention on that thing, but having it, in some

3    sense, enter your mind and think about it in some way.

4    Q.  And remember is a word that's probably more familiar with

5    people, but in this context, what do you mean by "remember"?

6    A.  Yeah.  So go back to that drive analogy, if you will, what

7    do you remember from that drive in this morning; right?  You

8    certainly don't remember everything you saw.  You certainly

9    don't remember even some things you might have registered.

10    You might have thought: That was an interesting sign.  But

11   if I asked you right now: What did the sign say? You're

12   probably not going to be able to remember it.

13    And so at each of those stages, even if a person or many

14   people are exposed to some stimulus in their environment,

15   doesn't necessarily mean they pay attention to it.

16    Even if they pay attention to it, it doesn't mean it

17   registers.  And even if it registers, it doesn't mean they

18   remember it.  It's almost like a funnel of multiple stages that

19   things must go through to eventually reach our memory.

20   Q.  So in stating your opinion, you said that an ordinary

21   viewer was unlikely to pay attention to, register, and

22   remember.  Why would an ordinary viewer be unlikely to pay

23   attention to their names in the documentary?

24   A.  Yeah.  I don't know about you guys, but at least when I'm

25   watching something, there's usually a lot going on in the

*BERGER - DIRECT/BRIAN*                              Vol. 3-603

1    environment.  Maybe I'm focused on the movie, hopefully I am.

2    Maybe a dog is running around in the background.  Maybe the

3    kids are yelling.  Maybe the phone is ringing.  Maybe I need to

4    go to the bathroom or something else.

5        And so even to that first step to pay attention, just

6    because I'm exposed to something, doesn't mean I'm necessarily

7    going to pay attention to it.  And those are the things in the

8    environment, let alone the documentary itself; right?

9        So I don't know how long it took everybody to drive in this

10   morning, but imagine it was a 90-minute drive, which I think is

11   somewhere along the length of the documentary.  Think about how

12   many cars you saw, think about how many people you saw, how

13   many buildings you saw, how many roads you saw.  Did you pay

14   attention to all of them?  Definitely not; right?

15       And so there are so many things in the documentary.  So

16   many -- music and people and events and things happening that

17   one or a couple small things, a name, for example, in the far

18   left corner for a half a second, it's going to be really

19   unlikely that people paid attention to that information.

20   Q.  How about register?  Why would an ordinary viewer be

21   unlikely to register the plaintiffs' names for the short time

22   they were on the documentary?

23   A.  Yeah.  So first of all, again, if we don't pay attention to

24   something, it's going to be really hard for it to register;

25   right?

*BERGER - DIRECT/BRIAN*                          Vol. 3-604

1      If you didn't really key in to when you were driving in

2   this morning: Oh, there's a red car, it's going to be really

3   unlikely, if you don't look at it, that you're going to say to

4   yourself: Oh, this is a red car or that's an interesting

5   advertisement.

6      And so given how quickly the names were on the screen -- I

7   think in one case it was a half a second in the far left, in

8   another it was slightly longer, I think it was something -- you

9   know, nine seconds or something like that, but that wasn't the

10  only thing on the screen.

11     There were many other things on the screen at the same

12  time, and there were many other things going on in the

13  documentary, more generally.  Many other moments and bits of

14  information and other sorts of things.  And so it's unlikely,

15  not only that people paid attention to it, but even if they

16  paid attention to it, that it would have actually registered.

17  Q.  And the third one, why would an ordinary viewer be

18  unlikely to remember the plaintiffs' names for the half a

19  second and nine seconds they were in the documentary?

20  A.  Memory is tough; right?  We all have things we wish we

21  could remember, but we don't.  And so if I gave -- you know, if

22  I gave you a memory test on, you know, a particular exit from

23  the highway that you might have seen driving in this morning or

24  what color a certain billboard was, you probably wouldn't

25  remember it; right?

*BERGER - DIRECT/BRIAN*                          Vol. 3-605

1      Going back to the documentary, for example, if I asked you:

2   Hey -- I think Dr. Cline was on the cover of a magazine in the

3   documentary, for example.  What magazine was it?  I don't

4   remember, and I watched the documentary a few times.  I don't

5   remember what the magazine was.  I actually had to go back and

6   look at it to be sure and think about it.  That was on the

7   screen for more than a second.  That was actually on the screen

8   for a few seconds.

9      What color was the tie?  I think there was a newscaster.

10  At least at one point in the documentary, he was wearing a tie.

11  What color was the tie?  I don't remember; right?

12     So just because it was there, even if I looked at it, even

13  if while I was looking at it I went: Oh, it's this magazine, or

14  it's this color tie, am I going to remember that information

15  later, given all the other things that are going on at the same

16  time?

17     And so there is so much information happening, so many

18  different things to remember.  It's quite unlikely that an

19  ordinary viewer would have not only paid attention to or

20  registered this information, but would have remembered it and

21  taken it home with them later.

22  Q.  Are you familiar with the phrase "inattentional blindness"?

23  A.  Yes.  Yes, I am.

24  Q.  What is it?

25  A.  So that's, kind of, the science behind what we've been

*BERGER - DIRECT/BRIAN*                               Vol. 3-606

1    talking about.  The main idea is that even if something is in

2    our visual field, even if we think we should have paid

3    attention to it because it was there, we don't necessarily pay

4    attention to it.

5        Research shows that even when you're directly looking at a

6    screen and something is very short, if something shows up on

7    that screen, you may not remember that it was there later, even

8    if it was right in the middle of the screen, even if one would

9    think, I should have remembered it, it was right there.

10       And so even in situations where one might predict that we

11   would remember something, we don't necessarily.  And I don't

12   know about you, but I have certainly had that experience

13   myself; right? Where I feel like I should have remembered

14   something or someone asked: Didn't you see this thing?  And I

15   didn't see it, unfortunately.

16       And so lots of literature shows that that feeling we have

17   is actually correct; right?  Even if you might imagine that

18   because something was there, we would have attended to it.

19   Even if it was on that screen, lots of research shows that we

20   don't see, we don't pay attention to and/or remember all of the

21   things in our visual field.

22   Q.  I think you testified that the documentary was

23   approximately 90 minutes in length, and Ms. Kennard's name was

24   on the document for less than a second and Ms. Bowling's was

25   approximately nine seconds.  Do you recall that?

1    A.  I'm not sure those numbers are perfect, so I apologize if

2    they're not, but I think they're ballpark accurate.

3    Q.  And does it matter, to your opinion, of what an ordinary

4    viewer likely would have paid attention to, registered, or

5    remembered the length of time that their names briefly appeared

6    compared to the length of the documentary?  Does that matter to

7    your analysis?

8    A.  It is useful.  It's a useful piece.  I think, again, a good

9    way to think about it is on that drive we were talking about

10   before, you know, if there's a blue pickup truck in front of

11   you for, I don't know, five minutes of your drive, and it's

12   driving really slowly and you're frustrated about it, maybe you

13   remember that blue pickup truck, because it was there for a big

14   chunk of your drive.

15       I don't -- I don't remember the exact percentage that the

16   names were on the screen, but I believe it was something

17   like -- you know, it wasn't a tenth of a percent, it wasn't

18   even a hundredth of a percent.  I think for the names that were

19   on the screen longer, it was like 2,000th of a percent.  And I

20   think for the name that was on the screen for less longer, it

21   was some number smaller than that.

22       But a decent way to think about that is for 99.99, whatever

23   it is percent, of the documentary, those names weren't up

24   there.  And so, you know, lots of other things are going on.

25   Those things were barely there.  In some cases, in the far side

*BERGER - DIRECT/BRIAN*                                    Vol. 3-608

1    of the screen.  Very unlikely that people would have attended

2    to, registered, or remembered that information.

3    Q.  The jurors, in this case, have been shown a handful of

4    still images of the plaintiffs' names in the documentary.  Is

5    that how an ordinary viewer would have seen the film?

6    A.  I mean, I don't think so.  I can't say for sure how every

7    person who watched the documentary watched it.  When I watch

8    shows, I don't pause them every single second and stop them.  I

9    don't think most people do.

10       And so it's obviously much easier if you freeze frame

11   something and are looking for something, to wait until you can

12   find it, than it is when that thing is breezing past you with

13   other information going on.  And so that doesn't seem to be the

14   natural situation which most people view information.

15   Q.  In your work, have you seen any evidence that a viewer of

16   the documentary, other than the plaintiffs, a family member or

17   someone who already knew about the plaintiffs' connection to

18   Cline or the connection in one case of the sister to Cline,

19   noticed their names in the documentary?  Any evidence?

20   A.  I don't believe so.  I even -- I even believe looking at

21   both the plaintiffs' documentaries --

22   Q.  You mean depositions?

23   A.  Depositions, sorry.  Depositions.  And I don't believe

24   either of them could identify a single individual who learned

25   of their connection to Cline from this documentary.  And so I'm

*BERGER - DIRECT/BRIAN*                              Vol. 3-609

1    not aware -- I have not seen any information identifying

2    individuals who learned about this from the documentary itself.

3    Q.  Let me go to a second area that we asked you to give an

4    opinion on.  And before I ask you what your opinion is, are you

5    familiar with something called the spotlight effect?

6    A.  Excuse me, sorry.  I'm drinking a little bit of water.

7        Yes, I am familiar with the spotlight effect.

8    Q.  What is the spotlight effect?

9    A.  A good way to think about the spotlight effect is imagine

10   you just had lunch and you get a stain on your shirt.  You're

11   walking back to meet your friends or back to the office,

12   whatever it might be.  You are sure that everyone is staring at

13   the stain on your shirt.  It's very salient to you.  You are

14   aware of it.  And so you overestimate the likelihood that other

15   people -- it is salient for other people, as well.  So in a

16   nutshell, that's the spotlight effect.

17       When something is salient to us, we overestimate the

18   likelihood that other people -- that information is salient to

19   them.  We know the stain is there.  You know, you walk out of

20   the bathroom, you spill water on your pants, you know it's

21   there.  Other people are paying attention to a whole bunch of

22   other things and might not even notice it.

23       And so the spotlight effect shows that, again, lots of

24   research has found people overestimate the likelihood that

25   other people are -- have salient or, again, the idea of pay

*BERGER - DIRECT/BRIAN*                    Vol. 3-610

1    attention to register and remember the things that might be

2    salient to you as an individual.

3    Q.  So in your opinion, under this spotlight effect, would the

4    plaintiffs themselves be more likely -- significantly more

5    likely than an ordinary viewer to notice their own names in the

6    documentary?

7    A.  That is exactly my expert opinion.  If you think about it,

8    for the plaintiffs, they knew their names were in the

9    documentary, they went looking for those names, and it's very

10   salient to them.

11        And so just like I might assume that everyone is looking at

12   the stain on my shirt or notices the stain on my shirt, they're

13   likely to overestimate the likelihood that other people in

14   their community, ordinary viewers, would be paying attention

15   to, registering, or remembering that information.

16        I even -- I don't want to misstate it, but I even believe

17   there's a quote from -- I think it was Lori Kennard, but I'm

18   not sure.  I think it was an exchange, maybe, with another

19   person where, you know, she was saying: It went by so quickly,

20   maybe it's more salient to us than it is to other people.

21        It probably is, which is exactly what the spotlight effect

22   would say:  You know, it's not just us that has that

23   experience.  Everybody has that experience.

24   Q.  But the ordinary viewer who's either not the plaintiffs,

25   not their friends, not their family, and didn't know of the

*BERGER – CROSS/MacGILL*                    Vol. 3-611

1  connection, would they be unlikely to pay attention to,

2  register, and remember those names?

3  A.  Yes, for all the reasons we talked about before.

4       MR. BRIAN:  Nothing further, Your Honor.

5       THE COURT:  You may cross-examine the witness.

6                  **CROSS-EXAMINATION**

7       MR. MacGILL:  May I proceed, Your Honor?

8       THE COURT:  You may, counsel.

9  BY MR. MacGILL:

10 Q.  Good afternoon, sir.  My name is Rob MacGill.  I'm one of

11 the lawyers representing Mrs. Bowling and Mrs. Kennard in this

12 case.  I have a couple of questions for you just to get

13 started.

14      So your work in connection with this, your compensation

15 rate is how much per hour?

16 A.  1,100 per hour.

17 Q.  And can you estimate for the jury and the Court how much

18 you've spent in connection with your work in this case?

19 A.  I don't know offhand.

20 Q.  I mean, would it be $10,000, 50,000?  I mean, what's the

21 number we could look at as a reasonable estimate?

22 A.  I usually think about cases in terms of hours.

23 Q.  Okay.

24 A.  I don't know the exact number offhand.  I would guess

25 somewhere probably in the 50- to 75-hour range, maybe a little

1    bit more.

2    Q.  Okay.

3    A.  But certainly not -- I don't think it's 150 hours, and it's

4    certainly not ten hours.

5    Q.  Okay.  So just an estimate, if you've spent 50 to $75,000

6    or more time in connection with your work in this case; is that

7    fair?

8    A.  I think about it as spending time, but rather than spending

9    money, but yes, how much time I spent.

10   Q.  I don't mean -- just rough estimate.  Okay.

11        So in connection with your work, I take it that it's

12   important to you to be thorough in your work; is that fair?

13   A.  Certainly, yes.

14   Q.  And you would want to review all of the case materials that

15   are relevant to the opinions that you give; is that also fair,

16   sir?

17   A.  I believe so, yes.

18   Q.  Okay.  Now, did you rely on the lawyers, the lawyers in the

19   case, to give you case materials that were related to your

20   work?

21   A.  Anything I asked for in the case, I was given.

22   Q.  And let me be asking a better question.  Did you rely on

23   them to give you case specific materials in order to support

24   your opinions?

25   A.  I'm sorry.  I'm not sure exactly what you mean.

*BERGER - CROSS/MacGILL*                        Vol. 3-613

1  Q.  All the depositions that are relevant.  Did they give you

2  those?

3  A.  I believe so.  I've looked at the depositions of both the

4  plaintiffs.

5  Q.  Any others?

6  A.  I'd have to go back and look at my expert report, but I

7  certainly looked at the plaintiffs' depositions.

8  Q.  Viewer numbers.  Did you look at viewer numbers?

9  A.  I don't believe I did.

10 Q.  Did you look at the movie that is at issue in this case?

11 A.  Do you mean the documentary?

12 Q.  The movie called *Our Father* and the version of the movie

13 that is at issue in this case.

14 A.  I watched the documentary, yes.

15 Q.  Please listen to my question one more time.  Did you or did

16 you not look at the movie that is at issue in this case?

17 A.  I'm sorry.  I'm trying to answer your question, but I don't

18 know what I'm missing.

19 Q.  All right.  The movie that aired on the 13th of May, 2022,

20 is the movie at issue in this case; is that your understanding?

21 A.  I don't remember the exact dates.  I have viewed the

22 unblurred version of this documentary.

23 Q.  Okay.  Well, your report you issued, you sent a report

24 here.  You issued a report, and would you turn to tab 2.  And

25 in terms of publicly available materials, do you see -- looking

*BERGER - CROSS/MacGILL*                              Vol. 3-614

1  at your report; do you see that you referenced *Our Father*,

2  www.netflix.com/title in the reference 81227735?

3  A.  Sorry.  Can you give me one second?

4  Q.  Yes, sir.

5  A.  What page should I be looking at?

6  Q.  Page 24.

7           THE COURT:  You're in Exhibit 470?

8           MR. MacGILL:  Yes.  I'm sorry.  Yes, Exhibit 470.

9  A.  Okay.  I am on page 24.

10  BY MR. BRIAN:

11  Q.  Do you see what you wrote, that you said that publicly

12  available materials, your words?

13  A.  I do.

14  Q.  Publicly available materials as of when?

15  A.  That, I'm guessing that the date that I turned in my expert

16  report.

17  Q.  Okay.  Which is October 23rd, 2023?

18  A.  That is the date on the front of the expert report, yes.

19  Q.  So roughly speaking, you reviewed the publicly available

20  movie, the Netflix movie, that was publicly available in

21  October of 2023; is that right?

22  A.  I know that I reviewed the unblurred version of the

23  documentary.  I went back and prepositioned in preparation for

24  today, and went through my e-mail records to be sure.  I have

25  an e-mail from the beginning of this case that is the unblurred

*BERGER - CROSS/MacGILL*                    Vol. 3-615

1   version of the documentary.  I don't know whether what is

2   referred to here is or is not the unblurred version of the

3   documentary.

4   Q.  Well, sir --

5            MR. BRIAN:  Your Honor.

6            THE COURT:  Don't cut him off.

7            MR. MacGILL:  Thank you.

8   BY MR. MacGILL:

9   Q.  Sir, what you referenced here --

10           MR. BRIAN:  Your Honor --

11           THE COURT:  Counsel, let him finish his answer.

12  A.  If this is not the correct reference to the unblurred

13  version of the documentary, I apologize.  I am sure that I

14  viewed the unblurred version.  I went back to check my e-mail.

15  It has a link to the unblurred version, and I know, because I

16  was able to see the names eventually when I -- it took me

17  awhile.  But the first time I didn't see them, I had to ask

18  exactly where they were.

19     I -- once I was given the timestamps, I was able to find

20  the time in the documentary in which the names appeared, but I

21  know, because I saw the names.  And so if that's not what this

22  refers to, I apologize.  That's what it should refer to.  That

23  must be a mistake or maybe some confusion, but I did view the

24  unblurred version.

25  BY MR. MacGILL:

*BERGER - CROSS/MacGILL*                              Vol. 3-616

1   Q.  Now that we're here, and now that you're looking at this,

2   you can admit that at least your reference is to exactly what

3   you say here, *Our Father*, https://netflix.com/title with

4   81227735.  That is what you wrote in your report; is that

5   right?

6   A.  Yes, that is what I wrote in my report.

7   Q.  All right.  And you understand, at least you'll admit now,

8   that as of October 2023, when you reviewed quote, publicly

9   available materials, specifically that publicly -- the movie

10  with Sarah Bowling's name in it and the movie with Lori

11  Kennard's name was not publicly available; right, sir?

12  A.  I -- if that is the case, I believe you.  All I can speak

13  to here is I know what version I watched, and so if I -- if

14  what you're saying is that I should have cited something

15  slightly different here and not called it publicly available

16  materials, I apologize.  I viewed the unblurred version of the

17  documentary.  I don't know what else to say, but I apologize if

18  I should have called it something else.

19  Q.  Well, sir, just to maybe show a little bit of a respect for

20  where we are and who we're in front of, you issued a report in

21  a case --

22              MR. BRIAN:  I am going to object to that --

23              THE COURT:  I am going to sustain to the commentary.

24  Questions only, counsel.

25              MR. MacGILL:  Thank you.

*BERGER - CROSS/MacGILL*                    Vol. 3-617

1              THE COURT:  Thank you.

2    BY MR. MacGILL:

3    Q.  You submitted a report in a United States District Court,

4    knowing it would be relied upon, on counsel, as a full and

5    correct statement of your opinions and your work; did you not?

6    A.  I believe so, yes.

7    Q.  Okay.  And you knew eventually we might be right here with

8    your report in hand; right?

9    A.  I always try to make anything I do to be accurate.  If

10   there's a -- if I should have referred to it differently here,

11   I apologize, but I -- it is -- I don't know what else to say.

12   Q.  Now, let me follow up on the manner in which you were

13   questioned by counsel and the specifics referenced in the work

14   here in your assignment.  The assignment in paragraph 10 is

15   that you were asked whether ordinary viewers would likely,

16   would be likely to infer, based on the documentary, that

17   plaintiffs are Cline children; right?

18   A.  I see that in paragraph 10 of my report, yes.

19   Q.  Okay.  And that's just exactly what you said.  Would be

20   likely to infer based on the documentary that plaintiffs are

21   Cline children; right?

22   A.  I apologize.  I'm not sure what you're getting at.  There's

23   a bunch -- before that in paragraph 10, in which it says very

24   similar to things I already said, but I see the part of the

25   sentence you're referring to, yes.

*BERGER – CROSS/MacGILL*                          Vol. 3-618

1  Q.  Okay.  And that's just what I want to focus on, if you

2  don't mind.

3  A.  Okay.

4  Q.  Would be likely to infer; right?

5  A.  I see those words.

6  Q.  Okay.  Viewers would be likely to infer; fair enough?

7  A.  Yes.  Those are the words.

8  Q.  All right.  Now we're going to get into this in a little

9  bit more detail, but you have a video, a monkey video or a

10  gorilla video that's one of the support research papers for

11  your report; do you not?

12  A.  Are you talking about the stimuli from one of the studies?

13  Q.  Yeah.  It was -- let me be specific.  There's a gorilla

14  walking through a crowd of people.  That's the study I'm

15  referring to.

16  A.  Sorry.  It's a stimuli in an experiment.  Many experiments

17  have been done.  That's one example of some of the things they

18  had people watch.

19  Q.  Help me.  What animal was involved in that testing?

20  A.  I think they've used a woman with an umbrella.  They've

21  used a person in a gorilla suit.  I think they've used a number

22  of different things in different experiments.

23  Q.  With respect to that paper, that's a paper that you relied

24  on in connection to your testimony given to this jury this

25  afternoon?

*BERGER - CROSS/MacGILL*                    Vol. 3-619

1   A.  There are many studies in this literature that all show

2   similar things.  Some of them have used the stimuli with the

3   monkey walking across and people passing a basketball, but not

4   all of them have.  Many have used other stimuli, but it's just

5   in some of the work that is an example task they have people

6   do.

7   Q.  Okay.  Now, moving from where you are in Pennsylvania,

8   reviewing the evidence that these lawyers provided to you to

9   the specifics of viewers in Indiana, did you get -- did you

10  review the deposition testimony of Sarah Sexson?

11  A.  I'm going to go to my documents considered list, and that

12  has everything that I reviewed in this case.  So it lists three

13  depositions:  Jane Doe, Janice Coe, and Janet Roe.

14  Q.  So you did not, sir, review the testimony from a social

15  worker from Indianapolis, Indiana, named Sarah Sexson?

16  A.  I don't believe so.

17  Q.  Now, you did not seek leave to listen -- from this United

18  States court, to listen to the testimony given during our case

19  in chief; did you?

20  A.  I'm sorry.  You just used a few words I don't understand.

21  I apologize.

22  Q.  Fair comment.  You did not attend the testimony given

23  during our plaintiffs' case in chief as a part of your work in

24  this case; did you?

25  A.  I'm sorry.  Do you mean the deposition itself?  Do you mean

*BERGER - CROSS/MacGILL*                    Vol. 3-620

1  something today?  Testimony today?  What?  I'm sorry.  I don't

2  --

3  Q.  All fair, all fair questions.  You didn't attend the court

4  proceedings here?

5  A.  No.

6  Q.  In person?  You didn't listen to the testimony given to

7  this United States court and to this jury; right?

8  A.  I don't believe so.

9  Q.  So you didn't listen to the -- you didn't read the

10  testimony of Sarah Sexson that she gave in her deposition prior

11  to coming here and working -- giving your opinions; did you?

12  A.  No, I did not.

13  Q.  And you did not listen to or read the testimony of Sarah

14  Sexson given under oath to this Court about what she observed

15  in the movie; did you?

16  A.  No, I did not.

17  Q.  All right.  Now, in terms of depositions, you read the

18  plaintiffs' depositions, but you did not read the deposition of

19  the -- of the therapist of Mrs. Bowling; did you?

20  A.  I don't believe so, no.

21  Q.  A woman by the name of Amy Strobel; you didn't read that?

22  A.  I was asked to think about how ordinary viewers would --

23  whether ordinary viewers and why the ordinary viewers would be

24  to pay attention to, register, and remember the information in

25  the documentary; specifically, the plaintiffs' names.  And so

*BERGER - CROSS/MacGILL*                    Vol. 3-621

1    that's where I focused my attention.  I may not have reviewed

2    some other pieces of this case, but I focused on the material

3    that I felt was most useful for answering the question I was

4    asked to speak to.

5    Q.  Now, let's turn from what you did review or didn't review

6    to the invisible gorilla study.  Did you make mention of that

7    on page -- Paragraph 17 and 18 of your report?

8    A.  Give me one second.  You said Paragraph 17 and 18?

9    Q.  Yes, sir.

10   A.  Yes.  So that's where I talk about examples of research on

11   "inattentional blindness".

12   Q.  Is that the study?  You referenced that study?

13           MR. BRIAN:  Excuse me, Your Honor, I don't think he

14   was done.

15           THE COURT:  Let him finish his answer.

16   A.  Just to be clear, I give a couple of examples.  I think I

17   talk here about the woman carrying an umbrella.  I talk about

18   the person in the gorilla suit; and just to be clear, by the

19   way, these are not the only paradigms or stimuli that are used

20   in this research.  They are just examples of papers, but

21   they're, I believe at this point, decades of literature on this

22   idea, this finding, this scientific finding that all point in

23   the same direction.  But these are examples of this literature.

24   BY MR. MacGILL:

25   Q.  And in that particular example, is that referred to -- was

*BERGER - CROSS/MacGILL*                          Vol. 3-622

1    that research by a professor by the name of Neisser?

2    A.  Is which professor?

3    Q.  What you cite in Paragraph 17 and 18 of your report.

4    A.  So Neisser is the woman carrying the umbrella.  I don't

5    believe Neisser is the gorilla, though.  I believe that's a

6    different paper.

7    Q.  Can you look at your report and tell us which paper is the

8    gorilla paper?

9    A.  I believe that's Simons and Chabris.

10   Q.  Okay.  Simons and Chabris?

11   A.  Yes.

12   Q.  Okay.  And in that -- could you tell the jury what that --

13   what was -- what was tested there?  What occurred in the study

14   in terms of the person wearing a gorilla suit?  What happened?

15   A.  I want to be a little bit careful here.  I didn't author

16   this paper, and I also didn't read it in great detail in

17   preparation for being on the stand today, so I'll do my best

18   from memory, but it may not be perfect.

19   Q.  Would you prefer I ask you questions?

20   A.  Whatever you like.  I just, I just --

21   Q.  Let me try --

22              THE REPORTER:  I'm sorry.

23   A.  I just didn't want to misstate someone's research and not

24   be correct, so I'm happy to do my best from memory, or you can

25   ask me questions, but I'm just saying, I don't know every

*BERGER – CROSS/MacGILL*                                    Vol. 3-623

1   detail of everything they did.

2   BY MR. MacGILL:

3   Q.  Okay.  But this report, this study in which a gorilla

4   walked through a circle of women passing a basketball, was one

5   of the studies, the Simon study, that you referred to; is that

6   right?

7   A.  Yeah.  So in brief, I'm happy to give you a brief summary.

8   There are people in white T-shirts, and people in black

9   T-shirts, they're passing basketballs.  You're asking to count,

10  I believe, the number of times that a certain team passed the

11  basketball, so how many times the team in the white T-shirt

12  passed the basketball.  While you're doing that counting, a

13  person in a gorilla suit walks across the screen and walks off

14  the screen.

15  Q.  Okay.  And that is one of the studies that you reported,

16  you included as an element, or at least something you relied on

17  in part, in your work; is that right?

18  A.  Yeah, an example of this literature.  I did not cite all

19  the papers in this literature.  There are many papers that all

20  show, essentially, the same thing with small variations, but I

21  gave examples of this type of work.

22  Q.  But in terms of your opinions that you gave to this Court a

23  few minutes ago, you referenced the idea or you referenced your

24  opinions and provided your opinions on processing information

25  memory; right?

*BERGER - CROSS/MacGILL*                    Vol. 3-624

1   A.  I believe so, yes.

2   Q.  All right.  And with respect to that opinion, sir, this

3   study is one of the studies that you made reference to in

4   making the analysis that you have provided to this Court today;

5   is that fair?

6   A.  It's an example from this literature, yes.

7   Q.  All right.  But in that literature, in that study that

8   you've described, at least generally, the viewer is asked to

9   count the number of times a basketball is passed to women or

10  people in white shirts; right?

11  A.  I think sometimes it's the white shirt team, sometimes it's

12  the black shirt team, but I believe so, yes.

13  Q.  Viewer counts; right?  That's the task, the viewer is to

14  count the number of times the basketball is passed; is that

15  correct?

16  A.  Again, I want to be careful here.  I don't remember offhand

17  every version that has used this paradigm, they may have asked

18  people to do other things, but at least in some of them, they

19  were asked to count the number of times that people passes --

20  the number of times the basketball was passed by a certain

21  team.

22  Q.  And while the viewer is watching the passing exercise, a

23  person in a gorilla suit walks through the center of the

24  circle; is that correct?

25  A.  That is correct.

*BERGER - CROSS/MacGILL*                    Vol. 3-625

1    Q.  All right.  Now, what Simon reported is that often it's the

2    case that the task of the viewer watching that passing of the

3    basketballs and counting, doesn't see the gorilla; is that

4    essentially one of the reports that Simon gives us?

5    A.  So I think that the takeaway from this paper, as well as

6    many papers in this literature, is you would expect that if

7    someone in a gorilla suit walked across the screen, everyone

8    would see it.  When asked: Did you see a gorilla?  100 percent

9    of the people would say yes.  Like imagine a gorilla, while

10   we're talking, a person in a gorilla suit walked out here in

11   the courtroom and walked out the other door and I asked you:

12   Did you see the gorilla?  You would go: Of course, I should be

13   able to see the gorilla, it was right there.  But they, as well

14   as many papers in this literate on intentional blindness show

15   that even if something is in plain sight, a large chunk of

16   people do not report seeing it.

17   Q.  A large chunk of people report not seeing it, according to

18   you?

19   A.  Not according to me.  According to the literature.

20   Q.  Okay.  Fair enough.  Now -- but in any event, the viewer in

21   that case is asked to perform a task to count during the

22   process that a gorilla walks through the center; right?

23   A.  In this specific paper, I believe so, but I don't -- I

24   don't know for sure because I haven't reviewed it, and I don't

25   know whether that's the case in every single time they've used

*BERGER – CROSS/MacGILL*                        Vol. 3-626

1  this task.

2  Q.  Okay.  But the viewers of this film that had the names of

3  Mrs. Bowling and Mrs. Kennard, they didn't have any task, to

4  your knowledge, similar to the Simon study; did they?

5  A.  I don't -- I don't know that that's exactly right.  So,

6  first of all, usually when you're watching a movie, while no

7  one has given you a task, you're trying to follow the action of

8  the movie; right?  You're following the characters, you're

9  wondering what Dr. Cline did, you're thinking about what is

10 happening, the reporting of the story, all these different

11 things, and so you are following a narrative.  You may not be

12 counting people passing basketballs, but you're engaging in a

13 task, and so you're doing something of which this information

14 is on the screen but may or may not be the most -- there are

15 many things you could focus on during that watching of the

16 screen.

17          MR. MacGILL:  May I display the board, Your Honor?

18          THE COURT:  You may.

19          MR. MacGILL:  Okay.

20 BY THE COURT:

21 Q.  Now, sir -- and I'll put this board next to you.

22 A.  Should I try to look at the board?  I'm going to move my

23 seat a little bit, if that's okay.

24 Q.  Let me --

25 A.  No, no, no, that's fine.  Don't worry about it.  I'll move

*BERGER - CROSS/MacGILL*                    Vol. 3-627

1  my seat, I don't mind, but I just wanted to make sure I'm

2  looking at whatever you want me to look at.

3  Q.  Are you aware, sir, that in this case, now we're talking

4  about this case, that between May 11 and May 18, there were

5  14,762,000 viewers of the film while Lori Kennard was in the

6  movie?

7  A.  I don't remember the exact number offhand, but I take your

8  word that that was the number.

9  Q.  All right.  Now, looking at the next total, May 1 -- May 11

10 through May 23, 18 million.  Are you aware that during the

11 movie -- strike that.

12     Are you aware that 18,010,187 people viewed the movie while

13 Sarah Bowling's name was in it?

14 A.  So I just want to make sure I understand.  Are you saying

15 14 is the left columns, and 18 is the right ones?

16 Q.  Well, it's more complicated than that.

17 A.  Okay.

18 Q.  I'm just asking my question, if you don't mind.

19 A.  Oh, between different dates.  Sorry.  Now I see what you're

20 saying.

21 Q.  There are two different dates.

22 A.  Okay.

23 Q.  Just Sarah Bowling was in the movie longer than Lori

24 Kennard; okay.  May 11 to May 23, are you aware that 18,010,000

25 people viewed the movie with her name in it?

*BERGER - CROSS/MacGILL*                Vol. 3-628

1  A.  Again, I remember a number.  I don't remember the exact

2  number, but I trust you that that is the correct number, if

3  that's the case.

4  Q.  Now, I want to be specific with you, if I may.  Do you have

5  any estimate of how many of the 14.7 million people were doing

6  a task while watching the Netflix movie with Lori Kennard's

7  name in it?

8  A.  I think we just talked about that.  My guess is that these

9  individuals are watching the movie.

10  Q.  But we just --

11  A.  As I -- may I finish?

12        THE COURT:  Let him finish.

13  A.  Yeah.  As we talked about already also, while shall -- and

14  I appreciate your use of the word "task," and I use the same

15  word.  In these studies, someone is focused on the screen, and

16  that is what they were asked to do.  As we've talked about

17  already, regardless of the exact number, there's a lot going on

18  in these individuals' environment.  They may not watch the

19  whole movie, they may be looking at their phone for a portion

20  of that movie, there may be things going on in their

21  environment.  And further, that movie is much longer,

22  90 minutes, versus most of these experiments, which again

23  apologies, I don't remember the exact number, but are certainly

24  not more than a couple minutes, often much, much less.  So

25  often people are doing a lot of things while they're watching a

1    movie, just like they might be doing an experiment.

2    Q.  This is your guess; is it not?  That's what you just

3    testified, this was your guess that what might have been

4    happening; is that correct?

5    A.  Ask me the question one more time.  You're asking did I

6    say: It was my guess that people are doing something while

7    they're watching the movie?

8    Q.  You prefaced your remarks that you just gave, "my guess

9    is," and that's what you did, you gave your guess to this

10   Court; right?

11   A.  Sorry, I don't -- I was not sitting with every single

12   viewer of the documentary, and so I can't speak to exactly what

13   every viewer did, but I can speak to general principles of

14   psychological that we know are true.  And what I am speaking

15   on, based on those principles, is given what we know about

16   attention and information processing, it is unlikely that an

17   ordinary viewer would have either paid attention to,

18   registered, or remembered the names.

19   Q.  Now, can you estimate, using scientific principles, a

20   specific number of people in the 18 million group that viewed

21   Sarah Bowling's, that would have been involved with a task at

22   the time they viewed the movie with Sarah Bowling's name in it?

23   A.  Again, I'm not sure why the word "task" is particularly

24   relevant here.  I've suggested, I totally understand if you

25   don't like my suggestion, but that while people in an

*BERGER - CROSS/MacGILL*                                    Vol. 3-630

1   experiment were asked to do something in particular, and no one

2   is asking a movie viewer to do something in particular, they do

3   have a goal.  They are interested in the story, for example,

4   which to me is, essentially, the same as a task.

5   Q.  All right.  But you cited a study involving viewers --

6   involving viewers of people performing a task -- or viewers who

7   had a task to do while making a view of an event; right?

8   A.  There is something they were asked to do, yes.

9   Q.  All right.  Now, there is some literature about this very

10  point; isn't there, sir, in terms of the literature that you

11  cited in your report and that you testified to this jury. There

12  is some literature about how many people in this task of a

13  gorilla walking through a circle of people passing a

14  basketball, there is some literature that says -- gives a

15  percentage of how many people see the gorilla; is that right?

16  A.  I'm not sure what you're asking.  Are you going back to the

17  sort of original study here, or are you asking about a

18  different set of research?

19  Q.  Well, let me ask you about the publication perception.  Can

20  you tell the Court what the publication perception is?

21  A.  I'm not sure what you mean, "the publication perception."

22  Q.  All right.  Well, let's take a look, you cited perception

23  in your report; did you not?

24  A.  Are you referring to a name of a journal, or are you

25  referring to the science of perception?  What?  I'm not --

*BERGER - CROSS/MacGILL*                    Vol. 3-631

1  Q.  Yeah.  Okay.  Well, that's fair.

2  A.  Yeah.

3  Q.  A journal.

4  A.  Okay.

5  Q.  I'm referring to a scientific journal.  Is there a

6  scientific journal named *Perception*?

7  A.  I believe so, yes.

8  Q.  Okay.  And in fact, you cited an article from the

9  scientific journal, *Perception*, in your report; did you not?

10  A.  That's where the "Gorillas in Our Midst" paper was

11  published, yeah, the journal of -- the journal called

12  *Perception*.

13  Q.  Okay.  I'm going to refer you to Exhibit 499.  And let me

14  give you a tab number.  So, sir, if you don't mind --

15         MR. MacGILL:  Thank you, Matt.

16  BY MR. MacGILL:

17  Q.  -- referring to tab 8, is this a publication in the

18  journal, *Perception*?

19  A.  This is the paper we've been talking about.  This is the

20  "Gorillas in Our Midst" paper, which is an example of a paper

21  in the "inattentional blindness" literature.

22  Q.  And this is something you yourself cited; is that correct?

23  A.  Yes.

24  Q.  Now, if you go to page 10 of this exhibit, there is a

25  reference to the number of viewers that actually -- who are

*BERGER - CROSS/MacGILL*                    Vol. 3-632

1   tasked with doing the counting, who actually noticed the

2   unexpected event; right?

3   A.  Are you referring to the table, table 1, or something else?

4   Q.  Well, let's read together.  If you look at the next to last

5   paragraph, it says the following:  Out of 192 observers across

6   all conditions, 54 percent noticed the unexpected event, and 46

7   failed to notice the unexpected event, revealing a substantial

8   level of sustained intentional (sic) blindness for a dynamic

9   event in confirming the basic results of Neisser and

10  colleagues.

11      Do you see that?

12  A.  Just to be careful, the word is "inattentional blindness",

13  but, yes, otherwise I see it.  Yes.

14  Q.  So to repeat, 54 percent of people who are assigned a task

15  noticed the unexpected event, in this case, the gorilla; right?

16  A.  50 percent -- 4 percent of people in this study noticed the

17  gorilla, yes.

18  Q.  While being asked to count the number of times a basketball

19  was passed; right?

20  A.  Yes.

21  Q.  All right.  Now, let's look -- I want to ask you about

22  another publication.  Are you familiar with the publication

23  *PNAS*?

24  A.  The journal *PNAS*.

25  Q.  Yes, sir.

*BERGER – CROSS/MacGILL*                    Vol. 3-633

1   A.  Yes.  And that's a journal.  I published it, yes.

2   Q.  And that's a learned treatise; is it not?

3   A.  I'm sorry, I don't know what you mean by "learned

4   treatise".

5   Q.  Well, it's a publication you published in?  Yes?

6   A.  Yes.

7   Q.  And scientific papers are published in that; is that

8   correct?

9   A.  Yes.

10  Q.  All right.  And you, in your work, you will, from time to

11  time, refer to literature in *PNAS* for your own purposes; is

12  that fair?

13  A.  I have cited to work in this journal, yes.

14  Q.  Let's look together at Exhibit 505.  Please tell me when

15  you're there.

16  A.  I'm there.

17  Q.  All right.  Now, this is the journal called *PNAS*; right?

18  A.  Yes, the *Proceedings of the National Academy of Sciences.*

19  Q.  Could you please say that again.

20  A.  Sorry.  *Proceedings of the National Academy of Sciences.*

21  Q.  Okay.  And the caption of this is "The Visible Gorilla:

22  Unexpected fast - not physically salient - Objects are

23  noticeable"

24      Do you see that?

25  A.  I do.

*BERGER - CROSS/MacGILL*                            Vol. 3-634

1   Q.  Now, there is a distinction in this case in terms of the

2   amount of exposure, and Lori Kennard's exposure in the movie

3   was less in duration than Sarah Bowling's; is that correct?

4   A.  That is correct, yes.

5   Q.  Let's read together the synopsis here.  And you see the

6   synopsis.  It says the following:  It is widely believed that

7   observers can fail to notice clearly visible unattended objects

8   even if they are moving.  Here we created parametric tasks to

9   test this belief and report the results of three high-powered

10  experiments, a total of 4,493, indicating this effect is

11  strongly modulated by the speed of the unattended object.

12      Do you see that?

13  A.  I do, yes.

14  Q.  Continuing, it says:  Specifically fast -- specifically

15  fast -- but not slow objects are readily noticeable whether

16  they are attended or not.

17      Do you see those words, sir?

18  A.  I do, yes.

19  Q.  Now, I want to move to one other question for you.

20      Speaking of Lori Kennard, I'm going to put up one other

21  exhibit.

22      Based on your work in this case, do you understand that

23  Mrs. Kennard has made a claim for emotional distress in this

24  case?

25  A.  I believe so, yes.

*BERGER – CROSS/MacGILL*                    Vol. 3-635

1  Q.  And do you understand, also, that her claim for emotional

2  distress is based on the fact that she saw the movie with her

3  name in herself?  Are you aware of that?

4  A.  I want to be careful.  But if you're saying that is the

5  case, I take you at your word.

6  Q.  Do you know that?  Did you know that before you gave your

7  testimony today?

8  A.  I don't remember every word in every document that I read.

9  I didn't review every word of every document I read in

10 preparation for today, but I have no reason to not believe what

11 you're saying.

12 Q.  All right.  So, now, with respect to her claim in this

13 Court, she is claiming that, based on her viewing her own name

14 in the report, she's had certain reactions.

15     With respect to her viewing of the movie with her name in

16 it, would that register with her under your methodology?

17 A.  I want to be careful.  I'm not sure exactly what you mean.

18 Would you mind asking it --

19 Q.  I'll rephrase the question.

20 A.  Yeah.

21 Q.  You'll admit, sir, without any equivocation on your part,

22 that when Lori Kennard saw her own name in the movie on May 11,

23 2022, that would register with her using your terminology?

24 A.  I believe she knew her name was in the documentary before

25 she watched it, and so she may have engaged actually similar to

*BERGER - CROSS/MacGILL*                          Vol. 3-636

1   what I did when I watched it the first time because I was

2   looking for it, looked to find her name.  And when she found

3   it, she was likely to see it, given she was looking for it, and

4   she may have stopped the documentary, as I did, trying to find

5   the names as an ordinary viewer, and so it is likely that she

6   found her name in the documentary.

7   Q.  And saw her name in the documentary, you'll concede that?

8   A.  I wasn't there when she watched it so I don't know exactly

9   what she did, but I take her at her word.

10  Q.  Turning to your testimony on direct examination, you talked

11  about processing of information, and you said one feature of

12  the appropriate analysis is whether the information would

13  register.  Do you remember that testimony?

14  A.  I do, yes.

15  Q.  You have no question in your mind, as you testified to this

16  judge and this jury, that when she saw her name in that movie,

17  that would, quote, register, unquote, with her; right?

18  A.  Again, I can't speak to her personal experience, so I'm

19  going to use my own words, but I would not be surprised, given

20  she knew her name was in the documentary and was looking for

21  it, that she paid extra attention to it.  And when it showed up

22  on the screen, she found it.  I would not be surprised that

23  that occurred.

24  Q.  But you're not willing to say and confirm that this fact of

25  seeing her name in the movie would, quote, register, unquote,

*BERGER - CROSS/MacGILL*                    Vol. 3-637

1  with her under your methodology?

2  A.  I don't mean to talk past each other.  I just -- I can't

3  speak to her personal experience.  I don't have access to her

4  personal experience, and so that's why I'm saying I would not

5  be surprised if, when she watched it, she attended to the

6  information, and it registered for her, if you'd like me to use

7  that word in this case, but that she found her name and she

8  remembered it was there.  I would not be surprised.

9  Q.  Last question on your methodology.  So one of the other

10  portions of your methodology was to say there needs to be an

11  inquiry about, in information processing, whether the person

12  seeing the information would, quote, remember, unquote, the

13  information; do you recall that?

14  A.  I spoke to whether an ordinary viewer would be likely to

15  pay attention, register, and remember the information, yes.

16  Q.  Now, Mrs. Kennard is here in the courtroom with us.  Can

17  you confirm that, based on your experience, your educational

18  background, your work in marketing for quite some period of

19  time, your work as a professor in the field of marketing, that

20  you could confirm that Mrs. Kennard would, using your

21  methodology, quote, remember, unquote, seeing her name on -- in

22  that movie May 11, 2022?

23          MR. BRIAN:  Objection, asked and answered, Your Honor.

24          THE COURT:  I'll allow him to answer it again because

25  it is cross, but this is the last time.

*BERGER - CROSS/MacGILL*                    Vol. 3-638

1              You may answer.

2    A.   Sorry.  So I want to be careful here.

3         You refer to my methodology.  This is not my methodology.

4    Scientists have long talked about attending to information,

5    register information, remembering it.  So I'm using that

6    language, but it's not mine.

7         But as I think we've already talked about, I can't speak to

8    her own personal experience.  I wasn't there with her, but I

9    would not be surprised if, because she looked for her name, she

10   knew it was in the documentary.  And because she looked at

11   it -- looked for it, she was able to find it.

12   BY MR. MacGILL:

13   Q.   One last question, sir.

14   A.   Referring to the 54 percent number that comes in the

15   *Perception* publication that we've reviewed, Exhibit 499 --

16   A.   Can you hold on just one second?

17   Q.   Yes, sir.

18   A.   Which tab is that?

19   Q.   That is tab number 8.

20   A.   Okay.  Can you give me just a second to get to where you're

21   referring to?

22   Q.   Yes, sir.

23   A.   Okay.  And you're referring to the table we were looking at

24   before?

25   Q.   Page 10.

1    A.  Great.  Thank you.

2    Q.  And just reminding you, this is out of the 192 observers

3    across all conditions, 54 percent noticed the unexpected event,

4    and 46 percent failed to notice the unexpected event, et

5    cetera.

6        You see that?  That's what I'm referring you to.

7    A.  I see that sentence, yes.

8    Q.  Okay.  Now, applying that 54 percent number to 14 million,

9    you would have over 7 million people in the case of Lori

10   Kennard; would you not?

11       MR. MacGILL:  Objection.  No foundation, Your Honor.

12   A.  This the not --

13       THE COURT:  Hold on.  Hold on.  There's an objection.

14   Let me rule.

15       MR. MacGILL:  You know what, Your Honor.  No further

16   questions.

17       THE COURT:  Thank you.

18       Any brief redirect?

19       MR. BRIAN:  Brief, Your Honor, brief.

20       THE COURT:  Okay.

21       Mr. MacGill, would you take your chart down?

22       MR. MacGILL:  Yes, I will.  I'll get them both.

23                   **REDIRECT EXAMINATION**

24   BY MR. BRIAN:

25   Q.  Let me start with the version of the documentary you

*BERGER– REDIRECT/BRIAN*                     Vol. 3-640

1    reviewed.

2         Before coming here today, did you go back and find an

3    e-mail to you before you issued your expert report conveying to

4    you the unblurred version of the documentary with their names

5    in it?

6    A.  Yes.  Sorry if there was some unclarity around that.  But,

7    yes, as I tried to mention before, I am sure I saw the

8    unblurred version of the documentary.  I have an e-mail that

9    shows the exact version that was sent to me, and so I know that

10   I viewed the unblurred version of the documentary before I

11   submitted my report.

12   Q.  Is there any doubt in your mind?

13   A.  No.

14   Q.  And it was important to view the unblurred version because

15   that's, in fact, what we're asking you to give an opinion on;

16   right?

17   A.  Yes, and that is the version that I saw.

18   Q.  You were asked some questions, whether you have read Sarah

19   Sexson's deposition.

20        I want you to assume that she went to high school with

21   Sarah Bowling's sister, Laura DiSalvo.  I want you to assume

22   also that Laura DiSalvo and Sarah Bowling's mother posted

23   publicly that her children were children of -- biological

24   children of Donald Cline.

25        Would she be an ordinary viewer of the film, in your mind?

*BERGER– REDIRECT/BRIAN*                    Vol. 3-641

1   A.  It doesn't sound like it.  It sounds like she was already

2   aware of the connection between the plaintiff and Dr. Cline.

3   Q.  You were asked a bunch of questions about this study of

4   people passing a basketball and somebody in a gorilla lawsuit,

5   and I want you to turn to Exhibit 499.  I don't remember what

6   tab it is, actually.

7          MR. BRIAN:  Do you remember -- Mr. Nguyen, do you

8   remember what tab it was.

9          MR. NGUYEN:  Tab 8.

10  BY MR. BRIAN:

11  Q.  Tab 8, do you have it there?

12  A.  I do.

13  Q.  And look at page 10.  And just to give the Ladies and

14  Gentlemen of the Jury a comparison of the study to, in fact,

15  the circumstances of *Our Father*, if you look on page 10, how

16  long was the film in which the people were passing the

17  basketballs back and forth?  Does it say near the top of the

18  page how long it was?

19  A.  I know that it was a very short period of time.

20  Q.  Maybe I have the wrong page.  Let me see.  Oh, I'm sorry.

21  It's page 9.  I'm sorry.

22          MR. BRIAN:  May I approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. BRIAN:

25  Q.  I apologize.  It's page 9.

*BERGER- REDIRECT/BRIAN*                    Vol. 3-642

1    A.  It looks like it's the bottom of the figure.  It says the

2    unexpected event lasted for five seconds of the 75-second long

3    video.

4    Q.  So the unexpected events was somebody walking, with a large

5    -- wearing a large gorilla outfit, in the center of the screen;

6    correct?

7    A.  Walking across the screen, yes.

8    Q.  For five seconds of a 75-second video; right?

9    A.  Yes, so a much -- yeah.

10   Q.  How -- thinking -- and what was remarkable about -- what

11   was the -- the study -- strike that.

12        The important finding there was that almost 50 percent of

13   the people didn't even notice the gorilla; isn't that right?

14   A.  So I was trying to say this earlier, but I didn't get a

15   chance to.  I think what's important to remember here is the

16   expectation is that everybody would see the gorilla; right?

17   The gorilla was right across the screen, moving, in the middle

18   of the screen for a while.  In one video, I think it actually

19   beat on its chest and walked out -- not an actual gorilla, a

20   person in a gorilla suit -- and walked out the other side of

21   the screen.  They were on the screen for a large portion of the

22   video.  Everyone is focused on the video.  And even under those

23   situations, a large percentage of people did not see the

24   gorilla.  And so the expectation is everyone should see it.

25   And even in a situation where everyone should see something, a

*BERGER– REDIRECT/BRIAN*                    Vol. 3-643

1   large chunk of people don't.

2       That is different than a situation where something is only

3   on the screen for a very short period of time in one case in a

4   far corner.  It's on the screen for a much smaller portion of

5   the time than it is in this situation, and people were focusing

6   on other things during that period, as well.

7   Q.  So maybe you just answered my question.  I was going to ask

8   you:  How do the circumstances of somebody pounding on their

9   chest in a gorilla suit in a 75-second video compare to

10  somebody's name in an upper corner for less than half a second,

11  and somebody else being for less than ten seconds, how do those

12  circumstances compare in evaluating whether an ordinary viewer

13  would have noticed those names, would have paid attention to,

14  registered, and remembered?  How do they compare?

15  A.  Yeah.  So ordinary viewers should have been much less

16  likely, given how much longer the documentary was, how much

17  shorter the -- in this case, the information we're talking

18  about, the names rather than the gorilla suit was on the screen

19  as a portion of that, how many other things were going on

20  during that time.  A much smaller portion of people should have

21  been likely to attend to, register, or remember that

22  information, and so that is part of why I reached my conclusion

23  that an ordinary viewer would be unlikely to do those things.

24  Q.  And did either Lori Kennard or Sarah Bowling, in their

25  deposition, identify anyone who saw their names, registered,

*BERGER– REDIRECT/BRIAN*                    Vol. 3-644

1  and remembered their names in the video, who was not either a

2  friend, a family member, or knew prior to watching it of their

3  connection to Cline?  Did they identify anyone?

4  A.  No, and I'm actually a little bit surprised.  I would have

5  assumed that, if they thought that was the case, they would

6  have provided some information to show that, but there's no

7  information that I've seen suggesting that any ordinary viewers

8  were exposed to the information for the first time because of

9  the documentary.

10         MR. BRIAN:  No further questions, Your Honor.

11         THE COURT:  Any questions on those?

12         MR. MacGILL:  Nothing.  Nothing further.

13         THE COURT:  All right.  Thank you very much, sir.  You

14  may be excused.

15         THE WITNESS:  Thank you.

16      (Witness excused.)

17         THE WITNESS:  Should I leave this here?

18         THE COURT:  You can leave it there.  That's fine, yes.

19         MR. MacGILL:  All right.  May I approach and retrieve

20  that, Your Honor?

21         THE COURT:  You may.  And, Mr. Brian, you may call

22  your next witness.

23         MR. BRIAN:  I think Ms. Young is handling the next

24  witness, Your Honor.

25         MS. YOUNG:  Before we do that, I would like to move a

Vol. 3-645

1    couple of exhibits into evidence that the parties have agreed

2    can go to the jury without a sponsoring witness, and those are

3    Exhibits 199, Exhibit 204, and Exhibit 1024.

4         Those are some of the therapy records, which we would

5    propose to redact to remove some of the information we've

6    discussed with Your Honor.

7         THE COURT:  Any objection to 199, 204, and 1024 as

8    redacted?

9         MR. CIULLA:  No objection, Your Honor.  We would,

10   under the same stipulation, move into evidence Exhibit 242 and

11   243.

12        THE COURT:  Any objection to 242 and 243?

13        MS. YOUNG:  Let me just confirm that, Your Honor.

14        No objection.

15        THE COURT:  The Court will admit into evidence

16   Exhibits 199, 204, 1024 as redacted, 242 and 243 without

17   objection.

18                  *(Defendants' Exhibits 199, 204, 1024, 242,*

19                  *243 were received in evidence.)*

20        MS. YOUNG:  The defendants call Al Wickers.  I believe

21   he's on his way.  We just sent someone to get him.

22        THE COURT:  Okay.  Mr. Wickers, if you'd come up to

23   the witness stand.  And if you remain standing and raise your

24   right hand.

25        (The witness is sworn.)

1    THE COURT:  You may have a seat.

2    And, counsel, you may examine your witness.

3    MS. YOUNG:  Thank you.  May I please the Court and

4  jury and counsel.

5                    **AL WICKERS, DEFENDANTS' WITNESS, SWORN**

6                         <u>**DIRECT EXAMINATION**</u>

7  BY MS. YOUNG:

8  Q.  Good afternoon, Mr. Wickers.  Could you please introduce

9  yourself to the jury.

10  A.  Hi.  My name is Al Wickers.  And for the court reporter,

11  that's A-L, W-I-C-K-E-R-S.

12  Q.  Are you currently employed, Mr. Wickers?

13  A.  I am retired.

14  Q.  You are retired.  Congratulations.  When did you retire?

15  A.  Officially April 1st.

16  Q.  And what did you do before you retired?

17  A.  I was a media and First Amendment lawyer.

18  Q.  What law -- was that with a law firm?

19  A.  Yes.  With Davis Wright Tremaine, Los Angeles office.

20  Q.  And for how long did you practice law as a media and

21  entertainment lawyer.

22  A.  I practiced law for 31 years, the last 27 years of which

23  were doing exclusively media, First Amendment, and intellectual

24  property law.

25  Q.  Okay.  And who were some of your clients?

*WICKERS – DIRECT/YOUNG*                              Vol. 3-647

1   A.  Clients like HBO, Showtime, Apple TV+, Amazon Prime, the

2   Los Angeles Times, Comedy Central, CNN, Fox, Electronic Arts.

3   Q.  And in doing that work, did you provide legal advice and

4   counseling related to documentary films or series?

5   A.  I did.

6   Q.  Approximately how many of those did you work on?

7   A.  Over the course of my career, probably 3- to 400 different

8   documentaries and docuseries.

9   Q.  And are you the attorney who was hired to review the *Our*

10  *Father* documentary?

11  A.  Yes.

12  Q.  Did you review multiple cuts of the *Our Father* documentary

13  from start to finish?

14  A.  I did.

15  Q.  And did you issue an opinion letter after reviewing those

16  cuts of the documentary?

17  A.  I did.

18  Q.  And did that include the final cut of the documentary?

19  A.  Yes.  I wrote the opinion letter after reviewing the final

20  cut.

21         MS. YOUNG:  Can we please pull up Exhibit 108?  It

22  will be in your binder.  Don't publish it yet.

23  BY MS. YOUNG::

24  Q.  Do you have a binder, Mr. Wickers?

25  A.  I do not.

*WICKERS - DIRECT/YOUNG*                    Vol. 3-648

1        Thank you.  Exhibit 108?

2   Q.  Yes.  And is Exhibit 108 the letter that you issued after

3   reviewing the *Our Father* documentary?

4   A.  Yes, it is.

5            MS. YOUNG:  We would move Exhibit 108 into evidence.

6            MR. MacGILL:  Objection, Your Honor.  May we go onto

7   the...

8            THE COURT:  Equipment?

9            MR. MacGILL:  Yes.

10       (Bench conference on the record.)

11            MR. MacGILL:  Your Honor, the legal opinion from

12   Mr. Wickers is no longer relevant.  The punitive damage issue

13   has been removed from the case.  And for that reason, the

14   opinion is an invasion of the Court's province.  This Court has

15   the right -- exclusive right to instruct this jury on the law.

16            The legal opinion, one, does not have an

17   appropriate -- is not an appropriately supported one, as the

18   Court has heard.

19            Number two, with respect to applicable law, we've got

20   a lot of cases we can cite.  His opinion may not be received

21   because it invades the province of the Court.  It includes,

22   specifically, his conclusions about whether this film violates

23   the laws of any place in the United States.

24            Or let me be more precise.  That no law -- no U.S. law

25   has been abrogated or invaded by this movie.  That's solely for

1    the Court.  They've referenced that he did legal work, that's

2    fine.  But they now seek to replace this witness for this Court

3    and they may not do so.

4           MS. YOUNG:  Your Honor, we don't intend to ask the

5    Court -- ask Mr. Wickers any questions other than to get this

6    opinion letter into evidence.  We simply want to admit it to

7    show what the parties had notice of.  And the parties have

8    stipulated that this is an admissible exhibit.

9           It shows that Netflix and Realhouse exercised

10   reasonable care.  We believe that that is an element that must

11   be proven in a claim like this.  We sought a jury instruction

12   on it.  And they did stipulate that it's admissible.  I will

13   not ask him any questions about his analysis.  I simply want to

14   get the opinion letter into evidence.

15          MR. MacGILL:  Your Honor, the opinion letter expressly

16   invades the province of this Court, number one.  Number two --

17   we've got law from virtually every circuit that confirms the

18   exclusive nature of this Court's authority.

19          Second, negligence is not in the case.  The Court has

20   repeatedly confirmed to the parties that privacy has four

21   elements and negligence is not one of them.

22          So is there an invasion of privacy or not?  That's the

23   question that remains for the jury.

24          THE COURT:  So which element of invasion of privacy

25   would this witness testify about?

*WICKERS - DIRECT/YOUNG*                          Vol. 3-650

1          MS. YOUNG:  We believe that under Gertz -- and I don't

2    have the citation handy, but it's in our trial brief, Your

3    Honor, and it's in our proposed jury instruction, that in

4    addition to the four elements that were set out in the

5    Community Health Care case, which first recognized this tort,

6    there is a negligence requirement under the law because of the

7    First Amendment concerns when you have a publisher as the

8    defendant.

9          The Community Health Care case involved the

10   publication of medical records, not -- it was not a publisher

11   like a news outlet or a documentarian.  And here we have

12   First Amendment concerns that are implicated, which we believe

13   implicates and requires a negligence element to the tort.

14         And for purposes of our record, we think it's very

15   important to put this into evidence so that we can establish

16   that the defendants did not act negligently.

17         MR. MacGILL:  Your Honor, we have briefed this in the

18   filing we made on October 30, 2024, which is Docket 319.

19         And with respect to the Community Health decision,

20   it's very clear invasion of privacy was affirmed as a tort in

21   this state, and the parameters, the metes and bounds of the

22   tort have been defined.  Negligence is not among them.

23         So negligence -- there's no negligence issue here.

24   The question is did they invade the privacy -- did they invade

25   the plaintiffs' privacy under the circumstances of the case.

*WICKERS - DIRECT/YOUNG*                                    Vol. 3-651

1          MS. YOUNG:  Again, I would refer the Court to the

2     Gertz decision by the United States Supreme Court, which

3     addresses the mens rea requirement when the defendant is a

4     publisher.  Those were not the facts of the Community Health

5     decision.

6          The Indiana Supreme Court has not passed on that

7     issue, and we think that the Supreme Court's guidance is what

8     this Court ought to follow in both instructing the jury and

9     allowing evidence in the case.

10         THE COURT:  I will allow you to offer it into

11    evidence.  I'll admit it over your objection, but -- and we'll

12    determine, once we figure out which instructions will go back

13    to the jury, whether or not it will go back with the jury.

14         MR. MacGILL:  Understood.

15         MS. YOUNG:  Thank you, Your Honor.

16                        (Open court.)

17         THE COURT:  All right.  So you're offering the

18    exhibit, counsel?

19         MS. YOUNG:  Yes.  We would offer Exhibit 108 into

20    evidence.

21         THE COURT:  And the Court will admit into evidence

22    Exhibit 108 over the plaintiffs' objection with conditions that

23    the Court stated on the equipment.

24                   *(Defendants' Exhibit 108 was*

25                   *received in evidence.)*

BY MS. YOUNG:

Q.  And I would simply ask you, sir, do you stand by your opinions in that letter?

A.  Yes, I do.

Q.  I want to ask a couple of questions about clearance logs, which our jury has heard a little bit about today.  Please tell us, what is a clearance log?

A.  A clearance log is basically a spreadsheet that is prepared by a television or film production, and it lists all of the, kind of, third-party materials.  It could be newspaper clippings.  It could be book covers.

     In this instance, for example, clips from television news reports on one column, and it will identify where you can find them in the documentary.  It will identify the source of the material and also whether it's been licensed or whether permission has been obtained from the copyright owner to use it.

Q.  And from your perspective, what is the purpose of a clearance log?

A.  A clearance log is really designed for the reviewing lawyer to assess whether all of those types of materials I just talked about, the clips from television news records, book covers, music, for example, has all either been properly licensed or whether the production has the right to use it under what's called fair use in copyright law.  And it's -- you know, that's

*WICKERS - DIRECT/YOUNG*                          Vol. 3-653

1   its primary purpose.  It's not really designed for other legal

2   issues.  It's primarily a copyright-related document.

3   Q.  Okay.  And are copyrights different from privacy rights?

4   A.  Yes.  Copyright law and privacy law are completely

5   different.

6   Q.  In providing advice about the *Our Father* film, did you

7   limit your legal analysis to the shots that were listed on the

8   clearance logs?

9   A.  No, not at all.

10  Q.  And why not?

11  A.  Because to do a legal review, you're not just looking for

12  copyright issues.  We're also looking to determine whether

13  there's anything defamatory, if it violates anybody's right of

14  publicity, if it might violate someone's right of privacy,

15  might infringe trademark issues.  So there are many more things

16  beyond just copyright law that we're looking to that would not

17  be reflected, generally, on a clearance log like that.

18          MS. YOUNG:  Thank you, Mr. Wickers.  I have nothing

19  further.

20          MR. MacGILL:  May I have one minute?

21          THE COURT:  You may.

22          MR. MacGILL:  No questions, Your Honor.

23          THE COURT:  All right.  Thank you.  You may be

24  excused.

25          THE WITNESS:  Thank you very much.

*WICKERS - DIRECT/YOUNG*                                    Vol. 3-654

1          (Witness excused.)

2               THE COURT:  Do you have any other witnesses?

3               MR. BRIAN:  We do not, Your Honor.

4               THE COURT:  Does the defendant rest?

5               MR. BRIAN:  If that's agreeable, we would rest our

6     case.  And we'll do that, of course, in the next couple of

7     hours.  I don't think there is, but I've been in situations

8     where I forgot to offer something.

9               THE COURT:  You won't be here in the next couple of

10    hours, Ladies and Gentlemen.

11              Do you have any rebuttal evidence?

12              MR. MacGILL:  We do not, Your Honor.

13              THE COURT:  All right.  Well, Ladies and Gentlemen of

14    the Jury, I believe you have heard all of the testimony and

15    received all of the evidence in this case, and we're going to

16    send you guys home for the evening and have you come back in

17    the morning, where you will hear the closing arguments of

18    counsel, and you'll get your final instructions on the law from

19    the Court, and then you will begin your deliberations.

20              During this period of time that you're allowed to

21    separate for overnight, it's very important that you do not

22    have any discussion about the case among yourselves or with

23    others, including your family.

24              If anyone should attempt to talk to you about the

25    matter, refuse and report that attempt to your bailiff at your

1   earliest opportunity.  And remember, no research about anything

2   related to this case.

3          We're -- we're almost finished, so thank you for your

4   attention, and we're going to go ahead and send you home.

5   We're going to stay here and work.

6          MR. BRIAN:  Your Honor, could we go on the equipment

7   very quickly before you let the jury go?

8          THE COURT:  Sure.

9      (Bench conference on the record.)

10         MR. BRIAN:  Can you hear me?  Your Honor, we will make

11  a -- we're making a formal Rule 50 motion on the remaining

12  cause of action for compensatory damages under all the elements

13  that they have not presented -- not submitted the sufficient

14  evidence to get to that a reasonable jury could conclude

15  establishes either that the information was private, that it

16  was disclosed to the public, that it was highly offensive,

17  and/or there was not a legitimate public concern, and in our

18  view, also, that we failed to show reasonable care.

19         We do intend to file something in writing this

20  evening.  Just before you let the jury go, I just wanted to

21  advise the court of that and see.  We would like some brief

22  opportunity to supplement that with argument, whether you want

23  to hear that before closings, whether you want to wait until

24  after closings, I defer to the Court, but I wanted to let the

25  Court know so you could take that into account.

1      THE COURT:  Sure.  I'm going to go ahead and send the

2  jury home, and then we can take care of any matters that we

3  need to take care of this evening, and that's fine with me if

4  you get your motion on file this evening.  If you want to

5  respond like you did last night at 7:00 a.m., and then we'll

6  talk about that, get a ruling on that in the morning, okay?  If

7  we come in and they get sent home, that is fine, but we're

8  going to go ahead and send them home for the evening.

9      MR. MacGILL:  May we have a deadline, a 6:00 p.m.

10  deadline on their brief?

11      THE COURT:  They have 15 lawyers.  I'm sure they can

12  get it done.

13      MR. MacGILL:  That's fine with us.

14      MR. BRIAN:  I didn't hear that.

15      THE COURT:  Can you have it by 6:15, your motion on

16  file?

17      MR. BRIAN:  What was that?

18      THE COURT:  By 6:15, your motion on file?  Do you want

19  a little later?

20      MS. YOUNG:  Yes, please.

21      THE COURT:  Is 6:00 too early?  You want it a little

22  later?

23      MR. BRIAN:  Can you hear me now?  Can we possibly get

24  until 7:00 or even 6:45?  Oh, we're told we need the transcript

25  to do it, but we'll -- we can file by 7:00, Your Honor.

Vol. 3-657

 1          MR. MacGILL:  Fine.

 2          THE COURT:  Okay.

 3                    (Open court.)

 4          THE COURT:  Okay.  Ladies and Gentlemen, you had your

 5   admonishment.  Have a good evening.  We'll see you -- let's

 6   have you here at -- because we may have to take care of some

 7   matters in the morning.  9:00 a.m.  So you get that extra time,

 8   extra half hour, but be here on time so we can get this case

 9   finished; okay?  Have a good evening.

10          COURTROOM DEPUTY:  All rise.

11      (Jury out at 4:38.)

12          THE COURT:  So, lawyers, what we'll do, we'll come

13   back in the courtroom, we're going to let the court reporter go

14   and any witnesses -- your parties can go.  Just as attorneys

15   and the court, we will go through your instructions, your

16   proposed instructions and your objections, and I'll make

17   rulings.  And then in the morning, when we get here, we'll put

18   those objections on the record.

19          And then in the morning, we can also deal with any

20   other matters.  We'll start at -- we'll get here at 8:00, and

21   then have the jury here at 9:00.  So let's take about -- at

22   5:00 -- let's take 20 minutes, and then we'll meet here in the

23   courtroom.  And we'll go through the -- get our final

24   instructions.

25          MR. BRIAN:  Two things, Your Honor:  Just in terms of,

Vol. 3-658

1    I think all parties have cooperated to move things rapidly.

2              THE COURT:  You have.

3              MR. BRIAN:  We appreciate the Court's guidance on

4    that.  In terms of the length of closing, would it be

5    acceptable to have each of us to get an hour to do that?

6              THE COURT:  What do you want?

7              MR. MacGILL:  Yeah.  Okay.

8              THE COURT:  I'll give you an hour.

9              MR. MacGILL:  Okay.

10             THE COURT:  Okay.

11             MR. BRIAN:  Obviously it has to be divided up, I

12   understand.

13             THE COURT:  Right.

14             MR. BRIAN:  And then secondly, Your Honor, with leave

15   of the court, I'm not a jury instruction guru, I have to work

16   on a closing.  Could I ask leave of court to go back and work

17   on a closing, and I'll let my colleagues handle the jury

18   instructions?

19             THE COURT:  You certainly may.

20             MR. BRIAN:  Thank you.

21             MR. MacGILL:  If you don't mind, may I do the same?

22             THE COURT:  You may.

23             MR. MacGILL:  I have got some homework too.

24             THE COURT:  Who is going to do your -- who is -- okay.

25             MR. MacGILL:  Mr. Ciulla.

 1          THE COURT:  Mr. Ciulla?

 2          MR. MacGILL:  Yes, Your Honor.

 3          THE COURT:  Okay.  All right.  Let's take about 15

 4   minutes -- we'll get 20 minutes, and we'll meet back here in

 5   the courtroom at 5:00.  And all the parties go on home and get

 6   some rest.  See you guys in the morning.

 7          COURTROOM DEPUTY:  All rise.

 8      (Proceedings adjourned at 4:40.)

 9

10   --------------------------------------------------------

11

12                 CERTIFICATE OF COURT REPORTER

13

14      I, David W. Moxley, hereby certify that the

15   foregoing is a true and correct transcript from

16   reported proceedings in the above-entitled matter.

17

18

19

20   /S/ David W. Moxley_____    December 4, 2024
     DAVID W. MOXLEY, RMR/CRR/CMRS
21   Official Court Reporter
     Southern District of Indiana
22

23

24

25