Vol. 4-660

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


SARAH BOWLING,                          )
LORI KENNARD,                           )
                                        ) Cause No.
        Plaintiffs,                     ) 1:22-cv-1281-TWP-MJD
                                        ) Indianapolis, Indiana
   vs.                                  ) **December 5, 2024**
                                        ) 8:09 a.m.
NETFLIX, INC., NETFLIX                   )
WORLDWIDE ENTERTAINMENT, LLC,           )
REALHOUSE PRODUCTIONS, LLC.,            )
                                        ) **VOLUME IV**
        Defendants.                     )



**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL




Court Reporter:            David W. Moxley, RMR, CRR, CMRS
                           United States District Court
                           46 East Ohio Street, Room 340
                           Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES:**

**For Plaintiffs:**          Robert D. MacGill, Esq.
                            Matthew Thomas Ciulla, Esq.
                            Mackenzie Thompson, Esq.
                            Jordan Cecelia Satterthwaite,Esq.
                            MacGill PC
                            Suite 1200
                            156 East Market Street
                            Indianapolis, IN  46204


**For Defendants:**         Brad Dennis Brian, Esq.
                            Munger, Tolles & Olson, LLP
                            50th Floor
                            350 South Grand Avenue
                            Los Angeles, CA  90071-3426

                            Blanca Young, Esq.
                            Munger, Tolles & Olson, LLP
                            Suite 27th Floor
                            560 Mission Street
                            San Francisco, CA  94105-2907

                            Andrea Roberts Pierson, Esq.
                            Faegre Drinker Biddle & Reath
                            Suite 2500
                            300 North Meridian Street
                            Indianapolis, IN  46204

**I N D E X**

Closing argument by Mr. MacGill  ..............692

Closing argument by Mr. Brian  ...............722

Closing argument by Mr. MacGill  ..............753

Final Jury Instructions.......................762

1          (In open court.)

2          THE COURT:  Good morning, everyone.  We are on the

3    record.  This is Sarah Bowling and Lori Kennard, plaintiffs,

4    versus Netflix, Inc., Netflix Worldwide Entertainment, LLC, and

5    Realhouse Productions, LLC, and we've got a lot of work to do

6    this morning, so we're going to go ahead and get started.

7          For the record, the Court last night informed parties

8    that both preliminary and final instructions will go back with

9    the jury when they deliberate, and the parties agreed that we

10   would edit preliminary Instruction Number 3, which is the issue

11   instruction, and we're going to remove the language regarding

12   punitive damages since punitive damages are no longer an issue

13   in the case.

14         Does plaintiffs' counsel agree?

15         MR. MacGILL:  We agree.

16         THE COURT:  Defendants' counsel agree?

17         MS. YOUNG:  Yes, Your Honor.

18         THE COURT:  We also agreed -- the parties also agreed

19   that no transcripts will be displayed in their closing

20   arguments and no videotapes of transcripts will be played

21   during closing arguments.

22         Does plaintiff agree?

23         MR. MacGILL:  We agree.

24         THE COURT:  Defendants agree?

25         MR. BRIAN:  Yes, Your Honor.

Vol. 4-664

1          THE COURT:  Okay.  So let's get to all of these many

2     things that you filed last night.

3          MR. BRIAN:  Your Honor, on that last, we're allowed to

4     read testimony, though, I assume?

5          THE COURT:  You may read.

6          MR. BRIAN:  Yeah.  Thank you.

7          THE COURT:  Okay.  All right.  So we have -- let's

8     talk about the instructions, first of all.  Well, maybe we'll

9     talk about the verdict forms, first of all.

10         All right.  So, lawyers, you both made some files on

11    verdict forms.  We'll hear from plaintiffs first.

12         Well, defendants you filed a new verdict form,

13    proposed verdict form?

14         MR. CIULLA:  Your Honor, the defendant did file a new

15    verdict form, but we filed just, kind of, a problem-solving

16    document.

17         So from the plaintiffs' perspective, essentially what

18    appears to have happened last night is defendants withdrew the

19    negligence issue from the case, so I think we're all agreed

20    that there are only two questions to go on the verdict form,

21    liability and damage.

22         We prefer Your Honor's approach, which would be four

23    verdict forms with two questions each.  Defendants have

24    proposed two verdict forms with two questions each, which is

25    okay with us as long as they use the word "or" and not the word

 1    "and."  We believe the word "and" is very problematic.

 2            MS. YOUNG:  Thank you, Your Honor.

 3            And that's correct.  We are withdrawing the negligence

 4    issue from the case, and that's --

 5            THE COURT:  So, counsel, by defendants withdrawing

 6    that negligence instruction and the negligence issue on the

 7    verdict form, you're waiving any First Amendment arguments

 8    pursuant to Gertz?

 9            MS. YOUNG:  The negligence First Amendment argument.

10    There's a separate First Amendment argument that we made in our

11    Rule 50 motion which we are not waiving.  But the argument that

12    negligence is an element, yes, we are withdrawing that, and we

13    recognize we would be waiving that argument.

14            THE COURT:  Okay.

15            MS. YOUNG:  And the -- I don't think this issue is --

16    so, as you'll see, Your Honor, we submitted a much-simplified

17    verdict form, and the reason it's so simple is because there

18    are four elements of this tort, and they don't depend on who

19    the defendants are.  They're all plaintiff centric.  And there

20    was one disclosure made in this case for which both of the

21    defendants are responsible.  It happened the same way.  And so

22    we don't actually think there's any need to have two different

23    verdict forms for two different defendants.  We think there

24    should be one verdict form for each of the plaintiffs, and

25    that's why it's phrased with an "and" instead of an "or."

1        The problem with using an "or" is, if we use, you

2   know, do you find Netflix or Realhouse liable, and then the

3   question is yes or no, let's suppose that the answer is yes.

4   We then don't know who has standing to appeal because we don't

5   know if they answered yes as to Netflix or yes as to Realhouse

6   or yes as to both of them.  So we think that the form that we

7   proposed does not raise that issue.

8        But there's a simple way to address this, which is

9   simply to take the form that we proposed, which is Docket 408,

10  and it will have three questions instead of two.  It's still

11  very simple.  Question number 1:  Did plaintiff -- fill in the

12  blank -- prove by the greater weight of the evidence that

13  Netflix committed the tort of invasion of privacy, yes or no.

14  Go to the next question:  Did plaintiff prove by the greater

15  weight of the evidence that Realhouse committed the tort of

16  invasion of privacy, yes or no.  If you answered yes to either

17  1 or 2, answer number 3:  What amount of money do you award?

18  So that, I think, is the simple solution to all of this.

19            THE COURT:  And that's in -- I don't see that in 408.

20            MS. YOUNG:  I'm suggesting an amendment.

21            THE COURT:  Oh, you're changing 408?

22            MS. YOUNG:  I'm suggesting an amendment to 408 that

23  would address Mr. Ciulla's concern.

24        The concern we have with going with one verdict form

25  for each defendant is that the jury could end up writing down

double damages awards when they intended to do only one damages award.  And the damages question is unique and plaintiff specific and should be answered once for each plaintiff.

MR. CIULLA:  Your Honor, I'll just say what I'm hearing is getting very close to, essentially, a stipulation of joint and several liability.  I mean, I think if we're going to have things like this, I mean, I would be okay with that, if we're going to stipulate to joint and several liability.  But I think, otherwise, as far as I understand, that's not being stipulated to, and so I think we should go with Your Honor's approach with the four verdict forms.  This is getting highly confusing.

THE COURT:  And plaintiffs did sue two separate defendants.

MR. CIULLA:  Yes, ma'am.

THE COURT:  The Netflix defendants are Netflix. Realhouse is a separate defendant.

MS. YOUNG:  It is, Your Honor, but the problem is that, if you have two separate verdict forms for each defendant, the injury is only one injury per plaintiff, and the jury should answer that question once for each plaintiff. Otherwise, we have a risk that the jury will write down -- let's say the jury thinks that Ms. Kennard was injured in the amount of $1 million.  That's her injury, and they find both Netflix and Realhouse liable.  They might write down a million

1    dollars for Netflix and a million dollars for Realhouse and

2    double her damages by doing that.

3         THE COURT:  Counsel, you can explain to them that they

4    cannot do that in your argument.

5         And, also, they may come back and say Netflix is

6    responsible for everything.  And the jury should have that

7    option because the plaintiffs sued two separate corporations.

8         Do you reject the plaintiffs' proposal that we put

9    "or" rather than "and" in your 408?

10        MS. YOUNG:  I think the issue with that, Your Honor,

11   is if it's "or" and the answer is yes, we don't know who --

12   which defendant has a right to appeal.

13        MR. BRIAN:  Your Honor, can you give me 30 seconds to

14   talk to Ms. Young?  I think maybe there's a solution here.

15        MS. YOUNG:  We might be able to resolve it.

16        THE COURT:  Okay.

17     (Off the record.)

18        THE COURT:  Why don't you all talk.  Do you think you

19   can work out something?

20        MS. YOUNG:  I think we might be able to.

21        THE COURT:  Okay.

22        MR. BRIAN:  I think, on the question that Mr. Ciulla

23   has raised, we need to confer with our clients, Your Honor.

24   That might work, I don't know, but I don't have the authority

25   to agree to that.

Vol. 4-669

1          MR. MacGILL:  On joint and several liability?

2          MR. BRIAN:  Yes, until they arrive.

3          THE COURT:  Okay.

4          MR. MacGILL:  Okay.  I think we're very close.

5          MS. YOUNG:  We might be able to come up with a

6    solution here.

7          THE COURT:  All right.  Because it was -- I assume

8    it's indemnification because you haven't said anything

9    otherwise.  You didn't raise it in summary judgment either.

10         So you all -- you all keep working on that; okay?

11         MR. MacGILL:  Agreed.

12         MS. YOUNG:  Yes, Your Honor.

13         THE COURT:  But, you know, they did sue four people so

14   -- I mean two people, so -- two entities.

15         All right, let's go to the instructions, and we can go

16   through what we worked on last night.

17         So I'm at Docket 309, and we have agreed -- we're

18   going to begin on Docket 309 at page 5, which is page 4 under

19   your page number, but page 5 on the docket.

20         The functions of the Court and the jury is given.

21         Your proposed number 2, all litigants equal before the

22   law, is given.

23         Your 3 and 4, 5, 6, 7, 8, 9 are given without

24   objection.

25         Your proposed 10, we're going to remove the language

1    about "behaved in a manner," and we're going to take out -- on

2    the last paragraph, we're going to say:  However, if a witness

3    testifies inconsistently under oath, we'll take out "either",

4    and we'll just say "under oath in this case."  You may also

5    consider the content of the witness' prior inconsistent

6    statements as evidence in this case, so given as modified.

7            Eleven on impeachment is given.

8            Twelve, 13 is given.

9            Your 14 is given.  We will remove "preponderance, a

10   preponderance" and just use the language "the greater weight of

11   the evidence."

12           On your 15, there was -- on expert witnesses, there

13   was one expert witness, so we will say: You have heard a

14   witness give opinions rather than plural.

15           Sixteen is given.

16           Seventeen is given.  We'll say: In deciding this case,

17   you must not consider or speculate about whether any party has

18   insurance, rather than "either."

19           Number 18, we're going to redact this to say: When you

20   review the documents admitted into evidence in this trial, you

21   may see that certain portions of a document have been blacked

22   out or whited out, and we'll use "blacked out" and "whited out"

23   in the second sentence, also.

24           Your 19, multiple plaintiffs, is given.

25           All right.  On 20, pseudonyms, we're going to say --

Vol. 4-671

1    we're going to strike the first paragraph and the

2    second paragraph, which is one sentence.  We will say: If you

3    heard the pseudonyms "Jane Doe," that referred to Sarah

4    Bowling.  If you heard "Janice Doe," that referred to Lori

5    Kennard.  You are instructed not to draw any inference as to

6    the use of pseudonyms, period.

7            Agree, plaintiff?

8            MR. CIULLA:  Yes, Your Honor.

9            But on Ms. Kennard, it's Coe, C-O-E, C as in cat.

10           THE COURT:  Okay.

11           Agree, defendants?

12           MS. YOUNG:  Yes, Your Honor.

13           THE COURT:  Okay.  All right.

14           Your proposed Instruction Number 21 about Laura

15    DiSalvo is not given.  And, instead, lawyers, we can give the

16    limiting instruction that I read earlier that's on the docket.

17           Agree, plaintiff?

18           MR. MacGILL:  Agree, yes.

19           THE COURT:  Defendant?

20           MS. YOUNG:  Your Honor, I would just wonder why that's

21    necessary.  I think that limiting instruction was given at the

22    time that Laura DiSalvo was referenced.

23           THE COURT:  Do you want it?  Do you care?

24           MR. CIULLA:  No, we don't care, Your Honor.

25           THE COURT:  All right.  Well, if you don't care, then

1    that will be less things to read so we won't give that one.

2           Okay.  All right, the proposed 22, over plaintiffs'

3    objection, the Court will not give this 22 because it is

4    cumulative.  It's covered by the pattern instruction on

5    invasion of privacy by public disclosure of private fact.

6           MR. CIULLA:  Yes, and we'll reserve our objections for

7    the record.

8           THE COURT:  Okay.  And your objection is noted for the

9    record.

10          Twenty-three, the instruction for invasion of privacy

11   by disclosure of private fact elements, the Court is going to

12   give the defendants' proposal, which is just the -- the

13   defendants' proposal on page 37:  The plaintiffs' information

14   is not private in nature if the information is left open to

15   public inspection, if the defendant merely gives further

16   publicity to information about the plaintiff that is already

17   public or if the plaintiff discloses that information to people

18   who are not close family or close friends.  And this is -- will

19   be given over the plaintiffs' objection.

20          MS. YOUNG:  Your Honor, may I clarify something for

21   the record?

22          THE COURT:  Yes.

23          MS. YOUNG:  I believe what Your Honor just read in was

24   our proposed Instruction Number 24.

25          THE COURT:  Oh, you're right.  Okay.

Vol. 4-673

1      MS. YOUNG:  And I believe what we discussed yesterday

2  on the Instruction Number 23 was that Sarah and Lori's names

3  would be changed to their first and last names and that this

4  instruction would be given without the last sentence.

5      THE COURT:  Right.  And so this is:  Netflix and

6  Realhouse disclosed.  Do you want to say:  Netflix or

7  Realhouse?

8      If we're looking at 23, we can do it two ways,

9  lawyers.  We can give an instruction -- we can give a separate

10  instruction for Netflix and a separate for Realhouse or you can

11  put the word "or" rather than "and."

12      MR. CIULLA:  I think "or" would be good for us, Your

13  Honor.  I think that's acceptable.

14      MS. YOUNG:  I think that's acceptable for the

15  instruction, Your Honor.

16      THE COURT:  Okay.

17      MR. CIULLA:  And then could we go back to 24 just for

18  the record?

19      THE COURT:  Yes.  Let me read 23 into the record.

20      MR. CIULLA:  Okay.

21      THE COURT:  So to recover damages from the defendants,

22  Netflix or Realhouse, the plaintiffs, Sarah Bowling and Lori

23  Kennard, must each prove by the greater weight of the evidence

24  that:  One, Netflix or Realhouse disclosed information; two,

25  Netflix or Realhouse's disclosure was communicated in a way

1    that either reached the public or was sure to reach the public,

2    in general or communicated to a larger number -- enough number

3    of persons that the matter was sure to become public knowledge;

4    three, Netflix or Realhouse's disclosure was one that would be

5    highly offensive to a reasonable person; and, four, the

6    information disclosed by Netflix or Realhouse was not of

7    legitimate public concern.

8            And we will omit that final sentence.  Agree,

9    plaintiffs?

10           MR. CIULLA:  Yes, Your Honor.

11           THE COURT:  Defendants?

12           MS. YOUNG:  Yes, Your Honor.

13           THE COURT:  Okay.  All right.  Now we're on your

14   proposed 24.  So the Court took this one under advisement, and

15   I was going to give the defendants' proposed version over

16   plaintiffs' objection.

17           MR. CIULLA:  Yes, Your Honor.  Just to make a

18   record -- well, I guess, first, are you inserting the word

19   "close" before family?

20           THE COURT:  Yes.

21           MR. CIULLA:  Okay.  So we object to that as not

22   supported by any case law or restatement.

23           And then for the record, we object to the omission of

24   our proposal on page -- ECF 36.

25           THE COURT:  Do you want to respond for the record?

1          MS. YOUNG:  We do believe that the proposal is

2    supported by the restatement.  It comes from the restatement

3    and the comments to the restatement do indicate that when it

4    refers to family, it's referring to close nuclear family, as

5    opposed to close relationships, and so that's why we proposed

6    "close" to be added, and I believe that's why the Court so

7    ruled.

8          THE COURT:  Agree.

9          So your objection is noted for the record.

10          Okay.  Proposed Final Instruction Number 25 was

11    withdrawn.

12          Proposed Final Instruction Number 26, highly offensive

13    to a reasonable person, is not given, no objection.

14          MS. YOUNG:  No objection.

15          THE COURT:  I believe there was no objection.

16          MS. YOUNG:  No objection, Your Honor.

17          THE COURT:  Okay.

18          Twenty-seven, all of these 27 versions were withdrawn

19    last night, so we won't give any of those.

20          And then 28, defendants, you are withdrawing your

21    request for this First Amendment negligence instruction?

22          MS. YOUNG:  Yes, Your Honor.

23          THE COURT:  Okay.  No problem with that, plaintiffs?

24          MR. CIULLA:  That's fine, Your Honor.

25          THE COURT:  Okay.  So that one is withdrawn.

Vol. 4-676

1              All right, 29, defendants' proposed final instruction

2      consent not required.  So what the Court talked about last

3      night, we talked about this a lot, a plaintiff is not -- a

4      plaintiff does not establish an invasion of privacy by public

5      disclosure of a private fact by showing that she did not

6      consent to the disclosure.  So the Court was going to give this

7      over plaintiffs' objection.

8              So, plaintiff, what's your objection, for the record?

9              MR. CIULLA:  Yes, Your Honor.  Just for the record,

10     we'll incorporate our objections at page ECF 4-9.

11             THE COURT:  All right.  So we'll give it over

12     plaintiffs' objection.

13             Proposed final instruction on compensatory damages at

14     30 was withdrawn.

15             And our instruction on damages, Number 31, the Court

16     is going to give the pattern, which says -- it's on page 56:

17     If you decided from the greater weight of the evidence that --

18     we'll say defendant Netflix -- do you want to say and/or

19     defendant Realhouse?

20             MR. CIULLA:  Yeah, "and/or".

21             THE COURT:  Okay.  We'll do that.

22             MR. CIULLA:  Thank you.

23             THE COURT:  Are liable to -- and we'll give the

24     plaintiffs' full names -- then you must decide the amount of

25     money that will fairly compensate each plaintiff to whom a

1  defendant is liable.  In deciding the amount of money you

2  award, you may consider:  One, the harm to plaintiffs' interest

3  in privacy result prosecuting the invasion; two, the

4  plaintiffs' mental distress proved to have been suffered, if it

5  is of a kind that normally results from such an invasion --

6  that's confusing, but they will fill it out; and three, special

7  damage of which the invasion is a legal cause.

8        Any objection to that instruction, plaintiffs?

9        MR. CIULLA:  Yes, Your Honor.  Just for the record, we

10 object, and we would request that the Court add the additional

11 categories listed on page ECF 57 under the case and other

12 authorities cited there.

13       THE COURT:  And your response?

14       MS. YOUNG:  For the reasons we discussed, those

15 additions are duplicative and unnecessary of what's in the

16 pattern instruction.

17       THE COURT:  I agree, because you can -- lawyers, you

18 can argue that mental distress is your personal humiliation,

19 harm to reputation, and all those things, so the Court is going

20 to give the pattern.

21       MR. MacGILL:  So may I ask, you said, the first thing

22 you said we may argue personal humiliation?

23       THE COURT:  You can say -- you can argue all of that.

24       MR. MacGILL:  Okay.

25       THE COURT:  You can say that that's mental distress.

 1          MR. MacGILL:  Okay.  Now I understand.  I'm sorry, I

 2     didn't hear you the first time.

 3          THE COURT:  Right.  We're going to give them the

 4     pattern instruction, but in your arguments, you can tell them

 5     what mental distress is.

 6          MR. MacGILL:  Thank you very much.

 7          THE COURT:  Okay.

 8          Final Instruction Number 33, no speculative damages is

 9     given.

10          We're removing 34 and 35.  Those were regarding

11     punitive damages.

12          Thirty-six, on jury deliberations, will be given.  The

13     only change in the last paragraph.  Since it's eight jurors,

14     we'll say four-four or five-three.

15          MS. YOUNG:  I'm sorry, Your Honor.  I missed that.

16          THE COURT:  On 36 --

17          MS. YOUNG:  Yes.

18          THE COURT:  -- the last paragraph says:  If you send

19     me a message, do not include the breakdown of any votes you may

20     have conducted.  In other words, do not tell me that you are

21     split four-four or five-three, just so that it totals eight,

22     since we have eight jurors.

23          And then our last instruction is the Allen charge.

24     Your verdicts must represent the considered judgment of each

25     juror.

1        Okay.  Any other objections to the final instructions,

2    for the plaintiffs?  None, other than those you have already

3    made?

4        MR. MacGILL:  Just one additional matter related to

5    what we just discussed.  We would ask that the Wickers' opinion

6    now be -- it was admitted conditionally.  We ask that it be

7    withdrawn and his opinion is of no moment now that negligence

8    is out of the case.

9        MS. YOUNG:  Your Honor, there are a lot -- a lot has

10   changed since this trial started a few days ago, because

11   punitive damages are out of the case, negligence is out of the

12   case, intent is now out of the case, and so if Mr. Wickers'

13   opinion is out, I think so are a lot of other exhibits that I

14   believe were only introduced to show what defendants intended

15   or thought about, whether they needed to get releases or

16   permissions.  And we do have a list of exhibits like that.

17   These are exhibits in which no plaintiff has specifically

18   mentioned, and they're talking about getting releases for all

19   of the Cline siblings.  These are things like the e-mails that

20   Alexandra Reed wrote to the insurance broker.

21       THE COURT:  These are exhibits that have been

22   admitted.

23       MS. YOUNG:  Yes, they are, Your Honor.  When punitive

24   damages was at issue, which it no longer is.  And these

25   include, for example, Exhibit 33, 38, 39, 41, those are a

1    series of e-mails that Ms. Reed -- e-mails and documents and

2    communications that Ms. Reed had with various people about a

3    defamation privacy risk, and we will get releases for anyone

4    who is -- we won't include information about anyone's inception

5    without their permission.  Those don't refer, specifically, to

6    the plaintiff.  It's not clear why those are relevant to any

7    issue remaining in the case.

8         There are other e-mails like that.  We saw e-mails

9    where Mr. Petrella said:  The siblings are fiercely protective

10   of one another's privacy without reference to either of the

11   plaintiffs.  We'll absolutely keep those names confidential

12   without references to either of the plaintiffs.

13        Those are Exhibits 7 and 8.  We saw e-mails where

14   Ms. Shapiro, this is Exhibit 14, wanted to blur some shots in

15   the trailer, not in reference to either of the plaintiffs to be

16   extra safe, and there are a number of other documents like

17   this, so I think because of the way the case has changed over

18   the last couple of days, these may have been relevant to an

19   attempt to prove punitive damages.  There was not clear and

20   convincing evidence of that, and we don't think that those

21   exhibits should go back to the jury.

22        Other exhibits like that include Exhibit 42, 51, 99,

23   102, 127, and 128.

24        MR. MacGILL:  So, Your Honor, we tried this case, as

25   you know, on the basis of how it was structured and invited by

Vol. 4-681

1    the defense.  What the defense said is you must prove

2    negligence.  We heard that from opening statement forward, and

3    we proceeded on that basis, so that's just one contextual

4    point.

5         But more importantly for today, when we look at what

6    the Court is going to instruct the jury on, element one, was

7    this information private or not.  These exhibits, each of them

8    that they just mentioned, relate to the first presentation

9    we're going to make.  This was all private.  They made -- they

10   maintained it was private, and they said it repeatedly that

11   they got assurances back that the information was private, on

12   element one.

13        Each of these exhibits that they've just referenced, I

14   think each of them, also relates to element two with respect

15   to, you know, what happened in terms of the information that

16   was published, how it reached the public, and whether or not it

17   was communicated to a large enough persons that the matter

18   ended up where it did.  And then element three also is

19   implicated by these exhibits that have been introduced into the

20   case in the sense that the disclosures that they made were

21   disclosures that were highly offensive.

22        And then this third element, they knew that these

23   disclosures would be highly offensive.  They knew and the

24   evidence shows, as one example, they knew these disclosures

25   would be triggering.  They knew that these disclosures would be

1    traumatic to the children.  All of that is relevant to the case

2    as it remains.

3        So for those reasons, striking exhibits and removing

4    exhibits, based on their decision, would be inappropriate at

5    this time.

6            MS. YOUNG:  Your Honor, the exhibits that I am

7    mentioning are not exhibits that talk specifically about the

8    plaintiffs.  There are other exhibits that do, you know,

9    Mr. Petrella's e-mail or Facebook message to the siblings with

10   Sarah Bowling's name on it, that's not on my list.  The e-mail

11   where Lucie Jourdan asks for Lori Kennard's name to be blurred

12   is not on my list.  These are general statements about Cline

13   siblings.  We know there are 94 or more of them.  We know that

14   some of those people were private about their information and

15   others were not and that does not prove that these plaintiffs

16   were private about their information.  These documents also

17   don't have anything to do with the breadth of the distribution.

18   There's plenty of evidence in the record about that, including

19   responses which are not on my list, that show the number of

20   people who viewed the film.  So a lot of the things that

21   Mr. MacGill just mentioned are not on this list.  These

22   exhibits contain specific statements about getting releases and

23   promising confidentiality to people who are not the plaintiffs,

24   specifically.

25            THE COURT:  All right.  I'm going to overrule that

1  request.  The evidence is what the evidence is, and if he

2  says -- if plaintiffs say that some of these exhibits go

3  towards their invasion of privacy claims, they can make those

4  arguments.  And if you, in your arguments, defendants, if you

5  think they've said something that they shouldn't have, you can

6  make an objection at the appropriate time.

7         But you have not responded to the Wickers' exhibits.

8         MS. YOUNG:  Well, I think if those come in,

9  Mr. Wickers --

10        THE COURT:  What exhibits did we get in with Wickers

11  that you wanted?

12        MS. YOUNG:  It's just Exhibit 108.  It's his opinion

13  letter.

14        THE COURT:  Okay.

15        MR. MacGILL:  So, Your Honor, the problem with the

16  opinion letter, he says that this meets all of the requirements

17  of United States law.  Only this Court will determine what the

18  requirements of United States law are.  So it invades your

19  province, and he has no right to tell this jury what U.S. law

20  requires.

21        We did allow and did not object to the testimony that

22  he gave the opinion.  We asked -- Lucie Jourdan said he gave

23  the opinion, she relied on it, so the jury knows an opinion was

24  given by counsel, and so we didn't object to that, but the

25  letter itself does expressly invade the province of the Court.

1    And I'm not sure how they might compare his legal analysis,

2    defective as it was in our judgment, how they would compare his

3    letter with your instructions.  And, you know, our circuit here

4    and the Seventh Circuit, the Fifth Circuit, every case, every

5    circuit I can think of has addressed this specifically.  Lawyer

6    opinions, statements of the law, are not allowed, and the only

7    statement of the law comes from this Court.  So they know it,

8    they know Mr. Wickers has testified -- I'm sorry, they know

9    that he gave an opinion, they know that Ms. Jourdan said as

10   director she relied upon it, Alexandra Reed said she relied on

11   the opinion, fine.  But the content of the opinion is

12   objectionable, and should be stricken.

13           THE COURT:  What was that exhibit number; do you have

14   it?

15           MR. MacGILL:  108.

16           THE COURT:  Okay.

17           MS. YOUNG:  Your Honor, there's a mountain of

18   evidence, that they were able to get in when punitive damages

19   were in the case, they're now saying is relevant to whether or

20   not these plaintiffs had an expectation of privacy and

21   Mr. Wickers' letter goes to that exact same issue and we think

22   that it's part of the same category of evidence that should

23   come in.

24           Your Honor is going to instruct the jury that they are

25   to follow your instructions, you will be the one instructing

1    them and they will get your instructions and I'm sure that the

2    Court can instruct them appropriately on that.  If the Court

3    wants, the Court could give an instruction that Mr. Wickers is

4    just another witness in this case.  You are the one who is

5    instructing the jury about the law.

6        But I think if all those other documents are relevant

7    to the issue of whether the plaintiffs did, indeed, treat their

8    information as private, then Mr. Wickers' letter also should

9    come into evidence.

10        THE COURT:  Okay.  I'm going to look at 108, and I'll

11    let you know what we'll do with 108.

12        MR. MacGILL:  Thank you.  And we'll go to work on the

13    verdict form.

14        THE COURT:  Okay.  Go to work on your verdict form.

15        MS. YOUNG:  Thank you, Your Honor.

16        THE COURT:  Okay.

17        COURTROOM DEPUTY:  All rise.

18        MR. BRIAN:  Your Honor, just --

19        THE REPORTER:  I'm sorry.

20        THE COURT:  We're going to get back on.

21        MR. BRIAN:  Oh, I'm sorry.  In light of the withdrawal

22    of the reasonable care issue, I'm going to need a few minutes

23    to revise the slides so we don't have slides going up.  I don't

24    know exactly how long, but probably 15 minutes or 20 minutes.

25        THE COURT:  You've got -- I think that's what you

Vol. 4-686

1  have.  The jury is not supposed to be here until 9:00 a.m., so

2  you have time.

3          MR. BRIAN:  I agree.  I know.  I'll try to make that

4  deadline.

5          THE COURT:  Okay.

6          MR. BRIAN:  I just don't want to put up a slide that's

7  not pertinent at this point.

8          THE COURT:  You're good.  And we'll get your copies of

9  the final instructions to you very shortly.

10          MR. MacGILL:  An administrative matter --

11          THE REPORTER:  I am sorry, I cannot hear you.

12          THE COURT:  Get on a mic.

13          MR. BRIAN:  He will learn, Your Honor.

14          MR. MacGILL:  You would think so.

15          One administrative matter, Your Honor.

16          THE COURT:  Yes, counsel.

17          MR. MacGILL:  I had asked -- or I would ask if we

18  might be able to move this over two or three feet during the

19  argument today, if there's no objection from the Court or from

20  --

21          THE COURT:  Sure.

22          MR. BRIAN:  To move what?

23          THE COURT:  The big screen.

24          MR. BRIAN:  Oh, I'm fine with that.

25          THE COURT:  Are you all going to be playing videos

 1    during your closing arguments?

 2            MR. MacGILL:  No.

 3            THE COURT:  Then we can move it all the way back, and

 4    we'll call IT to move it.  And they can just use their screens.

 5            MR. BRIAN:  I have a -- I think that's fine.  I

 6    have --

 7            MR. MacGILL:  Just move it --

 8            THE REPORTER:  I'm sorry, you're all speaking at the

 9    same time.

10            MR. MacGILL:  My preference would be, from the

11    argument that I want to present, is to move it here so they can

12    look at the screen, the large screen, rather than the smaller

13    monitors.

14            THE COURT:  Oh, okay.  Well, I really hate blocking

15    the left side of the courtroom, also.  Can you all see on the

16    left side?  That screen is in your way.  We need to move it.

17    So where are you asking to move it; right by your table?

18            MR. MacGILL:  Yeah, right here.

19            THE COURT:  Away from those.  Okay, we'll get IT here,

20    and we'll get it moved around.

21            MR. MacGILL:  Okay.

22            THE COURT:  Okay.

23            MR. MacGILL:  Thank you very much.

24            THE COURT:  All right.

25            MR. BRIAN:  The only issue I've got with that is

Vol. 4-688

1    whether it blocks the view of some of the folks on our side,

2    the clients' view, Your Honor.

3              THE COURT:  We'll let IT --

4              MR. BRIAN:  Let's take a look.

5              THE COURT:  We'll have IT come, and they will try to

6    situate it where it doesn't block anybody.

7              MR. BRIAN:  Thank you.

8              THE COURT:  Okay.

9              MR. BRIAN:  Thank you.

10        (Recess at 8:43, until 9:22.)

11             THE COURT:  We are back on the record.  Lawyers, the

12   Court is prepared to give a ruling on the motion to exclude --

13   the oral motion to exclude Trial Exhibit 108.  That exhibit was

14   admitted conditionally, and the record, it says that Michelle

15   [sic] says:  Your Honor, we don't intend to ask the Court if

16   there are any questions other then to get this opinion letter

17   in evidence.  We simply want to admit it to show that the

18   parties had notice of and the parties have stipulated that this

19   is an admissible exhibit.

20             It shows that Netflix and Realhouse exercised

21   reasonable care.  We believe that is an element that must be

22   proven in a claim like this.  We sought a jury instruction on

23   it, and they did stipulate that it's admissible.  I will not

24   ask them any questions about his analysis.  I simply want to

25   get this opinion letter into evidence.

Vol. 4-689

1    Mr. MacGill objected because he says that:  We've got

2    law from virtually every circuit that confirms the exclusive

3    nature of the Court's authority.  Negligence is not in this

4    case, and it's not relevant to invasion of privacy, and the

5    Court did admit it over objection.  But the Court will

6    determine once we figure out which instructions will go back to

7    the jury, whether or not it will go back to the jury.

8    And because your negligence instruction has been

9    withdrawn, and you're not going to pursue negligence in your

10    verdict forms, this exhibit is not relevant.  So 108 will not

11    go back with the jury.

12    And for the record, 108 is a legal opinion letter.

13    Okay.  So, lawyers, have you agreed on the verdict forms?

14    MR. MacGILL:  Your Honor, we have.  We have -- and I

15    will report our understanding.  We've agreed on a verdict form,

16    and the parties will stipulate and agree that if there is

17    liability, it will be joint and several liability of each of

18    the defendants.

19    MS. YOUNG:  That is our agreement, Your Honor.

20    MR. MacGILL:  And Your Honor, based on that agreement,

21    the form that counsel has is agreeable to the parties.

22    THE COURT:  Can I see which one?

23    MS. YOUNG:  Yes.  May I approach?

24    THE COURT:  Yes.  Is that one on the docket?

25    MS. YOUNG:  It is not on the docket, but we can file

Vol. 4-690

1    it on the docket.

2            THE COURT:  File it on the docket, and let me see what

3    it is.  Sorry about the reaching.

4            Okay.  If you would file it on the docket, this is

5    fine.  And we'll --

6            MS. YOUNG:  We'll do that, Your Honor.

7            THE COURT:  And for the record, the parties have

8    agreed that if liability for either defendant, there will be a

9    joint and several liability.

10           MR. BRIAN:  That's correct, Your Honor.  The jury will

11   not be told that.

12           THE COURT:  Right, but that's your stipulation once we

13   receive a verdict.

14           MR. MacGILL:  Agreed.

15           THE COURT:  Okay.  All right.  Both parties agree.

16           Okay, lawyers, Carly will be bringing in your final

17   instructions very shortly.  Do you want those before we bring

18   in the jury?

19           MR. MacGILL:  Yes, if we may.  And I had just one

20   question, Your Honor.

21           THE COURT:  Sure.

22           MR. MacGILL:  Is it your practice to read your

23   instructions prior to final argument?  After?

24           THE COURT:  After.

25           MR. MacGILL:  Thank you.  If we could have just a few

Vol. 4-691

1    minutes to read them, five or ten minutes?

2              THE COURT:  Sure, sure.  So we'll get those in here.

3    You can read those.  The jury is all here, and so we'll get

4    started very shortly.  Carly, you can pass those out.

5         (Off the record.)

6              THE COURT:  All right.  We're back on the record,

7    Sarah Bowling and Lori Kennard, plaintiffs, versus Netflix,

8    Inc., Netflix Worldwide Entertainment, LLC, and Realhouse

9    Productions, LLC, defendants.  And plaintiffs, you have had an

10   opportunity to review the preliminary -- the final

11   instructions.

12             MR. MacGILL:  Yes.

13             THE COURT:  Do you approve that packet?

14             MR. MacGILL:  We approve the packet based on the --

15             THE REPORTER:  I can't hear you.

16             THE COURT:  Go get a mic.

17             MR. MacGILL:  The packet is consistent with the

18   proceedings, Your Honor.

19             THE COURT:  And defendants, have you had an

20   opportunity to review the final instructions, and do you

21   approve the packet?

22             MS. YOUNG:  Yes, Your Honor.

23             THE COURT:  All right.  Plaintiffs, are you ready for

24   the jury?

25             MR. MacGILL:  We are.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-692

1          THE COURT:  You may bring in the panel, and do you

2    want me to give you a warning when you, when you are down --

3          MR. MacGILL:  Would you mind?  I would like to do 45

4    and 15, if I may, Your Honor.  A five-minute warning.  You were

5    kind enough to do that before.

6          THE COURT:  Certainly.

7          MR. MacGILL:  That would be wonderful.

8          COURTROOM DEPUTY:  All rise.

9       (Jury in at 9:33.)

10         THE COURT:  Good morning, Ladies and Gentlemen of the

11   Jury.  We are on the record.  Sarah Bowling and Lori Kennard,

12   plaintiffs, versus Netflix, Inc., Netflix Worldwide

13   Entertainment, LLC, and Realhouse Productions, LLC, defendants.

14   The case number is 1:22-cv-1281, and you have received all of

15   the evidence in this case, and at this time, you're going to

16   hear the closing arguments of counsel.

17         Again, because the plaintiffs do have the burden of

18   proof, they will go first.  And if counsel -- if Mr. MacGill

19   reserves some of his time, he will also give final rebuttal

20   comments.  And, counsel, you may give your closing statement.

21                    **CLOSING ARGUMENT BY:**

22         MR. MacGILL:  May it please the Court, Ladies and

23   Gentlemen of the Jury, counsel.  Welcome back, Ladies and

24   Gentlemen.  So what I would like to do is talk about where are

25   we?  You know, we are in a very important place.  We're in a

CLOSING ARGUMENT/MacGILL                    Vol. 4-693

1    United States District Court sitting in Indianapolis, Indiana.

2    We're in a federal court building, and this is where disputes

3    are resolved; and very importantly, the rights of Americans are

4    enforced or not.

5            And we're going to be asking you today to enforce one

6    of the most important rights that any American has, which is

7    the right of privacy.  So that's what we're going to do today.

8    We're in a very important place.  I want to say just a couple

9    of other things about where we are today.

10           As I said, we're in the United States District Court,

11   but not any judge sits in the United States District Court.

12   Our judge was appointed by the President of the United States.

13   Our judge was confirmed by the United States Senate.  Our judge

14   here, your judge, is the chief judge in this building; okay?

15   So this is a very important case in terms of where we sit;

16   okay?

17           In terms of what we are asking you to do, it's -- I

18   can't think, maybe you can't think of anything more important

19   that you can do as an American, and that is to enforce the

20   right of privacy that each and every person, any of us, every

21   person in this courtroom, has privacy with respect to their

22   information, to their most sensitive information, information

23   about their parentage, those kinds of things.

24           So we're here in an important place, and this is a

25   very important time, and I respectfully submit to you this is a

*CLOSING ARGUMENT/MacGILL*                 Vol. 4-694

1   very important case; okay?  But before I say anything more, I

2   would like to say thank you.  So thank you for giving a week of

3   your time.  Thank you for the extraordinary amount of time that

4   you spent each day, and our judge, your judge in this case,

5   kept it moving.  Thank you for that, and we're here for the

6   final argument today.  But thank you for your service, and as

7   we ask you today to enforce this important set of rights, we

8   understand that you're making a sacrifice to do so, and we

9   thank you.

10      So let's start -- we've got many things we want to

11  talk about, but we stand before you, and we examined witnesses

12  here in this courtroom with the important purpose of making

13  proof of our case.  We don't come to court with the idea that

14  we can talk in generalities or just platitudes or just things

15  that don't really matter.  We have a burden of proof, and I

16  would like to share with you what our burden is and what you're

17  going to be asked to evaluate.  Did we make our proof or not?

18      So what is proof that we are required to bring you?

19  If we're going to ask you to enforce a right of privacy, we

20  need to prove four things:

21      We need to prove to you that information about Sarah

22  Bowling and Lori Kennard is factually true and private in

23  nature; that is, what the defendants disclosed.  And you'll see

24  this, just so you know, this Court is going to give you

25  instructions, which you're going to be handed at the time of

1  making your deliberations, along with the exhibits in this

2  case.  And the Court will speak to you about the law and

3  provide it to you.  You'll see four elements that are in the

4  jury instructions that she provides.

5          The first is, did the defendants disclose information

6  about Sarah Bowling and Lori Kennard that is factually true and

7  private in nature?

8          Second, that either the public was -- that the

9  disclosure was either, either reached the public or was sure to

10 reach the public in general, and was communicated to a large

11 enough number of persons that the matter was sure to be public

12 knowledge.  Ladies and Gentlemen, we'll talk about that, but we

13 think we've proved that to you, as well.

14         Third, that the defendants' disclosure was one that

15 would be highly offensive to a reasonable person.  Now, you

16 will make the decision on whether or not the disclosures

17 involved here, in terms of privacy rights, were highly

18 offensive; okay?  That will be your judgment to make.

19         What I'm going to do, as I walk through this proof,

20 I'm going to show you evidence that we believe establishes that

21 not only we understood it was highly offensive in terms of what

22 Mrs. Bowling and Mrs. Kennard endured, but Netflix knew it, and

23 they acknowledge by their own conduct in their own e-mails that

24 they knew it was private.  They knew it was offensive, and

25 we'll review some of the evidence that you heard.

CLOSING ARGUMENT/MacGILL                    Vol. 4-696

1          Finally, the information disclosed by Netflix and

2    Realhouse was not of legitimate public concern.  We believe

3    we've proved that to you, as well.  So that's our burden.  We

4    accept it, and we endorse it as appropriate.  If we're coming

5    to you to ask you to enforce our rights, we understand it's our

6    burden of proof.  We accept it, and we embrace it.

7          Now, two things I want to tell you.  Enforcing the

8    rights in this Court, we're going to ask you to enforce these

9    rights of privacy that involve our clients, Mrs. Bowling and

10   Mrs. Kennard.  But enforcement is, you can't -- we're going to

11   ask you to issue, present a damage award, and to make a damage

12   award in your discretion and in your best judgment as to what's

13   appropriate.  That's the way in which you can enforce the

14   rights in this courtroom based on these proceedings, a damage

15   award.

16          If I can pause here a minute, I'm going to mention two

17   things.  The Court will also tell you what types of enforcement

18   can you make.  Can you just put a number out there, or is it

19   related to any particular type of damage?  Yes.

20          There are two types of damages.  We're claiming, and

21   the Court is going to authorize through its instructions:

22          One, that Mrs. Bowling and Mrs. Kennard endured mental

23   distress and all its features.

24          And second, and this is very important.  You may find

25   it is very important, what was the harm in their interest in

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-697

1   their privacy?

2           And, Ladies and Gentlemen, that will become very

3   important in your deliberations, I think, because it's not only

4   just a damage of how we can assess the mental duress they've

5   had, the mental pain they've had over all these years as one

6   element, but then you'll come to another element, all right, we

7   have privacy interests here.  And with respect to these privacy

8   interests, what is the damage associated with that?  So we'll

9   talk a little bit about that as we go through that, but that is

10  enforcement.  An American's right to privacy, the rights of

11  privacy of these women, and then enforcement.

12          So, private true fact.  Let's review the evidence.

13  I'm going to give you the evidence we think is important for

14  your consideration.  Let's talk about it.  True and private

15  fact, Donald Cline is a biological father of our clients.

16  That's a fact.  And it's a true fact.

17          That doesn't mean it goes into the public.  It doesn't

18  mean it goes into Times Square.  It doesn't mean that it goes

19  to Netflix with the authority, as Mr. Mizrahi admitted, by the

20  flip of a switch, they can expose information to 215 million

21  people, 215 million subscribers in United States and Canada.

22  Imagine.

23          So as we look at what they did and its impact, it's

24  that flip of the switch that gives the power and the

25  disclosures that have the extent -- extensive effects.

CLOSING ARGUMENT/MacGILL                    Vol. 4-698

1          Now, these secret children, there was a lot of

2   communications -- there was an upset.  We had a 2019 event that

3   shocked the women in this courtroom to their core.  Their

4   father wasn't their father.  They had a different biological

5   father.

6          The siblings, and we saw the movie yesterday, the

7   siblings, more than 70 of them, realized that this is very

8   private information.  What are we going to do about that?

9          So what they decided to do, was they created a

10  Facebook group, and the group had rules.  The rules were we, as

11  half-siblings, are going to handle things by confirming that we

12  are saying to -- this group is more private, more specifically,

13  secret.  The information shared in the two groups are not to be

14  shared with anyone outside these groups at any time.  Those are

15  the rules.

16         Now, we had the director.  There was one witness that

17  came -- that associated with Realhouse, only one witness.  She

18  came and she confirmed that she -- yeah, she understood that

19  her movie, her directorship, this movie she created, was

20  dependent upon somebody taking information and giving it to

21  them and they used it.  That somebody was Jacoba Ballard.

22         I asked her repeatedly about that yesterday.  Well,

23  you got your information from Jacoba Ballard.  You got private

24  information from Jacoba Ballard, and the private information

25  was Donald Cline was the biological father.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-699

1          Now, there were promises made.  And when you consider

2     the issue of private facts, we ask you to consider what they

3     did, the defendants in this case.  What did they say about

4     these facts?  What they said is very important.

5          Sarah Bowling got word -- you heard from the evidence

6     that she got word that Jacoba Ballard was taking some steps to

7     get a movie made.  So she, for her part, reached out to

8     Mr. Petrella.  Based on that sequence of events, she reached

9     out to Mr. Petrella.  What happened after she reached out to

10    Mr. Petrella and said: Hey, I'm one of the half-siblings?

11    That's what she told him.  That's what she testified to.

12         After she said that, there's a Facebook message that

13    comes from that producer, Sarah Bowling:  You will not be

14    identified unless you have already given us explicit permission

15    to do so.  She calls, he assures.  He knew -- he understood

16    what you can conclude.  These facts were sensitive, they were

17    private, and the assurance came there.  He never would have

18    given such an assurance, ever, had that not been private

19    information.

20         Now, there's an entire sequence of events where

21    Realhouse and Netflix, they -- in all their communications,

22    they were acknowledging this fundamental point, all of this was

23    private, all of this was sensitive.  Private, private, private.

24         Exhibit 128, this from Lucie Jourdan, she testified

25    about this and she said, well -- here's what she wrote, the

 1   director, on July 16, 2021:  All the siblings at this juncture

 2   want to remain anonymous.

 3          Now, she said:  Oh, well, you just need to understand,

 4   Mr. MacGill, that was then.  Well, okay.  That was then.  But

 5   you acknowledged from the outset this was private and this was

 6   sensitive.  This was involving people.  And it wasn't involving

 7   anything other than the most sensitive information involving

 8   people.

 9          So now let's look -- under the issue of what's

10   private, let's look at some other information.  This is

11   Exhibit 127.  Remember Mr. Rotmensz?  He testified, you know,

12   he was -- you know, he was the person that said: Not my job,

13   and, gee, I got all these list of things from the director and

14   I didn't really have any responsibility, and he concluded by

15   saying: Not my job, and you heard all of that.

16          But before we go any further about that, he says --

17   again, this is June of 2021:  All sensitive information, e-mail

18   addresses, names, physical addresses will be blurred.  Again,

19   confirming this is sensitive information, this is private

20   information.  They knew it, they knew it from the beginning,

21   they knew it at the middle point in time, and they knew it

22   throughout this entire thing.

23          Now, with respect to written permission, Netflix

24   admitted they didn't have written permission from either

25   plaintiff to publish their names, and so does Realhouse.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-701

1   You've seen that.

2         Now, there came a time -- and there was evidence that

3   wasn't perfectly clear on this and who did what and why and who

4   was responsible for agreeing and understanding that Lori

5   Kennard's name would be deleted, and it wasn't deleted.  One

6   reference to it was deleted, but the other was not.  And this

7   is the director:  We need to blur the following names and pic,

8   and Lori Kennard's name is reached there.

9         Again, she claimed, when she came to court, that this

10  was: Because I understood what was going on or perhaps it was

11  Jacoba Ballard that told me that.  Well, regardless of who told

12  her, the director, this was the commitment about this private

13  information.

14        Now, what did they say?  Again, we've been focusing on

15  not genetic relationships, not who are the secret children

16  related to you across the horizontal axis you saw, but whether

17  or not the biological father, Donald Cline, was disclosed by

18  23andMe.  He was not.  He was not.  He was not.  And we know

19  that from the screenshots that you've got, always unknown

20  relative, unknown parent.

21        They want to claim or leave you the inference that the

22  siblings sharing genetic information across a horizontal axis

23  is somehow disclosing the biological father.  Not true.  That's

24  what they will say.  Then the family tree doesn't depict

25  Dr. Cline.  You heard that.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-702

1          And then one final thing I wanted to share with you.

2     Mr. Ciulla questioned the general counsel and the vice

3     president of 23andMe to confirm this.  There was a first

4     portion these lawyers questioned that woman about, and then

5     Mr. Ciulla came on and he questioned and said:  Ms. Kook,

6     you're general counsel of 23andMe, is this -- could the people

7     on this axis see -- could they learn that Donald Cline was a

8     biological father from the website?  No.

9          So we have it in terms of what you've seen with your

10    own eyes in the 23andMe and we have it from the specific

11    testimony from a high-level executive from 23andMe.

12         So now the other thing you're going to hear about

13    private facts, they're going to -- they're going to talk about

14    several things.  They're going to say: Well, listen, after

15    2019, you didn't keep this perfectly private because, according

16    to them, you were e-mailing some people or giving information

17    about you being a sibling, and, boy, you weren't keeping it

18    private.  You'll see.  You've seen those e-mails.

19         They weren't disclosing in 2019 the biological father

20    and all the terrible details that you've seen in that film.

21    None of that was occurring.  But you'll also see, after the

22    film, in Sarah Bowling's case, you remember Mrs. Bowling

23    testified that she texted with her two best friends on the day

24    she saw it, and she testified to her anger, which we'll talk

25    about in a minute, but -- and Ms. Kennard was doing some of the

1    same things.  She didn't react in anger, as Sarah Bowling did,

2    but she reacted with denial.

3         They're going to say: Well, look, their communications

4    with people outside, you know, their immediate family, their

5    nuclear family, or outside there, you know, their best friends,

6    somehow would destroy their -- the reality that these are

7    private facts.  It doesn't.

8         But, you know, we did ask the director, and we said --

9    and you heard this testimony, and we said: Look, do you --

10   Ms. Jourdan, you're the director.  And this was when we had the

11   videotape rather than in the courtroom, but do you have -- do

12   you have any problems with the plaintiffs' communications to

13   relatives and friends?  And what she told you in this

14   courtroom:  No, these plaintiffs are not unique in this.  They,

15   like anyone else, can seek solace wherever they see fit.  That

16   was not a lawyers' argument, that was her testimony.

17        So now let's look at the second element:  Did this

18   reach the public?  Did these private facts about the parentage

19   of Sarah Bowling and Lori Kennard reach the public?  And the

20   answer is yes, they did.  How extensive?  Well, you've heard

21   this evidence.

22        As far as Sarah is concerned, it's a different

23   reaching of the public magnitude.  It's 18 million on the film

24   and 13 million for the trailer.  As far as Lori Kennard's name,

25   it's Netflix -- it's movie only, not the trailer, and it's

*CLOSING ARGUMENT/MacGILL*                           Vol. 4-704

1   14 million people.  That's the part of the reaching-the-public

2   evidence that you've heard.

3           Now, it was widely publicized.  You heard evidence in

4   the case that, specifically: We've got a trailer going.  They

5   publicized this on Times Square.  And Lucie Jourdan, who came

6   in this courtroom, Exhibit 78, she said: Well, look, for all

7   that is secret will eventually be brought into the open and

8   everything that is concealed will be brought to light and made

9   known to all, citing scripture.

10          Okay.  Well, that's what they did.  They made it known

11  to all.  They released it.  They released it to subscribers, of

12  200-some million subscribers, and these were private facts.

13          Now, with respect to Netflix's e-mails, how broadly

14  did they go?  You saw Exhibit 1041, Joelle Shapiro, who

15  testified by videotape during our case, she didn't come here to

16  testify, but during our case by videotape:  Trailer's

17  performing extremely well.

18          *Our Father* -- and these were two things we wanted to

19  get confirmed early on in the case.  You recall that Mr. Ciulla

20  read these discovery responses:  Netflix does not contest that

21  Lori Kennard's name appeared briefly in the documentary.  They

22  confirmed that by their admission, Exhibit 902.  Realhouse

23  doesn't contest Lori Kennard's name appeared briefly in the

24  documentary.

25          Now, let's talk about one -- you know, what do they

*CLOSING ARGUMENT/MacGILL*                           Vol. 4-705

1  have to say about the extent and the expanse of this

2  disclosure?

3          They brought a professor yesterday, Dr. Berger.  And

4  what he said, he testified: Well, you know, there's information

5  processing that goes on, and he wanted to tell about that.  And

6  he just -- you know, he testified in the manner in which he

7  did, and you heard what he had to say on direct examination.

8  But on cross-examination, he confirmed that he had not read all

9  the evidence in the case.  He had only looked at the

10 depositions given previously.

11         He had no knowledge of the testimony of Ms. Sexson or

12 Ms. Strobel.  No knowledge of that trial testimony which you

13 heard in terms of who actually processed, in real life, the

14 information, not in academic evaluation.  He failed to review

15 the movie with the plaintiffs' names in it, and he confirmed

16 that by virtue of his report.

17         That is what his report said, and that's what we asked

18 him on page 24 of his report.  I asked him:  You read this in

19 October of 2023, the public version?  Well, yeah.  Public

20 version in 2023 didn't have the plaintiffs' names in it.  He

21 watched the wrong movie.

22         Now, on redirect, they tried to rehabilitate that, but

23 you'll make you own judgment about what he wrote in his report,

24 what he testified to on cross-examination, and the reality of

25 actually what happened in an attempt to rehabilitate it.

CLOSING ARGUMENT/MacGILL                    Vol. 4-706

1          Now, he also founded his whole information processing

2     testimony to you on a study or two or three.  One of them was

3     the study of women passing a basketball in a circle and a

4     gorilla walking through the middle of it, and they would ask

5     the -- they told the people that they were evaluating:  You

6     have a task.  While looking at this, your task is to count the

7     number of passes to ladies in white shirts.  With that task,

8     how many viewers would see the gorilla?

9          Well, he admitted on cross-examination:  Okay.  The

10    same author says:  Well, even with a task, 54 percent of the

11    viewers would recognize and remember a gorilla appearance in

12    the basketball-passing experience.

13         Okay.  Well, you may find that very interesting as you

14    evaluate the expanse of the exposure, but you may also say:

15    None of that makes any difference.  His testimony is completely

16    irrelevant because no one assigned the viewers a task while

17    they were watching this movie.

18         It wasn't a situation where people watching this movie

19    were told:  Hey, you have a task to do.  You need to do X or Y

20    or Z.  And while you do that, we want you to make observations

21    about what's on the movie.  It didn't happen.  And he had no

22    scientific basis for saying how this task assignment would be

23    relevant to the reality in this case, which is nobody.  There's

24    no evidence of anybody having a task to do while they were

25    watching *Our Father*.

1          Academic research, again, impeached.  The fast objects

2     were more noticeable according to literature that he himself

3     acknowledged was in a credible scientific journal.

4          His testimony is irrelevant, completely irrelevant, to

5     the testimony of Lori Kennard.  And this -- I want to just make

6     this point.  What we are saying to you, Ladies and Gentlemen,

7     is very specific about Lori Kennard.  We are testifying that

8     she has mental distress based on her own viewing of the movie,

9     her own viewing of the movie.

10          He had no idea.  He said:  Well, I read the

11     deposition.  I didn't know that.

12          Well, that's what we've said from the outset here, her

13     own viewing of the movie, and we'll talk about that.

14        Now, comparing this testimony, which we say firmly has no

15     foundation in real life what happened, let's compare his

16     testimony with in real life, in Sarah Bowling's case.  Well, in

17     real life, we know what happened.  In real life, we had

18     Ms. Strobel, her therapist who saw the name in *Our Father*, and

19     she confirmed that she watched the movie and she was surprised

20     to see it.  Well, that's a person viewing the movie.

21        We asked Sarah Sexson to come and testify, another licensed

22     social worker by background anyway, and she testified she

23     didn't know Sarah Bowling, but she knew her sister, and she

24     said: Look -- she didn't know that Sarah's name would be in the

25     movie, and she saw it.

1    And this, I think you might find important.  She testified

2    that she had not communicated with her friend, Laura DiSalvo,

3    in six years; okay.  So not having communicated with her for

4    six years, seeing the movie, she messages her, after six years.

5    You may find that's very meaningful in terms of what's private,

6    what's impactful, what's emotionally damaging.  You can use

7    your logic about that sequence of events.  And Ladies and

8    Gentlemen, you may find that to be very powerful evidence of

9    how horrific this was to a woman who had not communicated to

10   her friend in six years, who does it right after seeing the

11   movie.  So that's real life.

12   Now, let's talk about the disclosure and whether it is

13   highly offensive.  Again, we want to review what Netflix had to

14   say at the time.  You've heard what our clients have had to

15   say, but let's go through what Netflix and Realhouse said in

16   real life again.

17   Now, Lucie Jourdan came here, and she admitted that the

18   disclosure that Sarah and Lori were children -- Sarah Bowling

19   and Lori Kennard were children of Donald Cline, she admitted on

20   cross-examination: Well, yes, that could be inferred from their

21   disclosure in the movie, okay, inferred, she said, from their

22   disclosure in the movie.

23   And you had the chance to see the movie in all its detail

24   yesterday morning.  And it's hard to describe what's in that

25   movie in adequate words, but there are a few things that stick

1    out to me.  You have your own impressions that are more

2    important.

3        But Dr. Cline is described by his partner as evil, he's

4    described as sick, he's a felon, et cetera.  The association,

5    the connection between Sarah Bowling and Lori Kennard to Donald

6    Cline, is connecting them as a biological father to this horrid

7    person, horrid person.

8        Now, what did they know?  As you evaluate the damage

9    evidence in this case, I will tell you what I think you may

10    find compelling.  What did they know in terms of whether this

11    disclosure would have an effect on the children?

12        Exhibit 96, the documentary, is not only traumatizing for

13    the children of Dr. Cline, but also equally so, if not more so,

14    for the mothers and parents.

15        Pardon me for repeating myself.  Traumatizing for the

16    children of Dr. Cline.  We have two children of Dr. Cline who

17    testified to how they were traumatized by what's occurred here;

18    okay?

19        Now, they knew it, they understood it.  And when they did

20    what they did and despite all the explanation of all the

21    lawyers, that reality doesn't change because they knew it, and

22    you heard how they were traumatized, and we'll talk about that.

23        Now, with respect to what else did they understand about

24    what they were doing in releasing this movie and these private

25    facts, they indicated that he -- that this -- these children --

1  they have a quote, they -- this is Joelle Shapiro:  This is a

2  super creepy film as they investigate their bizarre beginnings.

3  Well, whose beginnings are they talking about?  They're talking

4  about the secret children.  And then it's a real life horror

5  film is what they're saying to themselves January 25th, 2022,

6  four-and-a-half months before the movie is released.

7      Now, we're going to talk about this in a minute when we get

8  to damages.  And this is private, it's sensitive.  And in your

9  judgment, I think that you may find this extremely important as

10  far as Mrs. Bowling is concerned and extremely important as far

11  as Mrs. Kennard is concerned.

12      You heard each of them testify about whether they had a

13  feeling and it affected their lives in terms of how people

14  might judge them, in terms of how they were conceived, and both

15  of them confirmed to you, yes, I do have that fear; I have an

16  aversion about this because of how I was conceived.  Okay?

17      Now, I don't know what could be more private, I don't know

18  what could be more personal, I could not -- I can't put words

19  on it other than to give you one context.

20      You saw the movie.  The opening movie you saw -- you saw

21  all of it.  You saw the movie, and you saw the conception

22  context that was given there to these women.

23      Now, public reaction.  We have the -- maybe they're

24  congratulating themselves; right?  Jaw dropping, chilling,

25  disgust, horrified.  You know, how can you avenge yourself in

1    this situation that would be a worst fear?  This is based on

2    the trailer.  You know, huge congratulations to everyone on a

3    very successful announcement and trailer debut.  Lots of

4    subcongratulation there on April 19th, a month before the movie

5    is sent out.

6         Now, after the fact, what is -- what do you find helpful

7    and meaningful in terms of what they were acknowledging to

8    themselves after the fact?

9         After the fact, Joelle Shapiro says:  Well, so glad you

10   swapped that clip because we just found out there's a name in

11   the original one that didn't get cleared.

12        The Netflix director of social platforms said in the

13   first part of it:  OMG.  Oh, my God.  Well, that's a

14   confirmation you can find of just how serious and how private

15   and how awful this is.  Now, he didn't take it seriously, but

16   at least this director here -- at least he acknowledged with an

17   OMG the private nature of this.

18        Now, what else did they realize in terms of the private

19   nature of these facts, in terms of how they communicated with

20   themselves in real life, in the ordinary course of business,

21   and not with the witnesses that they brought to the Court?

22   Well, there are some very specific things here.

23        We have Alexandra Reed who testified by a reading of a

24   deposition, and this is on August 21, 2020.  Remember,

25   Alexandra Reed was in charge of all the business affairs of

*CLOSING ARGUMENT/MacGILL*                          Vol. 4-712

1   this movie.  That was her job at Realhouse.  She was in charge

2   of the business affairs of this movie.

3       Okay.  Well, what did she write?  August 21, 2020:  Many of

4   the half-siblings involved have spoken publicly about the

5   results of their DNA tests and their experiences, but -- this

6   is the lead business person -- we will not include any

7   information on any of the siblings without a signed release

8   from them.

9       How sensitive did the lead business person understand this

10  to be?  How private did she understand it to be?  We're not

11  doing it, she says, unless we get a release.

12      How private and how sensitive?  Let's read one more

13  sentence:  We will not include any personal information about

14  people's inception or new-found knowledge without their

15  permission.  Her capitals:  WE WILL NOT.  But it's very

16  specific, about people's inception, people's inception.  Well,

17  that's what they did.

18      Now, next element of our responsibility to make proof so

19  that you can enforce the rights of privacy here.  Was this a

20  public concern?  The answer is a resounding no.  Was the

21  parentage of Dr. Cline a public concern?  No.

22      Mr. Petrella, the producer, he did not need Sarah or Lori's

23  name in *Our Father* to have the impact and artistic value he

24  sought to deliver.

25      Now, the one witness that came from Realhouse or Netflix,

1    the only live witness that they brought, Director Jourdan.  She

2    tried to unwrite that testimony; didn't she?  She came and

3    said:  Well, he was the producer, and I was the director.

4         Did you trust him to do his job?

5         Yes, but I was the director.  I made the decisions here.

6         Well, what he's saying is, from what he was doing in

7    producing the movie, he didn't need the names.

8         Now, there was some wrangling; wasn't there?  When I did

9    the cross-examination of Lucie Jourdan, we had to press on some

10   points that we wanted you to hear.  So what we asked is -- and

11   this took some time.  It took some time.  On cross-examination,

12   she finally admitted.

13        Did you need Sarah Bowling's name in the film?

14        No.

15        Did you, as the director, need Lori Kennard's name in the

16   film?

17        No.

18        Those admissions came after the lawyers for Netflix and the

19   lawyers for Realhouse stood here and asked questions, very

20   specific questions:  What about this?  What about that?  You

21   heard all that testimony.  But the reality, of course, came

22   out.  There's no hiding this reality; okay?  She didn't need

23   the names.  She tried to say Petrella was wrong, and then she

24   had to admit to you on her oath she didn't need either name.

25        Not of public concern.  Not of public concern.  Nobody

CLOSING ARGUMENT/MacGILL                          Vol. 4-714

1    needed the name.  The director didn't need the name.  The

2    producer didn't need the name.  Nobody needed the name.

3        Now -- but it's worse than that.  Petrella is emphasizing

4    the sensitive, the private nature of this information when he

5    gives warnings.  And you saw he gave at least three warnings in

6    writing about this information, and we provided all that to

7    you.  But he says:  Don't do it.  And, you know, we've got

8    e-mails.  There are three different e-mails in your record

9    about, you know:  Don't do it.  Delete the information.

10       He makes the representation -- remember we talked about

11   this a minute ago.  Sarah Bowling reaches out to him.  She gets

12   news that something is percolating with this gentleman.  She

13   reaches out to him and says:  Hey, I'm a half-sibling.

14       You know, and then what follows is, he writes her the

15   Facebook message:  Don't worry.  So he knew how this was

16   private.  He knew it was not a public concern, Mr. Petrella

17   did.  And at least he, for his part, did an honorable thing

18   giving her a written assurance about her sensitive information,

19   her private information.

20       Now, I want to turn in the remaining minutes in this

21   opening, following here with you this morning, I want to talk

22   to you about the Court.

23       Now, the law comes from this Honorable Judge, and she's

24   going to give you an instruction.  She's explained to the

25   lawyers what the instructions will be so we had a chance to

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-715

1    talk with you about the instructions before you get them; okay?

2         So, remember, at the beginning, I was telling you that

3    there are two -- can I use the word buckets -- two buckets of

4    damage that we're going to talk with you about, mental distress

5    and specifically, the plaintiffs' interest in privacy resulting

6    from the invasion.  Mental distress and plaintiffs' interest in

7    privacy.  These two elements are what we're focusing our case

8    on and in terms of what we're asking you to do in this context

9    of enforcing the rights of privacy here in this Court in this

10   case.

11        How do you enforce?  Through the authorization you're given

12   here, a damage award.  Any harm to the plaintiffs' interest in

13   privacy, valuing that.  And let me just tell you.  We'll also

14   ask you to value the mental distress.

15        There is no economist that I could bring and say:  Here's

16   the pain of Mrs. Bowling.  Here's the pain of Mrs. Kennard.

17   Can you calculate that for me?

18        And I can't -- couldn't ask an accountant in one of these

19   buildings to say:  Ma'am, could you please do some calculations

20   about how much pain this person had and what they would be

21   willing to accept to endure that pain, for lack of a better way

22   to do it?

23        No.  No way.  How can you calculate that unless you put

24   that in the hands of a capable jury to make that assessment of

25   what was the distress, what were the effects, how long will it

1    last, and what can I do as a juror to make that analysis?  The

2    same is true with the harm to the interests in privacy,

3    enforcing that; okay?

4        So let's talk a little bit about mental distress.  Now,

5    there are some complexities here.  We're going to talk about

6    it.

7        But first of all, remember -- we talked about this

8    before -- Netflix itself knew that they were going to trigger

9    something; right?  Well, they did.  They triggered something in

10   Lori Kennard and Sarah Bowling.  The emotional disturbances

11   that they testified to, you heard them testify to them.  I

12   don't think I can give complete justice to that in this

13   first portion of the argument.  We'll talk about it a little

14   bit more, but let's at least go through some of the key

15   categories.

16       But, before we do that:  This is the traumatizing -- this

17   will be traumatizing for the children.  So triggering, they

18   admitted and understood and acknowledged in the business

19   records of the company, and traumatizing for the children.

20       Now, before we get there, let me just go through this with

21   respect to the mental distress.

22       We brought these plaintiffs here to you to testify on each

23   type of mental distress, each type, in their own words.  There

24   isn't anybody that -- there wasn't any necessity, as we saw it,

25   to bring anybody other than the people themselves, Mrs. Bowling

1    and Mrs. Kennard, to testify to that.

2        But there was no rebuttal by the defense.  Netflix and

3    Realhouse didn't bring a psychologist, they didn't bring a

4    psychiatrist to say:  Hey, wait a minute.  You're feigning

5    injury.  You're faking injury.  You're making up this

6    particular claim.  You're making up this particular emotional

7    disturbance.  No witness, none.  It's as if they want to say it

8    didn't happen.  They didn't bring a medical doctor; okay?

9        But what did they do?  In opening statement, these lawyers

10   wrote -- they wanted to make the case that you should not

11   enforce the privacy rights that exist in this country and in

12   this state and in this city because there were intemperate

13   e-mails written on May 11, 2022 by Sarah Bowling.

14       And so what did she write?  You saw it.  You'll see it,

15   again, I'm sure, in a few minutes.  She reacted in real time to

16   what had happened to her, and she said it best:  I was never

17   more angry at any time in my life.

18       So what is it that they're saying about May 11, 2022, as

19   far as Sarah Bowling is concerned?  I think you'll find, at the

20   end of the day, there's an angry woman over there in

21   Indianapolis.

22           THE COURT:  You have about 20 minutes left, counsel.

23           MR. MacGILL:  Thank you.

24           That's what they're saying.

25           Lori Kennard had a different reaction.  It wasn't

1    white hot anger.  It wasn't bad words.  It wasn't the type of

2    language that Sarah Bowling used on that day.  It was

3    different.  It was denial and coping; okay?

4          What do they say.  It doesn't mean anything to them.

5    They're saying:  Look, she's admitting she's either not hurt or

6    this is no big deal.  Not true.

7       So what are they saying as far as she's concerned?  Well,

8    in this case, I think you're going to find that all that

9    they're saying there is there's a woman in denial over there in

10   Brownsburg.

11      So, Ladies and Gentlemen, let's talk about the mental

12   distress that you've heard.  You've heard Lori Kennard talk

13   about persistent stress, the inherent feeling that other people

14   will regard her with dislike or aversion because her father is

15   Dr. Cline, the fear of being judged by others based on how she

16   was conceived, lack of control based on who can make a

17   connection that she is a child of Dr. Cline.  She lost control

18   of her personal information.

19      She has confidence issues in every environment, the school.

20   She had to change schools because of this.  She was traumatized

21   by this event, and you heard that, as well, and a constant fear

22   of anxiety of her children finding out and the outcome.  Her

23   enjoyment of life was impaired by this mental distress.  You

24   heard her testify, and we'll talk a little bit about it in the

25   final, final argument.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-719

1      Now, but in her case, it's different because you'll have

2   the ability to test some of this; right?  She not only

3   testified to you to these things, but each one of these things

4   are confirmed in the medical records, 736A, where she confirmed

5   these very things in the therapy records.

6      Now, what to do with that?  Well, Ladies and Gentlemen,

7   this is the hard work.  This is the hard work because, as I

8   said, there isn't an economist or an accountant that I could

9   bring to you or that we could bring to you to say: Can you

10  calculate the meaning or effect of this?  We do have two

11  guideposts from the testimony, and I'll talk about them briefly

12  here.  You may remember, I asked Lori Kennard, would you accept

13  $1,000 a day to endure the mental distress that you had, and

14  she said no.  How about 2,000, would you endure it for $2,000 a

15  day?  No.

16      And, you know, we didn't get -- I didn't ask her this, but

17  I just want to give you some numbers, but there are two things

18  we're going to ask you to evaluate in the end of the case.

19  What is right?  What is the right thing to do on that aspect of

20  the damages?  What's the correct and the proper thing to do?

21  But there's one other detail.  If you're going to value it this

22  way, if you, in your judgment, think I'm going to value this

23  year, how long -- what is the damage period?  How many years of

24  mental distress?  Is it five years?  Ten years, 20 years?

25  Well, that would be up to you.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-720

1    But that mental distress is hard work because you're going

2    to have to review and evaluate the testimony that was given

3    directly to you by this -- by Mrs. Kennard on this topic.

4    Now, one more, and this is hard work, this is hard work.

5    If the privacy rights that Americans and these women are going

6    to be -- that Americans have and these women have are going to

7    be enforced, it's through damages.

8    Here's the second element, and this is hard work.  The

9    Court -- as you have seen is they can -- we can also collect --

10   Mrs. Kennard can collect --

11           THE REPORTER:  I'm sorry, I can't understand.

12           MR. MacGILL:  Mrs. Kennard can also collect for the

13   harm to plaintiffs' interest in privacy.  Well, what was done

14   with her interests in privacy?  Well, her privacy, her private

15   facts, her most private facts of all, were streamed to people

16   who -- 14 million people on their network before it was taken

17   down.  We're going to ask you to assess the value and harm

18   associated with this; right?  And for the damages.  And it's

19   your sound discretion that we're going to ask that you exercise

20   on this second element of damage.

21           Mental distress, Sarah Bowling, she testified

22   persistent stress, preoccupation, a lack of presence in the

23   moment, and she testified about that in great detail, social

24   withdrawal, fear of being judged by others, lack of control

25   based on who can make a connection that she's a child of Donald

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-721

1    Cline, confidence issues in all environments, and just like

2    Mrs. Kennard, a constant fear and anxiety on her children

3    finding out about the outcome of this event, of what happened

4    here.

5            Her enjoyment of life has also been impaired.  The

6    same hard work.  How do you evaluate the emotional distress

7    without having accountants here and economists here that just

8    can't help?  How do you do that?  The same methodology that we

9    proposed, and we're asking you to evaluate the mental distress

10   component the same way.

11           And then finally, Ladies and Gentlemen, with respect

12   to Mrs. Bowling, we would ask you to consider her interest in

13   privacy, and on this second element of her damages, make an

14   analysis.  She had 18 million subscribers that streamed the

15   movie with her name in it, but also 13 million reviewed the

16   trailer.  We're going to ask you, at the end of this case, to

17   make an assessment of the value -- put a value on the harm of

18   this essential right and then to give an award of damages on

19   the second element.  But, again, this is all up to you and your

20   sound discretion, both elements of damages.

21           So, Ladies and Gentlemen, again, thank you for your

22   service.  I'll come back and talk to you at the end of the case

23   after the counsel for Netflix and Realhouse speak to you.

24   Thank you very much.

25           THE COURT:  All right.  Thank you, Mr. MacGill.

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-722

1          MR. BRIAN:  Your Honor, may we have just a couple

2   minutes to change the technology?

3          THE COURT:  You may.

4          MR. BRIAN:  And may I take a break very quickly?

5          THE COURT:  You may.

6          If you want to stand, Ladies and Gentlemen, feel free

7   to do so.

8      (Off the record.)

9          THE COURT:  Mr. Brian, you may make a closing argument

10  on behalf of the defendants.

11         MR. BRIAN:  I am, Your Honor.  I have to turn my mic

12  on.

13         THE COURT:  Mr. Brian, you may make a closing argument

14  on behalf of the defendants.

15                   **CLOSING ARGUMENT BY**:

16         MR. BRIAN:  May it please the Court, counsel, Ladies

17  and Gentlemen of the Jury.  You just heard Mr. MacGill ask you

18  to award his clients millions of dollars for a few seconds,

19  specifically, less than half a second for Lori Kennard's name

20  appearing on the screen, a half a second, which I challenge

21  anybody to say that anyone other than Lori Kennard and her

22  closest friends and relatives would have noticed, and less than

23  ten seconds for Sarah Bowling.  Millions of dollars for a

24  moment.

25         Throughout this trial, Mr. MacGill referred to his two

1    clients as secret children, but the evidence shows that neither

2    of the plaintiffs kept that information secret or private.

3            We know that Sarah Bowling posted this picture of her

4    with a Cline tattoo to all of her Instagram followers, smiling

5    broadly and brightly with her sister.  We know she participated

6    in this public podcast with her photograph right here in the

7    jeans jacket.

8            We know that when she learned that Realhouse and

9    Netflix were making a documentary about this, she reached out

10   voluntarily to one of the producers, Michael Petrella.  He

11   didn't contact her.  She reached out, and she said:  I'm a

12   recently discovered donor child of Cline.

13           That is not keeping your information private.  That is

14   Exhibit 205.  All the exhibit numbers are on the slide.  I ask

15   you to take notes of those exhibit numbers.

16           Lori Kennard did not keep her information private.

17   She gave permission to one of her half-siblings to give this

18   information to a couple that she didn't know, the Thompsons.

19   She went on and gave information to somebody she had never met,

20   happened to be a fourth cousin.  I'm not even sure I even know

21   how far away a fourth cousin is.  The point is she had never

22   met this person, and she told them that:  My biological father

23   was my mom's fertility doctor who impregnated her without her

24   consent.  I have over 70 half-siblings.

25           That is not keeping the information private.  That

1    alone is enough to defeat the plaintiffs' claim.  The

2    first element of what they have to prove -- and by the way,

3    they have the burden of proof, and I'll talk about that in a

4    bit.  They have the burden of proof.  This alone is enough to

5    defeat that.

6            Both of the plaintiffs voluntarily disclosed their

7    names and photographs on 23andMe so that anybody on 23andMe,

8    was a follower, connected, could use that information.  Both of

9    them have admitted, in messages they sent, that they don't keep

10   this information private.  Sarah Bowling:  I'm not out in the

11   media, but I don't keep this private.  Lori Kennard:  I'm not

12   hiding.

13           So then why are they suing?  I think the answer to

14   that question is actually different for the two plaintiffs.  I

15   think it's different.  This is Sarah Bowling's text message

16   that she sent at 9:00 a.m. on May 11th after her sister Laura

17   told her that her name appeared briefly in the film.  She had

18   not watched the film, but that was her initial reaction:  Fuck

19   Irresponsible.  I want to get rich bitch.

20           Now, you heard Sarah Bowling testify, you watched her

21   on the stand, you watched her during my questions on

22   cross-examination, and you can assess her credibility.  Is she

23   really sincere when she testified, or is she just out to

24   make -- did she just see an opportunity to make money?  Is that

25   what her lawsuit is about?

1          Lori Kennard, I would say, respectfully, is different.

2     I think Lori Kennard is a hurt, pained woman, and I think she

3     was very, very hurt by finding out that her biological father

4     was Donald Cline.  That's what hurt her, that coupled with all

5     of the other trauma and anxiety-driving events that have

6     occurred, sadly, in her life.  Counsel referred to the therapy

7     records, which are in evidence, and you can look at those.  And

8     what you'll find is there is not a single symptom that she has

9     complained about since the documentary came out that she did

10    not experience before the documentary came out.

11         The issue for you to decide is not whether Donald

12    Cline hurt the plaintiffs.  The issue to decide is not whether

13    Jacoba Ballard did something wrong.  The issue is not whether

14    you liked the movie, you didn't like the movie, it was a good

15    movie, a bad movie.  That's not the issue.  The issue is not

16    whether Donald Cline caused harm to them.  The issue is whether

17    or not the half second, fleeting second, in the upper left-hand

18    corner, where you can't really see Lori's Kennard's name, that

19    caused her to suffer the millions of dollars of damages that

20    Mr. MacGill just stood before you with a straight face and said

21    she suffered.  Or the eight or nine seconds of Sarah Bowling's

22    name.

23         Neither of the plaintiffs called a medical doctor, a

24    therapist, or other professional to testify to any of their

25    damages.  Mr. MacGill just said: Well, we didn't call an

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-726

1    expert, a medical doctor to rebut.

2         They have the burden of proof.  Their entire damage

3    case is based on each of the plaintiffs taking the stand and

4    saying that their daily life was better before the documentary

5    came out than it is after.  That's it.  He put that chart up

6    here with his funny handwriting in which he put up how they

7    felt before and are they engaged.  That's it.  That's the only

8    evidence of their damages, is their telling you to believe them

9    that this documentary caused them lifelong damage.  That's it.

10        Neither plaintiff started seeing a therapist after the

11   documentary came out.  Remember what Ms. Bowling said in

12   response to my questions on cross-examination?  Ms. Bowling had

13   seen a couple of therapists before the documentary came out.

14   She stopped seeing the therapists before the documentary came

15   out.  She said it was because of COVID, but she's not gone back

16   to see a therapist after the documentary came back -- came out.

17        And why didn't they call an expert to testify to these

18   supposed millions of dollars of damages?  Because the claim is

19   not credible.  That claim is not credible.

20        Judge Pratt will read to you what are called

21   instructions.  They're statements of law that guide your

22   deliberations when you go back and talk to each other.  And

23   some of them are -- you'll see Mr. MacGill, I think, showed one

24   on the elements that they have to prove for invasion of privacy

25   through disclosure of a private fact.  But one of the jury

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-727

1   instructions is perhaps the simplest, and it's Instruction

2   Number 8.  What does it say?  You should use common sense in

3   weighing the evidence and consider the evidence in light of

4   your own observations in life.

5           I've been trying cases for a long time, and this is a

6   jury instruction that I think is the most important.  I believe

7   deeply in the jury system and our justice system because I

8   think when people like yourselves listen to the evidence and

9   listen to the jury instructions and use your common sense, you

10  can figure it out.  And I think if you use your common sense

11  here, I think you can reach the right decision.

12          There's only one cause of action, one claim that the

13  plaintiffs have brought, and that is for invasion of privacy

14  for disclosure of a supposed private fact.  There's no claim

15  for breach of contract, there's no claim for breach of promise,

16  as much as Mr. MacGill would like to argue that there is.

17  There's no claim.  There's no claim for a breach of some sort

18  of promise that was made by Mr. Petrella or anybody else.

19  Those are not the elements of the case.

20          These are the elements that they must prove; and they

21  must prove it.  We have no obligation to prove anything.  They

22  must prove it.

23          First, they must prove that Netflix or Realhouse

24  disclosed information about Sarah Bowling and Lori Kennard that

25  is factually true and private in nature.

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-728

1          Secondly, they must prove that Netflix or Realhouse's

2     disclosure was communicated in a way that either reached the

3     public or was sure to reach the public, in general or was

4     communicated to a large enough number of persons that the

5     matter was sure to become public knowledge.

6          Three, that Netflix's or Realhouse's disclosure was

7     one that would be highly offensive to a reasonable person.

8     Focus on that phrase, "highly offensive to a reasonable

9     person."  I'll talk a little bit more about that.  The

10    information disclosed by Netflix or Realhouse was not of

11    legitimate public concern.

12         Those are the elements that they must prove.

13         Now, what is absent from that?  What's absent from

14    that is anything about consent or permission or a release.

15    Why?  Because it is the law of the State of Indiana, and Judge

16    Pratt will inform you that a plaintiff does not establish an

17    invasion of privacy by public disclosure of a private act by

18    showing that she did not consent to this disclosure.  A

19    plaintiff does not establish an invasion of privacy by public

20    disclosure of a private fact by showing that she did not

21    consent to disclosure.

22         For the last three days, you have heard Mr. MacGill

23    say, they didn't consent, they didn't sign a release, and all

24    of that.  The judge is going to tell you that that does not

25    establish the only claim we have in this case.  That's an

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-729

1  instruction I would ask you to remember because I think it

2  helps decide the case.

3          So let's go through each of these elements.  The

4  first one, that Netflix or Realhouse disclosed information

5  that was factually true and private in nature.  The plaintiffs'

6  names appeared in the documentary for one simple reason.  They

7  voluntarily and deliberately chose the most open settings on

8  23andMe.  If they had not done that, their names would not have

9  appeared, because their names appeared in this documentary when

10  Jacoba Ballard was scrolling through her 23andMe account and

11  their names, which they had voluntarily put in there, showed

12  up.

13          They did not have to post their names, their

14  photographs.  They chose to do that.  They could have gone

15  anonymously, like these people here:  P private, BNAE.  Others

16  made choices in their 23andMe account not to do what these two

17  plaintiffs did, which was to be as open with their information

18  as they chose to be.

19          They could have changed their information to

20  anonymous, which Lori Kennard did after, but not before.  Do

21  you remember Jacquie Cooke?  She was the general counsel, the

22  lawyer, senior lawyer at 23andMe, who testified by videotape.

23  She works at 23andMe.  She told you that both of the plaintiffs

24  had chosen the most open settings, and she then showed you the

25  terms that they had signed, that they had agreed to.

1        These are the terms of service.  Disclosure of

2   individual level, genetic and/or self-reported information to

3   third parties will not occur without explicit consent unless

4   required by law.  Note that 23andMe cannot control any further

5   distribution of genetic and/or self-reported information that

6   you share publicly on the 23andMe website.  Those were the

7   terms that they signed up to.

8        Ms. Kennard acknowledged, in response to my

9   colleague's questions, that 23andMe had warned her about

10  exactly what happened with Jacoba Ballard.  Jacoba Ballard saw

11  the information and had every right to do what she did, and

12  that's exactly what the plaintiffs, when they chose the most

13  open settings, had opened themselves up to.

14       You know, both of them testified that they -- I think

15  they used the phrase lost control of their information.  You

16  know, that's an interesting phrase.  I don't know if they lost

17  control or they voluntarily gave up control, because when they

18  chose to do this, yes, they lost control, because of a

19  deliberate choice they made not to keep the information

20  private.

21       And 23andMe was far from the only place in which they

22  decided not to keep it private.  I've already shown you this,

23  her outreach to Mr. Petrella.  I want to stress this, because

24  at the time that she did this in 2019, September 23rd -- this

25  is Exhibit 205 -- she had not been contacted by Mr. Petrella or

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-731

1    anyone on behalf of Netflix or Realhouse.

2         She had heard that folks were doing interviews, and so

3    she reached out and voluntarily disclosed the very -- to

4    someone who is making the film -- to the very information that

5    she now claims was private.  It's not surprising, then, that

6    she's written messages, Exhibit 208, Facebook message, saying:

7    I don't keep this private.

8         And this one -- remember, this was in response to a

9    message by another half-sibling who was deciding to go public

10   with the information, and I think she was looking for support.

11   And so Sarah Bowling responded:  Live your truth, exclamation

12   point.  The truth is, we're children of Dr. Cline.  That's the

13   truth.  There is no shame in it.  I found great freedom in

14   feeling like I wasn't keeping a secret any longer.  You've got

15   this, with the emoji at the end.

16        These are the sorts of things that Sarah Bowling was

17   saying before she hired a lawyer and filed a lawsuit.  Now it's

18   a very different tone, but when you assess credibility of a

19   witness in this case, the plaintiff, Ms. Bowling, look at what

20   she said back then, before she had the motive she has now to

21   ask you to award her millions of dollars.

22        I showed you this before.  This is her post.  Now, I

23   love this photograph, because you see what she did there.

24   She's on the -- if you look at the picture, she's the one on

25   the left.  Her sister, Laura DiSalvo, is on the right.  She's

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-732

1    bending her arm to display the tattoo.  That's what she's

2    doing.

3            Now, she said on the stand, well, she was bonding with

4    her sister, that's what this was all about.  No.  This was

5    about that she was going public with this information.  Her

6    sister posted the same photograph and got a response, three

7    hearts from Sarah.

8            Her sister reached out to a podcast run by the

9    celebrity, Kate Hudson, and offered for herself and Sarah to

10   speak to her on a public podcast.  When we asked her about

11   that, she said she was not offended by her sister doing that.

12   She wasn't offended by her sister doing that because it wasn't

13   private information.

14           Ms. Kennard did not keep her information private

15   either.  These are some of the messages she wrote:  I haven't

16   announced our situation on Facebook, but I'm not necessarily

17   hiding it either.  I'm not hiding it.

18           These are other messages:  I found out my dad isn't my

19   biological father.  It's very interesting.  I always wanted to

20   know that information.  I've always been interested in my

21   family's history.  I just didn't realize I was going to find

22   80-plus half-siblings.

23           These are messages:  Did your mom go to Dr. Donald

24   Cline?  Because my mom did, and he used his sperm instead of my

25   dad.  These are all messages she's putting out.

1          She told an acquaintance, this is an acquaintance on

2     Facebook, that her dad was not her biological father, and that

3     she had the 80-plus siblings.  This was not a close friend.

4     She sent a Facebook message to someone -- 23andMe, to someone

5     she had never met where she said:  My biological father was my

6     mom's fertility doctor who impregnated her without her consent.

7     She had never met this person.  I guess she qualified as a

8     fourth cousin.  She had never met her.

9          She gave permission to tell another couple, the

10    Thompsons.  The Thompsons, these are not close friends.  This

11    is not -- these are not the actions of people who are keeping

12    information private.

13         We all know in this age of the Internet that when you

14    put information on the Internet, you do lose control of it.

15    You can't control how it's used.  Each of the plaintiffs shared

16    their connection to Cline in Facebook groups, in Instagram.

17    Once it got out there, anyone who had access to that could take

18    it and use it.

19         They now want to claim that the information they put

20    out there publicly is somehow private.  It doesn't work that

21    way.  Once you make it public, it is public.  Once it's

22    publicly shared, it's publicly aired.

23         Now, here's an instruction, 22, that the Court will

24    read to you:  The plaintiffs' information is not private in

25    nature.  If the information is left open to public inspection,

*CLOSING ARGUMENT/BRIAN*                                    Vol. 4-734

1     if the defendant merely gives further publicity to information

2     about the plaintiff that is already public -- and listen to

3     this -- or if the plaintiff discloses that information to

4     people who are not close family or close friends.  That's

5     Instruction Number 22. It's not private in nature if the

6     plaintiff discloses that information to people who are not

7     close family or close friends.

8          That is exactly what each of them did.  They did not

9     limit their disclosures to close friends or family.  They did

10    not.  That is undisputed.

11         So let's go back to the very first element that they

12    have to prove, is that Netflix or Realhouse disclosed

13    information about Sarah Bowling and Lori Kennard that is

14    factually true and private in nature.  Have they proven that?

15    No, they have not.  That, right there, is enough for you to

16    return a verdict in favor of the defendants.  You really don't

17    have to do more, but, in fact, they haven't met their burden of

18    proving any of the elements.

19         Let's go to the second one.  The second element is

20    they must prove that Netflix or Realhouse's disclosure was

21    communicated in a way that either reached the public or was

22    sure to reach the public, in general or was communicated to a

23    large enough number of persons that the matter was sure to

24    become public knowledge.

25         Now, Mr. MacGill put up a chart of the 14 million or

*CLOSING ARGUMENT/BRIAN*                          Vol. 4-735

1    18 million people who watched the film around the whole world,

2    by the way.  That's not the issue here.  We don't dispute that

3    the film attracted a large number of viewers.  That's not the

4    issue.

5         The issue on Element Number 2 is whether or not these

6    supposedly private facts reached a large enough number of

7    persons that the matter was to become public knowledge.  What

8    did the undisputed evidence show about that?  Well, you heard

9    the testimony of Professor Berger.  What did Professor Berger

10   tell you?

11        I asked Professor Berger whether there was any

12   evidence that the plaintiffs' names in the film had been

13   noticed by anyone, anyone, other than themselves, their family,

14   their friends, close friends, or someone who already knew of

15   their connection to Donald Cline.  He said he had read both of

16   their depositions, and here was his testimony.  I'm going to

17   read this exactly.  I'll try to do it slowly.  Everybody has a

18   tendency to read quickly when they read.  It drives the court

19   reporters crazy.

20        I don't believe either of them could identify a single

21   individual who learned of their connection to Cline from this

22   documentary, and so I'm not aware.  I've not seen any

23   information identifying individuals who learned about this from

24   the documentary itself.

25        Now, their depositions were taken more than a year

1    ago.  They came here to testify.  Neither of them could

2    identify, in this trial, a single individual who had noticed

3    their names who was not themselves, family, close friends whom

4    they already knew about the connection.

5           Now, they brought in Sarah Sexson to testify;

6    remember?  Sarah Sexson went to high school with Sarah

7    Bowling's sister, Laura DiSalvo.  She knew about the connection

8    before she watched the documentary, because Ms. Bowling and

9    Ms. DiSalvo's mother had posted it publicly.  This was

10   Ms. Sexson's testimony in response to my colleague's question:

11          Isn't it true that before you ever saw the *Our Father*

12   documentary, you already knew that Sarah Bowling was a child of

13   her mother's fertility doctor?

14          Answer: yes.

15          Okay.  And the reason you knew about that is you had

16   seen a Facebook post from Sarah Bowling's mother where that

17   information was shared; is that correct?

18          Answer: yes.

19          Now, Professor Berger is an expert, but his expertise

20   really confirmed what we all know.  Lori Kennard's name was in

21   the upper left-hand corner of a scene that was focusing on the

22   scrolling on the thing for less than half a second in a

23   97-minute documentary.  Sarah Bowling's name was on there for

24   nine seconds.

25          Mr. MacGill made a big deal about this gorilla study

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-737

1    where they have about a half dozen people on a small stage

2    passing a basketball, and some full grown person wearing a

3    gorilla outfit walks across the stage.  And what is --

4    everybody was surprised when they studied that, because you

5    would have thought that everybody would notice this person;

6    right?  Half the people didn't notice it.

7            And then he argues: Well, that means half of these

8    people who saw the film must have noticed their names.  It's

9    ridiculous, the comparison.  It's not even apples to oranges.

10   It's not even fruit to meat.  It has nothing to do with it.

11           These people -- these plaintiffs' names were in the

12   film for less than one, two-thousandths of a percent of the

13   total time on the screen.  That's very different than a fully

14   grown person walking in the middle of a stage in a

15   75-second video.

16           This is Lori Kennard's own messages in which she says

17   that the average viewer may not even notice it:  As someone

18   told me today, this is our story.  So we are watching every

19   detail carefully.  The average Indy, Indiana U.S. viewer may

20   not even notice.

21           Do you remember when Professor Berger told you about

22   the spotlight effect, when he gave an example of somebody who

23   spilled something on his shirt or blouse and you noticed that,

24   and you go out to an event.  And you think everybody is

25   noticing, but they really don't?  That's what this is.  Lori

*CLOSING ARGUMENT/BRIAN*                     Vol. 4-738

1   Kennard was giving a message on the spotlight effect.  She is

2   saying that this is our story, so we are watching it very

3   carefully, but not the ordinary viewer.

4           The ordinary person who decided to watch *Our Father*

5   wasn't trying to find Lori Kennard or Sarah Bowling's name.

6   They wanted to find out about what this Dr. Cline, this

7   horrible person, had done.  That's what they were watching for.

8           There is literally no evidence, literally no evidence

9   in the record -- and they have the burden -- no evidence in the

10  record that anyone noticed their names in the film other than

11  themselves, family, or people who knew of the connection.

12          Counsel mentioned Amy Strobel.  That is Sarah

13  Bowling's former therapist.  She admitted, and you have this in

14  record, that Sarah Bowling had told her -- Sarah Bowling

15  admitted it on my cross.  Sarah admitted that she had told her

16  therapist of her connection to Dr. Cline.  That's why she

17  noticed it.

18          So on the second element, yes, a lot of people watched

19  the film, but the information that was private was not

20  communicated to a large number of persons such as became public

21  knowledge.  I would argue it didn't get to anybody, anybody

22  besides themselves, their families, and people they had already

23  told.

24          The third element, highly offensive.  They have the

25  burden of proving that Netflix or Realhouse's disclosure was

*CLOSING ARGUMENT/BRIAN*                      Vol. 4-739

1    one that would be highly offensive to a reasonable person.  To

2    a reasonable person.  I will accept that this was highly

3    offensive to Lori Kennard, I'll accept that.  That's not the

4    issue.  That is not the issue.

5          On this element, they have to establish that it was

6    highly offensive to a reasonable person.  They offered no

7    evidence of that.  They could have brought an expert to say it

8    was highly offensive to reasonable people.

9          They could have done a survey in the Indianapolis

10   community to establish that reasonable people had actually seen

11   it, and it was highly offensive.  They could have done any of

12   that.  They didn't do anything.  There's literally no evidence

13   that it's highly offensive to a reasonable person, which is

14   what they have to prove.

15         And, again, going back to Dr. -- to Professor Berger's

16   testimony, he sort of tells us why it wouldn't be highly

17   offensive to a reasonable person, because a reasonable person

18   wouldn't be focusing on that.  The reasonable person is not

19   focusing on the names that come up for brief moments as Jacoba

20   Ballard is scrolling through her 23andMe account, and, also,

21   let's look at what Sarah Bowling said about this.

22         Remember what she said?  She said:  It is actually a

23   really good documentary.  It was very well done.  I was worried

24   that it was going to be ridiculous conspiracy theory, but it's

25   actually well produced.

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-740

1      Then she said:  It's good, though.  Music is 100.  How

2  can she now say, and how can Mr. MacGill now say, that it was

3  highly offensive?

4      Now, you remember I played the clip from her

5  deposition where she frankly made up, okay, let me be really

6  blunt, where she made up what she meant by that.  She said:

7  Well, I meant it was a good documentary, well done because they

8  achieved their goal of being sickening and disgusting.

9      You saw that video where she kind of looked defiantly

10  at the end, you saw that.  You can evaluate that.  You're going

11  to get an instruction from Judge Pratt about how you assess the

12  credibility of witnesses.  I would respectfully submit that

13  that explanation was made up because she knew how bad that

14  Facebook message -- the text message is to her ability to prove

15  that, in fact, it was highly offensive.

16      And, again, it's not the film.  Maybe some people were

17  offended by the film, maybe some weren't.  That's not the

18  issue.  The issue is whether or not the brief mention of their

19  names was highly offensive to a reasonable person.

20      If you really think that if somebody managed to notice

21  Lori Kennard's name for half a second, they would think, I'm

22  highly offended by that?  I don't think they've met that, that

23  burden.

24      And this message, which I showed you previously:  Live

25  your truth, there is no shame.  I found great freedom in

*CLOSING ARGUMENT/BRIAN*                         Vol. 4-741

1    feeling like I wasn't keeping a secret.  You've got this.  This

2    is Sarah Bowling again.

3          They haven't met their burden of proving the

4    third element either, so let's turn to the fourth.  They must

5    prove that the information disclosed by Netflix or Realhouse

6    was not of a legitimate public concern.  So what was the

7    testimony on that?  The testimony on that is that -- really

8    from Lucie Jourdan.  We asked her about this.

9          Remember, she made this film because she was outraged

10   by the conduct of Donald Cline and by the fact that he had been

11   given a slap on the wrist.  No jail time, a $500 fine.  That's

12   why she made the film.

13         And it was very, very important to have real names of

14   some of the siblings in this.  This is a documentary.  This is

15   not a fictionalized dramatic account.  Documentaries are based

16   on the truth.  They are based on being accurate.  Every

17   documentarian will tell you that they want to have as many

18   details as possible in a film.  That includes the names.

19         Here was her testimony:  Was it important to you to

20   have at least some real names?

21               Answer:  Yes.

22         From your perspective, did you think real names were

23   of legitimate public concern?

24               Yes.

25               Why is that?

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-742

1          Answer:  If she's scrolling through a blank computer

2     screen with blurs, it doesn't have nearly the same kind of

3     impact as seeing the real people that she's associated with.

4     That testimony was uncontradicted.

5          She believed that the best way to tell this story was

6     to tell it through the perspective of Jacoba Ballard's own

7     journey.  And part of that journey, a key part of that journey,

8     was scrolling through her account on 23andMe and having names,

9     including the two plaintiffs, their names come up.

10         Now, Mr. MacGill focused, in his argument this

11    morning, on some testimony from Mr. Petrella which was played.

12    What he didn't do is tell you about the rest of the testimony

13    of Mr. Petrella.

14         Yes, Mr. Petrella said, as did Ms. Jourdan, that there

15    wasn't -- there wasn't a need to have any particular name.  You

16    could name any one of the half-siblings and say you didn't need

17    to have them.  That wasn't the point.  And Mr. Petrella said

18    this in the portion of his deposition that Mr. MacGill didn't

19    read to you, so I will read it to you.

20         He was asked -- and this is in the record:  Didn't

21    matter significantly to you as the creator and as the producer

22    of *Our Father* what particular identity the people affected by

23    Dr. or Mr. Cline was; fair statement?

24         Answer:  No.  I actually don't agree.  I think it's

25    very important that the identity is -- particularly if you're

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-743

referring to people who have been affected, referring to the
siblings, I think their identity is extraordinarily important
because ultimately, while it is the film about the behavior of
one man, it is told through the lens of the experience of a
group of people.  So their identity is very much the driving
factor of the story.

      Ms. Jourdan said the same thing.  She also agreed no
particular name was essential.  But I asked her:  Did you think
it was important to include the real names of some of the Cline
children in the documentary?

      Answer:  Yes.

      Why?

      Because these are real people.  It was a real story,
and this, the more reality you have in a documentary, the more
powerful it is.

      This documentary had real impact, real impact in the
world.  You saw the documentary, and you remember that I had to
get up and play the last two and a half minutes, which
plaintiffs had decided not to play.  And what you saw was that
in 2018, the mothers and siblings successfully passed
legislation in Indiana making illicit donor inseminations
illegal.

      This was a matter of legitimate public concern.
Having real names was important to that and was also a matter
of legitimate public concern.  Plaintiffs have not met their

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-744

1    burden on the fourth element either.

2          You know, it's interesting, as I was thinking about

3    this argument last night, very late, and this morning very

4    early, I was starting to think about: Well, what is invasion of

5    privacy?

6          Invasion of privacy is -- you know, if someone hacks

7    into your computer and takes your private information, that's

8    invasion of privacy.  You've kept that information private.  If

9    someone breaks into your house and steals, you know, personal

10   pictures or personal computer data, that's invasion of privacy.

11   Those are things that you kept private.  Those are things that

12   are not of a legitimate concern.  That's not what this is.

13   They've not met any of their elements here.

14         Now, perhaps because he can't prove any of these four

15   elements, Mr. MacGill tries to change the subject and throws up

16   some documents that are, frankly, not relevant to these issues.

17         Remember Exhibit 129.  This is an e-mail from Lucie

18   Jourdan.  Remember that Jacoba Ballard wanted -- wanted some

19   names to be blurred.  That was her instructions.  The only

20   reason that Lori Kennard's name appears in the film at all, for

21   the half second is -- because he took it out of the other

22   scene, was that she didn't notice it.  That's the only reason

23   it was in there at all.

24         He also, remember, talks about -- and he talked again

25   this morning -- about Exhibit 241.  This is the Facebook

1    message that Michael Petrella sent to Sarah Bowling and some

2    others in which he said: I would love for each of you to submit

3    a photograph, and if you -- you will not be identified.  And

4    she says: Aha, you're telling me that I will not be identified.

5    Yes, in connection with a photo.

6          This is the picture of the baby wall that actually

7    appeared in the film, and you'll see there's no names that are

8    identified in that.  He was not saying that I'm promising you

9    confidentiality in every scene of the movie, including the

10   23andMe.  But by the way, even if she read it that way, this is

11   not a suit for breach of promise.  It's a suit for invasion of

12   privacy.  This is a distraction.

13         This is the -- Exhibit 8.  This is the e-mail in which

14   they're talking about trying to keep these people confidential

15   because they're fiercely protective of one another's privacy.

16   Remember that this was in connection with a publicity of the

17   film a couple of months before the film was going to come out,

18   and Lucie Jourdan explained this.

19         She and Michael Petrella had a conversation -- you

20   can't see it in the blowup, it's in the first line.  We had a

21   conversation yesterday, she says, in which they talked about

22   they did not want, frankly, the Netflix publicity people or any

23   media people reaching out to talk to the half-siblings,

24   including those who appeared in the film.  This has nothing to

25   do with whether or not somebody's name would appear as Jacoba

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-746

1    Ballard is scrolling through 23andMe.

2           This one, he relies on this.  Lucie Jourdan said: As

3    all the siblings at this juncture want to remain anonymous.

4           Remember, she explained that when Jacoba Ballard first

5    started doing her journey, her search on the answers she cites,

6    she went to one other than 23andMe and seven names came up;

7    remember?  And none of them had their actual names because

8    those people had either chosen to be anonymous or she didn't

9    have the information.

10          And so they created a graphic.  It was different than

11   the scenes where she's actually scrolling.  They created a

12   graphic right there, and they depicted these seven here without

13   their names.  That's all she's saying when she first said "at

14   this juncture."  It's not the juncture in the film-making

15   process, it's the juncture of Jacoba Ballard's search.  That's

16   all she's saying, the first seven people wanted to remain

17   anonymous.

18          And then finally, remember the caveat?  She put up

19   this thing about Lucie had drafted something of Nathan

20   Rotmensz, all sensitive information, i.e. e-mail addresses,

21   names, physical addresses will be blurred.

22          That's not a reference -- that is not an instruction

23   that all names are to be blurred.  It's certain sensitive

24   information, which included some e-mail addresses and some

25   names.  There's no reference at all to 23andMe.  It does not

*CLOSING ARGUMENT/BRIAN*                      Vol. 4-747

1    pertain to that scrolling scene at all.

2              THE COURT:  You have ten minutes left, counsel.

3              MR. BRIAN:  Thank you, Your Honor.

4              So that means I better talk -- better move on.  I

5    think I could stop now, because I don't think they've met any

6    of their burdens, but I would not be doing my job if I didn't

7    talk about their claim for damages.

8              You'll get an instruction from the Judge on damages.

9    It's right there.  There are two things I would ask you to

10   remember about damages in this instruction:  One, they must

11   show actual damages; and, two, they must be actual damages that

12   result from the invasion of privacy.

13             That's very important, particularly with respect to

14   Ms. Kennard, because I don't -- I don't dispute that

15   Ms. Kennard has had some very traumatic experiences in her

16   life.  That's not the issue.  I'm sure we are all sympathetic

17   to that.  I think we all feel for her on that, we do.  That's

18   not the issue.  The issue is whether or not seeing -- that her

19   name being in the film for half a second caused those damages.

20             First, as I said before, you know, it's not just the

21   average viewer who missed it.  Ms. Bowling missed her name in

22   the trailer.  Remember that testimony?

23             I asked her on cross-examination:  You didn't notice

24   your name anywhere in the trailer when you first watched it;

25   did you?

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-748

1          No.

2          So let's talk about Ms. Bowling's damages.  I guess

3    she wants somewhere between 3 million and 18 million, if my

4    math is correct.  She submitted no medical bills, no therapy

5    bills, no lost wages, nothing.  No evidence at all of any

6    monetary damage.  She did not seek medical treatment.  She did

7    not seek therapy.  As I said earlier, she had gone to a

8    therapist earlier and then stopped going and did not bring it.

9          So I am going to go back to her first reaction.  Why

10   is this important?  Because it shows her first reaction was not

11   to talk about how hurt she was, how distressed she was.  I

12   agree she seems angry.  It's that she wanted to get rich.

13         But what was her explanation?  She said under oath

14   that she was mimicking the TV show "The Real Housewives of

15   Atlanta."  I guess that's a phrase, "rich bitch," that was used

16   in that.  I don't think "fuck irresponsible" is.  I don't think

17   she got that from the show.  And nor did she get -- in the next

18   one she said:  Seriously, this will be my 15 minutes.  I want

19   paid.  She didn't get that either.

20         Two days later, when she had had some time to think

21   about it, she wrote this text to her sister:  I want to tell

22   all those fools that said let us be clear no one made any money

23   off this film, not yet bitches.  Again, you can evaluate her

24   claim, her motives.  Her claim is not credible.

25         Let me talk about Ms. Kennard.  You're going to see

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-749

1    her therapy bills -- I'm sorry, therapy notes.  Exhibit 1024.

2    This was November of 2021, before the documentary came out.

3    All the things she talks about now, she was feeling before the

4    documentary ever came out.

5         She feels stressed and overwhelmed, feeling

6    inappropriately guilty, helpless many days during the week,

7    worries about stress triggers, reports overeating, et cetera,

8    et cetera.  Look at those notes.  All the conditions that I

9    believe she is suffering -- I'm not contesting that she is

10   feeling stress, but all of that existed before the documentary

11   ever came out.

12        Since -- she also said -- Mr. MacGill said that she

13   changed her job, but you'll see that, too, there have been a

14   lot of traumatic experiences in her school district, a student

15   committed suicide, a teacher was assaulted, and she said that

16   this was the final straw, that she needed to change.  She

17   didn't say I needed to change because of the documentary.

18   There were things going on in her school.

19        Now, you may all feel sorry for Ms. Kennard.  I get

20   that, I do.  I get that.  But that's not a reason to award her

21   millions of dollars of damages when they haven't met any of the

22   elements, and she's incurred a total of $1,908 of therapy bills

23   since the documentary came out.

24        If you multiply that $1,000 a year in therapy bills,

25   which is about what that is, for 40 years, that's about

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-750

1    $40,000.  And yet Mr. MacGill gets up here and says that they

2    should get a thousand dollars a day or $2,000 a day or $2,500 a

3    day because they said they wouldn't take that.  I -- I just --

4    there's no basis.  It's not commonsensical.  It's absurd,

5    frankly, that anybody would even think about that.

6            You know, we packed a lot of evidence into this trial

7    in three days, and I want to thank Your Honor and your court

8    staff for making that happen.  That is not the case in some

9    courts, to be honest.  This courtroom was run efficiently;

10   fairly to both sides.  And I know I speak for myself and

11   Mr. MacGill and his colleagues in thanking the Court in how

12   much we appreciate that.

13           We also appreciate the time and attention you've

14   spent.  I mean, I've tried cases that have gone three months.

15   This has gone three and a half days, but this was a long three

16   and a half days, and it was intense, and these are important

17   issues to everybody.  These issues are very important.

18           I said earlier that I love the jury system.  I think

19   the court system in the United States of America is the best

20   court system in the world, and one of those reasons for it is

21   the jury system.  And in taking out your time and doing what

22   you've done, we really, really appreciate it.  And on behalf of

23   Netflix and Realhouse, I would say thank you.

24           When you go back and deliberate, don't be afraid to

25   express your opinions.  You may have a difference of opinions.

*CLOSING ARGUMENT/BRIAN*                    Vol. 4-751

1    Talk to each other, listen to each other, but don't fold just

2    to fold.  Articulate your opinions and work together to reach a

3    verdict.

4         You know, a courtroom is a place where race, gender,

5    and even whether you're a profitable corporation doesn't

6    matter, because your obligation is to decide this case based on

7    the facts that were presented and the law that Judge Pratt will

8    instruct you.  And if you do that, I respectfully submit you

9    will conclude that they have not met their burden.

10        And I know sometimes it's hard to tell somebody that

11   they should walk away empty-handed.  But when they haven't met

12   their burden of showing either of the four elements or any

13   damages caused by their names for those few seconds, I would

14   respectfully submit and ask you to do your duty.  And your

15   duty, I believe in this case, is to return a verdict for my

16   clients, Netflix and Realhouse.  Thank you for your time.

17        THE COURT:  All right.  Thank you, counsel.

18        So, Ladies and Gentlemen, we're going to take our

19   morning break.  The Court is going to admonish you.  You are

20   not to begin any deliberation and no discussion and don't talk

21   about the case.  When you come back, you're going to -- he's

22   got 14 minutes -- Mr. MacGill has 14 minutes on his rebuttal,

23   and then I will give you your closing instructions on the law

24   and then we're going to get you deliberating.  So we'll see you

25   back in the courtroom in about ten minutes.

*CLOSING ARGUMENT/BRIAN*                     Vol. 4-752

1          COURTROOM DEPUTY:  All rise.

2     (Jury out at 11:22.)

3          THE COURT:  You may be seated.

4          Lawyers, we forgot to address 407, the second motion

5     for judgment as a matter of law that was filed by the

6     defendants.  The Court has reviewed the motion, the response,

7     and a written order will be docketed very shortly which denies

8     that motion.  So Sarah is going to get it on the docket in just

9     a few minutes.

10          Enjoy your ten-minute break.

11          MR. MacGILL:  Thank you.

12          MS. YOUNG:  Thank you, Your Honor.

13          MR. BRIAN:  Thank you.

14          COURTROOM DEPUTY:  All rise.

15     (Recess at 11:23 until 11:38.)

16          THE COURT:  We're back on the record, and you may be

17     seated.

18          And, Mr. MacGill, are you ready for the jury?

19          MR. MacGILL:  Your Honor, we are.  Thank you.

20          THE COURT:  You may bring in the panel.

21          COURTROOM DEPUTY:  All rise.

22     (Jury in at 11:39.)

23          THE COURT:  We are back on the record.

24          And, Mr. MacGill, you may continue with your argument

25     to the jury.

1    MR. MacGILL:  Thank you, Your Honor.

2                    **CLOSING ARGUMENT BY**:

3    MR. MacGILL:  Ladies and Gentlemen, welcome back.  I

4    want to start with just a remarkable, remarkable event that

5    just occurred when these lawyers made an argument to you.

6        Netflix flipped a switch exposing the *Our Father* film

7    and Mrs. Bowling and Mrs. Kennard to 200 million people, and

8    the reaction on May 11, 2022, was predictable.  Sarah Bowling,

9    who had been promised by Michael Petrella, that her -- that her

10   name would not be used sees her name in the movie, so blame the

11   victim.  Netflix and all the lawyers here that you can see in

12   this courtroom come in here and tell you:  Yeah, we disclosed

13   her private facts, and she reacted in anger, and her anger was

14   intemperate.

15       She used bad language, but she was outraged.  It was

16   the most sad day of her life, the most upset she's ever been in

17   her life, and they say:  Hey, you know that anger we created in

18   this lady, throw her out of the court.  Don't address her

19   privacy rights because she reacted to what we did in the manner

20   that she did.

21       Outrageous.  There's no basis for doing it, and I

22   can't imagine why the largest studio in America would bring

23   lawyers in here to make that argument to you.

24       What's worse?  And it got much worse minute by minute

25   in what these lawyers just said to you.  What they said to you

1    is, oh, they didn't think this was private information.

2            Are you kidding?  A criminal, a thug, a terrible

3    person, an evil person.  They're connected to him by virtue of

4    their movie.  As bad as bad gets.  And they connected him to

5    more than 200 million people with the flip of a switch,

6    Mrs. Bowling and Ms. Kennard.  That's what they did.  So they

7    made that judgment, and then they come to court and they say:

8    No, that's not private facts.  Are you kidding?  Their

9    connection of these women to him, that's as private as it gets.

10   It's as private as it gets, the means of conception.

11           How would any reasonable person like to know that they

12   were conceived in the manner depicted in that film?  How would

13   you like that?  How would any reasonable person like that?  Is

14   that offensive?  How would you like to walk around with that

15   knowledge?

16           How would you like to teach in a school system for 18

17   years and be exposed to what Mrs. Kennard estimated.  I think

18   Mrs. Kennard told us it was 8,000 people that she's touched as

19   a teacher, 8,000 people.  She doesn't hold her head high

20   anymore because she wonders -- this is Indianapolis story.  Who

21   is it in Brownsburg, Indiana, that decides:  I think I'll watch

22   *Our Father*.  Let's see who the names were because I'm curious.

23   Why don't I push that pause button.

24           What would it be like to live in that fear?  How would

25   it be like to be walking into a new school that you had to

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-755

1    leave because the old school you taught at, you couldn't bear

2    to get there anymore?

3            And one more outrage.  And I'm sorry, but I have to

4    use the word "outrage."

5            The lawyers questioning Mrs. Kennard questioned her

6    from this podium:  Gee, before the event, didn't you report

7    that you were stressed in your school because there was some

8    violence in your school?  And, gee, means you were stressed

9    before and you were stressed after.  You reported that you were

10   at your wits end.  And believe it or not, believe it or not,

11   the lawyer for Netflix just said it again, just said it again.

12           Ladies and Gentlemen, our teachers in Brownsburg and

13   Avon and Indianapolis, Indiana, especially our 18-year

14   teachers, they're the heroes of our society.  They're dealing

15   with everything that we need to be dealt with.  They teach our

16   children.  They deal with societal problems every day.

17           Lawyers here, these lawyers, they could care less

18   about that, and this company, Netflix, could care less about

19   that.  It's blame the victim.

20           And they blame Mrs. Kennard, and they say:  Gee, you

21   were stressed before because you had some violence in your

22   school.  And somewhere in the school system, somebody committed

23   suicide, so everything you told the jury, that's what this is

24   about.  That's wrong, and it's outrageous.

25       Next, they didn't -- this information, they didn't keep it

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-756

1    private.  Are you kidding me?

2       Witness after witness:  The Facebook group was private.  It

3    was secret and private.  Many, many of the communications that

4    they rehashed again in this argument were, again, the same

5    group, secret and private.  There was e-mailing within that

6    group.

7       They make a big deal out of the fact that Mrs. Bowling

8    reached out, reached out to Michael Petrella.  Why did she

9    reach out?  Because she heard that somebody named Petrella was

10   going to make a movie.  She stopped.  This wasn't some naked

11   attempt to just go disclose her private personal information.

12   She had a phone call, and she stopped it, as far as she was

13   concerned, but it's worse than that.  Petrella knew it was

14   private.  And Mrs. Bowling, of course, knew it was private.

15   She stopped it, and he wrote an e-mail of assurance in terms of

16   these private facts.

17      In terms of Ms. Kennard's communications, to the same

18   effect.  Many of Mrs. Kennard's communications that were

19   referenced by the Netflix lawyer, many of them, were the same,

20   to the same effect.  They were sibling communications, family

21   communications.

22      This Court has and will instruct you:  Mrs. Bowling and

23   Mrs. Kennard had every right to speak, to communicate with

24   their close friends and relatives.  They had every right to do

25   that in connection with these circumstances, every right.  But

CLOSING ARGUMENT/MacGILL                    Vol. 4-757

1  you will be the judge whether that right was exercised

2  appropriately, in a way that you think is reasonable, and

3  whether those communications eliminated or created a

4  circumstance where these facts are not private.

5      They did not.  It was close family and friends.  That was

6  the reality of it, Ladies and Gentlemen.

7      Now, let's talk a little bit about the criticisms and the

8  claims about -- one more thing about Mrs. Bowling.  With the

9  anger that she expressed, I don't think the phrase "gold

10  digger" was used, but essentially, it was used, and they

11  claimed that she wasn't credible.

12      Not credible?  Not credible?  To be assured that you --

13  assured that your private facts are not going to be

14  communicated by the producer of the film.  You're assured.  And

15  what happens?  You are.

16      What would be the emotional effect on anyone?  Well, we

17  didn't need any support to tell you the reality because only

18  our clients can explain to you what their mental stress is,

19  only them.  They don't -- they didn't need, you didn't need,

20  and we didn't need an expert to testify as to how these women

21  feel.

22      And it's almost as if the folks at Netflix believe that

23  somehow a woman in this courtroom cannot come to tell you what

24  the emotional impact is or the mental distress is that they

25  have, and it's lasting, and it's meaningful, and it has reduced

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-758

1  their ability to enjoy their life.

2      A woman can't do that or a man, either one, that these

3  women can't do that, and they're not credible when they do so,

4  not credible when they do so?  Outrageous.

5      Now, let's talk about your discretion.  When we started

6  this, if we go back to Mrs. Kennard -- and you've heard the

7  evidence in this case -- she talked about persistant stress.

8  And, remember -- if you don't mind, I have to say it once

9  because I have to admit -- Netflix has never understood, to

10  this moment as we're here together, we are basing Lori

11  Kennard's claim on the fact that she saw her name.  That's our

12  claim with respect to Mrs. Kennard.

13      What did her seeing her name do to her?  She has a feeling

14  that people will regard her with dislike or aversion because

15  her father is Cline.  She has a fear of being judged based on

16  how she was conceived.

17      Lack of control, how does that -- what does that mean?

18  That means a lot.  Don't we all control our own information,

19  all of us?  Of course, we do.  And there's information that's

20  private to us, and we have the right -- and in this United

21  States, and in Indianapolis, Indiana, and Brownsburg, Indiana,

22  the reality is the same.  We have the right to control our

23  private information, and no one can take it from us.  But if

24  they do, the rights against the person who does can be

25  enforced.

1    Now, how would you like to walk around in those schools if

2    you were Lori Kennard with knowing that maybe somebody paused

3    the video the night before and said:  Mrs. Kennard, that's her.

4    And then who does that person talk to?  How would you like to

5    walk -- how would any reasonable person like to walk around in

6    those schools?

7    How about her twins sporting events?  How would that feel?

8    How would you be confident, socially, knowing these

9    circumstances are there?

10   Fear and anxiety about her children.  You may decide it's

11   hell on earth to walk around in fear that your children will be

12   learning about, you know, grandfather.  And in Ms. Kennard's

13   case, the grandfather is in the life of the grandchildren every

14   day or every other day.  What would the fear and anxiety be in

15   any reasonable person if you ended up in fear of your children

16   knowing that grandfather is not your biological grandfather?

17   That fear and that anxiety Mrs. Kennard testified to, that's a

18   change in the meaning on enjoyment of life.

19   Mental distress.  Sorry.  Outrageous, the suggestion made

20   by these lawyers, outrageous, that somehow there was no change

21   before and after.

22   Ladies and Gentlemen, in Exhibit 736, there was a change

23   documented in the therapy records:  Worries about how she will

24   be perceived.  25 percent of the people will judge me.  Who

25   knows my half-siblings?  My constant worry about who judges

*CLOSING ARGUMENT/MacGILL*                                    Vol. 4-760

1   her.  Hopelessness.  Flashbacks at her school.  That's what the

2   reality is.  That is in real life, Ladies and Gentlemen.

3       So let's talk about this, and this is your discretion.

4   I've given you these numbers.  We -- you know, we -- these are

5   all up to you.  You will make the decisions on what's

6   reasonable and appropriate, and you'll do so in your good

7   judgment.

8       Now, Mrs. Bowling -- one other thing on Mrs. Kennard.

9   14 million people streamed the movie with her name in it, and

10  who knows how many people have paused it since then or during

11  the time.  But with respect to her interest in privacy, Ladies

12  and Gentlemen, you have to assess and value that privacy

13  interest.  My suggestion would be that you consider a dollar

14  figure for each exposure because that interest has been harmed.

15  She's no longer private.

16      What is a number that's appropriate?  Is it a dollar?  Is

17  it less than that?  Is it more than that?  We entrust that

18  entirely to your discretion.

19      Now, the last couple of things.  The mental distress that

20  Mrs. Bowling had is different from but similar in some ways.

21      It's different from in the sense that her preoccupation and

22  lack of presence in the moment is a very significant damage to

23  her.

24          THE COURT:  Two minutes, counsel.

25          MR. MacGILL:  Thank you.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-761

1          Because of that, she testified to you that that has

2     been a problem, specifically, to her.  It's made it so she

3     can't enjoy her children to the same extent that she did before

4     this event, or her husband.  She is not in the moment.

5          Confidence issues in all environments, fear and

6     anxiety, and then enjoyment of life.

7          The same thing that we ask here with respect to her,

8     again, Ladies and Gentlemen, we're asking for you to exercise

9     your discretion on this element of damage, and you will do so.

10         Finally, remember, in assessing her harm and in the

11    interest of privacy, there's a different number and metric,

12    18 million and 13 million.  We ask you to assess the value of

13    this harm.

14         So, Ladies and Gentlemen, again, thank you for all

15    you've done.

16         Here's where this is.  The interests of privacy here

17    is on trial.  The invasion of privacy is on trial.  And this is

18    a very serious matter.  This is an American value that goes to

19    our core existence, and we ask you to enforce it.  Enforce it

20    in a way that you think is appropriate.  I'm not going to

21    suggest numbers, other than I gave you the guidelines, but this

22    is for you, not us.  But I ask you, as your make your

23    evaluations, to make an appropriate enforcement of this

24    important right.

25         Ladies and Gentlemen, thank you.

*CLOSING ARGUMENT/MacGILL*                    Vol. 4-762

1          THE COURT:  All right.  Thank you, Mr. MacGill.

2          Ladies and Gentlemen of the Jury, at this time, I am

3  going to give you your final instructions on the law.  You may

4  follow along on your screens or on the big television or you

5  can just sit back and listen as soon as Sarah gets it pulled up

6  for us.

### FINAL JURY INSTRUCTIONS

8          THE COURT:  Members of the Jury, you have seen and

9  heard all of the evidence and the arguments of the attorneys.

10  Now I will instruct you on the law.

11          You have two duties as a jury.  Your first duty is to

12  decide the facts from the evidence in the case.  This is your

13  job and yours alone.

14          Your second duty is to apply the law that I give you

15  to the facts.  You must follow these instruction, even if you

16  disagree with them.  Each of the instructions is important, and

17  you must follow all of them.  Perform these duties fairly and

18  impartially.  Do not allow sympathy or prejudice to influence

19  you.  You should not be influenced by any person's race, color,

20  religion, ancestry, or sex.  Nothing I say now and nothing I

21  said or did during this trial is meant to indicate any opinion

22  on my part about what the facts are or about what your verdict

23  should be.

24          In this case, the defendants are corporations.  All

25  parties are equal before the law.  A corporation is entitled to

Vol. 4-763

1   the same fair consideration that you would give any individual

2   person.  The evidence consists of the testimony of the

3   witnesses, the exhibits admitted in evidence, and stipulations.

4   A stipulation is an agreement between both sides that certain

5   facts are true.  In determining whether any fact has been

6   proven, you should consider all of the evidence bearing on the

7   question regardless of who introduced it.

8          A witness may be discredited or impeached by

9   contradictory evidence or by evidence that at some other time

10  the witness had said or done something or has failed to say or

11  do something that is inconsistent with the witness' prior

12  testimony.  If you believe any witness has been impeached and

13  therefore discredited, you may give the testimony of that

14  witness such credibility, if any, you think it deserves.  If a

15  witness is shown knowingly to have testified falsely about any

16  material matter, you have a right to distrust such witness'

17  other testimony and you may reject all the testimony of that

18  witness or give it such credibility as you may think it

19  deserves.

20         During the trial, certain testimony was presented to

21  you by the reading of depositions and/or video from prior sworn

22  deposition testimony.  You should give this testimony the same

23  consideration you would give it had the witness appeared and

24  testified here in court.

25         Certain things are not to be considered as evidence.

1    I will list them for you.  First, if I told you to disregard

2    any testimony or exhibits or struck any testimony or exhibits

3    from the record, such testimony or exhibits are not evidence

4    and must not be considered.

5          Second, anything that you may have seen or heard

6    outside the courtroom is not evidence and must be entirely

7    disregarded.  This includes any press, radio, Internet, or

8    television reports you may have seen or heard.  Such reports

9    are not evidence, and your verdict must not be influenced, in

10   any way, by such publicity.

11         Third, questions and objections or comments by the

12   lawyers are not evidence.  Lawyers have a duty to object when

13   they believe a question is improper.  You should not be

14   influenced by any objection, and you should not infer from my

15   rulings that I have any view as to how you should decide the

16   case.

17         Fourth, the lawyers' opening statements and closing

18   arguments to you are not evidence.  Their purpose is to discuss

19   the issues and the evidence.  If the evidence, as you remember

20   it, differs from what the lawyers said, your memory is what

21   counts.

22         Fifth, certain models, charts, and summaries that have

23   been shown to you to help explain facts disclosed by documents

24   and witnesses in this case are not evidence.  They are merely

25   aids, and if they do not accurately reflect the facts or

1    figures shown by the evidence, you should disregard them.

2          Any notes you have taken during this trial are only

3    aids to your memory.  The notes are not evidence.  If you have

4    not taken notes, you should rely on your independent

5    recollection of the evidence and not be unduly influenced by

6    the notes of other jurors.  Notes are not entitled to any

7    greater weight than the recollections or impressions of each

8    juror about the testimony.

9          You should use your common sense in weighing the

10   evidence and consider the evidence in light of your own

11   observations in life.  In our lives, we often look at one fact

12   and conclude from it that another fact exists.  In law, we call

13   this inference.  A jury is allowed to make reasonable

14   inferences.  Any inference you make must be reasonable and must

15   be based on the evidence in the case.

16         You may have heard phrases "direct evidence" and

17   "circumstantial evidence."  Direct evidence is proof that does

18   not require an inference, such as the testimony of someone who

19   claims to have personal knowledge of a fact.  Circumstantial

20   evidence is proof of a fact or a series of facts that tends to

21   show that some other fact is true.

22         As an example, direct evidence that it is raining is

23   testimony from a witness who says, I was outside a minute ago,

24   and I saw it raining.  Circumstantial evidence that it is

25   raining is the observation of someone entering a room carrying

a wet umbrella.  The law makes no distinction between the
weight to be given to either direct or circumstantial evidence.
You should decide how much weight to give to any evidence.  In
reaching your verdict, you should consider all the evidence in
the case, including the circumstantial evidence.

When I say you should consider all the evidence, I do
not mean that you must accept all of the evidence as true or
accurate.  You must decide whether the testimony of each of the
witnesses is truthful and accurate in part, in whole, or not at
all.  You must also decide what weight, if any, you give to the
testimony of each witness.  In evaluating the testimony of any
witness, including any party to the case, you may consider,
among other things, the ability and opportunity the witness had
to see, hear, or know the things the witness testified about,
the witness' memory, any interest, bias, or prejudice the
witness may have, the witness' intelligence, the manner of the
witness while testifying, and the reasonableness of the
witness' testimony in light of all the evidence in the case.

Parties may attack the credibility of a witness by
showing that the witness made a statement inconsistent with the
witness' testimony.  You may consider the fact that the witness
spoke inconsistently, with his or her testimony in this case
only, to determine the weight you give to that witness'
testimony given during this trial.  However, if a witness
testified inconsistently under oath in this case, you may also

1    consider the content of the witness' prior inconsistent

2    statement as evidence in this case.

3         You may find the testimony of one witness or a few

4    witnesses more persuasive than the testimony of a larger

5    number.  You need not accept the testimony of the larger number

6    of witnesses.

7         The law does not require any party to call as a

8    witness every person who might have knowledge of the facts

9    related to this trial.  Similarly, the law does not require any

10   party to present as exhibits all papers and things mentioned

11   during this trial.

12        This is a civil case.  Plaintiffs have the burden of

13   proving their case by what is called the greater weight of the

14   evidence.  Accordingly, when I say the plaintiffs must prove

15   something by the greater weight of the evidence or when I use

16   the expression "if you find" or "if you decide," this is what I

17   mean:  When you have considered all the evidence in the case,

18   you must be persuaded that it is more probably true than not

19   true.  A greater number of witnesses testifying to a fact on

20   one side or a greater quantity of evidence introduced on one

21   side does not necessarily amount to the greater weight of

22   evidence.

23        You have heard a witness give opinions about matters

24   requiring special knowledge or skill.  You should judge this

25   testimony in the same way that you judge the testimony of any

1   other witness.  The fact that such person has given an opinion

2   does not mean that you are required to accept it.  Give the

3   testimony whatever weight you think it deserves, consider the

4   reasons given for the opinion, the witness' qualifications, and

5   all of the other evidence in the case.

6          The parties have stipulated or agreed to certain

7   facts.  You must now treat these facts as having been proved

8   for the purpose of this trial.

9          In deciding this case, you must not consider or

10   speculate about whether any party has insurance.

11          When you review the documents admitted into evidence

12   in this trial, you may see that certain portions of a document

13   have been blacked out or whited out and removed from your

14   consideration by the Court.  You should not speculate as to

15   what the content of the portions that have been blacked out or

16   whited out, nor should you consider as part of your

17   deliberation the fact that certain portions have been removed

18   from your consideration.  Rather, you should consider only

19   those portions that have been admitted into evidence.

20          You must give separate consideration to each claim and

21   each party in this case.  Although there are two plaintiffs, it

22   does not follow that if one is successful, the other is too.

23          During the trial, if you heard the pseudonym Jane Doe,

24   that referred to Sarah Bowling.  If you heard Janice Coe, that

25   referred to Lori Kennard.  You are instructed not to draw any

1  inference as to the use of pseudonyms.

2         To recover damages from the defendants, Netflix or

3  Realhouse, the plaintiffs Sarah Bowling and Lori Kennard must

4  prove -- must each prove by the greater weight of the evidence

5  that:

6         One, Netflix or Realhouse disclosed information about

7  a plaintiff that is factually true and private in nature.

8         Two, Netflix's or Realhouse's disclosure was

9  communicated in a way that either reached the public or was

10  sure to reach the public, in general or was communicated to a

11  large enough number of persons that the matter was sure to

12  become public knowledge.

13         Three, Netflix's or Realhouse's disclosure was one

14  that would be highly offensive to a reasonable person.

15         And, four, the information disclosed by Netflix or

16  Realhouse was not of legitimate public concern.

17         The plaintiffs' information is not private in nature

18  if the information is left open to public inspection, if the

19  defendant merely gives further publicity to information about

20  the plaintiff that is already public or if the plaintiff

21  discloses that information to people who are not close family

22  or close friends.

23         A plaintiff does not establish an invasion of privacy

24  by public disclosure of a private fact by showing that she did

25  not consent to the disclosure.

Vol. 4-770

1        If you decide from the greater weight of the evidence

2   that defendant Netflix and/or defendant Realhouse is liable to

3   one or more of the plaintiffs, then you must decide the amount

4   of money that will fairly compensate each plaintiff to whom a

5   defendant is liable.  In deciding the amount of money you

6   award, you may consider:  One, the harm that plaintiffs'

7   interest in privacy resulting from the invasion; two, the

8   plaintiffs' mental distress proved to have been suffered, if it

9   is of a kind that normally results from such an invasion; and

10  three, special damage of which the invasion is a legal cause.

11       Base your decision on the evidence and not on a guess

12  or speculation.  However, damages, if any, need not be proven

13  to a mathematical certainty.

14       Once you are all in the jury room, the first thing you

15  should do is choose a foreperson.  The foreperson should see to

16  it that your discussions are carried out in an organized way

17  and that everyone has a fair chance to be heard.  You may

18  discuss the case only when all jurors are present.  A verdict

19  form has been prepared for you.  Take these forms to the jury

20  room, and when you have reached unanimous agreement on the

21  verdicts, your foreperson will sign -- will fill in, sign, and

22  date the verdict forms.  If you need to communicate with me

23  while you are deliberating, send a note to the court clerk.

24  The note should be signed by the foreperson or by one or more

25  members of the jury.

1    To have a complete record of this trial, it is

2    important that you do not communicate with me except by a

3    written note.  I may have to talk to the lawyers about your

4    message, so it may take me some time to get back to you.  You

5    may continue your deliberations while you wait for my answer.

6    Please be advised that trial transcripts of testimony are not

7    available to you.  You must rely on your collective memory of

8    the testimony.

9    If you send me a message, do not indicate the

10   breakdown of any votes you may have conducted.  In other words,

11   do not tell me that you are split four-four or five-three or

12   whatever your vote happens to be.  Advise the clerk once you

13   have reached a verdict.  When you come back to the courtroom, I

14   will read the verdict aloud.

15   Your verdicts must represent the considered judgment

16   of each juror.  Your verdicts, whether for or against the

17   parties, must be unanimous.  You should make every reasonable

18   effort to reach a verdict.  In doing so, you should consult

19   with one another, express your own views, and listen to the

20   opinions of your fellow jurors.  Discuss your differences with

21   an open mind.  Do not hesitate to re-examine your own views and

22   change your opinions if you come to believe it is wrong, but

23   you should not surrender your honest beliefs about the weight

24   or effect of evidence solely because of the opinions of other

25   jurors or for the mere purpose of returning a unanimous

1    verdict.  All of you should give fair and equal consideration

2    to all the evidence and deliberate with the goal of reaching an

3    agreement that is consistent with the individual judgment of

4    each juror.

5          You are impartial judges of the facts.  Your sole

6    interest is to determine whether the plaintiffs have proved

7    their claims.

8          And at this time, I need my bailiff to approach so

9    that you can be sworn.

10    (The bailiffs are sworn.)

11          THE COURT:  Ladies and Gentlemen of the Jury, you may

12    now retire for your deliberations.

13          COURTROOM DEPUTY:  All rise.

14    (Jury out at 12:09.)

15          THE COURT:  Lawyers, would you come forward and view

16    the verdict forms.  We've got them in this --

17          Carly, why don't you come down and help us.

18    (Off the record.)

19          THE COURT:  Mr. MacGill, cut on your microphone.

20    Mr. MacGill, are you satisfied with the verdict forms?

21          MR. MacGILL:  We are, and we agree.  Thank you.

22          THE COURT:  And, Mr. Brian, are you satisfied with the

23    verdict form?

24          MR. BRIAN:  We are, Your Honor.

25          THE COURT:  All right.  We'll send these verdict forms

Vol. 4-773

1  back with the jury.

2         And I believe you all have already signed off on the

3  exhibits; am I correct?

4         MR. MacGILL:  Yes.  Yes, we have.

5         MR. BRIAN:  Yes, Your Honor.

6         THE COURT:  Okay.  All right.  Lawyers, so make sure

7  you leave your cell phones with Carly and Sarah, and if we get

8  a question, what I'll do, unless it's a question where we need

9  to reconvene, I'll call you.  And we'll talk about the

10  question, and then when we do convene, we'll put it on the

11  record; okay?

12         MR. BRIAN:  Okay.

13         THE COURT:  All right.  So just don't go too far.  All

14  right.

15         MR. MacGILL:  Thank you, Your Honor.

16         THE COURT:  We are in recess.

17         MR. BRIAN:  Your Honor, what are your intentions in

18  terms of hours?

19         THE REPORTER:  Are we on the record?

20         THE COURT:  Yes.  Let's go back on, Dave.

21         MR. BRIAN:  It's on.  It's on.

22         THE REPORTER:  Okay.

23         MR. BRIAN:  What are your intentions as to hours?

24         THE COURT:  We're going to let them deliberate until

25  they reach a verdict.  So we'll see.

Vol. 4-774

1          MR. BRIAN:  Thank you, Your Honor.

2          THE COURT:  We'll see.  We'll play it by ear.

3          MR. BRIAN:  Thank you, Your Honor.

4          THE COURT:  Okay.  We're in recess.

5          COURTROOM DEPUTY:  All rise.

6      (Recess at 12:12, until 6:51.)

7          THE COURT:  We are back on the record, Sarah Bowling

8    and Lori Kennard plaintiffs versus Netflix, Inc., Netflix

9    Worldwide Entertainment, LLC, Realhouse Productions, LLC,

10   defendants, and our case number is 1:22-cv-1281.

11         And, lawyers, the jury advises the bailiff that they

12   have reached a verdict.  And before we bring in the jury, we

13   did have one question, which we'll put on the record.

14         The question was:  Jury Instruction Number 21,

15   paragraph 3, is the disclosure supposed to be highly offensive

16   to the plaintiff in the case or a viewer of the show, we are

17   wondering about this interpretation, or does this mean we as

18   the jury must place ourselves in the particular shoes to

19   understand if the disclosure was offensive?

20         And the Court consulted with counsel over the

21   telephone.  The defendant requested that the Court direct the

22   jury to reread Instruction Number 21, plaintiffs requested that

23   the Court just direct the jury to reread all instructions, and

24   the Court's response was:  You have all of the instructions

25   before you.  Please reread the instructions.

1          Is that your understanding, plaintiffs' counsel?

2          MR. MacGILL:  Yes, Your Honor, that is our

3     understanding.

4          THE COURT:  And is that yours also, defendants?

5          MR. BRIAN:  Yes.

6          THE COURT:  All right.  So we're going to have Sarah

7     go and get the form of the verdict.

8          And while she's doing that, lawyers, state your names

9     for the record so we can have that on the record, beginning

10    with plaintiffs' table.

11         You can get them lined up, Sarah.

12         MR. MacGILL:  Your Honor, Rob MacGill and Matt Ciulla

13    and Ceclia Satterthwaie and McKenzie Thompson for plaintiffs.

14         THE COURT:  And plaintiff Sarah Bowling is present?

15         MR. MacGILL:  Yes, and Lori Kennard is also present,

16    seated in the back with her husband.

17         THE COURT:  Okay.  And at our defendants' table?

18         MR. BRIAN:  Brad Brian and Blanca Young and Andrea

19    Pierson for the defendants, Your Honor.

20         I had a question, Your Honor, about what your practice

21    is about if the jurors are willing to talk to counsel after,

22    how do you do that?

23         THE COURT:  We have a local rule that says you may

24    not.

25         MR. BRIAN:  That makes it easier.

1      THE COURT:  It makes it easy.  But I will talk to the

2   jury, and at the appropriate time I will give you feedback.

3      MR. BRIAN:  Thank you.

4      THE COURT:  Okay.  All right.  And the Court will

5   state for the record, regardless of whether you're happy or sad

6   about the verdict, there will be no outbursts in the courtroom,

7   so if you don't think you're going to be able to maintain your

8   composure, just step in the hallway.

9      We're ready for the jury.

10      COURTROOM DEPUTY:  All rise.

11   (Jury in at 6:54.)

12      THE COURT:  We are back on the record, Sarah Bowling

13   and Lori Kennard, plaintiffs, versus Netflix, Inc., Netflix

14   Worldwide Entertainment, LLC, and Realhouse Productions, LLC.

15      And Juror Number 6, you are holding the folder.  Are

16   you the foreperson?

17      PROSPECTIVE JUROR:  (Nodding.)

18      THE COURT:  Would you please hand the forms of the

19   verdict to the bailiff.

20      Plaintiff, Sarah Bowling's invasion of privacy claim

21   against Netflix, Inc. and Netflix Worldwide Entertainment, LLC

22   and Realhouse Productions, LLC, Question 1:  Did plaintiff

23   Sarah Bowling prove by the greater weight of the evidence that

24   Netflix committed the tort of invasion of privacy by disclosure

25   of a private fact?

1          No.

2          Question 2:  Did Sarah Bowling prove by a greater

3   weight of the evidence that Realhouse Productions committed the

4   tort of invasion of privacy by disclosure of a private fact?

5          Answer:  No.

6          Question 3:  What amount, if any, do you award to

7   compensate plaintiff Sarah Bowling for invasion of privacy by

8   disclosure of a private fact?  0.

9          Signed by the foreperson, dated December 5th, 2024.

10          Plaintiff Lori Kennard's invasion of privacy claim

11   against Netflix, Inc. and Netflix Worldwide Entertainment and

12   Realhouse Productions, LLC, Question 1:  Did plaintiff Lori

13   Kennard prove by the greater weight of the evidence that

14   Netflix committed the tort of invasion of privacy by disclosure

15   of a private fact?

16          Yes.

17          Question 2:  Did plaintiff, Lori Kennard, prove by a

18   greater weight of the evidence that Realhouse committed the

19   tort of invasion of privacy by disclosure of a private fact?

20          Answer:  Yes.

21          Question 3:  What amount, if any, do you award to

22   compensate plaintiff Lori Kennard for invasion of privacy by

23   disclosure of a private fact?  $385,000.

24          Signed by the foreperson, dated December 5th, 2024.

25          And Juror Number 1, are these your verdicts?

Vol. 4-778

1          JUROR:  Yes.

2          THE COURT:  Juror Number 2?

3          JUROR:  Yes.

4          THE COURT:  Juror Number 3?

5          JUROR:  Yes.

6          THE COURT:  Juror Number 4?

7          JUROR:  Yes.

8          THE COURT:  Juror Number 5?

9          JUROR:  Yes.

10         THE COURT:  Juror Number 6?

11         JUROR:  Yes.

12         THE COURT:  Juror Number 7?

13         JUROR:  Yes.

14         THE COURT:  And Juror Number 8?

15         JUROR:  Yes.

16         THE COURT:  All right, Ladies and Gentlemen of the

17    Jury, thank you very much for your four days of very diligent,

18    long hard work.  You performed a very important civic duty, and

19    on behalf of all of the parties, we do very much appreciate

20    you.

21         I'm going to send you back to your jury room, and I

22    will come back and talk to you before we excuse you.  Thank you

23    very much.

24         COURTROOM DEPUTY:  All rise.

25         (Jury out at 6:58.)

Vol. 4-779

1          THE COURT:  With respect to plaintiff Sarah Bowling,

2     the Court is going to enter judgment in favor of Netflix, Inc.,

3     Netflix Worldwide Entertainment, LLC, and Realhouse

4     Productions, LLC, based on the jury's verdict.

5          And with respect to the plaintiff Lori Kennard, the

6     Court is going to enter a judgment in favor of Ms. Kennard in

7     the total amount of $385,000.

8          So, lawyers, we -- you were great lawyers.  You did

9     very good lawyering, you were very professional, and it was a

10     pleasure trying this case with you.  So thank you all.

11          MR. MacGILL:  Thank you.

12          MS. YOUNG:  Thank you, Judge.

13          THE COURT:  All right.  So we're going have the CSOs

14     escort all of you have guys out.  Sarah is going to get the

15     jury out.  So once we've cleared the courtroom, then I'll let

16     the jury go.

17          MR. BRIAN:  Thank you, Your Honor.

18          THE COURT:  But I will let you guys know, I'll wait

19     until after the appeal period before I contact you.

20          MR. BRIAN:  Thank you, Your Honor.

21          MR. MacGILL:  Perfect.

22          THE COURT:  Thank you, lawyers.

23          COURTROOM DEPUTY:  All rise.

24       (Proceedings adjourned at 6:59.)

25

1    <u>CERTIFICATE OF COURT REPORTER</u>

2

3         I, David W. Moxley, hereby certify that the

4    foregoing is a true and correct transcript from

5    reported proceedings in the above-entitled matter.

6

7

8

9    <u>/S/ David W. Moxley</u>            December 5, 2024
     DAVID W. MOXLEY, RMR/CRR/CMRS
10   Official Court Reporter
     Southern District of Indiana
11   Indianapolis Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25