UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SARAH BOWLING, | ) |
| LORI KENNARD, | ) |
| | ) Cause No. |
| Plaintiff, | ) 1:22-cv-1281-TWP-MJD |
| | ) Indianapolis, Indiana |
| vs. | ) **December 2, 2024** |
| | ) 8:29 a.m. |
| NETFLIX, INC., NETFLIX | ) |
| WORLDWIDE ENTERTAINMENT, LLC, | ) |
| REALHOUSE PRODUCTIONS, LLC, | ) |
| | ) **REDACTED** |
| Defendants. | ) |

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
TRIAL, DAY 1

Court Reporter:            David W. Moxley, RMR, CRR, CMRS
                          United States District Court
                          46 East Ohio Street, Room 340
                          Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES:**

For Plaintiffs:                    Robert D. MacGill, Esq.
                                   Matthew Thomas Ciulla, Esq.
                                   Christopher C. Murray, Esq.
                                   MacGill PC
                                   Suite 1200
                                   156 East Market Street
                                   Indianapolis, IN  46204


For Defendant:                     Andrea Roberts Pierson, Esq.
                                   J. Benjamin Broadhead, Esq.
                                   Faegre Drinker Biddle
                                    & Reath, LLP
                                   Suite 2500
                                   300 North Meridian Street
                                   Indianapolis, IN  46204

                                   Rachel Strom, Esq.
                                   Jesse Feitel, Esq.
                                   Davis Wright Tremaine, LLP
                                   21st Floor
                                   1251 Avenue of the Americas
                                   New York, NY  10020

                                   Brad Dennis Brian, Esq.
                                   Sara A. McDermott, Esq.
                                   Munger, Tolles & Olson, LLP
                                   50th Floor
                                   350 South Grand Avenue
                                   Los Angeles, CA  90071

                                   Blanca Young, Esq.
                                   Munger, Tolles & Olson, LLP
                                   27th Floor
                                   560 Mission Street
                                   San Francisco, CA  94105-2907

# <u>I N D E X</u>

Opening statement by Mr. MacGill ............107

Opening statement by Ms. Young ..............126

**<u>PLAINTIFF'S WITNESSES:</u>**                            **<u>PAGE</u>**

MICHAEL PETRELLA

(Deposition read into record.)................150


LUCIE JOURDAN

(Deposition read into record.) ...............152


SARAH BOWLING

Direct Examination by Mr. Macgill ............155
Cross-examination by Mr. Brian  ..............223
Redirect examination by Mr. MacGill ..........263


MARCUS BOWLING

Direct Examination by Mr. MacGill ............266
Cross-examination by Mr. Brian ...............274

# I N D E X   O F   E X H I B I T S

**PLAINTIFF'S EXHIBITS:**                                    **PAGE**

7 ..........................................150
8 ..........................................150
14 .........................................150
15 .........................................182
35 .........................................184
36 .........................................185
78 .........................................152
100 ........................................186
119 ........................................168
120 ........................................179
132 ........................................163
135 ........................................164
208 ........................................172
388 ........................................188
642 ........................................189
653 ........................................187
946 ........................................175
956 ........................................173
9001 .......................................193


**DEFENDANT'S EXHIBITS:**                                    **PAGE**

205 ........................................233
220 ........................................231
233 ........................................245
918 ........................................246
919 ........................................236
987 ........................................250

1                      (In open court.)

2              THE COURT:  Good morning, everyone.  We are on the

3      record.  This is Sarah Bowling and Lori Kennard, plaintiffs,

4      versus Netflix, Inc., Netflix Worldwide Entertainment, LLC, and

5      Realhouse Productions, LLC, and the case number is

6      1:22-cv-1281, and we are here this morning for a jury trial.

7              And before we bring in the panel, there are some

8      matters that the parties wish to address with the Court, and

9      I'll begin, lawyers.

10             So in the -- I do a PowerPoint.  And in that

11     PowerPoint, I will name all of the attorneys who are

12     participating in the trial, and that would be any attorney

13     who's going to enter the well during the trial.  The reason

14     being, I'm going to ask them do they recognize this lawyer,

15     have they had any dealings with the lawyer or their law firm.

16     So if you are not an attorney who is going to sit at a table or

17     enter the well at any time, I don't have to read your name.  So

18     you need to make sure Sarah knows those names; okay?

19             All right.  So, plaintiff, did you have any matters?

20             MR. MacGILL:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MR. MacGILL:  Nothing from the plaintiff.

23             THE COURT:  All right.  Defendants?

24             MR. BRIAN:  Your Honor, Brad Brian for the defendants.

25     We have a few issues we wanted to raise.  I don't know that --

1  I'm sure Your Honor has finalized your voir dire questions.  We

2  did have two questions that we thought perhaps maybe we would

3  ask Your Honor to consider because I think they're better

4  coming from you than from us.

5          One is:  Do you believe that streaming services need

6  to do a better job of protecting the privacy of victims in a

7  documentary or shows?  And the other one was:  Have you or

8  anyone close to you ever had your name or photo stolen or used

9  without your permission or had your private information

10  publicized without permission?  We thought those were better

11  coming from you.

12          THE COURT:  The second one is in my voir dire.

13          MR. BRIAN:  It is, okay.

14          THE COURT:  Okay.

15          MR. BRIAN:  The first one, Your Honor, just if I can

16  repeat it, was:  Do you believe that streaming services need to

17  do a better job of protecting the privacy of victims?

18          THE COURT:  They would have no idea to know anything

19  about that.

20          Streaming?  What do you mean, streaming versus like

21  ...

22          MR. BRIAN:  Like Netflix.

23          THE COURT:  To protect their ...

24          MR. BRIAN:  Well, the plaintiffs --

25          THE COURT:  Other than in this case, why would anyone

1    ever have that experience?

2            MR. BRIAN:  That's what we want to find out, Your

3    Honor, but I can explore it.

4            THE COURT:  Okay.  Because I don't -- I don't think

5    it -- I mean, why -- other than if you've had this -- not many

6    people are subjects of a documentary.

7            MR. BRIAN:  Correct.

8            THE COURT:  And so ...

9            MR. BRIAN:  Understood, Your Honor.

10           THE COURT:  Yeah.  You can ask it.

11           MR. BRIAN:  Okay.

12           THE COURT:  Okay.

13           MR. BRIAN:  Another issue, Your Honor, is there's a

14    punitive damage claim in the case.  I think the law in this

15    circuit is, certainly this Court, clear that until they -- the

16    plaintiffs make a prima facie case of punitive damages, they're

17    not supposed to mention punitive damages or any of the

18    financial information.  So if we come to that point and the

19    plaintiffs think they've made that prima facie evidence, then,

20    of course, Your Honor would allow them.  But until that, we

21    don't think there should be a mention in opening statement of

22    punitive damages or the net worth or other financial

23    information about the plaintiffs.

24           I can cite you to two cases on that, one of which is

25    Your Honor's, Barnes versus General Motors case from 2023, and

1    Jenson versus Lowe's Home Centers.  I have copies of those

2    cases if Your Honor would like them, but I think that law is

3    pretty clear.

4              THE COURT:  Any response?

5              MR. MacGILL:  Yes, Your Honor.  One, the preliminary

6    instruction agreed to and approved by the parties includes this

7    very point.  And the issues to be considered by you, the jury

8    involve compensatory and punitive damages, number one.

9              Number two, with respect to this Court's opinion that

10   you have already provided the parties, you've indicated what

11   the standard is and that there is a question that the Court has

12   determined, as it said, that a reasonable jury could find

13   punitive damages in this case.

14             And for those reasons, we think that the preliminary

15   instructions should stand, number one.

16             Number two, I can say that in our opening statement,

17   we're not going to make reference to the financial information

18   of the plaintiff.  We are not going to expressly reference

19   punitive damages.  We're just going to reference the fact that,

20   as we've shared with the plaintiffs, that we think one of the

21   questions in the case is whether or not we have shown by clear

22   and convincing evidence a reckless disregard to the privacy

23   interests of the plaintiffs.

24             MR. BRIAN:  Your Honor, in the Jenson case, the Court

25   said -- that is not by Your Honor, but one of your

1  colleagues -- the latter request is well-taken, granting the

2  motion in limine as to evidence as to what amounts to punitive

3  damages.  The defendants' motion in limine is granted to the

4  extent that Jenson cannot reference an amount of punitive

5  damages or present evidence regarding Lowe's financial

6  condition or an amount of punitive damages the jury should

7  award, unless and until she establishes a prima facie case for

8  punitive damages.  Your Honor said the same thing in the Barnes

9  case, and the Court further agrees with G.M. that any such

10  evidence might elicit the jury's sympathy.  And you say the

11  Court is -- anyway, you went on and made the same holding.

12       I understand Counsel's point.  You did not rule in

13  denying the motion for summary judgment that they made out a

14  prima facie case.  You ruled on the facts presented that there

15  was a factual issue.  That's very different than establishing a

16  prima facie case.  So I think these cases hold that there

17  should be no mention, and certainly -- I appreciate counsel's

18  representation -- certainly no statement about any financial

19  net worth or any evidence like that until Your Honor has held,

20  if you do, that they've established a prima facie case.

21       THE COURT:  Okay.

22       MR. MacGILL:  Yes, Your Honor.  And we are clear, we

23  are not going to mention -- we're going to do what we said.  We

24  will not mention financial information of Netflix, we will not

25  mention financial information of Realhouse in the opening

1    statement.  The word "punitive damages" is not going to come up

2    in our opening statement.  We're just going to mention -- we're

3    going to ask them to resolve that question, all of which we

4    think is consistent with what the parties agreed to already in

5    the preliminary instruction.

6         THE COURT:  All right.  And you are correct, that the

7    word "punitive damages" is in one of the preliminary

8    instructions, which the parties agreed upon, so I'm going to

9    leave that as is.

10        And I think you're on the same page.  The plaintiffs'

11   counsel agree that they're not going to argue about the amount

12   of financial wealth of either of the defendants or make that

13   request for punitive damages until they've met their burden.

14        MR. BRIAN:  Understood, Your Honor.

15        There are two other issues which my colleague,

16   Ms. Young, is going to address.

17        THE COURT:  You may.

18        MS. YOUNG:  Good morning, Your Honor.  One issue we

19   wanted to address comes out of the recent attempt to amend the

20   statement of damages to include evidence of the plaintiffs'

21   physical conditions being caused by the disclosure, and that

22   raised a question about two different medical diagnoses that

23   the plaintiffs have each received.

24        Sarah Bowling has a preexisting condition of multiple

25   sclerosis, and Lori Kennard has been diagnosed with

post-traumatic stress disorder.  Neither of them have offered any medical expert opinion testimony that those conditions were either caused or exacerbated by the disclosure of their names in the documentary, which, under Indiana law and Seventh Circuit law, is required in order for them to put evidence in front of the jury to suggest that those conditions were caused or exacerbated by the disclosure in this case.

And because they don't have that kind of medical expert opinion testimony, which is required in these circumstances, we don't think that they should be permitted to mention or testify that they have been diagnosed with these things, because those disorders would only be relevant if they could establish a causal link.  And without that relevant causal link, that must be established through medical expert testimony, the evidence is confusing because I think it's going to lead the jury to think that those conditions are in some way related to the disclosure, and it's unduly prejudicial for obvious reasons.

THE COURT:  Well, Counsel, did you read the -- I believe that's contained in the Court's order on your Motion in Limine Number 12.

MS. YOUNG:  Well, we weren't exactly sure how far the Court's ruling extended.  We just wanted to confirm that it extented both to Sarah Bowling's multiple sclerosis diagnosis as well as to Lori Kennard's diagnosis for post-traumatic

1    stress disorder.  And, again, because medical opinion testimony

2    is necessary to establish causation -- they don't have a

3    medical expert -- we don't think that those conditions should

4    be mentioned at all.

5          MR. MacGILL:  Your Honor, you addressed this and so

6    ruled on Wednesday in terms of exacerbation of the MS.  That's

7    out.  We will not mention that.  The Court was clear on the

8    order on Wednesday, number one.

9          Number two, the expert for the defense, the

10   psychiatrist who did the IME is blaming the MS on Sarah

11   Bowling's emotional distress, so he is expressly pointing to

12   the multiple sclerosis.

13         We cannot and we will not make reference to any

14   exacerbation of her multiple sclerosis condition by virtue of

15   the Court's order, and that's clear.

16         Second, with respect to the post-traumatic stress

17   syndrome, that was diagnosed, and these therapy records are in

18   evidence.  This is Exhibit 736, and it's a stipulated exhibit

19   expressly where the post-traumatic stress diagnosis is given,

20   and the exhibit has been stipulated into evidence.  And that's

21   as to Lori Kennard.

22         So for those reasons, there is no reason for a further

23   ruling on the MS and exacerbation.  The Court has decided this,

24   and Exhibit 736 is the medical record which addresses the

25   post-traumatic stress syndrome.

 1           MR. CIULLA:  And, Your Honor, the stipulated document

 2    378, page 8, as preadmitted.

 3           MS. YOUNG:  So, Your Honor, the fact that the document

 4    has been preadmitted doesn't mean that they can put in front of

 5    the jury or have Ms. Kennard, for example, testify about her

 6    post-traumatic stress disorder diagnosis.  That suggests that

 7    there is some causal link between that disorder and the

 8    appearance of her name in the documentary, and they have no

 9    medical expert who is coming to trial to establish that causal

10    link.  And they need to do that.  And without it, the diagnosis

11    is not relevant and they should not be mentioning it.

12           There's a leading case in the Seventh Circuit, Higgins

13    versus Coke Development Corporation, that says exactly this.

14    Lay witnesses can testify about a causal connection only when

15    there's an obvious link between them, like you get in a car

16    accident and you walk out and your arm hurts and then you find

17    out it's broken.

18           Here we have something that has a very complex

19    etiology, that and multiple contributing causes to it, and you

20    need medical expert testimony to establish that, which they

21    don't have.  And without that causal link, with the required

22    medical expert testimony, the evidence isn't probative of

23    anything.

24           And even if it were remotely probative, under Rule

25    403, it's going to be confusing to the jury because they're

1    going to think that it's related.  And it's obviously unduly

2    prejudicial.

3            THE COURT:  Counsel, can you give me the citation for

4    Higgins?

5            MS. YOUNG:  Yes, and I actually have a copy for the

6    Court, if you would like me to bring it up.

7            THE COURT:  Okay.

8            MS. YOUNG:  But for the record, the citation is -- I

9    need my glasses to read that --  794 F.3d 697 2015.  It's a

10   Seventh Circuit case, Higgins versus Coke Development

11   Corporation.

12           THE COURT:  Okay.

13           MR. MacGILL:  Your Honor, and just quoting from the

14   medical records here -- this is Exhibit 736, on May 9th,

15   2023 -- what's referenced here in this stipulated exhibit:

16   Updated diagnosis code to Unspecified Trauma and

17   Stressor-Related disorder based on patterns of intrusive

18   thoughts and memories, constant anxiety and dysregulation,

19   being reactive with loud noises at the school, frequent

20   irritability and sadness, and worries about people finding out

21   who her father is.  So that's what the updated diagnosis is,

22   Bates Number 869 of this document.

23           MR. CIULLA:  And, Your Honor, I'll just add, similarly

24   to Ms. Bowling, where the expert -- the medical expert for the

25   defense will testify that the -- her emotional condition is

1    caused by her MS.  The medical expert of the defense in this

2    case is going to testify -- this is from his deposition -- did

3    Lori Kennard have a feeling of anxiety from the movie?

4            Lori Kennard has long-standing anxiety.  But based on

5    my examination, that was potentially attributed to her chronic

6    condition of PTSD.

7            So this is the same problem where the defense expert

8    is going to blame the PTSD, so it's going to come up, and so we

9    believe Ms. Kennard has a right to testify about it.

10           THE COURT:  What do you want her to say about it?

11           MR. MacGILL:  Just, Your Honor, specifically, really

12   one question:  One year after the movie, were you given a

13   diagnosis on May 9, 2023?

14           Yes.

15           Is this the diagnosis?  No further questions.

16           THE COURT:  May 2023, she was diagnosed with PTSD --

17           MR. MacGILL:  Yes.

18           THE COURT:  -- is that what you're saying?

19           MS. YOUNG:  So, Your Honor, I think that that question

20   highlights the problem.  It's making clear that the inference

21   they want the jury to draw is that the documentary came out and

22   then after that, she was diagnosed with PTSD.  And to make that

23   causal link, you cannot do that through the testimony of a lay

24   witness.

25           Now, we do have an expert who, if this comes into

evidence, will testify that the PTSD is attributable to a whole
host of other things, and actually that the symptoms of it
preexisted the documentary. But they don't have that expert,
and it's their burden of proof, and they cannot fill that gap
with lay testimony on something that is obviously a complex
mental health disorder.

THE COURT: Okay. And when did the other plaintiff
get diagnosed with MS?

MR. MacGILL: In 2017.

THE COURT: Okay.

MS. YOUNG: And that's the other problem, Your Honor.
That is a pre-existing condition. And so the only potential
relevance of it is if there's some medical expert testimony
that the documentary aggravated that condition in some way. I
think the Court's ruling on Motion in Limine Number 12
precludes that already, but we just don't believe that the MS
is relevant to anything without that causal connection and it
should not be mentioned.

THE COURT: Okay. All right. I'll read these cases
and get you a ruling very soon.

MS. YOUNG: Thank you, Your Honor.

THE COURT: All right, lawyers, our jury will be
here --

MS. YOUNG: Sorry, Your Honor, we have one more issue,
which my colleague Ms. McDermott will address.

 1          MS. McDERMOTT:  Good morning, Your Honor.  So we have

 2     one more.  Hold on one minute.

 3          Good morning, Your Honor.

 4          THE COURT:  Good morning.

 5          MS. McDERMOTT:  We have one more issue to address, and

 6     that is regarding Sarah Sexson, one of the witnesses who was

 7     disclosed for today.  Ms. Sexson was issued a trial subpoena by

 8     plaintiffs on November 14th.  She was listed on their witness

 9     list as a witness who would be coming live on November 15th.

10     Yesterday, just after noon, plaintiffs informed us that they

11     have been in touch with her, that she's a licensed clinical

12     social worker, and that they would like to -- that they intend

13     to play her deposition testimony in lieu of bringing her live

14     because she has a full schedule of patients.  Our view, Your

15     Honor, is that Ms. Sexson should come live to testify.  She is

16     within the subpoena power of the Court.  She lives in

17     Indianapolis.  She is, we believe, not a treating health care

18     provider under the definition in Your Honor's practices,

19     because she is testifying purely as a fact witness in this

20     case.  She's anticipated to testify that she saw one of the

21     plaintiffs' names in the documentary.

22          And what we are -- we are certainly sympathetic to her

23     full work schedule and we would be willing to accommodate a

24     time that is appropriate for her, that works for her, whether

25     that be an evening, 5:00 or later, whether it be in the

morning, 8:30 or earlier, that's fine with us, but we do think that she should be required to come in and testify live.

And we think that it's possible that, you know, perhaps if Your Honor gave her a call, she might be more willing to come in, just if that's -- if that might ease things.

MR. MacGILL:  Your Honor, quickly, a couple things: She is a social worker.  This is her prime time.  It's a lot of -- she counsels people on alcohol and drug abuse.  We subpoenaed her, copied counsel on it.  We suspected, because of her therapy work, that she would say I can't do this, I have therapy to attend to.  So we worked with plaintiffs -- pardon me, the defendants, and we agreed to a video.  And your court made rulings on objections they made to her video last week, on Wednesday.  So we had every anticipation that this video had been agreed to, the Court had ruled on the objection or objections they had.  We cut the video, and then we hear on Saturday they want us to call her live.

So I called her yesterday afternoon and I said, look, here's the subpoena we sent you November 13 and we need you to come.  And she said, you know, respectfully, I get subpoenas all the time, that's the nature of my job.  I cannot be there and attend to my patients.  And I said, look, the subpoena is here and, but she made her point.  We notified counsel and said, look, this is her prime time, she's not able to come,

1    there's no prejudice to this.  They took the deposition, we

2    didn't.  And as you may remember from reading the questions, so

3    we would ask that she be allowed to testify by deposition in

4    lieu of a live appearance.

5            THE COURT:  Well, Counsel, she's not unavailable under

6    the trial rules, so she needs to honor the subpoena.  When she

7    gets her -- tell her when she gets here, whoever is on the

8    witness stand, even if we have to take a witness, cut a witness

9    short and recess, we'll get her in and out, so if it's her

10   lunch hour or her evening break or whatever, but she does need

11   to honor her subpoena.

12           MR. MacGILL:  May we -- may I tell her that she can

13   come at 9:00, first thing tomorrow, and would that be

14   acceptable to the Court?  She told me yesterday she starts her

15   therapy at 9:30 and goes to 5:00 or 5:30.  So would that be

16   reasonable --

17           THE COURT:  Sure.  Tell her to be here at 8:30.

18           MR. MacGILL:  Okay.  We're starting at 8:30 in the

19   morning?

20           THE COURT:  We can start at 8:30 tomorrow.

21           MR. MacGILL:  Perfect.  I'll tell her.  Thank you.

22           THE COURT:  All right.

23           MS. YOUNG:  Thank you, Your Honor.  Your Honor, just

24   one last thing, Andrea Pierson.  Juror Number 6, I just wanted

25   to disclose to the Court that it's our belief that he may be

1    either a former husband or a partner of a legal administrative

2    assistant at Faegre.  I don't know the status of their

3    relationship.  I'm pretty sure that he is a person who is

4    related to one of our LAAs at one point in time, but I did want

5    to disclose that to the Court up front.

6                THE COURT:  Okay.

7                MS. YOUNG:  Thank you.

8                THE COURT:  And we'll ask him; okay?  All right.

9    Anything else?

10                MR. MacGILL:  No, Your Honor.  Thank you.

11                THE COURT:  All right.  The jury will be here in

12    about 10 minutes, lawyers, so -- okay, all right.  So we'll

13    be in recess until about 10 minutes when the jury arrives.

14                COURTROOM DEPUTY:  All rise.

15        (Recess at 8:50, until 9:16.)

16                THE COURT:  Good morning, Ladies and Gentlemen.  Thank

17    you all for coming out on this very cold morning.  My name is

18    Tanya Walton Pratt and I am the chief judge of the United

19    States District Court for the Southern District of Indiana, and

20    I am the judge who will be presiding over a jury trial that's

21    going to begin today in our Indianapolis courthouse.

22                I want to begin by thanking all of you for responding

23    to your summons and appearing for jury selection.  I'm certain

24    that each of you, it's a sacrifice for each of you to be here

25    today, whether it's a sacrifice of your time, for some it's a

1    financial sacrifice, but you all are very good citizens who

2    have come in today and I want to thank you for being good

3    citizens.

4         In just a moment, all of you in the box and in the

5    audience will be asked to take an oath or affirmation that your

6    answers this morning will be truthful to the questions that are

7    going to be addressed to all of you as a group.  If you desire

8    to answer yes to any of these questions, please raise your

9    paddle at the time that the question is asked.  After I have

10   questioned you, the attorneys will have an opportunity to ask

11   some supplemental questions.  Ladies and Gentlemen, these

12   questions are not intended in any way to be personal, prying,

13   or offensive, but rather they're necessary to ensure that we

14   can select a panel of fair and impartial persons for the

15   particular matter that's going to be tried.

16        You should not be offended if you are excused for no

17   apparent reason and if any of you have any personal knowledge

18   about the case or the parties in this case or have any bias

19   about any of the interest in this case, you may not be the

20   appropriate person to serve on this particular jury.

21        So I need all of you in the box and in the audience to

22   plead stand and raise your right hands.

23        (Venire is sworn in.)

24        THE COURT:  You may be seated.

25        All right, Ladies and Gentlemen, take a deep breath

1  and relax.  We're going to just talk for a few minutes, and as

2  we determine who's going to be the jury in this case.  The

3  matter to be tried is a civil case as opposed to a criminal

4  matter.  And the case is entitled Sarah Bowling and Lori

5  Kennard, plaintiffs, versus Netflix, Inc., Netflix Worldwide

6  Entertainment, LLC, and Realhouse Productions, LLC, defendants.

7  Throughout the trial proceedings, the parties will likely refer

8  to Sarah Bowling and Lori Kennard as either the plaintiffs or

9  Ms. Bowling or Ms. Kennard.

10        Is anyone personally familiar with or in any way

11  related to either Sarah Bowling or Lori Kennard?  Does anyone

12  have a close friend or family member by that name?  And would

13  Sarah Bowling please stand so everybody can get a look at you,

14  and if you turn around.  Okay.  Thank you.

15        And, Ms. Kennard, if you would stand.  Thank you.  You

16  may be seated.

17        Is anyone familiar with either of those plaintiffs?

18        Thank you.  Throughout the proceedings, the

19  defendants, Netflix, Inc., Netflix Worldwide Entertainment,

20  LLC, may be referred to as just Netflix or the defendant.  And

21  Realhouse Productions, LLC will likely be referred to as

22  Realhouse or defendant.  The defendants are all corporations.

23  Netflix is a subscription based streaming service that provides

24  a variety of movies, television shows, documentaries and more,

25  and Realhouse Productions is a production company primarily

1    associated with creating documentary content.

2            Are any members of the panel or your immediate family

3    members ever been employed by Netflix or Realhouse?  Anyone

4    have any of those connections?

5            Are you -- have any of you had any business dealings,

6    ever, with Netflix or Realhouse?

7            How many of you are subscribers to Netflix?  Raise

8    your paddle if you're a subscriber.  And we're going to write

9    your numbers down.  2, 3, 4, 5, 8 -- you can put your paddle

10   down after I call your number.  10, 12 -- turn yours around for

11   me, 17, 21, and in the audience, we're going to get those

12   numbers.  Okay.  23, 26, 34, 36, 31, 35, 38 -- let's see, where

13   is 38?  38, 43.  Judge Pratt can't see that good.  49, and then

14   we have 52, 56, and 57.  Thank you.  So you're all subscribers

15   of Netflix.  And we'll talk about that later in the

16   proceedings.

17           As I stated, Ladies and Gentlemen, this is a civil

18   case, and so what's going to happen is that the plaintiffs,

19   Sarah Bowling and Lori Kennard, they have filed a claim against

20   the defendants, and the claim is for invasion of privacy for

21   the public disclosure of private facts.  So the issue for this

22   trial will be whether the defendants, Netflix, Inc., Netflix

23   Worldwide Entertainment, LLC, and Realhouse Productions, LLC,

24   have invaded the privacy of Laura [sic] Bowling or Lori

25   Kennard.  The defendants, Netflix, Inc., Netflix Worldwide

1    Entertainment, LLC, and Realhouse Productions, each deny that

2    they invaded the privacy of these two plaintiffs.  And so

3    that's why we're here today, Ladies and Gentlemen, for you to

4    make a decision on that issue.

5         The lawyers in this matter not only represent the

6    particular parties in this case, but they're also -- they are

7    officers of this court, and they have spent many, many months

8    preparing this matter for trial, and of which you guys are

9    going to reach a verdict.  So at this time, I'm going to

10   introduce to you the attorneys involved in this case.  And

11   representing the plaintiffs, the lead attorney is Robert D.

12   MacGill.  So, Mr. MacGill, would you introduce all of your

13   lawyers?

14        MR. MacGILL:  Your Honor, thank you.  To my left is

15   my -- thank you.  To my left is my partner Matt Ciulla and also

16   my colleague Cecelia Satterthwaite to the left and Mackenzie

17   Thompson to her left.

18        THE COURT:  Thank you.  And you all are with the law

19   firm of MacGill, PC.

20        MR. MacGILL:  That's correct, Your Honor.

21        THE COURT:  So, Ladies and Gentlemen, in the box and

22   in the audience, is anyone familiar with any of these lawyers?

23   Have you ever had any business dealings with them or their law

24   firms?

25        All right.  Very good.

1          Representing the defendants, the lead attorney is

2   Mr. Brad Dennis Brian, and, Mr. Brian, will you introduce the

3   attorneys that will be representing the defendants with you.

4          MR. BRIAN:  I will.  Good morning, Ladies and

5   Gentlemen.  Next to me is Andrea Pierson.

6          THE COURT:  And which firm is Ms. Pierson with?

7          MR. BRIAN:  She's with Faegre Drinker, Your Honor.

8          THE COURT:  Faegre Drinker Biddle and Reath, correct?

9          MS. YOUNG:  That's right.

10          MR. BRIAN:  And I'm with a firm called Munger, Tolles

11   & Olson.  Blanca Young, my colleague also from Munger, Tolles &

12   Olson, and in the back, Sara McDermott, Will Orr, Andrew

13   Nguyen, and also another attorney named Elaine Goldenberg, who

14   is not here this morning.

15          THE COURT:  They're all with Munger, Tolles & Olson?

16          MR. BRIAN:  Correct, Your Honor.

17          THE COURT:  All right.  You may have a seat.

18          All right, so Ladies and Gentlemen, you all familiar

19   with one of the attorneys, Number 6?

20          PROSPECTIVE JUROR:  My wife works --

21          THE COURT:  All right, hold on, Number 6, we are gonna

22   give you a microphone so that we can hear you.

23          PROSPECTIVE JUROR:  Good morning, Your Honor.  My wife

24   works for Faegre Drinker, Faegre.

25          THE COURT:  Okay.  And is your wife an attorney?

1          PROSPECTIVE JUROR:  She's a LAA there.

2          THE COURT:  Okay.  And, sir, does -- has she talked to

3    you about this case?

4          PROSPECTIVE JUROR:  She don't talk to me about any

5    cases.  I just noticed the name.

6          THE COURT:  Thank you.  What is her name?

7          PROSPECTIVE JUROR:  Her name is Sherri Gahagen.

8          THE COURT:  Sherri Gahagen.  All right, so --

9          PROSPECTIVE JUROR:  That's Sherri with an "I," also.

10         THE COURT:  The fact that your wife is employed with

11   Faegre, which is also the law firm for Ms. Andrea Roberts

12   Pierson, do you think that would affect your ability to be a

13   fair and impartial juror in this case?

14         PROSPECTIVE JUROR:  No.  I don't know anything about

15   the case, so...

16         THE COURT:  And when you get home tonight, if you were

17   selected on the jury, you would be admonished that you couldn't

18   discuss the trial with her.  Would you be able to do that?

19         PROSPECTIVE JUROR:  No, she goes to bed at 8:00, and I

20   watch television sometimes, so we don't talk.

21         THE COURT:  All right.  Thank you.

22         Is anyone else familiar with any of the attorneys

23   whose names have been read or the law firms?

24         All right.  No other paddles are being raised.

25         So now I'm going to introduce to you the parties --

1    the people who are going to be assisting me during the course

2    of the trial.  Seated to my left is my judicial law clerk,

3    Carly Tebelman, and Carly is going to be assisting me with any

4    legal research or any other issues that I need during the

5    trial.

6              Carly, you may have a seat.

7              And my courtroom deputy clerk is Sarah Haltom, and so

8    Sarah acts as the official bailiff.  She's the person that will

9    escort the jury in and out and take care of all of the jury's

10   needs.  If anyone has any personal problems or issues during

11   the trial, they can bring that to Sarah's attention, and she

12   will make sure that I'm able to address that issue.

13             Also assisting me will be my other law clerk, one of

14   my other law clerks, Tamara Adams, and Tamara is going to be

15   helping this morning with passing the microphone during jury

16   selection.

17             And seated below the bench is the official court

18   reporter.  His name is David Moxley.  And he's not standing up

19   for you guys because he is doing something called

20   computer-assisted transcription, so he's actually giving me a

21   realtime transcript of everything that's happening in the case.

22   He's very good, but he's not perfect.

23             And so the jury, when they deliberate, will not have

24   access to a transcript.  The jury is going to have to make

25   their -- during their deliberations, they're going to have to

1    use their individual memory and recollection of the testimony

2    and evidence that comes from the witness stand, so the jury has

3    to pay close attention because they will not have that

4    transcript.

5            And this is a court of record, so everything that I

6    say, everything that you say, everything that comes from the

7    witness stand, will be in the transcript.

8            All right.  So, Ladies and Gentlemen, during the

9    trial, witnesses will be called, and they will be examined and

10   then cross-examined.

11           And at this time, I'm going to read to you the list of

12   possible witnesses who may be called to testify in this matter.

13   And if you recognize any of these names, I need you to raise

14   your paddle.  You've already met Sarah Bowling.  Another

15   possible witness will be Marcus Bowling.  You've met Lori

16   Kennard, and another possible witness will be Jared Kennard.

17   Timothy Mizrahi; Joelle Hughes, maiden name Shapiro; Zana

18   Lawrence; Alexandra Reed; Nathan Rotmensz; Michael Petrella;

19   Lucie Jourdan; Jacquie Cooke; Amy Strobel; Sarah Sexson;

20   Nathaniel E. Frank-White; Stephen Lanham; Alonzo Wickers, IV;

21   James Davis; Jerry Blake; Jonah Berger, Ph.D.; Khalid El-Sayed,

22   M.D., and Laura DiSalvo.

23           Does anyone recognize any of those names or have any

24   familiarity?  All right, we do have a paddle.  Number 36.

25           So Tamara is gonna come back there, Number 36.  And,

1    36, would you stand.  Thank you.

2              PROSPECTIVE JUROR:  Good morning.

3              THE COURT:  Good morning.  What person do you

4    recognize?

5              PROSPECTIVE JUROR:  Sarah Sexson.

6              THE COURT:  Okay.  And how do you know Sarah Sexson?

7              PROSPECTIVE JUROR:  I believe we went to high school

8    together, and we played in the orchestra together.

9              THE COURT:  So do you know --

10             Whose witness is Sarah Sexson?

11             Do you know if she -- what high school did you attend?

12             PROSPECTIVE JUROR:  Warren Central.

13             THE COURT:  Do you know if that is your witness,

14    plaintiffs?  We don't know?

15             MR. MacGILL:  I don't think so.

16             THE COURT:  Okay.  All right.

17             About how old is your Sarah Sexson?

18             PROSPECTIVE JUROR:  Twenty-one.

19             THE COURT:  Would it be the same person?

20             MR. MacGILL:  No.

21             THE COURT:  All right.  Thank you very much.

22             PROSPECTIVE JUROR:  Thank you.

23             THE COURT:  All right.  Anyone else have any

24    familiarity with any of those names?

25             Okay, Ladies and Gentlemen, the next phase of this

1    proceeding is actually the voir dire examination, and that's

2    where I'm going to ask specific questions to those of you in

3    the box.  So these questions are directed to the people in the

4    box.  The term "voir dire" is both a Latin and a French phrase,

5    which means speak the truth.  So that's what we want everybody

6    to do today is just be truthful and honest.

7         It is a very important civic duty to serve on a jury

8    when called upon.  It goes along the lines of your right to

9    vote and the duty to serve in the military.  And as I stated

10   earlier, you are all very good citizens who have responded to

11   your summons and who have appeared here today.

12        And now that we have you in the room, there are only

13   two ways -- well, really three, that you may be excused.  One

14   is through a challenge for cause, the other is a peremptory

15   challenge, and the third is if we just don't get to you today

16   and we don't need your services.

17        A challenge for cause is if there's a legal or

18   statutory reason why you cannot serve, such as age, you have to

19   be at least 18 years old, you have to understand the English

20   language, you have to be a resident of the Southern District of

21   Indiana.

22        Peremptory challenges, these are some challenges that

23   each of the attorneys, they get a designated number of strikes

24   that they can use, and they may use these pretty much at their

25   discretion to help the lawyers arrive at a panel of fair and

1    impartial persons for this particular trial.

2         And the good news is that from our panel of 32, we

3    will only be selecting eight of you to serve as jurors.  The

4    jurors' job will be to render a unanimous verdict that will

5    decide disputed issues of fact, and that's what we all

6    determine here, to seek the truth.

7         Now, this case is expected to take no more than four

8    days, so we will finish no later than Thursday of this week.

9    We'll take -- hopefully we can get in an hour for lunch each

10   day, and you'll get a break in the morning and the afternoon.

11   This is not a sequestered jury, so you'll go home each night.

12   And you'll be able to communicate with your family and your

13   friends during the breaks.  Of course, when you're in the

14   courtroom, no texting or calling anybody or anything like that.

15   But during the breaks, you can communicate with your employers

16   and your families, and the only time that you cannot

17   communicate with the outside world is during deliberation.

18        When the panel of eight jury members is deliberating,

19   we'll take your cell phones and give you plenty of food and

20   snacks, and we have a very comfortable jury room right there,

21   but you will not be able to communicate with the outside world

22   during that time.

23        Now, is there anyone, and we're talking about -- raise

24   your paddle also, is there anyone who cannot be here for up to

25   four days for any reason, other than inconvenience or you just

1    don't want to fool with us?  Anyone with a legitimate reason

2    why you cannot be called to serve for four days?

3                All right, so Number 22 and 36 and 57.

4                All right, Number 22, your reason?  Can you stand.

5                PROSPECTIVE JUROR:  I'm the office manager where I

6    work.  I have 50 employees.  This is payroll week, and I'm

7    supposed to be doing it today.  I managed to cover my spot for

8    today, but that's all we have.  We are a very small firm, and

9    nobody else can do that.  It's also month end, and I need to

10   send all the statements out to our members so that they can

11   keep our business running, so I appreciate any consideration to

12   be able to go.  Thank you.

13               THE COURT:  Thank you for that information.

14               And those of you in the audience, if you make it to

15   the box, we'll talk to you then.  Okay?

16               All right, so Ladies and Gentlemen, the federal court

17   has jurisdiction to hear this case on the basis of diversity of

18   citizenship of the parties, and that's pursuant to a federal

19   statute.  There are 94 federal judicial districts in the United

20   States, two in Indiana, the Northern District of Indiana, which

21   is up there in the northern part of the state, St. Joe County,

22   Allen County, et cetera, and then here in the Southern District

23   of Indiana, and the Southern District of Indiana is comprised

24   of the 60 most southern counties in the state of Indiana, so

25   that's why some of you are from right here in Indianapolis, and

1      some of you are from a little distance away.

2              As the judge in this case, it's my duty to ensure that

3      a fair and impartial jury is selected.

4              Sarah, can you change the screen.

5              I also will assess the evidence that's presented and

6      I'll rule on any objections and I will control the conduct of

7      these proceedings and how the trial will unfold in this

8      courtroom.  And I do run very efficient trials, so if you're on

9      the jury, we're going to be efficient, the lawyers know that.

10             Right, plaintiffs' counsel?

11             MR. MacGILL:  We sure do, Your Honor.

12             THE COURT:  Defendants' counsel?

13             MR. BRIAN:  Same.

14             THE COURT:  So we're definitely going to finish and

15     let you guys get back to your life after Thursday.

16             Your pool of 32 prospective venire persons, from this

17     pool, as I stated, eight persons will be chosen to serve on the

18     jury, and the jury's charge is to render a unanimous verdict.

19             To ensure diversity of our jury panels here in the

20     Southern District of Indiana, we draw the names of prospective

21     jurors from several database lists, so you are here today

22     because you are either a registered voter or a registrant with

23     the Indiana Bureau of Motor Vehicles or an Indiana property

24     taxpayer, so we go from several lists so we can make sure we

25     get a little bit of everybody on our jury panels.

1          If you are selected as a juror, it will be your duty

2     to listen to the evidence that comes from the witness stand

3     over here and I will give you instructions on the law and you

4     will be asked to weigh all the evidence and the testimony

5     that's presented to you and decide the outcome of the case

6     based upon that law and evidence that's presented.  Your

7     decision must be fair, it must be impartial, and free of any

8     bias or prejudice.  And you will do this, Ladies and Gentlemen,

9     by judging the credibility of each witness as they testify, and

10    of course, you're allowed to use your common sense and your

11    everyday life experiences.

12         And very importantly, Ladies and Gentlemen, you are

13    not to allow any sympathy, prejudice, bias, or any other

14    outside influences to influence you as you listen to the

15    evidence in this case.  Instead, you must follow the law and

16    the instructions which will be given to you at the very end of

17    the case.

18         At this time, I'm going to tell you a little bit about

19    the case that's going to be tried.  As I stated earlier, this

20    is a civil case, as opposed to a criminal matter.  The position

21    of the parties can be summarized as follows:  The incident

22    surrounding this case occurred in the Spring of 2022.

23    Plaintiffs Sarah Bowling and Lori Kennard each are secret

24    children of a doctor named Donald Cline.  Dr. Donald Cline was

25    a fertility doctor here in Indianapolis who improperly and

1    secretly used his own semen to inseminate several of his

2    patients, including Ms. Bowling and Ms. Kennard's mothers.

3         Ms. Bowling and Ms. Kennard have each sued the

4    defendants, Netflix, Inc. and Netflix Worldwide Entertainment,

5    who will commonly be referred to as Netflix, and Realhouse

6    Productions, who will be referred to as Realhouse, for a claim

7    of invasion of privacy for the public disclosure of private

8    facts.  Ms. Bowling and Ms. Kennard each alleged that Netflix

9    and Realhouse Productions invaded their privacy by disclosing

10   private facts in connection with the release of a documentary

11   film that was a film about Dr. Cline that was titled *Our*

12   *Father*.

13        The defendants deny Ms. Bowling and Ms. Kennard's

14   claims and deny that they invaded the plaintiffs' privacy and

15   so that's why we're here today, for a trial on this claim.

16        Now, Ladies and Gentlemen, my next question is going

17   to be if you have heard about this incident or the claims in

18   this case.  And there's nothing wrong with having heard about

19   this case, because it did receive some media attention.  What

20   is important is that you truthfully and fully answer the

21   following questions concerning any knowledge or familiarity

22   that you might have about this case.

23        Has any member of the panel heard or read anything

24   about this case?

25        Okay, so we have several paddles.  So we're going to

1    start in the box.

2          Number 4, if you would take the mic.  What have you

3    heard?

4          PROSPECTIVE JUROR:  I think I just saw the --

5          THE COURT:  Documentary?

6          PROSPECTIVE JUROR:  I haven't seen the documentary,

7    just the preview of it on Netflix, but I never actually watched

8    it.

9          THE COURT:  Okay.  And having -- is there anything

10   about having heard about it that would affect your ability to

11   be a fair and impartial juror in this case?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  And you can pass the mic to Number 5.

14         What have you heard or seen?

15         PROSPECTIVE JUROR:  I've seen the documentary, and

16   actually, last night I had a homework assignment in my college

17   course, my medical ethics course, about it.

18         THE COURT:  Okay.  So that was last night?

19         PROSPECTIVE JUROR:  I did that assignment last night,

20   yes.

21         THE COURT:  How ironic, huh?

22         PROSPECTIVE JUROR:  Yeah.

23         THE COURT:  So your assignment was about Dr. Cline?

24         PROSPECTIVE JUROR:  It is, yes, and the ethical

25   standpoint of everything that happened.

 1          THE COURT:  Okay.  All right.  And when did you watch
 2     the video, the documentary?  Was it years ago or recently?
 3          PROSPECTIVE JUROR:  It's probably been a year ago or
 4     so.  And then I read more articles last night as I was doing my
 5     assignment.
 6          THE COURT:  All right.  So with that familiarity, do
 7     you think that would affect your ability to be a fair and
 8     impartial juror in this case?
 9          PROSPECTIVE JUROR:  I definitely have strong opinions
10     about the doctor himself and everything that he did.  I don't
11     want to say that it would affect my ability to give a fair
12     opinion on everything, but...
13          THE COURT:  Because, Ladies and Gentlemen, the trial
14     is not about Dr. Cline.
15          PROSPECTIVE JUROR:  Yeah.
16          THE COURT:  Okay.  Thank you for your honesty.
17          Number 6?
18          PROSPECTIVE JUROR:  I just remember from the news and
19     unfortunately, at that point in time, my wife worked for the
20     Taft law firm.  One of the attorneys represented Dr. Cline.
21          THE COURT:  Okay.  And Number 6, because you had that
22     familiarity, do you think that would affect your ability to be
23     a fair and impartial juror in this particular trial?
24          PROSPECTIVE JUROR:  No, ma'am.  I didn't even follow
25     the news thing, so... I just knew it was a big blowup.

1          THE COURT:  All right.  Thank you.

2          Let's pass the mic.  Okay.  We can start down here

3     with Number 10, and then we'll go straight down your aisle.

4          Number 10?

5          PROSPECTIVE JUROR:  Yes.  I watched the documentary.

6     It's probably been over a year ago.

7          THE COURT:  And based on that documentary and having

8     watched it, do you think you can be a fair and impartial juror

9     in this case?

10          PROSPECTIVE JUROR:  Yes, ma'am.

11          THE COURT:  Okay.  Number 11?

12          PROSPECTIVE JUROR:  I did not see the documentary, but

13     I recall seeing it in the news headlines.

14          THE COURT:  Okay.  Do you recall what you saw?  Was it

15     about Dr. Cline?

16          PROSPECTIVE JUROR:  Yeah, just about the case.

17          THE COURT:  Okay.  All right.  And let's pass the mic.

18          PROSPECTIVE JUROR:  I have not seen the documentary,

19     but just because of the nature of it being in Indiana, it got a

20     lot of attention and so I just kind of know what the tagline of

21     it was.

22          THE COURT:  So that's Number 12.  And Number 12,

23     having -- knowing about the tagline, do you think that would

24     affect your ability to be a fair and impartial juror in this

25     particular matter?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  All right.  Number 13?

3          PROSPECTIVE JUROR:  Hello.  I just watched a review of

4    the documentary so I never really paid much attention, and that

5    was a long time ago.

6          THE COURT:  Okay.  And because you watched a review

7    awhile ago, do you think that would affect your ability to be a

8    fair and impartial juror in this case?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Okay.  Number 17?

11         PROSPECTIVE JUROR:  I did watch the documentary when

12   it came out.

13         THE COURT:  Okay.  And having watched the video -- I'm

14   sorry, the documentary, do you think that would affect your

15   ability to be a fair and impartial juror in this case?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  All right.  Number 21.

18         PROSPECTIVE JUROR:  I also watched the documentary

19   when it came out.

20         THE COURT:  Okay.  And having watched the documentary,

21   do you think it would affect your ability to be a fair and

22   impartial juror?

23         PROSPECTIVE JUROR:  No, ma'am.

24         THE COURT:  And Number 22, what about you?

25         PROSPECTIVE JUROR:  I just saw it on the news when it

1    came out.  I didn't see the documentary.

2          THE COURT:  And having seen it on the news, would that

3    affect your ability to be a fair and impartial juror?

4          PROSPECTIVE JUROR:  I'm not sure.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR:  Not sure.

7          THE COURT:  Okay.  Those of you in the audience, if

8    you make it to the box, we'll talk about it.

9          So, Ladies and Gentlemen in the box, just about

10   everybody raised their paddle.  Has what you've seen about the

11   matter been about Dr. Cline and his actions?

12         Raise your paddle if it was about Dr. Cline and his

13   actions.

14         Okay.  Is anyone familiar with the claims against

15   Netflix and Realhouse?  Has anyone seen any media or news

16   releases on that other than Number 57?  No one has had any

17   knowledge about this particular claim and this case for

18   invasion of privacy?

19         All right.  No paddles are raised.

20         Okay.  So based upon what you've seen or heard, which

21   I understand is about Dr. Cline, have any of you formed an

22   opinion about the claims of invasion of privacy against

23   Netflix?  Anyone made that reach?

24         Okay.  No paddles are raised.

25         All right.  Raise your paddle again if you actually

1  watched the Netflix documentary, *Our Father*.

2         Okay.  All right.  So Number 5, having watched the

3  documentary, will you still be able to be a fair and impartial

4  juror and base any decision on the claims in this case, on the

5  testimony and evidence that comes in this courtroom and the

6  instructions on the law that I give you?

7         PROSPECTIVE JUROR:  Yes.

8         THE COURT:  All right.  Let's pass the mic to the back

9  row.  Let's give it to Number 10.  Number 10, having previously

10 watched the documentary film, *Our Father*, will you still be

11 able to be a fair and impartial juror and base any decision on

12 the claims in this case, on the testimony and evidence that

13 comes in this courtroom and the instructions on the law that I

14 will give you?

15        PROSPECTIVE JUROR:  Yes.

16        THE COURT:  All right.  Let's pass it down.  Who was

17 next that watched the documentary?

18        THE COURT:  Number 17.  Having watched the

19 documentary, *Our Father*, will you still be able to be a fair

20 and impartial juror and base any decision on the claims, on the

21 testimony and evidence that comes from the witness stand and

22 the instructions that I give you on the law?

23        PROSPECTIVE JUROR:  Yes.

24        THE COURT:  And Number 21, the same questions.  Will

25 you be able to be a fair and impartial juror and base any

1    decision on the claims and the testimony and evidence that

2    you're going to hear in this courtroom and the instructions

3    that I give you on the law?

4         PROSPECTIVE JUROR:  Yes.

5         THE COURT:  Okay.  All right.  So, Ladies and

6    Gentlemen, Ms. Bowling and Ms. Kennard have the burden to prove

7    their claim, invasion of privacy, by the greater weight of the

8    evidence, which means more likely than not.  And their claim is

9    that Netflix and Realhouse Productions invaded their privacy by

10   disclosing private facts.

11        In a criminal case, the burden of proof is much

12   higher.  Again, in a civil case, it's greater weight of the

13   evidence.  In a criminal case, the burden is beyond a

14   reasonable doubt, and that is because in a criminal case what

15   is at stake is a person's liberty, and in a civil trial, the

16   claim is often for monetary damages.

17        Do you each understand that there's a different burden

18   of proof if you were on a criminal jury as opposed to being

19   here in a civil trial?

20        Raise your paddle if you understand that there is a

21   significant difference.

22        Thank you.

23        Is there anyone who served as a juror previously,

24   either on a civil or criminal case?

25        Raise your paddle in the box.

1           Okay.  Number 3.  Okay.  Can you tell us when you

2     served and what kind of trial you served on?

3           PROSPECTIVE JUROR:  It was about three years ago, and

4     it was just a drug trial; an individual sold drugs to an

5     undercover cop.

6           THE COURT:  Where was your trial?

7           PROSPECTIVE JUROR:  County court.

8           THE COURT:  Marion Superior Court?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  What was the verdict?

11          PROSPECTIVE JUROR:  We didn't reach one, so it was a

12    hung jury.  They declared a mistrial.

13          THE COURT:  We hate those.  Okay.  Is there anything

14    about that experience, Number 3, that might affect your ability

15    to be a fair and impartial juror in this case?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Okay.  All right.  Let's pass, on the back

18    row, and you're paddle Number 12.  Tell us about your prior

19    jury experience.

20          PROSPECTIVE JUROR:  It was about five years ago.  It

21    was a civil trial.  It was figuring out -- it was a car

22    accident -- who was at fault.  There was hospital time by one

23    of the -- that they wanted covered and the jury decided it was

24    50/50.  And because of that, the plaintiff was liable for the

25    full amount for the hospital time for the defendant.

1          THE COURT:  Okay.  So it was a liability and damages

2     issue?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Is there anything about that experience

5     that might affect your ability to be a fair and impartial juror

6     in this civil trial?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Thank you.  And was that here in the

9     Marion Superior Court?

10         PROSPECTIVE JUROR:  That was the Marion County court.

11         THE COURT:  Okay.  All right.  And our other prior

12    juror is Number 22.  Can you tell us about your prior jury

13    experience?

14         PROSPECTIVE JUROR:  Yes.  It was -- I don't remember

15    how long ago, but roughly 12 years ago, probably.  And it was

16    in Hamilton County.  And it also was a car accident.  The

17    plaintiff was injured and she was seeking --

18         THE COURT:  Monetary damages?

19         PROSPECTIVE JUROR:  Yes, for her injuries.  And we did

20    award her some to cover her medical expenses, but not nearly

21    what she asked for, for life.

22         THE COURT:  Okay.  And were any of you forepersons on

23    your jurors?

24         Number 12, you were the foreperson?

25         PROSPECTIVE JUROR:  (Nods head up and down.)

1          THE COURT:  Okay.  All right.  Thank you, Ladies and

2     Gentlemen.

3          Have any of you or anyone in your immediate family

4     ever participated in a lawsuit as a party, a witness, or any

5     other capacity?  That would be anything other than, like, a

6     traffic matter.  So if you have had a bankruptcy or divorce,

7     any kind of lawsuits, any kind of actions within the court.

8          Okay.  We do have some paddles.

9          Number 6, can you tell us about your prior experience

10    in a lawsuit?

11         PROSPECTIVE JUROR:  Two divorces.

12         THE COURT:  Okay.  And do you feel you were treated

13    fairly in those matters?

14         PROSPECTIVE JUROR:  Yes, ma'am.

15         THE COURT:  Is there anything about those experiences

16    that might affect your ability to be a fair and impartial

17    juror?

18         PROSPECTIVE JUROR:  No, ma'am.  Just made my life

19    better.

20         THE COURT:  Thank you.  Okay.  Pass it down to

21    Number 3, this way.  There we go.

22         All right.  Number 3, what kind of prior lawsuits have

23    you been involved in?

24         PROSPECTIVE JUROR:  Just divorce/custody.

25         THE COURT:  Okay.  All right.  Those are difficult.

1    Is there anything about those experiences that might affect

2    your ability to be a fair and impartial juror in this lawsuit?

3            PROSPECTIVE JUROR:  No, ma'am.

4            THE COURT:  Okay.  Let's go in the back.  Anybody in

5    the back row?

6            Okay.  Number 22.

7            PROSPECTIVE JUROR:  Just a divorce.

8            THE COURT:  Is there anything about that experience

9    that would affect your ability to be a fair and impartial juror

10   in this lawsuit?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Thank you.

13           Ladies and Gentlemen, if you're selected to sit as a

14   juror in this case, you will -- will each of you be able to

15   render a verdict solely on the evidence presented during the

16   trial and in the context of the law as I will give you in my

17   instructions?  You'll be asked to disregard any other ideas,

18   notions, or beliefs about the law that you have encountered in

19   reaching your verdict.

20           So the law -- you may have in your mind what invasion

21   of privacy is about, but you're not going to be able to depend

22   on that.  When you're on the jury, I'll give you the elements

23   of that offense and the law on that claim.  And so you'll be

24   asked to disregard any prior notions or beliefs that you might

25   have about the law in this case and you're going to be asked to

1    render a verdict solely on the evidence that's presented during

2    the trial and in the context of the law that I'm going to give

3    you in the instructions.  Raise your paddle if you can do that.

4              All right.  Every paddle is raised.

5              Is there anyone who holds the opinion that people

6    should not bring differences, such as those involved in this

7    case, for determination in a court by a jury?  Anyone think

8    just too many lawsuits, they shouldn't be filing lawsuits?

9              Okay.  No paddles are raised.

10             Is there any member of the panel who believes that

11   someone is automatically entitled to recover damages just

12   because that person has filed a lawsuit?

13             No paddles are being raised.

14             Is there anyone who believes he or she might have

15   difficulty following the law that the Court directs if it

16   differs from what you believe the law should be, and it may

17   differ from what you believe it should be?

18             No paddles are raised.

19             Because the plaintiffs, Ms. Bowling and Ms. Kennard,

20   are the moving parties, they will present their case first.

21   And only after the plaintiffs have presented their case, will

22   the defendants, Netflix and Realhouse Productions, have an

23   opportunity to present their side of the case.

24             You're going to be asked, Ladies and Gentlemen, to

25   keep an open mind and make no decisions about the evidence

1    until all of the evidence has been presented by both sides and

2    you've received your instructions on the law in this case, and

3    the jury of eight is back there deliberating.

4         So until that time, you're going to be asked not to

5    make a decision.  Can everyone follow that instruction that

6    you're going to be given?  Raise your paddle if you can do

7    that.

8         All right.  Every paddle is raised.

9         Ladies and Gentlemen, it's normal to feel sympathy for

10   someone who has experienced problems.  Sympathy, however,

11   cannot be your guide in rendering a verdict in this case.

12        Is there anyone who feels like he or she might not be

13   able to set aside feelings of sympathy for either side and base

14   a decision, in this case, on the evidence that's presented at

15   trial and the instructions on the law?  Anyone that feels that

16   way?

17        No paddles are raised.

18        Ladies and Gentlemen, Netflix, Inc. and Netflix

19   Worldwide Entertainment, LLC, and Realhouse Productions, LLC,

20   are all corporations.  The fact that the defendants are

21   corporations must not affect your deliberations or your

22   verdict.  You may not discriminate between corporations and

23   individuals.  Both are persons in the eyes of the law and both

24   are entitled to have a fair and impartial trial based on the

25   same legal standards.

1          Will the fact that plaintiffs Sarah Bowling and Lori
2     Kennard are individuals and Netflix and Realhouse are
3     corporations affect anyone's judgment in this trial?
4          Number 22.  Okay.  Can you give the mic to Number 22?
5          PROSPECTIVE JUROR:  And this is kind of going back to
6     when I should have maybe raised it for the sympathy.  I tend to
7     get very sympathetic and -- when I hear the facts and might
8     render a judgment based on how I feel about it rather than just
9     the facts.
10         THE COURT:  So based on sympathy?
11         PROSPECTIVE JUROR:  Uh-huh.
12         THE COURT:  Okay.  All right.  Okay.  Thank you for
13    your honesty.
14         Okay.  Does anyone else -- does anyone have any
15    negative opinions about large companies in general?
16         Some smiles but no paddles are raised.
17         Do any of you have feelings for or against
18    corporations that might prevent you from being completely fair
19    and impartial as a juror in this case?
20         All right.  No paddles are raised.
21         Ladies and Gentlemen, companies such as Netflix, Hulu,
22    Disney+, Max, these are all streaming services.  Have any of
23    you had any negative experiences with a streaming service or
24    have any of you had any negative opinions about streaming
25    services in general?  Anyone feel that way?

1        No paddles are raised.

2        Does anyone believe that they're going to have

3  difficulty giving both the plaintiffs and the defendants the

4  same fair and impartial consideration in this trial?

5        No paddles are raised.

6        Does anyone -- any juror or a relative or close friend

7  work or have any interest in Netflix or any of the other

8  streaming services?  Anyone have any connections, financial or

9  otherwise, to Netflix?

10        Have any of you been involved in a dispute involving

11  Netflix or Realhouse?

12        Okay.  No paddles are raised.

13        Would any of you tend to award damages to a plaintiff

14  simply because you think a corporation should be able to afford

15  it?

16        No paddles are raised.

17        Does anyone watch television shows, movies, or

18  streaming services on a daily basis?  Raise your paddle.

19        Everyone watches except number.

20        PROSPECTIVE JUROR:  I do.

21        THE COURT:  You do, too, Number 7?  Okay.  All right.

22        Have any of you entered into an agreement or contract

23  with another person or a company where you felt the other

24  person or company breached the terms of that agreement or

25  contract?  Anyone had any of those types of disputes?

 1              All right.  No paddles are raised.

 2              Have any of you had your photograph or your image or

 3     likeness used against you without your permission?

 4              No paddles are raised.

 5              Has anyone had their private information publicized

 6     without their permission?

 7              No paddles are raised.

 8              Have any of you ever worked in media, television,

 9     newspaper, film industry?  Anyone been employed in those areas?

10              No paddles are raised.

11              Again, Ladies and Gentlemen, these questions are not

12     intended to be personal, prying, or offensive, but they are

13     necessary to ensure that we get a panel that can be fair and

14     impartial to both sides.

15              Have any of you or anyone close to you gone through in

16     vitro fertilization, intrauterine insemination, or had

17     fertility difficulties?

18              Okay.  And if anyone wants to talk privately, you can.

19     But we're all in this together, so let's --

20              We're going to start with Number 4.  Raise your paddle

21     so she knows who you are, Number 4.  Thank you.

22              Okay.  So which procedures have you -- or experiences

23     have you had, Number 4?

24              PROSPECTIVE JUROR:  It was someone close to me.  It

25     was my sister-in-law.

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR:  She had IUI.

3          THE COURT:  Okay.  And did everything go okay?

4          PROSPECTIVE JUROR:  It went well, yes.  She had twins.

5          THE COURT:  She has twins?

6          PROSPECTIVE JUROR:  Uh-huh.

7          THE COURT:  That's great.

8          Is there anything about having had that experience in

9   your family that you think that would affect your ability to be

10  a fair and impartial person in this trial?

11          PROSPECTIVE JUROR:  No, ma'am.

12          THE COURT:  Okay.  Number 5, can you tell us about

13  your experience?

14          PROSPECTIVE JUROR:  Yeah.  My best friend has been

15  going through IVF for awhile.

16          THE COURT:  Okay.  And is everything going okay for

17  her?

18          PROSPECTIVE JUROR:  It's not working, but, I mean,

19  healthwise everything is fine, yeah.

20          THE COURT:  Okay.  Is there anything about having had

21  that experience with your close friend that would affect your

22  ability to be a fair and impartial juror in this kind of case?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  All right.  Do we have any other

25  hands in the box?

1        Number 22?

2        PROSPECTIVE JUROR:  My son and daughter-in-law just

3   did.  Well, four years ago now.  So it was successful.  But

4   there were no complications.  I don't think it would affect my

5   ability to ...

6        THE COURT:  To be a fair juror in the case?

7        PROSPECTIVE JUROR:  To be fair, that's right.

8        THE COURT:  Thank you, Number 22.

9        Have any of you or close friends adopted a child, gone

10  through adoption, or are any of you adopted?

11       No paddles.  Okay.

12       Do all of you in the box understand that your

13  obligation will be to follow the law as the Court instructs you

14  at the very end of the case?  So you'll get those

15  instructions -- raise your paddle if you understand that.

16       Thank you.

17       Is there anyone who believes that this is just not the

18  kind of case that they should sit on?  Does anyone think that

19  this is not the trial for you?

20       Number 22.  Okay.  And I think you've told us the

21  reasons why.

22       PROSPECTIVE JUROR:  Yes.

23       THE COURT:  Okay.  Ladies and Gentlemen, the Court is

24  able to reasonably accommodate most special needs or concerns

25  that a juror may have.  Like I said, we have a very comfortable

 1    jury room, plenty of snacks, take really good care of diabetics

 2    because we give them everything they need.  But is there anyone

 3    who has a special need or concern that they need to bring to

 4    our attention?

 5              Okay.  Everyone's good.

 6              Is there anyone who suffers from a condition or

 7    situation that would make it difficult for you to give both

 8    parties your full attention and fair consideration, if you were

 9    selected as a juror?  Anyone, anything going on at home or work

10    that's on their mind?

11              I know, Number 22, you've got something on your mind,

12    don't you?

13              PROSPECTIVE JUROR:  I do.

14              THE COURT:  Other than Number 22?

15              Okay.  All right.

16              How many of you are regular users of the Internet?

17    Raise your paddle.

18              Everybody.  All right.

19              Ladies and Gentlemen, you're going to instructed that

20    you are not allowed to research this case or any of the parties

21    or the witnesses or anything about this case if you're on this

22    jury.  You're not to look up anything in newspapers or

23    otherwise during the trial.  That means you may not Google the

24    witnesses or anything about the case.  You may not even

25    Facebook to your friends that you're a juror in this trial.

1    And I know it's human nature to want to talk about it.  But
2    once the trial is over, you're allowed to Google and research
3    to your heart's content.  But if you're on the jury, you're not
4    allowed to do that.

5            Is there anyone who would be so tempted by curiosity
6    that you would not be able to follow this instruction or
7    admonishment?  If you don't think you can do that and not
8    Google or research, raise your paddle.

9            Okay.  Thank you.

10           If at the end every time trial you feel that
11   Ms. Bowling and Ms. Kennard have proved their case, their claim
12   by the greater weight of the evidence, could you return a
13   verdict in their favor?  Raise your paddle if you can do that.

14           All right.  Every paddle is raised.

15           Likewise, if at the end of the trial you feel that
16   Ms. Bowling and Ms. Kennard did not prove their claims by the
17   greater weight of the evidence, could you return a verdict for
18   Netflix and Realhouse?

19           Every paddle is raised.

20           Is there anyone in the box with a matter that you
21   would prefer to discuss privately?

22           All right, Ladies and Gentlemen.  Is there anything
23   else about any of your ability to serve as a fair and impartial
24   juror that you think we should know about?  Anybody got
25   anything else you need to tell me that we haven't talked about?

1          All right.  So I'm going to ask individual questions.

2          Come on down here, Tamara, of everyone in the box,

3  just so we can hear from everybody, and all I'm going to ask

4  you is just to tell us a little bit about yourself, maybe your

5  marital status, what you do, what type of work, and what you

6  like to do in your spare time.  And we're going to start with

7  you, Number 2.

8          PROSPECTIVE JUROR:  Married for 48 years, college

9  graduate.  In my spare time, TV, crafts, gardening, driving my

10  husband nuts because we're retired.

11          THE COURT:  Where did you retire from?

12          PROSPECTIVE JUROR:  Ivy Tech Community College.

13          THE COURT:  Teacher?

14          PROSPECTIVE JUROR:  I was a financial advisor and a

15  teacher.

16          THE COURT:  Thank you very much.

17          All right.  Number 3, can you tell us a little bit

18  about yourself?

19          PROSPECTIVE JUROR:  Sure.  School psychologist, been

20  married for eight years, and have two kids.

21          THE COURT:  And what do you do in your spare time?

22          PROSPECTIVE JUROR:  My two kids.  That's my time.

23          THE COURT:  How old are your kids?

24          PROSPECTIVE JUROR:  Five and 16, so quite a range.

25          THE COURT:  Okay.  Thank you.

1          Number 4, can you tell us a little bit about yourself?

2          PROSPECTIVE JUROR:  Yes.  I'm a nurse practitioner.  I

3    work primarily in family medicine and acute care.  I'm married

4    for 15 years.  I have two kiddos, 11 and nine.  And our passion

5    is traveling.  We love to travel the world and take our kids

6    with us as often as we can.

7          THE COURT:  Wonderful.  Thank you.

8          Number 5, a little bit about yourself.

9          PROSPECTIVE JUROR:  I have three kids.  I'm in school

10   for nursing.  I work night shift in an ICU where I live.  I

11   don't know.  I just hang out with my kids and do homework.  I

12   don't really do much.

13         THE COURT:  Okay.  Thank you.

14         Number 6?

15         PROSPECTIVE JUROR:  I'm married, retired from the Navy

16   for 20 years.  That's where I met my current wife.  Three

17   children, 44, 39, and 33 -- or 36 rather.  And just waiting for

18   her to retire so we can start traveling.

19         THE COURT:  Okay.  Sounds good.  Thank you.

20         Number 7.

21         PROSPECTIVE JUROR:  I've been divorced for about 10

22   years.  I'm a machinist.  And I have got a son that's 26.

23   He's got cystic fibrosis, and he takes a lot of my time out.

24         THE COURT:  Okay.  Thank you.

25         Number 8?

1    PROSPECTIVE JUROR:  Married 47 years.  Wife and I, we
2   like to travel.  She's retired already.  I still work, truck
3   driver.  And we have three sons.
4    THE COURT:  Okay.  Number 22, can you tell us a little
5   bit about yourself?
6    PROSPECTIVE JUROR:  Yes.  I've been married for 34
7   years.  I have two children, two grandchildren.  I work
8   full-time, support my husband, who is -- has anxiety and
9   depression issues pretty bad, so he takes most of my time when
10  I'm not working.  Other than that, I like to get out in the
11  garden and do my flowers.
12    THE COURT:  Thank you.
13    Number 21?
14    PROSPECTIVE JUROR:  Hi.  I'm a mother of four
15  daughters, married 25 years.  I work at our local elementary
16  school.  I have no free time.  I have four daughters.
17    THE COURT:  Okay.  Thank you.
18    Number 17?
19    PROSPECTIVE JUROR:  I just graduated from Purdue.
20    THE COURT:  Congratulations.
21    PROSPECTIVE JUROR:  Thank you.
22    I'm a machinist.  I work in Peru.  Free time, mostly
23  just friends, video games, sports.
24    THE COURT:  Okay.  Thank you.
25    Number 13?

1    PROSPECTIVE JUROR:  I'm a pharmacy technician in a

2    closed-door pharmacy.  I could not handle retail.  I couldn't

3    do that.  And in my free time, I either draw or play video

4    games.

5    THE COURT:  All right.  Thank you.

6    And Number 12?

7    PROSPECTIVE JUROR:  I'm a construction project

8    manager.  Happily single, no kids.  In my free time, I do

9    community theater, and I like to sew and knit.

10    THE COURT:  Neat.  She's an actress.

11    Okay.  Number 11.

12    PROSPECTIVE JUROR:  Single, no kids.  I am a nursing

13    home administrator and a grad student.  And in my free time, I

14    like to garden and play with my pets.

15    THE COURT:  Okay.  Thank you.

16    And Number 10?

17    PROSPECTIVE JUROR:  I've been married for four years.

18    I used to teach kindergarten.  I did that for 10 years.  Now

19    I stay at home with my three-year-old and my nine-month-old.

20    And in my free time, I like to bake.

21    THE COURT:  Okay.  Thank you very much.

22    All right.  Ladies and Gentlemen, if at the end of the

23    trial -- oh, I've already asked that.

24    All right.  So, Ladies and Gentlemen, at this time,

25    I'm going to allow the lawyers to ask any follow-up questions

1  to my questions.  And, again, because the plaintiff has the

2  burden of proof, they will go first.

3          MR. BRIAN:  Your Honor, can I -- Your Honor, can I use

4  the equipment just briefly?

5          THE COURT:  Yes.

6          THE COURT:  So, Ladies and Gentlemen, after the

7  pandemic -- we used to huddle, but now we don't do that

8  anymore, so we use this equipment, this kind of like

9  walkie-talkie, and we put on some white noise so that you can't

10  hear us.  We'll see how good they learned to do it.

11      (Bench conference on the record.)

12          MR. BRIAN:  Can you hear me now?  I'm sorry.

13          Two issues, Your Honor:  On Juror Number 22, we could

14  wait, but we would make a cause challenge for Juror Number 22

15  for a number of reasons.  One was her -- she has 50 employees.

16  She's worried about payroll week.  But more importantly, she

17  said she has sympathies that would affect her ability to be

18  impartial, so we would make a cause challenge.  I can make that

19  later.  I wondered whether I should make it now.

20          And the second issue, Your Honor, is when you asked

21  the jurors whether they had a negative view of streaming

22  services, I don't think you noticed it, but Juror Number 13

23  began to raise her paddle and then when you went past her, so

24  she put it down.  I don't know if Your Honor wants to follow up

25  with that or not.

1        THE COURT:  I will follow up with Number 13, and

2    that's fine that you raise your challenge for cause, but we'll

3    deal with that after we finish with you guys' comments.  Okay?

4                    (Open court.)

5        THE COURT:  All right, plaintiffs, you may.

6        MR. MacGILL:  Thank you, Your Honor.  We have no

7    follow-up questions this morning.

8        THE COURT:  Thank you.  Any follow-up questions on

9    behalf of the defendants?

10       MR. BRIAN:  Yes, Your Honor.

11       Good morning.  Thank you all, thanks to all of you for

12   coming in.  Jury service is very important and I know we

13   appreciate it.

14       This is an important part of the trial.  This is

15   probably your only chance to actually talk to us.  You're going

16   to hear us talking to you a lot, and so it's both sides want to

17   have a jury that's fair and impartial, that doesn't have any

18   biases that will affect your ability to be fair and impartial.

19       The word bias has a bad connotation to a lot of

20   people.  In this context, all it means is you have something in

21   your experience or there's something about the case or

22   something you've heard that might make you lean one way or the

23   other.  That's all it means.  There's nothing wrong with that.

24   We all have those kinds of biases, so this one thing I would

25   ask you, and I'm sure Mr. MacGill would echo this, is be

1    truthful, be honest.  Tell us what you think.  If there's

2    anything I say that triggers something that you think, gosh, I

3    really shouldn't be on this jury, I'm not the right person for

4    this jury, I might be a really good juror for some other case,

5    please, please don't hesitate to tell me that.

6        I think you already answered questions about the

7    parties and said that you didn't know any of the parties.  On

8    either side, any of the lawyers.  And the witnesses as well.

9    Judge Pratt asked you about your views of large companies or

10   corporations, I think she said.  Obviously, I represent two

11   large companies, and companies are important in our society,

12   but I also know that sometimes companies can do things that bug

13   people a bit and so I really do want all of you to think hard.

14   Is there anything about the fact that we have two -- and I'm

15   using two, there are two Netflix entities, but I treat them

16   both together.  Is there anything about the fact that I

17   represent two companies that might make you think that the

18   plaintiffs start ahead?  I mean, think of this as a foot race.

19   Do they start the 100-meter dash a few meters ahead?  Does

20   anybody feel that way at all?

21       THE COURT:  For the record, there is a paddle raised.

22       MR. BRIAN:  So Number 3, please.

23       PROSPECTIVE JUROR:  To some extent, I think I tend to

24   view larger companies as kind of soulless, faceless, and

25   there's just been so many recent incidents of large companies,

1    you know, violating people's privacy and kind of, you know,

2    using people's public information for monetary gain and things

3    like that.  So that was why I had a little bit of a chuckle.  I

4    don't necessarily think that would prevent me from being

5    impartial, but it's definitely a feeling.

6            MR. BRIAN:  I appreciate you saying that.  So in a

7    lawsuit between two individuals and two big companies, if you

8    knew nothing else, would you lean toward the two individuals?

9            PROSPECTIVE JUROR:  Probably to some extent.

10           MR. BRIAN:  Okay.  I appreciate you saying that.

11           Anyone else feel that way?  You were waving your

12   paddle.

13           PROSPECTIVE JUROR:  Sorry.  No, I'm sorry.

14           MR. BRIAN:  Okay.  So do any of you believe that --

15   one of my clients is Netflix, a streaming service that probably

16   all of you are familiar with.  Do any of you think that

17   streaming services need to do a better job at protecting

18   privacy?  Anyone feel that way?

19           THE COURT:  Raise your paddle if you do.

20           MR. BRIAN:  Okay.  I think we've already addressed it.

21   Anybody else, anybody else feel that way?

22           Okay.  Now, I noticed in looking at the questionnaires

23   that at least some of you have -- either have worked or

24   currently work in, call it education, schoolteachers, working

25   for school districts and the like.  One of the two plaintiffs

1   is a schoolteacher, and would those of you who have either

2   worked in education or currently do, would you feel any

3   affinity, any sympathy that you think could just tilt the

4   scales a bit in her favor?

5          Okay.  I know some of you, I think some of you

6   actually noted it, but looking at where some of you live, some

7   of you have fairly long drives to the court each and every day,

8   and I know this is not going to be a terribly long trial, but

9   do any of you have such a long drive or other obligations at

10  home, with your children or work, that you feel that might

11  interfere with your ability to give this case the kind of

12  attention it deserves?  Do you feel you might be distracted in

13  any way?  22?

14          PROSPECTIVE JUROR:  I've already stated.

15          MR. BRIAN:  I think I've heard that.  Thank you.

16          Anybody else feel that way, that you're just going, to

17  oh, God, I got to drive 50 miles and sit through this, it's

18  going to hurt my ability to pay attention, nobody other than

19  22.  Okay.  I got that.  Thank you.

20          Does anyone here have, sort of, views about

21  individuals being retraumatized so to speak, from an earlier

22  experience because they're reminded of it through a

23  documentary?  They went through some experience in this case,

24  learning about a relationship of Dr. Donald Cline, and then

25  seeing it come back in a documentary.  Anyone have any views on

1    that?

2           You're nodding, Number 3.  What are your views on

3    that?

4           THE COURT:  Hold on, let's give him the mic.

5           PROSPECTIVE JUROR:  I mean, I think it certainly could

6    happen, if you experience trauma and then you have some kind of

7    memory inducing trigger, then I think it would be pretty likely

8    that that would trigger some of the same emotional responses

9    that the initial trauma triggered.

10          MR. BRIAN:  I think it was Juror Number 5, you said

11   that you had -- I think it was juror -- strong views about

12   Dr. Cline?

13          PROSPECTIVE JUROR:  Yes.

14          MR. BRIAN:  Okay.

15          PROSPECTIVE JUROR:  Yes, that's correct.

16          MR. BRIAN:  Anything about those views you think would

17   affect how you could judge this case brought by two of the

18   folks that learned many years later that their mothers had been

19   abused and that they were children of Dr. Cline?  You think it

20   would affect your views of this case?

21          PROSPECTIVE JUROR:  No, I don't believe so because

22   it's not directly correlated to what he did.

23          MR. BRIAN:  Okay.  Juror Number 22, I think you said

24   early that you've got -- this is payroll week, you've got 50

25   employees, I think you said you were covered for today, but may

1    not be covered for the rest of the week.

2        PROSPECTIVE JUROR:  Definitely am not covered for the

3    rest of the week.  This was difficult to even get, but I asked

4    for a postponement or whatever it was to be excused, and it was

5    denied, and which was not very settling to me in the first

6    place, but I came because I was obligated to do that.  But I

7    had to jump through hoops to cover my position today.

8        MR. BRIAN:  So you think if you had to sit here for

9    the rest of the week, you would be resentful?

10       PROSPECTIVE JUROR:  Oh, I can't sit here for the rest

11   of the week.  It's not an option.  I'm sorry.  With all due

12   respect.

13       MR. BRIAN:  Thank you.  I thank you for your honesty.

14       PROSPECTIVE JUROR:  Thank you for listening.

15       THE COURT:  You've got one minute left.

16       MR. BRIAN:  Thank you, Your Honor.

17       Has any -- are any of you familiar with the 23andMe or

18   other ancestry services?  Whoa.  Is there anything about --

19   have you used the service?

20       Is there anything about that, Juror Number 13,

21   anything about your experience with 23andMe that might affect

22   your ability to, in this case, 23andMe is going to be relevant

23   to this case.  Anything about that?

24       PROSPECTIVE JUROR:  Well, in my case I used Ancestry

25   DNA, but no.

1           MR. BRIAN:  Okay.  So one last question:  Everybody

2    here, I understand 22, besides Juror Number 22 because you also

3    said something about sympathy, all of you can be fair to both

4    sides in this case and understand that it's the plaintiff who

5    bears the burden?  Will each of you remember that?

6           Thank you.  Nothing further.

7           Thank you, Your Honor.

8           THE COURT:  All right.  Thank you.  All right.  So I

9    do have just a couple of questions.  I want to ask again, has

10   anyone had a negative experience with a streaming service?  No

11   one?

12          Okay.  All right.  Ladies and Gentlemen, is there

13   anything that we haven't talked about, that any of you -- any

14   reason not already covered in my questions, that any of you

15   might have for not being able to sit as a juror in this case,

16   to listen to the instructions from the Court, to follow those

17   instructions, and give both parties a fair and impartial trial

18   in this matter?  Anyone other than, I know, Number 22 has had a

19   lot of experiences.  Okay.  All right.

20          All right, lawyers, so, lawyers, we can put on our

21   equipment to discuss any challenges for cause, and then you can

22   issue your peremptory challenges.

23      (Bench conference on the record.)

24          MR. BRIAN:  Can you hear me, Your Honor?  Your Honor,

25   we would move to -- for, to challenge for cause Juror Number

1    22, and also, based on his answers to my questions, Juror

2    Number 3, where I felt he said that because of his working in

3    the school and other answers, that he leans in favor of the

4    plaintiffs.  So we would move to challenge both Number 3 and

5    Number 22 for cause.

6         MR. MacGILL:  Your Honor, first, on Number 22, all of

7    us have responsibilities, and I think that, you know, payroll

8    is payroll, but I don't think cause has been established with

9    respect to Number 22.

10        With respect to Juror Number 3, I don't -- I don't

11   think cause has been established.  I think there's a background

12   and experience that this juror has, but nothing that indicates

13   that he, for his part, could not be a fair and impartial juror.

14        THE COURT:  All right.  I'll ask them both the

15   question.

16              (Open court.)

17        THE COURT:  Number 22, I know you've discussed several

18   factors that are going on in your life, your sympathy, your

19   employment situation, so just answer this question honestly.

20   Do you think you could be a fair and impartial juror if you

21   were selected to sit on this trial or will you be so

22   preoccupied with your outside influences that you would not be

23   able to serve well on this trial?  And let's wait until you get

24   the microphone.

25        PROSPECTIVE JUROR:  I regret that I would not be able

1    to serve on this trial.

2            THE COURT:  Okay.

3            PROSPECTIVE JUROR:  Thank you for asking.

4            THE COURT:  All right.  And Number 3, you've indicated

5    that you might lean towards the two individuals as opposed to a

6    corporation.

7            PROSPECTIVE JUROR:  Correct.

8            THE COURT:  Do you think, sir, that you can be a fair

9    and impartial juror if you were selected, and just tell us the

10   truth, yes or no, do you think you can do it, can you do it?

11           PROSPECTIVE JUROR:  I think I can do it.  It would be,

12   when you mention kind of the starting point, with a start

13   ahead, I feel like if I'm honest, yes, but I do feel like I

14   could listen to evidence and make a decision.

15           THE COURT:  Okay.  All right.  Okay, lawyers, put your

16   equipment back on.

17       (Bench conference on the record.)

18           THE COURT:  All right, lawyers, I'm going to excuse 22

19   for cause, and Number 3, I think he's overcome the challenge.

20           MR. BRIAN:  Can you hear me?  So on Number 3, Your

21   Honor, I would ask that that last answer, where he said that

22   the plaintiffs would start ahead, I think that's fundamental to

23   the burden of proof, that both -- all parties have to start at

24   the same starting line.  And I know he answered that last

25   question, but the last question is inconsistent, his answer to

1    the last question is inconsistent to -- with saying that the

2    plaintiffs would start ahead, and I would ask Your Honor to

3    consider that.

4         MR. MacGILL:  Your Honor, he's answered full and

5    completely your questions.  I think he's indicated, in all

6    candor, a perspective that he's confirmed to this Court on his

7    own, that he can be a fair juror.

8         THE COURT:  Okay.  I'm going to ask him one more

9    question.  Take your equipment off.

10                       (Open court.)

11        THE COURT:  All right, Number 3, you're going to be

12   instructed that you can't let one side or the other start off

13   ahead on the starting line.

14        PROSPECTIVE JUROR:  Okay.

15        THE COURT:  Knowing that, do you think you can -- do

16   you think you can put them on the same -- can you start this

17   trial on the same even plane?  And just tell us the truth.

18        PROSPECTIVE JUROR:  No.

19        THE COURT:  You cannot do that?

20        PROSPECTIVE JUROR:  No.

21        THE COURT:  All right.  Thank you for your honesty.

22        Okay, lawyers, put your equipment back on.

23     (Bench conference on the record.)

24        THE COURT:  All right, I'm going to excuse Number 3,

25   also.  So, lawyers, you can issue your peremptory challenges.

1           MR. BRIAN:  Your Honor, can you give us just three

2    minutes to caucus, or so?

3           MR. MacGILL:  One more time.  We did have a cause

4    challenge, and our cause challenge is Juror Number 6.  The

5    basis of the challenge is he's got -- his wife works at the law

6    firm for the defendant.  Additionally, his law firm represented

7    Dr. Cline in this matter.  And for each of those reasons, we

8    feel he could not -- he should be excused for cause.

9           MR. BRIAN:  Your Honor, I disagree with both of those.

10   He testified very clearly that he knows nothing about this

11   case, he knew nothing about the case against Dr. Cline when his

12   wife worked at the other law firm and here, he doesn't know

13   anything about her work or the cases and knows nothing about

14   this and I'm quite sure he will follow the Court's instructions

15   not to discuss it with her.

16          THE COURT:  I'll ask him one more question, but he did

17   indicate that he could be fair, but I'll ask him.

18                      (Open court.)

19          THE COURT:  All right.  Number 6, one more question

20   for you, sir.  You have discussed the fact that your wife

21   worked at the law firm -- or still works at the law firm

22   that -- with one of the defendants' counsel and that she

23   previously worked at the law firm that represented Dr. Cline.

24   With that being the case, do you think you can be a fair and

25   impartial juror, in this trial, if you were selected?

1    PROSPECTIVE JUROR:  Absolutely, because I didn't

2    follow the first one, and I know nothing about this one, so

3    like, I'm starting on an even playing field, so...

4         THE COURT:  And you'll follow the admonishment when

5    you get home tonight?  You won't say: Honey, guess what my

6    trial is about?

7

8         PROSPECTIVE JUROR:  No, no, no, no, no.  Like I said,

9    I work also.  I'm an engineering technician, so I get home

10   about 4 or 5, and she is off at 6, so -- and she goes to bed

11   right after that because she is so tired, so the dogs come and

12   sleep with me downstairs until I go to bed, so...

13        THE COURT:  And you'll follow the admonishment?

14        PROSPECTIVE JUROR:  Oh, absolutely, yes.

15        THE COURT:  Thank you.  Okay.

16        Equipment one more time, lawyers.

17    (Bench conference on the record.)

18        THE COURT:  All right, Number 6 has survived the

19   for-cause challenge, so you can issue your peremptory

20   challenges.

21        Yes, you can have a minute to confer.

22                    (Open court.)

23        MR. BRIAN:  May we just walk and caucus?

24        THE COURT:  Yes, you may walk and caucus.

25        MR. BRIAN:  Thank you.

1    THE COURT:  So, Ladies and Gentlemen, in just a few,

2    we're going to -- the lawyers are going to issue their

3    peremptory strikes, and in just a few, we'll know who gets the

4    honor to stay for our jury and who is going to be excused, so

5    if you could just be patient, we'll give them a few minutes to

6    talk.

7    And we will take a restroom break once we finish this

8    round.

9    (Off the record.)

10    THE COURT:  Counsel, your microphones are on.  We can

11    hear you whispering.

12    MR. MacGILL:  May we ask a question, Your Honor?  Are

13    the peremptories as to the first six or all of them?

14    THE COURT:  All 14.

15    MR. MacGILL:  And plaintiffs goes first?

16    THE COURT:  You go simultaneously.

17    MR. MacGILL:  Simultaneously.  Thank you.

18    THE COURT:  Put it on that piece of paper.

19    MR. MacGILL:  Got it.  Thank you.

20    (Off the record.)

21    THE COURT:  And when you're finished, lawyers, just

22    bring up your sheet.  Hand them to Sarah.

23    All right, the following persons may be excused, and

24    thank you very much for coming in.  You will have fulfilled

25    your service in the federal system for two years.  Your county

1    might call you, but your federal court will not.

2            Number 3, Number 6, Number 7, Number 13, Number 21,

3    and Number 22.  You may all be excused.

4            So we have seven members of our jury.  We're going to

5    take a five-minute restroom break and then we're going to come

6    back and we need to select one more juror.

7            Ladies and Gentlemen, the Court is going to admonish

8    you, when you're on your break, don't have any discussion about

9    the case, among yourselves or with anyone else, and we'll have

10   you back in about five minutes.  And I'm going to let some

11   people go because we're not going to get to you.

12           So 57, 56, 52, 49, 45, 43, 38, 36, 35, you may be

13   excused because we're not going to get to you today.

14           And we'll see the rest of you in five minutes.

15           And, Ladies and Gentlemen of the Jury, we're going to

16   send you to the jury room.

17           COURTROOM DEPUTY:  All rise.

18       (Jury out at 10:34.)

19           THE COURT:  Okay, so the rest of our jurors,

20   prospective venire, go ahead and take your five-minute break.

21   We'll have you back in the courtroom in five minutes.  Five

22   minutes, everybody.

23       (Recess at 10:35, until 10:53.)

24           THE COURT:  We are back on the record.  This is Sarah

25   Bowling and Lori Kennard, plaintiffs, versus Netflix, Inc.,

1    Netflix Worldwide Entertainment, LLC, and Realhouse

2    Productions, LLC, defendants.  And we're going to continue with

3    jury selection.

4            So, Ladies and Gentlemen, welcome to the box.  Have

5    any of you -- did any of you have -- did -- first of all, did

6    all of you hear the questions that were asked during the

7    first round.  Raise your paddle if you heard those questions.

8    Thank you.

9            Off the bat, does anyone have any concerns or reasons

10   why this may not be the proper trial for you to serve on?  If

11   so, raise your paddle.

12           Okay.  All right.  Ladies and Gentlemen, how many of

13   you are familiar with the streaming service, Netflix?

14           And how many of you have the streaming service,

15   Netflix?

16           Okay.  Is there anything about having the streaming

17   service, Netflix and knowing what this trial is about that

18   would affect your ability to be a fair and impartial juror in

19   this case?

20           Anyone have any reasons?

21           Okay.  All right.  So, Ladies and Gentlemen, let me

22   get my question.  Does everyone understand that because this is

23   a civil case, the burden of proof is different than the burden

24   of proof in a criminal case?  In a criminal case, beyond a

25   reasonable doubt, and that's because a person's liberty and

1    freedom is at stake.  In a civil case, such as this one, the

2    burden of proof is just more greater -- the greater weight of

3    the evidence.

4            Raise your paddle if you understand the difference.

5            Thank you.

6            Are any of you familiar with any of the attorneys?

7    You've met them all, seen them all.  No paddles are raised.

8            And none of you raised your -- did any of you raise

9    your paddle for having knowledge of any of the witnesses that

10   may be called?

11           Thank you.

12           All right.  So those of you who have heard or read

13   about this case, raise your paddle, I'm going to ask you what

14   you've heard and have you formed an opinion about what you've

15   heard.

16           We'll start with Number 23.  I'm sorry, she's got them

17   backwards, Tamara, so Number 23 is down there.  Okay.

18           PROSPECTIVE JUROR:  I am aware of it, probably from

19   the news.

20           THE COURT:  Did you watch the documentary?

21           PROSPECTIVE JUROR:  No.

22           THE COURT:  Okay.  And have you formed any opinion

23   about the nature of this case?

24           PROSPECTIVE JUROR:  This case, no.

25           THE COURT:  Okay.  And do you understand that this

1    case is not about Dr. Cline or anything that Dr. Cline has

2    done?  This case is for invasion of privacy for the public

3    disclosure of private facts related to the two plaintiffs; do

4    you understand?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Have you heard anything about that

7    particular case?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  Thank you.  You may pass the paddle -- the

10   mic down.  I think there were more in that front row.

11           Number 25?

12           PROSPECTIVE JUROR:  I'm familiar with the case just

13   from local news media.

14           THE COURT:  Okay.  And are you familiar, at all, with

15   the claims of these two plaintiffs for invasion of privacy?

16           PROSPECTIVE JUROR:  No, Your Honor.

17           THE COURT:  All right.

18           Number 26, what is your familiarity?

19           PROSPECTIVE JUROR:  Just from the news.  I never saw

20   the documentary.  It's not going to -- I've never heard

21   anything about this.  It's not going to influence me.

22           THE COURT:  Thank you.  Let's pass it down.

23           Number 31.

24           PROSPECTIVE JUROR:  Yeah, I've seen the documentary.

25           THE COURT:  You have seen the documentary?

1           PROSPECTIVE JUROR:  Yeah.  I don't know anything about
2      the case, though.
3           THE COURT:  You don't know about this case, invasion
4      of privacy?
5           PROSPECTIVE JUROR:  No.
6           THE COURT:  So it won't affect your ability to be a
7      fair and impartial juror; correct?
8           PROSPECTIVE JUROR:  No, ma'am.
9           THE COURT:  Thank you.
10          And Number 34, we're going to bring the mic to you.
11     And what's your familiarity, sir?
12          PROSPECTIVE JUROR:  I've seen it on the news and my
13     wife and I have talked about it, but that's -- I don't know
14     anything about this case.  That's all I know about it.
15          THE COURT:  Okay.  Thank you.
16          Are there any of you who believe that someone is
17     automatically entitled to recover money just because the person
18     filed a lawsuit?  Anyone feel that way?
19          Number 32?
20          PROSPECTIVE JUROR:  I was on the last question.
21          THE COURT:  Oh, the last question?
22          PROSPECTIVE JUROR:  Yeah.
23          THE COURT:  Do you have the microphone?
24          PROSPECTIVE JUROR:  I do.
25          THE COURT:  Okay.

1        PROSPECTIVE JUROR:  I just seen advertisements on TV

2  about it.  That's all.

3        THE COURT:  And that was about Dr. Cline?

4        PROSPECTIVE JUROR:  Yes.

5        THE COURT:  Have you heard anything about this actual

6  lawsuit?

7        PROSPECTIVE JUROR:  No, ma'am.

8        THE COURT:  Is there anything about having heard about

9  Dr. Cline that would affect your ability to be a fair and

10  impartial juror in this case?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  Thank you.

13        The next question is:  Do any of you believe that

14  someone is automatically entitled to recover money because that

15  person has filed a lawsuit?  Anyone think it should be

16  automatic?

17        Is there anyone who believes these type of lawsuits

18  should not be filed?

19        No paddles are raised.

20        Do you all understand that because the plaintiffs,

21  Ms. Bowling and Ms. Kennard, are the moving parties, they'll

22  present their case first, then the defendants will have an

23  opportunity to present their case, and then the plaintiffs, if

24  they have any rebuttal evidence, they can present that, and

25  then the defendants can present any surrebuttal.  Then you'll

1    get your instructions on the law.  And until that time, you're

2    not to make my decisions about the evidence until after all the

3    evidence has been presented by both sides and you've been

4    instructed on the law.  Can everyone follow that?

5             Raise your paddle if you can follow that.

6             Thank you, Ladies and Gentlemen.  All paddles are

7    raised.

8             It is normal to feel sympathy.  Do any of you have any

9    concerns that you might be just super sympathetic and not be

10   able to base a decision on the evidence?

11            No one has that concern.

12            As you've heard, Netflix, Inc., Netflix Worldwide

13   Entertainment, LLC, and Realhouse Productions, LLC are all

14   companies or corporations.  The fact that they are corporations

15   must not affect your deliberations or your verdict.  You may

16   not discriminate or have any bias between corporations and

17   individuals because both are persons in the eyes of the law,

18   and both are entitled to have a fair and impartial trial based

19   on the same legal standards.

20            Would the fact that the plaintiffs are individuals and

21   the defendants are corporations or companies, will that affect

22   any of your ability to give fair judgment in this trial?

23            Anyone have any current concerns or had any issues

24   with large companies or corporations?

25            No paddles.

1        Have any of you had any concerns or issues with any

2    streaming companies, not just Netflix, but companies like Hulu,

3    Disney +, Max, other than they charge a lot of money?  Anybody

4    have any issues with those companies that might affect your

5    ability to be a fair and impartial juror?  Okay.

6        Do any of you believe that you have any difficulty

7    giving both the plaintiffs, these two ladies, and the

8    defendants, the same fair and impartial consideration during

9    this trial?

10        Do any of you have any family members or have you

11    yourself worked for Netflix or any other streaming company or

12    had business with any of those companies?

13        Have any of you been involved in a dispute involving

14    Netflix or Realhouse?

15        Have any of you entered into an agreement or contract

16    with another person or a company and felt that the other person

17    breached the terms of the agreement or contract?  Anyone had

18    that experience?.

19        How many of you have previously served on a jury?  Any

20    prior jurors?  Number 32 and Number 23.

21        Number 23, why don't you tell us about your prior jury

22    experience.

23        PROSPECTIVE JUROR:  It's been a while.  I've been on

24    two.  One lasted one day, one was three days.

25        THE COURT:  Were they civil or criminal?

1        PROSPECTIVE JUROR:  I think I had one of each.

2        THE COURT:  One of each.  Were you the foreperson on

3    either trial?

4        PROSPECTIVE JUROR:  I'm sorry, what?

5        THE COURT:  Were you the foreperson in either of those

6    trials?

7        PROSPECTIVE JUROR:  No.

8        THE COURT:  Was there anything about those experiences

9    that might affect your ability to be a fair and impartial juror

10   in this case?

11       PROSPECTIVE JUROR:  No.  They're all different.

12       THE COURT:  They're all different?  Okay.  Do you

13   remember what the others were about?

14       PROSPECTIVE JUROR:  One was about someone killed

15   somebody's dog, and the other one tried to kill his

16   ex-girlfriend.

17       THE COURT:  So the criminal one must have been the

18   killing of the girlfriend?

19       PROSPECTIVE JUROR:  That's right.

20       THE COURT:  Okay.  And then there was a civil trial

21   concerning a dog?

22       PROSPECTIVE JUROR:  Yeah.

23       THE COURT:  Okay.  All right.  Do you remember the

24   verdicts on each of those?

25       PROSPECTIVE JUROR:  Well, the dog one she wasn't able

1    to prove.

2              THE COURT:  Okay.

3              PROSPECTIVE JUROR:  The other one was very guilty.

4              THE COURT:  Okay.  All right.  And you've indicated

5    that there's nothing about those experiences that would affect

6    your ability to be a fair and impartial juror in this case;

7    correct?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Okay.  Thank you.

10             If you would pass the mic behind you to Number 32.

11             PROSPECTIVE JUROR:  Thank you.

12             THE COURT:  And, Number 32, can you tell us about your

13   prior jury experience?

14             PROSPECTIVE JUROR:  I was on a murder trial 40 years

15   ago.

16             THE COURT:  Forty?  Okay.  All right.  Do you remember

17   the verdict?

18             PROSPECTIVE JUROR:  It was -- I don't know what you

19   would say.  We didn't -- it was for murder, but it got reduced

20   to --

21             THE COURT:  A lesser?

22             MR. BRIAN:  Yes, a lesser count.

23             THE COURT:  Okay.  All right.  And is there anything

24   about that experience, sir, that would affect your ability to

25   be a fair and impartial juror in this jury trial?

1          PROSPECTIVE JUROR:  No, it wouldn't.

2          THE COURT:  Okay.  Thank you.

3          Have any of you or close friends gone through either

4     in vitro fertilization, intrauterine insemination, or had

5     fertility difficulties?  Okay.  Let's start with -- okay, let's

6     start with whichever one you would like, Tamara.  She's going

7     to start with 31.

8          PROSPECTIVE JUROR:  We have had -- my wife and I have

9     had some friends do it with success and not success.

10         THE COURT:  And having known people who have had that

11    experience, do you think that would affect your ability to be a

12    fair and impartial juror in this case?

13         PROSPECTIVE JUROR:  No, ma'am.

14         THE COURT:  Okay.  And then 32, up in the far end,

15    Tamara.

16         PROSPECTIVE JUROR:  A good friend of mine and his wife

17    went through the experience and had two healthy baby girls.

18         THE COURT:  Very good.  And is there anything about

19    their experiences and your knowledge of their experiences that

20    might affect your ability to be a fair and impartial juror in

21    this case?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Okay.  Thank you.

24         Does anyone have any concerns about fertility

25    assistance using a sperm donor?

1              Have any of you or close friends adopted a child, or

2      any of you adopted?  Anybody gone through the adoption process?

3      Okay.  Number 23, can you tell us your experience with

4      adoption?

5              PROSPECTIVE JUROR:  I was adopted as an infant.

6              THE COURT:  Okay.  And is there anything about having

7      been adopted that would affect your ability to be a fair and

8      impartial juror in this kind of case?

9              PROSPECTIVE JUROR:  I don't think so.

10             THE COURT:  Okay.

11             PROSPECTIVE JUROR:  Just my life.

12             THE COURT:  Just your life.  Okay.  Thank you.

13             Tamara, Number 30 and 31.

14             PROSPECTIVE JUROR:  I have an adopted daughter.

15             THE COURT:  Number 30, you have an adopted daughter?

16     Anything about the fact that you have an adopted daughter in

17     this case, the nature of this case, that would affect your

18     ability to be a fair and impartial juror?

19             PROSPECTIVE JUROR:  No, ma'am.

20             THE COURT:  Thank you.

21             Number 31?

22             PROSPECTIVE JUROR:  Yeah.  My aunt and uncle adopted

23     three sons that are my cousins now.

24             THE COURT:  They're doing well?

25             PROSPECTIVE JUROR:  Yeah.

1      THE COURT:  Anything about having adopted cousins that
2  would affect your ability to be a fair and impartial juror?
3      PROSPECTIVE JUROR:  No, ma'am.
4      THE COURT:  Thank you.
5      Do each of you understand that you will have an
6  obligation to follow the law as I instruct you at the end of
7  the case, even if you don't particularly care for that law, or
8  you think that it should be a different law?  Can you follow
9  the law that the Court gives you?  Raise your paddle if you can
10  do that.
11      All paddles are raised.
12      Is there anyone who believes that there's something
13  about this case that would prevent you from being a fair and
14  impartial juror to both parties?
15      Does anyone have any concerns or issues that they need
16  to bring to our attention?  Because the Court can reasonably
17  accommodate most special needs or concerns, so like I stated
18  earlier, if anyone is a diabetic or sometimes people have a bad
19  back and they need to stand.  Anyone have any issues or
20  concerns that they need to bring to our attention?
21      Do any of you have any conditions or situations that
22  would make it difficult for you to give both parties your full
23  attention and consideration if you were selected to serve as a
24  juror?
25      No paddles.

1          Ladies and Gentlemen, how many of you are regular

2    users of the Internet?

3          Every paddle is raised.

4          And do you understand that you're going to get an

5    instruction if you're on this jury, that you're not allowed to

6    do any research about this case or any of the parties or

7    witnesses using the Internet or searching newspapers or

8    otherwise during the trial.  That means no Googling, no

9    Facebooking, no whatever about the trial until it's over.  Can

10   everyone follow that admonishment that you're going to get?

11   Raise your paddle if you can follow it.

12         All the paddles are raised.

13         Does anyone have any matters that they want to discuss

14   privately?

15         Okay, Ladies and Gentlemen, I'm going to ask each of

16   you -- we're going to pass the mic to each juror and just for

17   you to just tell us a little bit about yourself, maybe your

18   marital status and your family, what type of work you do, and

19   what you like to do in your spare time.  And she's going to

20   start with 31.

21         PROSPECTIVE JUROR:  Yes.  I'm married, I have two

22   boys.  One is ten, one is seven.  My youngest is autistic.  I'm

23   a construction manager, and I like to spend time outdoors with

24   the boys.

25         THE COURT:  Thank you.

1              All right, Number 30.

2              PROSPECTIVE JUROR:  I've been married for 19 years.  I

3     have an adopted daughter and a 30-year-old son.

4              THE COURT:  And what do you do in your spare time?

5              PROSPECTIVE JUROR:  Golf, hang out with my kids.

6              THE COURT:  What kind of work do you do?

7              PROSPECTIVE JUROR:  I'm a supervisor at the post

8     office.

9              THE COURT:  Okay.  Thank you.

10             Number 28?

11             PROSPECTIVE JUROR:  I was married 28 years, widower

12    for eight years.  I have two daughters, 31 and 30, and a

13    granddaughter, 15 months old and one on the way.

14             THE COURT:  Okay.  Good for you.

15             PROSPECTIVE JUROR:  And I like to bike, golf, and

16    sports.

17             THE COURT:  Are you still working?

18             PROSPECTIVE JUROR:  Retired.

19             THE COURT:  Where do you retire from?

20             PROSPECTIVE JUROR:  Property management company.

21             THE COURT:  Okay.  Thank you.

22             Number 27?

23             PROSPECTIVE JUROR:  I've been married since I was --

24    since 2019.  Between my wife and I, we have five boys, ages 13

25    to 22.  I'm an electrical engineering technologist from Purdue.

1    I work -- I do HVAC systems engineer, so.

2            THE COURT:  And in your spare time, with those five

3    sons?

4            PROSPECTIVE JUROR:  Fishing.  We like to smoke meat:

5    Ribs, pulled pork, things like that.

6            THE COURT:  Okay.  Thank you.

7            Number 26?

8            PROSPECTIVE JUROR:  Married 27 years, two boys, 30 and

9    24.  And I work for Liberty Mutual in IT.  I've been there 12

10    years.

11            THE COURT:  What do you do in your spare time?

12            PROSPECTIVE JUROR:  Golf and travel.

13            THE COURT:  Okay.  Thank you.

14            Number 25?

15            PROSPECTIVE JUROR:  I've been married three years,

16    welcomed our first little one in April.  I work for an outdoor

17    service company locally in sales and business administration,

18    kind of a whole slew of things.

19            THE COURT:  Okay.

20            PROSPECTIVE JUROR:  Hang out with family.  I have got

21    a niece and a nephew and our little seven-month-old.

22            THE COURT:  Thank you, sir.

23            And Number 23?

24            PROSPECTIVE JUROR:  I've been at my job 36 years.  I'm

25    in the middle of a divorce.  I have three children, six

1    grandchildren, and a great granddaughter.  And I enjoy zumba

2    and line dance.

3              THE COURT:  And are you working?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  What kind of work do you do?

6              PROSPECTIVE JUROR:  Finance grants.

7              THE COURT:  Finance grants.  Thank you, Number 23.

8              And if you would pass the mic behind you to 32.

9              PROSPECTIVE JUROR:  Married, six kids, 12 grandkids,

10   two great grandkids.  Retired from a utility company.  I was an

11   operations manager.  I like to hunt, ride motorcycles in my

12   spare time.

13             THE COURT:  Okay.  Thank you.

14             And last but not least, Number 34?

15             PROSPECTIVE JUROR:  I've been married 31 years.  I

16   have a son, 27; a daughter, 26.  I have two granddaughters.  I

17   found out on Thanksgiving that my son is going to have another

18   grandchild, so I'm excited about that.  And I farm on the side,

19   and I'm a service manager at a truck shop.  So I like spending

20   my spare time with my grandkids.

21             THE COURT:  Sound good.  Thank you.

22             All right, Ladies and Gentlemen, is there any other

23   reason, not already covered in any of my questions, that any

24   member of this panel might have for not being able to sit as a

25   juror in this case, to listen to the evidence that comes from

1    the witness stand, listen to the instructions that the Court

2    will give you, follow those instructions, and give both of

3    these parties a fair and impartial trial?  Any reason other

4    than what we've already talked about?

5            Okay.  Plaintiffs?

6            MR. MacGILL:  No questions, Your Honor.

7            THE COURT:  Okay.

8            You only have one minute, but we'll give you two.

9            MR. BRIAN:  I'll be very brief, then.

10            Hello, everybody.  I've got to be very short.  I think

11    you all heard my questions earlier, I hope, but I do want to

12    ask you the question about the company, the individual versus

13    the company.  Obviously that's where we are.  We have two

14    individuals suing big companies.  Any of you feel that the

15    individuals start ahead in that sort of dispute?

16            Okay.  Has -- have any of you ever had a -- because of

17    a -- and I don't mean to pry into the specifics, but any

18    illness, anxiety, distress, ever had to take off, you know,

19    three or four months of work?  Anything like that?  Okay.

20            Yes.  Go ahead.

21            THE COURT:  Hold on, we have got to give him the mic.

22            PROSPECTIVE JUROR:  Sorry.

23            THE COURT:  That's okay.

24            PROSPECTIVE JUROR:  I had a minor stroke when I was --

25    I guess it's been 2018 is when it happened.  It affects my

1  speech a little but...

2          MR. BRIAN:  Your speech is great.

3          PROSPECTIVE JUROR:  Other than that -- thank you.  It

4  was quite a recovery, but apart from that, no side effects from

5  it.

6          MR. BRIAN:  Last question.  Does any of you have any

7  health issue or things going on at work or things going on at

8  home that could affect your ability to concentrate and give

9  both sides the attention they deserve?  Any of you?

10         Thank you.  Nothing further.

11         THE COURT:  Okay.  All right, lawyers, you may -- do

12  you have any challenges for cause?

13         MR. MacGILL:  None from plaintiff, Your Honor.

14         MR. BRIAN:  No, Your Honor.

15         THE COURT:  You may issue any peremptory challenges.

16         MR. MacGILL:  Your Honor, one administrative question.

17  Are we seating eight total?

18         THE COURT:  We're going to pick one more person.

19         MR. MacGILL:  One more?  Thank you.  And we start from

20  the right?

21         THE COURT:  Yes.

22         MR. MacGILL:  Thank you.

23         MR. BRIAN:  Your Honor, may I just use the equipment

24  briefly?

25         THE COURT:  Yes.

1    (Bench conference on the record.)

2        MR. BRIAN:  Just -- can you hear me, Your Honor?

3        Can you hear me?

4        I just have a quick point of clarification.  We

5    exercised three peremptories.  Are we done?

6        Thank you.

7                    **(In open court.)**

8        THE COURT:  And, lawyers, your mics are still on, so

9    we can hear your whispering.

10       Okay.  ▮▮▮▮▮▮▮, you are on the jury.  And everyone

11   else, thank you very much for coming in.  That's Number 25.

12   Everyone else, thank you for coming in.  We do not need your

13   services today and you have fulfilled your jury duty for the

14   federal court system for two years.  You may be excused.

15       All right.  And you may be seated.  We're going to

16   bring in the rest of the jurors and then I'll get them sworn

17   in.

18       COURTROOM DEPUTY:  All rise.

19   (Jury in at 11:18.)

20       THE COURT:  Everyone may be seated except the Ladies

21   and Gentlemen of the jury.  I want you to remain standing and

22   raise your right hands.  I'm going to get you sworn in.  And

23   you can move down so you don't have to sit close to each other.

24   We have plenty of space.  Okay.  And everyone can have their

25   own screen, I think.  Okay.  All right.  And if you would raise

1    your right hand.

2        (The jury is sworn.)

3           THE COURT:  All right.  You may be seated.

4           And so, Ladies and Gentlemen, the hour is early, it's

5    just 11:20.  So I'm going to send you to your jury room for

6    about five minutes and then we're going to have you come back

7    in and you're going to get your preliminary instructions on the

8    law and you're going to hear the opening statements of counsel,

9    where they will tell you what they expected the evidence will

10   be, and then we're going to send you to lunch.  So we'll have

11   you back in the courtroom in just a few.

12           COURTROOM DEPUTY:  All rise.

13       (Jury out at 11:19.)

14           THE COURT:  Okay.  Lawyers, take about three minutes,

15   get set up for your opening statements.  After I read the

16   preliminary instructions, then you can give your opening

17   statements.

18           And I'll give you a ruling -- I left my sheet of paper

19   in the office.  I'll give you a ruling on the outstanding

20   matters as soon as I get back in here.  So take about three

21   minutes to get set up.

22           MR. BRIAN:  I suppose it doesn't matter, but the

23   people who had been in the front row are now in the back row.

24   It doesn't matter to us, but does it matter to Your Honor?

25           THE COURT:  No.  So they should be seated --

1    COURTROOM DEPUTY:  I'll give them a seating chart, it

2    just takes me a minute to put it together.

3    THE COURT:  All right.  So Sarah doesn't have them

4    seated the way they will be seated, but we'll get them seated

5    appropriately.

6    MR. BRIAN:  Okay.  I was visualizing who they are.

7    THE COURT:  Right.  And that's why I put them back

8    like they should be; okay?  All right.  Anything else,

9    plaintiffs?

10    MR. MacGILL:  No, Your Honor.

11    THE COURT:  We'll see you in about three minutes.

12    MR. MacGILL:  Thank you.

13    (Recess at 11:20, until 11:29.)

14    THE COURT:  We are back on the record.  And, lawyers,

15    this morning the defendants did raise two issues regarding

16    plaintiffs' expected damages evidence.

17    First, the defendants argued that Ms. Bowling should

18    not be allowed to offer evidence that her pre-existing multiple

19    sclerosis was caused or exacerbated by the film.  This issue

20    was already addressed in my ruling on defendants' Motion in

21    Limine No. 12, which is at Docket 394.  And based on that

22    ruling, plaintiffs have represented that they will not offer

23    any evidence that Ms. Bowling's pre-existing MS was caused or

24    exacerbated by the film.

25    Second, defendants argued that Ms. Kennard should not

1    be allowed to offer testimony about her post-film diagnosis of

2    post-traumatic stress disorder.  Defendants argued that

3    Ms. Kennard's diagnosis is not relevant without any expert

4    causation testimony, and it would be improper for the jury to

5    draw a causal inference without expert testimony.

6         In response, plaintiffs state that they only intend to

7    ask Ms. Kennard whether she was diagnosed with PTSD in May of

8    2023.  Plaintiffs also argue that one of the defendants'

9    experts will testify that some of Ms. Kennard's emotional

10   damages are attributable to her PTSD rather than the film.  So

11   the plaintiffs argued that Ms. Kennard should be allowed to

12   testify about her diagnosis.

13        The Court does agree with the defendants that

14   Ms. Kennard may not testify about her post-traumatic stress

15   disorder diagnosis.

16        The Seventh Circuit's decision in Higgins versus Koch

17   Development Corp. is instructive.  Indiana law makes clear that

18   questions of medical causation of a particular injury or

19   questions of science, necessarily, depended on the testimony of

20   physicians and surgeons learned in such matters.

21        This comports with our decision -- their decision in

22   Meyers where it was made clear that when there is no obvious

23   origin to an injury and it has multiple potential etiologies,

24   expert testimony is necessary to establish causation.  Without

25   an expert, a plaintiff in such a complex case would be free to

1    prove allegation by relying on the logical fallacy of saying

2    that because effect A happened at some point after alleged

3    cause B, the alleged cause was the actual cause.

4           And unlike damages, with an obvious cause, such as a

5    broken leg caused by a car accident, a complex condition like

6    Ms. Kennard's PTSD requires expert testimony to establish

7    causation.  Allowing Ms. Kennard to testify about her diagnosis

8    and the date of her diagnosis would risk an improper inference

9    that the film caused her PTSD.

10          Defendants may still offer expert testimony that

11   Ms. Kennard's emotional damages are attributable to her PTSD

12   instead of the film, because that evidence speaks to the cause

13   of Ms. Kennard's damages, not the cause of her PTSD.

14          So those are the Court's rulings on that issue.

15          And so we're going to bring the jury in.  I'll give

16   them their preliminary instructions on the law, and then we'll

17   go straight into your opening statements.  And, Counsel, you

18   have up to 30 minutes each, so we will be running the clock for

19   you.

20          You may bring in the panel.

21          COURTROOM DEPUTY:  All rise.

22      (Jury in at 11:36.)

23          THE COURT:  Ladies and Gentlemen of the Jury, at this

24   time, I am going to give you your preliminary instructions on

25   the law.  You may sit back and listen or you can follow along

1    on your screens.

2            Ladies and Gentlemen, now that you have been sworn, we

3    are about to begin the trial of the case you heard about during

4    jury selection.  Before we begin the trial, I will first give

5    you preliminary instructions that may help you understand what

6    will be presented to you and how you should conduct yourself

7    during the trial.

8            One of my duties is to decide all questions of law and

9    procedure.  From time to time during the trial, and at the end

10   of the trial, I will instruct you on the rules of law that you

11   must follow in making your decision.  You should not take

12   anything I may say or do during the trial as indicating of what

13   I think the evidence or what your verdict should be.

14           The matter to be tried is a civil case.  The

15   plaintiffs, Sarah Bowling and Lori Kennard, are suing the

16   defendants, Netflix, Inc. and Netflix Worldwide Entertainment,

17   collectively referred to as Netflix, and Realhouse Productions,

18   referred to as Realhouse.

19           The plaintiffs, Sarah Bowling and Lori Kennard, have

20   sued the defendants, Netflix and Realhouse, on claims of

21   invasion of privacy.  Each plaintiff claims that Netflix and

22   Realhouse publicly disclosed private facts in connection with

23   the release of the documentary named *Our Father*.  Each

24   plaintiff must prove this claim and any claim for compensatory

25   damages by the greater weight of the evidence.

1    Each plaintiff also claims she is entitled to an award

2  of punitive damages because defendants engaged in willful and

3  wanton misconduct or acted maliciously, fraudulently, or with

4  gross negligence.  Each plaintiff must prove this punitive

5  damage claim by clear and convincing evidence to recover

6  punitive damages.

7    The defendants, Netflix and Realhouse, deny each of

8  the plaintiffs' claims.  Defendants are not required to

9  disprove plaintiffs' claims.

10    The evidence consists of the testimony of the

11  witnesses, the exhibits admitted in evidence, and any facts

12  that I may instruct you to find or the parties may agree or

13  stipulate to.  A stipulation is an agreement between both sides

14  that certain facts are true.

15    During the trial, you may hear me use terms that you

16  have heard before.  I will briefly explain some of the most

17  common terms to you.  The party who files a case is called the

18  plaintiff.  In this action, the plaintiffs are Sarah Bowling

19  and Lori Kennard.

20    The party being sued in a case is called the

21  defendant.  In this action, the defendants are Netflix, Inc.

22  and Netflix Worldwide Entertainment and Realhouse Productions.

23    You may hear me refer to counsel.  Counsel is another

24  way of saying lawyer or attorney.  I will sometimes refer to

25  myself as the Court.

1        When I sustain an objection, I am excluding that
2   evidence from the trial for a legal reason.  When you hear that
3   I have overruled an objection, I am permitting that evidence to
4   be admitted.  When I say "admitted into evidence" or "received
5   into evidence," I mean that the particular statement or
6   particular exhibit may be considered by you in making the
7   decisions that you must make at the end of this case.

8        You will have to decide whether the testimony of each
9   of the witnesses is truthful and accurate in part, in whole, or
10  not at all.  You also have to decide what weight, if any, you
11  give to the testimony of each witness.

12       You have two duties as a jury.  Your first duty is to
13  decide the facts from the evidence in the case.  This is your
14  job and yours alone.  Your second duty is to apply the law that
15  I give you to the facts.  You must follow these instructions
16  even if you disagree with them.  Each of the instructions is
17  important and you must follow them all.

18       Perform these duties fairly and impartially.  Do not
19  allow sympathy, prejudice, fear, or public opinion to influence
20  you.  You should not be influenced by any person's race, color,
21  religion, national ancestry, or sex.

22       You may have heard the terms "direct evidence" and
23  "circumstantial evidence."  Direct evidence is evidence that
24  directly proves a fact.  Circumstantial evidence is evidence
25  that indirectly proves a fact.

1            For example, direct evidence that it was raining

2    outside is testimony by a witness that it was raining.

3    Circumstantial evidence that it was raining outside is the

4    observation of someone entering a room carrying a wet umbrella.

5    You are to consider both direct and circumstantial evidence.

6    The law does not say that one is better than the other.  It is

7    up to you to decide how much weight to get any evidence, either

8    direct or circumstantial.

9            You should use your common sense in weighing the

10    evidence and consider the evidence in light of your own

11    observations in life.  In our lives, we often look at one fact

12    and conclude from it that another fact exists.  In law, we call

13    this inference.  A jury is allowed to make reasonable

14    inferences.  Any inference you make must be reasonable and must

15    be based on the evidence in the case.

16            The following things are not evidence and you must not

17    consider them as evidence in deciding the facts of this case:

18    the attorneys' statements; arguments; questions and objections

19    of the attorneys; any testimony that I instruct you to

20    disregard; and anything you may see or hear when the Court is

21    not in session, even if what you see or hear is done or said by

22    one of the parties or by one of the witnesses.

23            Furthermore, a particular item of evidence is

24    sometimes received for a limited purpose only.  That is, it can

25    be used by you only for one particular purpose and not for

another purpose.  I will tell you when that occurs and instruct you on the purposes for which the item can and cannot be used.  You should also pay close -- particularly close attention to such an instruction because it may not be available to you in writing later in the jury room.

From time to time during the trial, I may be called upon to make rulings of law on objections or motions made by the lawyers.  You should not infer or conclude from any ruling or other comment I may make that I have any opinions about how you should decide this case.

And if I sustain an objection to a question that goes unanswered by a witness, you should not guess or speculate about what the answer might have been and you should not draw any inferences or conclusions from the question itself.

At times during the trial, it may become necessary for me to talk with the lawyers out of your hearing by using the listen/talk devices or by calling a recess.  We meet because often during a trial something comes up that does not involve the jury.  We will, of course, do what we can to keep the number and length of these conferences to a minimum.  But you should remember the importance of the matter you are here to determine, and your patience is appreciated.

Any notes you take during this trial are only aids to your memory.  The notes are not evidence.  If you do not take notes, you should not -- you should rely on your independent

1    recollection of the evidence and not be unduly influenced by

2    the notes of other jurors.  Notes are not entitled to any

3    greater weight than the recollections or impressions of each

4    juror about the testimony.

5           When you leave the courthouse during the trial, your

6    notes should be left in the jury room.  When you leave at

7    night, your notes will be secured and not read by anyone.  At

8    the end of the trial, your notes will be destroyed and no one

9    will be allowed to read the notes before they are destroyed.

10          Pay close attention to the testimony as it is given.

11   At the end of the trial, you must make your decision based on

12   what you recall of the evidence.  You will not have a written

13   transcript to consult.

14          You may submit questions to witnesses to clarify their

15   testimony during trial under certain conditions.  If you feel

16   the answer to your questions would be helpful in understanding

17   this case, you should raise your hand after the lawyers have

18   completed their examinations, but before the witness is

19   excused.

20          I will have you write your question and hand it to the

21   clerk.  I will then privately confer with the lawyers about the

22   question and make a ruling on whether the law allows the

23   question to be asked of that witness.  If the question is of

24   the type that is allowed, I will address the question to the

25   witness.

1          Please do not speak directly to me, the plaintiffs,

2    the lawyers, the defendants, or the witnesses, but carefully

3    follow this procedure if you wish to have a specific question

4    addressed by a witness.

5          During the trial, I may sometimes ask a witness

6    questions.  Do not assume that because I ask questions I hold

7    any opinion on the matters I ask about or on how the case

8    should be decided.

9          I am now going to discuss several rules of conduct

10   that you must follow as jurors.  First, you should keep an open

11   mind throughout the trial.  Do not make up your mind about what

12   your verdict should be until after the trial is over, you have

13   received my final instructions on the law, and you and your

14   fellow jurors have discussed the evidence.

15         Your verdict, in this case, must be based exclusively

16   on the law as I give it to you and the evidence that is

17   presented during the trial.  For this reason and to ensure

18   fairness to both sides in this case, you must obey the

19   following rules.  These rules apply both when you are here in

20   court and when you are not in court.  They apply until after

21   you have returned your verdict in the case.

22         One, you must not discuss the case, including anyone

23   who was involved in the case, among yourselves until you go to

24   the jury room to deliberate after the trial is completed.

25         Two, you must not communicate with anyone else about

1    this case, including anyone who was involved in the case, until

2    after you have returned your verdict.

3            Three, when you are not in the courtroom, you must not

4    allow anyone to communicate with you about the case or give you

5    any information about the case or about anyone who was involved

6    in the case.  If someone tries to communicate with you about

7    the case or someone who was involved in the case, or if you

8    overhear or learn any information about the case or someone

9    involved in the case when you are not in the courtroom, you

10   must report this to me promptly.

11           Four, you may tell your family and your employer that

12   you are serving on a jury so that you can explain that you have

13   to be in court.  However, you must not communicate with them

14   about the case or anyone who was involved in the case until

15   after you have reached your verdict.

16           Five, all of the information that you will need to

17   decide the case will be presented here in court.  You may not

18   look up, obtain, or consider information from any outside

19   source.

20           There are two reasons for these rules.  First, it

21   would not be fair to the parties in the case for you to

22   consider outside information or communicate information about

23   the case to others.  Second, outside information may be

24   incorrect or misleading.

25           When I say that you may not obtain or consider any

information from outside sources and may not communicate with

anyone about the case, I am referring to any and all means by

which people communicate or obtain information.  This includes,

for example, face-to-face conversations, looking things up,

doing research, reading, watching, or listening to reports in

the news media, and any communication using any electronic

device or media, such as a telephone, cell phone, tablet,

computer, the Internet, text messaging, e-mails, chatrooms,

blogs, social networking web sites like Facebook, YouTube, X,

Instagram, LinkedIn, or any other form of communication at all.

        If you hear, see, or receive any information about the

case by these or any other means, you must report that to me

immediately.

        The trial will proceed in the following manner:

First, plaintiffs' attorney will make an opening statement.

Next, defendants' attorney will make an opening statement.  An

opening statement is not evidence but is simply a summary of

what the attorney expects the evidence to be.  After the

opening statements, plaintiffs will call witnesses and present

evidence.  Then defendants will have an opportunity to call

witnesses and present evidence.  After the parties' main cases

are completed, plaintiffs may be permitted to present rebuttal

evidence and defendants may be permitted to present surrebuttal

evidence.  After the evidence has been presented, the attorneys

will make closing arguments and I will instruct you on the law

1    that applies to the case.  After that, you will go to the jury

2    room to deliberate on your verdicts.

3              Thank each of you for your patience and attention.  We

4    will now hear the opening statements from the plaintiffs' and

5    then the defendants' lawyers.

6              And at this time, Plaintiffs' counsel, you may make

7    your opening statement.

8                    **OPENING STATEMENT BY**:

9              MR. MacGILL:  May it please the Court, Your Honor;

10   counsel; ladies and gentlemen of the jury.

11             As I introduced myself earlier, I'm Rob MacGill.

12   I'm one of the lawyers representing the plaintiffs in this

13   case.  And what I'd like to do is do just what the Judge said,

14   and that is to give you an overview of the evidence that we

15   expect to be produced to you here from the witness stand and

16   through the documents.  But maybe I can start with giving you a

17   little bit of an outline of what I'd like to share with you

18   here in this opening statement.

19        First, I'd like to cover what happened, and you get some

20   indication and some overview of that from the Court and what

21   our judge told us about, but let me give you a little bit more

22   detail.

23        Our clients, Sarah Bowling and Lori Kennard, each took a

24   genetic test, and they took a genetic test for their own

25   reasons that you will hear about in this evidence in this case.

1  And they got test results about their genealogy, their

2  background, and they found, each of them, that they had 40-plus

3  siblings.

4      What was significant, according to the evidence, I think,

5  that you'll hear in this case, is that Dr. Cline, a local

6  fertility doctor, used his own semen on many women in his

7  fertility practice, and he did so for the period of years 1974

8  to 1987.  The women did not know or consent to Dr. Cline as

9  their sperm donor.  Dr. Cline, the evidence will show, fathered

10 more than 90 children, and those children did not know that he

11 was their father.  His medical license was revoked.

12     Now, as you've heard, Netflix and Realhouse decided to make

13 a movie about this.

14     And a couple things, just to give you an orientation to

15 some of the evidence that you're going to hear.  At the left

16 side of your screen, you will see this is a promotional tweet

17 that is sent, and this comes from Blumhouse specifically on

18 April 14th about six weeks before the movie came out.

19     We've got the chills.  The unimaginable rocked this small

20 town by revealing over 90 siblings and counting...watch as one

21 fertility doctor's sinister secret unfolds in #OurFather, on

22 @Netflix May 11.

23     And you can see the promotional efforts and the

24 circumstances, according to the evidence that you're going to

25 hear.  You can see that Jason Blum -- after the movie was

1    distributed on the Netflix network, that it was the number one

2    movie on Netflix.

3        Now, a little bit about our plaintiffs.  You've heard and

4    you will hear the evidence in this case that our clients did

5    not consent, did not consent to the use of their names or their

6    pictures in this movie.

7        Mrs. Bowling, pictured here with her husband and her three

8    boys, never gave consent to her name or her image being used in

9    this movie, associating her with Dr. Cline.  You will hear her

10   describe how she's been affected.  You will hear her describe

11   emotional injuries.  You will hear her describe how this has

12   impacted her relationship with her family and how it's impacted

13   her in her community here in Indianapolis.

14       One of our other clients, Ms. Kennard, is pictured here

15   with her twins at their school with her husband, and one of her

16   twins here on the right side of the picture.  The same

17   circumstances.  Ms. Kennard did not consent, did not consent to

18   the use of her name in the movie.  She will testify and

19   describe how she has been affected emotionally from these

20   circumstances.  She will talk about how it's affected her in

21   terms of her relationships with her family and also her

22   community standard.

23       Now, Mrs. Bowling's community is in Indianapolis and

24   largely, you'll hear, centers on her children, her family, her

25   church, and her school.

1    Mrs. Kennard is a teacher, and she's going to be able to

2    describe what her community is in her testimony, and she's

3    going to be able to describe that her community -- a little

4    different.  It's in Brownsburg, one.  But, two, her community

5    involves an employer, it involves the community that she

6    interacts with, which is school children and families, and

7    she'll describe her social relationships.

8    Now, the next thing I want to share with you is one of the

9    topics you're going to hear evidence on in terms of the names

10   and the use of the names by Netflix in the movie.

11   You're going to hear evidence, specifically, from the *Our*

12   *Father* artist and producer of that movie.  And we had a chance

13   to ask him -- and you'll hear very early in our case -- the

14   following questions and answers from Mr. Petrella, the person

15   who produced this movie.

16   The question was: You didn't need to have Sarah Bowling's

17   name in the film in order to have the impact and artistic value

18   that you were seeking to deliver; right?

19   And his answer: Correct.

20   And it's also true that Lori Kennard, you didn't need her

21   name and identity to have the artistic effect and impact that

22   you were seeking from this film; is that right?

23   And his answer: Yes.

24   Now, what about these -- what about the disclosure and

25   whether or not these were facts that were private, that were

1    private to the plaintiffs?  Let's talk about that type of

2    evidence.  Were these facts private and who knew what, in terms

3    of the requests, that these facts, the secret children facts,

4    be left private?

5        We are going to show you evidence that involves about 13

6    different months of activities involving the producer,

7    Realhouse, and involving the companies, Netflix, 13 months of

8    exchanges.

9        But before we start, one thing I want to share with you.

10   When these secret children learned of the fact that Dr. Cline

11   was their father, many of them decided to create a private and

12   a secret Facebook group, and you will see in the evidence in

13   this case -- and I've shown you a portion of that Facebook

14   exchange -- that is, these secret siblings decided that they

15   would have a group that was private, more specifically, secret.

16   The information shared amongst these people in the two groups

17   are not to be shared with anyone outside these groups at any

18   time.  So that's the private Facebook group.

19       Now, what happened for 13 months?  What happened

20   thereafter?  Well, we can go through some details here that at

21   the end of the case you might find important as you make your

22   evaluations.

23       First, we've got some information here that comes directly

24   from Alexandra Reed, and Ms. Reed is the Realhouse production

25   executive that was involved in producing this movie.  And this

1    is an e-mail.  And we're going to focus, initially, on the year

2    2020.  And this e-mail, in particular, is on August 21st, and

3    she writes, in pertinent part, the first line there: Many of

4    the half-siblings involved have spoken publically about the

5    results of their DNA tests and their experiences.

6        Then she continues, the production executive at Realhouse:

7    But we will not include any information about any of the

8    siblings without a signed release form, release from them.

9        And later she continues: We will not include any personal

10   information about people's inception or newfound knowledge

11   without their permission.

12       Again, you'll find, I think, based on the evidence that you

13   will hear, we won't include any personal information about the

14   various circumstances that are at the focus of this case.

15       Now, as the year 2020 continued, what was being exchanged,

16   what's being further exchanged, well, here's Ms. Reed again

17   being e-mailed by Mr. Kyle Clancy, and Mr. Clancy e-mails

18   Ms. Reed and says: We may want -- they may want to see a final

19   legal opinion prior to airing to assess the defamation privacy

20   risks associated with this project.

21       So focus -- you may find there was a focus as early as

22   August 28, 2020, on defamation and privacy risks.

23       So what else happened in 2020?  And the screen has gone

24   blank because you'll hear this testimony, you won't see it so

25   much but you'll hear testimony, from our client, Lori Kennard

1  that she contacted, directly, Realhouse and confirmed that she

2  wanted to remain anonymous.  She will testify to that here in

3  the courtroom, and you will hear her describe what she

4  testified -- or what she requested.

5      Now, there are further communications that you may find

6  important as you make your analysis and evaluation of this

7  case, and this is a Facebook message from Mr. Petrella, who we

8  talked about earlier, when he confirmed, for his part, names

9  were not necessary.  Well, here's what he wrote, and

10  specifically, he writes in this Facebook message to one of our

11  clients.  You can see Mrs. Bowling is referenced there.  And

12  then here's what Mr. Petrella said in the second line that

13  we've highlighted.  Mr. Petrella: You will not be identified

14  unless you've already given us explicit permission to do so.

15  And that is April 26, 2021.

16      Well, what else happened?  What will you hear in the

17  evidence in terms of what else happened during the year 2021?

18      In 2021, we also see this is an e-mail, you can see, from a

19  gentleman by the name of Mr. Nathan Rotmensz, and he writes

20  with respect to this -- and just to back up a minute,

21  Mr. Rotmensz -- his role is he was in Realhouse's -- he was one

22  of Realhouse's post-production supervisors.  So what he says

23  for his part: All sensitive information i.e. e-mail devices,

24  names, physical addresses, will be blurred.  That according to

25  Realhouse's post-production supervisor.

1        So what else happens during this year of 2021?  Well, as

2    the summer approaches, we see more correspondence involving

3    Lucie Jourdan.  Now, this is Mrs. Jourdan.  You're going to

4    hear in the evidence in this case specifically, her role was

5    she was the movie, *Our Father* film -- she was the director.

6    And so what she said, again focusing on July 16, 2021: As all

7    the siblings at this juncture want to remain anonymous, et

8    cetera, et cetera, we can just use the standard female, et

9    cetera, icons.  Again, all the siblings at this juncture want

10   to remain anonymous.

11       Well, as 2021 continues, the director, Lucie Jourdan, again

12   communicates about this, and now she confirms what Mrs. Kennard

13   is going to testify to, is that she wanted to remain anonymous.

14   So what the director says specifically here, too: We need to

15   blur the following names and pic, Lori Kennard.

16       So that's the e-mail that occurred that we wanted to make

17   mention of in terms of private facts and what happened in the

18   year 2020 and the year 2021.

19       Now, turning to the next topic, I want to share with you

20   what happened with respect to this film and what was included

21   in this film, and you'll hear this from the evidence in this

22   case.  But Sarah Bowling's name and picture was included in

23   this film.

24       You'll also hear some things -- and this will be read, I

25   believe, at the outset of our presentation -- certain

 1   statements and confirmations from Netflix, and here they are.

 2       Netflix does not contest that plaintiff, Lori Kennard's,

 3   name appeared briefly in the documentary.

 4       Additionally, Realhouse does not contest that plaintiff,

 5   Lori Kennard's, name appeared briefly in the documentary.

 6       Netflix for its part, Netflix admits that it did not have

 7   written permission from Sarah Bowling or Lori Kennard to

 8   publish their names.

 9       Realhouse for its part, Realhouse admits that it did not

10   have written permission from Sarah Bowling or Lori Kennard to

11   publish their names.

12       Now, in terms of -- coming back to Ms. Shapiro for a

13   minute, there were different communications, internal

14   communications that we'll show you, and you can imagine that

15   with a movie like this, there are promotions of it, and there's

16   a plan like this exhibit, you're going to receive into

17   evidence, Exhibit 316, and this is an exhibit that you may

18   decide you want to take some time to review carefully.

19       But as they promoted this, there was a plan and they

20   promoted this with various documents, but also some exchanges.

21   And she said, hey, as Ms. Shapiro did her work and she began to

22   think about how this was going to go forward, she was

23   explaining to her, to the people involved: Well, hey, we have a

24   super creepy new documentary film full of twists and turns.

25   Continuing you can see as they investigate their bizarre

1    beginnings, they uncover a sinister motive for Dr. Cline's

2    actions beyond their imagination.  It feels like a horror film.

3        Well, as the company, as it works through its plan to

4    publish this and to confirm the realities of what they want to

5    promote, they have further exchanges about what types of

6    conversation themes they want to have.  And here are some more

7    examples in this particular exhibit.  The jaw dropping chilling

8    subject matter, referenced here.  Viewers were left with

9    disgust for the actions of Cline and further horrified, et

10   cetera.  People shared personal connections to the story

11   through similar experience, a connection to the case for

12   expressing sympathy by imagining themselves in a situation that

13   would be a worst fear.

14       Now, I mentioned to you a minute ago that there are some

15   communications and there are some internal documents that you

16   may want to evaluate in your deliberations, and there are a

17   couple -- there are a couple of them, you know, and you'll hear

18   about this in the evidence in the case, but there's Exhibit 96

19   and there's Exhibit 316 that you may decide, as you hear the

20   evidence or as you deliberate about the evidence, that these

21   are especially important in terms of what Netflix knew or what

22   Netflix and Realhouse expected in terms of the effects of the

23   film.  That will be up to you.  This will be your decision to

24   make, but you can look at these documents as you see fit as the

25   case progresses, but there are some things I wanted to share

1   with you, specifically.

2       Here's what Netflix had to say, and this is in this

3   document, 96, that I referred to.  And what it says here in

4   pertinent part in terms of challenges and opportunities for

5   this movie, Netflix says the documentary is not only

6   traumatizing for the children of Dr. Cline, but also equally so

7   if not more for the mother's parents.  The document is not only

8   traumatizing for the children of Dr. Cline.  Well, those are,

9   we think you'll find that the evidence, those are express

10  references to an understanding of what the disclosures here

11  involved, but that will be up to you.

12      Now, some other details here in the internal documentation

13  of Netflix and what they understood for their part, and

14  Realhouse understood for their part, is that this film, and

15  let's look at the words here, this film, here's what this says

16  in pertinent part.  With care to avoid shock value or making

17  light of triggering events.  The stories of Jacoba, one of the

18  secret children and so many others will serve as the foundation

19  for an exposure campaign.  Now, we'll ask you to make an

20  analysis of whether the prediction of the statement or you may

21  find it to be an acknowledgment by Netflix, that this is going

22  to be a triggering event.  We'll ask you to evaluate emotional

23  outcomes in our client and see if it was in fact a triggering

24  event.

25      Now, a couple other details I want to share with you in

1    terms of these documents that will come into evidence.  These

2    internal documents, Netflix, for its part, was summarizing what

3    Facebook reels might involve, what Netflix film copy might

4    involve, and with respect to Facebook, here's what they said

5    with respect to what the expectation was:  Facebook reels post

6    copy, you can see it here, someone really didn't want their,

7    someone didn't want their secret getting out, huh?  Well, their

8    is referring to -- you'll evaluate who they're referring to

9    when they say their, and they continue:  Well, now the secret

10   is out.

11       So, Ladies and Gentlemen, in terms of the -- these

12   disclosure -- the disclosure of these facts and circumstances,

13   there are some additional details that we wanted to share with

14   you that you may find important as you get through this.

15       So just shared with you some of the evidence that you're

16   going to hear in terms of the disclosure consequences as a

17   result of this, but there are a couple of details that you may

18   also find important as the case progresses, and specifically,

19   you may find that there was an extraordinary amount of

20   publicity associated with this, and you'll hear in the evidence

21   in this case that Exhibit 78, this is a photo of a Times Square

22   promotional effort, I should say, by Netflix.

23       In addition, you're going to hear evidence in this case

24   that the company Netflix, after being notified that these names

25   were included, removed, at least initially removed a reference

*OPENING STATEMENT / MACGILL*                      Vol 1-119

1    to Sarah Bowling's name and removed a reference to Lori

2    Kennard's name, removed a reference.  And by the time they had

3    done the removal, 18 million Netflix subscribers had streamed

4    the movie with Sarah's name in it, 14 million Netflix

5    subscribers had streamed the movie with Lori's name on it.

6        Now, with respect to these circumstances, what you're going

7    to find, also, is that there will be evidence from us on

8    disclosure and who saw it and the practical circumstances, and

9    we'll bring you a couple of witnesses of examples of people

10   that saw the documentary, essentially at the same time it came

11   out, or at the same time it came out, the day one.

12       Sarah's therapist, Amy Strobel, you will hear testimony,

13   how did you discover that Sarah's name was in the documentary?

14   I saw it.  And did you know that Sarah's name was it in it

15   before you watched it?  No.

16       With respect to Sarah Sexson, you will hear a high school

17   acquaintance from one of the -- from one of the secret children

18   involved here, she remembered seeing Sarah's name in the movie

19   as she watched it, and despite not having talked to her friend

20   for many years, called her after seeing that particular movie.

21   We've seen the *Our Father* movie.

22       Now, what I'd like to talk to you about for a few minutes

23   is this topic of damages.  And this involves a, you know,

24   essentially, a timeline that I want to share with you, at least

25   by virtue of overview so you can begin to consider, you know,

1    what is the timing of these, you know, what happened, and what

2    were the effects at different points in time?

3        And on this timeline, which I'm going to fill out a little

4    bit, I'm going to share with you a date here, and this May 11,

5    2022, is the date that the film came out, and you're going to

6    hear reactions at the same time, from the day that this

7    occurred, you're going to hear the reactions that Mrs. Bowling

8    had and Mrs. Kennard had, and we're going to ask them about

9    that and ask them to walk you through these day-of texts; okay?

10   We're going to ask -- we're going to go through these.  Well,

11   what we would say for our part in terms of the evidence that

12   you're going to hear, is that Mrs. Bowling reacted on that day

13   with anger.  And, you know, you're going to -- we're going to

14   present these texts to you and you're going to see what you may

15   consider to be anger.

16       Now, you'll have a chance to see what she wrote on the day

17   that she saw the film, to her best friends, and you're going to

18   hear, and you're going to see, that there are some pretty rough

19   language there in terms of what she said to her two closest

20   friends.  You're also going to hear that she didn't write in

21   terms of the Queens English, so to speak.  There's some pretty

22   rough language in here.

23       Second, with respect to what she wrote at the time, she and

24   her friends are going to hear, did communicate, they did have a

25   favorite show called *Housewives of Atlanta*, and some of that

1    language, some of that phraseology from that show appears in

2    this text, but you'll hear all that.  We'll ask her about each

3    and every one of these.

4        Now, the evidence will show, also, that there was a

5    different reaction that Mrs. Kennard is going to testify, that

6    when she, and there are more texts here, but when she saw the

7    movie with her name in it, her reaction you may find is

8    different, denial and coping.  Not so much anger, not so much

9    harsh language, but denial and coping, but that will be for you

10   to consider.

11       Now, the same day, real time, here's what happened to me at

12   the time this film came out and I see that my name was in it;

13   okay?

14           THE COURT:  Now, counsel, you have a little less than

15   five minutes.

16           MR. MacGILL:  Thank you very much.

17           So, the evidence you're going to hear, they're going

18   to describe to you the different forms, Mrs. Bowling, of

19   emotional distress that she's incurred since the movie.  You're

20   also going to hear the different -- how their enjoyment of life

21   has been affected by these events.  You may decide that they

22   have been and will never be the same people after these events.

23   That will be up to you.

24           Two other things to cover, Ladies and Gentlemen.

25   You're going to hear that Netflix, I think we can predict

*OPENING STATEMENT / MACGILL*                    Vol 1-122

1    safely that Netflix is going to say we had a legal opinion in

2    September of 2021, more than six months before this came out, a

3    legal opinion from what they will say is a respected lawyer.

4    You may decide that that opinion wasn't up to date and that

5    opinion wasn't correct, but that will be up to you.  But one

6    thing about the opinion that is important to keep in mind.

7    That opinion was informed by the production company Realhouse.

8    And Realhouse took the responsibility for saying here's the

9    movie, here are the logs of what's in the movie, and can you --

10   can you clear this legally?  Can you clear this legally?

11        The clearance logs they gave him did not include the

12   name of Sarah Bowling.  The clearance log they gave him to

13   review did not include the name of Lori Kennard.  So he didn't

14   clear either name is what we think you'll see in the evidence.

15        Now, with respect to the questions involved in this

16   case, what we're going to ask is for you to review, just as

17   this Court instructed and asked and requires, for you to hear

18   all the evidence, but we have two things that we want to leave

19   you with here this morning in terms of what we think the

20   evidence will show.

21        We believe the evidence is going to show you that the

22   plaintiffs, pardon me, the defendants, Netflix and Realhouse,

23   disclosed private facts about each of our clients, that the

24   disclosure reached the public, that the defendants' disclosure

25   was highly offensive, and that the disclosure was not a matter

1   of public concern.

2            Second, we're going to ask, among other things in the

3   closing argument here, but at the end of this case to say, for

4   you to determine, for your part whether the defendants' conduct

5   here has been shown by clear and convincing evidence to show

6   that Netflix and Realhouse acted voluntarily and willfully and

7   with a reckless disregard of the consequences to Lori Kennard

8   and Sarah Bowling.

9            Again, thank you for your time and attention, Ladies

10  and Gentlemen.

11           THE COURT:  Thank you, Counsel.

12           All right, who is going to present on behalf of the

13  defendant?

14           MR. BRIAN:  Ms. Young is, Your Honor.

15           MS. YOUNG:  Your Honor may I have one minute?

16           THE COURT:  You may.

17           MS. YOUNG:  We're having some audiovisual issues, Your

18  Honor.  I apologize.

19           THE REPORTER:  Can you turn on your microphone,

20  please?

21           MS. YOUNG:  I'm sorry.  Yes.  So we have no audio.

22  So, it's not working.  I'm stuck here.  I apologize, Your

23  Honor.

24        (Off the record.)

25           MS. YOUNG:  Your Honor, it's important for us to show

1    some video in this.  Do you mind if we take a short break to

2    see if we can figure out our audiovisual issues?  I'm so sorry.

3              THE COURT:  Let's put on the equipment.

4              MS. YOUNG:  Yes.

5         (Bench conference on the record.)

6              THE COURT:  Plaintiffs' counsel, do you object if we

7    go ahead and send them to lunch and then come back and let them

8    do their opening?

9              MR. MacGILL:  No, Your Honor, we do not.

10             THE COURT:  Okay.  Very gracious of you to do that.

11                       (Open court.)

12             THE COURT:  Okay, Ladies and Gentlemen of the Jury,

13   I'm going to send you to lunch so that they can figure out

14   their IT issues.  The Court is going to admonish you, during

15   this period of time, that you're allowed to separate for lunch,

16   that you're not to have any discussion about the case among

17   yourselves or with anyone else.  If you see any of the

18   attorneys and all these people in the courtroom during the

19   lunch break and no one speaks to you, they're not being rude,

20   but they're under the same admonishment.  They're not allowed

21   to talk to you either.  If anyone should attempt to talk to you

22   about this matter, you should refuse and report that attempt to

23   your bailiff, Sarah, as your earliest opportunity.  Again,

24   don't do any research about the case or the parties in the case

25   or anything about this matter, and we'll have you back in your

 1    jury room at 1:15.  So a little less than an hour.  Make sure

 2    you get back in plenty of time because you have to go through

 3    security so that you are in your jury room at 1:15.  We've got

 4    a lot of work to do, we're going to finish in four days like I

 5    promised you.  Enjoy your lunch break.

 6            COURTROOM DEPUTY:  All rise.

 7        (Jury out at 12:22.)

 8            THE COURT:  Defendants, you've got to work out all of

 9    your IT kinks.  During the trial, you can't have this happening

10    either.  So get everything running smoothly because we're on a

11    tight time constraint during our trial so we want everything to

12    work smoothly.

13            MR. BRIAN:  Understood, Your Honor.

14            THE COURT:  All right.  So get your professional

15    people to get it all working.  We'll see you all at, you all be

16    here at 12:00.

17            MR. BRIAN:  You mean 1:00.

18            THE COURT:  Be here at 1:00 so we can start promptly

19    at 1:00 finish.  Have a good lunch break.

20            MR. MacGILL:  Thank you.

21            MR. BRIAN:  Thank you.

22        (Recess at 12:23, until 1:21.)

23            THE COURT:  We are back on the record.

24            And, Plaintiffs, are you ready for the jury?

25            MR. CIULLA:  Yes, Your Honor.

*OPENING STATEMENT/MS. YOUNG*                    Vol 1-126

1          MR. MacGILL:  We are, Your Honor.  Thank you.

2          THE COURT:  Defendants, did you get your technology in

3     order?

4          MS. YOUNG:  We did.  And thank you for letting us have

5     that opportunity.

6          THE COURT:  All right.  Are you ready for the jury?

7          MS. YOUNG:  Yes, Your Honor.

8          THE COURT:  You may bring in the panel.

9          COURTROOM DEPUTY:  All rise.

10     (Jury in at 1:23.)

11          THE COURT:  You may be seated. We are back on the

12     record.  Sarah Bowling and Lori Kennard, plaintiffs, versus

13     Netflix, Inc., Netflix Worldwide Entertainment, LLC, and

14     Realhouse Productions, LLC.

15          And, Ladies and Gentlemen of the Jury, I hope you had

16     a nice lunch break, and we're going to hear the opening

17     statement of defendants at this time.

18          MS. YOUNG:  Thank you, Your Honor.

19                    **OPENING STATEMENT BY**:

20          MS. YOUNG:  Millions of dollars for just one moment,

21     for showing information that wasn't actually even a secret.

22     That's what the plaintiffs are seeking in this case, millions

23     of dollars for just one moment.  And I want to show you what I

24     mean by playing you part of the documentary.  Let's take a

25     look.

1      (Video playing in open court.)

2           MS. YOUNG:  Did you see either of the plaintiffs'

3   names in that clip?  One of them was in there, Lori Kennard,

4   her name was in that clip for less than half a second.  Less

5   than half a second in a 97-minute long documentary, and that

6   split second is the one and only place in the whole film where

7   Lori Kennard's name appears.

8           You're going to see this document in the trial.  This

9   is Ms. Kennard, in her own words, talking about how hard it is

10  to see her name in the documentary.  She said to the average

11  viewer it isn't noticeable, unless you know what you're looking

12  for.

13          Now, Mr. MacGill told you that you're going to hear

14  from some people saying they saw the plaintiffs' names in the

15  documentary.  Those people were talking about Sarah Bowling.

16  You will not see any evidence like that about Lori Kennard.

17          What about Sarah Bowling?  Her name was in a different

18  part of the documentary.  It was scrolling on the screen for no

19  more than seven to eight seconds.  What you're seeing here are

20  screenshots.  We're going to show you the documentary in this

21  trial.  You'll see just how quickly those names go by.  And

22  you'll also hear all the testimony from the witnesses, not just

23  the things the lawyers are choosing to highlight for you in

24  their opening statements.  There will be testimony from two

25  people who will say they saw Sarah Bowling's name in the

1   documentary.  Those people will also say that they already knew

2   about Sarah Bowling's connection to Dr. Cline before the

3   documentary aired.  The evidence will show that they knew this

4   fact because Sarah Bowling's so-called secret was already out

5   there.  In fact, you'll see that Sarah Bowling shared her

6   connection to Donald Cline quite freely.

7           And there's another important thing that you will

8   learn.  The plaintiffs' names were removed from the documentary

9   after just 12 days.  When the defendants found out about the

10  plaintiffs' concerns, they blurred the names out of there, even

11  though that was not legally required and even though the names

12  were barely visible.

13          Members of the Jury, that is what this whole entire

14  lawsuit is about, seconds of footage containing information

15  that wasn't even a secret, that was visible for no more than

16  12 days.  That is what the plaintiffs are seeking millions of

17  dollars for.

18          So before we get further into the evidence, I'd like

19  to introduce myself.  My name is Blanca Young.  You heard from

20  my partner, Brad Brian, earlier during jury selection.  Seated

21  next to him at counsel table is Andrea Pierson, and we are

22  honored to represent Netflix and Realhouse.  We were joined

23  today by our clients.  We have Mindy LeMoine, sitting right

24  there in the front, for Netflix, and we have Gretchen Palek,

25  for Realhouse, here with us today.  And on behalf of all of us,

1    I want to thank you sincerely for the work that you're about to

2    do.  Your duty is very important.  You're going to be asked to

3    apply the law and we trust that you will follow the law and do

4    that faithfully and we thank you for your service.

5            So over the next few days, we will show you the

6    evidence in this case.  And it will show three important

7    things.  First, the evidence will show that the plaintiffs'

8    connection to Donald Cline was no secret.  The plaintiffs'

9    claim, in this case, is for invasion of privacy.  You need to

10   keep your information private to bring a claim like that and

11   the plaintiffs have the burden to prove to you that they kept

12   their information private and the evidence will show they did

13   not do that.

14           Second, the evidence will show that the defendants

15   were not reckless or indifferent to the plaintiffs' privacy.

16   Even though the plaintiffs' names were barely visible, and even

17   though their connection to Donald Cline was not a secret, the

18   defendants verified with a lawyer that the documentary would

19   not violate anyone's privacy.

20           And, third, the evidence will show that the very brief

21   appearance of the plaintiffs' names in this documentary did not

22   harm their reputations and did not cause their distress.

23           And let me say a few words about that right now.  You

24   probably will not hear me refer to Donald Cline as a doctor.

25   That's because he doesn't deserve that title.  What he did was

1   absolutely terrible, and the plaintiffs have every right to

2   feel distressed about what he did.  They have every right to

3   feel distressed about learning that their biological father was

4   not the man who raised them, that this doctor violated their

5   mother's trust and their body, and that they have 90-plus

6   half-siblings.  That is all distressing.  We don't dispute any

7   of that.  But Donald Cline is not a defendant here, and the

8   questions -- the question for you is not whether his actions

9   caused the plaintiffs to be distressed, and it's not whether a

10  movie about Donald Cline caused them to be distressed.  The

11  question is whether seconds of footage in a documentary with

12  the plaintiffs' names in it has tarnished their reputation or

13  caused them to be distressed, and the evidence will show it did

14  not.

15         So let's talk about the plaintiffs' so-called secret.

16  It's important for you to understand how and why the

17  plaintiffs' names came to be in this documentary.  In this

18  trial, we're going to take you behind the scenes and show you

19  how this documentary was actually made.  The producer and

20  director for this film was Lucie Jourdan, and you'll get to

21  hear from her in this trial.  As the director, Lucie Jourdan

22  was the one who made the creative decisions about what story to

23  tell, and she was the one who decided what details would go

24  into the documentary.

25         Realhouse is one of the defendants in this case.

1    Realhouse is a documentary film studio.  It's a division of a

2    larger studio called Blumhouse, so if you hear that name,

3    that's what that is.  And if you hear people refer to the

4    production team, that's Realhouse.  Those are the people that

5    actually film the movie, they edit it, they put the sound in,

6    they do all of that.

7        Netflix is the other defendant in this case.  You all

8    know Netflix is a streaming service.  It invested in this

9    project, and then it distributed the film.  So Realhouse made

10   the film, Netflix distributed it.

11       And Ms. Jourdan will tell you about how this film came

12   to be.  You'll hear about how she learned about a fertility

13   doctor in Indianapolis named Donald Cline who had artificially

14   inseminated dozens of his own patients with his own sperm and

15   you'll hear how Lucie Jourdan was appalled about the way that

16   he had abused his position of power and then, when he was put

17   on trial, he walked away with a $500 fine, with a slap on the

18   wrist.

19       Ms. Jourdan also learned, when she was doing her

20   research, that there were actually other fertility doctors out

21   there that had done the same thing, and there were no laws on

22   the books to address any of this, so she felt that she had to

23   raise awareness about this issue.

24       Telling stories like this, bringing to light matters

25   of public concern, that is the fundamental job of every news

*OPENING STATEMENT/MS. YOUNG*                    Vol 1-132

1    reporter and every documentarian, and that is what Lucie

2    Jourdan was doing in this movie.  As you'll see when you watch

3    this documentary, Ms. Jourdan told this story from the

4    perspective of one of Donald Cline's biological children,

5    Jacoba Ballard.  She's actually the woman who you saw in that

6    clip in the beginning.  And the documentary shows how Jacoba

7    Ballard took a DNA test and learned, to her surprise, that she

8    had multiple half-siblings, people she had never heard of

9    before, and the documentary shows how the siblings used DNA

10   testing services like 23andMe and Ancestry.com to piece

11   together that they were all related through Donald Cline.

12        And it also shows how they learned about the scope,

13   the breadth of Donald Cline's misconduct after sibling after

14   sibling kept popping up in their 23andMe and Ancestry.com

15   accounts, and that is where you see the plaintiffs' names pop

16   up very briefly on Jacoba Ballard's computer screen.

17        So with that in mind, I ask you to think about one

18   thing.  If the plaintiffs were so secret about their connection

19   to Donald Cline, how come their names were visible on Jacoba

20   Ballard's computer screen?  How come the director was able to

21   film those names?  It's not because someone broke into their

22   homes and set up hidden cameras, it's not because someone went

23   prying around in medical records.  There's no HIPAA violation

24   here.  Their names appeared in the film because they

25   voluntarily posted their information on the Internet for other

1    people to see.

2          The evidence will show that the plaintiffs opted in to

3    some of the most public settings on 23andMe.  They could have

4    chosen to stay anonymous on 23andMe, they could have used their

5    initials, but they chose not to.  Jacoba Ballard could see

6    their full names because they made that information public on

7    23andMe.  That was their choice.  Jacoba Ballard then showed

8    that information to Lucie Jourdan, who filmed it.

9          23andMe actually warned the plaintiffs that something

10   like this could happen when they signed up for the service.

11   These are 23andMe's terms of service.  The evidence will show

12   that both of the plaintiffs agreed to these terms when they

13   signed up.  And it says right here in black and white: Note

14   that 23andMe cannot control any further distribution of genetic

15   and/or self-reported information that you share publicly on the

16   23andMe website.

17         And you will see that 23andMe is not the only place

18   where the plaintiffs voluntarily shared their connection to

19   Donald Cline.  They discussed it on Facebook, on Instagram, and

20   in messages with people they barely even knew.

21         Now, you've heard the plaintiffs referred to as the

22   secret children of Donald Cline, but that is not how the

23   plaintiffs were referring to themselves before this lawsuit was

24   filed.  You'll see text messages and Facebook messages that

25   they wrote before they filed this lawsuit, and here are some of

*OPENING STATEMENT/MS. YOUNG*          Vol 1-134

1   the ones you will see.  Now, an important date, in this case,

2   is May 11, 2022.  You may want to make a mental note of that.

3   That is the date the documentary was released.  And at the top,

4   we're showing you a message Lori Kennard wrote before the

5   documentary's release.  She said:  I haven't announced our

6   situation on Facebook, but I'm not necessarily hiding it

7   either.  And then two days after the documentary was released,

8   she said:  I'm not hiding, but I'm not announcing it either.

9        You'll also see this document here.  Ms. Kennard is

10  messaging with someone on Facebook in 2021, so before the

11  documentary was released, and she says:  I found out my dad

12  isn't my biological father.  I have 80-plus half-siblings.  Did

13  your mom go to Dr. Donald Cline in Indy for help conceiving

14  because my mom did, and he used his sperm instead of my dad's.

15       Ms. Kennard told this person, basically, everything

16  she is now claiming was a secret, and you'll see evidence of

17  Ms. Kennard revealing the same kind of information to a bunch

18  of other people.

19       What about Sarah Bowling, the other plaintiff in this

20  case?  Did she keep her connection to Donald Cline private?

21  She did not.  She admits it.  Right here you will see this

22  document, she says:  I'm not out in the media, but don't keep

23  this private.  She wrote this message in 2019, more than two

24  years before the documentary came out.

25       This is another document you'll see in this trial.

This is a 2020 post in that Facebook group you heard about for the half-siblings related to Donald Cline.  In this post, Sarah Bowling is responding to a half-sibling who had decided to go public about her connection to Donald Cline, and Ms. Bowling said:  Live your truth.  There's no shame, and I found great freedom in feeling like I wasn't keeping a secret any longer. I wasn't keeping a secret any longer.

The evidence will show that Jacoba Ballard was part of this Facebook group.  No wonder she thought it was okay to show the director, Lucie Jourdan, her 23andMe matches with Sarah Bowling.  Sarah Bowling had told Jacoba Ballard, and everyone else in the Facebook group, that she did not keep her connection to Donald Cline a secret.

This is another document you'll see in this trial. This is an Instagram post from Sarah Bowling's full sister, Laura DiSalvo.  Sarah Bowling and Laura DiSalvo have the same mother.  They were raised in the same household together.  They are both biological children of Donald Cline.  And you can see Sarah Bowling, there on the left and Laura DiSalvo, there on the right, and what Laura DiSalvo posted to her hundreds of Instagram followers was:  Happy #national siblings day to my other half and to all of my siblings, all 75-plus of you.

Now, what was Sarah Bowlings response?  Did she say: Hey, sis, why are you telling my secret to all of your Instagram followers?  No.  She gave this post three hearts.  She loved

1    this post.

2         Members of the Jury, these are not the words and actions of

3    people who kept their connection to Donald Cline a secret.  The

4    evidence in this trial will show that long before the

5    documentary ever aired, the plaintiffs had shared their

6    so-called secret with family members, with friends, and even

7    with total strangers.  By the time the documentary aired, there

8    was no secret to be told.

9         So that brings me to the second thing that the evidence

10   will show, and that is that the defendants were not indifferent

11   to the plaintiffs' privacy rights.  They weren't reckless.  The

12   evidence will show that from the time the defendants

13   first became involved with this project, they wanted to make

14   sure the documentary would not invade anyone's privacy.

15        This is the agreement between Netflix and Realhouse to

16   produce this film, and as you can see here, they agreed that

17   before the documentary was released, a qualified lawyer, that's

18   what's referred to as clearance counsel down there at the

19   bottom, would review the film to make sure that it did not

20   constitute an invasion of the rights of privacy.

21        Why did they require this legal review?  Because they were

22   going to tell a story about real events that affected real

23   people in real ways, and they wanted to respect the rights of

24   those people.  And the evidence will show that the defendants

25   took that job seriously.

1    The lawyer that Realhouse hired to review the documentary
2    was a man named Al Wickers.  You can see his signature right
3    there.  You're going to get to hear from Mr. Wickers in this
4    trial.  Mr. Wickers will tell you he recently retired after
5    more than 30 years of law practice, and you'll hear that he was
6    considered one of the best, if not the best, lawyers in the
7    entire country who does this kind of work.  Mr. Wickers went
8    through an extensive process to review the *Our Father*
9    documentary.  He will tell you how he did that.  He will tell
10   you that he reviewed multiple cuts of the film.

11   A cut is a version of the film.  He did that multiple
12   times.  He looked at it from start to finish.  He looked at
13   every single shot, and he saw the 23andMe family tree with the
14   Cline siblings in it.  He will also tell you what a clearance
15   log is.  You heard a little bit about that from the plaintiffs.
16   He will explain to you how a clearance log is created.  He will
17   explain to you how he used it.  It's not what you heard.

18   And you'll see that Mr. Wickers concluded that the
19   documentary would not invade privacy rights.  He put those
20   opinions in writing.  That's this letter that you're seeing
21   right here.  And he said:  We've reviewed multiple cuts of *Our*
22   *Father*, and we are confident.  He said:  We're confident the
23   documentary does not give rise to any viable invasion of
24   privacy claim under U.S. law.

25   What the evidence will also show is that people involved in

*OPENING STATEMENT/MS. YOUNG*                    Vol 1-138

1   this production wanted to go above and beyond the minimum that

2   was legally required.  They were trying to honor the wishes of

3   siblings who they understood were sensitive about their

4   connection to Donald Cline.  That's what was going on in the

5   documents Mr. MacGill showed you where people said:  We'll get

6   releases, we'll blur the names.  They were trying to go beyond

7   what the law required out of consideration for these siblings.

8        This is an example, and Mr. MacGill actually showed you

9   this in his opening statement.  This is a message Lucie Jourdan

10  wrote when they were putting the final touches on the

11  documentary.  As Lucie Jourdan will tell you, Jacoba Ballard

12  gave her the names of some siblings that she preferred not to

13  be identified in the film, and Lucie Jourdan then asked for

14  those names to be blurred, even though the lawyer didn't tell

15  her that that was necessary.

16       And you can see that Lori Kennard's name is on this list,

17  but Sarah Bowling's is not.  Now, was Lucie Jourdan's

18  instruction to blur these names ignored?  Was it disregarded?

19  The evidence will show it was not.  On the left, you can see

20  the shot that Lucie Jourdan was referring to in the document I

21  just showed you, and we know that's the shot she was referring

22  to because it has a timestamp in it.  And you can see Lori

23  Kennard's name there.  I've circled it so that you can see it.

24       On the right is what the shot looked like the day the

25  documentary was released on May 11, 2022, and you can see that,

*OPENING STATEMENT/MS. YOUNG*          Vol 1-139

1    just as Lucie Jourdan instructed, Lori Kennard's name was

2    blurred out of that shot.  That's what it looked like to the

3    viewing public when it was released.

4        So what happened?  Well, there was another place where Lori

5    Kennard's name appeared in this documentary earlier in the

6    film.  That's the shot I showed you at the very beginning, and

7    that's where Lori Kennard's name is on the screen for less than

8    half a second.  And Lucie Jourdan will tell you that she looked

9    through the film for Lori Kennard's name, and she did not see

10   her name in this shot.

11       And then, after the documentary was released and the

12   defendants found out that the plaintiffs were upset, they

13   quickly blurred the names from the film.  They did that even

14   though the names were barely visible and even though the

15   information was already public on 23andMe.

16       So that brings us to the third thing the evidence will

17   show, and that is that the very appearance of the plaintiffs'

18   names in this documentary did not cause damage to their

19   reputation and did not cause their distress.  And, again, the

20   plaintiffs may be distressed about what Donald Cline did or

21   about a movie being made about him or about other events in

22   their life, and you may hear them talk about some of that at

23   trial.  But remember, the plaintiffs did not sue Donald Cline.

24       The case is about this, not this.  It's about this, seconds

25   of footage in the documentary, where the plaintiffs' names

1    appeared very briefly, and you will need to decide whether it's

2    really the case that these seconds of footage caused extreme

3    distress to the plaintiffs or have ruined their reputations.

4        You heard the plaintiffs' lawyer say that millions of

5    people watched this documentary, and you'll hear the plaintiffs

6    talk about their reputations.  But that doesn't mean millions

7    of people noticed the plaintiffs' names in the documentary or

8    thought anything less of them.  The plaintiffs actually know

9    that.  You will see this message that Ms. Kennard wrote the day

10   the documentary was released.  She said:  As someone told me

11   today, this is our story.  So we're watching every detail

12   carefully.  The average Indy, Indiana, U.S. viewer may not even

13   notice.  That's common sense.

14       This documentary was about them, so, of course, they were

15   watching it closely, and so were people who already knew about

16   their connection to Donald Cline.  And you all are going to see

17   the documentary in this trial.  I'm sure you'll be watching

18   very closely for the plaintiffs' names, but if you could just

19   put it on Netflix while sitting on the couch yesterday at home,

20   I'm sure the names would not have even registered.

21       Now, when you hear the plaintiffs talk about millions of

22   people seeing the documentary, I also want you to ask yourself

23   three things:

24       First, what is the evidence that people actually noticed

25   each plaintiffs' name?  What is the evidence of that?

1      Second, did the plaintiffs already know the plaintiffs'
2  so-called secret?
3      And third, what is the evidence that the plaintiffs were
4  shunned or looked down upon by anyone who might have seen their
5  names?
6      I also want you to pay attention to what the plaintiffs
7  were saying before this lawsuit was filed.  Here is some of the
8  evidence you will see:  They were saying it's actually a really
9  good documentary.  It was very well done.  It's good.  I was
10  thoroughly impressed with the professional quality of the
11  trailer.
12      You'll also get to see what they said about the fact that
13  their names were briefly visible in the documentary.  They said
14  things like this:  This will be my 15 minutes.  I want to get
15  paid.  I want to tell all those fools that said, let us be
16  clear.  No one made any money off this film yet.  Not yet,
17  bitches.  And this -- and I'm sorry for the language.  These
18  are not my words.  Fuck irresponsible.  I want to get rich,
19  bitch, in all caps.
20      The evidence will show that Sarah Bowling sent this text
21  message at 9:39 a.m. the very morning the documentary was
22  released.  Apparently one of the first thoughts that went
23  through her head when she found out her name was in the
24  documentary was how she was going to get rich, and here we find
25  ourselves.

*OPENING STATEMENT/MS. YOUNG*                Vol 1-142

1      At the end of the trial, one of the plaintiffs' lawyers is

2  going to stand up here and ask you to award money to his

3  clients.  He's going to ask for a lot of money, probably

4  millions and millions of dollars, and when he does that, I

5  would just ask you to keep this text message in mind.

6      So the plaintiffs have the burden to prove their case to

7  you, and the evidence will show they cannot do that.  There are

8  at least three important reasons why, and I just want to review

9  them one last time:

10      First, the plaintiffs' connection to Donald Cline was no

11  secret.

12      Second, Netflix and Realhouse were not reckless or

13  indifferent.  They did the responsible thing and confirmed the

14  documentary could be released without invading privacy.

15      And, third, the very brief appearance of the plaintiffs'

16  names in the documentary did not harm their reputation or cause

17  them distress, and that is why, at the end of the day, we will

18  ask you to return a verdict for the defendants.  Thank you.

19          THE COURT:  All right.  Thank you, counsel.

20          All right, plaintiffs.  You may get your first witness

21  on the stand.  Who will you be calling?

22          MR. MacGILL:  Your Honor, we would like to read the

23  stipulation at Document 361.  May I do so?

24          THE COURT:  Come on up to the lectern.

25          MR. MacGILL:  Thank you.

1          May I proceed, Your Honor?

2          THE COURT:  You may.

3          And no objection to reading the stipulation,

4    defendants?

5          MR. BRIAN:  No, Your Honor.

6          MR. MacGILL:  Plaintiffs Sarah Bowling, Lori Kennard

7    and defendants Netflix, Inc., Netflix Worldwide Entertainment,

8    LLC, and Realhouse Productions, LLC, hereby stipulate as

9    follows:

10         One, defendant Netflix, Inc. is a publicly-traded

11   company.

12         Two, defendant Netflix Worldwide Entertainment, LLC,

13   is a wholly-owned subsidiary of defendant Netflix, Inc.

14         Three, defendants Netflix, Inc. and Netflix Worldwide

15   Entertainment, LLC, made the *Our Father* film available to

16   Netflix subscribers.

17         Four, defendant Netflix Worldwide Entertainment, LLC

18   engaged defendant Realhouse Productions, LLC to produce the *Our*

19   *Father* film.

20         Five, defendant Realhouse Productions, LLC delivered

21   the *Our Father* film to defendants Netflix, Inc. and Netflix

22   Worldwide Entertainment.

23         Six, Netflix made the *Our Father* film available to its

24   subscribers on May 11, 2022.

25         MR. CIULLA:  Your Honor, the plaintiffs now request

1    permission to read the discovery responses submitted to the

2    Court in excised format at 382-1.

3        THE COURT:  Is that pursuant to stipulation?

4        MR. CIULLA:  Pursuant to your order earlier at the

5    pretrial conference.

6        MR. BRIAN:  No objection, Your Honor.

7        THE COURT:  You may.

8        MR. CIULLA:  Defendants' discovery responses, part

9    one, response to requests for admission.

10        Request Number 3:  Admit that you have subsequently

11    blurred the name of each plaintiff contained in the documentary

12    on the Netflix service.

13        Netflix's response:  Netflix admits that the

14    incidental appearance of each plaintiffs' name was ultimately

15    concealed in the documentary at plaintiffs' request.

16        Realhouse's response:  Realhouse admits that the

17    incidental appearance of each plaintiffs' name was ultimately

18    concealed in the documentary at plaintiffs' request.

19        Request Number 6:  Admit that you did not have written

20    permission from Sarah Bowling to publish her name.

21        Netflix's response:  Admitted.

22        Realhouse's response:  Admitted.

23        Request Number 8:  Admit that you did not have written

24    permission from Lori Kennard to publish her name.

25        Netflix's response:  Admitted.

1      Realhouse's response:  Admitted.

2      Request Number 13:  Admit that Realhouse's clearance logs

3  do not reference the scenes of *Our Father* in which plaintiffs'

4  names are identified.

5      Netflix's response:  Admitted.

6      Realhouse's response:  Admitted.

7      Request Number 14:  Admit that Realhouse's clearance logs

8  do not address the film scenes in which plaintiffs' names

9  appear.

10     Netflix's response:  Admitted.

11     Realhouse's response:  Admitted.

12     Request Number 15:  Admit that Realhouse's clearance logs

13  do not reference or address the complained-of scenes.

14     Netflix's response:  Admitted.

15     Realhouse's response:  Admitted.

16     Part 2, responses to interrogatories.  Interrogatory Number

17  1:  State the date and time at which Sarah Bowling's name began

18  appearing in the documentary on the Netflix service and on

19  blurred form, the Bowling unblurred date.  And state the date

20  and time at which Sarah Bowling's name ceased appearing in the

21  documentary on the Netflix service and on blurred form, the

22  Bowling blur date.

23     Netflix's response:  Limiting Netflix's answer to the date

24  Sarah Bowling's name was first viewable by a member of the

25  public, it states that Sarah Bowling's name briefly appeared in

the documentary without intentional effort to conceal it.
Although Netflix denies that her name was ascertainable without
purposeful efforts by viewers to locate Sarah Bowling's name or
that it had any obligation to conceal her name.

On May 11th, 2022, when the documentary was first available
to be streamed, Sarah Bowling's name was first affirmatively
concealed from observation in the documentary version that
Realhouse provided to Netflix on May 23rd, 2022.

Realhouse's response:  Limiting Realhouse's answer to
the date Sarah Bowling's name was first viewable by a member of
the public.  It states that Sarah Bowling's name briefly
appeared in the documentary without intentional effort to
conceal it, although Realhouse denies that her name was
ascertainable without purposeful efforts by viewers to locate
Sarah Bowling's name or that it had any obligation to conceal
her name.

On May 11, 2022, when the documentary was
first available to be streamed, Realhouse delivered a version
of the documentary to Netflix with Sarah Bowling's name
affirmatively concealed from any observation on May 23rd, 2022.

Interrogatory Number 2:  Please state the number of
viewers of the documentary on the Netflix service between the
Bowling unblur date and the Bowling blur date, inclusive.
Please break the viewers into categories by IP address
location, State of Indiana, rest of United States, and rest of

1    earth.

2        Netflix's response:  Netflix does not contest that

3    Sarah Bowling's name appeared briefly in the documentary, nor

4    does it contest the documentary was streamed on its service and

5    available to its subscribers.  The number of viewers, as

6    Netflix understands the term, is irrelevant and cumulative.

7    Netflix does not track viewers of content nor could it.  The IP

8    addresses corresponding to the streaming of the documentary are

9    entirely irrelevant to any issue in this case and will not lead

10   to the discovery of admissible evidence.  Netflix also does not

11   collect or traffic streaming customers' residential zip codes,

12   billing addresses, mailing addresses, IP addresses, or mailing

13   zip codes.  For that and other reasons, Netflix cannot quantify

14   or identify viewers in the state of Indiana.

15       The below chart identifies the number of subscribers

16   that streamed over 90 percent of the show's run time by the

17   identified date, and let the record reflect we have displayed

18   Document 382-1 at page ECF 6, which is here on your screen.

19   Realhouse's response:  Realhouse does not contest that

20   Sarah Bowling's name appeared briefly in the documentary.

21   Thus, the number of viewers, as Realhouse understands the term,

22   is irrelevant and cumulative.  Further, the IP addresses

23   corresponding to the streaming of the documentary are entirely

24   irrelevant to any issue in this case and will not lead to

25   discovery of admissible evidence.  Realhouse lacks information

1   responsive to this interrogatory.

2       Interrogatory Number 5:  Please identify and describe all

3   documents that you contend granted you permission,

4   authorization or consent to place Sarah Bowling's name in the

5   documentary on the Netflix service in unblurred form.

6       Netflix's response:  Plaintiff Sarah Bowling's permission

7   was not necessary to include her identifying information in the

8   documentary.  Separately, Netflix did not place Sarah Bowling's

9   name in the documentary *Our Father*.  Netflix is not currently

10  aware of any documents responsive to this interrogatory, but

11  permission, authorization, or consent were all unnecessary as a

12  legal matter.

13      Realhouse's response:  Plaintiff Sarah Bowling's permission

14  was not necessary to include her identifying information in the

15  documentary.  Separately, Realhouse did not place Sarah

16  Bowling's name in the documentary, *Our Father*.  Realhouse is

17  not currently aware of any documents that respond to this

18  interrogatory, but permission, authorization, or consent were

19  all unnecessary as a legal matter.

20      Interrogatory Number 16:  Please state the number of

21  viewers of the documentary on the Netflix service between the

22  Kennard unblur date and the Kennard blur date inclusive.

23  Please break the number of viewers into categories by IP

24  address location, State of Indiana, rest of United States, and

25  rest of earth.

1    Realhouse's response:  Realhouse does not contest that

2    plaintiff Lori Kennard's name appeared briefly in the

3    documentary.  Thus, the number of viewers is irrelevant and

4    cumulative.  Further, the IP addresses corresponding to the

5    streaming of the documentary are entirely irrelevant to any

6    issue in this case and will not lead to the discovery of

7    admissible evidence.  Realhouse lacks information responsive to

8    this interrogatory.

9    Interrogatory Number 18:  Please identify and describe all

10    documents you contend granted you permission, authorization, or

11    consent to place Lori Kennard's name in the documentary on the

12    Netflix service in unblurred form.

13    Netflix's response:  Plaintiff Lori Kennard's permission

14    was not necessary to include her identifying information in the

15    documentary.  Separately, Netflix did not place Lori Kennard's

16    name in the documentary *Our Father*.  Netflix is not currently

17    aware of any documents responsive to this interrogatory, but

18    permission, authorization, or consent are all unnecessary as a

19    legal matter.

20    Realhouse's response:  Plaintiff Lori Kennard's permission

21    was not necessary to include her identifying information in the

22    documentary.  Separately, Realhouse did not place Lori

23    Kennard's name in the documentary *Our Father*.  Accordingly,

24    Realhouse has no documents in its possession, custody, or

25    control responsive to this interrogatory.  Realhouse is not

1   currently aware of any documents responsive to this

2   interrogatory, but permission, authorization, or consent were

3   all unnecessary as a legal matter.

4           MR. MacGILL:  Your Honor, we'd call Michael Petrella

5   and to read his testimony to the jury.  And we'd ask one of my

6   colleagues to be the witness, and I will ask the questions,

7   with the Court's permission.

8           THE COURT:  You may.

9           MR. CIULLA:  And, Your Honor, we offered into evidence

10  the exhibits that we read, which are 7, 8, and 14.

11          THE COURT:  Any objection to 7, 8, and 14?

12          MR. BRIAN:  Can you give us a moment, Your Honor?

13          THE COURT:  Yes.

14          MR. BRIAN:  No objection, Your Honor.

15          THE COURT:  Exhibits 7, 8, and 14 are admitted into

16  evidence without objection.

17              *(Plaintiffs' Exhibits 7, 8, and 14 were*

18              *received in evidence.)*

19          THE COURT:  And for the record, do you have the person

20  sworn in the depo, or do we need to swear her that she'll read

21  accurately?

22          MR. MacGILL:  Maybe we should swear her for the

23  record, if you don't mind, Your Honor.

24          THE COURT:  Will you stand and raise your right hand.

25       (The witness is sworn.)

1            THE COURT:  You may be seated.

2            MR. MacGILL:  And, Your Honor, for the record, this is

3    the testimony given by Michael Petrella on November 29, 2022.

4        (Deposition of Michael Petrella read in open court.)

5            MR. CIULLA:  Your Honor, I marked for identification

6    purposes what was just read, Mr. Petrella's Exhibit 8001.

7            We now call to the witness stand, by reading of

8    deposition designation, Lucie Jourdan, the director of *Our*

9    *Father*, and we offer into evidence Exhibit 78.  And I mark her

10   testimony as, for identification purposes, 8002.

11           THE COURT:  When you say "her," you're referring to

12   Lucie Jourdan?

13           MR. CIULLA:  Yes, ma'am.

14           THE COURT:  All right.  Any objection to -- first of

15   all, you're going to offer the deposition exhibit that you

16   just -- that was just read into the record, 8001; correct?

17           MR. MacGILL:  Yes.

18           MR. CIULLA:  Just that that's the actual -- what was

19   read.  That's the words because it's not being transcribed.

20           THE COURT:  Right.  So we'll need that --

21           MR. CIULLA:  Yes, ma'am.

22           THE COURT:  -- for the record.  Okay.

23           MR. BRIAN:  Your Honor, we would -- maybe we should

24   take that up.  But we would object to the exhibit of the

25   transcript going in as testimony.

1          THE COURT:  I agree, but it's going -- it's not going

2    to go back with the jury, but it will stay with the record.

3          MR. BRIAN:  I understand.  Thank you.

4          THE COURT:  Okay.  All right.  Any objection to 78?

5    They've offered Exhibit 78.

6          MS. PIERSON:  No objection.

7          THE COURT:  You can hand those to the courtroom deputy

8    clerk.

9          MR. CIULLA:  Yes, ma'am.

10         THE COURT:  Exhibit 78 is admitted into evidence

11   without objection.

12         MR. MacGILL:  Thank you.

13                  *(Plaintiffs' Exhibit 78 was*

14                  *received in evidence.)*

15         THE COURT:  And, witness, you are still under oath.

16         THE WITNESS:  Uh-huh.

17         MR. MacGILL:  Your Honor, this is the testimony of

18   Lucie Jourdan given on January 12th, 2023.

19      (Deposition of Lucie Jourdan read in open court.)

20         MR. MacGILL:  This concludes the examination of Lucie

21   Jourdan, Your Honor.

22         THE COURT:  All right.  And can you take down your

23   exhibit?

24         MR. MacGILL:  I'm sorry?

25         THE COURT:  Take down the exhibit.  Close it.  Thank

1    you.

2              All right.  And what's that deposition number?

3              MR. CIULLA:  That was 8002, Your Honor.

4              THE COURT:  8002.

5              MR. CIULLA:  We'd call to the stand Sarah Bowling.

6              MR. BRIAN:  Your Honor, can we go on the equipment

7    briefly?

8              THE COURT:  Yes.

9              Come on up, Ms. Bowling.

10             Counsel, put your equipment on.

11        (Bench conference on the record.)

12             THE COURT:  All right.  Go ahead, counsel.

13             Can everyone hear?

14             MR. MacGILL:  I can hear you.

15             THE COURT:  Go ahead, counsel.

16             MR. BRIAN:  Can you hear me?

17             I'm sorry for this.  I just want to know if it's

18    possible to take a two-minute biobreak.

19             THE COURT:  Yes.  We'll take a very short break.

20        (In open court.)

21             THE COURT:  All right.  We're going to take a very

22    short restroom break.  No deliberation.  No discussion.  We'll

23    have you back in the courtroom very shortly, ladies and

24    gentlemen.

25             COURTROOM DEPUTY:  All rise.

1          (Jury out at 2:31.)

2               THE COURT:  All right.  What kind of break do you

3     need?

4               MR. BRIAN:  Two minutes.

5               THE COURT:  Okay.  All right.

6               You can have a seat.

7               MR. MacGILL:  Okay.

8               THE COURT:  He'll be right back.

9          (Discussion held off the record.)

10              THE COURT:  So, Lawyers, we're going to go ahead and

11    let this be our afternoon break.  So 10 minutes.  We'll have

12    you back in the courtroom in about 10 minutes.  The court

13    reporter needs a break, also.

14              COURTROOM DEPUTY:  All rise.

15         (Recess at 2:32 until 2:45.)

16              THE COURT:  We're back on the record.

17              Are you ready for the jury?

18              MR. MacGILL:  Yes, we are.

19              THE COURT:  You may bring in the panel.

20              If you want to sit down, you may, but you're just

21    going to have to get right back up.  It's good to stand and

22    stretch.

23              COURTROOM DEPUTY:  All rise.

24         (Jury in at 2:46.)

25              THE COURT:  You may be seated.

1    And, Witness, if you would remain standing, and if you

2    would raise your right hand to be sworn.

3        (The witness is sworn.)

4            THE COURT:  You may have a seat.

5            Counsel, you may examine your witness.

6            MR. MacGILL:  Thank you.

7        **SARAH BOWLING, PLAINTIFFS' WITNESS, SWORN**

8                **<u>DIRECT EXAMINATION</u>**

9    BY MR. MacGILL:

10   Q.  Good afternoon.  Would you state your name for the record,

11   please?

12   A.  Sarah Bowling.

13   Q.  And could you tell the Court and jury where you live?

14   A.  Indianapolis, Indiana.

15   Q.  All right.  And so tell us where you grew up.

16   A.  I grew up on the north side of Indianapolis.  Born and

17   raised here my whole life.

18   Q.  You've lived here your entire life?

19   A.  Except for a brief stint after I was married.  My husband

20   and I relocated to Cincinnati for two years.

21   Q.  Okay.  Tell us about your mother.

22   A.  My mom's name is Barb.  She's amazing.  My parents got

23   divorced when I was 10.

24   Q.  Okay.

25   A.  And she raised us as a single mother.

1  Q.  All right.  And what is her current age?

2  A.  She's 70.

3  Q.  And what is her full name?

4  A.  Barbara Huff.

5  Q.  All right.  And let me ask you about your father.  What is

6  your father's name?

7  A.  His name is David Sheehan.

8  Q.  And what is his age?

9  A.  He's 72.

10  Q.  Okay.  And do you have a sister?

11  A.  Yes.

12  Q.  And what's her name.

13  A.  I have two sisters -- they're twins -- Laura DiSalvo and

14  Lisa Foley.

15  Q.  All right.  Now, you indicated that your parents had

16  divorced -- that your parents, specifically Dave Sheehan and

17  Barb Huff, divorced at some time, at some point?

18  A.  Yes.

19  Q.  And how old were you at the time of the divorce?

20  A.  Approximately 10 years old.  It was the summer between my

21  fourth and fifth grade.

22  Q.  Okay.  And then, thereafter, you were raised primarily by

23  your mother?

24  A.  Yes.

25  Q.  All right.  Now, let's talk a little bit about your working

*BOWLING - DIRECT/MACGILL*                    Vol 1-157

1    history and your education.  When did you first become -- when

2    did you have your first job?

3    A.  My first job I had in high school since I was legally able

4    to work.

5    Q.  Okay.  Did you work continuously thereafter?

6    A.  I did.  I worked continuously through high school, through

7    college, worked continuously until I stayed home with my second

8    son in 2014.

9    Q.  All right.  Let's talk about your educational background a

10   little bit.  Did you attend college?

11   A.  I did.

12   Q.  What college did you attend?

13   A.  For my first bachelor's degree, I started at Purdue

14   University in West Lafayette and then came back to Indianapolis

15   to finish the degree at IUPUI.

16   Q.  Okay.  And during those college years, did you work?

17   A.  Yes.

18   Q.  In addition to your student role?

19   A.  Yes, one or two jobs.

20   Q.  All right.  And after -- and that first BS was awarded in

21   what year?

22   A.  2004.

23   Q.  All right.  And did you have concentrations of study in

24   that first degree?

25   A.  Yes.

Q.  What were they?

A.  Communication studies and Spanish.

Q.  Okay.  Now, after you -- after the BS degree was awarded, where did you go next?

A.  So I graduated in May of 2004, and then my husband and I married in September of that year, and I immediately joined him in Cincinnati.  He had already relocated over the summer and I worked for a marketing firm there, and a chiropractic office.

Q.  And where -- just focusing on you and your husband's relationship for a minute, when did you first meet your husband?

A.  We first met, actually, in high school when I was a sophomore and he was a senior.  We had a mutual brother/sister friend, but we didn't start dating until after I came back to IUPUI, and we reconnected then.

Q.  Okay.  Looking at your -- did you pursue a second bachelor's degree?

A.  I did.

Q.  Where did you get that degree?

A.  From IUPUI.  So we moved back to Indianapolis in 2006.

Q.  And what field of study was your second bachelor's degree in?

A.  Nursing.

Q.  All right.  And what did you do after you got your nursing degree?

1  A.  I worked in the pediatric ICU at Riley Hospital for

2  Children.

3  Q.  And how long did you have that job?

4  A.  I started as a student nurse, I believe, in 2007, and I

5  worked up until I decided to stay home in 2014.

6  Q.  Okay.  And during the seven years at Riley, were you, at

7  all times, employed in the pediatric intensive care unit?

8  A.  Yes.

9  Q.  Now, you mentioned you have children.  How many children do

10  you have?

11  A.  I have three boys.

12  Q.  And what are their ages?

13  A.  Fourteen, ten, and eight.

14  Q.  Okay.  Now, looking just -- you mentioned that you and your

15  mother and your father had divorced.  At some point, did you

16  become reconnected with your father?

17  A.  I did.  After they got divorced, we kind of had a strained

18  relationship, and we reconnected after the birth of my

19  first child, when I was about 28.

20  Q.  And what is your current age?

21  A.  42.

22  Q.  All right.  How are things?  Does your father participate

23  in family activities at this point?

24  A.  He does.

25  Q.  All right.  Now, I want to talk a little bit about where

*BOWLING - DIRECT/MACGILL*                    Vol 1-160

1  you live and what you do, your community, so to speak.  Can you

2  describe, you know, your social life?  What is it?  Where is it

3  centered?

4  A.  Well, it's basically centered around my children.  I still

5  live on the north side of Indianapolis.  I live three minutes

6  from our school that they attend, that I attended, that my dad

7  and his siblings attended, that my grandparents founded.  It's

8  our church.  I would describe that as our main community.

9  Q.  Okay.  And that when you say "our church," what is the name

10 of the church?

11 A.  St. Pious the 10th Catholic church and school.

12 Q.  And do your children attend that school?

13 A.  Yes.

14 Q.  All right.  Now, just backing up for a second, focusing on

15 St. Pious for a minute, you indicated your family has had a

16 long history with that church and that parish; is that right?

17 A.  Yes, much.

18 Q.  Can you talk a little bit about your grandparents' role in

19 connection with the St. Pious church?

20 A.  Well, my grandparents were one of the founding members of

21 the church.  They lived in the neighborhood that surrounds the

22 parish, and they were some of the first members of the church.

23 Q.  Okay.  And you went to school there?

24 A.  I did.

25 Q.  Okay.  And just focusing on St. Pious for a minute, how

*BOWLING - DIRECT/MACGILL*                    Vol 1-161

1  many students are there today?

2  A.  Approximately just over 500.

3  Q.  Okay.  And each of your boys attend St. Pious currently?

4  A.  Yes.

5  Q.  What grades are they in?

6  A.  Eighth, fifth, and second.

7  Q.  Okay.  And looking at the parish for a second, you talked

8  about the school and the number of families.  How many families

9  are in the St. Pious church community?

10 A.  I don't know the amount of families, for sure, but I think

11 it's roughly 2,000 people.

12 Q.  Okay.  Now, with respect to your own social relationships,

13 is there a center of gravity, for lack of a better phrase, that

14 your activities fall in in terms of your social relationships?

15 A.  Well, I have, you know, some immediate, close best friends,

16 and then, you know, just some other close friends and my family

17 is probably my center of gravity, immediate social circle.

18 Q.  Fair enough.  Now, Ms. Bowling, I want to turn to the

19 discovery of Dr. Cline as your biological father.  Can you tell

20 the Court and jury when you discovered that?

21 A.  I took a 23andMe test, I believe in July of 2019, and those

22 results became available in August of 2019.

23 Q.  And can you tell the Court why you were interested in

24 taking that particular test?

25 A.  I had had some health issues, a recent health diagnosis,

*BOWLING - DIRECT/MACGILL*                    Vol 1-162

1    and I was interested in the medical component that the platform

2    offers.

3    Q.  All right.  What was the health diagnosis that you had?

4             MR. BRIAN:  Objection, Your Honor.

5             THE COURT:  Put on our equipment.

6         (Bench conference on the record.)

7             MR. BRIAN:  The objection, Your Honor, is based on the

8    argument we had this morning plus relevance and 403.  And I

9    thought you ruled that she would not be permitted to give this

10   testimony.

11            MR. MacGILL:  Your Honor, just the diagnosis is all

12   we're asking, not the exacerbation.  The Court has confirmed

13   that the exacerbation of symptoms associated with it are off

14   limits and may not be referenced.  I'm simply asking:  What

15   were you diagnosed with in the year 2017.

16            THE COURT:  Why is that relevant?

17            MR. MacGILL:  It's, among other things, it's the

18   reason that she took the 2017 23andMe test.

19            THE COURT:  She stated that she took a test, took the

20   23andMe test to get a medical diagnosis.  The diagnosis itself

21   is not relevant at this time, so I'll sustain the objection.

22                      (Open court.)

23            THE COURT:  All right, next question.

24   BY MR. MacGILL:

25   Q.  So, Sarah, I'm going to -- Mrs. Bowling, I'm going to

*BOWLING - DIRECT/MACGILL*                    Vol 1-163

1    display, on your screen only at this point, an exhibit that I'm

2    going to ask you about.  I should say the binder, and this will

3    be tab number 1, and I'm referring you to Exhibit 132.  And my

4    question, just to get started, is can you tell the Court what

5    this is?

6    A.  This is a portion of my 23andMe results.

7    Q.  Okay.

8         MR. MacGILL:  Your Honor, we would offer into evidence

9    Exhibit 132.

10        MR. BRIAN:  No objection.

11        THE COURT:  Exhibit 132 is admitted into evidence

12   without objection.

13             *(Plaintiffs' Exhibit 132 was*

14             *received in evidence.)*

15        MR. MacGILL:  Thank you.  May we publish, Your Honor?

16        THE COURT:  You may.

17   BY MR. MacGILL:

18   Q.  So, Mrs. Bowling, I have put in front of you Exhibit 132.

19   Can you tell us what this is?

20   A.  This is a part of my 23andMe results.

21   Q.  Okay.

22   A.  My, specifically my family tree.

23   Q.  Okay.  Now, if you go to -- if we go to the next page, do

24   you see, what is displayed there on this next page in terms of

25   what I'll call the horizontal section of this?

*BOWLING - DIRECT/MACGILL*                    Vol 1-164

1    A.   Just another view of my 23andMe results.

2    Q.   Okay.  And did you, in terms of your own perspective when

3    you saw this result, did you look at this as unusual when you

4    got the result?

5    A.   Yes, very.

6    Q.   Could you tell the Court why?

7    A.   Because I see all these people listed as half-siblings, and

8    at this point in my life, I don't even know that I'm donor

9    conceived, so I was confused and shocked.

10   Q.   All right.  I'm going to refer you to the next exhibit, if

11   I may, and, again, if you would turn in your binder, please, to

12   Exhibit 135.  Could you identify this exhibit, please?

13   A.   This is another view of my 23andMe results.

14         MR. MacGILL:  All right.  At this time, Your Honor, we

15   would offer Exhibit 135.

16         THE COURT:  Any objection?

17         MR. BRIAN:  No objection.

18         THE COURT:  Exhibit 135 is admitted into evidence

19   without objection.

20                   *(Plaintiffs' Exhibit 135 was*

21                   *received in evidence.)*

22         MR. MacGILL:  May I publish it?

23         THE COURT:  Yes, you may.

24   BY MR. MacGILL:

25   Q.   Mrs. Bowling, do you have Exhibit 135 in front of you?

*BOWLING - DIRECT/MACGILL*                    Vol 1-165

1    A.  Yes.

2    Q.  And is this part of your 23andMe results that you've been

3    describing to the Court?

4    A.  Yes.

5    Q.  And what does this image show in terms of who your father

6    is?

7    A.  It shows that it's unknown.  It says "unknown relative,

8    unknown parent."

9    Q.  All right.  Now, just to make sure we're following, so we

10   see at the left, in highlighted, "unknown relative," is that

11   what you were referring to?

12   A.  Yes.

13   Q.  And what's beneath that?

14   A.  "Unknown parent."

15   Q.  And with respect, is that a reference to you, specifically,

16   as you understood it?

17   A.  Yes.  It's a reference to an unknown parent.

18   Q.  Okay.  Did -- so this is -- this Exhibit 135, as we've just

19   displayed it, this is what you saw when you first clicked on

20   it; is that correct?

21   A.  Correct.

22   Q.  All right.  Now, turning to this page, specifically, with

23   respect to the unknown father, it should be more specific, let

24   me restate.

25       With respect to the unknown relative, unknown parent, did

1  that reference ever change, to your knowledge?

2  A.  No.

3  Q.  To your knowledge, did 23andMe ever change to show the name

4  of your genetic father?

5  A.  No.

6  Q.  After this test result was -- after you received this test

7  result, did you be given -- did you begin getting reachouts

8  from other secret children?

9  A.  Yes.

10  Q.  Could you tell the Court what happened?

11  A.  So I received a message on the 23andMe platform from a

12  half-sibling, and it was kind of generic.  It just said:  Hey,

13  Sarah, I'm sure you're probably wondering why you see all these

14  half-siblings, call or text me and I can explain this to you.

15  Q.  Okay.  Can we put that last screen up here for a minute.

16  Just with respect to the horizontal access, I'll call it, of

17  these different half-siblings, were there settings on this

18  23andMe as you understood it, in terms of who could access it?

19  A.  Well, I know that when I accessed my 23andMe, I have to put

20  in -- it's password protected.  I had to put in my thumbprint

21  or my facial recognition to even access my own platform.

22  Q.  Okay.

23  A.  So that's...

24  Q.  And when you got reachouts, what did you understand the

25  people -- how did people know to reach out to you as you

1    understood it?

2    A.  Because they could see me as a connection.

3    Q.  Okay.  And could you describe to the Court and jury here

4    how these discussions with your siblings, your half-siblings,

5    unfolded here at this time?

6    A.  Well, before I reached back out to the half-sibling that

7    contacted me, I had Googled her name, and I was just curious.

8    I thought -- I was talking to my husband and we thought that

9    this could potentially be a scam of some sort.  I didn't know

10    who was reaching out to me.  But just an unfolding of events,

11    we realized that, yes, these are half-siblings.  I connected

12    the half-sibling that reached out with Donald Cline and then

13    further confirmed it with my mom.

14    Q.  Confirmed what?

15    A.  That she was a patient of Dr. Cline.

16    Q.  Okay.  Now, could you tell the Court and jury how in 2019

17    you reacted to this news?

18    A.  I was upset.  I was shocked.  I felt like my whole identity

19    was a lie.

20    Q.  Okay.  Now, focusing on this point in time, 2019, did you

21    tell your children, at that point, who your biological father

22    was?

23    A.  No.

24    Q.  Have you to this day?

25    A.  No.

*BOWLING - DIRECT/MACGILL*                    Vol 1-168

1   Q.  Now, with respect to what you did, then, did you then begin

2   communicating with what I'll call your genetic family, so to

3   speak, other secret children?

4   A.  Yes.

5   Q.  All right.  Now, did you join a Facebook group?

6   A.  Yes.

7   Q.  Okay.  Now, I'd like to ask you, please, to turn to the

8   next exhibit.  Exhibit 119.  Could you please explain to the

9   Court and jury what this exhibit is.

10  A.  This is a post on our secret Facebook group.

11  Q.  Okay.  When you say "secret Facebook group," what do you

12  mean?

13  A.  I mean that it's a secret group that you have to be allowed

14  permission into from the administrator, and it's not even

15  searchable on Facebook by name.

16  Q.  Okay.  Is this a -- is this a screenshot of one of those

17  posts?

18  A.  Yes.

19          MR. MacGILL:  We would offer into evidence, Your

20  Honor, Exhibit 119.

21          MR. BRIAN:  No objection.

22          THE COURT:  Exhibit 119 is admitted into evidence

23  without objection.

24                  *(Plaintiffs' Exhibit 119 was*

25                  *received in evidence.)*

1          MR. MacGILL:  May we publish it, Your Honor?

2          THE COURT:  You may.

3    BY MR. MacGILL:

4    Q.  Looking at this now, this Exhibit 119, which has been

5    received by the Court in evidence, could you tell the Court

6    what this is?  First, who is the person that wrote this

7    particular message?

8    A.  This is Jacoba Ballard?

9    Q.  And what is the date of this message, ma'am?

10   A.  December 11, 2019.

11   Q.  Okay.  Now, I want to focus on some language here about

12   this group is private, more specifically, secret.

13        Did you understand that to be the case?

14   A.  Yes.

15   Q.  And was that important to you?

16   A.  Yes.

17   Q.  Could you please tell the Court why it was important to

18   you.

19   A.  Because this is private information, and it's just a

20   respect of privacy.  It's establishing the rules of this

21   Facebook group and being a part of it.

22   Q.  Okay.  Now, let's turn to the next sentence, if we may:

23   The information shared in the two groups are not to be shared

24   with anyone outside of these groups at any time.

25        Did you understand that to be one of the rules associated

*BOWLING - DIRECT/MACGILL*                              Vol 1-170

1   with this particular group?

2   A.  Yes.

3   Q.  And did you rely on that assurance in terms of how you

4   communicated on this Facebook group?

5   A.  Yes.

6   Q.  And then it continues:  We have siblings that want to

7   remain private, and even those public do not want their

8   information shared without consent.

9       Do you see that?

10  A.  Yes.

11  Q.  And was that also -- was that an understanding that you had

12  in terms of the rules of this particular group?

13  A.  Yes.

14  Q.  Now, one other thing I wanted to ask you about that's just

15  highlighted here:  Even the smallest details are not to be

16  shared.

17      Do you see that?

18  A.  Yes.

19  Q.  And part of your understanding of this group?

20  A.  Yes.

21  Q.  And then finally, the words, again: This is a safe place,

22  in terms of what Ms. Ballard wrote on December 11, 2019?

23  A.  Yes.

24  Q.  Now, we'll get to some communications that you had with

25  this group in a few minutes, but is this a fair summary of the

*BOWLING - DIRECT/MACGILL*                    Vol 1-171

1   rules you understood this group was operating under at the time

2   you communicated with this group at all times?

3   A.  Yes.

4   Q.  Now, at the time you joined this group, was it -- was it

5   entitled 86th Street conceived siblings only?

6   A.  Yes.

7   Q.  At the time that you joined this group, did you -- were

8   you -- did anyone explain to you the rules of this group?

9   A.  I mean, it was just prepared kind of like this.  It was

10  this is a private group, we are private, you don't share other

11  information about your half-siblings.

12  Q.  And was this 86th Street conceived siblings only limited to

13  a particular group of people?

14  A.  Yes.

15  Q.  What group?

16  A.  Just half-siblings.

17  Q.  Okay.  I'd like you to turn to the next exhibit in your

18  binder, please.  This is Exhibit 208.  Is this a series of

19  messages on Facebook that you participated in?

20  A.  Yes.

21  Q.  All right.  And did you participate in this messaging under

22  the rules you just described to this jury?

23  A.  Yes.

24          MR. MacGILL:  Okay.  Your Honor, we would ask to

25  publish Exhibit 208.

1          MR. BRIAN:  No objection.

2          THE COURT:  Exhibit 208 is admitted into evidence

3    without objection.

4                    *(Plaintiffs' Exhibit 208 was*

5                    *received in evidence.)*

6          MR. MacGILL:  And may I publish it?

7          THE COURT:  You may.

8          MR. MacGILL:  Thank you.

9    BY MR. MacGILL:

10   Q.  So we'll put on the board here, or on the screen, I should

11   say -- do you see the message that you wrote?

12   A.  Yes.

13   Q.  Okay.  And we now displayed the portion of this Facebook

14   message that you wrote?

15   A.  Yes.

16   Q.  All right.  Now, there's a reference here, and I think the

17   jury -- strike that.

18       There's a reference here:  I'm not, quote, out in the

19   media, but don't keep this private.

20       Could you explain what you meant by that.

21   A.  I meant that I'm not public in the media, but don't keep

22   this private in respect to I talk about this with other

23   half-siblings, I talk about this with my family and my close

24   friends.

25   Q.  Okay.  Anyone else?

1   A.  No.

2   Q.  And, again, not your children?

3   A.  No.

4   Q.  I'd like you to turn to tab 5, if you would, please.  Could

5   you please explain to the Court what Exhibit 956 is.

6   A.  This looks like a Facebook message.

7   Q.  Yeah.  If you look at page 2, my question should be more

8   specific.  Did you -- do you have a Facebook message on page 2

9   of Exhibit 956?

10  A.  Yes.

11          MR. MacGILL:  Your Honor, we would offer into evidence

12  Exhibit 956.

13          MR. BRIAN:  No objection.

14          THE COURT:  Exhibit 956 is admitted into evidence

15  without objection.

16                  (Plaintiffs' Exhibit 956 was

17                   received in evidence.)

18          MR. MacGILL:  May we publish 956?

19          THE COURT:  You may publish 956.

20          MR. MacGILL:  Thank you.

21  BY MR. MacGILL:

22  Q.  Sarah -- ma'am, again, this is 86th Street conceived

23  siblings only?

24  A.  Yes.

25  Q.  Okay.  Now, I would like to focus on what's written here,

1    Sarah Bowling; do you see that?

2    A.  Yes.

3    Q.  The words:  Live your truth, there's no shame, and I found

4    great freedom in feeling like I wasn't keeping a secret any

5    longer.  You got this.

6         Do you see that?

7    A.  Yes.

8    Q.  Can you explain what you wanted to --

9    A.  Well --

10   Q.  -- communicated here.

11   A.  Well, I was trying to be encouraging to a half-sibling who

12   had recently found out, because I know what she's going

13   through.  And when I'm saying great freedom and feeling like I

14   wasn't keeping a secret any longer, I have to tell you that

15   when we first found out about this, we --

16        THE COURT:  Okay, ma'am, you have to wait for the

17   question.

18        Next question.

19        MR. MacGILL:  Thank you.

20   BY MR. MacGILL:

21   Q.  So when you found out about this, what happened?

22   A.  Well, I'm just -- I'm explaining the answer.  I thought I

23   was answering the question.  But what I'm saying in this is

24   that the great freedom in feeling like I wasn't keeping a

25   secret any longer.  We weren't even going to tell my dad.

*BOWLING - DIRECT/MACGILL*                    Vol 1-175

1  Q.  Did you tell your father?

2  A.  Eventually.

3  Q.  Okay.

4  A.  Yes.

5  Q.  And with the reference here, secret any longer, as of the

6  time of this particular exchange, had you told your father

7  about this?

8  A.  Yes.

9  Q.  Now, I'd like to go -- I'd like you to look at Exhibit 946,

10 please, which is tab 6 in your binder.

11     Could you please tell the Court and jury what this is.

12 A.  This is an Instagram post from my sister.

13 Q.  Okay.  And which sister?

14 A.  Laura DiSalvo.

15 Q.  Okay.

16     MR. MacGILL:  Your Honor, we would offer into evidence

17 Exhibit 946.

18     MR. BRIAN:  No objection.

19     THE COURT:  946 is admitted into evidence without

20 objection.

21             *(Plaintiffs' Exhibit 946 was*

22             *received in evidence.)*

23     MR. MacGILL:  May we publish 946?

24     THE COURT:  You may.

25 BY MR. MacGILL:

*BOWLING - DIRECT/MACGILL*                    Vol 1-176

1   Q.  Mrs. Bowling, I want to make -- I want to ask you about

2   this asterisk tattoo.  Do you see that?

3   A.  Yes.

4   Q.  Can you explain this asterisk on your wrist.

5   A.  When I found out about Dr. Cline, it was just my results,

6   and so...

7   Q.  May I ask you a question?

8   A.  Yes.

9   Q.  So who's pictured here to your left?  Who's in the picture

10  with you?

11  A.  My sister, Laura.

12  Q.  All right.  Does she also have an asterisk?

13  A.  Yes.

14  Q.  Now, why -- can you tell the Court and jury why you got an

15  asterisk on your wrist.

16  A.  Yes.  So when I got my results, Laura and I agonized over

17  the fact that we may not be full siblings.

18  Q.  And you both -- in the sense you both had the same

19  biological father?

20  A.  Correct.  And she did end up taking a 23andMe that showed

21  that she was also Dr. Cline's.  And what Dr. Cline would do was

22  put an asterisk on the charts of his patients where he used his

23  own semen, and so if the mothers came back, he would know and

24  would give them a full sibling.

25  Q.  And this is Laura DiSalvo's post, Exhibit 946?

1   A.  Yes.

2   Q.  All right.  I want to go now to your involvement with

3   Mr. Petrella.  Who is Michael Petrella?

4   A.  He is the producer of *Our Father*.

5   Q.  And did you have interactions with him, at any time, prior

6   to the movie?

7   A.  Yes.

8   Q.  All right.  And could you tell the Court first, did you

9   exchange Facebook messages, at some point in time, with him?

10  A.  Yes.  He sent me a Facebook message.

11  Q.  Did you have any telephone conversations with Mr. Petrella?

12  A.  Yes, one.

13  Q.  And would you explain to the Court what that conversation

14  involved, at least in general terms?

15  A.  It was very brief.  It was just, he was sort of explaining

16  that they were doing a documentary and he wanted to gauge

17  interest from half-siblings and wanted as many participants as

18  possible to be included.

19       MR. MacGILL:  Now, just in time -- if we could go back

20  and display Exhibit 946 for a minute.

21  BY MR. MacGILL:

22  Q.  And Exhibit 946 is an Instagram post of your sister.  What

23  date?

24  A.  This is April 10th, 2020.

25  Q.  Okay.  Now, was your conversation with Mr. Petrella

*BOWLING - DIRECT/MACGILL*                    Vol 1-178

1  sometime after this time?

2  A.  Yes.

3  Q.  All right.  And some questions for you.  Did you ever agree

4  to participate in the movie *Our Father*?

5  A.  No.

6  Q.  Did you, at any time, ma'am, sign any document or release

7  relating to this movie, *Our Father*?

8  A.  Never.

9  Q.  Did you ever give permission to anyone at Realhouse or

10  Netflix for this movie to use your name?

11  A.  No.

12  Q.  Did you give permission to them -- strike that.

13      Did you give permission to Netflix or Realhouse, at any

14  time, to use your photograph in the movie?

15  A.  No.

16  Q.  Now, you mentioned a conversation and described that to the

17  Court a minute ago, the brief conversation you had with

18  Mr. Petrella, I would like to ask you about whether you ever

19  received a written assurance from Mr. Petrella about whether

20  you will be shown in the movie?

21  A.  Yes.

22  Q.  Okay.  I would ask you, please, to turn to the next

23  exhibit, Exhibit 20 (sic), which is your page -- your tab 7.

24      First --

25          MR. BRIAN:  Your Honor, I think counsel may have

*BOWLING - DIRECT/MACGILL*                        Vol 1-179

1  misspoken about the number of the exhibit.

2         THE COURT:  What number is the exhibit?

3         MR. MacGILL:  120.

4         MR. BRIAN:  I think you said "20."

5         MR. MacGILL:  My mistake.

6         THE COURT:  What is it?

7         MR. MacGILL:  120.

8         THE COURT:  120.

9         MR. MacGILL:  My mistake.  Thank you.

10  BY MR. MacGILL:

11  Q.  So what is Exhibit 120?

12  A.  This is a series of messages from Michael Petrella to

13  several half-siblings and Emma Choate.

14         MR. MacGILL:  Your Honor, we would offer into evidence

15  Exhibit 120.

16         THE COURT:  Any objection to 120?

17         MR. BRIAN:  No objection, Your Honor.

18         THE COURT:  Exhibit 120 is admitted into evidence

19  without objection.

20                *(Plaintiffs' Exhibit 120 was*

21                *received in evidence.)*

22         MR. MacGILL:  May we publish the exhibit?

23         THE COURT:  You may.

24  BY MR. MacGILL:

25  Q.  Mrs. Bowling, I have put in front of you Exhibit 120, and

1    what I'd like to do is first ask you about what is displayed on

2    the screen.  Is this a Facebook message between Mr. Petrella on

3    the one hand and certain of your siblings on the other?

4    A.  Yes.

5    Q.  There's a "re" line that references to Brian, Rob, Lisa,

6    and 15 others.  Do you see that?

7    A.  Yes.

8    Q.  And with respect to participants, are you shown as one of

9    the participants here?

10   A.  Yes.

11   Q.  Okay.  And just to ask, who is Emma Choate?

12   A.  She's a Realhouse employee.

13   Q.  Okay.  And let's look at the third-to-last paragraph on

14   page 11 of this exchange.  Do you see that on your screen?

15   A.  Yes.

16   Q.  Okay.  And is this a message that Mr. Michael Petrella sent

17   to you as a part of this Facebook exchange?

18   A.  Yes.

19   Q.  And did he write the following:  We would love to have each

20   of you to submit a photograph of your choosing, as well as one

21   of you as a baby.  A, you are comfortable being depicted

22   visually; do you see that sentence?

23   A.  Yes.

24   Q.  And then continuing:  You will not be identified unless

25   you've already given us explicit permission to do so.  Do you

1    see that?

2    A.  Yes.

3    Q.  Did you see that at the time it was written to you?

4    A.  Yes.

5    Q.  And what was your reaction to that?

6    A.  My reaction was that I would not be identified unless I

7    gave my explicit permission or consent.

8    Q.  Okay.  Was this important to you at the time?

9    A.  Yes.

10   Q.  And could you tell the Court why?

11   A.  Because I didn't want to be identified in a movie.

12   Q.  Okay.  And as things stood after April 26, 2021, what was

13   your understanding as to whether or not you would be named in

14   the movie *Our Father*?

15   A.  My understanding is that I would not be named in the movie

16   because Michael Petrella promised me that I would not be

17   identified unless I gave my explicit permission to do so.

18   Q.  Okay.  Let's turn to another subject, and let's turn to the

19   next exhibit, if we could.  And could you -- this is

20   Exhibit 15.  Can you tell the Court what Exhibit 15 is?

21   A.  This is a social media post from Netflix promoting the

22   movie.

23   Q.  Have you seen these marketing materials before?

24   A.  Yes.

25   Q.  And what is the date?

 1  A.  This is April 14th, 2022.

 2          MR. MacGILL:  Your Honor, we would offer Exhibit 15.

 3          THE COURT:  Any objection to 15?

 4          MR. BRIAN:  No objection.

 5          THE COURT:  Exhibit 15 is admitted into evidence

 6  without objection.

 7                  *(Plaintiffs' Exhibit 15 was*

 8                  *received in evidence.)*

 9          MR. MacGILL:  May we publish Exhibit 15?

10          THE COURT:  You may.

11  BY MR. MacGILL:

12  Q.  Now, on the bottom, we see the April 14, 2022, date.  Do

13  you see that, at the top?  We see April 14 --

14  A.  Yes.

15  Q.  -- you see that?

16  A.  Yes, yes.

17  Q.  What year was that?

18  A.  2022.

19  Q.  Okay.  Once you saw this, did you have an understanding as

20  to when the *Our Father* movie would premier?

21  A.  Yes.

22  Q.  Now, looking and just reading this together, it says, this

23  is from Blumhouse, at Blumhouse:  We've got the chills.  The

24  unimaginable rocked this small town by revealing over 90

25  siblings and counting.  Watch as one fertility doctor's

1    sinister secret unfolds in #Our Father on @Netflix, May 11.  Do

2    you see that?

3    A.  Yes.

4    Q.  When you saw this particular tweet, what was your

5    understanding as to whether you would be included?

6    A.  I didn't have an understanding I would be included because

7    I was promised by the producer that I wouldn't be without my

8    explicit permission.

9    Q.  Now, moving to May 11, 2022, did you make arrangements to

10    watch the movie?

11    A.  Yes.

12    Q.  And who did you watch the movie with?

13    A.  My mom and my sister.

14    Q.  What did you see when you saw the movie?

15    A.  I saw my name exposed.

16    Q.  And what was your reaction to that?

17    A.  I was very angry.  I was shocked.  I felt like a prop.  I

18    felt betrayed.  I felt lied to.

19    Q.  Okay.  Now, turning to -- I want to get into some

20    specifics.  Let's look at the next exhibit, which is Exhibit 35

21    in your binder.

22        Can you tell the Court what Exhibit 35 is.

23    A.  This is a still shot from the movie.

24        MR. MacGILL:  Your Honor, we would offer in

25    Exhibit 35.

```
 1              MR. BRIAN:  I need a moment, Your Honor.  I'm trying
 2    to look.
 3              THE COURT:  You may.
 4              MR. BRIAN:  That's fine.  No objection.
 5              THE COURT:  Exhibit 35 is admitted into evidence
 6    without objection.
 7                      (Plaintiffs' Exhibit 35 was
 8                       received in evidence.)
 9              MR. MacGILL:  May we publish Exhibit 35?
10              THE COURT:  You may.
11    BY MR. MacGILL:
12    Q.  Mrs. Bowling, I want to -- would you describe to the Court
13    what this is?
14    A.  This is a scene in the movie.  This is a still shot of a
15    scene in the movie.
16    Q.  Okay.  And is that your name there?
17    A.  Yes.
18    Q.  And beneath it, it says what?
19    A.  Half sister.
20    Q.  Okay.  Now, let's go to the next exhibit.  One final
21    question.  Is this what you saw on May 11, 2022?
22    A.  Yes.
23    Q.  If you would turn to the next tab in your binder,
24    Exhibit 36.
25         Can you describe what this is?
```

*BOWLING - DIRECT/MACGILL*                          Vol 1-185

1    A.  This is another still shot from the movie.

2             MR. MacGILL:  Your Honor, we would offer into evidence

3    number -- Exhibit Number 36.

4             MR. BRIAN:  No objection.

5             THE COURT:  Exhibit 36 is admitted without objection.

6                  *(Plaintiffs' Exhibit 36 was*

7                  *received in evidence.)*

8             MR. MacGILL:  May we publish Exhibit 36.

9             THE COURT:  You may.

10   BY MR. MacGILL:

11   Q.  Mrs. Bowling, can you tell the Court and jury what

12   Exhibit 36 is.

13   A.  This is a still shot of a scene in the movie with my name

14   exposed.

15   Q.  Okay.  Is this what you saw -- is this amongst what you saw

16   on May 11th?

17   A.  Yes.

18   Q.  Now, after -- you described your reaction when you saw this

19   previously, but what other steps -- did you take any other

20   steps with respect to Netflix that day, May 11, 2022, once you

21   saw the movie?

22   A.  Just talking with half-siblings, trying to get a bead on

23   what was going on.

24   Q.  Did you take any steps to review the movie trailer?

25   A.  Yes.

*BOWLING - DIRECT/MACGILL*                  Vol 1-186

1   Q.  Now, let's go to the next exhibit.  This is Exhibit 100.

2   Can you tell the Court what Exhibit 100 is.

3   A.  This is a still shot from the trailer.

4           MR. MacGILL:  Okay.  We would offer into evidence

5   Exhibit 100.

6           MR. BRIAN:  No objection.

7           THE COURT:  Exhibit 100 is admitted into evidence

8   without objection.

9                   *(Plaintiffs' Exhibit 100 was*

10                  *received in evidence.)*

11          MR. MacGILL:  May we publish Exhibit 100?

12          THE COURT:  You may.

13  BY MR. MacGILL:

14  Q.  Now, Mrs. Bowling, you described your name in the movie,

15  and now you've described your name being in the trailer.  Would

16  you describe to the jury what the trailer is?

17  A.  The trailer is a two-minute promotional piece for the

18  movie.

19  Q.  Now, separate and apart from the movie and separate and

20  apart from the trailer you just described, was your name used

21  in marketing posts?

22  A.  Yes.

23  Q.  I'm going to turn to now Exhibit 653, which is the next

24  tab, Mrs. Bowling.  In your binder, tab 13.

25      Can you tell the Court what Exhibit 653 is.

1  A.  This is a TikTok post sharing the trailer.

2          MR. MacGILL:  We offer into evidence Exhibit 653.

3          MR. BRIAN:  No objection.

4          THE COURT:  Exhibit 653 is admitted into evidence

5  without objection.

6                  *(Plaintiffs' Exhibit 653 was*

7                  *received in evidence.)*

8          MR. MacGILL:  May we publish Exhibit 653, Your Honor?

9          THE COURT:  You may.

10  BY MR. MacGILL:

11  Q.  So looking at 653, could you describe to the jury

12  specifically what this is?

13  A.  This is a still shot of the trailer where my name is

14  exposed.

15  Q.  And back at the -- did you have an understanding of how

16  many views of this marketing post had taken place?

17  A.  Yes.  On this particular one, 7.7 million views.

18  Q.  What is this a video of?  Can you tell us?

19  A.  It's a video of Jacoba scrolling through her 23andMe.

20  Q.  Jacoba Ballard, who you previously described?

21  A.  Jacoba Ballard.

22  Q.  She's the one who sent the e-mail that you described

23  earlier on the rules of the Facebook group?

24  A.  Yes.

25  Q.  Let's turn to the next exhibit, if we could, ma'am,

*BOWLING - DIRECT/MACGILL*                    Vol 1-188

1    Exhibit 388.  And is this a reference to -- what is this a

2    reference to, do you know?

3    A.  The trailer.

4    Q.  Yes.

5         MR. MacGILL:  And Your Honor, we would offer into

6    evidence Exhibit 388.

7         MR. BRIAN:  No objection.

8         THE COURT:  388 is admitted into evidence without

9    objection.

10             *(Plaintiffs' Exhibit 388 was*

11              *received in evidence.)*

12        MR. MacGILL:  May we publish and play the trailer,

13   Your Honor?

14        THE COURT:  You may.

15    (Video playing in open court.)

16   BY MR. MacGILL:

17   Q.  You testified earlier, you reviewed the movie for the first

18   time on May 11th.  What day did you review this trailer for the

19   first time?

20   A.  I don't know the first time, but I definitely reviewed it

21   after I watched the movie.

22   Q.  On what day?

23   A.  On May 11th.

24   Q.  Having reviewed the movie and having reviewed the trailer

25   on May 11th, could you explain to the Court and jury how you

1  felt at that time?

2  A.  Shock, betrayal, lied to.  I mean, I was upset.  I was

3  angry, I was -- it was just -- it was unimaginable to me.

4  Q.  All right.  Now, let's turn to the movie itself.  Let's

5  look at the next exhibit, 642.  And could you explain to the

6  Court what Exhibit 642 is.

7  A.  This is a social media post from Jason Blum.

8  Q.  On what date?

9  A.  On May 12th.

10  Q.  Okay.

11          MR. MacGILL:  We would offer into evidence, Your

12  Honor, Exhibit 642.

13          MR. BRIAN:  No objection.

14          THE COURT:  642 is admitted into evidence without

15  objection.

16                  *(Plaintiffs' Exhibit 642 was*

17                  *received in evidence.)*

18          MR. MacGILL:  May we publish Exhibit 642, Your Honor?

19          THE COURT:  You may.

20  BY MR. MacGILL:

21  Q.  Now, top left-hand corner, this is Jason Blum on May 12; is

22  that correct?

23  A.  Yes.

24  Q.  Who is Jason Blum?

25  A.  He's a famous horror movie producer.  He's the founder of

*BOWLING - DIRECT/MACGILL*                    Vol 1-190

1   Realhouse.

2   Q.  Okay.  And could you describe what this tweet was

3   displaying, to you?

4   A.  It's Mr. Blum verbalizing that *Our Father* is Number 1 on

5   the Netflix platform.

6   Q.  Okay.  Now, I want to ask you some questions about some of

7   the materials that was read in the presence of this judge and

8   jury earlier.  Were you here when Mr. Ciulla read discovery

9   stipulations at the beginning of this trial?

10  A.  Yes.

11  Q.  All right.  And what I would like to do is display for you

12  now a portion of what he read to this Court, and I've got a

13  question for you.

14      Do you recall hearing this, this read to the Court, and the

15  numbers that are shown at the right-hand margin?

16  A.  Yes.

17  Q.  Okay.  And have you, yourself, reviewed this table of views

18  that is on the right side of your screen?

19  A.  Yes.

20  Q.  And have you prepared or asked to be prepared a summary

21  chart and calculation of the numbers on this chart?

22  A.  Yes.

23      MR. MacGILL:  Okay.  One moment, Your Honor, if I may.

24  BY MR. MacGILL:

25  Q.  So I would like you first just to look at Exhibit 9001.

*BOWLING - DIRECT/MACGILL*                        Vol 1-191

1    Could you please look at that and describe to the Court what

2    this is?

3    A.  This is a chart of views of the movie in the USA and Canada

4    and the rest of the world.

5    Q.  Okay.  And did you prepare this -- did you total, provide

6    these totals that are on the right-hand margin of this court --

7    of this chart?

8    A.  Yes.

9           MR. MacGILL:  Your Honor, we would offer into evidence

10   Exhibit 9001.

11          MR. BRIAN:  Objection.  No foundation, Your Honor.

12          THE COURT:  And where is it, just the chart is 9001?

13          MR. MacGILL:  Yeah.  So, yes, 9001, Your Honor, is

14   this chart with totals on the right margin.

15          THE COURT:  Okay.  And he objects.

16          MR. BRIAN:  The objection is no foundation.

17          MR. MacGILL:  I can ask a few --

18          THE COURT:  If you would, counsel.

19          MR. MacGILL:  I'm happy to do so, Your Honor.

20   BY MR. MacGILL:

21   Q.  All right.  Now, looking at what's on your screen, do you

22   see that on the right-hand side, there's a region listed, UCAN;

23   do you see that?

24   A.  Yes.

25   Q.  And you see there's -- does that refer to the United States

*BOWLING - DIRECT/MACGILL*                         Vol 1-192

1    and Canada?

2    A.   Yes.

3    Q.   And then ROW; do you see that?

4    A.   Yes.

5    Q.   Does it refer to the rest of the world?

6    A.   Yes.

7    Q.   Now, prior to coming to court today, did you total up the

8    number of views on this chart during the period of time May 11

9    through May 18?

10   A.   Yes.

11   Q.   And how many people viewed this documentary, this *Our*

12   *Father* film, from May 8 to May 11 to May 18?

13   A.   14,762,628.

14   Q.   Okay.  Now, one other question:  In terms of your work in

15   connection with this chart, did you also total up the number of

16   views of *Our Father* during the time period May 11 to May 23?

17   A.   Yes.

18   Q.   And what was the total number of views in that period of

19   time?

20   A.   18,010,187.

21   Q.   Okay.  Do you have 9001 in front of you?

22   A.   Yes.

23   Q.   Does the Exhibit 9001 confirm the information that you just

24   testified to this Court?

25   A.   Yes.

*BOWLING - DIRECT/MACGILL*                    Vol 1-193

1    MR. MacGILL:  We would offer Exhibit 9001.

2    MR. BRIAN:  No objection.

3    THE COURT:  9001 is admitted into evidence without

4    objection.

5                (Plaintiffs' Exhibit 9001 was

6                received in evidence.)

7    MR. MacGILL:  May we publish, Your Honor?

8    THE COURT:  You may.

9    BY MR. MacGILL:

10   Q.  Ms. Bowling, I want to follow up with a few questions, if I

11   may.

12       So with respect to this May 11 to May 18, why is that

13   period of time referenced?

14   A.  That's the period of time between the release of the

15   documentary and the blurring of Lori Kennard's name.

16   Q.  Okay.  Now, would you please explain to the Court and jury

17   what the May 11 to May 23 total is?  Or let me ask a better

18   question.

19       Why is there a calculation -- why did you make a

20   calculation of views for the May 11 to May 23 period of time?

21   A.  Because that's the duration of time that my name was in the

22   movie.  So the documentary came out May 11th, and my name was

23   blurred on May 23rd.

24   Q.  Separate from -- in addition to the movie total of

25   18 million, was your name also included in the trailer?

A.  Yes.

Q.  Have you ascertained -- have you been able to evaluate and determine your best estimate as to how many people viewed the trailer?

A.  Millions.

Q.  You haven't totaled that up?

A.  No.

Q.  Okay.  18 million is movie only, not trailer?

A.  18 million is movie only.

Q.  Now, you described to the Court -- I'm going to take this down, if you don't mind.

In addition to the different marketing posts, the Times Square display, the trailer, the movie, was there local coverage of the *Our Father* film?

A.  Yes.

Q.  Okay.  And where did local coverage take place?

A.  It took place in The Indianapolis Star on a section of -- one of the sections of the Indianapolis Star, on the front page of that section.

Q.  Okay.  I'm going to hand --

MR. MacGILL:  Permission to approach the witness, Your Honor?

THE COURT:  You may.

BY MR. MacGILL::

Q.  I'm going to hand you, Ms. Bowling, Exhibit 726.  Can you

*BOWLING - DIRECT/MACGILL*                    Vol 1-195

1  please explain to the Court what that is.

2         MR. BRIAN:  Objection, Your Honor.  The document is

3  hearsay.

4         THE COURT:  All right.  She can describe what it is.

5         MR. MacGILL:  Thank you.

6  BY MR. MacGILL:

7  Q.  What is Exhibit 726?

8  A.  This is an article about *Our Father* published in The

9  Indianapolis Star on the front page of the Local Living section

10 on Thursday, May 19, 2022.

11 Q.  Thank you.

12        MR. MacGILL:  We would offer into evidence

13 Exhibit 726.

14        MR. BRIAN:  Same objection, hearsay.

15        THE COURT:  Do you have a hearsay exception?

16        MR. MacGILL:  It was publication of the *Our Father*

17 film, Your Honor.

18        MR. BRIAN:  That's hearsay.

19        THE COURT:  That's not a hearsay exception.  Under the

20 rules?

21        MR. MacGILL:  No specific --

22        THE COURT:  Counsel, one lawyer per witness.  Go talk

23 to your co-counsel, he has something to tell you.

24        MR. MacGILL:  If I may really quickly.  It's not

25 offered for the truth of the matter.  It's being offered, Your

*BOWLING - DIRECT/MACGILL*                    Vol 1-196

 1   Honor, for the fact that it was a publication about this, which

 2   caused community scrutiny and focus on this event.

 3              MR. BRIAN:  It's hearsay.

 4              THE COURT:  May I see the exhibit?

 5              MR. MacGILL:  Yes.

 6              THE COURT:  Can you put on your equipment?

 7        (Bench conference on the record.)

 8              THE COURT:  Counsel, is your client's name in the

 9   article?

10              MR. MacGILL:  It is not.

11              THE COURT:  Then why is it relevant?

12              MR. MacGILL:  It again shows -- in this community

13   where she lives, this is additional focus on the *Our Father*

14   film.

15              MR. BRIAN:  Your Honor, it's not the film.  As Your

16   Honor said in previous orders, the issue is whether the damage

17   has been caused by the disclosure of her name and her

18   connection to Cline.  If her name is not in the article, it's

19   not relevant to any claim, nor is it relevant to damages.

20              THE COURT:  Any response, counsel?

21              MR. MacGILL:  No further response.

22              THE COURT:  I'm going to sustain the objection to 726.

23   It's not relevant and it also contains hearsay.

24                         (Open court.)

25              THE COURT:  The objection is sustained.

1  BY MR. MacGILL:

2  Q.  On May 19, 2022, was your name still in the movie?

3  A.  Yes.

4  Q.  Now, I want to focus on additional events on May 11, 2022.

5  On May 11, 2022, did you reach out to -- did you receive any

6  text messages about the movie?

7  A.  Yes.

8  Q.  Would you please turn to the next exhibit, tab 19.

9       Could you tell the Court what this is.

10 A.  This is a series of text messages between me and my former

11 therapist, Amy Strobel, on May 11, 2022.

12        MR. MacGILL:  Your Honor, we would offer into evidence

13 Exhibit 348.

14        MR. BRIAN:  Your Honor, objection.  I think this was

15 ruled on.

16        THE COURT:  348?

17        All right.  So what's your objection, counsel?

18        MR. BRIAN:  Your Honor, I think I may have misspoken,

19 so perhaps we should go on the equipment.

20        THE COURT:  Okay.  We'll go on the equipment.

21     (Bench conference on the record.)

22        MR. BRIAN:  Your Honor, I think we made a motion on

23 this and my colleague has corrected me.  I think you denied our

24 motion.  The first text is hearsay.  You denied it with all

25 rights reserved.  So I think the first text is hearsay.  The

*BOWLING - DIRECT/MACGILL*                    Vol 1-198

 1    second one is irrelevant.

 2            MR. MacGILL:  Your Honor, you did rule on this,

 3    specifically.  And this is Document 345, page 3.  Stating,

 4    specifically, the fact that the parties told plaintiffs that

 5    they saw plaintiffs' names in the film causing plaintiffs to

 6    believe their names had been disclosed to third-party.  This is

 7    relevant to show the plaintiffs were harmed by defendants'

 8    alleged disclosure.

 9            MR. BRIAN:  Your Honor, I think we had argued that

10    it's not relevant to damages unless it's true.  Your Honor did

11    deny it at that time.  I'm making the objection now, but that

12    was the ruling.

13            The second text in this chain is irrelevant.

14            THE COURT:  Okay.  So the first text is from her

15    therapist; am I correct?

16            THE COURT:  Counsel, I didn't hear you.

17            MR. MacGILL:  I'm sorry.  I'm just reading the text.

18    The first text is at 8:40 a.m.  The next text is at 8:43.  And

19    the next text is at 8:49.

20            THE COURT:  So is the first text from her therapist:

21    Sarah, so sorry that I didn't text back.  I'm still working

22    from home.  Watching the documentary this evening.  Saw your

23    name.

24            MR. MacGILL:  Yeah.  As I understand it, they're not

25    objecting to the first text, but counsel is objecting to the

*BOWLING - DIRECT/MACGILL*                           Vol 1-199

1    second text.

2         MR. BRIAN:  We had previously made a motion on the

3    first text.  We're not withdrawing that objection.  We think

4    that is hearsay and it's not relevant unless it's true, which

5    is why it's hearsay.

6         The second is a text from the plaintiff that is

7    clearly an out-of-court hearsay statement.

8         THE COURT:  All right.  I'm going to sustain the

9    objection to the first -- to this exhibit.

10                        (Open court.)

11        THE COURT:  The objection is sustained.

12   BY MR. MacGILL:

13   Q.  Did you receive a text from your therapist on May 11?

14   A.  Yes.

15   Q.  Okay.  And what did you learn from the text?

16        MR. BRIAN:  Same objection, Your Honor.

17        MR. MacGILL:  Your Honor, this is --

18        MR. BRIAN:  That goes to the contents of the --

19        THE COURT:  She can say.  What did you learn from the

20   text, without saying what the therapist said to you?

21        MR. MacGILL:  Yeah.

22        THE WITNESS:  I learned that she saw my name in the

23   film.

24   BY MR. MacGILL:

25   Q.  So with respect to -- on what day?

*BOWLING - DIRECT/MACGILL*                    Vol 1-200

1          MR. BRIAN:  Your Honor, move to strike.  That's

2     hearsay.

3          THE COURT:  That's hearsay.  I'll sustain the

4     objection to that answer.  And the last answer is stricken from

5     the record.

6          MR. MacGILL:  Okay.  May we go back on then?

7       (Bench conference on the record.)

8          MR. MacGILL:  Your Honor, looking at the Court's

9     ruling on November 6, 2024, page 3, the Court is not persuaded

10    by the defendants' reply.  The fact that third parties told

11    plaintiff that they saw plaintiffs' name in the film, causing

12    plaintiffs to believe that their names had been disclosed to

13    those third parties is relevant to showing that plaintiffs were

14    harmed by defendants alleged disclosure regardless of whether

15    third parties actually saw the names.

16         So it is her -- it's her receipt of this information

17    that we're focusing on, not the truth of it.

18         THE COURT:  Counsel?

19         MR. BRIAN:  I'm sorry.  I could not have -- I did not

20    have my equipment on.  I did not hear that.  I'm sorry.

21         THE COURT:  Can you repeat?

22         MR. MacGILL:  So the Court, specifically, ruled on

23    page 3 of Document --

24         MR. BRIAN:  And also, Your Honor -- Your Honor, could

25    counsel be directed to look away from the jury when he's

1    talking into the equipment?

2         THE COURT:  Yes, if you would, counsel.  But, lawyers,

3    go ahead and make your argument.

4         MR. MacGILL:  So, specifically, what we're citing is

5    document 345 and this Court's ruling under the headline

6    stating: Statements about seeing plaintiffs' names.  The Court

7    ruled --

8         We're referring to Document 345, page 3, under the

9    headline statements about seeing plaintiffs' names.

10        Second paragraph:  The Court is not persuaded by

11   defendants' reply.  The fact that third parties told plaintiffs

12   they saw plaintiffs' names in the film causing plaintiffs to

13   believe that their names had been disclosed to those third

14   parties is relevant to showing that plaintiffs were harmed by

15   defendants' alleged disclosure, regardless of whether third

16   parties actually saw plaintiffs' names.

17        The Court therefore finds that the plaintiffs have

18   identified a permissible nonhearsay use of the out-of-court

19   statements.  The defendants have not shown the out-of-courts

20   statements about plaintiffs' names are clearly not admissible

21   for any purpose so their request to exclude those statements is

22   denied.

23        THE COURT:  And what's your position?

24        MR. BRIAN:  Your Honor, that was what Your Honor

25   ruled.  All of your rulings on the motions in limine, you said

*BOWLING - DIRECT/MACGILL*                    Vol 1-202

1    were essentially preliminary.  We think, for the reasons I've

2    just articulated, that this is hearsay.  It does not go to

3    damages, as to damage or reputation, unless what's being said

4    in the e-mail, in the text message, is true.

5             THE COURT:  Okay.  So, Counsel, I'm going to allow you

6    to lead the witness because she can't say what her therapist

7    said, that's hearsay, and it is being offered for the truth of

8    the matter, but you can ask her if she believes, based on her

9    conversation or texts with her therapist, did she believe that

10   her name was -- had been disclosed.

11            MR. MacGILL:  Understood.

12                      (Open court.)

13            THE COURT:  Counsel, would you rephrase your question?

14            MR. MacGILL:  Happy to, Your Honor.

15   BY MR. MacGILL:

16   Q.  Based -- Mrs. Bowling, based specifically on your

17   communications with your therapist in May of 2022, did you

18   believe that your name had been disclosed?

19   A.  Yes.

20   Q.  Based on that conversation, how did that particular

21   conversation or communication make you feel?

22   A.  It was upsetting.

23   Q.  I'm sorry?

24   A.  It was upsetting.

25   Q.  Okay.  Now, in addition to this communication that you just

*BOWLING - DIRECT/MACGILL*                    Vol 1-203

1    described to the Court and jury with your therapist in May, on

2    May 11, 2022, did you also send -- did you exchange some texts

3    with your sister-in-law?

4    A.   Yes.

5    Q.   And what is -- what is your sister-in-law's name?

6    A.   Sarah Sorenson.

7    Q.   Okay.  And based on the conversation that you had with

8    Sarah Sorenson, did you understand that she had seen your name

9    in the movie?

10   A.   Yes.

11   Q.   And with respect to those circumstances, on that day, did

12   you exchange a series of texts with Sarah Sorenson?

13   A.   Yes.

14           MR. MacGILL:  May I have one minute, Your Honor?

15           THE COURT:  You may.

16       (Off the record.)

17   BY MR. MacGILL:

18   Q.   If you would, Mrs. Bowling, would you please turn to the

19   next document in your binder.  And I'm referring specifically

20   to Exhibit 230.  That would be at tab 24.

21       Do you have that in front of you?

22   A.   Yes.

23   Q.   And would you explain what that is for the jury, please.

24   A.   This is a series of text messages between me and my

25   girlfriends.

*BOWLING - DIRECT/MACGILL*                              Vol 1-204

1   Q.  Okay.  Now, is there --

2          MR. MacGILL:  Well, first of all, let's just offer

3   Exhibit 230 into evidence?

4          MR. BRIAN:  No objection.

5          THE COURT:  Exhibit 230 is admitted into evidence

6   without objection.

7                    *(Plaintiffs' Exhibit 230 was*

8                    *received in evidence.)*

9          MR. MacGILL:  And may we publish Exhibit 230?

10         THE COURT:  Yes.

11  BY MR. MacGILL:

12  Q.  So looking at this, could you describe this more

13  specifically in terms of who is a part of this text group?

14  A.  These are my girlfriends:  Shannon Heider, Lindsay Adams,

15  and Carla Crouse.

16  Q.  All right.  And do you have a -- you say they're your

17  girlfriends.

18  A.  They're my best friends.

19  Q.  Your best friends, all right.

20      And do you have a -- is this a group chat that has some

21  kind of name for it?

22  A.  Yes.

23  Q.  Okay.  Now, what's the date of this exchange?

24  A.  May 11, 2022.

25  Q.  Okay.  At the time -- at what time were you exchanging

1   these texts?

2   A.  Just after 9:00 a.m.

3   Q.  Okay.  And at this point, had you seen your name in the

4   movie?

5   A.  Yes.

6   Q.  Okay.  And with respect to what you -- and this -- this --

7   it's shown here, Shannon Heider, Lindsay Adams, Carla Crouse.

8   That is the group that you're communicating throughout this

9   Exhibit 230?

10  A.  Yes.

11  Q.  Now, there's some language here that we can see in the

12  second text that was displayed in the opening statement and we

13  can see it.  Do you see the second text there?

14  A.  Yes.

15  Q.  All right.  Is that the kind of language you ordinarily

16  use, Mrs. Bowling?

17  A.  Not ordinarily, no.

18  Q.  And can you explain why you used such language in this

19  exchange with Shannon Heider, Lindsay Adams, and Carla Crouse

20  on May 11, 2022?

21  A.  I was in shock.  I was the most angry I've ever been in my

22  entire life.  I am just seeing my name in a movie where I had

23  been previously promised that I would not be exposed without my

24  explicit consent, and I was irate.

25  Q.  Okay.  Now, is there any humor in any of this to you or any

*BOWLING - DIRECT/MACGILL*                    Vol 1-206

1  part of the communication with Shannon Heider, Lindsay Adams,

2  and Carla Crouse that involved at least some levity of any

3  kind?

4  A.  Yes.

5  Q.  And can you tell the Court and jury what that is?

6  A.  I want to get rich, bitch.

7  Q.  Why do you say that?

8  A.  Well, "rich bitch" is a reference in a TV show.

9  Q.  What TV show?

10 A.  The Real Housewives of Atlanta.

11 Q.  Is this something -- is Real Housewives of Atlanta

12 something that you communicate with this friend group about?

13 A.  I mean, that's a -- "rich bitch" is a communication that I

14 communicate with this friend group about.

15 Q.  Had you capitalized it?

16 A.  Yes.

17 Q.  Now, Carla Crouse texted you back on page 5.  Let's take a

18 look at page 5.

19     Are you there?  Let's get there.  We can pull it up.

20 A.  Yes.

21         MR. MacGILL:  Can I have one moment, Your Honor?

22         THE COURT:  Yes.

23     (Off the record.)

24 BY MR. MacGILL:

25 Q.  Let me refer you to the next exhibit, if I may,

*BOWLING - DIRECT/MACGILL*                              Vol 1-207

1    Exhibit 717.  That's tab 21.

2         Do you have that in front of you?

3    A.  Yes.

4    Q.  Okay.  Could you tell the Court what tab 20 -- pardon me.

5    Can you tell the Court what Exhibit 717 is?

6    A.  This is another series of texts between me and my

7    girlfriends.

8    Q.  Again, Ms. Carla Crouse?

9    A.  Yes, she's included.

10   Q.  Shannon Heider?

11   A.  Yes.

12   Q.  And Lindsay Adams?

13   A.  Yes.

14   Q.  And what is the date of this text stream?

15   A.  This is May 13th, 2022.

16        MR. MacGILL:  We would offer into evidence, Your

17   Honor, Exhibit 717.

18        MR. BRIAN:  Objection.  It's hearsay.

19        THE COURT:  All right.  I don't have that one in front

20   of me.

21        MR. MacGILL:  Your Honor, maybe I could solve the

22   problem if I could ask a particular question.

23        THE COURT:  Sure.

24   BY MR. MacGILL:

25   Q.  Based on this -- based on the exchange of texts on May 13

1    with your friend group -- strike that.

2        Based on this exchange on May 13, 2022, with your friend

3    group, did you come to an understanding as to whether Carla

4    Crouse had seen your name in the movie?

5            MR. BRIAN:  Your Honor, I'll make it easier.  I'll

6    withdraw the objection to the exhibit.

7            THE COURT:  Okay.  You withdraw the objection.

8            So 717 can be admitted into evidence without

9    objection.

10               *(Plaintiffs' Exhibit 717 was*

11               *received in evidence.)*

12           MR. MacGILL:  Okay.

13   BY MR. MacGILL:

14   Q.  Ma'am, I would like you to turn to page 5, if you would.

15           MR. MacGILL:  And may I publish Exhibit 717?

16           THE COURT:  Yes, you may, counsel.

17   BY MR. MacGILL:

18   Q.  So did Carla Crouse text you on May 13 saying:  Just saw

19   your name?

20   A.  Yes.

21   Q.  Okay.  How did this text message make you feel?

22   A.  Upset.

23   Q.  And why is that?

24   A.  Because she saw my name in the documentary.

25   Q.  Okay.  Turn to the next exhibit if you would, Exhibit 217.

*BOWLING - DIRECT/MACGILL*                              Vol 1-209

1   Could you tell the Court what this is.

2   A.   This is a series of text messages between me and a

3   girlfriend.

4   Q.   And who is the girlfriend?

5   A.   Her name is Anne Werbach.

6   Q.   And would you call her a close friend?  How would you

7   characterize her at all?

8   A.   We've been friends for 30 years.

9   Q.   Okay.

10          MR. MacGILL:  We would offer into evidence

11   Exhibit 217.

12          MR. BRIAN:  No objection.

13          THE COURT:  Exhibit 217 is admitted into evidence

14   without objection.

15                  *(Plaintiffs' Exhibit 217 was*

16                  *received in evidence.)*

17          MR. MacGILL:  Okay.  May I publish it, Your Honor?

18          THE COURT:  You may.

19   BY MR. MacGILL:

20   Q.   All right.  Let's look at 217.  You write to Ann Werbach:

21   I actually thought the documentary was well done.  It's a shame

22   it's kind of ruined for me because they used my full name and

23   picture without consent.

24       Do you see that?

25   A.   Yes.

*BOWLING - DIRECT/MACGILL*                    Vol 1-210

1  Q.  Now, describe what you mean with respect to this "well

2  done" comment?

3  A.  Well, I thought it was well done in that it was creepy, it

4  was disgusting, it was scary.  The music gave me a visceral

5  reaction, and in that regard, I thought it was well done.  I

6  thought that what they set out to do, they had achieved.

7  Q.  Okay.  What then was the problem with the documentary as

8  you saw it, on that day, when you were writing this text to Ann

9  Werbach, if any?

10 A.  The problem was that they used my name without my consent

11 after they promised me that I would not be exposed without my

12 explicit permission, and then they showed it to a platform of

13 over 200 million people where 18 million people viewed it.

14 Q.  Let's turn to the next exhibit, 229.  And that is at tab

15 23, Mrs. Bowling, in your binder.

16     Do you have Exhibit 229 in front of you?  Could you tell

17 the Court what this is, please.

18 A.  This is a text message between me and my friend, Lindsay

19 Adams.

20 Q.  Okay.  And what time were you texting her?

21         MR. MacGILL:  Pardon me.

22         We would offer into evidence, Your Honor, Exhibit 229.

23         MR. BRIAN:  No objection.

24         THE COURT:  229 is admitted into evidence without

25 objection.

1           (Plaintiffs' Exhibit 229 was

2           received in evidence.)

3           MR. MacGILL:  Okay.  And could we publish Exhibit 229,

4    Your Honor?

5           THE COURT:  You may.

6    BY MR. MacGILL:

7    Q.  Okay.  Now, let's look at page 1 at the top.  And this is

8    your text exchange with your friend, Lindsay Adams?

9    A.  Yes.

10   Q.  Okay.  What time?

11   A.  This is on May 11th, 2022, at 10:06 a.m.

12   Q.  Okay.  And you had just seen the movie?

13   A.  I had just -- I'm not even sure, at this point, I'm

14   finished watching it yet.

15   Q.  Okay.  And was this text while you were watching the movie?

16   A.  Yes.

17   Q.  Okay.  And there's a reference here.  Looking at this, the

18   time is shown at 5/11/2022 at 10:06 a.m.; is that right?

19   A.  Yes.

20   Q.  You write your friend Lindsay Adams, quote:  Seriously.

21   This will be my 15 minutes.  I want paid.

22         Do you see that?

23   A.  Yes.

24   Q.  Would you, looking at this today, consider this to be harsh

25   language from you?

*BOWLING - DIRECT/MACGILL*                    Vol 1-212

1   A.  Yes.

2   Q.  All right.  Why?

3   A.  Because I was looking at a screen with my name exposed to

4   millions of people after I had already given my -- or after --

5   after I had already been promised that I would not be

6   identified without my explicit permission, and I wanted someone

7   to be held accountable.  I was in shock, I was irate, I was --

8   felt betrayed.  I was out of my mind.

9   Q.  Okay.  Now, I want to switch topics and talk about your

10  life before this movie; okay?

11      Before the movie, did you look at -- did you regard

12  yourself as a trusting person?

13  A.  Yes.

14  Q.  What degree of confidence, if any, did you have in your

15  St. Pious community?

16  A.  I had a hundred percent confidence.  I had been a part of

17  that parish and community since I was born.

18  Q.  What confidence, if any, did you have before the movie in

19  your social life?

20  A.  I had great confidence.  I liked to get to know people.  I

21  liked spending time with people.

22  Q.  Tell us, then, in terms of before the movie, how would you

23  characterize your own personal interactions with your children

24  and husband?

25  A.  I mean, it was good.  I loved being a mom.  I -- I stayed

*BOWLING - DIRECT/MACGILL*                    Vol 1-213

1    home in 2014 to be a mom.

2    Q.  Okay.

3         MR. MacGILL:  I'll move this back so we can see it.

4    BY MR. MacGILL:

5    Q.  Now, Mrs. Bowling, you've described to the jury some of

6    your reactions on May 11 -- or your reactions on May 11, '22;

7    have you not?

8    A.  I have.

9    Q.  And do you think you have -- have you fairly, to the best

10   of your ability, described your feelings and reactions on that

11   day?

12   A.  Yes.

13   Q.  Okay.  Now, we are here on December 2nd, 2024; is that

14   right?

15   A.  Yes.

16   Q.  Okay.  Now, I'd like to focus on first a general question.

17   Since the movie was published by Netflix and produced by

18   Realhouse, have you encountered any emotional distress?

19   A.  Yes.

20   Q.  And could you tell the Court and jury whether that

21   emotional distress has been intermittent, persistent, in terms

22   of frequency, could you tell the Court the frequency of the

23   emotional distress?

24   A.  Persistent, daily.  I mean, this is a load I carry

25   constantly.

1  Q.  Okay.  Is the emotional distress during this period of time

2  from May 11, 2022, to the present day, has it also been,

3  sometimes, specific to certain situations that you were in?

4  A.  I would say yes.  At St. Pious, around my kids' friends,

5  around their parents, just constantly thinking who knows about

6  this, who's thinking about me, who's judging me, who now knows

7  that I've been part of a community for, at that point,

8  40 years, that I was proud to be a part of, that I fully

9  identified with, and now they may regard me as not part of that

10  family.  It's definitely situational at St. Pious.

11  Q.  Now, has the movie -- has your -- have you -- let me state

12  it better.

13      From your perspective, at least in general terms, have you

14  lost, at least to some extent, the joy in life since the movie?

15  A.  Yes.

16  Q.  Now, I want to focus on -- we covered May 11th.  After

17  May 11 to the present day, could you describe whether you've

18  had stress associated with this?

19  A.  Yes, a lot of stress.

20  Q.  Could you describe for the Court and jury the type of

21  stress you've had.

22  A.  Just a complete all encompassing preoccupation.  It's like

23  when there's nothing to think about or distract, it's always

24  there.

25  Q.  Have you experienced any humiliation in your community as a

1    result of this event?

2    A.  I mean, I do feel humiliated because, as I stated, I've --

3    the Sheehan family were founding parishioners of St. Pious.  I

4    have always been proud to be a part of this family.  My cousins

5    went to St. Pious.  My aunts and uncles went to St. Pious.  I

6    went to St. Pious, my kids go to St. Pious.  And just thinking

7    now who could know that I'm not part of this family and that

8    I'm associated with Dr. Cline.  Yeah, it's very humiliating.

9    Q.  Okay.  Now, have you, relative to this period of time since

10   May 11, have you had, at any point, an inherent feeling that

11   other people might judge you based on your -- the fact that

12   your biological father is Dr. Cline?

13   A.  Yes.  I mean, he's depicted and regarded as a monster.

14   Q.  When you -- to the extent -- as you -- strike that.

15       With respect to this inherent feeling that you just

16   described, do you have that feeling as to parish members?

17   A.  Yes.

18   Q.  Long-time friends?

19   A.  Yes.

20   Q.  Children's classmates?

21   A.  Yes.

22   Q.  Parents of children's classmates?

23   A.  Yes.

24   Q.  Now, with respect to whether -- strike that.

25       As to whether you have certain feelings about other people

1   and how they will regard you, do you have any concerns about

2   whether people in your community will view you with dislike or

3   aversion because of how you were conceived?

4   A.   Yes.

5   Q.   Why is that important to you?

6   A.   Because my whole identity has been part of this family, and

7   then for people to know that, in fact, I was conceived in a

8   completely different way, it's upsetting.

9   Q.   Okay.  Now, I want to compare your sleeping before this

10  event and your sleeping today.  Are you able to provide that

11  comparison to the Court?

12  A.   Yes.

13  Q.   Could you describe to the Court how your sleeping has been

14  affected, if at all, based on the events of May 11, 2022, and

15  after?

16  A.   My sleep is heavily disrupted.

17  Q.   Okay.

18  A.   I have trouble falling asleep, I --

19          MR. BRIAN:  Object, Your Honor, I'm going to object.

20  Your Honor has ruled this is a physical symptom.

21          THE COURT:  I'll let what she's answered go.  Next

22  question.

23  BY MR. MacGILL:

24  Q.   Next question.  Now, with respect to your life before

25  May 11, 2022, at that time, did you feel that you had control

1    over the information about your life?

2    A.  Yes.

3    Q.  Today, and after May 11, 2022, do you feel like you today

4    have control over information about your life?

5    A.  No.

6    Q.  Are you more or less trusting today than you were before

7    May 11, 2022?

8    A.  Absolutely less trusting.

9    Q.  Okay.  Now, a couple of final topics on this line I wanted

10   to ask you about.  Do you feel -- since May 11, 2022, have you

11   been preoccupied or lack presence in the moment from time to

12   time?

13   A.  Yes.

14   Q.  Could you explain to the Court and jury what this is, this

15   preoccupation?

16   A.  It's -- it's just a preoccupation of how I was betrayed,

17   how I was promised that I wouldn't be shown in this film

18   without my consent.  My autonomy over my private information.

19   Q.  Now, with respect to circumstances after May 11, 2022, when

20   you have experienced some form of emotional distress, does the

21   emotional distress impair your family interactions to any

22   extent?

23   A.  Yes.

24   Q.  How?

25   A.  Well, I just -- I feel like I'm on a hamster wheel of

1    emotional distress, and when I'm so preoccupied, it's hard to

2    enjoy my life.  I feel like the best years of my kids' lives

3    are just passing me by.

4    Q.  Okay.  Now, with respect to what you've described in terms

5    of your outlook on life here to the jury and the Court today,

6    do you have any confidence as to when this particular set of

7    feelings and distress will stop?

8             MR. BRIAN:  Objection, calls for expert opinion, Your

9    Honor.

10            THE COURT:  She can give her opinion, her lay opinion.

11   A.  Can you repeat that, please?

12   BY MR. MacGILL:

13   Q.  You described the emotional distress that you've had in

14   these different forms.  You described how enjoyment of life has

15   been lost to an extent.  Do you have any opinion or view as to

16   when this stops for you?

17   A.  The emotional distress?

18   Q.  Yes.

19   A.  No.  I mean, it doesn't stop.  I try every day, but --

20   Q.  Now I want to switch topics with you in terms of

21   situations.  I want to ask you a couple of questions.  Based on

22   the events today, how do you feel about building new

23   relationships?

24   A.  I have no interest in building new relationships.

25   Q.  Why is that?

1   A.  Because I don't trust anyone.

2   Q.  Is that true for your school community?

3   A.  Yeah.

4   Q.  Is it true for your church community?

5   A.  Yes.

6   Q.  Now, with respect to the emotional distress component of

7   this, since May 11, I want to ask you about your children.  You

8   testified earlier you have not told your children?

9   A.  No.

10  Q.  What emotional distress, if any, does that circumstance

11  cause to you?

12  A.  A ton of emotional distress.  This is not something I want

13  my children to know right now.

14  Q.  And, again, remind us what the ages of your children are.

15  A.  Fourteen, ten, and eight.

16  Q.  Now, ma'am, I want to ask you a couple of difficult

17  questions now.  You've described to the best of your ability

18  the emotional distress that you've experienced over time; is

19  that fair?

20  A.  Yes.

21  Q.  And have you given what you think is a fair and full

22  description of that distress?

23  A.  Yes.

24  Q.  Have you also described to the best of your ability how

25  your enjoyment of life has been affected since May 11 of 2022?

*BOWLING - DIRECT/MACGILL*                    Vol 1-220

1    A.  Yes.

2    Q.  Okay.  Now, based on these circumstances and the type of

3    experiences that you're having, and the extent of the

4    experiences that you expect, have you given thought to

5    appropriate compensation under these circumstances that would

6    be acceptable to you?

7    A.  Yes.

8    Q.  Could you tell the Court and jury what those thoughts are?

9             MR. BRIAN:  Objection, that calls for expert opinion,

10    Your Honor.

11            MR. MacGILL:  I can ask some questions if that would

12    be helpful.

13            THE COURT:  Ask some more questions.

14            MR. MacGILL:  Okay.

15    BY MR. MacGILL:

16    Q.  So you understand this is a personal injury lawsuit; right?

17    A.  Yes.

18    Q.  And you understand that the lawsuit involves invasion of

19    your privacy; right?

20    A.  Yes.

21    Q.  Now, as you look at the invasion of privacy circumstances,

22    do you understand that as far as you are concerned, as far as

23    just thinking about the movie, that your name was referenced

24    18,010,187 times?

25    A.  Yes.

*BOWLING - DIRECT/MACGILL*                    Vol 1-221

1   Q.  Does that factor into you in terms of how you feel about

2   these events?

3   A.  Yes.

4   Q.  How?

5          MR. BRIAN:  Objection, Your Honor.  It calls for

6   expert opinion, it calls for a legal conclusion.

7          MR. MacGILL:  Just how she feels, Your Honor.

8          THE COURT:  How do you feel?  You may state how you

9   feel.

10  A.  How I feel with how I believe I should be compensated?

11  BY MR. MacGILL:

12  Q.  No.  Just how do you feel about these 18 million exposures

13  from the movie alone?

14  A.  I feel disgusted.  I feel lied to, I feel betrayed, I

15  feel -- I mean, like I said, I felt like a prop.

16  Q.  With respect to -- with respect to the invasion of privacy,

17  as you sit here this afternoon testifying to this judge and to

18  this jury, do you feel that your privacy was invaded at least

19  18 million times?

20         MR. BRIAN:  Objection, leading, Your Honor.

21         THE COURT:  And he has been leading, I'll sustain.

22         MR. MacGILL:  Sustained.

23  BY MR. MacGILL:

24  Q.  Have you assessed the circumstances and made an assessment

25  yourself as to how often your privacy has been invaded by the

1  publication of this movie?

2          MR. BRIAN:  Same objections, Your Honor.  It calls for

3  expert opinion and a legal conclusion.

4          THE COURT:  I'll sustain.

5  BY MR. MacGILL:

6  Q.  Okay.  Now, ma'am, with respect to -- just focusing on the

7  emotional distress since May 11 and the loss of enjoyment of

8  life, would you agree to endure these emotional disturbances or

9  distresses in exchange for $1,000 day?

10         MR. BRIAN:  Same objection, Your Honor.

11         THE COURT:  I'll let her answer that.

12 A.  No.

13 BY MR. MacGILL:

14 Q.  Ma'am, would you agree to sustain these emotional

15 distresses and the loss of enjoyment of your life for $2,000 a

16 day?

17 A.  No.

18         MR. MacGILL:  May I have one minute, Your Honor?

19         THE COURT:  You may.

20         MR. MacGILL:  Nothing further, Your Honor.  Thank you.

21         THE COURT:  Okay.  All right.  Let's take a recess.

22         Ladies and Gentlemen of the Jury, you're not to begin

23 any deliberations, no discussion, and we'll have you back in

24 the courtroom in about 10 minutes.

25         COURTROOM DEPUTY:  All rise.

1    (Jury out at 4:26.)

2        THE COURT:  Okay, we'll take about a ten-minute break,

3    and then we'll allow cross-examination.  When you come back,

4    just come back up to the stand.

5        (Recess at 4:26, until 4:41.)

6        THE COURT:  We're back on the record.  And go get your

7    jury lined up, Sarah.

8        Are you ready for the jury?

9        MR. BRIAN:  We are.

10       THE COURT:  Bring them in.

11       COURTROOM DEPUTY:  All rise.

12   (Jury in at 4:42.)

13       THE COURT:  We're back on the record.

14       And, counsel, you may cross-examine the witness.

15       MR. BRIAN:  Thank you.  May it please the Court,

16   counsel, members of the jury.

17                       **CROSS EXAMINATION**

18   BY MR. BRIAN:

19   Q.  Good afternoon, Ms. Bowling.  My name is Brad Brian.  I

20   represent Netflix and Realhouse.  We've never met, have we?

21   A.  No.

22   Q.  Let Marie start with Exhibit 230.

23

24       MR. BRIAN:  If we could put that up on the screen.

25       It's been admitted into evidence, Your Honor.

*BOWLING – CROSS/BRIAN*                              Vol 1-224

1   BY MR. BRIAN:

2   Q.  230 is these series of text messages that you exchanged

3   with Shannon -- is it Heider?

4   A.  Yes.

5   Q.  Heider, Lindsay Adams, and Carla Crouse; right?

6   A.  Yes.

7   Q.  And these are, I think you described them, as very close,

8   really best friends; right?

9   A.  Yes.

10  Q.  And you socialize with them, I assume?

11  A.  Yes.

12  Q.  You play tennis with them; don't you?

13  A.  Yeah.

14  Q.  And I think you said you confided in them, and at one

15  point, you described them at your therapists; didn't you?

16  A.  Yeah.

17  Q.  So all of these text messages in Exhibit 230 start just a

18  little bit after 9:00 in the morning; isn't that right?

19  A.  Yes.

20  Q.  And that's the same morning that the documentary *Our Father*

21  first came out; right?

22  A.  Yes.

23  Q.  And I think you testified in response to Mr. MacGill's

24  questions that you first learned that your name was in the

25  documentary when you watched the documentary that morning with

*BOWLING – CROSS/BRIAN*                    Vol 1-225

1   your sister and your mother.  Did I hear that right?

2   A.  Yes.

3   Q.  Okay.  And that's not right, is it?

4   A.  I'm not sure what you mean.

5   Q.  Well, isn't it a fact that your sister, Laura DiSalvo,

6   called you that morning when you were driving to your mom's to

7   watch the documentary?  Isn't that true?

8   A.  Yes, that's correct.

9   Q.  And your sister told you in that call that your name

10  appeared in the documentary; isn't that right?

11  A.  Yes.

12  Q.  Okay.  So at the time you sent the first text messages to

13  your three best friends, you had actually not seen the shots

14  yet in which your name appeared; isn't that right?

15  A.  I don't recall.

16  Q.  Okay.  So let's look at the very top of the first --

17          MR. BRIAN:  I'm going to need my reading glasses, Your

18  Honor, for this.  It's pretty small.

19  BY MR. BRIAN:

20  Q.  At the top, in row 2, you see at the left, the very left,

21  there's, essentially, row numbers starting at 1, 2, 3.  Do you

22  see that?

23  A.  Yes.

24  Q.  So I'm going to refer to the rows to identify these.  The

25  first text message was one that you sent.

 1          MR. BRIAN:  If we could go a little bit to the right,

 2     it's at 9:02:59.

 3     BY MR. BRIAN:

 4     Q.  Do you see that?

 5     A.  Yes.

 6     Q.  And you said:  Ummmm, Shanny, I need your expertise.  My

 7     first and last name are used in the document.  I signed jack

 8     shit.

 9          That's what you wrote; right?

10     A.  That's correct.

11     Q.  And when you say "Shanny," you were addressing that to

12     Shannon Heider; right?

13     A.  Yes.

14     Q.  She's a lawyer; right?

15     A.  Well, she went to law school.

16     Q.  Okay.  Close enough.

17     A.  Yes.  Yeah, yeah.

18     Q.  Okay.  And you went on to tell your friends, in this series

19     of text messages, that your name had appeared in the

20     documentary; right?

21     A.  Yes.

22     Q.  And then, if you look at row 9 -- I'm sorry, row 5, one of

23     your friends, I guess it was Shannon Heider, said:  How is it

24     used?

25          Do you see that?

*BOWLING − CROSS/BRIAN*                    Vol 1-227

1    A.  Yes.

2    Q.  And you responded, in row 6:  In two frames, like shown

3    above.

4        Right?

5    A.  Yes.

6    Q.  Now, if you turn to the next page, that would be page 2,

7    row 14, one of your friends, I guess again Shannon Heider,

8    suggested that you ask them to blur it out.  Do you see that?

9    A.  Yes.

10   Q.  And then toward the bottom of page 2, row 20, you respond

11   to that and say:  Absolutely.

12       Isn't that right?

13   A.  I didn't -- can you repeat that?

14   Q.  Yeah.  Well, in row 20, you wrote:  Absolutely.

15       Right?

16   A.  Yes.

17   Q.  And wasn't that a response to her suggestion that you

18   contact them and ask them to blur it out?

19   A.  I'm not sure.

20   Q.  Okay.  Read the whole document.  I don't mean to -- go

21   ahead and read all the texts between there.

22   A.  I'd e-mail them and remind them of your convo.  Ask them to

23   blur it out.  See what they say.  If they say no, they will

24   probably tell you what they are relying on.

25   Q.  I think you're on the wrong -- well -- yeah, okay.  And

*BOWLING – CROSS/BRIAN*                    Vol 1-228

1    then, go ahead.  And:  If they say no, they will probably tell

2    you what they are relying on.  I'd say you may have a case.

3    But do you want to fight Netflix?  Just ask them to take it

4    down.  And you said:  Absolutely.

5        Correct?

6    A.  Yes.

7    Q.  And then if you go to page 3, on row 29, that's where your

8    friend Ms. Heider says:  Yeah, that's irresponsible for sure.

9        Right?

10   A.  Yes.

11   Q.  And then down at the bottom on line 32 is where you wrote

12   -- and I apologize to the jurors for the language -- that's

13   where you wrote:  Fuck irresponsible, I want to get rich bitch.

14       Is that right?

15   A.  Yes.

16   Q.  Now, you said today, in response to Mr. MacGill's question,

17   that you were mimicking language from the TV show Real

18   Housewives of Atlanta; is that right?

19   A.  Yes.

20   Q.  When you write messages like this, do you take

21   responsibility for them?

22   A.  I mean, if I write them, yes, I do.

23   Q.  So let's turn to page 4, line 30 -- row 33, at the top

24   where Lindsay Adams laughed at your fuck irresponsible, I want

25   to get rich.  Do you see that?

*BOWLING — CROSS/BRIAN*                    Vol 1-229

1    A.  Yes.

2    Q.  And in response, you didn't say to her:  This isn't funny,

3    I'm really emotional hurt by this.

4        You didn't say that; did you?

5    A.  No, I didn't say that.

6    Q.  No.  Instead, in line -- in row 34, you said:  What kind of

7    attorney would I need?

8        That was your response, wasn't it?

9    A.  That's correct.

10   Q.  Let's go to a different chain of text messages, 229.  Now,

11   this one -- these are text messages between you and just

12   Lindsay Adams on that same day; correct?

13   A.  Yes.

14   Q.  And this is the same day as the last one, May 11th, 2022,

15   the day the film came out; right?

16   A.  Yes.

17   Q.  And Lindsay Adams is one of the three friends, the other

18   that was involved in the text exchange of Exhibit 230; right?

19   A.  Yes.

20   Q.  Okay.  Let's look at the first text message in row 2 of

21   Exhibit 229.  You wrote:  Seriously.  This will be my

22   15 minutes.  I want paid.

23       That's the message you sent to Ms. Adams; is it not?

24   A.  That's correct.

25   Q.  And you didn't say to her that you felt -- that you had

*BOWLING - CROSS/BRIAN*                    Vol 1-230

1    been violated or that you were distressed, you didn't write any

2    of that; did you?

3    A.   No, I didn't write that, but that was absolutely what I was

4    feeling at the time.

5    Q.   Not my question, though.  Did you write that, ma'am?

6    A.   Did I write that?  No.

7    Q.   What you wrote was:  This will be my 15 minutes.  I want

8    paid.  That's what you wrote; didn't you?

9    A.   That's what I wrote.

10   Q.   And so your immediate reaction to learning that your name

11   was in the documentary was to see this as an opportunity to get

12   rich?

13   A.   No.

14   Q.   No, it wasn't?

15   A.   No.  I have never tried to get rich off anything in my

16   entire life.  I have worked every day of my life since I was

17   legally able to.  I put myself through college twice.

18   Q.   So let's take a look at Exhibit 220.  This is a text

19   message -- these are text messages exchanged between you and

20   your sister, Laura DiSalvo; right?

21   A.   Yes.

22   Q.   And that's two days later after the documentary has been

23   released; is it not?

24   A.   Yes.

25   Q.   And that's two days after you had a chance to think about

*BOWLING – CROSS/BRIAN*                     Vol 1-231

1   your immediate reaction; isn't that true?

2   A.  Yes.

3   Q.  So take a look --

4           MR. BRIAN:  I would offer Exhibit 220.  I can't

5   remember whether it's in, Your Honor.  I'll offer 220.

6           THE COURT:  Any objection to 220?

7           MR. MacGILL:  No objection.

8           THE COURT:  220 is admitted into evidence without

9   objection.

10                  *(Defendants' Exhibit 220 was*

11                  *received in evidence.)*

12  BY MR. BRIAN:

13  Q.  So let's turn to page 5, Exhibit 220, row 74.  And you see

14  in row 74 a text message from you, which says:  I want to tell

15  all those fools that said let us be clear no one made any money

16  off this film.  Not yet, bitches.

17      That's what you wrote?

18  A.  Yes.  Can I put that into context?

19          THE COURT:  No, ma'am.  You cannot ask him questions.

20  You answer.

21          THE WITNESS:  I'm sorry.

22  BY MR. BRIAN:

23  Q.  So at the end of your examination, when Mr. MacGill was

24  asking you whether a certain amount of money was enough, so

25  you're not -- you didn't file this lawsuit to get money?  Is

*BOWLING – CROSS/BRIAN*                    Vol 1-232

1   that right?

2   A.  I mean, I -- right, I did file this lawsuit to get money.

3   I don't know what other compensation -- when people file

4   lawsuits, that's typically what --

5   Q.  You're asking these members of the jury to award you money?

6   I want to be clear about that.  That is what you're asking;

7   correct?

8   A.  Yes.

9   Q.  I think you testified about a man named Michael Petrella.

10  Do you recall that, generally?

11  A.  Yes.

12  Q.  And he was one of the producers of the documentary, was he

13  not?

14  A.  Yes.

15  Q.  Now, sometime in 2019 -- strike that.

16      When did you learn that you were a child of Donald Cline?

17  A.  2019.

18  Q.  Okay.  And sometime in 2019, you heard that he,

19  Mr. Petrella, was involved in making a film about Donald Cline;

20  correct?

21  A.  I'm not sure what time it was.

22  Q.  Okay.  That's fine.  Take a look at Exhibit 205.

23          MR. BRIAN:  I don't think that's been admitted yet.

24  Just put it up on the witness' screen, if we can.

25  BY MR. BRIAN:

1  Q.  This is a -- 205, at the top, is a Facebook message dated

2  9/23/19 that you sent to Mr. Petrella; is it not?

3  A.  I don't see anything.

4          THE COURT:  You need to give her a hard copy.

5          MR. BRIAN:  Oh, why don't you take a look at it, yeah.

6   There's a binder.  I'm sorry.

7          THE COURT:  What tab is it?

8          MR. BRIAN:  It's Exhibit 205.

9  BY MR. BRIAN:

10  Q.  Tell me when you have it.

11  A.  I have it.

12  Q.  Okay.  And you see at the top, there's a message, a

13  Facebook message that you sent to Mr. Petrella on

14  September 23rd, 2019; is it not?

15  A.  Yes.

16          MR. BRIAN:  I would offer Exhibit 205, Your Honor.

17          THE COURT:  Any objection to 205?

18          MR. MacGILL:  No objection.

19          THE COURT:  205 is admitted into evidence without

20  objection.

21                  (Defendants' Exhibit 205 was

22                  received in evidence.)

23          MR. BRIAN:  Let's go ahead and put that up on the

24  screen, Mr. Nickels.  Maybe we can make that a little larger.

25  BY MR. BRIAN:

*BOWLING – CROSS/BRIAN*

1  Q.  And you wrote on September 23rd, 2019:  Hi, Michael.  I'm a

2  recently discovered donor child of Cline.

3      You wrote that; did you not?

4  A.  I did.

5  Q.  You had never met or talked to Mr. Petrella, did you?

6  A.  No.

7  Q.  And the first thing that you said to this man, who you knew

8  was making a film and you had never met, was:  Hi, Michael.

9  I'm a recently discovered donor child of Cline.

10     That's what you wrote to a man you had never met and you

11 knew was making a film; right?

12 A.  That's what I wrote, but that's not my consent to be

13 included in his movie.

14         MR. BRIAN:  Your Honor, I move to strike that.

15         THE COURT:  That response is stricken because it was

16 not responsive to the question.

17 BY MR. BRIAN:

18 Q.  Is this your first message to Mr. Petrella, a man you had

19 never met, and a man you knew was making a movie?  Was that the

20 first message you sent to him?

21 A.  Yes.  This is me reaching out to gather more information.

22 Q.  And you added a smiling emoji at the end; didn't you?

23 A.  Yes.

24 Q.  And anywhere in this message that I just read to you, did

25 you say to him that this information that you were a recently

1  discovered donor child of Cline was private?  Did you say that

2  anywhere in the message that's on the screen right now?

3  A.  No.  I didn't believe that I needed to.

4  Q.  Okay.  Ms. Bowling, you have an Instagram account; do you

5  not?

6  A.  I do.

7  Q.  And have over 420 Instagram followers; don't you?

8  A.  I don't know the exact number.

9  Q.  Okay.  Now, I think -- I think -- well, it's in the

10 hundreds, isn't it?  Do you know that?

11 A.  I believe so, yes.

12 Q.  Okay.  Now, I think you testified in response to

13 Mr. MacGill's questions, that the only people that you

14 communicate with about your status as a donor child of Cline

15 are family and close friends.  Did I hear that right?

16 A.  To the -- yes.

17 Q.  Okay.  I'd like you to look at Exhibit 919.

18       MR. BRIAN:  I don't know if that's in evidence yet,

19 Your Honor.

20 BY MR. BRIAN:

21 Q.  Maybe look at the binder, ma'am.

22     If you could look at the very first page, at the top.  Are

23 you with me?

24 A.  Yes.

25 Q.  Do you see where it says at the very top, top right hand,

*BOWLING – CROSS/BRIAN*                    Vol 1-236

1    sarahmarieb82?

2    A.  Yes.

3    Q.  That's your -- that's you; right?

4    A.  Yes.

5    Q.  Okay.  And this is your Instagram post?

6    A.  Yes.

7    Q.  Is that right?

8    A.  Yes.

9            MR. BRIAN:  I'll move to admit Exhibit 919, Your

10   Honor.

11           MR. MacGILL:  No objection.

12           THE COURT:  Exhibit 919 is admitted into evidence

13   without objection.

14                   *(Defendants' Exhibit 919 was*

15                   *received in evidence.)*

16   BY MR. BRIAN:

17   Q.  And if you look at the very bottom of the same, the first

18   page; right above where it says trial exhibit; do you see a

19   date, September 22nd, 2019?

20   A.  Yes.

21   Q.  It's around the same time you reached out to Mr. Petrella;

22   isn't it?

23   A.  I would have to go back and double check that date, but.

24   Q.  Don't worry.

25   A.  2019.

*BOWLING - CROSS/BRIAN*                          Vol 1-237

1   Q.   Okay.  And two and a half years or so before the

2   documentary was released; right?

3   A.   Yes.

4   Q.   And on the very first page, there's a picture of you

5   getting a tattoo; right?

6   A.   Yes.

7   Q.   Now, let's turn to page 20 of Exhibit 919.  That's a

8   picture of the tattoo you ended up getting; right?

9   A.   I'm sorry.  Page?

10  Q.   It's on the screen.  I think it is on the screen in front

11  of you.

12  A.   Yes.

13  Q.   Okay.  And the significance of the asterisk is that you

14  understood that Donald Cline would -- it's sick, but Donald

15  Cline would put an asterisk connected to the women that he had

16  offensively intruded into; is that right?

17  A.   Yes.

18  Q.   So let's turn to the next page, page 21, if we can put that

19  up.

20      Now, that's, I think, the same picture that Mr. MacGill

21  showed earlier, but this is your Instagram account, not your

22  sister Laura's.  Now, in this picture, that's a picture of you

23  and your sister, Laura DiSalvo; right?

24  A.   Yes.

25  Q.   And you're the one on our left as we look at the picture?

*BOWLING - CROSS/BRIAN*                    Vol 1-238

1   A.  Yes.

2   Q.  With the arm bent showing the asterisk tattoo; is that

3   right?

4   A.  Yes.

5   Q.  And then, and your sister has a similar tattoo next to you;

6   right?

7   A.  Yes.

8   Q.  And both of you are smiling in the picture; are you not?

9   A.  Yeah.

10  Q.  And you say in the right, you wrote, up at the top:  This

11  life is a crazy ride.  Here for it.  You wrote that; did you

12  not?

13  A.  I did.

14  Q.  And then you tagged your sister, lauradisalvo84; right?

15  A.  Yes.

16  Q.  And you know that other Cline children -- I'll call them

17  your half-siblings -- many of them also got asterisk tattoos;

18  is that right?

19  A.  Some of them.  I don't know how many.

20  Q.  Fair enough.  Do you still have the asterisk tattoo?

21  A.  Uh-huh.

22  Q.  If you look at the bottom of the page, and I'm looking now

23  at page 21, it's liked by carlacrouse and 78 others; is that

24  right?

25  A.  Yes.

*BOWLING – CROSS/BRIAN*                    Vol 1-239

1  Q.  So would you agree that at least 79 people saw this -- your

2  Instagram post of your photograph with your sister with your

3  asterisk tattoo; right?

4  A.  Yes.

5  Q.  Now, there were some people on that list whose accounts you

6  were not following at that point; is that right?

7  A.  I'm not sure.

8  Q.  Okay.  Take a look at page 11 of 919.

9       MR. BRIAN:  If you can put that up, Mr. Nickels?

10  BY MR. BRIAN:

11  Q.  And you see, you see the words:  Follow, follow, follow,

12  following, follow, follow.  You understood that when it said

13  following, this was somebody you were already following; right?

14  A.  Yes.

15  Q.  And when it said follow, essentially Instagram is asking

16  you to push the button and start following them; right?

17  A.  Correct.

18  Q.  But up until then, these were people who saw the picture

19  with your asterisk tattoo, the Donald Cline tattoo, that you

20  were not following at that point; is that right?

21  A.  Yes.

22  Q.  Did you decide to follow any of those people on page 11?

23  A.  I have no idea.

24  Q.  So now let's look at Exhibit 946 --

25       MR. BRIAN:  Which I think Mr. MacGill already showed

*BOWLING – CROSS/BRIAN*                    Vol 1-240

 1   you, is already in evidence, Your Honor.

 2         THE COURT:  Yes.  946 is in evidence.

 3   BY MR. BRIAN:

 4   Q.  And I think if you -- let's -- do you know how many

 5   Instagram followers your sister has?

 6   A.  I don't.

 7   Q.  Hundreds again?

 8   A.  I could assume, but I don't know the exact number.

 9   Q.  And if you look at page -- I guess there's only one page on

10   this one.  That's the same photograph we looked at in 919, your

11   own Instagram post; right?

12   A.  Yes.

13   Q.  And this post was made on -- if you look at the bottom,

14   April 10th, 2020; right?

15   A.  Yes.

16   Q.  Again -- well, about two years before the documentary came

17   out; right?

18   A.  Yes.

19   Q.  And you see what your sister wrote in her text is:  Happy

20   national siblings day to my other half and to all of my

21   siblings, all 75 plus of you.  My life is filled with hundred

22   times more love because of you.  Cheers to making more lemonade

23   together.

24         That's what she wrote; did she not?

25   A.  She did write that.

*BOWLING – CROSS/BRIAN*                                Vol 1-241

1    Q.  And she tagged you; right, with sarahmarieb82?

2    A.  Yes.

3    Q.  And you didn't object to her doing that; did you?

4    A.  Not on this Instagram post.

5    Q.  And well, in fact, you gave this post three stars; didn't

6    you, down at the bottom?  If we go down below there, Mr.

7    Nickels?

8    A.  I gave it three hearts and two asterisks.

9    Q.  Three hearts, I'm sorry.  You gave it three hearts and two

10   asterisks; right?

11   A.  Uh-huh.

12   Q.  And the hearts were to signify your approval of her post;

13   right?

14   A.  No.  It's to signify my love for my sister.

15   Q.  And the asterisks were to signify sort of like the tattoo,

16   right, it's a reference to Donald Cline; isn't it?

17   A.  It's not a reference to Donald Cline.

18   Q.  You just chose an asterisk; is that right?

19   A.  No.  As I testified before, I don't think about Donald

20   Cline when I look at this tattoo.  I think about my sister and

21   the agony that we went through when we were awaiting her

22   23andMe results to see if we were full siblings.

23   Q.  Let's take a look at the bottom of the page of 946.

24         MR. BRIAN:  We can take 919 down.  Just leave up 946.

25   Maybe that was a bad idea.  Okay.

BY MR. BRIAN:

Q.  So down at the bottom, you see it says:  Liked by my3sonsseth and 95 others.  Did I read that correctly?

A.  Yes.

Q.  So at least 96 followers saw this Instagram post by your sister; right?

A.  Yes.

Q.  And you don't know -- you don't know all those 96 people; do you?

A.  Well, I can't see them, so I don't know if I know them or not.

Q.  Okay.  Now, your sister, Laura DiSalvo, also told you that she reached out to a podcast hosted by the celebrity Kate Hudson and disclosed that you were -- that she and you were Cline children.  She told you that; right?

A.  She told me that she sent them an e-mail.

Q.  And you were not offended by that; were you?

A.  I wasn't offended because when she told me that, in my mind, in no way, in no part am I going to go on a podcast talking about this.

Q.  Well, let me just read this exact question to you.  The bottom line is you were not offended by this communication by your sister to a national podcast hosted by celebrity Kate Hudson identifying you as a Cline child; were you?

A.  I don't know if I was offended or not.  I can't recall my

*BOWLING – CROSS/BRIAN*                    Vol 1-243

1   exact emotion at that time.

2   Q.  Permission to play her deposition testimony at page 183,

3   lines 5 through 8?

4            THE COURT:  You may.

5       (Video playing in open court.)

6   BY MR. BRIAN:

7   Q.  That was your deposition, sworn deposition testimony; was

8   it not?

9   A.  Yes.

10  Q.  And by the way, when you took your deposition, you

11  understood you were under oath; were you?  Didn't you?

12  A.  Yes, yes.

13  Q.  The same oath you've taken here; right?

14  A.  Yes.

15  Q.  Okay.  Your name appears in the documentary *Our Father* when

16  Jacoba Ballard, another half-sibling of yours, is scrolling

17  through and looking at her DNA matches on 23andMe; correct?

18  A.  Yes.

19  Q.  Okay.  She doesn't mention your name in any of the audio;

20  does she?

21  A.  No.

22  Q.  There's no audio of your name anywhere in the documentary

23  film, is there?

24  A.  No.  There's just printed and my picture.

25  Q.  Your name shows up in the documentary because it appears in

*BOWLING – CROSS/BRIAN*                    Vol 1-244

1   her 23andMe account; isn't that right?

2   A.  That's correct.

3   Q.  And Jacoba Ballard had access to your name in her 23andMe

4   account; did she not?

5   A.  She did.

6   Q.  And you chose to share your full name with anyone who

7   matched you as a DNA relative on 23andMe; isn't that true?

8   A.  Well, I put my full name on my profile when I signed up for

9   23andMe, but I --

10  Q.  And you signed up for the DNA relative sharing; did you

11  not?

12  A.  I can't recall.

13  Q.  Well, let's play your deposition at page 70, lines 2

14  through 5.

15      (Video playing in open court.)

16  BY MR. BRIAN:

17  Q.  And that was truthful testimony when you gave it; was it

18  not?

19  A.  Yes.  When I signed up for 23andMe, I chose to put my full

20  name on.

21  Q.  Okay.  Take a look at Exhibit 233.

22      This is from your 23andMe account; is it not?

23  A.  Yes.

24          MR. BRIAN:  I'm going to offer Exhibit 233, Your

25  Honor.

1          MR. MacGILL:  No objection.

2          THE COURT:  Exhibit 233 is admitted into evidence

3   without objection.

4                  *(Defendants' Exhibit 233 was*

5                  *received in evidence.)*

6   BY MR. BRIAN:

7   Q.  And this Exhibit 233 shows your 23andMe settings; doesn't

8   it?

9   A.  Yes.

10         MR. BRIAN:  So let's take a look at the very

11  first page, and if you go to about the middle, Mr. Nickels.

12  BY MR. BRIAN:

13  Q.  You see where it says profile settings?  So let's look

14  under that, and there's a profile picture; isn't it?

15  A.  Yes.

16  Q.  That's your picture; right?

17  A.  Yes.

18  Q.  You chose to provide that to 23andMe; did you not?

19  A.  I did.

20  Q.  You didn't have to include a profile picture; did you?

21  A.  No.

22  Q.  You chose to do that; didn't you?

23  A.  I chose to do that, not knowing what was coming.

24  Q.  Very simple question.  Did you choose to do that?

25  A.  Yes.

*BOWLING – CROSS/BRIAN*                    Vol 1-246

1    Q.  Thank you.  And let's look at the third-to-last row at the

2    bottom of page 1.  It's a DNA relative displayed name; do you

3    see that?

4    A.  Yes.

5    Q.  And you displayed your first name, Sarah and your last

6    name, Bowling; did you not?

7    A.  Yes.

8    Q.  And you see at the very bottom, it says:  Your DNA

9    relatives see this name.  You were aware of that; were you not?

10   A.  I mean, my DNA relatives, yes.

11   Q.  You didn't have to include your name; did you?

12   A.  I'm not sure, at the time, but I'm guessing not.

13   Q.  In fact, take a look at -- let's take a look at

14   Exhibit 918.  This is another printout from your 23andMe

15   account; is it not?

16   A.  Yes.

17          MR. BRIAN:  I'll offer Exhibit 918, Your Honor.

18          MR. MacGILL:  No objection.

19          THE COURT:  918 is admitted into evidence without

20   objection.

21                    *(Defendants' Exhibit 918 was*

22                    *received in evidence.)*

23   BY MR. BRIAN:

24   Q.  And this appears to be at least a list of -- some partial

25   list of names that were connected to you as DNA relatives on

*BOWLING - CROSS/BRIAN*                    Vol 1-247

1   23andMe; isn't that true?

2   A.  Yes.

3   Q.  Do you know how many names are on this list?

4   A.  I would have to count them.

5   Q.  Well, turn to page 7.  Do you see where it says:  Showing

6   1,500 of 1,500 relatives.  That's what it says right there;

7   does it?

8   A.  It says that.

9   Q.  Now, you don't know everyone on this list of 1,500 people,

10  do you, ma'am?

11  A.  No.

12  Q.  And some of the people on this list in Exhibit 918 do not

13  have profile pictures, do they?

14  A.  No.

15  Q.  They decided not to submit one apparently; right?

16  A.  It appears so.

17  Q.  And if you look at the same page that we're on, 918-007,

18  below where it says -- showing 1,500 to 1,500 relatives, you

19  see some people that submitted -- that submitted their

20  information on 23andMe just with initials; isn't that right?

21  A.  Yes, I see that.

22  Q.  There's an LK and a KJ.

23      At any time after you learned you were a child of Donald

24  Cline, did you go back to 23andMe and try to change your

25  profile?

*BOWLING - CROSS/BRIAN*                      Vol 1-248

1   A.  Change what portion of my profile?  Any portion?

2   Q.  For example, did you go back and remove your photograph?

3   A.  No.

4   Q.  Did you go back and remove your name?

5   A.  I don't believe I went back and removed my photograph.  I

6   would have the double check.  I don't --

7   Q.  You don't think you did; right?

8   A.  I'm not sure.

9   Q.  Okay.  Did you remove your name?

10  A.  Yes.  I believe at some point, I put my initials.

11  Q.  Okay.  Let's take a look at Exhibit 208, which I think is

12  in evidence.

13         MR. BRIAN:  Yes, it is, Your Honor.

14  BY MR. BRIAN::

15  Q.  And I think Mr. MacGill showed you this document earlier.

16  Remember that?

17  A.  Yes.

18  Q.  And this is one of the documents where you say in the

19  second line -- this is a text exchange with another

20  half-sibling; is it not?

21  A.  Yes.  It's a Facebook correspondence.

22  Q.  Also -- I'm sorry, a Facebook message with a half-sibling;

23  right?

24  A.  Yes.

25  Q.  And the second line you said:  I'm not out in the media but

*BOWLING – CROSS/BRIAN*                                    Vol 1-249

1   don't keep this private.  That's what you wrote; did you not?

2   A.  I did.

3   Q.  Had you ever met this half-sibling when you sent this

4   Facebook message?

5   A.  I don't think so, no.

6   Q.  Okay.  Let's take a look at Exhibit 956.

7        MR. BRIAN:  Actually, let's take this down.  I want to

8   save that, do that later.

9   BY MR. BRIAN:

10  Q.  You're aware of something called the *Sick* Podcast?

11  A.  Yes.

12  Q.  And the *Sick* Podcast is a local podcast; correct?

13  A.  Correct.

14  Q.  And the first season of the *Sick* Podcast was about Donald

15  Cline; wasn't it?

16  A.  Correct.

17  Q.  And the first season of the *Sick* Podcast aired before the

18  documentary *Our Father* was released; isn't that true?

19  A.  I believe, yes, sometime, I believe, in 2019.

20  Q.  And there was a launch party for the first season of the

21  *Sick* Podcast; wasn't there?

22  A.  Correct.

23  Q.  And you went to it?

24  A.  I did.

25  Q.  And you attended other events relating to the *Sick* Podcast;

*BOWLING – CROSS/BRIAN*                          Vol 1-250

1  didn't you?

2  A.  I attended one other public event at a brewery.

3  Q.  Okay.  How many people were there?

4  A.  Less than 20.  Fifteen?

5  Q.  Take a look at Exhibit 987.

6          MR. BRIAN:  Not yet in evidence, Your Honor.

7  BY MR. BRIAN:

8  Q.  Tell me when you've found that.

9  A.  Yes.

10 Q.  Okay.  And that's a photograph -- well, it's a Twitter post

11 with a photograph; right?

12 A.  Yes.  It looks to be.

13 Q.  And it says: *Sick* Podcast on the right; doesn't it?

14 A.  Yes.

15 Q.  And you're in the photograph; aren't you?

16 A.  Yes.

17         MR. BRIAN:  I would offer 987, Your Honor.

18         MR. MacGILL:  No objection.

19         MR. BRIAN:  Let's put that up on the screen,

20 Mr. Nickels.

21         THE COURT:  Exhibit 987 is admitted without objection.

22              *(Defendants' Exhibit 987 was*

23              *received in evidence.)*

24 BY MR. BRIAN:

25 Q.  And in this photograph, you're seated all the way to the

*BOWLING - CROSS/BRIAN*                    Vol 1-251

1   right with the jean jacket on; are you not?

2   A.  Yes.

3   Q.  And let's read what it says to the right:  Thanks to

4   everyone who joined us for "Podcast at the Pub."  We loved

5   answering listener questions and hearing from some of the

6   people directly involved with the Cline story.

7        Did I read that correctly?

8   A.  Yes.

9   Q.  And you were one of the people directly involved with the

10  Cline story; were you not?

11  A.  I never spoke once in public at that event.

12  Q.  Did you consent to have your photograph taken?

13  A.  I mean, I'm at a public place.  I didn't know that they

14  were taking photographs.

15  Q.  So you went to this event thinking that this was private;

16  is that right?

17  A.  No.  I didn't go to this event thinking that this was a

18  private event.  It was open to WFYI listeners of the *Sick*

19  Podcast.

20       MR. BRIAN:  Okay.  Let's turn to Exhibit 120 in

21  evidence.

22  BY MR. BRIAN:

23  Q.  I think I showed you earlier your initial outreach to

24  Michael Petrella in 2019; do you remember that?

25  A.  Yes.

1  Q.  When you introduced yourself as a Cline -- a donor child of

2  Cline; is that right?

3  A.  Yes.

4  Q.  Now, let's go to page 11, which is the page that

5  Mr. MacGill showed you.

6         MR. BRIAN:  If we could make that larger.

7  BY MR. BRIAN:

8  Q.  And you understood that Mr. Petrella was reaching out to

9  you and other siblings to see if you would submit a photograph

10  to use in what became the baby wall of the documentary; right?

11  A.  Correct.

12  Q.  And it turned out there was a baby wall; right?

13  A.  Yes.

14  Q.  And you understood that he was saying that if people chose

15  to submit a baby photo, that baby photo would not be identified

16  with the people who submitted it; right?

17  A.  Correct.

18  Q.  Okay.  And you chose not to submit a photo; right?

19  A.  Correct.

20         MR. BRIAN:  Okay.  Let's go to -- let's look back at

21  Exhibit 229.  This is already in evidence.  Let's turn to

22  page 2 and look at row 32.

23  BY MR. BRIAN:

24  Q.  Now, this was on May 11th, the same day the documentary

25  came out; right?

*BOWLING – CROSS/BRIAN*                    Vol 1-253

1   A.  Yes.

2   Q.  But it was at 1:26 in the afternoon; right?

3   A.  Yes.

4   Q.  So by then, you've definitely watched the documentary,

5   haven't you?

6   A.  Yes.

7   Q.  And you wrote to Ms. Adams -- again, one of your three

8   closest friends; right?

9   A.  Yes.

10  Q.  You wrote:  It is actually a really good documentary.  It

11  is very well done.  I was worried that it was going to be a

12  ridiculous conspiracy theory, but it's actually well-produced.

13      That's what you wrote; didn't you?

14  A.  Yes.

15  Q.  Now, you had your deposition taken in this case; didn't

16  you?

17  A.  Yes.

18  Q.  And you were asked about this; weren't you?

19  A.  I was.

20  Q.  And you gave an explanation as to what you meant by this;

21  didn't you?

22  A.  I did.

23          MR. BRIAN:  Permission to play depo page 118, line 3,

24  through 118, line 14.

25          THE COURT:  For impeachment purposes, you may.

*BOWLING – CROSS/BRIAN*                               Vol 1-254

1      (Video playing in open court.)

2          MR. BRIAN:  So go back to the text message,

3   Mr. Nickels, that we just had up on the screen.  On page 2.

4   BY MR. BRIAN:

5   Q.  So when you wrote the message to one of your three best

6   friends, somebody you've called one of your therapists --

7   that's what you refer to them in your deposition, you said

8   these are my therapists; right?

9   A.  Yes.

10  Q.  Okay.  You didn't say to Ms. Adams: This is actually a

11  really good documentary because it's disgusting.  You didn't

12  say that; did you?

13  A.  No, I didn't.

14  Q.  And you didn't say to Ms. Adams, one of your closest

15  friends: It's actually a really good documentary because it's

16  sickening.  You didn't write that either; did you?

17  A.  I didn't write that.

18          MR. BRIAN:  Let's turn to page 4 of Exhibit 229 and

19  look at row 46.

20  BY MR. BRIAN::

21  Q.  And where Ms. Adams asked you:  So no weird twists or

22  turns?  She wrote that; didn't she?

23  A.  Yes.

24  Q.  And you responded in rows 48 and 49; didn't you?

25  A.  Yes.

*BOWLING – CROSS/BRIAN*                    Vol 1-255

1    Q.  And you wrote on row 48, no, nothing I wasn't aware of;

2    right?

3    A.  I mean, yes, I had seen the trailer, and I had seen what

4    they included, the conspiracies and all of that information.

5    And so I was prepared for the content that would be in the

6    documentary.

7    Q.  We'll get to the trailer.

8         MR. BRIAN:  I move to strike that as nonresponsive,

9    Your Honor.

10         THE COURT:  I'll strike that answer.

11   BY MR. BRIAN:

12   Q.  And then you said in line 49:  It's good, though.  Music is

13   100 -- and then 100 and then you put some figures.  You wrote

14   that; did you not?

15   A.  I did.

16   Q.  Now, you mentioned the trailer, so let's talk about the

17   trailer.  You testified today that you watched the trailer

18   after the documentary came out.  That's what you said in

19   response to Mr. MacGill's questions; did you not?

20   A.  Yes.

21   Q.  That's not true either, is it?  Well, strike that.

22        It's not the first time you watched the trailer, is it?

23   A.  It's not the first time I watched the trailer.

24   Q.  No.  You watched the trailer for the first time pretty

25   close to when the trailer came out before the documentary came

*BOWLING - CROSS/BRIAN*                              Vol 1-256

1  out; isn't that right?

2  A.  Correct.

3  Q.  And at the time you were -- you watched the trailer, you

4  were not expecting your name to appear in it; were you?

5  A.  No.

6  Q.  So you weren't looking for your name; were you?

7  A.  No, I was not looking for my name.

8  Q.  And so when you first watched the trailer, you did not

9  notice your own name; did you?

10  A.  In that specific scene, no.

11  Q.  Well, you didn't notice your name anywhere in the trailer

12  when you first watched it; did you?

13  A.  No.

14  Q.  And you -- because you weren't looking for it, were you, at

15  that time; is that right?

16  A.  I was not looking for it because I was promised by the

17  film's producer that I would not be --

18  Q.  That's not --

19  A.  -- exposed without my consent.

20  Q.  That's not my question.

21      Were you looking for your name when you watched the trailer

22  the first time?

23  A.  No.

24  Q.  Okay.  But when you watched the documentary, your sister,

25  Laura DiSalvo, had already told you that your name was in it;

*BOWLING - CROSS/BRIAN*                    Vol 1-257

1  isn't that right?

2  A.  That's correct, but the specific scenes in the trailer

3  are -- there are additional scenes in the documentary.

4  Q.  That's not what I'm getting at.  When you watched the

5  documentary, you knew, because your sister had told you, that

6  your name was in it; didn't you?

7  A.  I knew, and then I very clearly saw my name when I watched

8  it with my own eyes.

9  Q.  And you were looking for your name; weren't you?

10  A.  I was aware that my name was in it, and you couldn't miss

11  it.

12  Q.  Were you looking for your name when you watched the

13  documentary?

14  A.  Yes.  I was told that my name was in it, so, yes, I was

15  looking for my name.

16  Q.  Thank you.

17      Mr. MacGill asked you some questions about how this has

18  impacted you.

19      You have -- you have seen therapists sometimes as an adult;

20  have you not?

21  A.  Yes.

22  Q.  And one of your former therapists is the one we heard

23  about, Amy Strobel; right?

24  A.  Correct.

25  Q.  And you were seeing Ms. Strobel before the film ever came

*BOWLING – CROSS/BRIAN*                    Vol 1-258

1  out; isn't that true?

2  A.  That's correct.  I started seeing her in the Fall of 2019.

3  Q.  And you stopped seeing her before the documentary was

4  released in May of 2022; didn't you?

5  A.  I stopped seeing her in March of 2020 because of the COVID

6  pandemic and she wasn't seeing patients in person.  And being

7  on Zoom just with a therapist did not work for me.

8  Q.  Okay.  So in any event, at the outset of the COVID

9  pandemic, you stopped seeing her; right?

10  A.  Correct.

11  Q.  And Kathy Henley was another therapist you had seen; right?

12  A.  Yes.

13  Q.  And you're not continuing to see her either; are you?

14  A.  I'm not.

15  Q.  You stopped seeing her before the documentary was released;

16  isn't that true?

17  A.  I stopped seeing her because she wasn't a good fit for me.

18  Q.  Okay.  You've not seen any therapist since the documentary

19  was released; isn't that true?

20  A.  I have not.  I don't need a therapist to -- as I testified

21  before and you asked me, my friends, my family are the best

22  therapists that I could ever ask for.

23  Q.  So you testified, I think, several times in response to

24  Mr. MacGill's questions that millions of people watched this

25  documentary; do you recall that?

*BOWLING – CROSS/BRIAN*                    Vol 1-259

1   A.  Yeah, 18 million.

2   Q.  And you testified that that hurt your reputation; correct?

3   A.  Hurt my reputation, hurt my trust, hurt a lot of aspects of

4   my life.

5   Q.  I got it.

6       They showed you a list of all the viewers around the world;

7   right?

8   A.  Yes.

9   Q.  Now, I don't mean this to be offensive in any way, but you

10  don't have a reputation in -- overseas, do you?

11  A.  No.  I'm a normal person.

12  Q.  Okay.  And nor do you have -- and, again, I don't mean to

13  be offensive.  You don't have a reputation in all 50 states in

14  the United States.  Your relationships are in Indianapolis, as

15  you described; right?

16  A.  Yes.

17  Q.  Okay.  And you describe that you went to St. Pious school,

18  your kids go there.  I think you had a -- I forget -- a

19  grandfather or great grandfather that was involved in the

20  founding; correct?

21  A.  Correct.

22  Q.  And you have a number of very close friends; don't you?

23  A.  Yes.

24  Q.  And as I said earlier, you confide in those friends; don't

25  you?

*BOWLING - CROSS/BRIAN*                    Vol 1-260

1  A.  I do.

2  Q.  And you've been able to talk openly with all those close

3  friends; haven't you?

4  A.  Yes.

5  Q.  And you also have told a number of other friends who are

6  not your closest friends, but a number of others, about 15 or

7  so, about this; haven't you?

8  A.  Yes.

9  Q.  None of your close friends have said they don't want to see

10 you or talk to you, have they, as a result of this?

11 A.  No.

12 Q.  Now, Mr. MacGill asked you about a text message from your

13 former therapist, Amy Strobel; do you remember that?

14 A.  Yes.

15 Q.  You had -- she knew before the release of the documentary

16 that you were a child of Donald Cline; didn't she?

17 A.  Yes.

18        MR. MacGILL:  Objection.

19        MR. BRIAN:  I'll reframe that.

20        THE COURT:  Okay.

21 BY MR. BRIAN:

22 Q.  You told her before the documentary came out that you were

23 a child of Dr. Cline; didn't you?

24 A.  Yes, as a trusted provider.

25 Q.  Okay.  And Sarah Sorenson is somebody -- is your

1  sister-in-law; isn't she?

2  A.  Yes.

3  Q.  And you had told her that you were a biological child of

4  Dr. Cline; had you not?

5  A.  Yes.  She's my sister-in-law.

6  Q.  Uh-huh.

7     And they're your closest friends -- Lindsay Adams, Shannon

8  Heider, Carla Crouse -- you told all of them that you're a

9  donor child of Cline; did you not?

10 A.  I did.

11          MR. BRIAN:  May I have a second, Your Honor?

12          THE COURT:  Yes.

13     (Off the record.)

14          MR. BRIAN:  Let's put up Exhibit 956.

15 BY MR. BRIAN:

16 Q.  I think you were asked about this by Mr. MacGill; do you

17 recall that?

18 A.  Yes.

19 Q.  These are questions about the Facebook group called

20 86th Street; right?

21 A.  Yes.

22 Q.  And I think one of those -- one of the people who was a

23 member -- in fact was the administrator -- was Jacoba Ballard;

24 right?

25 A.  Correct.

*BOWLING - CROSS/BRIAN*                    Vol 1-262

1    Q.  And the post upstairs at sort of the middle of the page by

2    Stephanie Gilbert, she was one of the half siblings; is that

3    right?

4    A.  Yes.

5    Q.  And the context of this is she's about to go public, and

6    that -- by that you understood she meant disclose her status as

7    a child of Cline; right?

8    A.  Yes, to the people of her discretion.  I don't know what

9    public meant to her.

10   Q.  Okay.  She said:  I'm about to go public probably sometime

11   this week.  That's what she said; right?

12   A.  That's what she said.

13   Q.  And you responded:  Live your truth.  There is no shame.

14   And I felt great freedom in feeling like wasn't keeping a

15   secret any longer.  You've got this.

16       That's what you wrote; didn't you?

17   A.  That's correct.  And as I already testified, I was --

18          THE COURT:  Ma'am, you've answered the question.  Your

19   lawyer can ask you some more questions; okay?

20   BY MR. BRIAN:

21   Q.  When you said:  Live your truth, there is no shame, did you

22   mean it?

23   A.  Of course I meant it.

24          MR. BRIAN:  Nothing further, Your Honor.

25          THE COURT:  All right.

1          MR. MacGILL:  Can we leave that up, please?

2          THE COURT:  It's up.

3          You may redirect.

4          MR. BRIAN:  Give me a second to get my stuff out of

5     here.

6          MR. MacGILL:  Just a few, and I mean it.

7          So, Your Honor, if I may proceed?

8          THE COURT:  You may, Counsel.

9                    **REDIRECT EXAMINATION**

10    BY MR. MacGILL:

11    Q.  So I'd like to --

12         MR. MacGILL:  Could we have that last exhibit up,

13    please, that we just had?

14         MR. NICKELS:  What number was it?

15         UNIDENTIFIED SPEAKER:  Go ahead, Mr. Nickels.

16         THE COURT:  956.

17         MR. MacGILL:  Yes, Your Honor.

18    BY MR. MacGILL:

19    Q.  So, counsel for Netflix and counsel for Realhouse just

20    asked you about:  Live your truth.  There's no shame.  And I

21    found great freedom in feeling like I wasn't keeping a secret

22    any longer.

23         What were you referring to, specifically?

24    A.  I was referring to telling my dad.

25    Q.  Okay.  And you so testified on your direct exam; is that

*BOWLING – REDIRECT/MACGILL*                              Vol 1-264

1  right?

2  A.  Correct.

3  Q.  Thank you.

4         MR. MacGILL:  Let's go to Exhibit 135, if we could.

5  BY MR. MacGILL:

6  Q.  A lot of questions, Mrs. Bowling, about 23andMe.  If we

7  could, I would just like to go -- just make one reference here.

8      Biological father, Dr. Cline, unknown relative; is that

9  right?  Is that what you understood?

10  A.  Unknown relative, unknown parent.

11  Q.  Okay.  At all times?

12  A.  At all times.

13  Q.  From beginning to where we sit here today; right?

14         MR. BRIAN:  Objection, leading, Your Honor.

15  BY MR. MacGILL:

16  Q.  Has that always been the case?

17  A.  That has always been the case.

18  Q.  Okay.  Now, you keep your social media on private settings?

19  A.  Yes.

20  Q.  Now, counsel for Netflix and counsel for Realhouse, in

21  Exhibit 918, collected DNA relatives.  Did you see that?

22  A.  Yes.

23  Q.  Okay.  Now, looking at the asterisk and the testimony that

24  you gave on the asterisk, in connection with those Instagram

25  posts, did you ever disclose in those posts that Donald Cline

1   was your biological father?

2   A.  No.

3   Q.  Mr. Brian asked you a number of different questions about,

4   essentially, you're not a citizen of the world, et cetera; do

5   you remember that?

6   A.  Yes.

7   Q.  You have a community, don't you?

8   A.  I do.

9   Q.  It's St. Pious; is it not?

10  A.  Yes.

11  Q.  How many people are in that community by your estimate?

12  A.  Roughly 2,000, 2,500.

13          MR. MacGILL:  No further questions, Your Honor.

14          MR. BRIAN:  Nothing further, Your Honor.

15          THE COURT:  All right.  Thank you, ma'am.  You may

16  return to your seat.

17      (Witness excused.)

18          THE COURT:  Do you have a 10-minute witness?

19          MR. MacGILL:  We do.  I think I can keep it to 10

20  minutes.

21          THE COURT:  Let's do your 10 minutes.

22          MR. MacGILL:  Let's do it.

23          THE COURT:  And then we'll go home.

24          Counsel, you're making a lot of noise with your

25  microphone.

1      MR. MacGILL:  Thank you.

2      THE COURT:  Sir, would you please stand and raise your

3  right hand and face me.

4    (The witness is sworn.)

5      THE COURT:  You may have a seat.

6      MR. MacGILL:  Thank you.

7         **MARCUS BOWLING, PLAINTIFFS' WITNESS, SWORN**

8                **<u>DIRECT EXAMINATION</u>**

9  BY MR. MacGILL:

10  Q.  Good evening, sir.  Would you state your name for the

11  record?

12  A.  Yeah.  Marcus Bowling.

13  Q.  And are you married, sir?

14  A.  Yes, I am.

15  Q.  And to whom are you married?

16  A.  Sarah Bowling.

17  Q.  A little test for you.  When were you married, sir?

18  A.  September 4th, 2004.

19  Q.  Okay.  So you've been married now --

20  A.  Twenty years this year.

21  Q.  Okay.  And do you have children?

22  A.  Yes, we do.  We have three boys.

23  Q.  Okay.  What I'd like to do is talk to you about your wife

24  in the time remaining here this evening and ask some questions.

25    First, you were married, at the time, prior to the *Our*

1  *Father* film coming out; were you not?

2  A.  Yes.

3  Q.  Now, are you able --

4           THE COURT:  The court reporter cannot transcribe when

5  you're talking at the same time.  I know we're trying to finish

6  up.  But take your time, ask the question, pause for one

7  second, and let the witness answer before you ask the next

8  question.

9           MR. MacGILL:  I certainly will.  Thank you.

10          THE COURT:  Thank you.

11  BY MR. MacGILL:

12  Q.  So, Mr. Bowling, you were married prior to the time of the

13  *Our Father* film being distributed; is that correct?

14  A.  Yes.

15  Q.  And based on that marriage and your relationship with your

16  wife, I take it you had the opportunity to observe her

17  behaviors; is that fair?

18  A.  Yes.

19  Q.  Now, focusing on the period of time, sir, if we may, to

20  before the *Our Father* film, can you describe, at least

21  generally speaking, whether your wife had an optimistic outlook

22  on life?

23  A.  Yes, I would consider her to be, you know, a very

24  optimistic, calm, level-headed, grounded person, and -- which

25  are all -- you know, many of the reasons why I was attracted to

1    her and ended up, you know, marrying her.

2    Q.  Okay.  And with respect to her general demeanor and your

3    observations as her spouse, could you tell the Court and jury

4    whether she was a trusting person at the time prior to the *Our*

5    *Father* film?

6    A.  Yes.  She was very trusting, had a lot of deep

7    relationships that, you know, were built on trust and a large

8    family full of love and trust that just kind of grew with her

9    as she aged and became a mother and a wife and all of those

10   good things.

11   Q.  Okay.  And prior to the film, were you able -- was your

12   wife confident in her social interactions?

13   A.  Yes.  She had a, you know, large, strong social circle with

14   folks of different walks of life that had, you know, just built

15   her network and her group of friends.

16   Q.  And would that include the St. Pious community, generally?

17   A.  Yes.

18   Q.  The church?

19   A.  Yes.

20   Q.  The school?

21   A.  Yes.

22   Q.  The children's activities?

23   A.  Yes.

24   Q.  Okay.  Now, three boys at home?

25   A.  Yes.

1    Q.  All right.  Now, with respect to Sarah before the event,

2    I'm going to use a phrase and see if we can get this in

3    context, at least generally speaking, prior to this event, was

4    she consistently present in the moment?

5    A.  Yes.

6    Q.  Okay.  And do you know what I mean by that?

7    A.  I do.

8    Q.  Okay.  Would you explain what -- make sure we're talking

9    about the same thing.  "Present in the moment" means what to

10   you, sir?

11   A.  Well, if -- I'll put it in the context of our life.  If

12   you're engaged in a kids' basketball game, you're going to one

13   of your boy's basketball games, are you there, are you

14   cheering, are you watching, are you engaged, are you aware of

15   what's going on.  And a non-sports example would be, you know,

16   some of the volunteering and, you know, religious retreats and

17   activities that, you know, she would be involved in and was she

18   present, was she there in the moment, or was she not.

19   Q.  Okay.  Now, sir, I want to turn to after the movie and your

20   life with your wife and your -- specifically, your observations

21   about her after the movie; fair enough?

22   A.  Uh-huh.

23   Q.  Now, looking after the movie, can you tell us, has your

24   wife been interested in going outside the home for social

25   events?

1    A.  That has --

2            MR. BRIAN:  Your Honor, I'm going to object to that

3    under marital privilege, which they've asserted.

4            THE COURT:  I don't -- I don't think that one would

5    involve marital privilege.

6            So you may answer.

7    BY MR. MacGILL:

8    Q.  Has your wife been -- after the movie, has your wife had a

9    different interest in going outside the home to social events

10   than before the movie?

11   A.  Significantly less interested.

12   Q.  And can you explain that answer, sir.

13   A.  Yeah.  Just to give an example, if you averaged one date

14   night a week, you know, over the course of your 18 years of

15   marriage, and then this is presented, that one night a week is

16   more like, you know, once every six to eight weeks.

17   Q.  Okay.  Now, after the event, have you made observations of

18   your wife, specifically in social settings?

19   A.  Yes.  She is more inclined to want to leave early.  The

20   larger the gathering, the more -- well, I would say the less

21   interested in participating.  The stress of a wider net of

22   people being around and involved in social settings is

23   something that she has seemingly ran away from, versus to,

24   which would be a contrast in pre-*Our Father* versus post-*Our*

25   *Father*.

*BOWLING - DIRECT/MACGILL*                    Vol 1-271

Q.  Sir, there are a couple of other things I want to ask you
about.  Daytime sleeping, has there been more daytime sleeping
by your wife since the *Our Father* movie came out as compared to
prior?

          MR. BRIAN:  Objection.

A.  Yes.

          MR. BRIAN:  Objection, Your Honor.  That goes to your
ruling before trial on physical symptoms.

          THE COURT:  I'll sustain.

          We'll strike that portion and answer.

          Next question.

BY MR. MacGILL:

Q.  So with respect to participation in school events, what has
happened since the movie, as compared to prior to the movie, by
your wife?

A.  Since the movie, she's certainly participated in less.

Q.  Than she did before?

A.  Correct.

Q.  Had she been involved before in retreats at the school?

A.  Yes.

Q.  Prior to the movie, had she been involved with different
programs of the school, like breakfast with Santa, those kinds
of things?

A.  Yes.

Q.  Okay.  Now, after this, you know, we -- can you give any

*BOWLING - DIRECT/MACGILL*                    Vol 1-272

1  example -- well, after the movie, have there been -- have you

2  made observations of your wife, specifically, in certain

3  situations, being preoccupied or not present in the moment that

4  you haven't already described?

5  A.  Yes.

6  Q.  Could you please describe those.

7  A.  I would just say, generally speaking, when we are doing the

8  variety of things that you do when you're a parent of three

9  kids and you're involved in, you know, your church community

10  and you're involved in the community, because we both have very

11  deep roots here in Indianapolis, that you are

12  invited/potentially involved in a lot of different things. And

13  number one, just the sheer participation of those, that sample

14  size has gotten noticeably smaller in terms of, you know, what

15  she's interested in doing, what she's willing to do, what she's

16  willing to invest her time in.  And then once you get into

17  those social settings, I typically was always the one that

18  wanted to leave early, and that's kind of been my MO for our

19  marriage is I'm always the one, you know, ready to go at 9:00

20  and I would tell you that that's flipped and she is more

21  inclined to leave and get out of some of these settings that I

22  would imagine is driving some of her anxiety and her concern.

23  Q.  Based on these circumstances you've described and the

24  observations that you have made since the movie came out, how

25  would you assess your wife's approach to life as compared to

*BOWLING - DIRECT/MACGILL*                    Vol 1-273

1    previously, prior to the movie?

2           MR. BRIAN:  Objection, Your Honor, calls for expert

3    opinion, legal conclusion, and medical testimony.

4           MR. MacGILL:  Let me try a more specific question, if

5    I may, Your Honor.

6           THE COURT:  Please do, counsel.

7    BY MR. MacGILL:

8    Q.  Is she more or less optimistic as a person, by your

9    observation, since the movie came out?

10   A.  Very much so, less.

11   Q.  And can you explain.

12   A.  Well, once this occurred, you lose a significant amount of

13   trust and you lose control through this experience.  When

14   appearing -- it was clear that, you know, your participation in

15   something was not what you wanted to do yet --

16          MR. BRIAN:  Objection, it's non-responsive, Your

17   Honor.

18          MR. MacGILL:  Your Honor --

19          THE COURT:  I'll sustain.

20          MR. MacGILL:  Yeah.

21          Nothing further, sir.  Thank you for your testimony

22   this afternoon.

23          Thank you, Your Honor.

24          THE COURT:  Thank you.

25          You have may cross-examine briefly.

*BOWLING − CROSS/BRIAN*                          Vol 1-274

1          MR. BRIAN:  I know everybody wants to go home for the

2   day, so I'm going to make this very short.

3                        **CROSS EXAMINATION**

4   BY MR. BRIAN:

5   Q.  Mr. Bowling, I'm Brad Brian.  I represent Netflix and

6   Realhouse.  We've never met, have we, sir?

7   A.  No.

8   Q.  You're a partner at a benefits advisory firm; is that

9   right?

10  A.  Correct.

11  Q.  You help run the firm; don't you?

12  A.  You would have to define I help run the firm.  I don't know

13  what -- I don't know what your definition of "run" means.

14  Q.  That was a phrase you used in your deposition.  What did

15  you mean by it?

16  A.  I helped grow it, I help manage clients, and I help make

17  sure that, you know, we are a sought-after employer in

18  Indianapolis.

19  Q.  Okay.  Good.  So you're -- you mentioned your three

20  children.  Your wife has good relationships with your children;

21  doesn't she?

22  A.  Yes.

23  Q.  Okay.  And I think that -- you can't recall watching the

24  *Our Father* documentary with your wife; can you?

25  A.  No.

*BOWLING – CROSS/BRIAN*                        Vol 1-275

1   Q.  So you did not witness her immediate reaction to watching

2   the documentary; did you?

3   A.  "Immediate" is what, the second of --

4   Q.  The same morning.

5   A.  The same morning, I would say yes.  The second of, I would

6   say no.

7   Q.  Did you -- did your wife share with you the text messages

8   that she sent to her best friends in the morning of May 11th?

9   A.  Did she share the text messages like -- I don't -- I don't

10  recall her sharing those.  I've certainly seen them as a part

11  of this exercise.

12  Q.  But you don't recall her giving you, for example, a copy of

13  a text message she sent to her best friends saying that she

14  wanted to get rich; you don't recall that?

15  A.  No.

16  Q.  Okay.  You love your wife, don't you, sir?

17  A.  Obviously.

18          MR. BRIAN:  No further questions, Your Honor.

19          THE COURT:  No questions on those?

20          MR. MacGILL:  Nope.

21          THE COURT:  All right.  Thank you, sir.  You may be

22  excused.

23          THE WITNESS:  Thanks.

24      (Witness excused.)

25          THE COURT:  So we're going to go home for the day,

1    Ladies and Gentlemen.

2           MR. MacGILL:  Thank you.

3           THE COURT:  All right.

4           Ladies and Gentlemen of the Jury, I'm going to give

5    you have an admonishment.  Sit down, everybody.  We're not

6    leaving yet.  They get to leave first.

7           During this time that you're allowed to separate for

8    the evening, you're not to have any discussion about the case

9    among yourself or with anyone else.  What is gonna happen when

10   you get home tonight and your family -- they probably already

11   know you've been selected for jury duty.  Their question is

12   going to be: Hey, what is your trial about?  You may not tell

13   them, the reason being that if you begin to discuss it with

14   your family and your friends, you will begin to form and

15   express opinions about the case, and you're not allowed to do

16   that until you've heard all of the testimony, received all of

17   the evidence, gotten the final instructions on the law, and the

18   eight of you are in your jury room deliberating together.  So

19   this is very important that you each have to tell them, I can't

20   talk about it now, but once the trial is over, I will share

21   everything I can with you.

22      Can everyone follow that admonishment?  It's hard to do,

23   it's human nature to want to talk about it, but it's very

24   important that you not.

25      If anyone should attempt to talk to you about this matter,

1   you should refuse and report that attempt to your bailiff at

2   your earliest opportunity.  And remember, you're not to do any

3   research on your own.  Don't Google anybody, don't look up

4   anyone in newspapers or any of the -- you've heard a lot of

5   things out here about this case and Dr. Cline and what's

6   happened, but do not research anything.  Again, once the trial

7   is over, you can research all that you would like.  It's a

8   tough admonishment, but I need all of you to follow this.  Can

9   you follow your admonishment?

10        All right.  You're allowed to be excused for overnight, and

11  we'll see you back in your jury room -- we're going to start

12  early, at 8:30 a.m.  We'll see everybody bright and early.

13  Remember, the traffic is often a mess, especially if you get on

14  the interstate, so do what you can to be in your jury room at

15  8:30 a.m. so that we can get started and we can finish up in

16  our four days.  Have a good evening.

17            COURTROOM DEPUTY:  All rise.

18        (Jury out at 5:54.)

19            THE COURT:  Sarah, you can escort your jury out.

20            COURTROOM DEPUTY:  All right.

21            THE COURT:  All right, you may be seated.

22            Lawyers, let's get your order of proof for tomorrow.

23  Who are we going to hear from first in the morning, the 8:30

24  lady?

25            MR. MacGILL:  Yeah, Sarah Sexson, we did reach her.

1    She tells us she will be here early.  She'll get here at

2    8:00 and be ready to go at 8:30.

3              THE COURT:  Okay.

4              MR. MacGILL:  We told her that she's not going to be

5    here hours.  We have 10 minutes of questions for her and, of

6    course, counsel will cross-examine.

7              THE COURT:  And who's after that?  Let's get your

8    whole morning lineup.

9              MR. MacGILL:  Amy Strobel by video; Sarah Sexson live

10   first; Strobel; Jacquie Cooke, a video, it's about 11 minutes;

11   Jarrell Shapiro.

12             THE COURT:  Live?

13             MR. MacGILL:  By video.  Tim Mizrahi by video; Zana

14   Lawrence for 18 minutes or so; then a reading of Alexandra Reed

15   deposition.

16             THE COURT:  Okay.  I think that will be the morning.

17             MR. MacGILL:  And then we'll -- we're hoping to finish

18   tomorrow.

19             THE COURT:  Wonderful.

20             MR. MacGILL:  So that's the hope.  We're working at

21   it.

22             THE COURT:  All right.  Very good.

23             All right.  So, lawyers, I'll need you here, try to

24   get here between 8:00 and 8:15 since we're going to try to

25   start at 8:30 a.m.

1          Anything further before we adjourn?

2          MR. BRIAN:  Does Your Honor intend to go until about

3  6:00 again tomorrow?

4          THE COURT:  We'll see.

5          MR. BRIAN:  The only reason I ask is I want to know

6  whether we should have a witness ready to go.

7          THE COURT:  No, I don't think you'll need a witness

8  tomorrow.

9          MR. BRIAN:  Okay.  Thank you, Your Honor.

10          THE COURT:  Okay.  But if we go real fast in the

11  morning, we'll let you know.  But it sounds like a lot of

12  witnesses for tomorrow.  Okay, everybody.  So I do need --

13  we're going to have to have you escorted out.  Carly is going

14  to take all of the lawyers down because -- is it 6:00 when they

15  lock the doors?  Oh, after 5:00, you can only go out the

16  handicap door, which is B12.

17          So pack up and head on out.  We'll have a CSO up there

18  until 6:30.  You have to be out by 6:30.  You have 30 minutes,

19  but I'm sure it will take you less than that.  All right, we'll

20  see everybody in the morning.

21          MR. BRIAN:  Good night, Your Honor.

22          THE COURT:  Good night.

23      (Proceedings adjourned at 5:57.)

24

25

1      <u>CERTIFICATE OF COURT REPORTER</u>

2

3

4          I, David W. Moxley, hereby certify that the

5      foregoing is a true and correct copy of the

6      transcript originally filed with the clerk of court

7      on December 11, 2024, and incorporating redactions

8      of personal identifiers requested by Chief Judge

9      Tanya Walton Pratt, in accordance with Judicial

10     Conference.  Redacted characters appear as blacked

11     out in the transcript.

12

13

14

15     /S/ David W. Moxley                February 13, 2025

16     DAVID W. MOXLEY, RMR/CRR/CMRS
       Official Court Reporter
17     Southern District of Indiana
       Indianapolis Division
18

19

20

21

22

23

24

25